UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,    ) Tampa, Florida
                               )
              Plaintiff,  ) No. 8:18-cr-594-T-24JSS
                               )
                               ) Docket No. 111
           vs.             )
                               ) May 7, 2019
RUDOLPH RANDOLPH MEIGHAN,  )
JORGE RAMON NEWBALL MAY, and  )
CALBOT REID-DILBERT,       )
                               )
              Defendants. ) Courtroom 10B
_____)


**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

**(Examination of Steven Bomentre)**


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

      **Daniel M. Baeza, Assistant U.S. Attorney**
      **Nicholas G. DeRenzo, Assistant U.S. Attorney**
      United States Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6000


**DEFENSE COUNSEL:**

      **David A. Dee, Esq.**
      Law Offices of David A. Dee, PA
      311 South Brevard Avenue
      Tampa, Florida 33606
      (813) 258-0406

      **Bjorn E. Brunvand, Esq.**
      Bjorn E. Brunvand, PA
      615 Turner Street
      Clearwater, Florida 33756
      (727) 446-7505

      **Pedro Amador, Jr., Esq.**
      Law Office of Pedro Amador, Jr.
      2203 North Lois Avenue, Suite 925
      Tampa, Florida 33607
      (813) 250-0556



           **ALSO PRESENT:**

               James Plunkett, Interpreter

               Etienne van Hissenhoven,
               Interpreter


               - - -

**TABLE OF CONTENTS**

**EXAMINATIONS**

| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEVEN BOMENTRE | 4 | | | |

(Direct Examination resumed on May 8, 2019, Vol. 3)

**EXHIBITS**

| GOVERNMENT | PAGE | LINE |
|---|---|---|

(No exhibits received)

1              **P R O C E E D I N G S**

2    May 7, 2019                                    3:37 p.m.

3                      - - -

4              THE COURT:  You may call your next witness.

5              THE COURTROOM DEPUTY:  Please raise your right

6    hand.

7              Do you solemnly swear or affirm under penalty of

8    perjury that the testimony you shall give in this cause will

9    be the truth, the whole truth, and nothing but the truth?

10             THE WITNESS:  I do.

11             THE COURTROOM DEPUTY:  Please have a seat in the

12   witness box.  State your name for the record and spell your

13   last name.

14             THE WITNESS:  Senior Chief Steven Bomentre,

15   B-o-m-e-n-t-r-e.

16             THE COURT:  Mr. DeRenzo.

17             MR. DERENZO:  Thank you, Your Honor.

18                      STEVEN BOMENTRE,

19   having been first duly sworn by the Courtroom Deputy,

20   testified as follows:

21                   DIRECT EXAMINATION

22   BY MR. DERENZO:

23   Q.    Good afternoon, Senior Chief.

24   A.    Good afternoon.

25   Q.    What do you do for a living?

1   A.     Senior Chief Maritime Enforcement Specialist in the

2   United States Coast Guard.

3   Q.     How long have you been doing that job?

4   A.     Almost 14 years.

5   Q.     And how did you become a maritime law enforcement

6   specialist?

7   A.     Something that I've always wanted to do.  In 2010, when

8   they established the rating, I was one of only three people

9   allowed to transfer over from my previous rating based on my

10  training and experience in the law enforcement realm.

11  Q.     And did you have to go to any schools or training to

12  become that particular rating?

13  A.     I did.

14  Q.     Okay.  When did you do that?

15  A.     I've been to multiple schools and maritime law

16  enforcement academy, boarding officer school, boarding team

17  member school, maritime drug trafficking course, lots of

18  fishery schools, IONSCAN schools.

19  Q.     And we will talk about those in a minute.

20         You mentioned you're Senior Chief.  Where does

21  that place you?  On which rung of the ladder in the enlisted

22  workforce is that?

23  A.     One below the top.

24  Q.     And how long total have you been in the Coast Guard?

25  A.     It will be 14 years in September.

1  Q.    And where are you currently assigned?

2  A.    I'm currently the assistant training officer at

3  Tactical Law Enforcement Team Pacific, located in San Diego,

4  California.

5  Q.    What are your roles and responsibilities as assistant

6  training officer?

7  A.    I'm responsible for maintaining and assuring that all

8  high-risk training and all training related to law

9  enforcement is conducted properly.  One of my primary

10 responsibilities is certifying operators in the IONSCAN.

11 Q.    And how did you become -- let's go back a little bit in

12 your career.  Have you been involved in any counter-narcotics

13 operations while you've been in the Coast Guard?

14 A.    I have.  I've been involved in 14 separate

15 interdictions.  Two of them were hidden compartment vessels;

16 interdicted over 20 metric tons of cocaine and detained more

17 than 45 suspected smugglers.

18 Q.    And in what geographic regions have you been deployed?

19 A.    The Eastern Caribbean, Central Caribbean, Western

20 Caribbean, and Eastern Pacific Oceans.

21 Q.    Prior to your arriving at your current unit, have you

22 had any, shall we say, non-operation jobs in the Coast Guard?

23 A.    I have.  From 2012 to 2017 I was an instructor at the

24 Maritime Law Enforcement Academy located at the Federal Law

25 Enforcement Center in Charleston, South Carolina.  There I

1    taught boarding officer school, boarding team member school.

2    It's a federal law enforcement training accredited program.

3    Q.    And you mentioned the IONSCAN instrument.  How did you

4    become qualified to do your job with respect to that

5    instrument?

6    A.    My first certification was back in October of 2007

7    where I was trained to be an operator on the Smith Detection

8    IONSCAN 400Bravo -- 400B model.

9    Q.    And after that, have you received any subsequent

10   training?

11   A.    I have.  In 2018, June, I attended the Smith Detection

12   course for operator training, technician training, and

13   instructor training -- training the trainer training -- in

14   Edgewood, Maryland.

15   Q.    And what did that specific training allow you to do in

16   the Coast Guard?

17   A.    It allowed me to certify other members to be IONSCAN

18   operators, per Smith Detection.

19   Q.    And is that something you currently do at your unit?

20   A.    It is.

21   Q.    What geographic region are you responsible for

22   overseeing that training?

23   A.    I'm responsible for the Pacific area, which is anything

24   west of the Mississippi, including Alaska, Hawaii, and Guam.

25   Q.    How many people in that region have the same

1    qualifications that you just talked about?

2    A.    Two.

3    Q.    You are one of those people?

4    A.    I am.

5    Q.    Which models have you been certified as an actual

6    operator as opposed to a trainer on the instrument you just

7    described?

8    A.    I've been certified in the 400B model and the 500DT

9    model as well.

10   Q.    Are you still qualified to use those instruments?

11   A.    I am qualified to use both instruments, correct.

12   Q.    Okay.  Let's just start with, what is an IONSCAN

13   instrument?

14   A.    To put it in layman's terms, an IONSCAN instrument is

15   the equivalent of having a K9 detection dog, only in the

16   machine form.  It detects trace amounts of narcotics and

17   explosives.

18   Q.    Okay.  And is this something -- well, you mentioned

19   you've been using it for some time.  How long have you been

20   using this instrument?

21   A.    Since 2007.

22   Q.    Okay.  And why does the Coast Guard use the IONSCAN?

23   A.    As far as the science behind it, ion-mobility

24   spectrometry is highly reliable.  It's an extremely sensitive

25   piece of equipment.  It's portable.  It doesn't have a very

1    big footprint.  It has a wide range of parameters for

2    operating.  So as far as temperature, it operates at regular

3    air pressure.  It's cost affordable.  So a lot of reasons why

4    that instrument is used for trace detection.

5    Q.    You mentioned that it's portable.  Why does that matter

6    to a Coast Guard boarding officer or boarding team member?

7    A.    The Coast Guard does the counter-drug mission in the

8    areas mentioned before -- Eastern Pacific and the Caribbean.

9    Every ship that goes down there to conduct counter-drug

10   operations will have an IONSCAN instrument on board.

11   Q.    And since you've been working with these instruments

12   since 2007, do you know if it's used only in the narcotics

13   environment or in other contexts as well?

14   A.    No, the instrument is used every day at the airport.

15   TSA uses it to screen passengers for explosives.  It's used

16   at border checkpoints as far as people crossing into the

17   U.S. -- people and cargo.  It's used at ports of entry.  I

18   know Capitol Police use it.  It's widely used.

19   Q.    And how often is the Coast Guard using these particular

20   instruments?

21   A.    I would say on a daily basis, while deployed.  Maybe

22   not daily, but every time they go aboard it will be used.

23   Q.    How frequently will a Coast Guard slip or a ship that

24   has Coast Guard personnel on it have an IONSCAN instrument on

25   board?

1  A.    Every time.

2  Q.    And when a Coast Guard vessel or a vessel that's got

3  Coast Guard personnel on board and has one of these

4  instruments on board, what's the purpose?  What is the

5  boarding team going to use it for?

6  A.    The purpose is to detect trace amounts of drugs left

7  behind on board vessels.  A lot of times drugs aren't hidden

8  in plain sight.  They are sometimes in hidden compartments or

9  other areas, which would cause them to have to search the

10 vessel more extensively to find them.

11         The IONSCAN, because it's highly sensitive and

12 it's detecting trace amounts not visible to the human eye,

13 will give the boarding team results if cocaine is present or

14 any other drug, for that matter, is present on board a vessel.

15 Q.    Other than situations where there might be a hidden

16 compartment on a boat, are there other operational contexts

17 in which the boarding team might use an IONSCAN instrument?

18 A.    Sure.  They can use it to see if passengers or people

19 on board have come into contact with the substance that was

20 either on board or maybe what was on board at a certain time.

21         There are a lot of times -- there is something

22 called a Nat-T transfer where one vessel might meet up with

23 another vessel and transfer the drugs off for further

24 trans-shipment.  It is a way of linking those vessels

25 together as a conspiracy case.

1   Q.    So in a case like that, you might have a vessel with

2   people but no drugs on it?

3   A.    Correct.

4   Q.    And throughout your experience using these instruments

5   and the training you received, do you know if this instrument

6   has a known error rate?

7   A.    It does.  The published false alarm rate for this

8   instrument is less than 1 percent.

9   Q.    You used the word "false alarm."  What does that mean

10  to you?

11  A.    A false alarm would be the instrument alarming for a

12  substance that wasn't present.

13  Q.    And are you familiar with a term called "false

14  negative"?

15  A.    I am.

16  Q.    What does that word mean to you?

17  A.    That would mean that the instrument should alarm for

18  something but it does not.

19  Q.    And what kind of situations in your experience would

20  you encounter a false negative result?

21  A.    The machine or the instrument is -- variations in

22  humidity or air pressure or temperature can affect what the

23  instrument is detecting.  So a sample that was wet would slow

24  down or possibly change the detection time period for an ion

25  it's looking for.

1   Q.    So, if you have a false negative, there might be drugs

2   but the instrument didn't alert for that?

3   A.    Correct.  There is an alarm algorithm that needs to

4   meet all the requirements of the algorithm for it to show the

5   alarm.  If one of those is not met, it will not alarm.

6   Q.    How many times have you used an IONSCAN?

7   A.    Hundreds.

8   Q.    And do you have any roles or responsibilities in

9   maintaining these instruments in your current unit?

10  A.    I do.  I'm also certified as a technician from Smith

11  Detection.  Operators are allowed to conduct standard

12  preventive maintenance on the instruments -- changing filters

13  and whatnot.  I am authorized to go inside the instrument and

14  change out motherboards, air purification system, flow

15  control modules, everything on the inside, with the exception

16  of the ion-mobility spectrometer itself.

17  Q.    In terms of the scope of maintenance and inspections

18  that you're authorized to do, is that something every IONSCAN

19  operator can do?

20  A.    It is not.

21  Q.    So how many people in the Pacific Region can perform

22  the maintenance and inspections that you are authorized to do?

23  A.    Two.

24  Q.    And are you aware of an interdiction that took place on

25  or about December 1st of last year?

1   A.   I am.

2   Q.   And are you aware of which IONSCAN instrument was

3   actually used to conduct testing in that case?

4   A.   I am.

5   Q.   Have you had an opportunity to take a look at that

6   instrument?

7   A.   I have.

8   Q.   And what were the results of your examination of the

9   instrument?

10  A.   Before sending an instrument out the door on a

11  deployment, it's verified that the instrument is working

12  properly and that upon return, preventive maintenance is done

13  on the instrument.  Changing filters and consumable items

14  that can be used up during its deployment and then verified

15  again.  And both times the instrument was operating properly.

16  Q.   And what model instrument was actually used in that

17  interdiction?

18  A.   It was a Smith Detection IONSCAN 500DT.

19  Q.   Could you describe to the jury exactly how that

20  instrument is used?

21  A.   Sure.  I put a PowerPoint, couple of slides together,

22  if I can.

23  Q.   Would that aid you in your testimony this afternoon?

24  A.   It would.

25  Q.   Can we pull up demonstrative 1.

 1              MR. BRUNVAND:  May we approach, Your Honor?

 2              THE COURT:  Yes.

 3              (The following was held at sidebar:)

 4              THE COURT:  I'm assuming this is the same thing

 5  you had put up for the hearing, or is it something different?

 6              MR. DERENZO:  Pared down from that, Your Honor.

 7  It's the first slide that shows the exterior, the third line

 8  shows the cross-section, and the last slide --

 9              MR. BRUNVAND:  Okay.  Then, no objections.

10              THE COURT:  Okay.

11              (Sidebar ended.)

12              (Documents handed to the witness.)

13              THE WITNESS:  So this is a picture of the actual

14  instrument itself.  It's not very big.  Like I mentioned

15  before, the footprint is small, about the size of a

16  microwave.

17              The top part here is your display screen in which

18  the operator who runs the sample gets to visually see the

19  results of each sample as it's run through.  This front

20  section here is where the sample is inserted.

21              So we get the next slide and I'll explain how the

22  whole process works.  One more slide.  This is a dissection

23  of what the ion-mobility spectrometer is actually doing.

24              When the sample is inserted, this ring raises up

25  and heats the sample to vaporize any particles that are

1    contained within it.  The sample then drifts into this region

2    here where there is a weak radioactive source, in this case,

3    Nickel-63, which gives the sample or the analyte a specific

4    electrical charge.

5            Additionally, in here is something called a

6    reactant or Dopin, which aids in the drug or explosive to

7    receive that charge.

8            From there, this electrical grid or fence is

9    lowered.  I can give you exact numbers here in a second.  It

10   goes all the way across to a collector, where the collector

11   gets a reading, and then that reading is displayed on a

12   plasmogram for the operator to see.

13           If it meets all the criteria for an alarm, being

14   the amplitude, the rate, time, the full width, half-maximum,

15   and the number of segments, the display will alarm and alert

16   the operator that one of its items was detected.  In this

17   case, cocaine.

18   Q.    Okay.  And you said a plasmogram.  Is that a certain

19   kind of graph or something that's used?

20   A.    Correct.  It's pretty much a graph showing peaks on it.

21   Q.    What are the primary data points or criteria that the

22   instrument will use to evaluate whether this is cocaine or

23   Coca-Cola?

24   A.    So the reactant or the Dopin that's actually used in

25   the instrument is designed to bond with drug chemicals rather

1  than anything else that might be stuck within the swab.

2         Then the specific requirements for each of

3  those is in a library, as well.  So, for instance, cocaine

4  has a minimum amplitude of 50 DU.  It has a drift time of

5  15.66, depending on the atmospheric pressure and everything,

6  time to get from point A to point B.

7  Q.   So using this view here of the instrument that we have

8  displayed, this cross-section here, can you describe where

9  the drift time comes from here?

10  A.   Sure.  So from this gate here to this collector here,

11  every analysis takes about 8 seconds to run.  It's divided

12  into 30 segments.  Then each segment is broken down into

13  further scans.

14         The first 18 segments have five scans each and the

15  last 12 segments have 20 scans each.  During those 30

16  segments, the gate -- or during each scan the gate is raised

17  and lowered, allowing a small portion of the charged ions to

18  transit from point A to point B, so from here to here

19  (indicating).

20  Q.   And why is that time important in analyzing a

21  particular substance?

22  A.   Because every molecule, based on its geometry, its

23  mass, the way it tumbles through the air, has a specific

24  drift time that identifies it.

25  Q.   Would it be fair to say this is like a fingerprint, of

1   sort, for that particular substance?

2   A.    That's exactly what it is.  It's a fingerprint to

3   identify specific substances.

4   Q.    Okay.  You mentioned the word "segments."  Can you

5   describe in layman's terms, what does segment mean?

6   A.    Sure.  So one of my alarm criteria is segments, meaning

7   that I can't get it to alarm just one time.  I need a minimum

8   of two alarms to ensure that, yes, that is exactly what I'm

9   looking for.

10          So let's say I went to a Publix and they are

11  having a special today and inside their deli slicer there is

12  a box hiding it.  I don't know how much meat is on there, but

13  I get a free sandwich.  It could be zero meat.  It could be a

14  whole ham.  Who knows.  I'm not greedy.  All I want is two

15  slices of ham for my sandwich, but you can get up to 30

16  slices of ham.

17  Q.    And then in terms of -- and so I put a swab in.  There

18  might be cocaine or something else on it.  I mean, what's

19  physically happening to the amount of substance on there?

20  Can you test it 30 times?

21  A.     It is -- because the DT in the 500 is a dual tube,

22  automatically half of the vapor is sent to an explosives tube

23  for analysis, so that's already gone.  Then the other half is

24  sent to a narcotics tube for analysis.

25  Q.    Okay.  So each time we have a segment that's a separate

1   test, if you will?

2   A.    Correct.  So once the analysis begins, it's held here

3   (indicating).  Each segment is a separate test during that

4   period.

5   Q.    That number 30, is that fixed or does that change?

6   A.    No, it's always 30.

7   Q.    And does -- the IONSCAN instrument, the 500DT in

8   particular, does it have any built-in features that enhances

9   for reliability or accuracy?

10  A.    Yes, the 500DT has a built-in calibrant.  Since the

11  instrument is based on air pressure, temperature, humidity,

12  it's constantly calibrating to its environment or wherever

13  it's at.  This is every second it is being run through the

14  instrument it is constantly calculating and making

15  adjustments for where it sees the calibrant.

16  Q.    You mentioned before that the Coast Guard uses this

17  instrument because it's sensitive.

18  A.    Correct.

19  Q.    How sensitive?  Do we need some white powder on a

20  surface to detect cocaine?

21  A.    No.  It's designed to detect for trace amounts that's

22  not visible to the human eye because trace contamination

23  is -- it's hard to hide.  If I touch something, next thing I

24  touch I'm going to transfer it over to it.  And I might think

25  I'm not transferring anything, but I am because it's on my

1   hands.

2   Q.    So in your experience in the counter-narcotics

3   environment, why is that likely to occur in maritime coke

4   trafficking?  You are surrounded by water; right?

5   A.    Correct.  What's the question again?

6   Q.    Why would you expect, as a boarding officer or an

7   IONSCAN instrument operator, to find trace amounts of cocaine

8   either on a person or a boat?

9   A.    Because the primary method for shipment of cocaine is

10  via boat.  A lot of times from the packaging, even though

11  it's wrapped in multiple layers, hands are involved in the

12  packaging process, and eventually trace amounts are

13  transported to kilograms, kilogram trace amounts are

14  transferred to bales, and then those are concealed within a

15  vessel or placed on deck on a vessel.  Then whatever they

16  come into contact with will deposit trace amounts of cocaine

17  from there, as well.

18  Q.    In your experience in the field, have you ever seen a

19  bale that's been compromised in any way?

20  A.    I have.

21  Q.    What have you observed in those instances?

22  A.    Because it's getting beat around for days, you know, a

23  lot of times there is water intrusion, too, you will get kind

24  of -- you'll get one that's soggy.  The packaging has been

25  compromised and it's leaked a cocaine liquid pretty much into

1   where it's held.

2   Q.     And are there any steps that -- an operator, rather

3   than the person taking the swabs, are there any steps that

4   individual takes to make sure the machine is working?

5   A.     Sure.  There is something called a "verific," which is

6   short for a verification.  What it does is it helps the

7   operator build confidence in the instrument and that it is

8   working properly.

9   Q.     What happens if for some reason the operator forgot to

10  do that?

11  A.     If the operator did not do a verific, the chances of

12  them missing alarms is possible.  So a false negative is

13  likely.

14  Q.     How would not doing a verific test affect the

15  likelihood of a false positive?

16  A.     It would not.

17  Q.     And could you describe the -- when you are actually

18  using the machine itself, what steps are you going to take?

19  A.     As far as from start to finish?

20  Q.     Put in the sample to getting a result.

21  A.     So we are a little unique in the way we operate.  Most

22  of the time the person collecting the sample is the one

23  that's also operating the system.  Because our instrument is

24  kept separate from the area where the samples are collected,

25  it's a different person that operates and runs the samples.

1      From start to finish, the boarding team would --

2  they would put on -- well, even before going over, the

3  boarding team would be swabbed to make sure they are not

4  introducing any contamination into the vessel itself.  Then

5  once over there, the boarding team will -- the person taking

6  the samples wears gloves, and then take a sample of an area

7  that the hands -- that's how we train them, wherever the

8  hands come into contact with or possibility of hands coming

9  into contact with, take samples of those areas.

10      Then after each sample they will remove the glove,

11  they will label the sample, and then they will place that

12  sample -- it's still inside the glove -- inside a watertight

13  bag, and they will do this until the finish.  They will seal

14  the bag and send it back to the instrument for analysis.

15  Q.    So once you are ready to actually test these swabs and

16  figure out if there is anything on there, what's the next

17  step?

18  A.    So then the operator will, at the instrument itself,

19  take the bag.  He'll be gloved as well.  He'll remove each

20  sample from the bag, log the -- he'll run the analysis

21  through there and he'll either get two results, either an

22  alarm or no alarm.  And I do have another slide to kind of

23  show the jury what that looks like to them.

24  Q.    What are we looking at here on the slide?

25  A.    So before the operator can even run the analysis, he

1   has to have a green screen that says "Ready."  If he has any

2   other screen, he won't be allowed to analyze.  As you can see

3   over at the side, the yellow screen analyze button and the

4   red screen analyze button are stippled out.  They are greyed

5   out.  It won't even allow them to select that button for

6   analysis.

7          Once the instrument is ready, meaning it's met all

8   the parameters -- it detects the calibrant, it's the right

9   temperature, right air pressure -- the green display lets the

10  operator know they can run an analysis.

11         When they run the analysis, they will either get

12  one of two responses.  The bottom screen would be an alarm,

13  which would display and turn red and say "Alarm" at the top

14  and give a display reading what it detected, or it will be

15  green and say "No alarm detected."

16         So back to the operator.  So they will run that.

17  Once they get the reading from this, they will log the

18  results and continue on to the next sample.  If they get an

19  alarm, they are required to clear out the instrument to make

20  sure that there is no trace left in there.  The instrument

21  requires a minimum of two blanks to be run and they have to

22  be consecutive and they have to show that there is no trace

23  amounts left in there that are detectable for an alarm.

24  Q.   And if you get that red screen right there on the

25  bottom, it says "Alarm," what's the significance of that

1  screen?

2  A.    If you get an alarm, it's -- a hit is a hit.  So if you

3  get an alarm, it's present.

4  Q.    So what if, you know, it's 1 percent as opposed to

5  25 percent?

6  A.    One percent, twenty-five percent, one hundred percent,

7  an alarm is an alarm.

8  Q.    The presence of whatever is alarmed for?

9  A.    Correct.

10  Q.    Based on what you know about the instrument and your

11  hundreds of times using it, is it possible to falsify an

12  alarm for a substance like cocaine?

13  A.    It is not.  The only way that could happen is if you

14  would have to physically introduce that substance into the

15  instrument for it to alarm.

16  Q.    You would have to have cocaine in some form and put it

17  on a swab?

18  A.    Correct.

19  Q.    Has any of your training and experience included

20  instruction on how to actually interpret and verify the

21  results of an IONSCAN instrument?

22  A.    It has.

23  Q.    And just in a general -- we will go through the results

24  in this case in a minute, but in a general sense, what are

25  the things you are looking at to determine if this is a good

1    hit or not?

2    A.    Whenever an alarm is displayed, a printout can be

3    received from the instrument and it displays at the bottom

4    the characteristics of what that alarm was.  Some of those

5    items include the drift time, your delta, which is your

6    difference from where it's expected to be, you have your

7    amplitude and number of segments, are the four criteria for

8    what makes an alarm.

9    Q.    You mentioned the word "delta."  In layman's terms,

10   what is the significance of the delta?

11   A.    A delta of zero would be a dead-center bullseye,

12   whereas a delta 50 might be the outer ring of the bullseye.

13   Q.    And what's the -- what number are you looking for in

14   terms of the delta?

15   A.    Anything less than 30 is a good number.

16   Q.    And what about the amplitude?

17   A.    Amplitude has to be a minimum of 50.

18   Q.    And what other criteria do you need to ensure it's a

19   positive hit?

20   A.    So you need a minimum amplitude of 50 and your delta of

21   plus or minus 50.  You need that a minimum of two times.

22   Q.    So those criteria at least twice in a row?

23   A.    Correct.

24   Q.    Okay.  Or twice out of the 30?

25   A.    Correct.  And has to be consecutive.  It has to be two

1   consecutive.  It can't be just one and then one later on.

2   Q.    Okay.  Prior to your testimony here this afternoon,

3   have you reviewed any results from IONSCAN analysis that was

4   conducted for go-fast vessel interdiction on December 1st of

5   2018?

6   A.    I have.

7   Q.    And based on your review of those results, are you able

8   to form an opinion regarding the presence of drugs on that

9   vessel?

10  A.    I am.

11  Q.    Okay.  And are you also able to form an opinion

12  regarding the contact by that crew with respect to any

13  surface areas that touched drugs?

14  A.    I am.

15  Q.    We will talk about the first one.  What is your opinion

16  regarding the presence of drugs on that vessel?

17  A.    Do you have a printout of the results I can look at to

18  speak to it as well?

19  Q.    Sure.  We can pull up Exhibit 7A.  If it helps, we can

20  go through each one.

21  A.    Sure.

22  Q.    Let's start with page 2.

23  A.    Okay.

24  Q.    And just in a more general sense, what is your opinion

25  with respect to whether or not there were drugs on that

1   vessel?

2   A.    There was cocaine present on this vessel.

3   Q.    Okay.  And what, if anything, do you have about the

4   contact by the crew members of the vessel with any surface

5   they touched?

6   A.    That the members -- the people that were on board the

7   vessel came into contact with cocaine.

8   Q.    Okay.  Just so the jury is clear, are you able to tell

9   from these results exactly how much cocaine was on board?

10  A.    The instrument doesn't tell you a quantitative.  I

11  can't tell you exactly how much cocaine is present.  I can

12  tell you the quality.  It's a qualitative machine, that

13  cocaine was present.

14  Q.    Okay.  And, again, just to be clear, are you able to

15  determine exactly at this hour, on this day, when cocaine was

16  present on the vessel?

17  A.    As far as time goes, I cannot.  However, I can, based

18  on my training and experience, give a reasonable time frame

19  of the time that it was on board.

20  Q.    Okay.  And what is your opinion with respect to the

21  reasonable time frame?

22  A.    One, the makeup of the vessel is fiberglass, so it's a

23  nonporous material.  Additionally, it's in an environment

24  that's wind and water, so it's easily -- anything that was

25  trace amounts on there is easily washed away or blown away.

27

1   So based on just the environmental factors, it would not last

2   on the vessel for very long.

3   Q.    Okay.  So let's talk about this particular result here.

4   A.    Is there a way we can go up a little bit?  That way you

5   can see --

6   Q.    Sure.

7   A.    That's fine.  Thank you.

8           MR. DERENZO:  If you could, just zoom out from

9   there for a minute, please, and then just capture the bottom

10  half of the receipt.

11  A.    Where it says "tube and channel"?

12  Q.    For the record, this is labeled as location, portside

13  rail.  What is the basis for your opinion that this surface

14  came into contact with cocaine?

15  A.    This surface came in contact with cocaine.

16  Q.    What is the basis for that?

17  A.    So, one is your drift time.

18  Q.    Can we stop there for just a second.  You mentioned a

19  library before.  Is that something that the Coast Guard

20  operator on board the vessel is going to input into the

21  machine?

22  A.    It's not.  It's programmed from the factory.  Smith

23  Detection has done extensive research on the drift time based

24  on reasonability of the ion to determine what the expected

25  drift time should be for that specific -- for that particular

1  compound, for that element.

2  Q.    That's the center of the bullseye you talked about

3  before?

4  A.    The instrument is saying that it expects to see cocaine

5  at 15.659 milliseconds.

6  Q.    And what did it find in this particular swab?

7  A.    It found that based on that time of where that would be

8  a perfect time, it found it at 4 microseconds away from

9  there.  So to put that in perspective, a blink of an eye is a

10  third of a second.  That would be -- you know, 1 microsecond

11  is 300,000 times faster than a blink of an eye.

12  Q.    I became a lawyer because I'm not very good at math.

13  Microsecond, is that one out of a million?

14  A.    Correct.

15  Q.    Okay.  So in this case, it was four over a million

16  within the center of the bullseye?

17  A.    Correct.

18  Q.    What's the number you are looking for, plus or minus,

19  with respect to that category, the delta?

20  A.    For alarm for cocaine, the acceptable range is plus or

21  minus 50.

22  Q.    Okay.  And what's one of the other data points that you

23  relied on in forming that opinion?

24  A.    So the other one is the amplitude.  In this case it

25  says amplitude 93 on here.  The minimum amplitude threshold

1    to alarm for cocaine is 50.

2    Q.    What's the data point to the left of there?

3    A.    Cumulative amplitude is how much -- well, we will go

4    over the first one.  The number is 11 segments, meaning the

5    instrument saw cocaine 11 times out of 30 during the

6    analysis.  Then cumulative amplitude is the total amplitude

7    of all 11 of those segments.

8    Q.    Okay.  So if you added up all the amplitudes for all

9    11, that's the cumulative amplitude?

10   A.    Correct.

11   Q.    What, if anything, can you infer about the segment

12   number in the cumulative amplitude?

13   A.    The more segment number and higher cumulative

14   amplitude, one, it could help me discover a hidden

15   compartment, if there was one.  Two, the higher the number,

16   the likelihood increases.  So if I had amplitude of 500, that

17   would be ten times greater than the amount that I would need

18   for an alarm.

19   Q.    Is there any correlation between those data points, the

20   segment and the cumulative amplitude, in terms of the

21   quantity, the amount of substance on the swab?

22   A.    It means there was more substance on the swab.  The

23   issue that the operators run into is because it's not

24   detectable by the naked eye, I could have a large amount, and

25   this one section here -- and I took a sample that was just

1   kind of skirting the edge of that, so I might not have gotten

2   a full amount of what was actually on board, but I got enough

3   to tell me that it was there.

4   Q.   And what is the correlation between -- if we could zoom

5   out from here and go to toward the top of the receipt.

6        What is the correlation between those data points

7   you just described and that percentage number there, the

8   cocaine 3 percent?

9   A.   So the alarmed 3 percent really has no bearing on --

10  it's not saying that, oh, this is 3 percent chance it's

11  cocaine.  It's a hundred percent chance it's cocaine.  And

12  the threshold for the instrument, because it's so sensitive,

13  is set at an amplitude of 1500, and then the minimum is 50.

14  So if I had a hit of 50, it would say a 1 percent alarm,

15  where if I had a hit of 1500, it would say a hundred percent

16  alarm.  That's where you come back to an alarm is an alarm.

17  If it meets the requirements, it's present.

18  Q.   Okay.  Is there any correlation between that number

19  and, say, the segment and cumulative amplitude?  In other

20  words, if you have a higher or lower segment and cumulative

21  amplitude we have a higher or lower percentage when you look

22  at this slide?

23  A.   The higher the cumulative amplitude -- they will all be

24  based on the amplitude itself.  So that alarm is based on

25  amplitude, not the cumulative amplitude.

1          MR. DERENZO:  Okay.  And if we can, go to the next

2    receipt here.  And go to the bottom where the individual data

3    points are at, please.

4    BY MR. DERENZO:

5    Q.    So we are looking now at what's labeled "Location,

6    center hold."  What are the -- in your analysis of this

7    particular result, what are the important data points?

8    A.    Again, detection time or drift time, your delta, your

9    number of segments, and your amplitude.

10   Q.    Okay.  So delta, what were you expecting to see there?

11   A.    A perfect sample would be zero.  This is as near

12   perfect as you can probably get in an operating environment.

13   Q.    Okay.  What about the other data points you talked

14   about just a minute ago?

15   A.    So drift time and delta, those go hand in hand.  In

16   this sample that was run, it was only 2 microseconds off of

17   the expected drift time.

18          Your amplitude here of 227 is almost five times

19   greater than what was needed to alarm, and the number of

20   segments, 24.  Since I only need two consecutive segments to

21   alarm, this one had 24.  So if we go back to the deli analogy

22   where Publix is giving away free ham sandwiches, I only

23   needed a sandwich of two slices of ham.  This sandwich had 24

24   slices of ham.

25   Q.    Twenty-four out of how many?

1    A.    Out of 30.

2    Q.    What, if any, conclusion can you draw about the data

3    points in this particular swab?

4    A.    Based on how close and the near perfect it is and the

5    amplitude, I would, in my professional opinion, say that

6    center hold was where the cocaine was located.

7              MR. DERENZO:  Zoom out of that.  Move to the next

8    page, please.

9    BY MR. DERENZO:

10   Q.    So this receipt on the left side of Page 3 is labeled

11   "Forearms, Calbot Reid-Dilbert."  In your analyzing this

12   particular result, what were the important data points?

13   A.    Again, the drift time, your delta, your amplitude and

14   your number of segments.

15   Q.    Okay.  Again, what was the range you are looking for

16   here?

17   A.    I'm looking for plus or minus -- where it says, "Delta

18   plus or minus 50," in this case it was 4.  For my amplitude,

19   I'm looking for 50 or higher.  In this case it was a hundred.

20   And for number of segments, I'm looking for two, and in this

21   case it was 12.

22   Q.    Okay.  Move to the next receipt.

23             Again, what conclusions did you draw about this

24   particular result?

25   A.    Again, for cocaine, this one is 20 microseconds off of

1  the expected drift time, well within the acceptable range.

2  The amplitude is above 50, and then the number of segments is

3  at 17.  So 15 more than what was needed.

4  Q.    Move now to the next page.  To the left we have the

5  receipt from the analysis of sample labeled "Rudolph Randolph

6  Meighan, hands."  What is your opinion about this particular

7  sample?

8  A.    That his hands did come into contact with cocaine.

9  Again, the drift time, delta, amplitude, and number of

10 segments all meet the criteria for an alarm for cocaine.

11 Q.    Move now to the right-hand side, which is labeled

12 "Jorge Ramon Newball-May, hands," what is your opinion with

13 respect to this individual analysis?

14 A.    That Mr. Newball-May's hands did come into contact with

15 cocaine.

16 Q.    Is there anything notable about this particular result?

17 A.    Again, the delta, amplitude, and number of segments, it

18 alarmed for 17 out of 30 segments for cocaine.

19 Q.    So that cumulative amplitude number --

20 A.    It's a higher amplitude.  So if I were to look at all

21 of them together, I think the center hold had an amplitude of

22 4,000 or somewhere around there.  This amplitude is really

23 high.  In fact, probably almost each one of the segments that

24 alarmed had an amplitude of 161, so three times the

25 required -- little more than three times the required amount

1   to alarm for cocaine.

2   Q.    When you reviewed all of these results, what was the

3   highest cumulative amplitude?  Which slot?

4   A.    That was the center hold.

5   Q.    What was the second highest?

6   A.    I believe it was this one (indicating).

7   Q.    Move to the next page.  This is receipt labeled "Emiro

8   Hinestroza Newball, forearms."  What is your professional

9   opinion about the particular results?

10  A.    That Mr. Newball's forearms came into contact with

11  cocaine.

12  Q.    What are you basing that on?

13  A.    Based again on the number of segments, the amplitude,

14  the delta, and the drift time, D-time.

15  Q.    We are looking now at the receipt labeled "Emiro

16  Hinestroza Newball, hands."  What is your professional

17  opinion about this result?

18  A.    That Mr. Newball's hands came into contact with cocaine

19  based on the number of segments, amplitude, delta, and drift

20  time.

21  Q.    Now, of all the results that you examined, if you

22  recall, how many alarmed positive for cocaine?

23  A.    Out of 18 possible results from the vessel itself, nine

24  of them resulted in positive hits for cocaine.  So 50 percent

25  of their swabs tested positive for cocaine.

1   Q.    Did that include the crew members as well?

2   A.    Correct.

3   Q.    And knowing what you know about the instrument itself

4   and its potential rate error, in your professional opinion,

5   what is the likelihood that all nine of those positive alarms

6   were actually false positives?

7   A.    It's not likely at all.  It's not possible.

8           MR. DERENZO:  All right.  May I have just a

9   moment, Your Honor?

10          THE COURT:  Yes.

11  BY MR. DERENZO:

12  Q.    Just one more question, Senior Chief.

13  A.    Yes, sir.

14  Q.    Based on your experience in the maritime environment,

15  working on counter-narcotics operations and the results

16  you've analyzed in this particular case and what you know

17  about the interdiction itself, in your professional opinion,

18  which is more likely to have occurred, that there were

19  essentially false negatives or false positives?

20          MR. AMADOR:  Objection.  Compound.

21          THE COURT:  Overruled.

22          THE WITNESS:  False negative is more likely than a

23  false positive.

24  BY MR. DERENZO:

25  Q.    Why is that?

1  A.    Because to get a positive alarm I need to meet all the

2  requirements for that alarm.  Whereas, if any of those

3  requirements is off by a very minute amount, I won't get an

4  alarm.

5            MR. DERENZO:  I tender the witness, Your Honor.

6            THE COURT:  I think, Mr. Brunvand, we will take an

7  evening recess.

8            Ladies and gentlemen, before we start the

9  cross-examination of the witness, we are going to recess a

10 little early this afternoon.  We are running on time, maybe a

11 little ahead of time from the schedule I told you.

12           So we are going to recess, and it's almost 4:30.

13 We will be in recess until 9:30 tomorrow morning.  I think we

14 will start promptly at 9:30 tomorrow morning.

15           Please leave your pads on your chairs.  Please

16 don't discuss the case, and I'll see you in the morning at

17 9:30.

18           COURT SECURITY OFFICER:  All rise for the jury.

19           (Jury exits courtroom at 4:27 p.m.)

20           COURT SECURITY OFFICER:  Please be seated.

21           THE COURT:  Chief, you may step down.  Please

22 don't discuss your testimony with anyone over the recess, and

23 we will start tomorrow morning at 9:30.

24           Anything else?

25           MR. DEE:  No, Your Honor.

```
 1              THE COURT:  Okay.  I do have statuses in the
 2   morning, so you'll have to take your things with you.
 3   All right, 9:30.
 4              (Proceedings adjourned at 4:28 p.m. and reconvened
 5   on May 8, 2019.)
 6                             -  -  -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


### REPORTER CERTIFICATE


     I, Scott N. Gamertsfelder, Official Court Reporter
for the United States District Court, Middle District of
Florida, do hereby certify that pursuant to Section 753,
Title 28, United States Code, that the foregoing is a true
and correct transcript from the stenographic notes taken by
the undersigned in the matter of *UNITED STATES vs. RUDOLPH
RANDOLPH MEIGHAN, JORGE RAMON NEWBALL MAY, and CALBOT
REID-DILBERT*, Case No. 8:18-cr-594-T-24JSS (Pages 1 through
37), and that the transcript page format is in conformance
with the regulations of the Judicial Conference of the United
States.



/s/ *Scott N. Gamertsfelder*, RMR, FCRR

*Official Court Reporter*

                              Date: September 7, 2019