UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:18-cr-594-T-24JSS |
| | ) | |
| | ) | Docket No. 117 |
| vs. | ) | |
| | ) | May 8, 2019 |
| RUDOLPH RANDOLPH MEIGHAN, | ) | |
| JORGE RAMON NEWBALL MAY, and | ) | |
| CALBOT REID-DILBERT, | ) | |
| | ) | |
| Defendants. | ) | Courtroom 10B |
| _____ | ) | |


**EXCERPT TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

(**Examinations of Steven Bomentre and Steven Ray**)


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

<u>**A P P E A R A N C E S**</u>

**GOVERNMENT COUNSEL:**

      **Daniel M. Baeza, Assistant U.S. Attorney**
      **Nicholas G. DeRenzo, Assistant U.S. Attorney**
      United States Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6000

**DEFENSE COUNSEL:**

      **David A. Dee, Esq.**
      Law Offices of David A. Dee, PA
      311 South Brevard Avenue
      Tampa, Florida 33606
      (813) 258-0406

      **Bjorn E. Brunvand, Esq.**
      Bjorn E. Brunvand, PA
      615 Turner Street
      Clearwater, Florida 33756
      (727) 446-7505

      **Pedro Amador, Jr., Esq.**
      Law Office of Pedro Amador, Jr.
      2203 North Lois Avenue, Suite 925
      Tampa, Florida 33607
      (813) 250-0556

                    **ALSO PRESENT:**

                       James Plunkett, Interpreter

                       Etienne van Hissenhoven,
                       Interpreter

                       - - -

## TABLE OF CONTENTS

### EXAMINATIONS

| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEVEN BOMENTRE | | 5 | 22 | |
| STEVEN RAY | 32 | 85 | 100 | |

(Bomentre Examination resumed from May 7, 2019.)

### EXHIBITS

| GOVERNMENT | PAGE | LINE |
|---|---|---|
| 9........................ | 54 | 21 |

**P R O C E E D I N G S**

May 8, 2019                                              9:41 a.m.

                              - - -

          THE COURT:  Would you bring the jury in, please.

          COURT SECURITY OFFICER:  Yes, ma'am.

          THE COURT:  Then you can go get the witness.

          COURT SECURITY OFFICER:  Yes, ma'am.

          All rise for the jury.

          (Jury enters courtroom at 9:38 a.m.)

          COURT SECURITY OFFICER:  Thank you.  Please be
seated.

          THE COURT:  Good morning.  Ladies and gentlemen,
anything happen over the evening hours that any of you think
might affect your ability to serve on this jury in any way?

          (*Unanimous negative responses.*)

          THE COURT:  Any questions or any concerns before
we start this morning?

          (Unanimous negative responses.)

          THE COURT:  I anticipate we will follow a similar
schedule and recess mid-morning and then recess sometime
between 12 and 12:30 for lunch.  Again, if anybody needs to
recess at a time other than that, just raise your hand and
let me know.

          Mr. Fitchett, could you get the witness.

          While he's doing that, you will recall that when

1  we recessed yesterday afternoon Senior Chief Petty Officer

2  Steven Bomentre was on the stand.  The government had

3  finished their direct examination of the witness, and we are

4  going to start now with the defendant's cross-examination.

5           Sir, if you would, retake the witness chair.  I

6  won't swear you in again.  I will remind you, you are under

7  oath, and for everybody, so we all remember, would you state

8  your name.

9           THE WITNESS:  Yes, Your Honor.  Senior Chief

10  Steven Bomentre.

11           THE COURT:  Mr. Brunvand.

12           MR. BRUNVAND:  Thank you, Your Honor.

13                     STEVEN BOMENTRE,

14  having been previously duly sworn on May 7, 2019, by the

15  Courtroom Deputy, testified as follows:

16                   CROSS-EXAMINATION

17  BY MR. BRUNVAND:

18  Q.    Good morning.

19  A.    Good morning, sir.

20  Q.    The analogy that you gave the jury involving the ham

21  sandwich, I think you said if there were two slices of ham,

22  up to 30 slices of ham, it would be identified as a ham

23  sandwich.

24  A.    Correct.

25  Q.    Okay.  That's the analogy to how this machine operates;

1    right?

2    A.    Correct.  That's how the machine operates.

3    Q.    And, so, if it was only one slice of ham, it would not

4    identify it as a ham sandwich; right?

5    A.    It doesn't have enough to alarm for a ham sandwich.

6    Q.    Right.  That's the machine we are asking the jury to

7    rely on; correct?

8    A.    Correct.

9    Q.    Now, in 2007, I believe, you were in the Coast Guard.

10   Yes?

11   A.    Correct.

12   Q.    You have to answer out loud.  Otherwise, there is no

13   record of it.

14         You were at that time taught how to operate an

15   IONSCAN machine that was made by Smith Detection; right?

16   A.    That's correct, sir.

17   Q.    Okay.  And the people who taught you how to operate the

18   machine -- and it was the predecessor machine to the one we

19   have here today; right?

20   A.    It is.  It's still in service, though.  The 400B is

21   still in service.

22   Q.    In fact, one of the claims that Smith Detection has is

23   that these machines are good for ten years; right?

24   A.    I don't know offhand what they claim for lifespan.

25   Q.    All right.  That's fine.

1          But certainly, if you have some from 2007 that are

2    still in service, fair to say those have been used for ten

3    years; right?

4    A.    I would believe so, yes.

5    Q.    At the time you were taught by other members of the

6    Coast Guard how to operate the machine?

7    A.    Yes, sir.

8    Q.    And those individuals have been taught by Smith

9    Detection how to teach you how to operate the machine; right?

10   A.    That's correct, sir.

11   Q.    All right.  At that time you were not able to service

12   the machine?

13   A.    Other than standard preventive maintenance, no.

14   Q.    Okay.  Other than being taught by other Coast Guard

15   members who had been taught by Smith Detection, no one else

16   back in 2007 taught you how to operate the machine.  Is that

17   a fair statement?

18   A.    That is.

19   Q.    Okay.  In 2018, is that when you go for additional

20   training?

21   A.    Yes, sir.

22   Q.    And on this occasion your additional training takes

23   place at, what, at the manufacturing location?

24   A.    At the Smith Detection facility in Edgewood, Maryland.

25   Q.    And that's where they manufacture these machines?

1  A.    There is a depot there, so they do repairs and they

2  also assemble.  They don't necessarily make everything in

3  house, but they assemble the components to manufacture an

4  instrument, correct.

5  Q.    Understood.  These machines, from what you understand,

6  they sell for about $50,000 apiece; right?

7  A.    Around that range, yes, sir.

8  Q.    All right.  Presumably, in addition to the $50,000

9  initial cost of the machine, it requires service throughout

10 its lifespan; right?

11 A.    There are consumables that are required throughout its

12 life.  Correct, sir.

13 Q.    And, presumably, those are in addition to the 50,000

14 per machine?

15 A.    They are, sir.

16 Q.    Okay.  You are here not only as an operator, but you

17 basically have been here and you testified as an expert of

18 sorts; right?

19 A.    Yes, sir.

20 Q.    About the reliability of the machine?

21 A.    Yes, sir.

22 Q.    About the potential for error results from the machine,

23 false positive results of the machine; right?

24 A.    Yes, sir.

25 Q.    And, so, in order to make your way from an operator to

1    someone who holds himself out as an expert, you went to these

2    classes at the manufacturer's facility; right?

3    A.    Correct, sir.

4    Q.    And you were taught by people who worked for the

5    manufacturer who sells these machines; right?

6    A.    Yes, sir.

7    Q.    And it was those people who told you that the error

8    rate for this machine is less than 1 percent?

9    A.    Not only did they say that, it's also published in the

10   technical manual.

11   Q.    Let's talk about that.  We talked about -- are you

12   talking about the technical manual that's prepared by the

13   manufacturer?

14   A.    It is.

15   Q.    Okay.  Well, can we agree that if a representative of

16   the manufacturer says less than 1 percent error rate and the

17   manual for the machine that's prepared by the manufacturer

18   says less than 1 percent error rate, it's coming from the

19   same voice?

20   A.    Sure.

21   Q.    Okay.  Now, in order to make sure that you are accurate

22   and certain about what you present to this jury, I assume

23   that you have done some additional investigation into whether

24   or not these allegations that are made by the manufacturer,

25   in fact, are corroborated by anyone?

1   A.    I've done my own research on IONSCAN technology

2   separate from what Smith supplies, correct.

3   Q.    Okay.  And other than -- let me ask you this:  Can you

4   cite an article that you can say definitively is not in any

5   way connected with Smith Detection that supports your

6   testimony?

7   A.    In front of me or off the top of my memory, I cannot.

8   Q.    Okay.  And you knew you were coming here to testify

9   yesterday and today as relates to that matter; right?

10  A.    I knew I would be testifying today, correct, sir.

11  Q.    And if you do the research, you do know how you can go

12  about figuring out who authored a paper; right?

13  A.    Yes, sir.

14  Q.    When it was authored; right?

15  A.    Yes, sir.

16  Q.    And in what publication it may have been published;

17  right?

18  A.    Yes, sir.

19  Q.    And you can't present any of that to us; right?

20  A.    I don't have any in front of me at this time, sir.

21  Q.    I assume you know based on literature that you've read

22  and press releases from the manufacturer that in 2011 Smith

23  Detection, the company, had sold in excess of 10,000 of these

24  machines.  Were you aware of that?

25  A.    I didn't know how many they sold.  I assume there is at

1    least 15,000 -- not necessarily Smith's, but 15,000 IONSCANs

2    in service throughout.

3    Q.     Would you agree that 10,000 IONSCANs, at the rate of

4    $50,000 apiece, is $500 million?  Would you agree with that?

5    A.     Correct.

6    Q.     Half a billion dollars; correct?

7    A.     Correct.

8    Q.     As part of your research and preparation for coming in

9    here today, have you researched cases that are known to the

10   public where, in fact, false positive results took place, it

11   was determined that false positives took place and it was

12   corrected?

13   A.     I've not come across any of those articles, sir.

14   Q.     Have you Googled -- you are familiar with Google, I

15   assume?

16   A.     Yes, sir.

17   Q.     Have you Googled false positives Smith Detection?

18   A.     I have not.

19   Q.     Have you Googled false positives IONSCAN 500DT?

20   A.     I have not.

21   Q.     You explained to the jury how this machine works; right?

22   A.     Yes, sir.

23   Q.     You call it an instrument.  I call it a machine.

24   Right?  Same thing?

25   A.     Not necessarily.  An instrument is doing an analysis

1  where a machine could give you a soda.

2  Q.    You talked to the jury about how it works; right?

3  A.    Yes, sir.

4  Q.    And in order to be trained on it, you have to be able

5  to see, initially I believe, a green light that comes on that

6  says it's ready to submit this piece of paper; right?

7  A.    That's correct, sir.

8  Q.    And the little piece of paper we are talking about,

9  it's similar to one that you might have seen in an airport

10 when someone gets stopped and they are asked to either swab

11 their shoes or computer laptop and they put it into that

12 machine; right?

13 A.    Similar.  I would assume it's a similar type of swab,

14 yes.

15 Q.    That's what this machine does; right?

16 A.    It does.  It traps particles into a swab and vaporizes

17 them and analyzes their speed based on drift time.

18 Q.    Okay.  So you have a green light.  What's the next

19 light?

20 A.    The instrument will display "Ready" at the top of the

21 title and the status bar will be green.  A yellow screen will

22 be waiting as the instrument is waiting for a parameter to be

23 met, whether it be flow, temperature, or pressure, and then

24 the red screen is alarm.

25 Q.    Okay.  And if the alarm shows up, that means something

1  has been detected?

2  A.    Something that's programmed into the library that has

3  been detected.

4  Q.    Something that's been programmed into the library of

5  this computer/machine; right?

6  A.    Yes.

7  Q.    Do you know everything that's been programmed into the

8  library?

9  A.    One of the printouts in the IONSCAN in evidence shows a

10  list of every item on there.

11  Q.    Do you know every item that's been programmed into this

12  machine?

13  A.    If I were to look at that sheet, I could tell you every

14  item that was programmed into that instrument.

15  Q.    Is it, like, one page?

16  A.    It's probably about maybe a foot-and-a-half long

17  (indicating).

18  Q.    So what are we talking, a couple of hundred items?

19  A.    I would say around a hundred.  Probably around a

20  hundred items.

21  Q.    About a hundred items.  Okay.  And these are

22  microscopic ion items; right?

23  A.    They could be down to the size of between a microgram

24  and a nanogram.

25  Q.    So seems to me a hundred items is fairly significant in

1   the universe of ions that might be surrounding us.

2   A.    It is.

3   Q.    Okay.  Would it be fair to say that, unfortunately,

4   there is no alarm that tells the operator that the reading is

5   false?

6   A.    It would just show as an alarm if it was.

7   Q.    Right.  Right.  It doesn't show any -- there is no

8   warning that says, whoa, we have a false result; right?

9   A.    There is not.

10  Q.    The only way that you can have confirmation of the

11  false result is if, in fact, the items that have been

12  submitted could be tested by another machine; right?

13  A.    In theory, I would say yes.

14  Q.    A more sophisticated machine?

15  A.    Something that could analyze the exact makeup of what's

16  on there.

17  Q.    Right.  There are other machines that are much more

18  sophisticated than these; right?

19  A.    Sure.

20  Q.    Okay.

21  A.    The issue is when you run a sample you've exhausted

22  anything that's on that sample, so there is nothing left to

23  run.

24  Q.    Right.  So the only way you could really have a second

25  sample that you might be able to corroborate or vindicate to

1   show that it's a false result is if you take two samples in

2   the same general area, you preserve one for testing later,

3   and you test one on the ship; right?

4   A.    That could present the same problem.  Since it's trace

5   detection, you can't see it.  The second sample might not

6   gather anything.

7   Q.    Might not, but it might gather something; right?

8   A.    Possibility.

9   Q.    Would it be fair to say that there are others, for

10  example, toxicologists and physicists, who may be better able

11  to answer those questions?

12  A.    Sure.

13  Q.    Okay.  Presumably, you're not a physicist; right?

14  A.    I am not.

15  Q.    You're not a toxicologist?

16  A.    I am not.

17  Q.    You're not an electrical engineer; right?

18  A.    I'm not.

19  Q.    Okay.  Presumably, when these machines are made by this

20  manufacturer, Smith Detection, they have a team of experts

21  that are assisting them in making it.

22  A.    Presumably, I would say, yes.

23  Q.    Okay.  We would hope so; right?

24  A.    I would imagine so, to sell 10,000 instruments.

25  Q.    Okay.  And would it be fair to say that you have no

1   idea what type of experts or who might be part of the team

2   that created this machine?

3   A.    I do not know offhand.

4   Q.    You testified that a false negative is more likely than

5   a false positive.

6   A.    Yes, sir.

7   Q.    Again, this is information that you have as a result of

8   your training by the manufacturer; correct?

9   A.    Not necessarily.  This is some reading I've done from

10  other papers.

11  Q.    Okay.  So, again, you are talking about reading that

12  you've done.  Can you please cite any of these studies that

13  you've read that lead you to these conclusions?

14  A.    Offhand, no, I cannot, sir.

15  Q.    Not a single one; right?

16  A.    No, sir.

17          MR. BRUNVAND:  May I have a moment, Your Honor?

18          THE COURT:  Yes.

19  BY MR. BRUNVAND:

20  Q.    When you went through the results of that printout from

21  this machine -- right?

22  A.    Yes, sir.

23  Q.    -- there's indications of cocaine 2 percent, cocaine

24  7 percent, cocaine 8 percent.

25  A.    Yes, sir.

1  Q.     I believe you indicated it really doesn't matter --

2  A.     That's correct.

3  Q.     -- whether it's 1 percent or a hundred percent.

4  A.     Yes, sir.

5  Q.     Okay.  So it's just a fancy number that's put down?

6  A.     The relative strength, or bar FS is what the

7  manufacturer calls it, it's based on a maximum amplitude of

8  1,500.  That number is arbitrary.  It doesn't mean anything.

9  The percentage for an alarm threshold, the absolute bottom is

10  50.  So 50 would be a 1 percent, but still enough to alarm

11  for cocaine.

12  Q.     Could we agree that the item that we are looking --

13  that the machine is supposedly looking at is microscopic;

14  right?

15  A.     Yes.

16  Q.     Can't see it?

17  A.     It would be like looking in a sunbeam and seeing a

18  flake of dust or something like that.

19  Q.     Sure.  It's like those air cleaners that they advertise

20  where they zap the ions out of the sky, right, and help you

21  have a cleaner room?  They are microscopic.  You can't see

22  them.

23  A.     Yes, not detectable to the naked eye.

24  Q.     And so when it's 8 percent, does that mean it's 8

25  percent of that item that we cannot see?

1  A.    It means that an 8 percent would be somewhere around a

2  400 -- I have to do the math here for a second.

3  Q.    Well, a hundred percent is 1500?

4  A.    Yes, 1500.

5  Q.    So 50 percent would be what?

6  A.    Seven-fifty.  Six hundred would be 37 percent.  If I

7  have a scratch paper, I could give you the exact percentage

8  of what it would come out to.  But it's directly related to

9  -- so whatever your amplitude height is, it's directly in

10  relation to the strength of the alarm.

11  Q.    Understood.  And it's assuming that the ion that we are

12  looking at is included in this list of about a hundred items,

13  right, that are included in the lab library?

14  A.    Correct.

15  Q.    Okay.  Do you have any idea how many thousands or

16  millions or billions of ions exist?

17  A.    So to eliminate false alarms and the prevention of

18  other ions that exist in the universe from being detected,

19  the instrument uses something called a Dopin or a reactant

20  for the narcotics tube.  The Dopin is called nicotinamide,

21  which helps give an electrical charge to drugs and anything

22  else that does not receive an electrical charge.  So anything

23  that the instrument is reading is going to be a drug or

24  reactant.

25            Whereas, the same is true for the explosives tube

1   where it uses a Dopin called hexachloroethane, which bonds

2   with the explosives to give the reading.  Everything else

3   that doesn't receive a charge is washed out through an

4   exhaust flow or the drift air or receives an opposite charge

5   and it's immediately drawn to a side of the instrument, which

6   it loses its charge and is exhausted out of the intake.

7   Q.    Did you misunderstand my question?

8   A.    Can you repeat it, then, sir?

9   Q.    You have a list of a library of about a hundred ions;

10  correct?

11  A.    Correct.

12  Q.    Do you have any idea how many hundreds or thousands or

13  hundreds of thousands or millions of ions exist in our

14  universe?

15  A.    Lots.

16  Q.    Okay.  Does that mean you don't know or you do know?

17  A.    I know that there is more than a hundred ions that

18  exist in the universe.

19  Q.    My question is, do you know how many?

20  A.    I do not.

21  Q.    Do you know if it's in the millions?

22  A.    I do not.

23          MR. BRUNVAND:  That's all that I have, Your Honor.

24  Thank you.

25          THE COURT:  Mr. Amador?

1          MR. AMADOR:  No questions.

2          THE COURT:  Mr. Dee?

3          MR. DEE:  Very briefly, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. DEE:

6    Q.    Chief, you testified that -- I believe your words were

7    a wet sample could slow down the process or slow it down.

8    Can you explain that to me?

9    A.    There are three items that could slow down or speed up,

10   for that matter, the drift time.  Humidity greater than

11   95 percent or a possible wet sample would release the water

12   molecule, which would bond with the reactant and possibly

13   bond with the drug that was on the swab.

14            Pressure is another one.  A sudden drop in air

15   pressure or a quick increase in air pressure would either

16   slow down or speed up the drift time.  And then heat, sudden

17   increase in heat would make it faster and a decrease in heat

18   would make it slower.

19   Q.    Prior to swabbing someone's hands they had fallen into

20   the ocean, could that possibly affect the outcome?

21   A.    I don't know offhand who did the swabs, how they were

22   taken.  I wasn't there.  However, the operators are trained

23   not to submit wet samples.

24   Q.    So if someone fell into the ocean, then the operator

25   would probably hand them a towel or something to dry off

1  before they take the sample?

2  A.    Again, I wasn't there.  I don't know what they did for

3  that.

4  Q.    Okay.  Now, you also talked about -- I think you said

5  touch it, have it, or something, was the term you used as far

6  as the actual element that would be found, where the

7  ingredient that would be found in the swab?

8  A.    Can you rephrase that?  I'm sorry.

9  Q.    I'll show you.  I have, if you touch it, it will

10 transfer to it.

11 A.    Correct.

12 Q.    Can you explain -- does that mean, if there is

13 something on this podium and I'm standing here talking to you

14 like this and I turn around and walk away, it's possible I

15 have that on my hand?

16 A.    Possibility.  Another way to think about it is, if

17 somebody sneezes into their hand and then they touch a door

18 and someone comes along and touches that door, they can get

19 sick later on, but it's transferred because it's trace.

20 Q.    It's possible that someone whose hand tested positive

21 for cocaine could have touched something else that the

22 cocaine was on?

23 A.    It's possible, yes.

24        MR. DEE:  No other questions, Your Honor.  Thank

25 you.

1          THE COURT:  Mr. DeRenzo, redirect?

2          MR. DERENZO:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. DERENZO:

5    Q.    Senior Chief, how long has the Coast Guard been using

6    the 500DT, the current model?

7    A.    The 500DT was manufactured in 2005.  They have been

8    using it since, as far as I know, 2009.

9    Q.    And you were asked about articles you might have

10   researched prior to your testimony here today.  Is there

11   anything that might refresh your recollection regarding --

12   A.    Yes, sir.  I did print out some articles, and I do have

13   them here with me.

14          MR. DERENZO:  May I approach the witness,

15   Your Honor?

16          THE COURT:  You may.

17          MR. BRUNVAND:  Your Honor, may we approach?

18          (The following was held at sidebar:)

19          MR. BRUNVAND:  When he testified the other day, he

20   supplied some notes with an uncited article.  He just

21   testified that he can't supply us with any articles or any

22   cites to any articles, and it appears now that the

23   prosecutor --

24          THE COURT:  No, that's not what he said.  He said,

25   not offhand.  He said -- you asked him if he could cite any

1  articles, and he said, not offhand.

2          MR. BRUNVAND:  He could have said, I can't

3  remember.  I have them here in the courtroom.  But now we are

4  not going to have an opportunity to requestion him about

5  these articles.

6          THE COURT:  Let me see what you are going to ask

7  him.  What are you going to use the articles to refresh his

8  recollection about?

9          MR. DERENZO:  That's it, Judge, just to ask him on

10  the question that Mr. Brunvand asked about do you know, and

11  he said, not off the top of my head.  I was going to give him

12  an opportunity to cite some articles he reviewed with respect

13  to the reliability of the instrument.

14          MR. BAEZA:  Also, the question that Mr. Brunvand

15  asked was a question about false negatives, if I recall

16  correctly.  He was talking about the citation of articles

17  about false negatives.  The articles that are going to be

18  referenced here are broader than that.

19          THE COURT:  Okay.  I'm not sure I understand what

20  you are saying.

21          MR. DERENZO:  Reliability.  And I think you asked

22  him about false positives as well.  I was just going to allow

23  him to explain his answer with respect to his inability to

24  recall the specifics of the articles off the top of his head.

25          THE COURT:  He didn't recall the specifics.  He

1  didn't recall the articles, period.

2          MR. DERENZO:  Manual, article, et cetera.  I'm not

3  going to ask him to read from it.  I'm going to ask if this

4  refreshes your recollection.

5          THE COURT:  All right.

6          MR. BRUNVAND:  If that's allowed, I'm asking to

7  either be allowed to recross or I'm going to ask that he

8  remain so that we can recall him.

9          THE COURT:  Well, it just depends on what he asks

10  him.  If you ask the question about any articles off the top

11  of his head, he said no; if you ask him, is there something

12  to refresh your recollection about any articles and he says

13  yes, then you can ask him if that refreshes his recollection.

14  If it doesn't, it doesn't.  If it does, it does.  Rather than

15  asking him about content.  That's a whole different story.

16          (Sidebar ended.)

17          MR. DERENZO:  May I proceed, Your Honor?

18          THE COURT:  You may.

19          MR. DERENZO:  May I approach the witness?

20          THE COURT:  Well, I'm sorry, I'm not sure where we

21  left it.  Why don't you start again with your questioning.

22  BY MR. DERENZO:

23  Q.   Okay.  I think my last question was, you were asked on

24  cross-examination about some articles that you might have

25  reviewed prior to your testimony here this morning, and I

1  believe your response was, I can't remember off the top of my

2  head.

3  A.    Correct.  Off the top of my head, I cannot remember the

4  title or author of those articles.

5  Q.    Is there anything that would refresh your recollection?

6  A.    Yes.  I did print out those articles and bring them

7  with me.

8          MR. DERENZO:  May I approach the witness,

9  Your Honor?

10          THE COURT:  You may.

11          MR. BRUNVAND:  Your Honor, can we see whatever it

12  is he's going to show the witness?

13          THE COURT:  To refresh his recollection, sure.

14          (*Documents tendered.*)

15  BY MR. DERENZO:

16  Q.    If you would, Senior Chief, take your time and review

17  whatever you need to review, and then just put them face down

18  and look up at me when you are done.

19  A.    Okay.

20  Q.    Senior Chief, has reviewing those documents refreshed

21  your recollection about the articles that Mr. Brunvand asked

22  you about?

23  A.    Yes, sir.

24  Q.    And what are the articles that he specifically asked

25  you?

1  A.    This is an article written by FIU, "Field Detection

2  Using INS Technology For Drugs and Narcotics."

3         THE COURT:  I'm sorry, we are not understanding

4  the acronym, FIU meaning?

5         THE WITNESS:  Florida International University.

6         THE COURT:  Thank you.

7  BY MR. DERENZO:

8  Q.    Any others?

9  A.    I had some excerpts from the technical manual, and then

10 there is an NCBI article that covers the uses in the medical

11 field, as well as different future uses for the ion-mobility

12 spectrometer.

13 Q.    Do you know what NCBI stands for?

14 A.    National Center for Biochemistry Institute, I believe.

15 Q.    Okay.  You testified earlier you are in the Coast

16 Guard.  How long have you been in the Coast Guard?

17 A.    Almost 14 years, sir.

18 Q.    Have you ever worked for Smith Detection?

19 A.    Worked with them?

20 Q.    Worked for them.

21 A.    I have not.

22 Q.    Do you make any money by testifying here today from

23 Smith?

24 A.    I do not.

25 Q.    Have you ever been paid by them for anything?

1   A.     I have not.

2   Q.     Mr. Brunvand was asking you about the multitude, I'm

3   sure, of ions that are present on planet Earth.  What

4   specifically is the IONSCAN instrument designed to look for?

5   A.     The IONSCAN 500DT is optimized to look for narcotics

6   and explosives.

7   Q.     So, for example, is it designed to look for anything

8   else on planet Earth other than those two things?

9   A.     INS technology can be designed to look for anything.

10  The particular instrument that we use is only designed to

11  look for narcotics and explosives.

12  Q.     Why is that?

13  A.     Because that's what we expect to find with it.

14  Q.     And other than the Coast Guard, who else uses this

15  instrument?

16  A.     TSA uses it daily at airports to screen for explosives.

17  Ports of entry, so your land borders and sea borders use it

18  to screen cargo, use it to screen people entering into the

19  United States.

20  Q.     Okay.  You mentioned on cross-examination you're not a

21  chemist or a scientist of any kind.

22  A.     That's correct.

23  Q.     And you didn't learn everything that you talked about

24  today when you became a maritime enforcement specialist;

25  right?

1   A.     I have not.

2   Q.     Have you done throughout your number of years working

3   with the IONSCAN instrument your own research on this

4   technology?

5   A.     I have.

6   Q.     Okay.  And based on not only your training from Smiths

7   and your independent research, do you know how to interpret

8   the results that come out of the instrument?

9   A.     I do.

10  Q.     Based on your examination of the particular instrument

11  used in this case, was it working properly on December 1st,

12  2018?

13  A.     It was.

14  Q.     Mr. Brunvand was asking you about the library or the

15  list of items that you can look for in the instrument.  In

16  general terms, how is that library created?

17  A.     The library is created -- it's based on extensive

18  testing to discover what the reduced mobility of that ion

19  specifically is.  It's a constant, so once the mobility is

20  discovered, it's put into an equation to solve for that

21  specific ion.  It's definitely done -- I don't have the

22  ability to do that.  It's done at the factory or the depot.

23  Q.     What kinds of people are involved in that analysis?

24  A.     Again, I testified I don't know who exactly works

25  there, but I would assume chemists, physicists.  Anyone that

1  would be involved in that.

2  Q.    And what setting are we talking about?  In a factory

3  where it's built, or is this in the field, or where is this

4  done?

5  A.    This would be in a laboratory setting.

6  Q.    And, again, are you able -- was the Coast Guard able

7  to -- you or any one of the operators able to actually

8  authorize or to actually change that information in the

9  instrument?

10  A.    We are not.  And we wouldn't even know what to change

11  it to.

12  Q.    You were asked, I think, by Mr. Dee about the impact of

13  water on an IONSCAN analysis.

14  A.    Yes, sir.

15  Q.    If the swab is wet, are you more likely to get a false

16  negative or a false positive for cocaine?

17  A.    Most likely a false negative.

18  Q.    Why is that?

19  A.    Because the water molecule slows down the drift time of

20  the cocaine molecule, pushing it outside the detection

21  window.

22        MR. DERENZO:  Again, can we bring up Exhibit 7A.

23  And if you could, zoom to the bottom right.

24  BY MR. DERENZO:

25  Q.    Right here we are looking at page 1 of Exhibit 7A, the

1    results, labeled location center hold.  If you are talking

2    about drift time being off, what would you expect to see if

3    there was a problem with it being wet?

4    A.    If the drift time was upwards of above 30 to 50, I

5    would say that I might question the sample.

6    Q.    But in which column would you expect to see that?  Is

7    that the delta?

8    A.    That's the delta column.

9    Q.    So if that happened, would you likely see that red

10   screen or would it still run green?

11   A.    If it still fell within the parameters of the plus or

12   minus 50 delta, you would still get an alarm screen.

13   Q.    If it was above 50?

14   A.    If it was above 50, it would fall outside the detection

15   window.

16   Q.    On this particular result, what is the delta?

17   A.    The delta is negative 2, which is 2 microseconds off of

18   perfect.

19   Q.    Mr. Brunvand was asking you about some Google searches

20   you apparently hadn't done.  I think I have one more

21   question.

22          In your professional opinion, based on all of the

23   training you've received, your experience with the machine,

24   what is the likelihood of having nine false positives all

25   from one vessel and one crew?

1  A.    It's not likely at all.  It's not possible.

2           MR. DERENZO:  No further questions, Your Honor.

3  Thank you.

4           THE COURT:  All right.  You may step down, sir.

5  Thank you.

6           THE WITNESS:  Thank you, Your Honor.

7           (The witness exits the courtroom.)

8           THE COURT:  You may call your next witness.

9           MR. DERENZO:  The United States calls Special

10 Agent Steven Ray, Coast Guard Investigative Service.

11          THE COURT:  Sir, if you will, come forward to be

12 sworn.

13          THE COURTROOM DEPUTY:  Please raise your right

14 hand.

15          Do you solemnly swear or affirm under penalty of

16 perjury that the testimony you shall give in this cause will

17 be the truth, the whole truth, and nothing but the truth?

18          THE WITNESS:  I do.

19          THE COURTROOM DEPUTY:  Please have a seat in the

20 witness box.  State your name for the record and spell your

21 last name.

22          THE WITNESS:  Steven Ray, R-a-y.

23          THE COURT:  Mr. Baeza.

24          MR. BAEZA:  Yes, Your Honor.

25 ///

```
 1                          STEVEN RAY,

 2    having been first duly sworn by the Courtroom Deputy,

 3    testified as follows:

 4                     DIRECT EXAMINATION

 5    BY MR. BAEZA:

 6    Q.    Good morning, sir.

 7    A.    Good morning, sir.

 8    Q.    Would you kindly tell the jury who you work for.

 9    A.    I am a special agent with the Coast Guard Investigative

10    Service, assigned to Operation Panama Express.

11    Q.    How long have you been a special agent with the Coast

12    Guard Investigative Service?

13    A.    Since 2008.

14    Q.    Is that the entirety of your law enforcement experience?

15    A.    It is not.

16    Q.    Would you tell the jury the entirety of your law

17    enforcement experience.

18    A.    Yes.  I graduated from the United States Military

19    Academy in 1995 and was commissioned as a military police

20    officer.  From 1995 to 2000 I served at Fort Stewart Hunter

21    Army Airfield in Georgia at the provost marshal office, which

22    is the military version of the police.

23              I did deployments to Bosnia and Herzegovina, as

24    well as into Kuwait at Camp Doha, provost marshal.  In 2000,

25    I left the Army active duty and became a special agent with
```

1   the Drug Enforcement Agency.  I served there in Seattle and

2   in Yuma, Arizona.

3           In addition, I joined the Coast Guard Reserves in

4   2003, where I initially served as a diver, but then in 2006 I

5   became a reserve special agent with the Coast Guard

6   Investigative Service.  When I became a full-time civilian, I

7   became a maritime law enforcement specialist with the Coast

8   Guard.  I served in Sector San Diego, the Tactical Law

9   Enforcement Team South, Sector St. Petersburg, and then I

10  finally retired out of the Coast Guard Reserves at Station

11  St. Petersburg in 2016.

12  Q.    Thank you for your service, sir.

13          So we are on year 25, 24?

14  A.    It's 24 years, as federal law enforcement; 19 as a

15  special agent.

16  Q.    We are going to get into the Panama Express Strike

17  Force in a moment, but you said at the start of your time

18  with the Coast Guard you were a diver and you were involved

19  in maritime law enforcement as well.

20          Will you expound on those, please.

21  A.    I came into the Coast Guard in 2003.  I was at -- it's

22  called the Maritime Security Team in Seattle, Washington.  I

23  missed 9/11/01.  They conducted maritime law enforcement.

24  One of the aspects of it was with diving.  They would conduct

25  sweeps of the piers and ensure that boats would be fine.  We

1  would go recover weapons.  I had training in improvised

2  explosives for in the water in the maritime environment.

3          So when I transferred with the DEA from Seattle to

4  Yuma, Arizona, I transferred to the Coast Guard to

5  Los Angeles/Long Beach, where I dove on the Queen Mary II

6  when it came into harbor to make sure it was free of any

7  improvised munitions, along with Adelaide Police.

8          At one point I became a special agent with CGIS

9  where I was doing law enforcement.  Then from there, when I

10  became a civilian, they wouldn't allow me to be a civilian

11  and a reservist, so that's when I became a maritime law

12  enforcement specialist with the Coast Guard, where I would

13  conduct boardings on boats and enforce federal laws on boats.

14  Q.    I just need to backtrack a little bit.

15          At the government, we love acronyms.  CGIS, Coast

16  Guard Investigative Service?

17  A.    Yes, sir.

18  Q.    At anytime during your experience with the Coast Guard,

19  have you ever served on a law enforcement detachment during a

20  cocaine interdiction?

21  A.    Yes, I have.

22  Q.    Will you describe that for the jury, please.

23  A.    I was working with TACLET South, Tactical Law

24  Enforcement Team South, down in Miami, and I did a deployment

25  on the first Canadian ship that came in.  It was the first

1    time that Canada actually brought in ships and we would

2    deploy on that.  I participated in one of those.

3    Q.    So you are now with the Panama Express Strike Force as

4    a special agent with the Coast Guard Investigative Service.

5    How long have you been doing that?

6    A.    Since 2011.

7    Q.    Would you describe your duties and responsibilities as

8    a special agent, in general, and then we will talk about

9    Panama Express.

10   A.    Absolutely.  As a special agent, in general, for the

11   Coast Guard, what we do is we investigate crimes in the

12   maritime environment.  If you think of the regular Coast

13   Guard as like a uniform police, CGIS, C-G-I-S, would be the

14   detective.  So we would enforce any of the laws that reach a

15   felony level, anything that the Coast Guard enforces.  Then,

16   specifically, what I do at Panama Express is I enforce

17   maritime narcotics smuggling coming out of South America into

18   Central America and the Caribbean.

19   Q.    Big picture, what is the Panama Express Strike Force?

20   A.    It is a national strike force that is designed to

21   dismantle and disrupt transnational criminal organizations

22   that utilize the maritime environment in the Eastern Pacific

23   and in the Caribbean.

24         Basically, what we do is any vessel on or below

25   the water that leaves South America, going either into the

1  Eastern Pacific or into the Caribbean, into Central America

2  or the Caribbean Islands, we target to arrest and detain the

3  mariners who do it.

4          From there, what we will do is find out who the

5  recruiters and dispatchers are.  Using our host country

6  companions in Colombia, we'll indict them, arrest them,

7  extradite them to the United States.  From there we will

8  learn who the actual owners of the cocaine are and,

9  basically, do the same process after indicting them and

10  arresting them.  That's basically taking out an entire drug

11  trafficking network from the base -- from the bottom

12  mariners, financiers, to the head people who own it.

13  Q.   You used two terms.  Disrupt and dismantle.  What you

14  are referring to with extraditions working with foreign

15  countries, you would agree that's referred to as a

16  dismantling in your training and experience?

17  A.   Yes, it is.

18  Q.   You also refer to a disruption.  What is a disruption?

19  A.   A disruption is, if you take out an element of an

20  organization -- and if you look at a criminal organization,

21  you have a head member, and if you take some of the parts out

22  of it and arrest them, well, they are still going to function.

23          They will assign a new lieutenant.  They will have

24  someone else.  You've disrupted their abilities to function

25  in the short term, but they are still able to continue

1    operating.  So you've disrupted them a little bit.  The whole

2    goal is to arrest them and take out the whole organization,

3    and that's a complete dismantlement.

4    Q.    How would you define an interdiction of a vessel in

5    international waters, disruption or dismantle?

6    A.    It's a disruption.

7    Q.    We spoke about the objectives of the Panama Express

8    Strike Force, and let's talk about areas of responsibility.

9           Where does the Panama Express Strike Force operate?

10   A.    There is a Panama Express North and Panama Express

11   South.  The reason was when it first was created, one was up

12   in Clearwater and one was in Sarasota, so it was literally

13   north and south.  But Panama Express North targets the

14   Caribbean.  So the Caribbean ocean, Atlantic side, the Panama

15   Express South does the Eastern Pacific.

16   Q.    What's your area of responsibility with Panama Express?

17   A.    I started my first five years at Panama Express North

18   and the last four I've been with Panama Express South.

19   Q.    You just answered the question of why is an

20   interdiction south of Jamaica here in the Middle District of

21   Florida.  What federal district is the Panama Express Strike

22   Force located?

23   A.    We are located here in Clearwater, which is the Middle

24   District of Florida.

25   Q.    All right.  How is the Panama Express Strike Force

1  composed?

2  A.    We have agents from the Federal Bureau of

3  Investigation, the Drug Enforcement Agency, and Homeland

4  Security investigations, as well as the Coast Guard

5  Investigative Service.  We work in conjunction with each

6  other to maximize their ability.

7          Our laws, we have to go and disrupt and dismantle,

8  like I stated, these criminal organizations operating on the

9  water, you have different agencies, different funding

10 sources, as well as their different databases.

11         We are unique in the fact that as a strike force,

12 we actually get along well and we cooperate among each other.

13 One of the additional duties that I have as being a Coast

14 Guard Investigative Service is I liaison between the Coast

15 Guard uniformed and our law enforcement partners.  So I do a

16 lot of logistics with the drugs and detainees, working with

17 them, so if a case comes through, we will coordinate the

18 movement of the detainees and drugs coming into Guatemala,

19 Guatemala flying into the Middle District of Florida for

20 prosecution.

21 Q.    In the course of your time with the Panama Express

22 Strike Force, approximately how many cases have you been

23 involved in within any capacity there?

24 A.    I've been either a lead or co-case on about 70, but

25 probably involved in over 500 cases overall where I have

1  knowledge about who is doing what, the type of vessels, the

2  detainees, the amount of cocaine and having an operational

3  knowledge based on my interactions with the Coast Guard and

4  my federal fellow agencies.

5  Q.     And that includes this case; correct?

6  A.     That does.

7  Q.     Approximately how many maritime interdictions have you

8  been involved in?  We are talking about cases.  So I just

9  want to make clear here, the entirety of those cases that

10 you've been dealing with, are those maritime interdictions?

11 A.     Yes.  All of them.

12 Q.     Are you familiar with common cocaine smuggling routes

13 utilized in the Caribbean Sea?

14 A.     Yes, I am.

15 Q.     Are you familiar with common smuggling tactics utilized

16 in the Caribbean Sea?

17 A.     Yes, I am.

18 Q.     Are you familiar with the appearance of cocaine?

19 A.     Yes, I am.

20 Q.     Are you familiar with the packaging and preparation of

21 cocaine for distribution?

22 A.     Yes, I am.

23 Q.     Are you familiar with the packaging of cocaine for

24 distribution in international waters?

25 A.     Yes, I am.

1  Q.    Are you familiar with common surveillance and

2  counter-surveillance techniques utilized by drug traffickers

3  in the Caribbean Sea?

4  A.    Yes, I am.

5  Q.    Are you familiar with common attempts to evade law

6  enforcement by drug traffickers in the Caribbean Sea?

7  A.    Yes, I am.

8  Q.    Let's talk about cocaine.  First of all,

9  synthetic/organic drugs, which one is cocaine?

10 A.    Cocaine is an organic.  It's made from the coca plant,

11 which is grown in the mountains of the Andes.  What happens

12 is they will gather the plant -- actually, for thousands of

13 years people have used the coca leaves.  If you go there, the

14 indigenous people use it in teas as well as to chew on it.

15         They will gather these coca leaves.  They will,

16 basically, use types of solvents.  And it's kind of like --

17 if you've ever seen people making wine, when they stomp on

18 the grapes, they will use powerful solvents.  Unfortunately,

19 people's feet tend to get chewed up, but they convert it from

20 the plant to cocaine paste -- this happens, typically, deep

21 in the jungle -- to another lab where they will convert it

22 from a cocaine paste into a cocaine hydrochloride, which your

23 table salt is sodium chloride, so it goes from the paste into

24 a powder form.

25         In that powdered form, they will convert it into

1    these little brick-size things, typically a kilo size.  A lot

2    of times they will put an individual stamp on during the

3    pressing of it, and that's kind of like a logo for marketing.

4    Ferrari, Pokémon.  It really depends on what the latest fad

5    is where it's going to be sold at.  It's kind of the moniker

6    about, hey, this cocaine was packaged here because I'm the

7    owner further selling it, and it's kind of a branding.

8    Q.    You said a brick of cocaine is approximately

9    1 kilogram; right?

10   A.    Correct.

11   Q.    Converting that from the metric system, that's about

12   2.2 pounds?

13   A.    Yes, 2.2 pounds.

14   Q.    When you talk about the brick, what is the actual

15   process in packaging the cocaine in that brick shape?

16   A.    So what happens is they will manufacture, basically,

17   this powder-type form and then they have a machine that kind

18   of, like, vacuum seals it and sucks it together.  As soon as

19   they seal it, they will wrap it up in plastic.  From

20   there they take a rubberized plastic and seal that, and then

21   they will put tape around it, and then they will put wrapping

22   tape around it.  What it does is that one brick of kilo is

23   now packaged and protected from the environment.

24          Cocaine is a powder.  In kilo form it's hard, but

25   it's susceptible to dissolving in water.  So they will,

1   basically, waterproof it through this taping of it and

2   putting a rubber membrane around it and then further taping

3   it up.

4   Q.   So multiple layers of cover on a brick of cocaine?

5   A.   Correct.

6   Q.   Are you familiar with what is generally done with

7   cocaine after it leaves a cocaine laboratory and then is

8   transported for distribution in the Caribbean Sea?

9   A.   Yes, I am.

10  Q.   Would you explain that, please.

11  A.   What happens is the cocaine will go from this lab and

12  it will move in bulk to a -- in the Caribbean or in the

13  Pacific, it will move through the jungle to a launch point

14  where it will get gathered up, so that way it can get put on

15  a maritime vessel.  So it's put in bulk and moved there

16  because, ideally, it's easier to move things in bulk from the

17  source than it is further down the line.

18           So they will package up these individual bricks,

19  and then they will put them into a bale.  A bale will be

20  between 20 -- typically between 20 and 40 kilograms.  So you

21  will have this 10-kilogram stack, another 10-kilogram stack,

22  and what they will do is they will wrap that again in more

23  plastic, another type of rubber protective coat, and they

24  typically cover it with a plastic type of burlap and have two

25  handles on the side and, therefore, it's easier to transport.

1          If it's 20 kilos, that's 44 pounds, to about 40,

2    which is 88.  If you get heavier than that, the problem is it

3    takes more people to move it, as well as it's kind of

4    symmetrical and in bulk shape.

5    Q.    What are the -- for the lowest-size bales, what are the

6    dimensions of those approximately?

7    A.    You are talking maybe about 3 feet by 2 feet by maybe a

8    foot-and-a-half.

9    Q.    Okay.  And have you had any experience in handling

10   these kinds of bales?

11   A.    Yes, I have.

12   Q.    Ballpark estimate, how many?

13   A.    Well, last year, for example, PanEx itself was

14   responsible for the seizure of approximately 70 tons.  Out of

15   those 70 tons, I probably processed about 50 of them.  Over

16   the course of eight years, let's say 400 tons of cocaine.

17          That's 400,000 kilos of cocaine that I've opened

18   up bales, because when we count them, what we do is open all

19   the bales, we will strip them out and count individual

20   bricks, and then we will put that in and then send it off to

21   DEA lab for processing and storage.

22   Q.    So approximately 400,000 kilograms of cocaine you have

23   personally had experience in handling while a Coast Guard

24   Investigative Service special agent in the PanEx Strike

25   Force?

1   A.     Yes, sir.

2   Q.     Approximately 20 kilograms per bale, 400,000.  Let's do

3   the math.  That's approximately 20,000 bales you've handled?

4   A.     Yes, sir.  A lot.

5   Q.     How do you handle these bales?  How do you carry them?

6   A.     Carry them by the strap.  And typically what we will do

7   for processing is we will get them from the Coast Guard, they

8   will put them on pallets, put them in a truck, from the truck

9   we take them.  You grab them by the handles.  You throw them

10  out, stack them up, photograph it, and you go through and

11  start slicing them open, take a photograph of the total

12  amount of bricks, and you start putting them in boxes so that

13  way you can count them.

14  Q.     In those 20,000 occasions where you are carrying a bale

15  of cocaine by the handle -- approximately 20,000, have they

16  ever come into contact with your forearms?

17  A.     Yes.

18  Q.     In your training and experience, are you familiar with

19  the price of a kilogram of cocaine?

20  A.     Yes, I am.

21  Q.     Would you describe for the jury, what is the price of a

22  kilogram of cocaine?

23  A.     Sure.  In Colombia, in the jungle, the price is going

24  to be about a thousand dollars a kilo.  As you get to the

25  coast, it goes up to 4,000.  As it gets transported going

1   north, if you are talking about Honduras and Central America,

2   it's worth about 10,000.  The cost of cocaine in Tampa is

3   about 30,000.

4           Realize, when I'm talking about the cost, this is

5   the Costco version of cocaine.  You are talking the bulk.

6   This cocaine is sold at the kilo level, and individual use of

7   cocaine is approximately a gram.  If you guys are -- if

8   anyone is drinking coffee or tea and you get those little

9   packets of sugar, Stevia or Sweet 'N Low, that's

10  approximately 1 gram.

11          The cocaine that we are seizing on the high seas

12  is about 95, 99 percent pure.  When it's sold here in the

13  United States, it's called stepped on.  What they do is,

14  basically, cut it.  It's kind of like if you are cooking and

15  you do one drop of vinegar, one tablespoon of vinegar and

16  three cups of water to mix it up to dilute it, they do the

17  same thing with the cocaine.

18          The cocaine purity on the street here in Tampa,

19  for example, is closer to 20 percent to 25 percent.  So it

20  gets stepped on four to five times.  But for us, what we do,

21  because we are doing bulk and it's pure, we use an average of

22  $30,000.

23  Q.   So in your training and experience, putting aside the

24  wholesale value of a brick of cocaine, after it's stepped on,

25  as you say, that kilogram of cocaine/hydrochloride would be a

1  value in excess of $30,000?

2  A.    Absolutely.

3  Q.    By several factors; right?

4  A.    Correct.  They will sell it at the gram dosage of

5  between 50- and a hundred dollars.  So even if you are going

6  to be conservative, 1 gram, $50.  A thousand grams, that

7  would be $50,000.  But now you've made it five times because

8  you stepped on it five times.  Now your price is up to

9  250,000.

10         But like I can said, some people sell it at the

11  ounce.  If you sell it at the ounce, now you are going to get

12  a discount because it's the higher cut rate.  When we talk

13  about kilos of coke, it's the Costco packaging.  Think about

14  it that way.  We are dealing at the high-level retailer pure,

15  not the street-level end user.

16  Q.    So you've been around this substance for a while.  Have

17  you ever had an opportunity to smell it?

18  A.    Yes, I have.

19  Q.    Would you describe the smell of cocaine for the jury,

20  please.

21  A.    It smells like cocaine.  Sorry.  It's a very distinct

22  smell.  I've been a DEA agent.  I've smelled methamphetamine,

23  heroin, cocaine, marijuana.  They have distinct smells.  I

24  would say it's a bit of a solvent smell.  It smells like

25  cocaine.  It's like how does a roast smell.  A roast smells

1  like a roast.  I know what cocaine smells like.

2  Q.    But you would describe it as a chemical smell that has

3  a distinct quality to it?

4  A.    Correct, based on the manufacturing of it with the

5  different solvents that it has.

6  Q.    You've been detailed at sea with the Coast Guard.

7  You've had experiences as a diver.  Have you ever in your

8  experience confused the smell of cocaine with the smell of

9  fish?

10  A.    Never.

11  Q.    What about conch?

12  A.    Never.

13  Q.    Let's talk about Colombia as a distributor of cocaine.

14  Are you familiar with that in your training and experience?

15  A.    Yes, I am.

16  Q.    In the course of your duties as a special agent in the

17  PanEx -- Panama Express Strike Force, have you had occasion

18  to travel to Colombia?

19  A.    Yes, I have.

20  Q.    Any other Central American countries or South American?

21  A.    I've been to Honduras, Guatemala, Costa Rica, Dominican

22  Republic, Puerto Rico, Panama.

23  Q.    That's not a country but --

24  A.    Panama.  Mexico.

25  Q.    Are you familiar with the chief narcotic exports in the

1    Republic of Colombia?

2    A.    Yes, I am.

3    Q.    How many are there?

4    A.    Primarily cocaine.   There is heroin and there is

5    marijuana, but marijuana is almost grown everywhere.   But

6    they still will move it.

7    Q.    Okay.   Are you familiar with which countries are the

8    primary exporters of marijuana and heroin in Central and

9    South America?

10   A.    Yes.

11   Q.    Which country is that?

12   A.    It's Mexico.

13   Q.    Are you familiar with the appearances of bales of

14   marijuana?

15   A.    Yes, I am.

16   Q.    Would you describe a bale of marijuana for the jury,

17   please.

18   A.    A bale of marijuana is going to be larger than a bale

19   of cocaine.   It's normally around about 80 to a hundred

20   pounds.   It will be wrapped in much more of the plastic

21   wrapping.   Marijuana is compressed, so they make it into

22   these, basically, squares and it's compressed, wrapped up.

23          When I was in San Diego there was an operation I

24   did where we seized approximately 40,000 pounds of marijuana

25   in the maritime area.

1  Q.    In your training and experience, have you ever confused

2  marijuana with cocaine?

3  A.    I have not.  The density is a lot different because

4  marijuana is -- even though it's packed tightly, it is not

5  nearly packed as tightly as cocaine.  It's a powder that's

6  pressed.  Marijuana is a plant, and even though it's pressed

7  it is a lot less dense than cocaine.

8  Q.    How do you compare the dimensions of a bale of

9  marijuana to cocaine?

10 A.    Cocaine, like I said, is much more rectangular, where

11 marijuana is more square and a lot larger.  Because even with

12 the same weight, it's like comparing feathers to lead.

13 That's an extreme, but one pound of feathers is going to be a

14 lot bigger than one pound of lead based on the density of

15 what it is.

16 Q.    And in your training and experience, how often do you

17 encounter heroin in international waters?

18 A.    I haven't encountered it on the water.  I have heard

19 there's been some intermixed at small levels, but I have not

20 personally encountered it.

21 Q.    Let's talk about the triad of methods of exporting

22 cocaine from Colombia.  What are the three main conveyances?

23 A.    Well, there are more than three.  You'll have go-fast

24 boats, you'll have fishing vessels, you'll have commercial

25 containerized vessels, you'll have sailing boats, you'll have

1  semi-submersibles, self-propelled semi-submersibles.  In that

2  category you also have what are called low-profile go-fast

3  vessels, which they are barely above the waterline so they

4  are harder to see.

5            In the jungles -- we have never caught one on the

6  water, but in the jungles they have caught fully submersible

7  submarines.

8  Q.    Let me qualify my question.  You are referring to

9  maritime conveyances; right?

10  A.    Correct.

11  Q.    Are there any other general conveyances of cocaine

12  absent maritime?

13  A.    Yes.  Aircraft.

14  Q.    Anything else?

15  A.    Over land.

16  Q.    So land, sea, and air?

17  A.    And air.

18  Q.    What is the primary conveyance of cocaine based on your

19  training and experience?

20  A.    It's maritime.

21  Q.    After cocaine reaches a destination, are you familiar

22  with land-based smuggling routes of cocaine?

23  A.    No.

24  Q.    Are you familiar, in general terms, with the intended

25  destination of cocaine in Central America?

1    A.    Yes.

2    Q.    Would you explain that answer, please.

3    A.    Basically, once it comes on the land, it will then be

4    transported via different routes and on different vehicles

5    into Mexico.  From Mexico through pretty much the land border

6    of the United States and then brought into the United States

7    that way.

8    Q.    So you spoke about maritime routes and you referred to

9    fishing vessels, freighters, go-fast vessels, low-profile

10   vessels, submarines, and semi-submarines; right?

11   A.    And sailboats.

12   Q.    Sailboats.  Are you familiar with the vessel that was

13   involved in this case?

14   A.    Yes, I am.

15   Q.    How would you describe that vessel?

16   A.    As a go-fast vessel.

17   Q.    Are you familiar with common smuggling routes utilized

18   by go-fast vessels in the Caribbean Sea?

19   A.    I am.

20   Q.    Would you describe the extent of your familiarity based

21   on the amount of case -- actually, let me rephrase that

22   question.

23         Are you familiar with the -- you said you were

24   familiar with the common smuggling routes in the Caribbean

25   utilized by go-fast vessels.  Approximately how many main

1  conveyances are there?

2  A.    Main routes or main conveyances?

3  Q.    My apologies.  Main routes.

4  A.    Four.

5  Q.    Would you describe those routes, please.

6  A.    Sure.  The first route is called the Hyperlitoril

7  route.  What it does is you'll have a boat that will

8  basically weave in and out of -- at 12 nautical miles is

9  where countries' international waters end, and what they will

10 do is hug between 10 and 14 miles, hugging the coast, trying

11 to mix in with local fishing traffic.

12        And if for some reason they are detected, they

13 will try to run into a country's water, because as you go up

14 the coast from Colombia to Panama, Nicaragua, Honduras, there

15 are different areas where they can go in.

16        The second route is commonly referred to as kind

17 of like the Honduran Rise, which basically leaves from the

18 corner of Venezuela and Colombia.  It goes up north, and as

19 it gets close to Honduras it makes -- they will head straight

20 west and then they will put landings in Nicaragua, Honduras,

21 Belize, Guatemala, that area.

22        Third route, they will basically go straight up

23 from Colombia, heading toward outside of Hispaniola, Haiti,

24 Dominican Republic, at which point they can either go to

25 Haiti, Dominican Republic, or Puerto Rico.

1              The last route is they basically follow the Lesser

2    Antilles.  If you know the Caribbean, all the islands on the

3    outside, the ABCs, they go from Colombia and then they

4    basically go up through the different islands, intermixing in

5    with traffic that way.

6              MR. BAEZA:  May I approach the witness, Your Honor?

7              THE COURT:  You may.

8              (Documents tendered.)

9    BY MR. BAEZA:

10   Q.    Special Agent Ray, I presented you with what has been

11   previously marked for identification as Government's Exhibit

12   9.  Please take a moment to look at it and look up when you

13   are finished.

14             First of all, do you recognize Government's

15   Exhibit 9?

16   A.    I do.

17   Q.    What is it?

18   A.    It's a depiction of the map of the Caribbean.  In

19   particular, it shows Cartagena, San Andreas, an island

20   belonging to Colombia, the Serrana Bank, which is at the

21   interdiction point which is southwest of Jamaica, and it

22   depicts Belize.

23   Q.    Can you recognize the source of the document?

24   A.    Google Earth.

25   Q.    And are you familiar with the layout of this portion of

1  the Caribbean Sea that you've described?

2  A.     Yes, I am.

3  Q.     And is Government's Exhibit 9 a fair and accurate

4  representation of the portion of the Caribbean Sea that also

5  includes Cartagena, San Andreas Island, the Serrana Bank, the

6  interdiction point, and Belize?

7  A.     Yes, it is.

8  Q.     So this map has a couple of markings on it for those

9  locations as well?

10  A.     That is correct.

11  Q.     Based on your training and experience and familiarity

12  with this area, are those true and accurate representations

13  of the locations of the areas depicted on the map?

14  A.     Yes, they are.

15            MR. BAEZA:  At this time we would move for the

16  admission of what has been identified as Government's Exhibit

17  9 into evidence as Government's Exhibit 9.

18            THE COURT:  Any objection?

19            MR. DEE:  No objection, Your Honor.

20            THE COURT:  Received into evidence, 9.

21            (*Government Exhibit 9 received in evidence.*)

22            MR. BAEZA:  Permission to publish, Your Honor.

23            THE COURT:  You may.

24  BY MR. BAEZA:

25  Q.     Special Agent Ray, there is a projection behind you as

1  well as a screen in front of you.  You also can make markings

2  on the screen as you see fit.  And to erase, there is a

3  little module in the upper-right corner of the screen, and

4  there will be a series of editing tools, and one of those is

5  to clear the image when you are done.

6            First, in general terms, will you describe for the

7  jury what is being depicted here in Government's Exhibit 9.

8  A.    Sure.  This is the Caribbean Sea, basically around

9  Central America, showing Colombia and Central America.  It

10  depicts the point where the vessel was interdicted.  It shows

11  the land belonging to Colombia, that San Andreas and Serrana

12  Bank.

13  Q.    You were previously discussing various smuggling routes

14  that you are familiar with utilized by go-fast vessels in the

15  Caribbean based on your training and experience.  Are there

16  any that you can depict within Government's Exhibit 9 based

17  on that testimony?

18  A.    Yes, there are two of them.  Actually, three.

19  Q.    Okay.  And what three are those?

20  A.    The Hyperlatoril, the Honduran Rise, and basically the

21  straight route up to Hispaniola.

22  Q.    Hispaniola, for everyone, based on your knowledge,

23  includes the Dominican Republic?

24  A.    Haiti and the Dominican Republic.

25  Q.    Would you draw on the map the Latoril route that you

1  previously discussed?

2          (Witness complies.)

3  BY MR. BAEZA:

4  Q.   When you make the markings, will you tell the jury what

5  you just did.

6  A.   Basically what they do is the vessels will hug the

7  coast.  As I said, they will go between 10 and 14 miles out

8  to sea.  Basically going between international waters and

9  territorial seas.  They do that to blend in with the local

10 traffic.

11         Like I said, if they are being chased by

12 Colombians, they run into Panama.  They are going to be safe

13 in Panama from the Colombians.  Then, if they are being run

14 out by Panama, they could run up to Nicaragua.  Their main

15 goal is to hug close to the coast.

16         Also, their refueling points will be inland where

17 they will basically make a beeline inland and stop for the

18 day, park their boats on the beach, get some food, refuel and

19 resupply.

20 Q.   We will get to refueling in a moment.

21         What in your training and experience are the

22 advantages and disadvantages of the Latoril route?

23 A.   The advantage is that you are relatively close to land,

24 so you are easily able to communicate with the people who are

25 doing it.

1              You can run, typically, smaller loads because they

2     are smaller vessels because they want the horsepower to move

3     out.  If there is a problem, it's easy to get to shore.  The

4     downside is that you have to have a lot of logistical support

5     for it.  You have to have more boats because you are moving

6     smaller loads, as well as you are now in jeopardy of being

7     caught by -- every country along the way can arrest you or

8     interdict you, so you're worrying about multiple countries

9     and multiple police and law enforcement agencies detecting

10    you.

11    Q.    So to be clear, then, for the Latoril route we are

12    talking more countries you are at risk for interdiction, have

13    to travel slower, have to be refueled more, have to carry

14    smaller cocaine loads?

15    A.    Correct.

16    Q.    All right.  Let's just address the Hispaniola route

17    real quick.  Will you depict what that is, please.

18    A.    Do you want me to erase this one?  Does that do this?

19    Q.    You can leave it up there.

20    A.    The Hispaniola one, they come up to this point and then

21    they will shoot off into different places or even Puerto

22    Rico.  And it's a straight shot.  Basically they go as fast

23    as they can to get to a point.  They will have some type of

24    intelligence that tells if there is law enforcement present.

25    Based on that, they will split into different areas to go to

1    land.

2    Q.    Is the location of law enforcement assets part of the

3    surveillance that you said you were familiar with?

4    A.    Yes, it is.

5    Q.    And the area of Colombia that you marked, this is a

6    peninsula known as Guajira?

7    A.    Yes, it is.

8    Q.    Let's go now to the Honduras Rise route.

9    A.    Basically it goes straight north and then hits a

10   certain point and they bank west and they start heading

11   toward Honduras.

12   Q.    Let's clear the screen and go --

13   A.    You may need to walk me through that one.

14   Q.    Upper right you'll see an arrow.

15          Would you depict, based on your training and

16   experience, the Honduras Rise route if the boat left the

17   Cartagena area.

18          (Witness complies.)

19   BY MR. BAEZA:

20   Q.    Okay.  Would you describe what you've depicted on the

21   screen for the jury, please?

22   A.    Pretty much it goes straight north, hits a certain

23   degree and will head west toward Honduras.

24   Q.    With respect to this route, what are the advantages and

25   disadvantages based on your training and experience?

1   A.    Typically you're not worried about as many countries

2   interdicting you.  You are only worried as you leave Colombia

3   for the destination or the U.S. Coast Guard that will be in

4   the middle.

5          You can carry a larger load.  You do need a refuel

6   point that will be somewhere around that turn that you make.

7   So you need at least one logistical vessel to help refuel

8   you.  You need to have coms that are, basically, satellite

9   fed so you can maintain communication back with your

10  dispatcher because you're not in an area that is covered,

11  obviously, by cell phone service.

12         It's typically around a two-day trip, so the

13  things in the Caribbean are fast because the area and the

14  space is a lot smaller than, for example, the Eastern Pacific

15  where a trip can take five to six days.

16  Q.    Let's describe the refueling process.  Are you familiar

17  with that based on your training and experience?

18  A.    Yes, I am.

19  Q.    Are you familiar with the general range of go-fast

20  vessels in the Caribbean?

21  A.    Yes.

22  Q.    Okay.  You said that a vessel undertaking the Honduras

23  Rise route would need at least one refueling?

24  A.    Correct.

25  Q.    Why do you say that?

1    A.    Because the distance is so great that, basically, they

2    can do the trip and they will be full of fuel when they

3    leave.  They need to swap out, get full of fuel and then they

4    will able to land.  Typically most of the refuelers are

5    coming out of San Andreas and Providencia.

6    Q.    Let's describe the logistics and coordination behind

7    the refueling at sea.  Will you describe that for the jury,

8    please.

9    A.    Typically what happens is as the vessel gets dispatched

10   and leaves Colombia, it will have a rendezvous point,

11   typically a GPS coordinate, and a code, whether it's going to

12   be a satellite or a radio code.  Then they are supposed to

13   meet at a certain time, certain location.

14         They will break squelch and say, hey, I'm here.

15   The refuel boat will typically break radio silence and say,

16   hey, we are here, and then they will meet.  Then they will

17   swap the fuel over from one vessel to the other.

18         If they need some food and extra supplies, they

19   will give it, and then the refuel boat goes a different

20   direction and the drug boat continues on its venture.

21   Q.    Let's talk about some characteristics of go-fast

22   vessels now.  Are you familiar with that based on your

23   training and experience?

24   A.    Yes, I am.

25   Q.    First of all, what is the purpose behind a go-fast

1    vessel?

2    A.    The purpose of a go-fast vessel -- and it sounds

3    silly -- is to move things from point A to point B rapidly.

4    Thus, they call them semi-submersibles.  The main object is

5    that speed is their main attribute because they want to move

6    through where -- you know, they want to move through the

7    point where they can be interdicted as quickly as possible.

8    So they will typically have normally two engines, sometimes

9    more, and a lot of fuel to move it.  Then the rest of the

10   space is primarily done for storage of drugs.

11          The vessels tend to be blue or dark in color so it

12   kind of hides their overall -- if you are flying, from above

13   it's difficult to see it.  They don't normally use running

14   lights or any type of AIS, automatic information system, like

15   major ships.  They'll always beacon where they're at because

16   they don't want to get hit and run over.  Well, go-fast boats

17   don't do that.  They try to hide and go as fast as they can.

18   Q.    You spoke about the purpose behind the hull color, the

19   equipping of fuel, equipping of engines, and the equipping of

20   controlled substances.

21          Let's talk about navigation lights.  What are

22   those?

23   A.    Navigation lights are lights on a boat to let people

24   know where you are, as well as what direction you are

25   heading.  They will be green and blue and they mark your

1    vessel.  There are a requirement on pretty much all

2    registered vessels.

3            That brings me to the point, most of these vessels

4    are called stateless, which means that they don't register.

5    Like if you are familiar here in Florida and you go down to

6    St. Petersburg or Tampa, you will notice there will be FL

7    numbers on the boats, or on the back of it it will say, like,

8    the Sassy.  Those boats are all registered with Florida or

9    the United States, which means it's property of the United

10   States.  So there is governing rules with it.

11           A lot of these vessels do not actually, in fact,

12   register with the countries that they belong to, so when the

13   Coast Guard comes along, if a vessel is registered, you're

14   part of that property.  Even if that vessel says Florida or

15   Sassy in the United States, as it travels the ocean, it is

16   property of the United States.

17           If another country wants to board it, they need

18   permission from the United States to get on board that vessel

19   because it's United States property.

20           If you don't claim any nationality, you don't get

21   to escape and go, hey, guess what.  No one gets to board me.

22   In fact, any country that comes upon it can board it as if it

23   belonged to itself, so you get punished for not registering

24   your boat.  But people who are smuggling don't want to

25   register a boat because then there is a paper trail that that

1  boat belongs to me, and people want to inspect it, make sure

2  it has safety equipment, make sure it has lights, make sure

3  it follows in some form of that country's safety standards.

4          I'm not saying every country is as stringent as

5  the United States Coast Guard, but every country has rules

6  about what you need to do on vessels.

7  Q.    Let's talk about some of that.  You talked about a

8  registration number sometimes being present on the hull of

9  the boat.

10          THE COURT:  Mr. Baeza, we are going to have to

11  take a morning recess, and perhaps this is a good time.

12          Ladies and gentlemen, we are going to take a

13  recess.  We will be in recess until about 16 minutes after

14  11.  You are welcome to walk around.  Please don't discuss

15  the case, and we will start again at that time.

16          COURT SECURITY OFFICER:  All rise for the jury.

17          (Jury exits courtroom at 11:01 a.m.)

18          COURT SECURITY OFFICER:  Please be seated.

19          THE COURT:  Agent, you may step down as well.

20  Please don't discuss your testimony over the recess.  We will

21  start again at 11:16.

22          (Recess taken from 11:04 a.m. to 11:15 a.m.)

23          COURT SECURITY OFFICER:  All rise.

24          This Honorable Court is now in session.

25          THE COURT:  Okay.  Will you get the jury.

```
 1                 COURT SECURITY OFFICER:  All rise for the jury.

 2                 (Jury enters courtroom at 11:15 a.m.)

 3                 COURT SECURITY OFFICER:  Thank you.  Please be

 4      seated.

 5                 THE COURT:  Mr. Baeza.

 6                 MR. BAEZA:  Yes.

 7      BY MR. BAEZA:

 8      Q.    Special Agent Ray, before we continue any further, just

 9      a reminder that there is a court reporter making a transcript

10      of your testimony and there are translators for the

11      defendants, and also for some people in the audience, so just

12      please speak as slowly as possible.

13      A.    Yes, sir.

14      Q.    Thank you.

15                 THE COURT:  Or slower.

16                 THE WITNESS:  Yes, ma'am.

17      BY MR. BAEZA:

18      Q.    Fair enough.  I had to stop to think whether I said as

19      fast as possible or as slow as possible.

20                 We were talking about vessel registration.  Do you

21      recall that testimony?

22      A.    Yes, sir.

23      Q.    And you were talking about the registration numbers,

24      commonly seen on vessels registered in the United States.  Do

25      you recall that?
```

1   A.     I do.

2   Q.     Based on your training and experience, what other

3   indicia for a vessel's registration could be placed on a

4   go-fast vessel?

5   A.     You can actually place the flag of the country it

6   belongs to.  They will normally have names, as well as most

7   countries will actually have some type of number or

8   registration on that vessel.

9   Q.     What about a home port?

10  A.     Yes.

11  Q.     When you talk about the flag, is it flying a flag?  Is

12  it painted on?  Explain that.

13  A.     It could be any of those things.  A lot of vessels,

14  especially if you are looking at the commercial ones, will

15  actually fly the flag or they will have, like, an emblem of

16  the country they belong to or the home port where it is, and

17  they will say not only the port but the port and the country.

18  That is all an indication of which country owns and is

19  responsible for that vessel and has the rules and regulations

20  responsible for it.

21  Q.     Are you also familiar with a document known as a zarpe?

22  A.     Yes, I am.

23  Q.     Would you explain that for the jury.

24  A.     What it is, in Colombia it's the allowable amount of

25  fuel that a vessel is supposed to be carrying or is

1   authorized to carry.

2   Q.    In your training and experience, are zarpes commonly

3   found on semi-submersibles?

4   A.    They are not.

5   Q.    Would you describe that, please.

6   A.    Because go-fast vessels are going to have numerous fuel

7   barrels and move the cocaine, they are not going to want to

8   register they have an illegal amount of fuel on board a

9   vessel, because they are going to take more fuel than what a

10   legitimate fishing trip would be or some other transportation

11   because they are using excessive fuel because, like I said,

12   they are trying to go as fast as possible, moving from

13   point A to point B and trying to make as few stops as

14   possible.  So they balance it out with taking large

15   quantities of fuel, which would be in excess of what would be

16   reported to the Colombian government.

17   Q.    Let's talk about common provisions found on a vessel

18   for these crews based on your training and experience.  Are

19   you familiar with that?

20   A.    I am.

21   Q.    Would you explain that for the jury, please.

22   A.    So because these guys are out on the sea for two days

23   and their primary purpose is to move, they are going to have

24   bottled water, canned foods, things like that which are easy

25   to grab, that are waterproof.  They tend to be higher priced

1    things than what fishermen would use.

2            If you are fishing, you would tend to use a whole

3    storage container of water because it's cheaper to put in a

4    hose-type thing or a pot of water than it is if they buy

5    small bottles.  Canned food and prepackaged items, they are

6    more expensive than what you would do if you are out on the

7    water for several days and you are trying to save money.

8    Q.    Okay.  Let's talk about electronic equipment next.

9    What kind of electronic equipment have you encountered on

10   these types of vessels?

11   A.    Satellite phones, GPSs, handheld GPSs, as well as the

12   two-way communicating GPSs, and sometimes buoys or tracking

13   devices.

14   Q.    We are going to get into methods of evading law

15   enforcement in a moment.  But in your training and

16   experience, what is often done with electronic equipment in

17   anticipation of a law enforcement boarding?

18   A.    It's thrown overboard.

19   Q.    What is the significance of retrieving the electronic

20   equipment in your training and experience?

21   A.    Well, it allows you to look through the GPS, the route

22   of travel, as well as way points, because a lot of times

23   either they will preprogram the GPS with the way points and

24   give a sheet to the captain, saying, hey, these are the

25   points that you need to stop to.  This is your departure

1   point.  This is your refuel point.  This is your end point.

2            If there are multiple refuel points, they will be

3   marked along the route, as well as the satellite phone.

4   There is no cell phone service out there.  The only way to

5   communicate back and forth to dispatch is through satellite

6   phone.

7            Almost all of those boats carry a normal radio.

8   They'll typically only use the radio because it's a

9   short-wave line-of-sight communication.  If they are at a

10  refuel point, at that point they will use a radio, use a

11  coded word to indicate, hey, I'm here.  That way they can

12  communicate directly with the refueling boat.

13  Q.    Is it common in your experience for these interdictions

14  to result in the seizure of no electronic equipment?

15  A.    Yes.

16  Q.    Let's talk about the composition of the crews now.  In

17  your experience, approximately how many people do you see on

18  these go-fast vessels?

19  A.    Typically you'll see between three and four.

20  Q.    And are you familiar now with the roles of the crew

21  members on a go-fast vessel?

22  A.    Yes, I am.

23  Q.    Are you familiar with the role of the captain?

24  A.    I am.

25  Q.    Would you describe the role of the captain for the

1  jury, please.

2  A.    The captain is the one who's overall responsible for

3  the boat.   He is the one that normally operates the GPS and

4  knows the coordinates of where they are going.   He's the one

5  that will operate the satellite phone and make the

6  communication back with dispatch to give updates or if he's

7  using it to send text messaging.   He will be the one who will

8  help direct other people on what line of travel.   So when you

9  are driving a boat, he may take a break and say, hold course,

10 you know, 207 and hold that course, so someone relieving him

11 knows which way to steer the boat.

12 Q.    Are you also familiar with a navigator?

13 A.    Well, typically the captain is the navigator.   Normally

14 you will have a mariner or a mechanic and/or load guard.

15 Q.    Let's talk about, first, the mariner on a four-person

16 crew.   Would you explain that.

17 A.    So a mariner has been out on the sea, probably been a

18 fisherman for a while.   Their general purpose is to help with

19 handling of items on the boat and typically refueling of the

20 boat because engines are in the back and typically they have

21 jugs of fuel.

22        What they will do is move these pipes back and

23 forth from different fuel barrels until they empty out to

24 maintain the flow of fuel to the engines, as well as handling

25 any gear or generally whatever is needed by the captain.

1    They will relieve the captain on steering of the boat.

2    Q.    What about a mechanic?

3    A.    The mechanic's job is to make sure the engines keep

4    functioning.  And if there is an issue with the engines, to

5    make whatever repairs to keep the engine functioning and

6    operating.

7    Q.    Are you familiar with the term "load guard"?

8    A.    Yes, I am.

9    Q.    Would you explain what a load guard is for the jury,

10   please.

11   A.    So a load guard is responsible for the cocaine that's

12   on board the vessel.  Typically, if you have a crew of four,

13   three are going to be from one country.  The other is going

14   to be from the destination country.  His job or her job is to

15   fly down to observe where the cocaine is, to make sure it

16   gets on the boat properly and that nothing happened to it

17   from its start to its final destination.

18   Q.    So is it fair to say that the load guard is the

19   representative for the organization receiving the cocaine?

20   A.    Yes.

21   Q.    And that the responsibility of the load guard includes

22   making sure that all of the cocaine that leaves Colombia

23   makes it to its intended destination?

24   A.    Correct.  The load guard will also give updates to the

25   people who are receiving it to make sure that things are

1  flowing, as I said, from the people who are sending it off.

2  Q.    How are these crew members recruited?

3  A.    Typically what happens is that most of these people are

4  fishermen in villages.  If you are fishing, your normal trip

5  you are going to make maybe a hundred dollars to $200 a week

6  doing legitimate fishing.  The recruiters know this.

7  Typically a recruiter has done several trips himself and will

8  basically go up to fishermen and ask them if they want to

9  make significantly more money.  A typical trip can make

10  anywhere between 10,000 to $40,000 one way depending on the

11  amount of cocaine, the length of the trip, and the

12  responsibility.

13       So what they will do is they prey upon people and

14  say, hey, I'll give you money if you go ahead and do this.

15  What they will normally do is give an amount of the money up

16  front as a forwarding of it.  For example, they promise that

17  I'll give you $5,000 up front, but out of that I'm taking

18  1,000 as a finder's fee.  That's how the recruiter makes his

19  money.  He's taking money from the money he's giving to these

20  people he's sending off.

21  Q.    These recruiters, do they approach people they trust

22  for recruitment purposes?

23  A.    Yes.

24  Q.    And what do you mean by that?

25  A.    The people that they are approaching will be receptive

1    to them saying, yes, I'm interested in a trip.  Or if they

2    are not this time, they will be, like, yeah, that's not a

3    problem.  I'll think about it.  And then depending on my

4    circumstances, a couple of months later I might go back and

5    say, you know what?  I think that's good.  Especially when

6    they see other people who have successfully returned, coming

7    back and bringing in large amounts of money.

8    Q.   You spoke a little bit about nationality composition on

9    a vessel.  Would you explain that a little further, please.

10   A.   Typically the people who are operating the boat are

11   from the same country because they are the ones recruited by

12   the same recruiter.  They are the fishermen, captain, and the

13   mechanic.

14            Typically the load guard is recruited from the

15   country that the drugs are going to.  So they will fly from

16   Mexico down to Colombia, hang out with the mariners until

17   the drugs are loaded on board the boat and stay with the

18   drugs and follow them to the final destination.  A lot of

19   times the load guards do not have a nautical background.

20   Their main goal is to watch and observe drugs, not

21   necessarily be on boats.

22   Q.   You spoke a little bit about the pricing of a kilogram

23   of cocaine and the amount of kilograms in a bale.

24   Approximately $30,000 in Tampa for wholesale value and

25   approximately 20 kilograms in a bale.  Is that accurate?

1  A.    That is correct.

2  Q.    Is it fair to say, then, that a bale, based on your

3  training and experience, in Tampa would be about $600,000?

4  A.    That is correct.

5  Q.    Are you familiar with the nationality composition of

6  the crew in this case?

7  A.    I am.

8  Q.    What is it?

9  A.    You have three Colombians and a Belizean.

10  Q.    Based on your training and experience and knowledge of

11  the investigation, what do you believe was the role of the

12  Belizean?

13  A.    He was the load guard for the final destination in

14  Belize.

15  Q.    And the other three Colombians?

16  A.    They were the ones operating the boat.  They were the

17  captain, mechanic, and mariner.

18  Q.    We talked about captains, mariners, mechanics, load

19  guards, how they are paid, how they are recruited.  What

20  about the friends on the boat that are just going along for

21  the ride, what about them?

22  A.    There are no friends that go on a boat just for a ride.

23  Q.    Would you explain your answer, please.

24  A.    These people are moving high levels of drugs.  They are

25  not going to include anyone into a conspiracy that isn't part

1   of it, that isn't getting paid.  It's a business.  They pay

2   these people money to move that.  They are not going to bring

3   anyone who would help further -- who would have knowledge

4   that wouldn't be getting paid or have responsibility for

5   that.

6              If they lose a load and they escape, then they are

7   going to owe basically two loads for free that they now have

8   to make for the next trip.  So when they sign up for it, they

9   are signed up for the one trip.  And their understanding,

10  they are not going to take along somebody else that has no

11  basis, being paid, or doesn't understand what's going on on

12  these trips.

13  Q.    Let's talk about methods of surveillance and

14  counter-surveillance by semi-submersibles and the

15  organizations that dispatch them.  First of all, how would

16  you define surveillance?

17  A.    Surveillance is basically observing a specific area,

18  looking for something of interest.

19  Q.    What is counter-surveillance?

20  A.    Counter-surveillance is, if I know I have something

21  going on, I'm looking for law enforcement or military that

22  might interfere or some other operation -- in this case, like

23  I said, there will be people looking for law enforcement and

24  to give them a warning that they are there in the area, so I

25  would postpone sending my trip out.

1   Q.    These transnational criminal organizations that you

2   spoke about, in your training and experience, do they often

3   acquire suspected locations of naval assets, meaning vessels

4   in the water?

5   A.    They do.

6   Q.    Are these obtained by legal or illegal means?

7   A.    It's a mix of the two.  They normally have a report

8   before they ever dispatch.  You have a mix of -- these people

9   are fishermen and they live in villages.  If they are fishing

10   today and moving drugs tomorrow, they will more likely tell

11   their friend, hey, I was out fishing and I saw a Coast Guard

12   boat, and relay that to people, saying, hey, I know we saw

13   this Coast Guard in this area.  So you might want to watch

14   out.

15          In addition, there are some corrupt government

16   officials that will be willing to sell potential layouts of

17   the host country assets to drug people.  And it's not unheard

18   of that Colombian or Panamanian or Nicaraguan law

19   enforcement/military will be in the pockets of cartels and

20   say, hey, so you know, we are sending a patrol out on this

21   date and going to this location.

22   Q.    Let's slow down a little bit on your answers.

23   A.    Okay.

24   Q.    So we have elements of corruption in host countries, as

25   well as human intelligence or HUMINT?

1   A.    Correct.

2   Q.    What are the methods of counter-surveillance while at

3   sea by a go-fast vessel?

4   A.    What they will do is they will sometimes come to a

5   stop, look around and listen.  They will send their members

6   out to look out in the horizon.  Most marked vessels have

7   lights on them that they see, as an alternate.  And in

8   addition they sometimes stop in the daytime and put a blue

9   tarp over their boat to gain some sleep, as well as if it's a

10  hard-to-see boat with a blue tarp, it blends in with the

11  ocean very well.

12  Q.    Does it always have to be a blue tarp?

13  A.    No.

14  Q.    All right.  The methods of law enforcement detection

15  you are familiar with, does that include the maritime patrol

16  aircraft?

17  A.    It does.

18  Q.    What about helicopters?

19  A.    Yes.

20  Q.    And the Coast Guard cutter/law enforcement detachment

21  people; right?

22  A.    Correct.

23  Q.    What's the role of the maritime patrol aircraft?

24  A.    An aircraft up 10,000 feet has a much wider view and

25  able to see vessels on the ocean.  It's a lot easier to see

1  vessels that are moving because they leave a wake.  So they

2  will patrol certain areas looking for vessels, especially in

3  areas that aren't normal fishing ground or transit areas that

4  drug trafficking happens.

5          One aircraft can cover a lot more water than a

6  boat can.  In addition, a lot of the aircraft have, like,

7  radar capability and things to identify, especially if they

8  see a boat and it's not listed, like I said, on AIS.  AIS is

9  an automatic information system that most major boats that

10  are transiting the ocean, you know, broadcast where they are

11  at so they don't get run over or hit by any other vessel.

12  Q.    What's the role of a helicopter?

13  A.    The role of the helicopter is once a target has been

14  identified, they get up and get a closer view of it to help

15  identify what country it belongs to.  For example, if it

16  belongs to Colombia and it shows a Colombian registration and

17  has a flag of Colombia, the Coast Guard needs to ask Colombia

18  permission before they can actually go and say, hey, we want

19  to board your boat.

20          The helicopter helps verify if it's a vessel with

21  nationality.  And in addition, because a lot of these

22  vessels, in fact, are faster than some of our Coast Guard

23  vessels, they are armed and they will do what's called

24  disabling fire and they can actually shoot out the engines of

25  these go-fast vessels so that the Coast Guard can actually

1    stop them and say, hey, what country are you from?  We want

2    to board you.

3    Q.     Hypothetically, if the engines are already at the

4    bottom of the ocean, what need, if any, is there for the

5    helicopter?

6    A.     The helicopter will maintain surveillance on the vessel

7    until the boat can come.  The helicopter can fly, obviously,

8    a lot faster than a Coast Guard boat can drive out there.  It

9    will mark where it is and then help steer in a small Coast

10   Guard vessel or small boat so they can conduct the boarding.

11   Q.     In this case we are talking about a law enforcement

12   detachment on a Canadian vessel.  Do you know what, if any --

13   you don't know whether this Canadian vessel had helicopter

14   capability?

15   A.     I do not.  What the Coast Guard does is -- obviously we

16   have Coast Guard ships, but because we also have countries

17   like England, the Dutch, and the Canadians who bring cutters

18   down, they offer the United States Coast Guard and these law

19   enforcement detachments a team so that we can use our team

20   upon that ship.  Then when they board the small boat, it's

21   acting as if it's a U.S. boat.  It's basically the conveyance

22   of it and it allows us, as the Coast Guard, to employ more

23   assets out there than what we have ships to do.

24   Q.     So when we talk about going from a patrol aircraft to a

25   helicopter to a boarding ship, that's typically the procedure

1   from a Coast Guard cutter and patrol aircraft?

2   A.    Correct.

3   Q.    Okay.  And in other scenarios, the interdiction would

4   fall to the closest allied nation with an asset in the water?

5   A.    Correct.  There are a lot of times the allied ship will

6   do an interdiction and then pass it on to the Coast Guard for

7   prosecution.  Pretty much England, the Netherlands, and

8   Canada have written agreements that will prosecute.  If the

9   French grab it, they will do their own prosecution.  They're

10  French.

11  Q.    I'll reserve comment.

12          Is it fair to say that -- withdrawn.

13          Let's talk about methods of evidence spoliation.

14  Are you familiar with that?

15  A.    Getting rid of evidence?

16  Q.    Yes.

17  A.    Yes.

18  Q.    What in your training and experience are methods of

19  destroying evidence of narcotics on a go-fast vessel?

20  A.    The first thing is to throw it overboard and get it as

21  far away from you as possible.  The second thing is to sink

22  it by either attaching weights or objects to it.  The third

23  thing is to set it on fire, where they douse the boat or

24  douse the drugs and they light it in any effort to keep drugs

25  away from you.  As well as they will a lot of times use

1   gasoline to wipe down a boat in hopes it will remove any

2   evidence of trace elements of drugs.

3   Q.    Let's talk about sinking of bales.  What

4   instrumentalities are you familiar with in your training and

5   experience that could be used to sink cocaine bales?

6   A.    Sometimes they will actually weight the bales in

7   advance, or other times what they will do is attach the bales

8   to the engine and then sink the engine.

9              We had one case where they weren't able to detach

10  the engine because they didn't take all the cords that

11  connected it to the steering mechanism, so the engine is

12  hanging off with about 20 bales attached to it.

13  Q.    Are you familiar with what happens when a bale of

14  cocaine is thrown into the water?  I'm talking about the

15  buoyancy of the bale.

16  A.    I do.

17  Q.    What happens to a bale?

18  A.    It floats.  Cocaine bales are buoyant, so they will

19  float out there and drift.  In fact, sometimes if you catch

20  on Bay News 9 you'll hear someone say, oh, we drove by and

21  picked up floating drugs and reported it to FWC, because the

22  drugs will stay floating out there until they are recovered.

23  Q.    In addition to sinking the cocaine, what, if anything,

24  is done with any electronic equipment that was used to

25  communicate with other members of the organization that's

1   involved?

2   A.    They will throw it overboard so that it will sink.

3   Sometimes they throw it in a bag and it doesn't always sink,

4   but the exposure to saltwater degrades the ability of being

5   able to extract any information from electronics.

6   Q.    Would you explain further your answer about using

7   gasoline on the vessel?

8   A.    Yes.  They have a lot of gasoline.  It's a solvent, so

9   a lot of times they will rub themselves down or rub the boat

10  down, trying to use it kind of like Clorox, to remove any

11  elements they think would be on there or eliminate any

12  evidence.  In addition, they think that because now you have

13  fuel on all that, it creates a safety hazard so that the

14  Coast Guard might be less [sic] hesitant to get on board or

15  do a more thorough inspection because of gasoline being

16  present.

17  Q.    You said less hesitant.  Do you mean more hesitant?

18  A.    I'm sorry.  More hesitant.

19  Q.    We have talked about what you do with the physical

20  objects on the vessel.  What about the crew themselves?

21  What, if anything, in your training and experience is done by

22  the crew in order to evade law enforcement?

23  A.    Well, the crew, normally, if they get detected, they

24  will try to flee.  When they flee, they try to throw the

25  drugs overboard or fuel overboard or try to make distance,

1    especially if they see the boat.

2              A lot of times, if they see just the aircraft,

3    they may just dump everything and then hoping and waiting for

4    the Coast Guard to arrive.  Then a lot of times during that

5    time they will sit down and start concocting a version of

6    events that explain why they are where they are at.

7    Q.    In your training and experience, what are the common

8    explanations utilized by go-fast vessel crew members about

9    their purpose at sea?

10   A.    They were fishing, they were evading pirates, they

11   found the drugs just floating and they didn't know what they

12   were, they were SAR survivors or they will tell the truth and

13   say it was a drug venture.

14   Q.    So, just to summarize, you said fishing, pirates --

15              THE COURT:  You shouldn't summarize, Mr. Baeza.

16              MR. BAEZA:  Yes, Your Honor.

17   BY MR. BAEZA:

18   Q.    Let's talk about -- you said SAR survivors.  Is that

19   search and rescue?

20   A.    Search and rescue.

21   Q.    Would you explain that, please.

22   A.    They will claim they were lost at sea, drifting for

23   days at a time, and that explains why they are in the

24   location that they are at.

25   Q.    What methods, if any, are used in your training and

1  experience to assess the validity of that explanation?

2  A.    Well, normally because we have eyes on the boat and we

3  know it's moving, we know that when they say they are lost at

4  sea, that's not accurate.

5         In addition, just even the actions that they have.

6  People who are lost at sea have no provisions and water.

7  They tend to be dehydrated.  They can't talk.  When they

8  happen to see the Coast Guard, they get really excited and

9  they wave.  They use any method they can to communicate to an

10  aircraft or a vessel, even if it's not Coast Guard, to any

11  vessel because they want to be rescued.

12        Whereas, most people who have done something

13  illegal and get caught and arrested have the head down and

14  they are just in despair because they realize their freedom

15  is up and the venture they are doing is over and now they

16  have serious consequences to face.

17  Q.    I'm not going to go through all five.  The other one I

18  want to talk to you about is the fishing story.  Would you

19  explain that, please.

20  A.    A lot of times people say, oh, we were just fishing.

21  And while these vessels are capable of fishing and you will

22  occasionally even find a single fishing pole, a fishing

23  vessel, if it was, in fact, fishing, would have nets, bait,

24  ice, reels, hooks.  It would have limited fuel because the

25  whole point is to capture as much fish as possible.  Just

1  because it has a single fishing pole doesn't make it a

2  fishing boat.

3          I've been on many a United States cutter where a

4  nice chief brought his fishing pole.  That cutter is not a

5  fishing vessel.  It's still a United States Coast Guard

6  cutter doing its mission.  Just because there is a fishing

7  pole doesn't make it a fishing vessel.

8  Q.   Are you also familiar with conch, Agent Ray?

9  A.   I have a familiarity with it.  I'm not an expert on

10 conch.

11 Q.   I'm not asking you to be an expert; but just in your

12 experience with conch, what exactly is it?

13 A.   It's a --

14          MR. AMADOR:  Objection.  Foundation.

15          THE COURT:  Do you know generally what it is?

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  You may answer the question.

18          THE WITNESS:  It's a mollusk with a shell on it.

19 They will use the shell to blow into it.  Like "Lord of the

20 Rings," they use the conch shell.  It's a mollusk-type thing.

21 Typically it's in shallow water.  A lot of times divers will

22 free-dive, pick it up, poke a hole in the back of it and it

23 allows you to pull the conch out.  That's the meat part.

24 They make conch fritters.  It's a common thing in the

25 Caribbean.  You can also eat it raw, like, on salad.  Like I

1    say, the shell itself has a value.

2    BY MR. BAEZA:

3    Q.    Agent, I have to say one thing.  You said, "Lord of the

4    Rings."  I think you meant "Lord of the Flies."

5    A.    Thank you.

6    Q.    Are you familiar in your experience with whether conch

7    can swim?

8    A.    Normally it crawls on the bottom of the water.

9    Q.    Sink?

10   A.    Yes.

11   Q.    Don't see floating conch shells?

12   A.    No.

13   Q.    Don't see schools of conch swimming around?

14   A.    No.

15            MR. BAEZA:  Thank you, Agent.

16            I tender the witness.

17            THE COURT:  Mr. Dee?

18            MR. DEE:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20   BY MR. DEE:

21   Q.    Special Agent, you talked about certain things about

22   the vessels, the go-fast vessels, that you are familiar with

23   as far as drug smuggling.  You mentioned that a common

24   element that they use is a blue tarp to cover the vessel in

25   daytime.  Do you recall that?

1   A.    Correct.

2   Q.    That's because, from a plane up above, that might blend

3   in with the sea and make it a little bit harder to see?

4   A.    Correct.

5   Q.    Okay.  Now, as far as the actual route, you describe

6   the Honduran Rise route, I believe is the term; is that

7   correct?

8   A.    That is correct.

9   Q.    And basically the smuggling boats that take that route

10  will go north out of Colombia and make a west or left turn

11  and head to Honduras?

12  A.    Correct.

13           MR. DEE:  No other questions, Your Honor.

14           THE COURT:  Mr. Brunvand?

15                    CROSS-EXAMINATION

16  BY MR. BRUNVAND:

17  Q.    Good morning.

18  A.    Good morning.

19  Q.    You provided the jury with an extensive bit of

20  information this morning about how these general operations

21  work.  Would that be a fair assessment?

22  A.    Yes, sir.

23  Q.    And you yourself have not been on any of these types of

24  vessels, transporting anything; correct?

25  A.    I have been on go-fast vessels before.

1    Q.    Transporting drugs?

2    A.    No.  Actually, yes, because I was moving it to

3    evidence.

4    Q.    All right.  But other than in the capacity as law

5    enforcement, you haven't been on any of these types of

6    vessels while the operation is taking place other than when

7    the seizure takes place and then bringing the drugs to your

8    ship or wherever you are bringing it?

9    A.    Correct.

10    Q.    Okay.  The information that you provided the jury about

11    how things generally work is information that you learned by

12    talking to other individuals who were involved at the various

13    stages.  Is that a fair statement?

14    A.    That and doing it myself, yes.

15    Q.    Well, okay.  I think you started out talking about how

16    people are recruited to go on these trips; right?

17    A.    Correct.

18    Q.    And certainly you haven't been there during the

19    recruitment process; right?

20    A.    I have not.

21    Q.    Okay.  But the information that you provided to the

22    jury about how that works, you have obtained that from

23    individuals who were arrested and then sat down with you and

24    told you how it worked in their particular case?

25    A.    That is correct.

1  Q.    Okay.  And you indicated -- first of all, the

2  motivation for those people who provide you with information

3  is they hope that it's going to result in them getting a

4  lower sentence?

5  A.    Correct.

6  Q.    Okay.  And you indicated that generally the people on

7  the boats are fishermen; right?

8  A.    Correct.

9  Q.    That there are people above them who recruit people to

10  go on the boat; right?

11  A.    Yes.

12  Q.    There are people that you call dispatchers?

13  A.    Correct.

14  Q.    And those are some of the players in the organization;

15  right?

16  A.    Absolutely.

17  Q.    And your hope is that during your work you are able to

18  climb all the way to the top and arrest the owners and

19  operators of these organizations?

20  A.    Absolutely.

21  Q.    Okay.  And you dealt with it at all the various stages.

22  Is that a fair assessment?

23  A.    Yes, sir.

24  Q.    Okay.  And you've talked to people, from the people

25  that are on the boats to the owners; right?

1   A.    Yes, I have.

2   Q.    And the motivation, whether you are on the boat or an

3   owner, is to get a lower prison sentence -- right -- for

4   talking with you?

5   A.    For talking with me, yes.  Their motivation is to make

6   money but, yes, they are talking to me to lower their prison

7   sentence.

8   Q.    The motivation for talking to you is to get a lower

9   prison sentence; right?

10  A.    Right.

11  Q.    In fact, the owners sometimes, whether they are in

12  Colombia waiting to be brought to the United States or in the

13  United States, will provide you with coordinates of where you

14  might find a vessel with drugs?

15  A.    That is correct.

16          MR. BAEZA:  Object to the relevance, Your Honor.

17          THE COURT:  I'm not in a position to know if it's

18  relevant or not.

19          MR. BAEZA:  May we approach, Your Honor?

20          THE COURT:  Sure.

21          (*The following was held at sidebar*:)

22          MR. BAEZA:  Your Honor, based on this line of

23  questioning, it looks like it's intended to elicit some type

24  of admission that sometimes these interdictions have somewhat

25  higher-ups looking for a reduction in their sentence and

1    provide that to law enforcement, but that still has no

2    bearing on the relevance of these defendants' intent to

3    engage in a conspiracy and their attempt to possess cocaine

4    with intent to distribute it.

5              We have not raised any information about how this

6    vessel was located.  We don't have all the information as

7    part of this record.  We don't intend that -- we have already

8    presented testimony from the maritime patrol aircraft crew

9    members about what they were tasked to do.  There is no

10   evidence we have heard about any tracking information printed

11   on the vessel, anything about coordinates, and this looks

12   like it's reasonably calculated to suggest that there is

13   something nefarious afoot here or something untoward by the

14   government where we are making a deal with some other higher

15   level person in order to go after these fishermen.

16             MR. BRUNVAND:  The government has alluded in great

17   detail about how these trips operate, what the routes are,

18   how things work and all the information that he relies on for

19   purposes of presenting the testimony as to how everything

20   works, from the owners to the dispatchers to the recruiters

21   to the people on the vessels is information that he received

22   from people that were cooperating and it's really for the

23   purposes of showing that those people had motivation to

24   fabricate.

25             So based on that, I believe it is fair game for us

1  to discuss who he got the information from and what their

2  motivations were.  And I'm not -- as far as specifically

3  about whether or not there was a tracking device on this

4  vessel or not, I'm not going there at this point.  We dealt

5  with that previously and the Court ruled on that previously.

6          MR. BAEZA:  The suggestion then, Your Honor, is

7  somehow these defendants were set up.

8          MR. BRUNVAND:  We're not making that kind of

9  argument.

10          THE COURT:  I don't think he's made that

11  suggestion.

12          MR. BAEZA:  It's an inference, Your Honor.

13          THE COURT:  You went into the owners, you went

14  into the higher-ups and went into the whole thing, so I think

15  he's entitled to cross-examine.  Overruled.

16          MR. BAEZA:  Yes, Your Honor.

17          (Sidebar ended.)

18  BY MR. BRUNVAND:

19  Q.    Do you recall my question?

20  A.    Yes.

21  Q.    Okay.

22  A.    Yes, they do.

23  Q.    Okay.  I believe my question was whether or not the

24  owners will sometimes provide coordinates of vessels to you

25  so that it will benefit you and it would also help them,

1  hopefully, get a reduced sentence.  Is that an accurate

2  statement?

3  A.    Yes, they do.

4  Q.    Okay.  Would you agree that -- the organizations that

5  you've described and who you've described as some of the

6  players that are involved in these organization, would you

7  agree that some of these organizations are huge

8  organizations?

9  A.    Yes.

10  Q.    Would you agree that some of these organizations are

11  extremely powerful organizations?

12  A.    Yes.

13  Q.    Would you agree that some of these organizations deal

14  with money in excess of a billion dollars?

15  A.    Yes.

16  Q.    Would you agree that some of these organizations are

17  dangerous organizations?

18  A.    Yes.

19  Q.    Would you agree that there is an intimidation factor

20  among people who live in the coastal communities of Colombia,

21  be it Buenaventura, on the Pacific or in the Caribbean, as

22  relates to these organizations?

23  A.    Yes.

24  Q.    There is a fear element?

25  A.    Yes.

1    Q.    You indicated generally how people are recruited and

2    how people end up on these vessels; right?

3    A.    Yes.

4    Q.    You don't know specifically how these individuals ended

5    up on this vessel?

6    A.    I do not.

7    Q.    You don't know what they may have been told?

8    A.    I do not.

9    Q.    Or by whom?

10   A.    I do not.

11   Q.    You don't know -- you testified about generally the

12   people that are on these vessels when encountered by law

13   enforcement will concoct a story about why they are there;

14   right?

15   A.    Correct.

16   Q.    You don't know on this vessel whether or not if, in

17   fact, the story was concocted, who may have concocted the

18   story?

19   A.    I don't have any idea.

20   Q.    You don't know whether the captain of the vessel may

21   have told the crew members this is the story you will tell?

22   A.    I do not.

23   Q.    Let's talk about the -- you were asked to describe the

24   smell of cocaine.

25   A.    Yes.

1  Q.    Your description was it smells like cocaine.

2  A.    Yes.

3  Q.    You indicated maybe there is some solvents that you may

4  smell?

5  A.    It's a pungent, solvent-type smell.

6  Q.    You've dealt with a lot of cocaine?

7  A.    I have.

8  Q.    And so it's reasonable for you to be familiar with the

9  smell that you are now telling the jury about?

10 A.    Absolutely.

11 Q.    People who don't deal with a lot of cocaine wouldn't

12 know what it smelled like?

13 A.    No, they wouldn't.

14 Q.    Would not.

15        When you described the -- I think you described

16 the dimensions of a bale of cocaine.

17 A.    Of a 20-kilo bale of cocaine.

18 Q.    Of a 20-kilo bale of cocaine.

19        What are the general dimensions of a bale of

20 marijuana?

21 A.    Because marijuana -- like I said, cocaine is stacked by

22 the kilos; marijuana is not.  It's basically all grouped

23 together and packaged.  I would guess it's closer to about

24 five feet, four-and-a-half feet by four-and-a-half feet by

25 maybe two-and-a-half feet.

| | |
|---|---|
| 1 | Q.    Four-and-a-half feet by two-and-a-half feet by what? |
| 2 | A.    Four feet.  They are more square.  And as I said, it's |
| 3 | more -- they are thick and they are light but because -- |
| 4 | kilos are individual.  Marijuana is packed together and just |
| 5 | pressed and all tied up together. |
| 6 | Q.    But marijuana, nevertheless, is packaged in bales as |
| 7 | well; right? |
| 8 | A.    It is. |
| 9 | Q.    And so when you look at them from a distance, the |
| 10 | marijuana -- I believe what you are indicating is the |
| 11 | marijuana bales may be slightly larger than the cocaine |
| 12 | bales? |
| 13 | A.    Yes. |
| 14 | Q.    Slightly bulkier? |
| 15 | A.    Yes. |
| 16 | Q.    Up to maybe a foot longer, a foot wider? |
| 17 | A.    Correct. |
| 18 | Q.    Is that a fair statement? |
| 19 | A.    Yes. |
| 20 | Q.    Somewhat difficult to distinguish from 6,000 feet. |
| 21 | Would you not agree with that? |
| 22 | A.    A bale by itself, without any context? |
| 23 | Q.    Right. |
| 24 | A.    Yes. |
| 25 | Q.    Okay.  Or multiple bales by themselves? |

1    A.    Without any context, absolutely.

2    Q.    Okay.  You talked about the different routes and the

3    destinations of the cocaine --

4    A.    Correct.

5    Q.    -- coming from Colombia; right?

6    A.    Yes.

7    Q.    And you indicated that the majority of the cocaine is

8    headed for the United States?

9    A.    Yes.

10   Q.    Is that what you said?

11   A.    I said the majority of the cocaine was traveling from

12   South America into Central America for further distribution

13   into Mexico and subsequently to the United States, but it can

14   also go to Europe and Asia and other things once it reaches

15   Mexico.  The dynamic of the cartels are different than what

16   they were in the '80s.

17   Q.    Sure.  So that's the cocaine that's in the Caribbean

18   ocean, which is what we are talking about; right?

19   A.    Yes.

20   Q.    There are two primaries; the Pacific and the Caribbean;

21   correct?

22   A.    Correct.

23   Q.    So cocaine that may be in the Caribbean ocean may be

24   destined for the United States?

25   A.    Yes.

1  Q.    It may be destined for a ship that might be headed to

2  Europe?

3  A.    Correct.

4  Q.    Might be headed to Asia?

5  A.    Not typically.

6  Q.    More likely in the Pacific?

7  A.    In the Pacific.  And if you are going to Africa, you

8  would head directly east, and we don't have as much

9  visibility because the Coast Guard protects north.

10  Q.    Certainly Europe and Africa are two destinations from

11  the Caribbean; right?

12  A.    Yes.

13  Q.    I think that's what you referred to when you talked

14  about rendezvousing with maritime vessels in the Caribbean?

15  A.    Correct.

16          MR. BRUNVAND:  One moment, Your Honor.

17          That's all that I have, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Amador?

20          MR. AMADOR:  Thank you, Judge.

21                    CROSS-EXAMINATION

22  BY MR. AMADOR:

23  Q.    Agent Ray, you talked about a zarpe and only dealing

24  with fuel; but, in fact, a zarpe deals with crews and perhaps

25  what they are doing on their trips; does it not?

1    A.    Correct.

2    Q.    It's not limited to just fuel?

3    A.    True.  It describes the number of crew members who are

4    supposed to be on board and what they are doing.

5    Q.    Now, the captain is in charge of the go-fast; correct?

6    A.    Correct.

7    Q.    He is the one that gives orders; correct?

8    A.    Yes.

9    Q.    Now, in these organizations that you -- I think that

10   they were called transnational drug organizations?

11   A.    Transnational criminal organizations.

12   Q.    Okay.  That happen to deal in drugs?

13   A.    But they also do other crimes, so that way it's the

14   general label.  But, yes, we are looking at drug trafficking

15   organizations.

16   Q.    In the context that you are here today to testify

17   about, these go-fast boats, and you've testified about how

18   they are recruited, the members of go-fast, how they could be

19   recruited, and there is not just the three or four people on

20   the boat that are involved in a particular load; right?

21   A.    Correct.

22   Q.    There are the people that recruited them?

23   A.    Yes.

24   Q.    The people that perhaps hired those recruiters?

25   A.    Correct.

1   Q.     People that own the drugs?

2   A.     Absolutely.

3   Q.     And then there are people that perhaps did other acts

4   in this transporting of drugs, like refueling?

5   A.     Correct.

6   Q.     And perhaps the people that organize that refueling

7   operation?

8   A.     Correct.

9   Q.     And then on the other end there are people that

10  purchased the drugs on these boats; correct?

11  A.     Absolutely.

12  Q.     And then those people, at times, hire other people to

13  retrieve the drugs or to receive the drugs; is that right?

14  A.     That is correct.

15  Q.     So there is a number of levels of organization on the

16  receiving end as well?

17  A.     Absolutely.

18  Q.     So it's fair to say that there are many, many, many

19  people and levels in one transport of a go-fast shipment?

20  A.     Yes.  It's also more than one organization.  Very few

21  organizations control everything from start to finish.  They

22  subcontract out, and so you have people who specialize in,

23  for example, the transportation of maritime and those will do

24  the recruiting, the dispatching and that.  So, yes, many

25  different people, but it's also more than one, necessarily,

1   organization.

2   Q.    And many different levels of responsibility?

3   A.    Absolutely.

4   Q.    You mentioned that these recruiters -- your words --

5   prey on people?

6   A.    What I say, they go after people they know that need

7   money, but they are known -- they are well known and people

8   will go to them when they want to go work and they want to

9   move up.

10  Q.    Those are your words, right?  Prey on people?

11  A.    I don't recall exactly what I said.  They recruit

12  people.  And the people who want to get paid, they will go to

13  the recruiter.

14  Q.    I don't have anything further.  Thank you.

15              THE COURT:  Redirect, Mr. Baeza?

16                    REDIRECT EXAMINATION

17  BY MR. BAEZA:

18  Q.    Agent, I'm going to start with the basis of knowledge

19  that you have on the process that we have heard about in

20  terms of recruitment and whatnot.  Okay?

21  A.    Okay.

22  Q.    The issue was raised during cross-examination that the

23  information you are getting is from people who are

24  cooperating with law enforcement in the hope of a reduced

25  sentence.  Do you recall that?

1    A.    Yes.

2    Q.    Approximately how many interviews have you been

3    involved in of crew members on go-fast vessels or any other

4    people in the supply chain that we have talked about?

5    A.    Several hundred.

6    Q.    Of those several hundred, how much did they differ

7    between what you've already testified to about the process?

8    A.    They haven't.

9    Q.    There was also some discussion about the recruitment of

10   fishermen for these trips.  Do you recall that?

11   A.    I do.

12   Q.    Are they done with money, guns?  How are these people

13   recruited?

14   A.    It's through money.  They are paid.

15   Q.    So they don't give a person thousands of dollars while

16   pointing a gun at them?

17   A.    No.

18   Q.    They don't give a person millions of dollars worth of

19   cocaine, while giving them thousands of dollars, while

20   pointing a gun at them?

21   A.    They do not.

22   Q.    Mr. Amador was referring to all these different

23   transnational criminal organizations, the recruiters, the

24   logistical side, the supply side.  Do you recall that

25   testimony?

1  A.     I do.

2  Q.     Do you agree that these typically involve more than two

3  people doing something illegal?

4  A.     Absolutely.

5  Q.     Is there another word for that in your training and

6  experience?

7  A.     Conspiracy.

8  Q.     And in your training and experience, what is the key

9  component between cocaine traffickers in Colombia and the

10 cocaine traffickers in Central America receiving the cocaine?

11 A.     The ones in Colombia, they own it and they pretty

12 much -- I mean, back in the '80s and the during the war on

13 drugs, they owned everything from supply all the way to

14 distribution in Miami in the United States.

15        As time has progressed, the Colombians have pretty

16 much said, hey, we will move the cocaine as far as up to

17 Central America and let the Mexican cartels take it from

18 Central America and move it up because it's less risk for us

19 and we can still make enough money to make a living and make

20 a profit without the whole end of supply and distribution.

21        So you see the fall of the Colombian cartels and

22 the rise of the Mexican cartels.  Nowadays what you see is

23 the Colombians, by and large, they are paying it.  They do

24 the distribution into Central America and let the Mexicans

25 then run it for process and distribution into the United

1    States and the rest of the world.

2    Q.    Was that an essential part for the Mexican cartels to

3    get the cocaine that you've talked about?

4    A.    They need mariners to move it.

5              MR. BAEZA:  No further questions.

6              THE COURT:  Thank you, sir.  You may step down.

7              (Witness exits the courtroom at 12:09 p.m.)

8                          - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT  )
                              )
MIDDLE DISTRICT OF FLORIDA    )


### REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter
for the United States District Court, Middle District of
Florida, do hereby certify that pursuant to Section 753,
Title 28, United States Code, that the foregoing is a true
and correct transcript from the stenographic notes taken by
the undersigned in the matter of *UNITED STATES vs. RUDOLPH
RANDOLPH MEIGHAN, JORGE RAMON NEWBALL MAY, and CALBOT
REID-DILBERT*, Case No. 8:18-cr-594-T-24JSS (Pages 1 through
103), and that the transcript page format is in conformance
with the regulations of the Judicial Conference of the United
States.



    /s/ *Scott N. Gamertsfelder*, RMR, FCRR

    *Official Court Reporter*

                              Date: September 7, 2019