1           IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                  TAMPA DIVISION

3

4  UNITED STATES OF AMERICA,      )
                                  )
5                Plaintiff,       )
                                  )
6                                 ) Case No.
         vs.                      ) 8:18-CR-00594-SCB-JSS-1
7                                 )
                                  )
8  EMIRO HINESTROZA-NEWBBOOLL,    )
                                  )
9                Defendant.       )

10

11

_____
12

       EXCERPT OF JURY TRIAL – TESTIMONY OF STEVEN BOMENTRE
13         BEFORE THE HONORABLE SUSAN C. BUCKLEW
                UNITED STATES SENIOR JUDGE
14
                   JANUARY 29, 2020
15                     9:12 A.M.
                    TAMPA, FLORIDA
16 _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
   transcript produced using computer-aided transcription.
22 _____

23            DAVID J. COLLIER, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24        801 NORTH FLORIDA AVENUE, 7TH FLOOR
                TAMPA, FLORIDA  33602
25

```
1    APPEARANCES:

2

3    FOR THE GOVERNMENT:

4

5             Nicholas G. DeRenzo

6             United States Attorney's Office

7             400 N. Tampa Street, Suite 3200

8             Tampa, Florida  33602

9             (813) 274-6000

10

11   FOR THE DEFENDANT EMIRO HINESTROZA-NEWBBOOLL:

12

13            Daniel Mario Hernandez

14            Law Office of Daniel M. Hernandez

15            902 North Armenia Avenue

16            Tampa, Florida  33609

17            (813) 875-9694

18

19

20   INTERPRETERS:

21            Beatriz Velasquez

22            Etienne van Hissenhoven

23

24

25
```

```
 1                         I N D E X

 2                    JANUARY 29, 2020

 3

 4     GOVERNMENT'S WITNESSES:

 5

 6     SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE          PAGE

 7     Direct examination by Mr. DeRenzo                      4

 8     Cross-examination by Mr. Hernandez                    42

 9     Redirect examination by Mr. DeRenzo                   49

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            *(Excerpt commences at 9:12 a.m.)*

2            THE COURT:  All right.  The Government may call

3    its next witness.

4            MR. DERENZO:  The United States calls Senior Chief

5    Petty Officer Steven Bomentre.

6            THE COURT:  All right.  Thank you.

7            MR. DERENZO:  U.S. Coast Guard.

8            THE COURT:  Sir, if you will raise your right hand

9    to be sworn.

10           COURTROOM DEPUTY:  Do you solemnly swear or affirm

11   under penalty of perjury that the testimony you're about to

12   give will be the truth, the whole truth and nothing but the

13   truth?

14           THE WITNESS:  I do.

15           COURTROOM DEPUTY:  Please state your name for the

16   record and spell your last name.

17           THE WITNESS:  Steven Bomentre, B-O-M-E-N-T-R-E.

18           COURTROOM DEPUTY:  Thank you, sir.  Please take

19   the witness stand.

20           THE COURT:  Mr. DeRenzo.

21           MR. DERENZO:  Thank you, Your Honor.

22                    **DIRECT EXAMINATION OF**

23        **SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE**

24   **BY MR. DERENZO:**

25   Q    Good morning, Senior Chief.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      5
Direct Examination by Mr. DeRenzo

1   A    Good morning, sir.

2   Q    What do you do for a living?

3   A    I am a Senior Chief Maritime Enforcement Specialist

4   with the United States Coast Guard.

5   Q    How long have you been a maritime enforcement

6   specialist?

7   A    I've been -- since 2010, January 1st, so a little over

8   ten years.

9   Q    And what did you do before you became a maritime

10  enforcement specialist?

11  A    Before I was a maritime enforcement specialist I was an

12  operations specialist from 2005 to 2010.

13  Q    Could you just describe for the jury your experience in

14  Coast Guard law enforcement.

15  A    Sure.  I have 12 years of law enforcement experience in

16  the Coast Guard operationally.  I've done well over

17  20 boardings, 14 interdictions, detained 49 suspected

18  smugglers, seized 20 metric tons of cocaine on multiple

19  vessels.  I've been an instructor at the Maritime

20  Law Enforcement Academy in Charleston, South Carolina, it's

21  a Federal Law Enforcement Training Center, where there

22  I taught authority and jurisdiction, international law,

23  narcotics identification, at-sea space accountability,

24  multiple different venues.

25  Q    And what is the Coast Guard's Maritime Law Enforcement

1   Academy, what takes place there?

2   A     So the Maritime Law Enforcement Academy is where we

3   train all of the Coast Guard law enforcement officers how to

4   do the law enforcement mission in the maritime domain, so it

5   could be anywhere from recreational boating safety to

6   counter-drug to alien migrant interdiction operations,

7   anything that takes place that's a Federal law on the water

8   is what we train there and certify them.  It's a FLETA

9   accredited course, Federal Law Enforcement Training

10  Accreditation course.

11  Q     At that Academy, in addition to being an instructor

12  like you just described, did you have any other duties?

13  A     Yes.  So for three years while I was there I was a

14  member of a CLEAR team.  CLEAR stands for Comprehensive

15  Law Enforcement Assessment and Readiness, it's an auditing

16  team that goes around to all the Coast Guard units that

17  conduct law enforcement to ensure that they are following

18  policy and procedures, they are training their members

19  correctly, they're keeping up with their certifications, and

20  we do evaluations on them to make sure that they can do the

21  job properly.

22  Q     Where are you currently assigned?

23  A     Currently I'm assigned at a unit called the Tactical

24  Law Enforcement Team Pacific, located in San Diego,

25  California.  My job there is the assistant training officer.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE          7
Direct Examination by Mr. DeRenzo

1   My primary responsibilities include training, mainly in the

2   area of trace detection and at-sea space accountability.

3   Q    Let's talk about the training you provide.  Could you

4   describe for the jury at your current unit what kind of

5   training you provide.

6   A    I currently do all of the high risk training, so water

7   survival training, all of the range training, shoot house

8   training, and then for trace detection I train the members

9   on an instrument called a Smiths Detection 500DT, they get

10  that training annually to maintain their certification to

11  operate that.

12  Q    How many people in the Coast Guard Pacific region are

13  qualified, certified to provide the training on the 500DT

14  that you just described?

15  A    So last year we only had two in the entire Pacific

16  region.  We just certified two more this year, so we have

17  four members able to train on it, but we only have

18  two technicians capable of, you know, analyzing data from it

19  and conducting higher level instrument maintenance on it.

20  Q    And are you one of those two individuals?

21  A    I am.

22  Q    Okay.  Let's talk about the training you received

23  throughout your Coast Guard career, specifically as it

24  relates to the ion scan instrument.  What kind of training

25  have you personally received?

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE          8
Direct Examination by Mr. DeRenzo

1    A    So my first experience with the trace detection

2    equipment, ion scan, was -- I believe it was 2006, on a

3    previous version of it that was the Smiths Detection

4    Ion Scan 400B, and then from -- and I maintained

5    certification for that for many years, and then I was

6    trained on the 500DT back in 2017, I believe, where

7    I learned how to be operator/technician, Train the Trainer,

8    and all this training came from the company that

9    manufactures the instrument.

10   Q    That's Smiths Detection?

11   A    That's correct.

12   Q    When you say "Train the Trainer," what do you mean by

13   that?

14   A    It's a course that teaches you how to be an instructor.

15   Some people might have a wealth of knowledge but don't know

16   how to get that information across, so the Train the Trainer

17   course is a -- it's a requirement to certify other operators

18   within your -- within the Coast Guard.

19   Q    Have you trained anybody on how to use an ion scan

20   instrument at your current unit?

21   A    Many.  I've trained all the members there on how to use

22   it.

23   Q    And how about people outside the TACLET?

24   A    Yes, I've trained multiple Coast Guard cutters from

25   Port Angeles, Washington, Seattle, San Francisco, San Diego.

1  I've flown to Guam to train the members over in Guam on how

2  to use it, including CBP, ICE, Customs Border Protection,

3  ICE, and their Coast Guard Investigative Services.

4  Q    In addition to your ion scan instrument training, is

5  there any other relevant law enforcement training that

6  you've received over the years?

7  A    Yes.  So I've been to a multitude of courses in my

8  career with the Coast Guard.  I've attended Boarding Team

9  Member School at MLE, the Maritime Law Enforcement Academy

10 in Charleston, South Carolina.  I attended Boarding Officer

11 School at Maritime Law Enforcement Academy.  I attended

12 something called Maritime Counter-Trafficking Course there

13 as well, a multitude of fishery schools.  So I think

14 I pretty much hit every school that we offer.

15 Q    You mentioned a couple qualifications already.

16 In addition to being an ion scan instrument trainer,

17 maintainer and operator, do you have any other

18 law enforcement qualifications?

19 A    Currently a professional member of an

20 ASTM International working group to develop methods for

21 detecting synthetic opioids, mainly fentanyl, fentanyl

22 analogues, precursors, and what instruments will work to

23 detect those synthetic opioids, and that's funded by the

24 Department of Homeland Security Science and Technology

25 Directorate and Pacific Northwest National Laboratory.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      10
Direct Examination by Mr. DeRenzo

1   Q    In addition to yourself, what kinds of other people are
2   on this working group?
3   A    Scientists, chemists, engineers, first responders in
4   the field for hazmat, hazardous materials, lots of Ph.D.s.
5   Q    How many people in the Coast Guard are on this working
6   group?
7   A    There's currently two, two members on this working
8   group from the Coast Guard.
9   Q    And you're one of them?
10  A    Correct.
11  Q    Are you a qualified boarding officer as well?
12  A    I am.
13  Q    That's just not your primary day-to-day job at the
14  TACLET?
15  A    We maintain all of our certifications regardless of if
16  it's a primary job or not, because we don't know when
17  something might happen and you need extra bodies to go out
18  the door, but my primary job is training.
19  Q    Okay.  And I should have asked you this at the
20  beginning of your testimony, but what is a Senior Chief in
21  the Coast Guard?
22  A    So Senior Chief is the second highest enlisted rank.
23  It goes from Enlisted 1 or E-1 to Enlisted 9.  I am
24  Enlisted 8 or E-8.
25  Q    Let's talk a little bit about ion scan instruments in

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      11
Direct Examination by Mr. DeRenzo

1  the Coast Guard.  What kinds of instruments does the

2  Coast Guard use?

3  A    The Coast Guard currently uses the Smiths Detection

4  Ion Scan 500DT, DT standing for dual tube.

5  Q    You mentioned another model before.  Was that just

6  something you were trained on or was that something the

7  Coast Guard used as well?

8  A    So the 500DT didn't come about until 2005.  The 400 --

9  400B came around in the 19 -- late 1990's, 1997, so the 400B

10 is the same technology, the only difference is that I could

11 only do -- I could only analyze drugs or explosives, I could

12 do one at a time, I couldn't do them both, where the 500DT,

13 for dual tube, I can analyze drugs and explosives at the

14 same time.

15 Q    So the 500DT, is that the one the Coast Guard is

16 currently employing?

17 A    That's correct.

18 Q    Basically a newer model?

19 A    Newer model, same technology.

20 Q    Okay.  And for what purposes does the Coast Guard use

21 this instrument?

22 A    The Coast Guard has been using it for trace detection

23 of narcotics during boardings.

24 Q    And do you know why in particular the Coast Guard uses

25 the ion scan instrument specifically, the 500DT and its

1   predecessor the 400B?

2   A    Sure.  The technology has been around since the 1970s.

3   It's been proven to be effective.  It's highly sensitive for

4   detecting things that aren't visible to the naked eye, down

5   to approximately less than a nanogram or one billionth of a

6   gram.  It's -- this one is optimized for drugs and

7   explosives, but they can be optimized to detect anything

8   they want, so it's used in the medical industry for bacteria

9   and other items that they're looking for.  It's used in

10  universities for science, in their science labs.  It's used

11  at the airport every day.  I don't know if any of you have

12  been lucky enough to get a random inspection.  Well, that

13  hand swipe they do of your carry-ons and yourself, that goes

14  through an instrument similar to the Smiths Detection 500DT,

15  if not that one, to look for explosives.

16  Q    Now, when you're doing specifically the counter-drug

17  mission at the Coast Guard, you're not in a laboratory doing

18  these tests, right?

19  A    We are not.  They're designed to be field use and field

20  detection, so they're certified in a laboratory setting,

21  however, they're designed to be used out in a non-laboratory

22  setting.

23  Q    All right.  If you could, please, just describe for the

24  jury just what an ion scan instrument looks like.

25  A    Sure.  I got a couple of slides I can show you about

1    that, or --

2    Q    Would that help you in your testimony, explaining that?

3    A    It would.

4         So this is the Smiths Detection Ion Scan 500DT.

5    To give you an approximate size, about a small or

6    medium-sized printer in an office or like a microwave size.

7         Looking at the front of this here, here is the

8    sample inlet area, where the operator inserts a swab.

9    Up here is your display touch screen, where the operator

10   selects what they want to do, whether it's, you know,

11   conduct a verification or an analysis of the sample.

12   Additionally, this is where it will display other

13   information, like alarms.  It has a built-in printer which

14   can be configured so that whenever an alarm is displayed it

15   will print out a receipt and it will list all of the

16   operating parameters of the instrument at the time, it will

17   list what it alarmed for.  A lot of different information is

18   displayed on this receipt.

19   Q    How long has the Coast Guard been using this particular

20   instrument?

21   A    They've been using this before I -- maybe not this

22   model, but they've been using ion scan technology since

23   before I joined in 2005.

24   Q    Are you aware if any other Federal agencies or State

25   agencies use either this instrument itself or the underlying

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      14
Direct Examination by Mr. DeRenzo

 1   technology?

 2   A     Yes.  So they use it at the border, so CBP uses it at

 3   the border, border patrol.  They use it in airports every

 4   day, so TSA uses it, Capitol police use it.

 5   First responders have the capability of using this type of

 6   instrument for if they come across a clandestine lab where

 7   they manufacture methamphetamines or fentanyl, they can use

 8   it to identify what chemicals they may be coming across.

 9   Q     So those other agencies you spoke of, do they also use

10   it for detection of trace amounts of drugs as well?

11   A     Some do.  Some use it strictly for explosives.

12   So airport TSA uses it strictly to detect explosives.  At

13   the border they use it for both.  It depends on what your

14   unit -- or your agency's mission is.

15   Q     Are you aware of any known or potential rates of error

16   with this particular instrument?

17   A     So the published false alarm rate or false positive

18   rate is less than 1 percent.

19   Q     And you said "published."  Published by whom?

20   A     It's part of the operating manual for the Smiths

21   Detection equipment.

22   Q     You mentioned the term "false positive."  What does

23   that mean?

24   A     So a false positive means that when the operator runs a

25   sample, they don't know if there's anything on it yet or

1    not, that's what they're relying on the instrument for.

2    A false positive would be there was not a drug or narcotic

3    on the swab but the instrument said that there was.

4    Q    Are you familiar with the term false negative?

5    A    Yes.

6    Q    What does that mean?

7    A    So a false negative would be there is drugs on the swab

8    or explosives on the swab and the instrument does not alarm.

9    Q    And what are some of the reasons why there might be

10   drugs on a swab and yet the instrument does not signal or

11   alarm for that drug?

12   A    So because it's highly sensitive, there's three things

13   that can affect the detection criteria for an alarm, that's

14   mainly air pressure, temperature and humidity.  So if a swab

15   was wet, it creates steam when it's heated, it would bond

16   with the sample and possibly slow it down, not showing an

17   alarm for cocaine or some other explosive.

18   Q    Are there any environmental factors when, say, you're

19   taking swab samples from a vessel that would make it more or

20   less difficult to find trace amounts of drugs on the boat?

21   A    Sure.  If a sample was submitted and it was still damp

22   with moisture, it could affect the result of that sample.

23   Like I said, when water is heated it creates steam, and that

24   will slow down the molecules.

25   Q    Are you aware of any solvents or any other substances

1  that can move particles of drugs, cocaine, for instance,

2  around a vessel at sea?

3  A    So, yes, fuel is used commonly to wash down the boat.

4  Additionally, fuel is just inherently there because of the

5  amount that's on board and the amount of containers during

6  fuel -- during transferring of fuel containers.  We

7  generally train not to swipe anything wet because of this

8  reason; however, if it is, we instruct the operators to let

9  it evaporate before running it through.  Additionally

10  I wouldn't want to run fuel through this because it is

11  heating it, and when you heat fuel you could create an

12  explosion and that would not make the instrument work very

13  well.

14  Q    To be clear, when you're actually doing the samples

15  themselves on a surface, boat or anywhere else, are you

16  looking for visible amounts of drugs?

17  A    No.  So this instrument is designed for trace

18  detection, it's not visible to the naked eye, so because

19  it's not visible, the operators are trained to swipe

20  anywhere that the hands may come in contact with or where

21  bulk packaging may come in contact with, so generally the

22  rails, side rails, hatches, the steering column or steering

23  wheel where the helm is at, radios, or even areas where they

24  believe that possibly it might be concealed.

25  Q    And how would an operational setting, like on a boat

1   out in the middle of the ocean, affect the movement of

2   potential drug particles?

3   A    So generally speaking these are large quantities of

4   narcotics that are being smuggled, so -- and they're running

5   at high rates of speed, so when you're talking many, many

6   bales that are in a compartment, they're going to bounce

7   around, they're going to be hitting sides.  Additionally,

8   the people on board have to move around to change the fuel,

9   so they're going to have to come across and touch certain

10  areas, so transfer is highly likely.

11  Q    Can the fact that you're in a marine environment or the

12  fact that there's fuel on board -- you mentioned the

13  possibility of someone wiping down a boat.  How could that

14  affect whether or not you ultimately find some of the

15  substance on the surfaces you're swiping?

16  A    Yeah.  So water is a universal solvent.  If there's

17  anything it was on, like trace amounts, the water would mix

18  with that and then as the water evaporated it would leave

19  the trace amounts behind.  So if you think like a -- like a

20  slurry and I get my hand wet with cocaine water, wherever

21  I touch I'm leaving -- I'm leaving trace amounts of cocaine

22  behind.  However, over a period of time, eventually it's

23  going to wash away, so wind will affect, blowing away the

24  trace amounts, water will eventually wash it all away and it

25  will just go into the ocean.

1  Q    Okay.  Now, I want to go back to those two terms, false

2  positive and false negative.

3        Is a false negative more or less likely than a

4  false positive?

5  A    A false negative would be more likely based on those

6  factors that can affect it, mainly the humidity, because

7  we're working in a maritime environment, there's water all

8  around.

9  Q    All right.  So let's talk a little bit more about this

10  instrument specifically, the 500DT, and how it actually is

11  used to determine whether or not there's drugs on a surface.

12  Can you describe that process.

13  A    Sure.  I have another slide here that shows a cutaway

14  of what an ion mobility spectrometer looks like inside.

15        So what we're looking at here is one of the IMS

16  tubes, or ion mobility spectrometry.  The front of the unit

17  I showed you before, where I showed you the operator inserts

18  a sample, that's this area here.  What happens is the

19  operator will insert one of the swabs into there and they

20  will hit Analyze on the touch screen.  When they hit

21  Analyze, this right here will raise up and it will heat or

22  vaporize the swab, uses about 450-degree heat to vaporize

23  everything that's on the swab.  Additionally, it will blow

24  clean dry air into the instrument.  So anything that's on

25  the swab is then vaporized and it goes through this tube

1    here to an ionization region.  This has a weak radioactive

2    source that either gives a positive or a negative charge, so

3    for narcotics it gives it a positive charge, for explosives

4    it gives it a negative charge, and this happens

5    simultaneously in two different tubes.

6          From here it's held in this region until what's

7    called a gating grid opens up.  So we have a mixture of

8    different charged molecules in there and the gating grid

9    will open up 30 times during an analysis and allow particles

10   to drift from point A to point B, which is over here at the

11   collector, and the time that they reach there is called the

12   drift time.  Each particular molecule has a specific drift

13   time based on its mass and shape or the way it spins through

14   the air from point A to point B, and that's a known number

15   that's been tested in a laboratory setting, it's been

16   programmed by the manufacturer into the system to kind of

17   give a fingerprint for everything that it's been designed to

18   look for.

19   Q    So that drift time, is that something you input into

20   this instrument?

21   A    It is not.

22   Q    How about another individual in the Coast Guard, an

23   ion scan, just an operator, do they put that information

24   there?

25   A    They do not.

1    Q    Okay.  And how does that -- well, what are the factors

2    you're looking for, or specifically the instrument looks for

3    to determine whether it's cocaine or some other substance?

4    A    So it's mainly based on drift time, but it also has

5    other factors added in to eliminate false alarms, so not

6    only drift time, it needs to have a minimum amplitude or a

7    minimum height, so it has to detect a certain number of

8    molecules of cocaine, it has to be the right shape, so the

9    width of the peak when it gets there has to fall within

10   certain parameters, and then it also has to have the correct

11   number of segments consecutively.  These numbers have been

12   set very high to get a less than 1 percent false alarm rate,

13   so -- yeah.

14   Q    Let's talk about actually using the instrument.

15   A    And we can go back a slide.  I can -- the touch screen

16   is a little off.  I can't clear it.

17   Q    Could you describe for the jury exactly how it is that

18   you test a sample.

19   A    Sure.  So this is the display that the operator sees

20   when they're inserting a sample.  Before they insert the

21   sample they'll see a green screen, which is the ready screen

22   located here, and then when they want to run the sample

23   there's a button over here to the right called Analyze, we

24   can see that it's bold and black right there in the green

25   screen.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE        21
Direct Examination by Mr. DeRenzo

1  Q    What does that mean?

2  A    It means that the instrument is ready to submit a

3  sample.  If it was not ready, they would not be able to

4  submit a sample, meaning it would show a yellow screen.

5            So above here we have a yellow screen, which is

6  Waiting, this is an error on the slide, it should say

7  Waiting, Not Ready, and you will also notice that the button

8  over here Analyze is stippled out or grayed out, meaning the

9  operator cannot select it.

10  Q    So if I were trying to analyze a sample, a swab that I

11  took from a boat and I saw that yellow screen and I tried to

12  press Analyze, what would happen?

13  A    It wouldn't analyze.  The instrument -- it's very

14  operator user friendly, it's designed for a person who is

15  not a chemist or a lab scientist to operate.  So the

16  instrument conducts all the calibrations, it maintains its

17  proper air flow and temperatures, and if it was not ready,

18  it would not let the operator select Analyze.

19  Q    If when testing an ion scan swab the instrument does

20  detect some substance that's programmed into it, what will

21  the operator see?

22  A    So the operator would see the red screen at the bottom

23  here, it will display Alarm and then it will also show the

24  operator what it alarmed for, so that would be this area

25  here, telling the operator what it alarmed for.

 1              Additionally it could be configured to print out a

 2    receipt at that time for case package purposes or

 3    documentation purposes; however, the instrument stores every

 4    sample, every run into its hard drive, so if it doesn't

 5    print out, we can always go back in there and print it

 6    again, because it's permanently stored.

 7    Q    Is that something you've done as a -- not only a

 8    trained operator but someone who is trained to actually

 9    repair and maintain these instruments?

10    A    It is.

11    Q    Let's talk about some of the other features of the

12    instrument itself.  Are there any built-in features that

13    decrease the likelihood that there's going to be user error?

14    A    Increase the likelihood of user error?

15    Q    Decrease the likelihood.

16    A    Decrease the likelihood of user error.

17              Can you rephrase the question?

18    Q    Are there any built-in features that help the --

19    A    Yes.

20    Q    -- reliability of the instrument itself?

21    A    So there's something called a verification.  What a

22    verification is is it helps the user build confidence that

23    the instrument is working properly.  So if the machine did

24    not pass verification then it would not alarm for what it's

25    detected to alarm for.  We train to conduct a verification

1  at a minimum of weekly, and in this particular instrument

2  involved in this -- in this court case, verification was

3  done prior to the boarding, within that week timeframe, and

4  a verification was done after the boarding, which showed

5  that the instrument was working properly before and after.

6  Q    How do you know that?

7  A    Because it passed the verification.

8  Q    But how do you personally know that?

9  A    I was able to go into the instrument, pull the

10  verification log and verify that it -- what the instrument

11  was designed to look for, the instrument found.

12  Q    So let me give you a hypothetical.  If I swab a

13  surface, it just so happened that surface has some cocaine

14  on it, but for some reason that verification process either

15  wasn't done or didn't go right --

16  A    Or it didn't pass.

17  Q    -- and I sample -- try to analyze a sample, what would

18  you expect to happen?

19  A    It would not show an alarm for cocaine.

20  Q    And what would you call that?

21  A    I would call that a false negative.

22  Q    You mentioned some factors earlier that can affect this

23  testing process, air temperature, humidity.  Is there

24  anything in the instrument itself, built in, that adjusts

25  for those factors?

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      24
Direct Examination by Mr. DeRenzo

1   A    Yes.  So the instrument is constantly maintaining its

2   optimal operating specifications.  There is a calibrant,

3   which is built into both of the ion mobility spectrometry

4   tubes, and that calibrant is constantly running through the

5   instrument and it's -- excuse me, it's calculating what the

6   expected drift time is for all of the narcotics and

7   explosives in its library based on where it sees the

8   calibrant at.  So if air pressure changes, it sees the

9   air pressure has changed, it calculates where it expects to

10  see the calibrant, and this is constantly being done while

11  the instrument is on.

12  Q    You mentioned that the instrument itself is somewhat

13  portable.  In your experience, and the way you train

14  members, is that -- is this process done, the analysis on

15  the target that you're looking at?

16  A    So it is not.  The instrument requires power, either

17  120 or 240 volts, so the instrument stays on board the host

18  ship wherever the crew -- the bulk of the crew is located

19  at, and then the samples are taken separately from the

20  boarding team.  Those samples are then bagged, gloved and

21  bagged and sent back to the host ship, where they are run

22  separately from the actual collecting of it, so there is no

23  chance of contamination from the actual ship.

24  Q    Now, every ship is a little bit different in the way

25  it's set up and how big it is, but is there any spaces in

1   general where you would not only store this instrument

2   during a patrol but actually run the tests?

3   A    So the instrument is generally stored in a restricted

4   space which has limited access only to people with

5   clearances, either secret or above, and in that space is a

6   air conditioned climate-controlled positive air flow

7   controlled space.

8   Q    And why that space, other than the security aspect?

9   A    Because there's other electronics in that space, it's

10  generally where all their radar equipment is, and it needs

11  to stay cool.  Additionally it needs to stay dry.  You can't

12  have wet computers.  So it's an optimal space to run samples

13  because of the dry -- dry cool environment.

14  Q    You mentioned before that one of your jobs is to train

15  people on how to use this particular instrument.  Do you, in

16  the course of your current duties, train people on how to

17  actually take the samples from a boat?

18  A    I do.

19  Q    And what do you train people to do?

20  A    So before the boarding team or the officers go out to

21  conduct a boarding, swabs are taken of them, of their hands,

22  to -- palms, hands, fingertips, to ensure that they do not

23  have cocaine residue on them and they could not be a source

24  of contamination.  Those samples are run, and if a positive

25  is observed, one of the members alarms, they're either

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      26
Direct Examination by Mr. DeRenzo

1    removed from the boarding or they're sent to decontaminate,

2    wash their hands, whatever it might be that alarmed, and

3    come back and be tested again.

4    Q    And then the actual process of sampling, what do you

5    train people to do?  How do you do that process?

6    A    So during the boarding it's a two person operation, you

7    have the person who writes down where the samples are taken

8    from and then you have a person who actually physically

9    takes the samples.  The person physically taking the

10   samples, that's what they call loading up gloves, or he'll

11   put on nitrile gloves, ten maybe at a time, whatever he can

12   fit on his hand, and what he will do is he will take a clean

13   swab from a sealed container, he will take that swab, swab

14   an area where he expects to find trace amounts of narcotics.

15   Again, we're dealing with non-visible particles, so they are

16   trained to swab wherever hands might come in contact with.

17   He then removes that glove, leaving the sample in there, he

18   will label it with a number or a place, and then the person

19   who is taking the log will write down what sample 1 is of.

20   That glove is then placed into a sealed bag and that bag is

21   brought back to the ship.  And this is repeated multiple

22   times.

23   Q    When you actually analyze a sample and you get that

24   red screen that we can see here in the PowerPoint, what is

25   the significance of seeing that red screen, that alarm?

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE          27
Direct Examination by Mr. DeRenzo

1    A    It notifies the operator that a substance that the

2    instrument was looking for was detected.  It will display a

3    red screen, it will play an audible alarm, we have ours

4    configured to print receipts, and then the operator will

5    notify the people on board of the results.

6    Q    Now, you have detailed for the jury your extensive

7    training and experience you have with this instrument.  Are

8    you able to actually look at the data from the testing and

9    analyze and interpret those results?

10   A    I am.

11   Q    Let's talk first about the methodology that you use to

12   interpret those results.  What's the starting point for you

13   when you see one of the receipts you talked about with the

14   information on it?

15   A    So the first thing I look at is the operating

16   parameters, the top, make sure the instrument was operating

17   properly, then I will look to see what the instrument

18   alarmed for, and that will be displayed at the bottom of the

19   receipt.  Then there's multiple sectors -- there's multiple

20   different items listed there for the alarm, and I'll look at

21   those items to determine the quality of the hit.

22   Q    And we'll talk about those individual factors in a few

23   minutes here, but are you aware of any known thresholds that

24   you're looking for when you're looking at this information?

25   A    Yeah.  So there's different things you're looking for.

1   For example, cocaine needs a minimum amplitude of 50, it

2   needs to have a drift time of plus or minus 50 microseconds,

3   which is -- a microsecond is one billionth of a second.  If

4   you were to think of a blink of an eye, which is a third of

5   a second, it would be 6,000 times faster than a blink of an

6   eye.  It has -- you're looking for the shape or the width of

7   the -- of the peak, the reference peak, and then you're also

8   looking for something called the consecutive number of hits.

9   For instance, cocaine is two consecutive hits.

10  Q    And what's that number called?

11  A    That's your segments.

12  Q    When you look at that data, say for a receipt that

13  alarmed for cocaine, what can you infer simply by looking at

14  that information?

15  A    So the instrument is a qualitative instrument, not

16  quantitative.  Qualitative meaning that it's very good at

17  identifying substances.  It will not tell you how much of a

18  substance is available, because we're dealing with such

19  small amounts.  I couldn't tell you, you know, if it was one

20  brick or a million bricks, but I just know that cocaine is

21  present.

22  Q    Okay.  So some amount.

23  A    Some amount.

24  Q    You couldn't say definitively when or how it got there,

25  but by looking at one of those receipts, how much confidence

1  can you have that some amount of that substance is there?

2  A    I could have high confidence that there was some of

3  that substance there.

4  Q    All right.  You mentioned this case, the interdiction

5  in this case earlier.  Have you had an opportunity to

6  examine the ion scan results from this case in particular?

7  A    I have.

8  Q    Are you able to, based on the criteria you just

9  discussed, render an opinion as to those results?

10  A    I am.

11  Q    Let's take a look at those.

12         Pulling up what's now been admitted as

13  Government's 7A --

14         THE COURT:  Could we dim a little bit more.

15  Q    We'll start at the top here.

16         As an ion scan operator, and based on the

17  experience you just discussed, what is relevant to you at

18  this part of the result?

19  A    So I'm looking at, one, that -- the ion scan model,

20  serial number, but I'm also looking at the alarm and that

21  the operation was normal.  I take into account the

22  air pressure, differential pressure and drift flow.  For

23  those numbers I generally want the differential pressure to

24  be less than .1 and drift flow to be somewhere between 299

25  and 301, which is kind of the standard operating for this

1    instrument.

2    Q    We'll zoom in.  This is the second page of 7A at the

3    top here.

4         Do you see the area I've highlighted that says

5    cocaine 3 percent?  Did I read that right?

6    A    You did.

7    Q    What does that mean to you?

8    A    So the percentage doesn't necessarily mean anything.

9    It's a subjective number.  Because the instrument already

10   has a high threshold to get that less than 1 percent alarm

11   rate, all the 3 percent is saying, that it was 3 percent

12   higher than its threshold amount.  It could be a 1 percent

13   alarm or it could be a 100 percent alarm, they both mean the

14   same thing to me.  An alarm is an alarm or a hit is a hit.

15   Q    And that means what?  "A hit is a hit," what does that

16   mean to you?

17   A    It means that cocaine was present.

18   Q    We'll zoom into the bottom of that left-hand receipt.

19   And in the Comments section it says, location, port side

20   rail.  Did I read that right?

21   A    Yes, sir.

22   Q    I'm going to highlight some numbers.  If you could

23   just explain to the jury what is the significance, if any,

24   of those numbers.

25   A    Sure.  So at the top we saw an alarm for cocaine.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      31
Direct Examination by Mr. DeRenzo

1    This was the cocaine 3 percent alarm.  So down here it gives

2    you more specific information about what it actually saw

3    during that alarm.  For instance, this number -- this number

4    symbol here, this tells me the number of segments that it

5    saw cocaine.  During an analysis there are 30 possible

6    segments.  In this one it saw cocaine in 11 out of 30 of

7    those segments.

8         You have your amplitude -- this is not working.

9         You have your amplitude, which is your highest

10   peak that it saw, in this case it was 93, where the minimum

11   I need is 50.

12        You have your delta.  In this case it's

13   negative 4.  This is measured in microseconds.  So the

14   expected drift time was 4 microseconds off of where it

15   needed -- or where it wanted to be.  And the threshold for

16   this is plus or minus 50 microseconds.  So if we think of

17   the delta of being zero as the very, very, very center of a

18   bullseye, you can't get more center than that, this would be

19   4 microseconds away from that very center of the bullseye.

20        And then your cumulative A is -- your cumulative

21   amplitude is how much -- it adds up all of the 11 segments

22   and tells you how much it saw during that -- during that

23   analysis.

24   Q    Okay.  So let's talk about the delta briefly.

25        When you talk about the drift time, that's the

1   ideal -- we're in a laboratory, we know what's on the swab

2   is cocaine or whatever we're testing for, and this time has

3   been figured in an ideal setting.  Did I have that right?

4   A    That's correct.

5   Q    And so relative to that ideal time, what does the delta

6   tell us?

7   A    That's almost as close to perfect time as you could see

8   for a sample run in the field.

9   Q    And how does that affect your confidence that the

10  substance was in fact cocaine when you are looking at a

11  result like this?

12  A    Based on the fact that it already has a less than

13  1 percent false alarm rate, my confidence is already high,

14  but reading this I would have an even greater confidence

15  that, yes, that was cocaine.

16  Q    So fair to say that the lower that number is, the

17  delta, the closer it is to zero, plus or minus, does that

18  increase your confidence that it is in fact some amount of

19  cocaine?

20  A    It does.

21  Q    Thank you.

22         Now, the figure in between the number sign and the

23  A-M-P, CumA.

24  A    Cumulative amplitude.  Is that what you're talking

25  about, the CumA?

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE        33
Direct Examination by Mr. DeRenzo

1    Q    Yes.  Mathematically how do we get that number?

2    A    So it's just a total of the 11 segments added up to get

3    your cumulative amplitude of cocaine molecules detected.

4    Q    Does the amplitude have any correlation to the quantity

5    of substance on a particular swab?

6    A    The higher the amplitude, the more cocaine is present

7    on that swab.

8    Q    But to be clear, you couldn't say whether it's so many

9    grams or milligrams or nanograms?

10   A    I could not.

11   Q    But the higher the number in amplitude means a

12   relatively higher quantity?

13   A    Correct.

14   Q    So is there any correlation between the cumulative

15   amplitude, the number right next to it, and the relative

16   quantity of cocaine on the sample?

17   A    So the higher the cumulative amplitude, the more

18   molecules of cocaine were detected, the higher amount of

19   cocaine was on that sample.

20   Q    So we'll zoom into the right-hand receipt which the

21   Comments section has labeled as Location, center hold.  Did

22   I read that right?

23   A    Yes, sir.

24   Q    Could you discuss for the jury the figures I have

25   highlighted just above that.

1   A    Yes.  So, again, we have an alarm for cocaine.  This

2   time the pound sign below that, we see 24, meaning that out

3   of a possible 30 segments, the instrument saw cocaine in 24

4   of them.  Remembering that I only need two consecutive

5   segments to get an alarm, this one had 12 times that number.

6          The cumulative amplitude is in the thousands, with

7   a high amplitude of 227.  The minimum I need for a cocaine

8   alarm, again, is 50 for amplitude, so this is four and a

9   half times higher than the minimum required.

10         And the delta here is minus 2 microseconds.

11  We can have up to plus or minus 50 microseconds.  This is

12  almost dead center on the bullseye for cocaine.

13  Q    How many samples, either in a training setting,

14  operational setting, total, do you think you've run through

15  an ion scan instrument?

16  A    Hundreds.  Many, many hundreds of samples.

17  Q    In relationship to other samples you've seen,

18  personally analyzed, how would you compare this particular

19  sample?

20  A    This sample is probably as near perfect as you can get

21  in a -- in a field setting.

22  Q    Go to the next page of Exhibit 7A and zoom in on the

23  bottom of the left-hand receipt, which is labeled in the

24  Comments section as, forearms, Calbot Reid-Dilbert.  Did

25  I read that right?

 1   A     Yes, sir.

 2   Q     I'll again highlight the information here just above,

 3   and if you could just take the jury through that

 4   information.

 5   A     Again this is an excellent alarm for cocaine.  We saw

 6   cocaine in 12 out of 30 segments.  We have an amplitude of

 7   100, which is twice the minimum.  Your delta is

 8   4 microseconds from dead center.  This is an excellent --

 9   additionally, the members that -- the detainees or suspects

10   are -- they're not swabbed until very later on, so they have

11   a chance of actually washing down between then, so the fact

12   that you got a sample like this is very good on a person.

13   Q     And based on the parameters you just discussed, is this

14   sample itself within parameters?

15   A     Yes, it is.

16   Q     Zoom into the right-hand side of 7A.  The Comments

17   says, Calbot Reid-Dilbert, hands.  Did I read that right?

18   A     Yes.

19   Q     If you could, again, explain to the jury these figures

20   that I've highlighted.

21   A     Yes.  So again we have a cocaine alarm, 17 segments out

22   of 30; amplitude of 98, which is pretty much twice the

23   minimum required; a delta of minus 20 microseconds, or

24   20-millionths of a second, which is well within the plus or

25   minus 50 microseconds allotted for an alarm for cocaine.

1   Q    And how many segments do you need consecutive?

2   A    I need two.

3   Q    And here we have how many?

4   A    17.

5   Q    So is this sample within parameters as well?

6   A    It is.

7   Q    What is your confidence level that some amount of

8   cocaine is on this swab?

9   A    I have high confidence that there was cocaine on this

10  swab.

11  Q    All right.  We'll go to the next page of 7A, zoom in on

12  the bottom left receipt, it's labeled Rudolph Ralph Meighan,

13  hands.  Did I read that right?

14  A    Yes, sir.

15  Q    Could you once again explain to the jury the

16  significance, if any, of the figures I've just highlighted.

17  A    So again we have an alarm for cocaine.  Number of

18  segments, we have eight; amplitude of 58; and a delta of

19  minus 19 microseconds.  We were four times required number

20  of segments.  We're slightly above the minimum amplitude

21  threshold, but we're well within the timeframe for cocaine.

22  So there was cocaine detected.  It wasn't a large amount of

23  cocaine on that swab.

24  Q    When you say that, you mean relative to the other

25  swabs?

1  A     Relative to the swab.  Again, you're dealing with trace

2  amounts, not visible to the eye.  It doesn't mean that it

3  wasn't there, it just means that maybe they didn't swab an

4  area that had more located on it.

5  Q     I'll move to the other receipt on the right-hand side

6  of the page, comments labeled, hands, Jorge Ramon

7  Newball May.  Did I read that right?

8  A     Yes.

9  Q     And if you could do the same thing with the highlighted

10 portion.

11 A     So we have an alarm for cocaine, 17 segments out of the

12 required 2; I have an amplitude of 161, where all I need is

13 50; and my microseconds are minus 7 microseconds, which is

14 well within the plus or minus 50.  This is a very good hit

15 for cocaine.

16 Q     Is every one of those figures within the parameters?

17 A     It is.  The instrument will not alarm if it's not

18 within the parameters.

19 Q     Go to the next page.  I'm zooming into the bottom here.

20       Comments of this result labeled Emiro

21 Hinestroza-Newbbooll, forearms.  Did I read that right?

22 A     Yes, sir.

23 Q     Highlight some data just above that, if you could, to

24 explain to the jury the significance of that information.

25 A     Sure.  So again it alarmed for cocaine.  We have

1  8 segments where cocaine was seen; we have an amplitude of

2  72, which is above the 50; and a delta of minus 22

3  microseconds, which is well within my plus or minus 50.

4  Q    Now, we're obviously dealing with small particles here.

5  In your experience would you expect to find a relatively

6  stronger hit on an individual's hands or their forearms if

7  they were handling cocaine bales?

8  A    You would expect to see a higher hit most likely on

9  their hands because the hands are the tools that come in

10  contact with everything, but again, because we're dealing

11  with trace amounts, you're kind of swabbing blindly, hoping

12  that where you're swabbing is a good spot.

13  Q    To be clear, is this particular analysis within

14  parameters --

15  A    It is.

16  Q    -- on each of the relevant criteria?

17  A    It is.

18  Q    Zoom into the right-hand side of this page.  It's

19  labeled under the Comments section as

20  Emiro Hinestroza-Newbbooll, hands.  Did I read that right?

21  A    Yes.

22  Q    If you could explain the significance of the portion

23  I've highlighted just above that.

24  A    So in this sample an alarm for cocaine was detected in

25  13 segments; the amplitude was 147, three times the required

1   amount; the delta was minus 12 microseconds, which is within

2   my 50 plus or minus; and like I said, 13 segments is six and

3   a half times the requirement for consecutive segments.

4   Q    Is every one of these criteria within parameters?

5   A    It is.

6   Q    So this last two pages, Senior Chief, it's a longer

7   receipt.  I'll first zoom into the bottom.  It's labeled as

8   Location, starboard side rail.  Did I read that right?

9   A    Yes, sir.

10  Q    What we'll do is scroll back to the previous page,

11  middle of the receipt.  Can you explain the significance of

12  the portion that I've highlighted.

13  A    Yes.  So this is another excellent hit.  This is an

14  alarm for cocaine.  22 out of 30 segments, the instrument

15  saw cocaine, with an amplitude -- a max amplitude of 150,

16  which is three times the required amount.  Your expected

17  drift time was minus 6 microseconds from dead center of

18  bullseye, which is within that plus or minus 50.

19  Q    So that first number, 22, is that 22 out of 30?

20  A    That is correct, 22 out of 30.

21  Q    Now, what side of the boat is the starboard side?

22  A    That's the right side of the boat.

23  Q    Now, after analyzing each of these results, and based

24  on what you know about ion scan technology, your experience

25  as a boarding officer, your training as a boarding officer,

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      40
Direct Examination by Mr. DeRenzo

1    are you able to form an opinion regarding the presence of

2    drugs on board the vessel where these swabs were taken?

3    A    I am.

4    Q    What is your opinion?

5    A    That cocaine was present on board this vessel.

6    Q    Now, are you able to say exactly when or how long ago?

7    A    I can't say when or how long ago because trace

8    detection can be persistent; however, the fact that the

9    vessel is made from fiberglass, it's nonporous, it would

10   have a hard time clinging to a surface like that,

11   additionally the maritime environment, water would end up

12   washing it away, along with wind, and sun would degrade the

13   results.

14   Q    And does that in any way affect your opinion of how

15   recently you believe cocaine was on board the vessel where

16   these samples were taken?

17   A    Based on the number of samples that alarmed for

18   cocaine, the quality of the samples, meaning the number of

19   segments that it alarmed on, and the amplitudes, I would say

20   that cocaine was on board this vessel very recently.

21   Q    What is the likelihood that every single one of these

22   positive samples for cocaine was a false positive?

23   A    Again, since the instrument already has a 99 percent --

24   less than 1 percent false alarm rate, if it was maybe one

25   alarm out of that, there's a possibility.  The fact that we

1  have ten alarms for cocaine out of 18 swabs taken is -- it

2  would probably be easier to win the lotto.

3  Q    Now, based on the same criteria, experience or training

4  that we've just discussed, are you able to form an opinion

5  about contact by the individuals referenced in these samples

6  with respect to cocaine?

7  A    Yes.  So are you talking about people?

8  Q    People, yes.

9  A    So, yes, all four persons on board this vessel came in

10 contact with cocaine.

11 Q    Now, I just want to be clear, you can't say exactly

12 when or exact how?

13 A    I can't.  It could be from direct contact or indirect

14 contact, meaning they physically actually touched cocaine or

15 they touched something that cocaine did touch, so that would

16 be -- indirect would be they touched something that cocaine

17 touched.

18 Q    I see.  But in some way or manner is it your opinion

19 that they did have direct contact with some amount of

20 cocaine?

21 A    Yes.

22        MR. DERENZO:  May I have just a moment,

23 Your Honor?

24        THE COURT:  You may.

25        MR. DERENZO:  No further questions, Your Honor.

 1              THE COURT:  Mr. Hernandez, this might be a good

 2     time to take a short break before you start your Cross.

 3              Ladies and gentlemen, we'll be in recess until

 4     10:30.  You're welcome to walk around.  Please don't discuss

 5     the case, and leave your pads on your chairs.

 6                   *(Jury exits proceedings.)*

 7              THE COURT:  Chief Bomentre, you may step down.

 8     Please don't discuss your testimony over the recess, and we

 9     will start again at 10:30.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  We're in recess until 10:30.

12                        - - - - -

13          *(Recess at 10:12 a.m. until 10:30 a.m.)*

14              *(Jury re-enters proceedings.)*

15                        - - - - -

16              THE COURT:  Mr. Hernandez.

17              MR. HERNANDEZ:  Thank you, Your Honor.

18              Good morning, sir.

19                   **CROSS-EXAMINATION OF**

20        **SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE**

21     **BY MR. HERNANDEZ:**

22     Q    Your law enforcement experience, has it always been

23     maritime or has it ever been on land?

24     A    It has not, sir.  It's always been in the maritime

25     environment.

1   Q    Okay.  And the reason I ask is are you familiar with

2   procedures that may exist, say, in a traffic stop where

3   someone is stopped and may be suspected of having drugs?

4   A    I'm familiar with that.

5   Q    Okay.  And are you familiar with procedures --

6   something called a Valtox test that is a test that is done

7   at the scene of a traffic stop?

8   A    A Valtox test?  I am not familiar with that term, with

9   that test.

10  Q    Are you familiar with testing procedures that a police

11  officer might make at the scene to determine at least

12  preliminarily if there is evidence of illegal drugs?

13  A    I am.

14  Q    Okay.  And are you aware that generally the typical

15  procedure is that subsequently, if in fact there is a

16  finding pursuant to a test by the officer, it is

17  subsequently sent to a lab where a chemist would actually do

18  further testing and more -- and actual scientific testing?

19  A    That's correct, sir.

20  Q    Okay.  Now, you are not a chemist, correct?

21  A    I am not.

22  Q    Okay.  And in this case you did not -- would it be

23  correct to say that you did not participate in the actual

24  testing on board, correct?

25  A    I was not present, that's correct.

1    Q     And your opinion is based solely on the documents

2    containing the test results prepared by other officers,

3    correct?

4    A     That's correct, sir.

5    Q     And if there was any error by them, you would not have

6    any personal knowledge of that?

7    A     Based on the fact I was not there, I would not know if

8    there was a procedural error.

9    Q     And you would have no knowledge of how many people were

10   actually involved in handling up the evidence before it was

11   given to you for further testing?

12   A     Other than what the officers' statements say, no,

13   I would not.

14   Q     Okay.  And would it be correct to say that whatever was

15   tested, these swipes, that in the course of that testing,

16   that that was destroyed, correct?

17   A     So once the sample is analyzed, yes, it is destroyed,

18   it cannot be used again.

19   Q     So there is nothing that can be submitted to a chemist

20   for testing, scientific testing, to determine what in fact

21   those results are, correct?

22   A     That's correct.

23   Q     Would you agree that the ion scan method used in this

24   case, and I assume in these other cases that you've been

25   involved in, is not scientifically valid -- it's not a

1   scientifically valid means of discriminating between

2   individuals who knowingly handled illicit drugs and

3   individuals who were unknowingly exposed to residue of

4   illicit drugs?

5   A    So the ion scan is very good at identifying substances.

6   Again, it is qualitative, not quantitative, so it just says

7   that a person came in contact or an object came in contact

8   with narcotics or explosives.

9   Q    So it does not give you any more information other than

10  that, correct?

11  A    It doesn't tell you who physically handled it.

12  Q    And consequently is it correct to say that a positive

13  ion scan result for cocaine does not provide any information

14  about how, when or where the trace quantity came to be

15  present on the sampled surface, correct?

16  A    It doesn't tell you how, when or where.

17  Q    Do you know the boarding officers that actually did the

18  testing at the scene, or obtained the swipes -- my

19  understanding is that they are tested themselves before

20  boarding on the vessel, correct?

21  A    That's correct.  That's per policy.

22  Q    But they are not tested after they have left the

23  vessel, correct?

24  A    They're not tested after they left the vessel because

25  most likely from moving around the vessel they might come

1  back with some amount on them, but it's only policy to test

2  prior to the boarding to make sure that they're not bringing

3  over contaminants.

4  Q    But you would agree that if they were tested afterwards

5  it might be informative if inadvertently they had picked up

6  traces while on the boat, correct?

7  A    It's not policy, but it's -- anything is informational.

8  Q    But you would agree that it would -- it would certainly

9  provide information that it could have been picked up

10 inadvertently in the course of their testing, correct?

11 A    Sure.

12 Q    The machine that is used, does it have the capability

13 to use a printer?

14 A    The instrument does have the capability to use a

15 printer, correct.

16 Q    And these logs that are prepared are prepared in a

17 handwritten fashion, correct?

18 A    They are.  So when they -- when the instrument alarms,

19 the person who is operating it will take down certain

20 information, what sample number it correlates to, what the

21 alarm was for percentage-wise and any other pertinent

22 information that's on the log.

23 Q    Would it not be the case that if there -- in light of

24 the fact that it does use a printer, that a direct

25 instrumental printout of the results would be -- there would

1    be less chance of error because it would eliminate the

2    chance of human error?

3    A    Yes.  However, the hard drive stores all the samples

4    and it's easier to submit a one page listing of everything

5    rather than flipping through 18 different receipts.

6    Q    But it would eliminate the possibility of human error?

7    It could be mechanical error but it would eliminate the

8    possibility of human error, correct?

9    A    Sure.

10   Q    Okay.  Can a trace amount exist on a substance more

11   than a year?

12   A    Possibly, depending on the substance and the way it's

13   stored, you know, if it's not subjected to elements, sure.

14   Q    Would it be the same principle say as fingerprints or

15   DNA, that as long as the surface where the sample is found

16   is not disturbed, that it could -- it could -- you cannot

17   determine the age of it, correct?

18   A    Correct.

19   Q    And again, all that we're talking about is something

20   that is completely microscopic, correct?

21   A    We're talking down to the nanogram level, one billionth

22   of a gram, trace amounts.

23   Q    And again, nothing visible to the naked eye, correct?

24   A    Correct.

25   Q    And these traces could have been put there by a

1  previous -- it could have been a previous voyage or by

2  different people on a different crew at a different time,

3  correct?

4  A    All I know is that cocaine was present on board that

5  vessel at some time.

6  Q    And when you make that determination of traces, you're

7  not able to determine how much was on the boat, correct?

8  A    That's correct.

9  Q    It could have been, you know, two, three, four grams of

10  cocaine for personal use by someone on that boat, or it

11  could have been something much larger, but you cannot make

12  that determination, correct?

13  A    I cannot make that determination, that's correct, sir.

14  Q    Any attempt to make that determination would be pure

15  speculation, correct?

16  A    That's correct, sir.

17  Q    And when you stated that there is a less than

18  one percent error rate, that's coming from the manual that

19  is prepared by the manufacturer, correct?

20  A    That's correct.  However, the illicit drug detection

21  working group I'm part of right now, where trace detection

22  is one of the items that they're evaluating, the ASTM

23  International develops the standards for the accuracy of

24  that and those are generally published into the operator's

25  manual.

1          MR. HERNANDEZ:  If I may have a moment,

2    Your Honor.

3               Thank you.  That's all I have, Your Honor.

4          THE COURT:  Mr. DeRenzo, any Redirect?

5          MR. DERENZO:  Yes, Your Honor.

6                    **REDIRECT EXAMINATION OF**

7          **SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE**

8    **BY MR. DERENZO:**

9    Q    Senior Chief, Mr. Hernandez was asking you about how

10   trace amounts of drugs might be moved from surface to

11   surface and essentially the limits of what you can testify

12   to.  From your experience as a boarding officer in

13   counter-drug interdictions, how is it that -- well, do you

14   know how cocaine particles --

15         THE COURT:  I'm not sure we've established what

16   his experience is of board -- I know he's trained, but

17   I don't know what his experience as a boarding officer is.

18         MR. DERENZO:  I'll back up just a minute.

19   BY MR. DERENZO:

20   Q    How many counter-drug patrols have you been on,

21   Senior Chief?

22   A    Counter-drug boardings?

23   Q    Patrols in particular.

24   A    I've been on at least 14 counter-drug patrols.

25   Q    How many interdictions have you participated in?

1  A    I've interdicted 14 suspected smugglers, seized

2  20 metric tons of cocaine, detained 49 -- 49 people,

3  discovered two hidden compartments.  I have a vast -- a good

4  amount of experience on the boardings in the maritime

5  domain.

6  Q    I take it you've seen a cocaine bale before?

7  A    I have.

8  Q    Do you know how it's packaged?

9  A    So -- yes.  It's generally packaged in a laboratory

10 somewhere on land.  During the packaging it's wrapped in

11 multiple layers.  It's pressed into a brick form to

12 consolidate it and then that brick is then wrapped in

13 multiple layers of cellophane, duct tape, packaging tape,

14 rubber, to try to prevent water intrusion.  But during the

15 packaging people's hands come in contact with all the

16 packaging material, so trace amounts of that get left behind

17 on the outside of that packaging, and then those packages

18 individually wrapped go into bales or like burlap sacks or

19 large rice bags, generally in about 20 -- two stacks of

20 10 kilos in each one for a standard bale and double that for

21 a super bale.

22 Q    So despite all of that numerous layers of packaging you

23 just referenced, would you expect to potentially find trace

24 amounts of cocaine on the outside of a cocaine bale?

25 A    I would.  It's something called particle contamination

1   theory, that when people's hands come in contact with items

2   that have a low vapor pressure like narcotics and explosives

3   they leave trace residue amounts onto that packaging or

4   whatever they touch.  It would be like somebody coughing

5   germs into their hand and then touching a doorknob and then

6   I touch that doorknob and now I got sick.

7   Q    If I then picked up one of those cocaine bales, could

8   you find potentially cocaine on my hands?

9   A    I would.

10  Q    How about on my forearms?

11  A    If your forearms came in contact with it, I would.

12  Q    If I were trafficking cocaine on a boat, could those

13  particles on the outside of the cocaine bales be found on

14  other surfaces in the boat?

15  A    They would.  Most likely wherever it was stored would

16  have the higher concentration, and then wherever else

17  anything would have come in contact with it.

18  Q    In a case -- in a jettison case, where the Coast Guard

19  doesn't find contraband on the boat but either observed in

20  some way a jettison, throwing of bales overboard, how does

21  the Coast Guard use the ion scan testing procedure in its

22  investigation?

23  A    So there's three particular ways that they use it.  The

24  reason for it is it helps build reasonable suspicion for

25  that officer to believe that criminal activity is afoot,

1   especially if you get on board a vessel and you don't see

2   any -- it's not blatantly obvious that there's bales right

3   in front of you, it's used to determine if there's possibly

4   hidden compartments on board the vessel, which in my

5   personal experience I have seen that happen where ion scan

6   swabs have determined there was a hidden compartment on the

7   vessel.  It can also be used to determine in a jettison case

8   that the vessel at one time had it on board and it was

9   thrown overboard, not to be recovered.  And then the third

10  one would be an at-sea transfer, where a vessel was

11  transmitting it to a certain point and then offloaded it to

12  another vessel to take it to its final destination, so it

13  could be used to link two vessels together in a conspiracy

14  case.

15  Q    To the best of your knowledge, did whoever it is that

16  did the testing in this case, did they print the receipts?

17  A    To the best of my knowledge they did.

18  Q    Okay.  Mr. Hernandez was asking you about the

19  possibility of cocaine being on a surface for more than a

20  year.  Let's talk about a boat in particular.

21         Would the fact that -- what are the factors, in

22  your experience, that would decrease the likelihood that

23  trace amount of narcotics were present on a boat from a year

24  ago?

25  A    Wind, water and sun.

1  Q    And why is that?

2  A    Wind would blow away trace amounts because it would --

3  the particles don't have anything to physically cling onto,

4  the vessel is exposed to the elements, water would wash it

5  away, it would wash it down to the bilge and then the bilge

6  would end up washing it out to sea, the sun would just

7  degrade it --

8  Q    There was some talk on --

9  A    -- evaporate it.

10 Q    I'm sorry.  What?

11 A    I'm sorry.  Or evaporate it.

12 Q    There was some discussion on cross-examination about

13 scientific testing.  I think we were talking about

14 confirmatory testing in a laboratory.  Do you remember that?

15 A    Correct.  They were talking about presumptive positives

16 in confirmatory settings in the field.  To give probable

17 cause you need presumptive evidence that what you're dealing

18 with is actual -- is an actual drug, and then generally

19 that's sent to a laboratory to confirm it in a confirmatory

20 setting, that, yes, that is drugs.

21 Q    Now, minus -- again, what is the name of the underlying

22 methodology that this particular instrument uses to detect

23 the presence of cocaine?

24 A    This particular instrument uses IMS, ion mobility

25 spectrometry, meaning that a particle is charged, the ion,

 1   the mobility means it moves from point A to point B, and

 2   then the spectrometry, it's displayed in a graph format for

 3   a user to understand or read.

 4   Q    Is IMS a scientifically valid way of determining the

 5   presence and identification of narcotics on a particular

 6   surface?

 7   A    It is.

 8   Q    Is the ion scan instrument, in particular the 500DT, a

 9   scientifically valid and reliable instrument for detecting

10   the presence of cocaine on any particular surface?

11   A    It is.

12   Q    When you said -- when we were talking about the basis

13   of your opinion on cross-examination, we're talking about

14   relying on the results that somebody else did.

15   A    Correct.

16   Q    Did you also have an opportunity to examine the

17   particular instrument that was used in this case?

18   A    I did.

19   Q    Did you find anything in your examination of that

20   instrument that led you to believe that there were any

21   errors in either the instrument's operation or the process

22   used by the person who did the analysis?

23   A    As I testified before, a verification was conducted

24   prior to and after that, and upon return to TACLET, Tactical

25   Law Enforcement Team Pacific, we conduct maintenance on it.

1    There was nothing wrong with this instrument.

2              MR. DERENZO:  No further questions, Your Honor.

3              THE COURT:  All right.  Any other questions,

4    Mr. Hernandez?

5              MR. HERNANDEZ:  No, Your Honor.  Thank you.

6              THE COURT:  All right.  Thank you, sir.  You may

7    step down.

8              THE WITNESS:  Thank you, Your Honor.

9                   *(Excerpt concludes at 10:47 a.m.)*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in an excerpt of a jury trial in the

5    United States District Court is a true and accurate

6    transcript of the proceedings taken by me in machine

7    shorthand and transcribed by computer under my supervision,

8    this the 31st day of March, 2020.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25