```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,      )
                                    )
 5                  Plaintiff,      )
                                    )
 6                                  ) Case No.
             vs.                    ) 8:18-CR-00594-SCB-JSS-1
 7                                  )
                                    )
 8   EMIRO HINESTROZA-NEWBBOOLL,    )
                                    )
 9                  Defendant.      )

10

11

12   _____

                       JURY TRIAL - DAY 1
13          BEFORE THE HONORABLE SUSAN C. BUCKLEW
                  UNITED STATES SENIOR JUDGE
14
                       JANUARY 27, 2020
15                        8:59 A.M.
                        TAMPA, FLORIDA
16   _____

17

18

19

20

21         Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23                 DAVID J. COLLIER, RMR, CRR
                   FEDERAL OFFICIAL COURT REPORTER
24             801 NORTH FLORIDA AVENUE, 7TH FLOOR
                     TAMPA, FLORIDA  33602
25
```

1   **APPEARANCES:**

2

3   **FOR THE GOVERNMENT:**

4

5           *Nicholas G. DeRenzo*

6           *Toni Goodin*

7           United States Attorney's Office

8           400 N. Tampa Street, Suite 3200

9           Tampa, Florida  33602

10          (813) 274-6000

11

12  **FOR THE DEFENDANT EMIRO HINESTROZA-NEWBBOOLL:**

13

14          *Daniel Mario Hernandez*

15          Law Office of Daniel M. Hernandez

16          902 North Armenia Avenue

17          Tampa, Florida  33609

18          (813) 875-9694

19

20

21  **INTERPRETERS:**

22          Beatriz Velasquez

23          Etienne van Hissenhoven

24

25

```
 1                    I N D E X

 2                JANUARY 27, 2020

 3

 4                                            PAGE

 5   Jury empaneled and sworn                  140

 6   Preliminary Instructions by the Court     148

 7   Government opening statement              158

 8   Defense opening statement                 168

 9

10

11   GOVERNMENT'S WITNESSES:

12

13   LIEUTENANT COMMANDER THOMAS HUMPHREY      PAGE

14   Direct examination by Mr. DeRenzo         173

15   Cross-examination by Mr. Hernandez        190

16

17   PETTY OFFICER BRANDON DICKINSON           PAGE

18   Direct examination by Mr. DeRenzo         193

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                     - - - o0o - - -

 3           THE COURT:  All right.  The matter that is set

 4  this morning is the United States of America versus Emiro

 5  Hinestroza-Newbbooll.  This is Criminal Case 18-594.

 6           Let me begin by -- let me begin by -- I'm sorry.

 7  I'm going to have to swear the interpreter, but I need to

 8  wait until she makes the phone call.

 9           COURTROOM DEPUTY:  Interpreters, please rise and

10  raise your right hand.

11           Do you solemnly swear or affirm that you will

12  truthfully and to the best of your ability interpret from

13  English to Spanish and Spanish to English all questions and

14  responses propounded by this Court?

15           INTERPRETER:  I do.

16           INTERPRETER:  I do.

17           THE COURT:  Please state your names for the

18  record.

19           INTERPRETER:  Etienne van Hissenhoven.

20           INTERPRETER:  Beatrice Velasquez.

21           COURTROOM DEPUTY:  Thank you.

22           THE COURT:  Does the court reporter need them to

23  spell their names?

24           All right.  If counsel will state their

25  appearances, starting with counsel for the United States,
```

1   please.

2           MR. DERENZO:  Good morning, Your Honor.

3   Nicholas DeRenzo for the United States.  Also present at

4   counsel table, assisting me in this case, is Special Agent

5   Tim Campbell with Homeland Security Investigations, to my

6   left, as well as Special Assistant United States Attorney

7   Toni Goodin, who is my co-counsel.

8           THE COURT:  Good morning.

9           And on behalf of the defendant?

10          MR. HERNANDEZ:  Hi.  Good morning, Your Honor.

11  Daniel Hernandez on behalf of defendant, who is sitting to

12  my right.

13          THE COURT:  All right.  Mr. Hinestroza-Newbbooll,

14  if you would stand, please, and I'm going to ask the

15  courtroom deputy to swear you in.

16          COURTROOM DEPUTY:  Raise your right hand.

17          Do you solemnly swear or affirm, under penalty of

18  perjury, that the statements you will give in these

19  proceedings will be the truth, the whole truth and nothing

20  but the truth?

21          THE DEFENDANT:  Yes.

22          COURTROOM DEPUTY:  Please state your name for the

23  record.

24          THE DEFENDANT:  Emiro Hinestroza-Newbbooll.

25          COURTROOM DEPUTY:  Thank you.

```
1              THE COURT:  All right.  Sir, if you'll remain
2    standing.
3              In the past 24 hours, have you had any medicine of
4    any kind?
5              THE DEFENDANT:  I am fine, Your Honor.
6              THE COURT:  What?
7              THE DEFENDANT:  I am fine, Your Honor.
8              THE COURT:  No.  Have you had any medicine?
9              THE DEFENDANT:  Yes.
10             THE COURT:  What?
11             THE DEFENDANT:  Losartan.
12             THE COURT:  All right.  Mr. Hernandez, do you know
13   what he's taking?  I don't -- I don't know what that is.
14             MR. HERNANDEZ:  Judge, I don't either.  May I ask
15   him a question?
16             Judge, whatever -- I don't know the name of it,
17   but it's for diabetes.
18             THE COURT:  All right.  That's fine.
19             Mr. Hinestroza-Newbbooll, we're about to bring a
20   jury up to hear this case.  Is it your desire to go to
21   trial?
22             THE DEFENDANT:  Yes.
23             THE COURT:  All right.  And you've discussed with
24   your attorney the pros and the cons about going to trial?
25             THE DEFENDANT:  Yes.
```

```
 1                 THE COURT:  Okay.  And you have decided that you
 2    wish to go to trial; is that correct?
 3                 THE DEFENDANT:  Yes.
 4                 THE COURT:  All right.  Thank you, sir.
 5                 Okay.  Charmaine, I would normally say go get the
 6    jury, but we need to get this fixed or we're going to have
 7    to move.
 8                 Mr. Hernandez, did you have anything you wanted to
 9    bring up before we get the jury?  Because I'm not going to
10    get the jury until we get this sound problem worked out.
11                 MR. HERNANDEZ:  Briefly, Your Honor.  I was asked
12    the question this morning and I want the Court to -- I just
13    want to put it on the record.
14                 Mr. Newbbooll and I did discuss whether to dress
15    him out, and we decided jointly, but it was certainly his
16    final decision, that he preferred to be in the jail clothes
17    that he's in and that he's been in since he's been arrested.
18                 THE COURT:  Okay.  And is that correct, sir?
19                 THE DEFENDANT:  Yes.
20                 THE COURT:  Okay.
21                 MR. DERENZO:  Your Honor?
22                 THE COURT:  Mr. DeRenzo.  Yes.
23                 MR. DERENZO:  Just for the benefit of
24    Mr. Hernandez, who is relatively new to this case, I wanted
25    to renew my motion to have the Court find that the vessel in
```

```
 1   this case was subject to U.S. jurisdiction.  I do know that
 2   when we had the hearing on that case
 3   Mr. Hinestroza-Newbbooll was present with his previous
 4   counsel, Mr. Martinez, but given that he does have a new
 5   lawyer, and to the extent Mr. Hernandez has any objections
 6   that weren't previously lodged, I wanted to raise it again.
 7            THE COURT:  I'm looking back at the motion.  Hold
 8   on.
 9            All right.  Back on April the 25th of 2019 the
10   Government filed a motion specifically requesting judicial
11   determination of the vessel's jurisdiction as to
12   Mr. Hinestroza-Newbbooll and his co-defendants, and on
13   May the 1st, 2019 I orally granted that motion or
14   determination that the vessel was subject to the
15   jurisdiction of the United States, and I so found that the
16   vessel was subject to the jurisdiction of the United States
17   for reasons that I stated on the record on May the 1st,
18   2019.
19            I am told the noise problem is going to be
20   resolved in five minutes, so we are going to go down and get
21   the jury.  Hopefully that's correct.
22            MR. HERNANDEZ:  Judge, even though I can do it
23   contemporaneously, I did want to renew all previous pretrial
24   motions filed by the defense, including exclusion of the
25   ion scan testing as well as the 404(b) evidence.
```

1          THE COURT:  Okay.  Previously I had ruled -- when

2    Mr. Hinestroza-Newbbooll was represented by other counsel,

3    I had ruled on the defendant's motion to exclude ion scan

4    evidence and request for a Daubert hearing.  We did have

5    that hearing, and after the hearing I denied the defendant's

6    motion and entered an order, which is document 108.

7          In addition to that motion -- well, that might

8    have been the only motion.  I'm sorry.

9          There was also a Daubert motion regarding the

10   expert and I denied that motion as well.  It may have been

11   one and the same motion, but the motion was to keep out the

12   ion scan evidence and to not allow Senior Chief Maritime

13   Enforcement Specialist Steven Bomentre to testify, and as I

14   said, I denied those motions, but at any rate, my rulings

15   would be the same.  Any orders that I made either orally or

16   in writing regarding motions that have been filed on behalf

17   of Mr. Newbbooll prior to his being represented by his

18   current attorney, Mr. Hernandez, my rulings would be the

19   same as they were originally.

20          MR. HERNANDEZ:  Judge, another matter that maybe

21   we can discuss before the jury panel gets here is I have --

22   I didn't know what time the Court -- I know today we were

23   supposed to start at 9:00.  I know that in the past

24   sometimes you started at 9:30.  I have most of everything

25   covered by other attorneys on my schedule, but I do have a

1  couple matters on a couple of days in State Court that

2  I would prefer to cover, and I could do that if we could

3  start at 9:15 or maybe 9:30.

4          THE COURT:  Okay.  And what days would those be?

5          MR. HERNANDEZ:  Tomorrow and Wednesday.

6          THE COURT:  Well --

7          MR. HERNANDEZ:  Specifically, tomorrow is the most

8  important.  Wednesday I probably -- if the Court really

9  wants to start at 9:00, I probably could get coverage.

10          THE COURT:  Okay.  Well, I would like to start at

11  nine o'clock on Wednesday.  What time can you be available

12  to start tomorrow?

13          MR. HERNANDEZ:  Oh, I -- Judge, it's with

14  Judge Polo.  I would certainly ask that my case be called

15  first, it's a calendar call for the following trial week, so

16  I wouldn't want someone else there to cover that.  If I did

17  it right at 8:30, I could be here by 9:05, but I don't want

18  to count on that as being the case, because usually there's

19  some delay, and I'm not even sure if Judge Polo takes the

20  bench at 8:30, sometimes, you know, it might be 9:45.

21          THE COURT:  Well, can you find out sometime today?

22          MR. HERNANDEZ:  Certainly can.

23          THE COURT:  And then I will know what to tell the

24  jury tomorrow morning.  I had originally had a sentencing

25  scheduled for tomorrow morning, but that has been continued,

1  so I don't have anything tomorrow morning and I would have

2  normally started at nine o'clock.

3       MR. HERNANDEZ:  If the Court -- I'll see if my

4  secretary can check, but if we could do 9:15, I'm confident

5  that tomorrow -- and then I would say not even be concerned

6  about Wednesday, I'll get coverage.

7       THE COURT:  Okay.  9:15 tomorrow morning.

8  All right.

9       MR. HERNANDEZ:  Yes, ma'am.

10      THE COURT:  Okay.  And as long as we're talking,

11  I had agreed to participate in a court program that is

12  tomorrow at noon, but they had asked that we be there at

13  11:30, so normally I would take -- I would take lunch

14  between 12:00 and 12:30, but I'm probably going to take

15  lunch at 11:30 tomorrow as opposed to 12:00 or 12:30.

16      Okay.  I'm going to leave the bench for just a

17  minute to see if I can make a phone call in an effort to try

18  to resolve this issue.  I'll be right back.

19                         - - - - -

20          (Recess at 9:15 a.m. until 9:24 a.m.)

21                         - - - - -

22      THE COURT:  All right.  I think we're good.

23      Anything else before we start and I bring the jury

24  in, from either side?

25      MR. HERNANDEZ:  Judge, quick question.  It's been

1   a while since I tried a case with the Court.  Do you allow

2   the attorneys to actually participate in voir dire?

3               THE COURT:  Oh, yeah, and I've tried cases with

4   both of you, so I normally go through that, but I didn't,

5   but let me just go through it again.

6               Yes.  I will ask any questions that I normally ask

7   or questions that you have given me to ask, if you've given

8   me some, and then after that I will give each side

9   15 minutes to voir dire the jury.  After that I'll send the

10  jury out, we'll do challenges for cause and then we'll do

11  the preemptory challenges.

12              All right.  I'm not sure where Mr. Fitchett is,

13  but you can bring the jury in.

14              COURTROOM DEPUTY:  Yes, Your Honor.

15                  *(Venire enters proceedings.)*

16              THE COURT:  Okay.  I'm going to just check and

17  make sure you are where I think you should be on my seating

18  chart.

19              Mr. Palmetto -- or Ms. Palmetto.  Brooke Dawson

20  Palmetto.  Am I saying that wrong?

21              JUROR BROOKE DAWSON:  Palmetto is the city I live

22  in.

23              THE COURT:  Oh, I'm sorry.

24              JUROR BROOKE DAWSON:  That's okay.

25              THE COURT:  That's correct.  Dawson.

1           JUROR BROOKE DAWSON:  Correct.

2           THE COURT:  My mistake.  I didn't realize they

3    were putting the city on here now.

4           Okay.  Courtney Burdett Johnson, and Helen Hester

5    Madison.  All right.

6           Joann Elizabeth Dixon, would you raise your hand.

7    Thank you.

8           And David M. Neal, and Jennifer Anne Sawicki.

9    Okay.  I think we're good.

10          All right.  Good morning, ladies and gentlemen.

11   My name is Susan Bucklew and I am the United States District

12   Judge that will be presiding over the selection of this jury

13   as well as the trial of the case.

14          We have called you in here this morning, and

15   I want to say from the outset we appreciate your being here

16   and we'll try to be very cognizant of your time and not

17   waste your time.

18          We are going to select a jury.  Hopefully we will

19   select 14 of you to sit as jurors in this case.  If you are

20   selected on the jury, we will start immediately into the

21   trial as soon as we have selected the jury.

22          We'll work until about five o'clock this

23   afternoon.  I am told by the attorneys this is about a

24   four day trial, so if you are selected on this jury you need

25   to be prepared to be here Monday, Tuesday, Wednesday and

1   Thursday.  As far as Federal cases are concerned, that's a

2   very short case.  Most of them last a lot longer than

3   four days.

4          So with that said, our hours are generally about

5   nine o'clock in the morning until five o'clock in the

6   afternoon.  We obviously take breaks for lunch and we'll

7   take a short break mid-morning and mid-afternoon.  So that's

8   essentially the schedule.

9          At some point when I talk to you I will ask you if

10  there is any reason that you could not serve if selected,

11  and when I ask that question, I mean a good reason, not the

12  fact that you have a job or something of that sort, because

13  most people here do have jobs.  It would be something like

14  you have a loved one or you yourself are going in the

15  hospital for surgery, for example.  Another example might be

16  you have prepaid airline tickets that you couldn't get a

17  refund for, something like that.

18         So the case that is set for trial is a criminal

19  case, and the style of the case is the United States of

20  America versus Emiro Hinestroza-Newbbooll.

21         I'm going to begin by introducing you to everybody

22  involved in the trial to find out if any of you know any of

23  us in any way.  After that I'm going to talk to each of you

24  individually, and after I've done that I will have some

25  group questions to ask you.  After I have finished, I'm

1    going to give both of the attorneys an opportunity to ask

2    you questions, and then we're going to select a jury.

3            This part of the trial is known as the voir dire

4    or voir dire, it's a jury selection process.  There aren't

5    any right answers or wrong answers, just truthful answers.

6    We're trying to select a jury that can fairly and

7    impartially try this particular case.

8            So that's what's going to happen.  I'm probably

9    not going to take a recess until such time as we've all

10    asked our questions, but if any of you need to recess for

11    any reason, raise your hand and let me know.

12            If at any time during this question and answer

13    session I ask a question or -- I ask a question or one of

14    the attorneys asks a question that you would prefer to

15    answer at sidebar instead of in front of the other

16    prospective jurors, just tell us that and I'll hold the

17    question.

18            I don't anticipate we will ask embarrassing

19    questions of you, but sometimes I ask a question or an

20    attorney will ask a question and it ends up being something

21    that you don't want to discuss in front of everyone, and if

22    that's the case, you just tell us that.

23            Again, we appreciate your being here and we will

24    try to be very conscious of your time.

25            So I've told you the style of the case.  It is a

1   criminal case.  We try both civil cases and criminal cases

2   in Federal Court.  A criminal case -- and I'm probably

3   telling you something you know, but a criminal case is

4   usually a case where we have the prosecution on one side, in

5   this case it's the Assistant United States Attorneys who

6   will be trying the case on behalf of the Government, we have

7   the defendant on the other side, and the defendant is

8   represented by counsel.

9           You will also note that up in the -- over there to

10  the far side on the front row there are two other people,

11  and I will introduce you in a moment, but they are

12  interpreters.  Mr. Hinestroza-Newbbooll speaks Spanish as

13  opposed to English, and so they will be interpreting for his

14  benefit the English into Spanish.  Sometimes you might see

15  one of them leave the courtroom because they're taking

16  breaks, there's only one that will interpret at one time, so

17  you may see one of them get up and leave the courtroom, and

18  that's fine.

19          At one point I'm going to ask if any of you speak

20  Spanish, and the reason I'm asking that is because we have a

21  Spanish speaking defendant and we have interpreters who will

22  be interpreting.

23          Okay.  Let me begin by introducing you to the

24  people that I call the courtroom personnel, the people that

25  are associated with this case that aren't associated with

1    either the Government or the defendant, they generally work

2    for the Court system, but let me find out if you know any of

3    us.

4              My name is Susan Bucklew and I will be the

5    United States District Judge that presides over the trial of

6    this case.  The courtroom deputy who brought you from you

7    the jury assembly room is Charmaine Black.  The security

8    officer is James Fitchett.  The court reporter, who is

9    seated over here to my left, is David Walker-Collier.

10             I'm also going to introduce you to the

11   interpreters.  On the far side is Etienne van Hissenhoven,

12   and then there's also Beatriz Velasquez.

13             Do any of you know any of us in any way?

14             JURORS:  No.

15             THE COURT:  Okay.  Let me introduce you to those

16   persons that are seated at counsel table.

17             To my right is what I will call counsel table for

18   the Government, so let me begin by introducing you to the

19   Assistant United States Attorneys who will be trying the

20   case on behalf of the Government.

21             Closest to the aisle is Nicholas DeRenzo.

22             Mr. DeRenzo, would you stand, please, sir.

23             Do any of you know or think you might know

24   Mr. DeRenzo?

25             Okay.  Also representing the Government is

```
 1    Toni Goodin.
 2              Ms. Goodin, if you'll stand.
 3              Do any of you know or think you might know
 4    Ms. Goodin?
 5              No?  All right.
 6              And seated between Mr. DeRenzo and Ms. Goodin is
 7    Homeland Security Special Agent Tim Campbell.  Do any of you
 8    know or think you might know Agent Campbell?
 9              No?  All right.
10              Let me move over here to my left.
11              Representing the defendant,
12    Mr. Hinestroza-Newbbooll, is Daniel Hernandez.  Do any of
13    you know or think you might know Mr. Hernandez?
14              No?
15              And seated next to Mr. Hernandez is Emiro
16    Hinestroza-Newbbooll.  Do any of you know or think you might
17    know Mr. Newbbooll?
18              All right.  Thank you.
19              Okay.  None of you know any of us in any way.
20              Down in the jury assembly room you should have
21    been given a sheet of paper, it has some questions on it.
22    What I would like to do at this time is to go through the
23    questions with each of you, it just gives us an opportunity
24    to briefly find out something about you and to get to know a
25    little bit about you, and when I do that I'll ask
```

1   Mr. Fitchett to hand you a microphone, I'll ask you to

2   stand, and I'll ask you to go through the answers to those

3   questions.

4           So let us start with the juror who is seated in

5   seat number 1, Dianne -- is it Brisson or Brisson?

6           JUROR BRISSON:  Brisson.

7           THE COURT:  Would you give her the mic, please.

8           And would you answer those questions that are on

9   that sheet of paper, please.

10          JUROR BRISSON:  Okay.  State your city of

11  residence and how long you have lived there.

12  Tarpon Springs, Florida, 15 years.  Lived in Florida for

13  15 years.  Highest level of education, high school.

14  Occupation, customer service manager.  I'm single, no

15  children, and no military service, and no previous jury

16  service either.

17          THE COURT:  All right.  Give me just a second.

18  The Clerk handed me a note that I was looking at.

19          JUROR BRISSON:  Would you like me to sing?  I can

20  clear this room really fast.

21          THE COURT:  Okay.  Suppose you are selected on

22  this jury.  Is there any reason that you could not serve if

23  selected?

24          JUROR BRISSON:  I have Epstein-Barr and I get

25  really tired and I fall asleep sometimes and it's hard to

```
 1   pay attention, that's the only thing I could think of.

 2             THE COURT:  Okay.  Well, you have a job?

 3             JUROR BRISSON:  I do.

 4             THE COURT:  And you're able to hold a job?

 5             JUROR BRISSON:  Yep.  I take lots of naps at my

 6   desk.  They're aware of it.  I've been there for 15 years,

 7   so they work with me on it.

 8             THE COURT:  And you told us what you do, but who

 9   do you work for?

10             JUROR BRISSON:  Kelby Media Group.

11             THE COURT:  And what do they do?

12             JUROR BRISSON:  They teach people how to use

13   Photoshop, Lightroom and photography equipment.

14             THE COURT:  All right.  Well, we can certainly

15   keep an eye on you, and I do take recesses.

16             JUROR BRISSON:  Just give me a nudge.

17             THE COURT:  I'll have the juror next to you keep

18   an eye on you.  But you are able to maintain a job?

19             JUROR BRISSON:  Yes, I am.

20             THE COURT:  Okay.  Other than that, is there any

21   reason you could not serve?

22             JUROR BRISSON:  No.

23             THE COURT:  All right.  Thank you.

24             Would you pass the mic over to Ms. Rhum.

25             JUROR RHUM:  Rhum.
```

1          THE COURT:  Rhum.  Like rum?

2          JUROR RHUM:  Rum and coke.

3          Okay.  Cheryl Rhum.  State your city of residence.

4   44 years, New Port Richey, Florida.  44 years that I've been

5   in Florida.  High school education.  Retired postal clerk.

6   Married.  He's retired.  No children.  No military service.

7   I did serve on a jury about 20 years ago, it was a criminal

8   one, and, yes, we reached a verdict.

9          THE COURT:  Okay.  Do you remember what kind of

10  criminal case it was?

11         JUROR RHUM:  Tax evasion.

12         THE COURT:  Okay.  Was it here in Federal Court?

13         JUROR RHUM:  Yes, it was here at this --

14         THE COURT:  In this building?

15         JUROR RHUM:  Not this building.  It was the one

16  over on Twiggs, when you were over there.

17         THE COURT:  Okay.  The one down the street then.

18         JUROR RHUM:  Oh, okay.

19         THE COURT:  Yeah.  All right.  Was I the Judge, by

20  any chance?

21         JUROR RHUM:  No.

22         THE COURT:  Okay.  What did your husband do before

23  he retired?

24         JUROR RHUM:  He retired from the -- he was --

25  worked for the Pasco County School System in administration

1  for 35 years.

2           THE COURT:  Okay.  Suppose you are selected on

3  this jury, Ms. Rhum.  Is there any reason you could not

4  serve if selected?

5           JUROR RHUM:  No.

6           THE COURT:  All right.  Thank you.

7           Would you pass the mic over to Ms. Lewis, please.

8           JUROR LEWIS:  I live in Davenport, Florida.  I've

9  lived there for 20 years, and I have lived in Florida since

10  1993.  I have a Bachelor's degree.  I am an entertainment

11  technician currently.  I am not married.  I do not have any

12  children or previous military experience.  I did serve on

13  the Federal grand jury in this building for a year ten years

14  ago.

15           THE COURT:  Oh, okay.  All right.  And that's a

16  commitment, isn't it, being on the grand jury?

17           JUROR LEWIS:  It was.  It was -- yeah.

18           THE COURT:  All right.  Let me ask you a question.

19  You told me that you are an entertainment technician.  What

20  does that mean?

21           JUROR LEWIS:  I do lighting and special effects at

22  Walt Disney World, so I work backstage on the shows.

23           THE COURT:  Okay.  So you are employed by

24  Walt Disney World?

25           JUROR LEWIS:  Yes.

1            THE COURT:  All right.  Ms. Davenport, suppose you

2    are selected on this jury.  Is there any reason you could

3    not serve if selected?

4            JUROR LEWIS:  I don't think so, no.

5            THE COURT:  Okay.  This is much shorter than your

6    previous commitment, isn't it?

7            JUROR LEWIS:  Yes.  I'm very grateful.

8            THE COURT:  All right.  Thank you.

9            Would you pass the mic over to Ms. Rossman.

10           JUROR ROSSMAN:  I live in Hudson, for 28 years.

11   Florida for 30.  Highest level of education is high school

12   graduate.  Occupation, I'm retired.  I was an Albany County

13   Probation Officer Assistant in Albany, New York.  Marital

14   status is widowed.  I had have two children, one is 40 and

15   one is like 59.  No military service, and then I have not

16   served on a jury.

17           THE COURT:  Okay.  And can you tell me what your

18   husband did.

19           JUROR ROSSMAN:  He was a City of Albany fireman.

20           THE COURT:  Okay.  And in your job -- I know you

21   told me what you did.  What exactly did you do?

22           JUROR ROSSMAN:  I handled transfers from Albany

23   County to different counties within the tristate area, and

24   I went and had the -- went to the jail, I monitored them,

25   I monitored them until they were transferred.

```
 1              THE COURT:  All right.  Suppose you're selected on
 2   this jury.  Is there any reason you could not serve if
 3   selected?
 4              JUROR ROSSMAN:  No.
 5              THE COURT:  All right.  Thank you.
 6              Would you pass the mic over to Mr. Sowers.
 7              JUROR SOWERS:  I live in Tampa.  I've lived in
 8   Tampa for about 30 years.  I've lived in Florida for about
 9   36 years.  I have a Bachelor of Science.  I am a TV news
10   reporter for the Fox station.  I am married.  My wife is
11   self-employed, she owns a business.  I have two children,
12   boys, 18 and 17.  I haven't served in the military.  I was
13   called to jury service in Pinellas County in the late '80s,
14   I went, but I was not seated on a jury.
15              THE COURT:  Okay.  Mr. Sowers, I thought you
16   looked familiar.  You're just in a different setting.
17              JUROR SOWERS:  Right.
18              THE COURT:  Let me ask you, you said your wife is
19   self-employed.  Can you give me an idea about what she does.
20              JUROR SOWERS:  Yes.  She owns a personal care
21   products company that manufactures things like sunscreen and
22   antibacterial hand solution.
23              THE COURT:  Okay.  Mr. Sowers, suppose you are
24   selected on this jury.  Is there any reason you could not
25   serve if selected?
```

1          JUROR SOWERS:  None.

2          THE COURT:  Thank you, sir.

3          Would you pass the mic over, please, to

4   Ms. Alderson.

5          JUROR ALDERSON:  I live in Riverview, Florida.

6   I've lived there for about 15 years.  I've lived in Florida

7   for about 15 years.  I have a Bachelor's degree.  I am a

8   movie theater manager, unmarried, no children, no previous

9   military service, and I have been called to jury duty before

10  but was not selected.

11         THE COURT:  Okay.  Suppose you're selected on this

12  jury.  Is there any reason you could not serve if selected?

13         JUROR ALDERSON:  No, ma'am.

14         THE COURT:  All right.  Thank you.

15         Would you pass the mic over, please, to

16  Ms. Dawson.

17         JUROR BROOKE DAWSON:  Brooke Dawson.  I live in

18  Palmetto, Florida.  I've been there for a little over a year

19  now, been in the general area though for much longer.  I've

20  lived in Florida since '89, so 31 years.  I have a Master's

21  degree.  I am an architect and product manager for a home

22  builder and developer.  Married.  My husband is a

23  high school music teacher for the Manatee County School

24  District.  No children.  No military service.  I served on a

25  jury in the late '90s, it was -- it was a criminal case, and

1    we did reach a verdict.  I believe it was about also four

2    days long.  And then I was also called for jury duty in

3    Manatee County a few months ago but wasn't selected.

4                THE COURT:  Okay.  The case that you did actually

5    serve on, what kind of a case was it?

6                JUROR BROOKE DAWSON:  Insurance fraud.

7                THE COURT:  Okay.  And it was in State Court?

8                JUROR BROOKE DAWSON:  It was Dade County,

9    Miami-Dade County.

10               THE COURT:  Yeah.  Okay.  All right.

11               Suppose you're selected on this jury, Ms. Dawson.

12   Is there any reason you could not serve if selected?

13               JUROR BROOKE DAWSON:  No.

14               THE COURT:  All right.  Thank you.

15               Would you pass the mic back to the juror behind

16   you.

17               Is it Noffz?

18               JUROR NOFFZ:  It's Noffz.

19               THE COURT:  Say it again.

20               JUROR NOFFZ:  Noffz.

21               THE COURT:  Noffz?  I wasn't even close.

22               JUROR NOFFZ:  Blame it on my husband.

23               I live in Port Richey, been about six months

24   there, but in the New Port Richey/Port Richey area for quite

25   a while.  Been in Florida for almost 30 years.  A little bit

1    over high school education, a few college courses, but not

2    much.  I am a construction coordinator for a builder, and

3    my -- I'm married and my husband is disabled.  No

4    military -- oh, sorry.  Children.  Two children, 24 and 22.

5    No military service.  And I've been called for jury duty but

6    never been seated.

7              THE COURT:  Are your children in Florida?

8              JUROR NOFFZ:  Yes.

9              THE COURT:  Can you tell me how they are employed.

10             JUROR NOFFZ:  The older one is going to school and

11   being a server at the same time here in the state.  The

12   younger one is up in Pennsylvania, works for a credit union.

13             THE COURT:  Okay.  Suppose you're selected on this

14   jury.  Is there any reason you could not serve if selected?

15             JUROR NOFFZ:  Just if anything ever happened to my

16   husband, since he is disabled.

17             THE COURT:  Hold the mic up.

18             JUROR NOFFZ:  Sorry.  If anything happens with my

19   husband, he is disabled and he ends up in the hospital quite

20   a bit.

21             THE COURT:  Okay.  And if that happens, would you

22   have to leave; is that what you're saying?

23             JUROR NOFFZ:  Probably.

24             THE COURT:  All right.  Do you have someone caring

25   for him while you are here?

1          JUROR NOFFZ:  No.  He's pretty able-bodied until

2     something happens where he ends up in the hospital.

3          THE COURT:  Okay.  Well, and that's certainly

4     understandable if that happens and if you had to leave.  We

5     understand that.  We try to pick at least one alternate

6     juror just in case something like that happens.

7          All right.  Thank you.

8          JUROR NOFFZ:  You're welcome.

9          THE COURT:  If you would pass the mic over to

10    Ms. Stewart.

11         JUROR STEWART:  I currently live in Lutz, I've

12    lived there about a month, but I've been in the Tampa area

13    for about five years.  I have a Bachelor's degree.  I do

14    payroll at a battery company.  I am married.  My husband

15    works for the same company.  He's a battery shipper.  I do

16    have a child, he's ten years old.  No military service.

17    I have previously served on two juries, one was about

18    ten years ago for Broward County, that was a criminal case,

19    we did reach a verdict; and then one was just over a year

20    ago for a civil case down the street, we did reach a

21    verdict.

22         THE COURT:  Okay.  In State Court then?

23         JUROR STEWART:  Yes.

24         THE COURT:  Would have been State Court here in

25    Hillsborough County?

1          JUROR STEWART:  Yes.

2          THE COURT:  Okay.  Your criminal case, do you

3    remember what kind of case it was?

4          JUROR STEWART:  It was an assault case.

5          THE COURT:  Okay.  Suppose you're selected on this

6    jury.  Is there any reason you could not serve if selected?

7          JUROR STEWART:  No.

8          THE COURT:  All right.  Thank you.

9          Would you pass the mic over to Ms. Parrish.

10          JUROR PARRISH:  My name is Ebony Parrish.  I live

11    in Lake Alfred, Florida.  I've lived in Florida all my life,

12    38 years.  High school education was Associate in Science.

13    I work for a company called GC, it's contracted with

14    Verizon.  I deal with fraud.  I'm married.  My husband is a

15    manager at Walmart distribution in Winter Haven, Florida.

16    I have two kids, one -- the younger one is 14, the oldest is

17    16.  Neither one of them work.  No previous military

18    services.  I was a juror, it was like maybe three years ago,

19    for criminal at Polk County.  It was -- it was drug-related.

20          THE COURT:  Drug-related?

21          JUROR PARRISH:  Yeah.

22          THE COURT:  And do you remember whether your jury

23    reached a verdict?

24          JUROR PARRISH:  Yes, they did.

25          THE COURT:  Do you remember what kind of drugs?

 1              JUROR PARRISH:  It was cocaine and marijuana.

 2              THE COURT:  Okay.  All right.  Ms. Parrish, when

 3    you say you work in fraud, what do you do exactly?

 4              JUROR PARRISH:  Like, you know, fraud goes around,

 5    so say, for instance, someone steals your identity, set up

 6    services, it could be home services with Verizon, and we

 7    help them to get them disassociated from the account, like

 8    remove it from their credit report, like it's affected their

 9    credit, so we get like the required documents in and ship it

10    off to the credit bureau to inform them that it was fraud

11    and get it removed from that credit report.

12              THE COURT:  In doing that, do you work with

13    law enforcement at all?

14              JUROR PARRISH:  Correct.  Like, yes, sometimes, it

15    depends on how bad it is, we get police reports and they fax

16    them over to us, because they have to file a police report

17    to indicate that their identity was stolen.

18              THE COURT:  Okay.  All right.  Thank you.

19              Suppose you're selected on this jury.  Is there

20    any reason you could not serve if selected?

21              JUROR PARRISH:  No.

22              THE COURT:  All right.  Thank you.

23              Would you pass the mic over to Mr. Luetzow.

24              JUROR LUETZOW:  Close enough.

25              THE COURT:  Come on, tell me, how should I have

1   said it?

2           JUROR LUETZOW:  It's Luetzow.

3           THE COURT:  Luetzow?

4           JUROR LUETZOW:  Yes.

5           THE COURT:  All right.

6           JUROR LUETZOW:  I'm a resident of Largo since

7   Saturday.  Previously Seminole.  State of -- I've been in

8   Florida for 31 years.  Second year of college.  I'm a

9   regional manager for Florida, Gulf Coast, Caribbean and

10  Bahamas for a concrete company.  I'm married.  My spouse is

11  retired.  No children.  No military service.  And I have

12  served on jury duty here in this building and about seven

13  times in Pinellas County.  For some reason they love me.

14  I was on two criminal trials and there were verdicts in

15  each.

16          THE COURT:  Okay.  Let's talk about the service in

17  this building.  Do you remember if that was a criminal or

18  civil case?

19          JUROR LUETZOW:  It was civil.

20          THE COURT:  And how long ago was that,

21  approximately?

22          JUROR LUETZOW:  Seven, eight years ago.

23          THE COURT:  Was I the judge, by any chance?

24          JUROR LUETZOW:  No.

25          THE COURT:  All right.  And of the criminal cases

1　that you served on, have any of them been drug cases?

2　　　　　JUROR LUETZOW:  No.

3　　　　　THE COURT:  All right.  And as far as the civil

4　case that you served on in this courthouse, did your jury

5　reach a verdict?

6　　　　　JUROR LUETZOW:  I was excused.

7　　　　　THE COURT:  All right.  Suppose you're selected on

8　this jury.  Is there any reason you could not serve if

9　selected?

10　　　　　JUROR LUETZOW:  No.

11　　　　　THE COURT:  All right.  Thank you, sir.

12　　　　　If you'd pass the mic over to Mr. -- I don't want

13　to mispronounce that.  Schilit?

14　　　　　JUROR SCHILIT:  Schilit.  Correct.

15　　　　　THE COURT:  All right.

16　　　　　JUROR SCHILIT:  I've been a resident of Tampa and

17　Florida for the last 35 years.  Education is a Doctorate.

18　I'm an investor and advisor to a number of private

19　companies.  Marital status is married, and my wife

20　coordinates board activities for a major cancer center.  We

21　have two children, not children anymore, young adults,

22　they're 29 and 27.  The older one is an executive recruiter

23　and the younger one does the analytics for a company that

24　distributes fuel pumps.  No military service.  I've been

25　on -- I've been on a jury about 40 years ago, it was a

1   drug-related case, we did arrive at a verdict, and I've been

2   called a few times since then but have not served, I guess,

3   just was not selected for the jury duty.

4           THE COURT:  Okay.  The jury service 40 years ago,

5   was that in Federal Court or State Court, or do you

6   remember?

7           JUROR SCHILIT:  I do not recall.  It was --

8   I recall it was a drug-related case.  I believe I was living

9   in Washington at the time but living in the State of

10  Maryland, and I believe it was a Federal case.

11          THE COURT:  Okay.  And you say you are an advisor.

12  What do you advise on?

13          JUROR SCHILIT:  It's all -- well, small growth

14  companies that typically need capital or need advice in

15  their growth.  I'm usually involved in those kind of

16  activities.

17          THE COURT:  Okay.  Suppose you are selected on

18  this jury.  Is there any reason you could not serve if

19  selected?

20          JUROR SCHILIT:  Well, there's two issues.  If it

21  goes beyond Friday, I do have to fly out of town.

22          THE COURT:  It will not go beyond Friday.

23          JUROR SCHILIT:  Oh.  Well, then that should not be

24  a problem.  And you see I have some neck issues, so it kind

25  of prevents me -- I'm in varying levels of discomfort, so

1  that could be problematic.

2          THE COURT:  Okay.  Are you taking any medication?

3          JUROR SCHILIT:  I am.

4          THE COURT:  Okay.  Do you mind telling me what

5  you're taking?

6          JUROR SCHILIT:  There's some muscle relaxers and

7  some nerve reduction activities that are there really for

8  pain.

9          THE COURT:  Okay.  If you don't mind me asking, is

10 this a chronic problem or have you had an accident or is

11 this a recent problem?

12         JUROR SCHILIT:  It's been a chronic problem.  I've

13 had some spine and neck issues for many years, and partly as

14 a result of the treatment and the condition itself, it just

15 causes a dropping of the neck.

16         THE COURT:  Okay.  Thank you, sir.  If you would

17 pass the mic over.

18         Mr. Santos.

19         JUROR SANTOS:  Seffner, Florida for nine years.

20 Been in Florida for 14.  Associate's degree, science.  I'm a

21 factory production manager.  I'm single.  No children, no

22 military service and no prior jury service.

23         THE COURT:  All right.  Suppose you're selected on

24 this jury.  Is there any reason you could not serve if

25 selected?

```
 1              JUROR SANTOS:  No, ma'am.

 2              THE COURT:  All right.  Would you pass the mic

 3    back to Mr. Johnson, please.

 4              JUROR JOHNSON:  Courtney Johnson, and I live in

 5    Lakeland, Florida, for 36 years.  I was -- highest level of

 6    education was a Bachelor's degree in business.  Occupation,

 7    well, I'm retired in 2018 but I'm working part-time at my

 8    family's tire store as a service writer, but I was in

 9    logistics and warehousing, transportation mainly, that was

10    my prior occupation.  Married.  My wife, she does not work

11    right now.  She was a project manager.  I have two children,

12    one in the State of Texas, the younger one, and he's in

13    construction.  I have one in Colorado and he's in

14    construction.  No military -- prior military service and no

15    prior jury service.

16              THE COURT:  Suppose you're selected on this jury.

17    Is there any reason you could not serve if selected?

18              JUROR JOHNSON:  No.

19              THE COURT:  All right.  Thank you, sir.

20              Would you pass the mic over, please, to Ms. Arias.

21              JUROR ARIAS:  Maria Arias.  I live in Wimauma,

22    Florida.  I've lived in Wimauma for three years.  I've been

23    in Florida for three and a half years.  I have a Master's

24    degree in social work.  I'm a social worker for the

25    Children's Board.  I'm married.  My husband is an
```

1    electrician.  I have two kids, two and three years old.  No

2    previous military service, and it's the first time that I'm

3    called to do jury service.

4              THE COURT:  Okay.  Suppose you're selected on this

5    jury.  Is there any reason you could not serve if selected?

6              JUROR ARIAS:  No.

7              THE COURT:  Let me just ask you, I know you have a

8    little bit of an accent, do you speak Spanish?

9              JUROR ARIAS:  Yes.

10             THE COURT:  And would you consider yourself fluent

11   in Spanish?

12             JUROR ARIAS:  Yes.

13             THE COURT:  And can you tell me, are you -- can

14   you tell me what country you are from, or your relatives are

15   from.

16             JUROR ARIAS:  Puerto Rico.

17             THE COURT:  Puerto Rico.  The States.  All right.

18             JUROR ARIAS:  Yes.

19             THE COURT:  Thank you.

20             If you would pass the mic over.

21             Mr. -- is it Frongillo?

22             JUROR FRONGILLO:  Yes.  Good morning, Your Honor.

23             I live in Brooksville, Florida.  I've lived there

24   for six years.  I moved to Florida in '83.  I'm a

25   high school graduate.  I'm retired from the Postal Service

1  after 38 years.  I'm married.  My wife is a dental

2  assistant.  I have two daughters, ages 30 and 33.  One is an

3  assistant store manager at Publix.  One is a bartender.

4  I was in the Army for three years prior to the Postal

5  Service.  I served on a jury for three weeks down in

6  Fort Lauderdale on a civil case.  We reached a verdict.

7  That's about it.

8          THE COURT:  All right.  Suppose you are selected

9  on this jury.  Is there any reason you couldn't serve if

10 selected?

11         JUROR FRONGILLO:  I'm going to say no.  I'm having

12 neck surgery on February 6th, so you may see me fidgeting,

13 rubbing my neck while I'm sitting here, it's going to get

14 uncomfortable after a while, but I don't see a problem.

15         THE COURT:  Okay.  And you may have said this and

16 I may have missed it.  Did you serve in the military?

17         JUROR FRONGILLO:  Yes, ma'am.  I was in the Army.

18         THE COURT:  And what did you do in the Army?

19         JUROR FRONGILLO:  I was a radio operator.

20         THE COURT:  Okay.  Thank you, sir.

21         Would you pass the mic over to Ms. Nau.

22         JUROR NAU:  Yes.  Nau.

23         My name is Kennedy Nau.  I have lived in Dunedin,

24 Florida for four years.  I have lived in Florida for

25 four years.  I have completed three years of college.  I'm a

1   full-time student.  I am not married.  I have no kids and no

2   military service and this is my first time I've had jury

3   service.

4               THE COURT:  Okay.  Where are you a full-time

5   student?

6               JUROR NAU:  Florida International University,

7   online.

8               THE COURT:  Okay.  All right.  I was going to say,

9   how can that be.

10              What are you studying?

11              JUROR NAU:  I'm studying English.

12              THE COURT:  And what do you want to do when you

13  graduate?

14              JUROR NAU:  I'm not sure, maybe technical writing,

15  and I also want to do art as well, so I'm all over the place

16  with that.

17              THE COURT:  Okay.  Suppose you're selected on this

18  jury.  Any reason you could not serve if selected?

19              JUROR NAU:  No.

20              THE COURT:  Okay.  Thank you.

21              Would you pass the mic over, please to

22  Ms. Madison.

23              JUROR MADISON:  I live in Seminole, Florida.  I've

24  been in Florida for seven years.  One year of secretarial

25  school after high school.  I worked in a dental office as a

```
1    secretary.  I'm a widow.  I have two children, ages 47 and
2    38.  I don't have military service, but I do receive widow's
3    benefits.  And I did serve on a jury in Massachusetts about
4    25 years ago for a DWI.
5              THE COURT:  All right.  Your children, how are
6    they employed, if they're employed?
7              JUROR MADISON:  My daughter is a teacher and my
8    son is a millwork specialist.
9              THE COURT:  I realize it's been a long time ago.
10   Do you recall what your jury trial was about?
11             JUROR MADISON:  DWI and disorderly conduct.
12             THE COURT:  Okay.  Suppose you're selected to
13   serve on this jury.  Is there any reason you could not serve
14   if selected?
15             JUROR MADISON:  No.
16             THE COURT:  Okay.  Thank you.  You may have a
17   seat.  Hang onto the mic just a moment.
18             Let me just tell you, for those of you -- and
19   I eventually will say the same thing to those of you in the
20   courtroom.  Let me just tell you a little bit about this
21   case and then I'm going to ask a follow-up question.
22             This case has two counts, and if you're selected
23   on the jury I will read the indictment to you, but
24   essentially the defendant is charged, with others, with
25   conspiring to distribute and possess with the intent to
```

1   distribute 5 kilograms or more of cocaine while on board a

2   vessel subject to the jurisdiction of the United States.

3   He's also charged in a second count with what we call the

4   substantive crime, in other words it's not a conspiracy but

5   it's a possession with the intent to distribute 5 kilograms

6   or more of cocaine while on board a vessel subject to the

7   jurisdiction of the United States.

8          I anticipate that you will hear the defendant is

9   from Colombia.  I also anticipate that you will hear --

10  well, I've already told you, that he's Spanish speaking, so

11  let me just ask a couple of follow-up questions about that.

12         I did ask one juror this question, but let me just

13  ask the rest of you.  I think it was Ms. Arias.  Are any of

14  the others of you fluent in Spanish?  Anybody?

15         Okay.  I'm going to come to you.  I'm going to ask

16  the same questions out here, just give me a chance.

17         All right.  Do any of you have any particular --

18  well, let me just ask this:  Have any of you ever been to

19  Colombia?

20         Oh, a couple of people.

21         All right.  Ms. Arias, you have?

22         JUROR ARIAS:  Yes.

23         THE COURT:  Could you pass the mic down to her,

24  please.

25         Do you have relatives there, or was that vacation

```
 1   or what?
 2           JUROR ARIAS:  Yes, my dad is from Colombia.
 3           THE COURT:  You have relatives there?
 4           JUROR ARIAS:  Yes.
 5           THE COURT:  And how often do you go to Colombia?
 6           JUROR ARIAS:  Maybe once every two years.
 7           THE COURT:  Okay.  And when you say "relatives,"
 8   what's the relationship?
 9           JUROR ARIAS:  Uncles, aunts, cousins.
10           THE COURT:  Okay.  And would that affect your
11   ability to be a fair juror, if you hear the defendant is
12   from Colombia?
13           JUROR ARIAS:  No.
14           THE COURT:  Okay.  Thank you.
15           Somebody else had a hand up.  Who else said --
16   all right.  Is that Mr. Schilit?  You speak Spanish, sir?
17           JUROR SCHILIT:  Not at all.
18           THE COURT:  Okay.  But you have -- you've been to
19   Colombia?
20           JUROR SCHILIT:  I've been to Bogota for -- it was
21   for a consulting project, a business consulting project.
22           THE COURT:  Okay.  All right.  So would that
23   affect your ability to be a fair juror, if you were selected
24   on this jury, the fact the defendant may be from Colombia?
25           JUROR SCHILIT:  No.
```

1          THE COURT:  Okay.  Anyone else?

2          All right.  We talked briefly about this for those

3   of you that have had prior jury service, but you will hear

4   that the -- and I'll read the indictment to you if you're

5   selected, but essentially you're going to hear the drug

6   involved here is cocaine, and so let me just ask a couple of

7   questions about that.

8          Are there any of you on the jury panel that

9   believe either the possession of cocaine or the sale of

10  cocaine or the drug cocaine, to possess cocaine, ought to be

11  legal?

12         Okay.  Cocaine now.  I'm not asking about other

13  drugs.  Cocaine.

14         Okay.  Could you pass the mic down to the first

15  row.

16         Okay.  Ms. Alderson, I don't want to put words in

17  your mouth, so why don't you tell me.

18         JUROR ALDERSON:  I just have issues with the

19  criminalization of certain drugs, including cocaine, and I'm

20  not sure I could be entirely impartial on it.

21         THE COURT:  Okay.  So -- and I specifically did

22  not say marijuana.  I said cocaine.

23         JUROR ALDERSON:  Yeah, I know.

24         THE COURT:  Okay.  So you believe cocaine should

25  be legal?

1            JUROR ALDERSON:  Maybe not legal, but I feel like

2    it's one of those things where I might not be 100 percent

3    impartial on it.

4            THE COURT:  Okay.  Well, explain that to me, if

5    you -- in you're not -- if you're not certain about it being

6    legal -- because here is the --

7            JUROR ALDERSON:  I think the criminalization

8    sometimes for possession -- I don't know as much about

9    distribution, it's something that I don't know a whole lot

10   about, but for possession, I would have a hard time -- yeah,

11   because -- is this something I can talk about on the sidebar

12   maybe?

13           THE COURT:  I'm sorry.  What?

14           JUROR ALDERSON:  Is this something I can talk

15   about on sidebar?

16           THE COURT:  Certainly.  Certainly.  Absolutely.

17   I'll hold that question.

18           JUROR ALDERSON:  Okay.

19           THE COURT:  Anybody else that thinks possession of

20   cocaine should be legal?

21           All right.  Let me ask the flip question.

22           Your job on this jury, if you're selected on this

23   jury, is to decide if the defendant is guilty or not guilty

24   after having heard the evidence and having listened to my

25   jury instructions and the law, but, you know, you must

1    follow the law, and at this point it is illegal to possess

2    cocaine, so I need to also know if there are any of you,

3    because of any kind of personal experience, that could not

4    give the defendant a fair trial because he -- you know, both

5    sides deserve a fair trial.  The Government deserves a fair

6    trial, the defendant deserves a fair trial.  Your job as a

7    juror is going to be to listen to the evidence and determine

8    if the Government has proven its case beyond a reasonable

9    doubt, and we just need to know up front, both sides need to

10   know up front that they're going to get a fair deal, a fair

11   shake with these jurors, and that you'll make a decision

12   based on what you hear in the courtroom and not come in with

13   any preconceived ideas that I'm not going to follow the law

14   or I'm automatically going to decide the defendant is guilty

15   before I've heard any evidence.

16          So have any of you had any experience with drugs

17   that would make it impossible for you to be a fair juror?

18   And I'm carving -- I'm carving Ms. Alderson out of that

19   question.  Anybody else?  Okay.

20          Have any of you in the past ever been employed by

21   law enforcement?  Do any of you have -- and let me define

22   this -- a close friend or a close relative, and I don't

23   mean, you know, a cousin that lives somewhere you never talk

24   to or something like that, but I mean somebody that is a

25   mother, father, daughter, son, brother, sister or a close

1  friend you see every day or talk to on a routine basis, that

2  is involved in law enforcement?

3          Okay.  Mr. Frongillo, if you would pass the mic

4  back.  Can you tell me the relative and what agency he or

5  she is employed by.

6          JUROR FRONGILLO:  My dad was a Boston cop.

7          THE COURT:  Okay.  So he worked for the Bartow

8  Police Department?

9          JUROR FRONGILLO:  No, the City of Boston,

10  Massachusetts.

11          THE COURT:  Oh, Boston.  I thought you said

12  Bartow.  Boston.  He worked for the City of -- or the Boston

13  Police Department.  Okay.  All right.

14          Obviously we're not going to have any witnesses

15  that are from the Boston Police Department, but we will

16  have, I anticipate, witnesses from the Coast Guard and

17  Homeland Security and, you know, maybe the FBI, so would

18  that affect your ability to be a fair juror, if you're going

19  to have witnesses that testify that are in law enforcement,

20  but certainly not with the Boston Police Department?

21          JUROR FRONGILLO:  No, Your Honor.

22          THE COURT:  Okay.  Because your job will be to

23  judge the credibility of those witnesses just like all

24  witnesses.

25          JUROR FRONGILLO:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Which brings up the
 2   Coast Guard.  I anticipate you'll hear a number of
 3   Coast Guard witnesses.  You're going to hear evidence that
 4   the defendant was on a boat that was intercepted in
 5   international waters and intercepted by the Coast Guard, so
 6   we're going to have Coast Guard people come in here and
 7   testify.  Anybody have any connection to the Coast Guard?
 8              Okay.  Good thing you got the mic.
 9              JUROR FRONGILLO:  Yeah.
10              THE COURT:  Mr. Frongillo, can you tell me about
11   that.
12              JUROR FRONGILLO:  I have a close friend of mine
13   who retired from the Coast Guard.  I hang around with a lot
14   of ex-military people.  I used to ride with a veterans
15   motorcycle club, so I'm just -- those are the kind of people
16   I hang around with, and actually two of them that I'm close
17   to are with the Coast Guard, one is active, one is retired.
18              THE COURT:  Okay.  Well, we're going to have a
19   number of Coast Guard witnesses, and your job is going to be
20   to listen to what they say, and I will give you an
21   instruction that says with any witness you can believe or
22   disbelieve the witness, part of the testimony or all of the
23   testimony, but what we need to know is if you can fairly
24   judge the credibility of that witness's testimony, so can
25   you do that with Coast Guard officers?
```

```
 1              JUROR FRONGILLO:  Yes, Your Honor.
 2              THE COURT:  Okay.  Thank you.
 3              Anybody else have any connection to the
 4   Coast Guard?
 5              Yes, sir.  Pass the mic down to Mr. Santos.
 6              Can you tell me what that is, Mr. Santos?
 7              JUROR SANTOS:  Yeah.  My cousin is a chief in the
 8   Coast Guard.
 9              THE COURT:  And do you know where he's stationed?
10              JUROR SANTOS:  Cape Cod.
11              THE COURT:  All right.  And do you know what he
12   does?
13              JUROR SANTOS:  Training.
14              THE COURT:  Train?
15              JUROR SANTOS:  Yeah, he does training for like the
16   surf and -- surf rescue boats and stuff.
17              THE COURT:  All right.  Would the fact that you
18   have a cousin in the Coast Guard affect your ability to
19   judge the credibility of the witnesses who testify?
20              JUROR SANTOS:  No, Your Honor.
21              THE COURT:  All right.  Thank you.
22              Anybody else with any connection to the
23   Coast Guard?
24              Okay.  I mentioned, I believe, the FBI,
25   I mentioned Homeland Security.  I didn't mention DEA, Drug
```

1  Enforcement Administration, there may be witnesses from the

2  Drug Enforcement Administration.  Anybody have any

3  connection with anybody from the Drug Enforcement

4  Administration?

5           All right.

6           We have representing the Government an Assistant

7  United States Attorney.  Do any of you have any friends or

8  relatives that are employed by the U.S. Attorney's Office

9  here in the Middle District?  No?

10          Yes, ma'am.

11          If you would bring the mic down to the first row,

12 Ms. Dawson.

13          JUROR BROOKE DAWSON:  I'm honestly not sure.

14 I know she works in Hillsborough County, but I'm not sure if

15 she's State Attorney or U.S. Attorney or what the difference

16 is, but I do have a good friend.

17          THE COURT:  Okay.  And can you tell me her name.

18          JUROR BROOKE DAWSON:  Amy Casanova Ward.

19          THE COURT:  Okay.  I'm not aware that she works

20 for the U.S. Attorney's Office, so --

21          JUROR BROOKE DAWSON:  I'm pretty sure it's

22 Hillsborough County, but --

23          THE COURT:  All right.  Thank you.

24          JUROR BROOKE DAWSON:  We don't discuss her work

25 though.

```
 1              THE COURT:  All right.  Anyone else?

 2              All right.  And to the extent that you would know,

 3    are any of you currently under investigation by any Federal

 4    agency, such as FBI or IRS, for example, or the

 5    U.S. Attorney's Office?  And I say to the extent that you

 6    would know.

 7              All right.  Let me just ask another question.

 8    Have any of you been a witness in a case where you've

 9    actually gone to court and testified?  Anybody?

10              A couple people.  Okay.

11              Ms. Dawson, you have?

12              JUROR BROOKE DAWSON:  Again, just for full

13    disclosure, I don't really think it's relevant, but, I mean,

14    I was in a car accident when I was 16 and I had to be a --

15    I was a witness and, you know, had to testify for myself.

16              THE COURT:  Yeah.  You actually went to court?

17              JUROR BROOKE DAWSON:  Yeah.  Somebody ran into me

18    at a stop sign and totaled my car.

19              THE COURT:  And there was a trial and you

20    testified at the trial; is that what happened?

21              JUROR BROOKE DAWSON:  Yes.

22              THE COURT:  Okay.  All right.  And that was

23    obviously in State Court somewhere?

24              JUROR BROOKE DAWSON:  Yes.  It was -- it was in

25    Miami.  I was 16.  I --
```

```
 1              THE COURT:  Okay.
 2              JUROR BROOKE DAWSON:  I mean, I was completely not
 3    at fault, and the whole thing took about an hour, so --
 4              THE COURT:  All right.  Thank you.
 5              We had a couple of other people that had their
 6    hand up, in the second row.  Yes.  Mr. Schilit.
 7              JUROR SCHILIT:  It was all expert witness work
 8    that I've done.
 9              THE COURT:  Okay.  Well, we're going to have,
10    I anticipate, a couple of expert witnesses in this trial,
11    and they're not going to be expert witnesses, I'm assuming,
12    with the type of expertise that you have, but we are going
13    to have expert witnesses testify in the trial, and your job
14    is going to be to determine whether you believe what they
15    have to say as well.  Would the fact that you've been an
16    expert witness affect that at all?
17              JUROR SCHILIT:  No.
18              THE COURT:  All right.  Thank you.
19              And I believe Mr. Santos, did you have your hand
20    up?  No?  All right.
21              Mr. Luetzow.
22              JUROR LUETZOW:  Yes.  I testified in an accident
23    trial where I represented the truck company plus the company
24    that had rented the truck.
25              THE COURT:  Okay.  You testified on behalf of the
```

```
 1   company?
 2              JUROR LUETZOW:  Yes.
 3              THE COURT:  Okay.  And that too was in State
 4   Court?
 5              JUROR LUETZOW:  Yes.
 6              THE COURT:  In a civil case?
 7              JUROR LUETZOW:  It was county court, Pasco County.
 8              THE COURT:  All right.  Thank you.  Anybody else?
 9              I ask about connections.  Maybe I should ask the
10   flipside of the story of the question.
11              Have any of you had an experience with
12   law enforcement that was so bad that you think it might
13   affect your ability to judge the credibility of any
14   law enforcement officer that testified?  Does that apply to
15   anybody?
16              I've asked -- I believe I've asked about being a
17   witness.  Let me ask another question.
18              Do any of you have any close friend, and again,
19   I've already defined what that means, or a relative who has
20   been convicted of a crime?  And if the answer is yes, would
21   you raise your hand.
22              Okay.  A number of people.
23              Where is the mic, please?
24              Okay.  We'll start in the back row, back there,
25   and Mr. Johnson, can you tell me the relationship.
```

```
1              JUROR JOHNSON:  Yes.  My brother-in-law.
2              THE COURT:  Brother-in-law?  Okay.  And can you
3      tell me what type of crime.
4              JUROR JOHNSON:  It was a drug charge.
5              THE COURT:  Okay.  And are you close to your
6      brother-in-law?
7              JUROR JOHNSON:  Yeah, I work with him at the tire
8      store.
9              THE COURT:  Okay.  And do you remember what kind
10     of drug charge?
11             JUROR JOHNSON:  Can't recall that.  No, I don't.
12             THE COURT:  Did he go to jail?
13             JUROR JOHNSON:  Yes, for -- I think it was a
14     felony charge.  Yes.
15             THE COURT:  Okay.  Is he --
16             JUROR JOHNSON:  A couple of years I think.
17             THE COURT:  But he's no longer in jail?
18             JUROR JOHNSON:  No longer.
19             THE COURT:  Would that affect your ability to be a
20     fair juror in this case?
21             JUROR JOHNSON:  No, it shouldn't.  No.
22             THE COURT:  Okay.  Who else -- thank you -- had
23     their hand up?
24             Okay.  Mr. Frongillo.
25             JUROR FRONGILLO:  Yeah.  A good friend of mine
```

1  back in the '80s got arrested at the airport with a kilo of

2  cocaine taped to his body, went to jail.

3         THE COURT:  Okay.  Was it at the airport here?

4         JUROR FRONGILLO:  In Miami.

5         THE COURT:  Miami.  All right.  And do you recall

6  what happened as far as he was concerned?  Did he get

7  convicted and go to jail?

8         JUROR FRONGILLO:  He did.  He did two years, so --

9         THE COURT:  Okay.  And is he out?

10        JUROR FRONGILLO:  Oh, yeah.  This is back in the

11 '80s.

12        THE COURT:  And you still keep up with him?

13        JUROR FRONGILLO:  I haven't seen him in --

14        THE COURT:  Okay.  Would that affect your ability

15 to be a fair juror?

16        JUROR FRONGILLO:  No, but you said something that

17 may affect my thing now.

18        THE COURT:  Okay.

19        JUROR FRONGILLO:  I'm going back to this --

20 I don't want to say this impeachment thing, but I do believe

21 the D.O.J. and the FBI and some of those people lied during

22 all this stuff with the politics that are going on now, so

23 that may be a problem for me.  I mean, I'm going to

24 obviously do a lot of thinking on what they say.

25        THE COURT:  Well, that's fair enough.  You should.

1              JUROR FRONGILLO:  And unfortunately a lot of the

2    trust -- I do believe the FBI and D.O.J. lied on this

3    impeachment, so --

4              THE COURT:  You're talking about with something

5    related to the current impeachment proceeding of the

6    President?

7              JUROR FRONGILLO:  Yes.  Of President Trump.  Yes.

8              THE COURT:  All right.  Well --

9              JUROR FRONGILLO:  Okay.  I'm just letting you

10   know.

11             THE COURT:  You're certainly -- everybody is

12   entitled to whatever opinion, but really the only thing

13   I need to know is whether -- this is a totally unrelated

14   thing, whether you can listen to these witnesses and make a

15   determination on their credibility.

16             JUROR FRONGILLO:  I believe I could.

17             THE COURT:  Okay.  All right.  Thank you.

18             Yeah, I'm sure that a lot of people have certain

19   feelings about what's going on now and probably very strong

20   feelings on either side, but obviously this is completely

21   unrelated and we just need you to listen to the evidence in

22   this case and make a determination as far as this case is

23   concerned.

24             Anybody else?

25             Okay.  Ms. Parrish.

```
 1              JUROR PARRISH:  My brother.

 2              THE COURT:  Okay.  And can you tell me what kind

 3   of case and did he go to jail?

 4              JUROR PARRISH:  Yes.  Drugs.

 5              THE COURT:  Okay.  Do you know what kind of drugs?

 6              JUROR PARRISH:  Pills.

 7              THE COURT:  Okay.  And did he go to trial and get

 8   convicted?

 9              JUROR PARRISH:  Yes, he went to jail.  Prison.

10              THE COURT:  He went to prison?

11              JUROR PARRISH:  Um-hum.

12              THE COURT:  Is he still in prison?

13              JUROR PARRISH:  No.

14              THE COURT:  Would that affect your ability to be a

15   fair juror here in any way?

16              JUROR PARRISH:  No.

17              THE COURT:  Okay.  Thank you.

18              And if you would pass the mic down to Ms. Dawson.

19              JUROR BROOKE DAWSON:  Again, this is just in full

20   disclosure, since I took an oath, something I prefer not to

21   talk about, but my brother definitely -- several drug

22   charges, assault, a couple of other things, but he committed

23   suicide in 2015, and we were not close.

24              THE COURT:  Okay.  And would that affect your

25   ability to be a fair juror here?
```

1          JUROR BROOKE DAWSON:  No, not at all.

2          THE COURT:  All right.  Thank you.

3          Anyone else?

4          All right.  I'm going to move out into the

5     courtroom now, and so you guys in the jury box can just

6     relax.  It's going to be -- we're going to start and do the

7     same sort of thing, and I will start with the juror who is

8     seated in seat 19, and that would be Ms. Dixon.

9          Ms. Dixon, would you stand and answer the

10    questions that are on that sheet of paper, please.

11         JUROR DIXON:  I am an original Floridian, from

12    Clearwater, Florida, for 60 years, and I got a --

13    I graduated from high school.  I work at McDonald's.  I'm

14    not married, and I don't have any children, but I do have a

15    fur dog -- excuse me, a dog, so I consider him my child.

16    I have not been in the military or served on a jury before.

17         THE COURT:  Okay.  And suppose you are selected on

18    this jury.  Is there any reason you could not serve if

19    selected?

20         JUROR DIXON:  No, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Would you pass the mic over to Ms. Hayden.

23         JUROR HAYDEN:  I live in Venice, Florida.  I've

24    lived there in that residence 30 years.  I've been in

25    Florida 58 years.  High school education.  I am the sole

1   owner of a salon where I'm the only worker.  My husband is

2   employed, he has his own landscaping maintenance business.

3   I'm married.  I have two children, 49 and 43.  One works on

4   a crab boat, the other one works in a grocery store.  No

5   military and no previous jury service.

6           THE COURT:  Okay.  I got what the second son does,

7   but what does the first one do?

8           JUROR HAYDEN:  He works on a stone crab boat.

9           THE COURT:  Oh, okay.  Is that out of -- where

10  does he live?

11          JUROR HAYDEN:  We live in Venice, Florida.

12          THE COURT:  Oh, okay.  So is he having a good

13  stone crab season?

14          JUROR HAYDEN:  Yes, they are.

15          THE COURT:  Stone crabs are good stuff, huh?

16          JUROR HAYDEN:  Yes, they are.

17          THE COURT:  Ms. Hayden, and I may have missed

18  this, did you say you've never served on a jury?

19          JUROR HAYDEN:  No.

20          THE COURT:  All right.  And you've never been in

21  the military?

22          JUROR HAYDEN:  No, I have not.

23          THE COURT:  And suppose you are selected on this

24  jury.  Is there any reason you could not serve if selected?

25          JUROR HAYDEN:  Well, it would be a hardship on my

1  work because I'm the only worker in the salon and I don't

2  have anybody else to cover for me, but I also have two sons

3  that both have felony charges and one was drug-related, so

4  I think I should just say that now.

5           THE COURT:  All right.  As long as you brought

6  that up, we'll go ahead and talk about it.

7           The salon, is this like a hair salon?

8           JUROR HAYDEN:  Yes, ma'am.

9           THE COURT:  And if you're not there, the

10 appointments get canceled; is that what you're saying?

11          JUROR HAYDEN:  Yes.  Yes.

12          THE COURT:  And obviously you don't get paid if

13 you're not there.

14          JUROR HAYDEN:  Right.  Right.

15          THE COURT:  Okay.  You brought up your sons, so

16 why don't you tell me about that.

17          JUROR HAYDEN:  Well, I had one son that was in

18 drugs since he was 12 years old, that's the one that's 49.

19 It's amazing he's alive, but he has spent -- I've spent a

20 ton of time with courtrooms and all that kind of stuff.

21 He's been in halfway houses, he's been in jail.  He is clean

22 now and he's doing very well, but it's hard to like anybody

23 or want anybody to have any dealings with drugs.  It's been

24 a long road.

25          THE COURT:  Would it be difficult for you to be a

```
1    fair juror in this case?
2              JUROR HAYDEN:  Yes.
3              THE COURT:  All right.  Thank you.
4              If you would pass the mic over to Mr. Skidmore.
5              JUROR SKIDMORE:  I currently live in Oldsmar, been
6    there about four months, been in Florida for 15 years.
7    I have a Master's degree.  I am a project manager.  I am
8    divorced.  I have two children, 19, full-time student, and
9    22, active duty military.  I have served in the military.
10   I have not served on a jury before.
11             THE COURT:  Okay.  Who do you work for?
12             JUROR SKIDMORE:  Jabil.
13             THE COURT:  And when you're a project manager,
14   tell me what you do exactly.
15             JUROR SKIDMORE:  My primary responsibilities is
16   managing budgets and scheduling of the engineers performing
17   the project.
18             THE COURT:  Okay.  All right.  And you said you'd
19   been in the military.  Can you tell me what service you were
20   in and what you did.
21             JUROR SKIDMORE:  Yes, ma'am.  I was in the
22   Air Force for eight years, and I was on the maintenance
23   crew.
24             THE COURT:  Suppose you are selected on this jury,
25   Mr. Skidmore.  Is there any reason you could not serve if
```

```
 1   selected?
 2            JUROR SKIDMORE:  No, ma'am.
 3            THE COURT:  All right.  Thank you, sir.
 4            If you would pass the mic over to Ms. Smith.
 5            JUROR SMITH:  I'm a resident of Riverview,
 6   Florida, for 35 years.  65 I've lived in Florida.
 7   High school education.  I am semi-retired.  I work for
 8   customer service two and a half days a week.
 9            THE COURT:  I'm sorry, I missed that.  Worked in
10   customer service where?
11            JUROR SMITH:  Walmart.
12            THE COURT:  Walmart.  Okay.
13            JUROR SMITH:  And married but recently separated.
14   He is retired.  We have two children, 48 and 42.  No
15   military service and I've not served on a jury.
16            THE COURT:  Okay.  And the two children that are
17   48 and 42, are they employed?
18            JUROR SMITH:  Yes, ma'am.
19            THE COURT:  Can you tell me how -- would you hold
20   the mic up -- how they're employed.
21            JUROR SMITH:  My 48-year-old is a respiratory
22   therapist at Brandon Hospital.  The other one is a
23   construction worker.
24            THE COURT:  Okay.  Ms. Smith, suppose you are
25   selected on this jury.  Is there any reason you could not
```

1   serve if selected?

2            JUROR SMITH:  Currently, yes.

3            THE COURT:  Hold the mic up, please.  We're having

4   a hard time hearing you.

5            JUROR SMITH:  Yes.  Currently I am having a lot of

6   mental issues with -- my husband just recently left me and

7   it's -- I don't think I would be suitable, and I've missed a

8   couple -- took out -- a couple weeks out of work because of

9   it.  It's just been pretty hard.

10           THE COURT:  Okay.  Is it -- this is a recent

11  thing?

12           JUROR SMITH:  Yes, ma'am.  30 years married.

13           THE COURT:  I'm sorry.  What?

14           JUROR SMITH:  We were married 30 years.

15           THE COURT:  You said you missed some work.  Are

16  you currently working?

17           JUROR SMITH:  I went -- I've gone back for

18  two days now over the last three weeks and tried, so -- it's

19  hard.

20           THE COURT:  Okay.  Thank you.

21           If you would pass the mic over to Mr. Schnieders.

22           JUROR SCHNIEDERS:  Schnieders, actually.

23           THE COURT:  Schnieders.

24           JUROR SCHNIEDERS:  I moved to Florida in '85 and

25  lived in Tampa the whole time except the early years, '85,

1  '86 was Clearwater.  I was -- have a Bachelor's degree.  I

2  am a licensed CPA doing CFO fractional work for middle

3  market practice.  I'm married.  My wife is retired and

4  worked retail in her occupation.  I have a 29-year-old son

5  who sells heavy construction equipment.  I have no prior

6  military service.  I was on a -- I did -- was on a case, a

7  civil case, probably 15 years ago.  We did reach a verdict.

8          THE COURT:  Thank you.  Can you tell me again how

9  you're employed.

10          JUROR SCHNIEDERS:  Mainly consulting services.

11  I go into middle market, small businesses, and give CFO

12  services if they can't afford a full-time CFO, so I come in

13  and -- maybe you need me eight hours a week, the next guy

14  needs me 30 hours a month, so it just depends on what kind

15  of services you need.  So I'm working for more than one

16  client.

17          THE COURT:  Okay.  Suppose you are selected on

18  this jury.  Is there any reason you could not serve if

19  selected?

20          JUROR SCHNIEDERS:  No.

21          THE COURT:  All right.  Thank you, sir.

22          If you would pass the mic over to Mr. Sapio.

23          JUROR SAPIO:  Good morning, Your Honor.  I live in

24  Land O' Lakes, Florida, been there about six months.

25  Recently moved from Bushnell.  I've been in Florida for

1  51 years.  I've got about 18 months of community college.

2  I am retired about a year, retired from the Florida

3  Department of Revenue.  I worked for the child support

4  program.  I'm married.  My wife is retired also.  She also

5  retired from the Department of Revenue.  We have two

6  children.  I have a daughter that is 44, and my son is 40.

7  My daughter is a director of a daycare center, and my son is

8  a parts manager for a diesel repair facility.  I was

9  four years in the United States Navy.  I was a missile fire

10  control technician.  I have never served on a jury.

11          THE COURT:  Okay.  Suppose you are selected on

12  this jury.  Is there any reason you could not serve if

13  selected?

14          JUROR SAPIO:  No, ma'am.

15          THE COURT:  Thank you, sir.

16          If you would pass the mic over to Mr. Ostema.

17          JUROR OSTEMA:  Ostema.

18          THE COURT:  Ostema.

19          JUROR OSTEMA:  Good morning.  I live in Sarasota.

20  I've lived there since -- well, 49 years now, same town.

21  I have an Associate's in Science.  I am self-employed.  I'm

22  a product designer, engineer basically.  I'm divorced.

23  Two children, 26 and 29.  26-year-old works at uBreakiFix.

24          THE COURT:  Works where?

25          JUROR OSTEMA:  UBreakiFix.  You can say it the

1  other way.

2          My daughter is a child speech therapist.  She's

3  29.  I did not have the honor to serve.  I tried but

4  I didn't pass the physical.  I was blind in one eye.

5  I didn't know they wouldn't take me just because of that.

6          I've never been selected.  I've been there a few

7  times, but I never get asked to this point.

8          THE COURT:  Okay.  Suppose you're selected on this

9  jury.  Is there any reason you could not serve if selected?

10          JUROR OSTEMA:  I suffer with migraines.

11  Occasionally they're kind of bad.

12          THE COURT:  I'm sorry.  Somebody coughed.  I kind

13  of missed it.

14          JUROR OSTEMA:  Issues with migraines.  Sometimes

15  they're pretty bad.  Sometimes I have cognitive issues where

16  I can't understand exactly what someone is saying, have to

17  sleep for a few hours, and then it gets better.  It's no

18  fun.

19          THE COURT:  Okay.  But you're -- I'm sorry, I need

20  to go back to you.

21          JUROR OSTEMA:  Yes, ma'am.

22          THE COURT:  You're able to maintain a job?

23          JUROR OSTEMA:  Well, I work for myself, so I can

24  take a nap if I need to.  I've worked for myself since I was

25  in my early 20s.  I've been very lucky in that department.

1          THE COURT:  Okay.

2          JUROR OSTEMA:  I'm on lots of patents for other

3   companies, I help them navigate that kind of stuff, so,

4   you know how -- it just doesn't -- I don't have to be

5   someplace 9:00 to 5:00.

6          THE COURT:  Okay.  So would it be difficult for

7   you to serve as a juror here?

8          JUROR OSTEMA:  Yes, if I have a migraine,

9   you know.  I have a headache for like three hours.

10          THE COURT:  Okay.  And maybe you -- I know there

11   are -- different people that have migraines have different

12   effects, for want of a better word.  Do you suffer from

13   migraines on a daily basis or a weekly basis or --

14          JUROR OSTEMA:  I'd love to be able to control

15   that.  Sometimes it happens, you know, regularly, over a

16   period of a few weeks, and then I can go three weeks without

17   one.

18          THE COURT:  Okay.

19          JUROR OSTEMA:  I have aurora problems, so I can't

20   see for about 20 or 30 minutes when that happens.

21          THE COURT:  Let me ask it a different way then.

22   When was the last time you had a migraine?

23          JUROR OSTEMA:  Last week.

24          THE COURT:  Okay.  All right.  Thank you, sir.

25          If you would pass the mic over to Ms. Sawicki.

```
 1            MS. SAWICKI:  I'm from Ellenton, Florida.  I've
 2    lived there 13 years.  I've lived in Florida 29 years.  I've
 3    completed three years of college.  I currently work
 4    part-time at a golf course.  Prior to that I was a full-time
 5    clinical liaison.  I'm married.  My spouse is a sales
 6    manager for a fire and sprinkler company.  I have four
 7    children.  My oldest is 26, he is an art director in
 8    St. Petersburg.  He lives there.  My daughter is 22, is a
 9    sales manager for retail.  I have a 19-year-old that's at
10    U.F. right now and a 13-year-old that's in seventh grade.
11    No military status.  I've never served on jury duty.
12            THE COURT:  Okay.  Suppose you're selected on this
13    jury.  Is there any reason you could not serve if selected?
14            MS. SAWICKI:  No.  I do take medication for
15    bipolar, sometimes makes me antsy, jittery or forgetful, but
16    I've been on it for a while, so --
17            THE COURT:  Okay.  Thank you.
18            MS. SAWICKI:  You're welcome.
19            THE COURT:  If you would pass the mic back,
20    please, to Ms. Ebsworth.
21            JUROR EBSWORTH:  Good morning, Your Honor.  I'm in
22    Valrico, Florida.  I've lived there for ten years.  In
23    Florida 14 years.  I have a doctorate.  I'm a podiatrist at
24    James A. Haley Veterans Hospital, work out of Lakeland.
25    I am divorced.  I have four kids, one 19, one 14 and twins
```

1   that are five.  I've never served in the military.  I have

2   never been part of a jury.

3   THE COURT:  Suppose you are selected to be on this

4   jury.  Is there any reason you could not serve if selected?

5   JUROR EBSWORTH:  No.

6   THE COURT:  All right.  Thank you.

7   Would you pass the mic over to Ms. Badillo.

8   JUROR BADILLO:  Good morning.  I've been living in

9   Tarpon Springs for 20 years, in Florida for 25 years.

10  Doctorate.  I'm a nephrologist.  Married to a physician.

11  I have three children, ages 27, 25 and 19.  The oldest is a

12  physician, doing his residency in Philadelphia; I have a

13  25-year-old that's finishing med school this May; and my

14  19-year-old is in college.  No military service and never

15  been selected for a jury trial.

16  THE COURT:  Okay.  And you said you are a

17  nephrologist?

18  JUROR BADILLO:  Correct.

19  THE COURT:  Do you have your own practice or do

20  you work for a hospital, or what do you do?

21  JUROR BADILLO:  It's a group private practice.

22  THE COURT:  Okay.  Suppose you're selected on this

23  jury.  Is there any reason you could not serve if selected?

24  JUROR BADILLO:  Well, the hardship of the

25  practice.  I cover five dialysis clinics.  Right now I'm

```
 1   being covered by one of my partners, but obviously it's more
 2   work for them, but also I have a wedding that I'm planning
 3   on attending this weekend, leaving on Thursday, in
 4   New Orleans.
 5            THE COURT:  And where is the wedding?
 6            JUROR BADILLO:  In New Orleans, Louisiana.
 7            THE COURT:  And when are you leaving?
 8            JUROR BADILLO:  Thursday.
 9            THE COURT:  All right.  Thank you.  If you would
10   pass the mic over to Mr. Amin.
11            JUROR AMIN:  I live in Lakeland, Florida,
12   31 years.  I am M.S. graduate, Master's degree, and me and
13   my wife have a gas station, one gas station.  Married.
14   I have a -- my wife also working with me.  We working on an
15   open to close, 7:00 to 9:00.  I have one daughter, she's a
16   physician in Athens Georgia Hospital.  Never worked for the
17   military service and I never have any jury duty at any time.
18            THE COURT:  Okay.  Could I go back and ask you a
19   question.  You say you are an M.S. graduate.  Tell me what
20   that means.  You have a Master's?
21            JUROR AMIN:  I have Master's degree.
22            THE COURT:  Okay.  And I understand how you are
23   employed.  You're not there today.  Is your wife there?
24   Is that what --
25            JUROR AMIN:  Yes.  Yes, ma'am.  I have -- my wife
```

1   works in the morning, 7:00 to 9:00, today.  Mostly she works

2   three o'clock every day.

3            THE COURT:  Okay.  Mr. Amin, is English your first

4   language?

5            JUROR AMIN:  No.  Indian language is first

6   language.

7            THE COURT:  Okay.  Did you immigrate from

8   someplace in India?

9            JUROR AMIN:  Yes.

10           THE COURT:  Can you tell me where.

11           JUROR AMIN:  I not understand.  What do you say,

12   ma'am?

13           THE COURT:  Okay.  Where are you originally from?

14           JUROR AMIN:  I am from India, from Gujarat.

15           THE COURT:  Okay.  All right.  Suppose you are

16   selected on this jury.  Is there any reason you could not

17   serve if selected?

18           JUROR AMIN:  Only problem is that my wife has to

19   work like almost 14 hours straight, 7:00 to 9:00.

20           THE COURT:  Okay.  Thank you.

21           JUROR AMIN:  Thank you.

22           THE COURT:  Mr. Dawson.

23           JUROR GREGORY DAWSON:  I'm Greg Dawson.  I'm a

24   resident of Zephyrhills, Florida, where I've been for about

25   six years.  I've lived in Florida for about 31 years.  I do

```
1    have a Bachelor's degree.  I am -- God has entrusted me with
2    a software and database development company, where I am the
3    President, Chief Ministry Officer and only full-time
4    developer.  I'm also a project manager in that role as well.
5    I also run a small farm.  I am married, and my wife takes
6    care of our children and home schools them.  I'm about to
7    bring up the average of children in the room.  I have seven
8    boys and four girls.
9              THE COURT:  Wow.
10             JUROR GREGORY DAWSON:  My oldest is 22, he is an
11   EMT working for a private ambulance company.  I've got a
12   20-year-old daughter, about to turn 21, she works in child
13   care.  I have a 20-year-old daughter who is about to give
14   birth any day.  I have a 19-year-old son who works in
15   landscaping and is training to be an EMT.  I have a son that
16   just turned 18 today and a daughter who turned -- is about
17   to turn -- well, she's 16 now.  I have a son that's 14, a
18   son that is 11, a son that is nine, a son that is -- oops,
19   no.  Missed one.  A daughter who is almost seven and a son
20   who is four.
21             THE COURT:  Okay.  Good job.
22             JUROR GREGORY DAWSON:  Say again, Your Honor?
23             Thank you.
24             No military service.  I have been called for jury
25   duty but did not serve on a jury.
```

```
 1              THE COURT:  All right.  Suppose you are selected
 2    on this jury.  Is there any reason you could not serve if
 3    selected?
 4              JUROR GREGORY DAWSON:  It is a hardship on my
 5    business, and certainly I do want to be there for the birth
 6    of my first grandchild.  My daughter is due February 4th,
 7    but you never know.  Full disclosure based on some of your
 8    other questions as well.  I have done business with a
 9    company in Colombia.  I also did apply to the U.S.
10    Coast Guard Academy through my connections in college of
11    Eckerd College Search and Rescue.  I know some that
12    certainly became U.S. Coast Guard personnel and have a lot
13    of connections through church, none that are close
14    currently, but in the past of different police officers and
15    sheriff's officers, things like that, and I do know somebody
16    that's in the DEA.
17              THE COURT:  All right.  Who is it you know from
18    DEA?
19              JUROR GREGORY DAWSON:  Mark Webb.
20              THE COURT:  Okay.  He's not going to be a witness,
21    but go ahead.
22              JUROR GREGORY DAWSON:  There was something else
23    there.  I don't know.  It will come up later, I guess.
24              THE COURT:  All right.  Well, let me just ask you,
25    you said you had a connection, you did business with someone
```

1   in Colombia.  What kind of business?

2          JUROR GREGORY DAWSON:  They provided us metal and

3   plastic parts in the marine industry.  I took over another

4   business from my father years ago.

5          The other thing, full disclosure, we do work as a

6   part of my current business with a company that subcontracts

7   work to us directly for Central Florida Behavioral Health

8   Network as well as North Coast Jewish Services, and in the

9   past -- and FADA, the Federal Drug Administration -- or the

10  Alcohol Administration, and I think there's one -- oh,

11  Operation PAR over in Pinellas.

12         THE COURT:  And what is it you do for them?

13         JUROR GREGORY DAWSON:  We do custom software and

14  database development, so it varies for -- for Central

15  Florida Behavioral Health Network, that primarily deals with

16  invoicing of their managing entity for the State of Florida

17  for behavioral health and substance abuse, and so we have

18  built their financial system to deal with their providers

19  and their network, and we're currently bidding on a

20  vouchering system as well.

21         THE COURT:  And you say "we."  That's your

22  business?

23         JUROR GREGORY DAWSON:  That's correct.

24         THE COURT:  Is that a business you own yourself?

25         JUROR GREGORY DAWSON:  Yes, ma'am, it is.

1           THE COURT:  Okay.  And is it -- you own the

2   business and you work in the business?

3           JUROR GREGORY DAWSON:  That's correct.

4           THE COURT:  Okay.  Does anybody else work in the

5   business?

6           JUROR GREGORY DAWSON:  We have two other part-time

7   employees, my wife and one of my sons, and then I have a lot

8   of subcontractors.  In some cases we've got subcontractors

9   that serve as the project manager and in some cases for some

10  of the businesses I serve as the project manager.

11          THE COURT:  All right.  So essentially it's your

12  business and you are -- you work -- you're the primary

13  employee of your business?

14          JUROR GREGORY DAWSON:  Yes, ma'am.

15          THE COURT:  All right.  Mr. Dawson, anything else

16  that you want to tell us?

17          JUROR GREGORY DAWSON:  No, ma'am.

18          THE COURT:  All right.  Thank you, sir.

19          You can pass the mic over to Ms. Young.

20          JUROR GREGORY DAWSON:  Certainly.

21          JUROR YOUNG:  I moved to Tampa in '76.  I've lived

22  here 44 years.  I have a B.A. in education and I worked as a

23  teacher until I had children.  I'm married and my husband is

24  the area director for the Fellowship of Christian Athletes

25  and a part-time mortgage broker.  I have seven children,

1   ranging in age from 40 to 22.  I have not had military

2   service or jury service.

3              THE COURT:  Okay.  Can we talk about the children

4   who -- the ones that are employed, can you tell me how they

5   are employed.

6              JUROR YOUNG:  I have a son that's the

7   Vice President of Live Events for Dave Ramsey.  I have a

8   self-employed photographer, a restaurant and coffee shop

9   owner, a synchronized swimming coach, and a daughter who is

10  a chef and kitchen manager.

11             THE COURT:  Okay.  Suppose, Ms. Young, you are

12  selected on this jury.  Is there any reason you could not

13  serve if selected?

14             JUROR YOUNG:  No.

15             THE COURT:  All right.  Thank you.

16             Would you pass the mic over to Mr. Neal.

17             JUROR NEAL:  Good morning.

18             THE COURT:  Good morning.

19             JUROR NEAL:  I'm from the City of North Port,

20  lived there 20 years.  I've lived in Florida for 40 years.

21  High school education.  I'm a truck driver, worked

22  previously as a mechanic.  I'm married and my spouse is

23  disabled, retired.  I have no children.  She has two.  No

24  military service.  I've never been on a jury.

25             THE COURT:  All right.  Mr. Neal, suppose you're

1    selected on this jury.  Is there any reason you could not

2    serve if selected?

3            JUROR NEAL:  Well, my wife is in the hospital

4    today having her gallbladder taken out, but I don't know

5    what kind of complications.  It's an in-and-out thing,

6    you know, day surgery, so -- but I don't know what kind of

7    complications or discomfort she's going to be in the rest of

8    the week.

9            THE COURT:  Who is with her as we speak?

10           JUROR NEAL:  Excuse me?

11           THE COURT:  Who is with her in the hospital?

12           JUROR NEAL:  We have a family friend took her.

13   I couldn't take her today because I had to be here.

14           THE COURT:  Okay.  All right.  Thank you, sir.

15           JUROR NEAL:  All right.

16           JUROR DIXON:  Your Honor, excuse me, I forgot to

17   mention my job status.  I am currently employed.

18           THE COURT:  Okay.  Hold on.  Let me go back.

19           JUROR DIXON:  Sorry.

20           THE COURT:  You have the mic.  If you'll stand up,

21   Ms. Dixon.

22           JUROR DIXON:  Yes.  I'm currently employed --

23           THE COURT:  I can't hear you.  Go ahead, start

24   again.

25           JUROR DIXON:  Okay.  I am currently employed at

1    McDonald's, so I'm in salad and vegetable prep.

2              THE COURT:  Okay.  All right.  I am not sure we

3    got all of that.  You said you're employed at McDonald's in

4    vegetable and salad prep?

5              JUROR DIXON:  Right.

6              THE COURT:  Yes?

7              JUROR DIXON:  Yes.  Yes, Your Honor.

8              THE COURT:  Okay.

9              JUROR DIXON:  My apologies.

10             THE COURT:  Thank you.  Okay.

11             Let me just ask some group questions of those of

12   you that are out in the courtroom, and they're essentially

13   going to be the same questions that I asked those people

14   that are in the jury box.  I've told you what the -- what

15   the allegations in the indictment are, that the defendant is

16   charged with a conspiracy to possess with the intent to

17   distribute 5 kilograms or more of cocaine while on board a

18   vessel subject to the jurisdiction of the United States, and

19   he's also charged with the substantive crime of possession

20   with the intent to distribute 5 kilograms or more of cocaine

21   while on board a vessel subject to the jurisdiction of the

22   United States, so I do have some questions that I want to

23   ask about cocaine.

24             In addition to that you will hear evidence, as

25   I told the people in the jury box, that the defendant was on

1   a boat that was intercepted by the Coast Guard in

2   international waters.  You will hear evidence that the

3   defendant is from Colombia, and obviously the defendant is

4   Spanish speaking.

5           Could I see a show of hands of those of you who

6   are in the courtroom who speak Spanish.

7           Okay.  Let me just make sure I have it.

8           Ms. Ebsworth, you do, or Dr. Ebsworth.  And

9   Dr. Badillo, you do.

10          JUROR BADILLO:  I do.

11          THE COURT:  Okay.  And for either of you is

12   Spanish your first language?

13          JUROR BADILLO:  Yes, for me.

14          JUROR EBSWORTH:  Me as well.

15          THE COURT:  Okay.  Then, Ms. Ebsworth, let me

16   start with you.

17          You grew up speaking Spanish, I'm assuming?

18          JUROR EBSWORTH:  Yes, ma'am.

19          THE COURT:  And can you tell me where you are from

20   or where your parents are from.

21          JUROR EBSWORTH:  I'm from Puerto Rico.

22          THE COURT:  Puerto Rico?

23          JUROR EBSWORTH:  Um-hum.

24          THE COURT:  Same question, Dr. Badillo, for you.

25          JUROR BADILLO:  Same place.  From Puerto Rico.

```
 1                THE COURT:  Same place?
 2                JUROR BADILLO:  Yes.
 3                THE COURT:  Okay.  Thank you.
 4                Are there any of you in the jury box that have
 5      been to Colombia?
 6                JUROR BADILLO:  Yes, I've been to Bogota and Cali
 7      when I was younger, like 10 to 12 years old.  I'm not sure
 8      exactly, but around that time.
 9                THE COURT:  Okay.  And was that for pleasure or
10      what?
11                JUROR BADILLO:  Yes, pleasure, with my family.
12                THE COURT:  Okay.  Thank you.
13                All right.  Mr. Masterson.
14                JUROR MASTERSON:  Yes, ma'am.
15                THE COURT:  Can I get someone to hand
16      Mr. Masterson the mic, please.
17                All right.  Mr. Masterson, would you state your
18      name for me.
19                JUROR MASTERSON:  John Lynn Masterson.
20                THE COURT:  And Mr. Masterson, where do you live,
21      sir?
22                JUROR MASTERSON:  Do what, ma'am?
23                THE COURT:  Where do you live?
24                JUROR MASTERSON:  17615 Orange Drive, Spring Hill,
25      Florida.
```

```
 1              THE COURT:  Spring Hill?  Okay.

 2              And it's my understanding you were late this

 3   morning?

 4              JUROR MASTERSON:  No, I was -- mine was supposed

 5   to be at 12:00.

 6              THE COURT:  I'm sorry?  Say that again.

 7              JUROR MASTERSON:  I was supposed to be here at

 8   12:00.

 9              THE COURT:  For jury service?

10              JUROR MASTERSON:  That's what I had down.  The

11   phone said to be here by 12:00.

12              THE COURT:  Okay.  All right.  Well, let me just

13   go through.  Could you go -- do you have a list of

14   questions?  Did they give you a list of questions?

15              JUROR MASTERSON:  Yes, ma'am.

16              THE COURT:  Could you go through the answers to

17   those questions, please.

18              JUROR MASTERSON:  Let me get my glasses so I can

19   see.

20              Do you want me to give the address again?

21              Oh, how long have you been there?  I've been there

22   for 38 years.  I've been 45 in Florida.  I'm a high school

23   grad.  I'm retired.  The previous thing was I worked as a

24   supervisor at an area maintenance support activity for the

25   Army.  I'm married, and my spouse is retired too.  Children,
```

1   I got three older daughters, 38, 36, 34, and I got four more

2   that were just adopted a little while ago, and they're 15,

3   14, 13, and one will be three.  The adult children, their

4   occupation, one is a -- has a lawn service, the other one

5   works for lawn maintenance, and then the other one is a

6   housewife.  I was in the Army reserves.  I was a watercraft

7   engineer in that.  Jury duty, it's been a long time ago, but

8   it was regular county jury duty.  I was never selected.

9           THE COURT:  So you didn't actually serve?

10          JUROR MASTERSON:  No, I didn't serve actually on

11  the jury.

12          THE COURT:  Okay.  Can you tell me where you're

13  retired from?  What did you do before you retired?

14          JUROR MASTERSON:  I worked for the Department of

15  Army, Area Maintenance Support Activity, Watercraft.

16          THE COURT:  Okay.  And where was that?

17          JUROR MASTERSON:  Tampa, Florida.

18          THE COURT:  All right.  And can you tell me what

19  your wife did before she retired.

20          JUROR MASTERSON:  She was a secretary, but mostly

21  housewife.  She didn't work that much.

22          THE COURT:  Okay.  All right.  I had earlier told

23  the jury that this is a criminal case that we're selecting a

24  jury for, that the defendant is charged with two crimes,

25  he's charged with a conspiracy to possess with the intent to

1  distribute 5 kilograms or more of cocaine while on board a

2  vessel subject to the jurisdiction of the United States, and

3  possession with the intent to distribute 5 kilograms or more

4  of cocaine while on board a vessel subject to the

5  jurisdiction of the United States.  I've also told them that

6  the trial will not last more than four days, so if you're

7  selected on the jury you will need to be able to be here

8  today, Tuesday, Wednesday and Thursday.

9           So let me just ask you, is there any reason you

10  could not serve if selected on this jury?

11           JUROR MASTERSON:  No, ma'am.

12           THE COURT:  All right.  A couple of other things

13  that I have already talked about.  I have said that the

14  defendant was on a boat that was intercepted in

15  international waters.  You will hear evidence about that.

16  You will hear evidence that the defendant is from Colombia,

17  and obviously the defendant is Spanish speaking, so let me

18  just ask you, have you ever been to Colombia?

19           JUROR MASTERSON:  Once.

20           THE COURT:  Okay.  And when was that?

21           JUROR MASTERSON:  It's been probably about

22  15 years ago.

23           THE COURT:  For pleasure?

24           JUROR MASTERSON:  No, it was -- the Army flies

25  down there.

```
 1              THE COURT:  I'm sorry?
 2              JUROR MASTERSON:  The Army -- because I was on
 3      boats.
 4              THE COURT:  Okay.
 5              JUROR MASTERSON:  Jet, they took supplies down
 6      there.
 7              THE COURT:  And do you speak Spanish?
 8              JUROR MASTERSON:  No.
 9              THE COURT:  All right.  The charges against the
10      defendant are drug-related, they involve cocaine.  Is there
11      any reason you could not serve on a jury where it's going to
12      be your job to determine if the defendant is guilty or not
13      guilty of two charges that involve the drug cocaine?
14              JUROR MASTERSON:  No.
15              THE COURT:  Okay.  Do you think cocaine should be
16      legal?
17              JUROR MASTERSON:  No.  It's up to the Government.
18              THE COURT:  Okay.  All right.  Let me introduce
19      you to the people involved with this trial to see if you
20      know any of us in any way.
21              My name is Susan Bucklew and I will be the Judge
22      that presides over the trial.  The courtroom deputy -- if
23      I could get you to stand, please -- is Charmaine Black.
24      James Fitchett is the Court Security Officer, who is back
25      there, right over there.  We have two interpreters, and to
```

1  the far -- closest to the wall is Etienne van Hissenhoven,

2  and then Beatriz Velasquez.  Do you know us?

3          JUROR MASTERSON:  I don't know any of them.

4          THE COURT:  All right.  Let me introduce you to

5  the people at counsel table.

6          To my right is counsel table that will be -- that

7  has we call it counsel table for the Government.  There are

8  two Assistant United States Attorneys who are seated there.

9  One is Nick DeRenzo, Nicholas DeRenzo.

10         Mr. DeRenzo, if you will stand.

11         And the other is Toni Goodin.  Do you know either

12  Mr. DeRenzo or Ms. Goodin?

13         JUROR MASTERSON:  No, ma'am.

14         THE COURT:  And seated between them is Homeland

15  Security Special Agent Tim Campbell.  Do you know

16  Agent Campbell?

17         JUROR MASTERSON:  No.

18         THE COURT:  Okay.  To my left is Daniel Hernandez.

19  He will be representing the defendant in the case.  Do you

20  know him, by any chance?

21         JUROR MASTERSON:  No.

22         THE COURT:  And seated next to him is the

23  defendant, Emiro Hinestroza-Newbbooll.  Do you know

24  Mr. Hinestroza?

25         JUROR MASTERSON:  No.

```
 1                THE COURT:  All right.  Thank you.
 2                All right, sir.  You may have a seat.
 3                Let me see if I can remember about going through
 4   group questions.
 5                Have any of you ever been employed in
 6   law enforcement?  Anybody in the jury box ever been employed
 7   in law enforcement?
 8                Do any of you have a close friend or close
 9   relative who is employed in law enforcement?
10                Okay.  If you could get the mic, please, and
11   I believe that's Mr. Ostema.
12                JUROR OSTEMA:  Yes.  My best friend was Deputy
13   Chief of Police in Bradenton.
14                THE COURT:  I'm sorry.  What?
15                JUROR OSTEMA:  My best friend was the Deputy
16   Chief, Bradenton Police Department.
17                THE COURT:  Bradenton?
18                JUROR OSTEMA:  Yes.  He's retired now.
19                THE COURT:  Okay.  Thank you.
20                Anybody else?
21                All right.  If you'd pass the mic down, please,
22   to --
23                JUROR SCHNIEDERS:  My niece is married to --
24                THE COURT:  I'm sorry.  Could you stand.
25                JUROR SCHNIEDERS:  My niece is married to --
```

```
 1    I think he's a state patrolman or sheriff's officer in
 2    Omaha, Nebraska.
 3              THE COURT:  All right.  Thank you.  Anybody else?
 4              JUROR SKIDMORE:  My son-in-law -- or, excuse me,
 5    my son's in-law are both Hillsborough County Sheriff's
 6    deputies.
 7              THE COURT:  Thank you, Mr. Skidmore.
 8              Anybody else?
 9              Dr. Ebsworth.
10              JUROR EBSWORTH:  My husband used to be employed by
11    the Postal Service, he used to be a Postal Inspector, and
12    I might as well -- he then was charged with fraud and now
13    he's not, so I just wanted to disclose that.  I know you're
14    going to ask that question later, but there it is.
15              THE COURT:  All right.  Thank you.
16              JUROR AMIN:  I got -- my brother-in-law is working
17    in a sheriff's department in Georgia.
18              THE COURT:  Okay.  Is working in the what in
19    Georgia?
20              JUROR AMIN:  Macon, Georgia.
21              THE COURT:  Macon.
22              Do any of you, unless you've already told me about
23    it, have any connections to the Coast Guard?  I anticipate
24    we'll have a number of Coast Guard witnesses.
25              All right.  Thank you.
```

```
1              Do any of you have any friends or relatives
2    employed by the U.S. Attorney's Office?
3              Are any of you currently under investigation by
4    any Federal agency or the U.S. Attorney's Office, that you
5    know about?
6              All right.  Have any of you ever been a witness in
7    a case where you've gone to court and testified?
8              Okay.  Dr. Badillo.
9              JUROR BADILLO:  Yeah.  I've served as a treating
10   physician witness.
11             THE COURT:  Okay.  Thank you.
12             Anyone else?
13             Okay.  I anticipate that we will have Coast Guard
14   witnesses.  We may have witnesses from Homeland Security,
15   DEA, the FBI.  Have any of you had an experience with
16   law enforcement that might make it difficult for you to be a
17   fair juror?
18             Okay.  I think I asked Mr. Masterson, but maybe
19   not the rest of you.  Do any of you feel that cocaine, the
20   drug cocaine, should be legal?  Okay.  Because obviously
21   that's the drug here and ultimately you're going to have to
22   make a determination as to whether the defendant is guilty
23   or not guilty, and I will tell you that the possession of
24   cocaine is not legal, so I would need to know if you
25   disagree with that.
```

1              I asked about speaking Spanish and I asked about
2      Colombia.
3              Do any of you -- and I should have asked and I'll
4      ask up here.  I anticipate we'll have some expert witnesses
5      in this case, and we will have some testimony regarding
6      boats, we may have some testimony about nautical or maritime
7      activities, the navigation of a boat, that kind of thing.
8      Do any of you have any special training in navigation or
9      shipping or maritime activities?
10             Okay.  A couple of people.
11             All right.  Mr. Masterson, why don't we start with
12     you and you tell me what that is.
13             JUROR MASTERSON:  Well, with the Army I was a
14     watercraft engineer on boats and was a licensed captain.
15             THE COURT:  I'm sorry.  You're a licensed captain?
16             JUROR MASTERSON:  I had a captain's license for
17     100-ton.
18             THE COURT:  Okay.  And you're talking about while
19     you were in the Service, that's what you did?
20             JUROR MASTERSON:  Yeah, serving as watercraft
21     engineer.
22             THE COURT:  Okay.  So you do -- and you've been,
23     I'm assuming, on a boat throughout -- you said you'd gone
24     down to Colombia, so I'm assuming that you've traveled
25     where, in the Atlantic, Pacific?

1          JUROR MASTERSON:  Mostly all in the Atlantic and
2    the Gulf.
3          THE COURT:  Okay.  All right.  Thank you, sir.
4          Someone else had their hand up.
5          Mr. Dawson.
6          JUROR GREGORY DAWSON:  Yes.  For three years while
7    I was in college I was a sailing instructor, so I studied
8    navigation, those kinds of things.
9          THE COURT:  Okay.  And you instructed sailing to
10   whom?
11         JUROR GREGORY DAWSON:  To students primarily that
12   were a part of the college, as well as during their summer
13   programs to little kids.
14         THE COURT:  Okay.  All right.  Thank you, sir.
15         Anybody else?
16         Anybody up here have any special training in
17   maritime activities or -- you can just leave the mic back
18   there, Mr. Fitchett.
19         Anybody else up here that might have that
20   specialized training in navigation activities or maritime
21   activities, ships, boats?
22         Back in the courtroom, do any of the prospective
23   jurors have a close friend or close relative who has been
24   convicted of a crime?
25         Okay.  We've got one hand up, maybe two.

```
 1                  Let's move over to the first row.  Ms. Hayden.
 2                  JUROR HAYDEN:  Yes.  I have two sons that have
 3       been convicted.
 4                  THE COURT:  And that's what you were talking about
 5       earlier?
 6                  JUROR HAYDEN:  Yes.  Yes.  Yes.
 7                  THE COURT:  Okay.  And that is for drug --
 8                  JUROR HAYDEN:  Neither one was convicted of drugs.
 9       They had drug problems, which dealt with what they ended up
10       in trouble with.
11                  THE COURT:  Okay.
12                  JUROR HAYDEN:  Stealing and stuff like that to get
13       the drugs.
14                  THE COURT:  And I think you mentioned earlier it
15       might be difficult for you to be a fair juror?
16                  JUROR HAYDEN:  Yes, ma'am.
17                  THE COURT:  And can you explain that a little bit
18       to me.
19                  JUROR HAYDEN:  Yeah.  When you've been through
20       years of hell because of the drug, it's very hard to look at
21       somebody and not think they're guilty if they're trying to
22       bring more into the country, and that's my opinion.
23                  THE COURT:  Okay.  Thank you.
24                  Anyone else?
25                  Okay.  Ms. Smith?
```

```
 1              JUROR SMITH:  Yes.  My son, for drugs, theft and
 2    domestic violence.
 3              THE COURT:  Did your son go to prison?
 4              JUROR SMITH:  Yes.
 5              THE COURT:  Is he still in prison?
 6              JUROR SMITH:  No, ma'am.
 7              THE COURT:  Okay.  And he was convicted of a
 8    drug-related offense?
 9              JUROR SMITH:  Yes, for marijuana and pills.  I
10    can't remember the type.
11              THE COURT:  Pills?
12              JUROR SMITH:  Yes.
13              THE COURT:  Okay.  Thank you.
14              Someone else had a hand up?
15              All right.  Dr. Ebsworth.
16              JUROR EBSWORTH:  So my ex-husband was convicted,
17    and I apologize because I don't know the details of it
18    because we were separated already.  He was a Postal
19    Inspector and he was convicted of fraud.  I know that he
20    didn't go to jail, I know he did have to go to probation,
21    and he lost his job, but at that point we were divorced.
22              THE COURT:  Okay.  Thank you.
23              Anyone else?
24              Mr. Masterson.
25              JUROR MASTERSON:  Yes.  My one daughter was
```

1   convicted of drugs, was in jail.  She's been out for

2   nine years now, so --

3           THE COURT:  Do you remember what kind of drugs?

4           JUROR MASTERSON:  I think it was opium, the pills.

5           THE COURT:  Pills?  Okay.  Thank you.

6           All right.  Let me just talk generally to everyone

7   in the jury box and the courtroom.

8           I told you, I think, earlier that you'll hear

9   witnesses testify in this case, and there will be maybe

10  documents introduced, there will be a video, I know, that

11  you'll have an opportunity to view, and at the close of the

12  trial, after you've seen or heard all of the evidence,

13  I will instruct you in the law, and then it will be your job

14  to go back and make a decision in this case as to whether

15  Mr. Hinestroza-Newbbooll is guilty or not guilty of what

16  he's charged with, but that's your job.

17          Are any of you -- do any of you for some reason

18  feel that you can't do that?  Because that's what a juror

19  does.

20          All right.  A couple of other things.  This is a

21  criminal case, and there are certain instructions that

22  I always give in a criminal case, and I know I will give

23  them in this criminal case.  The first one has to do with

24  the presumption of innocence.  I'm sure you've heard those

25  words, presumption of innocence.  I will tell you that the

1  defendant, as he sits there today, enjoys the presumption of
2  innocence.  He must be presumed by you, if you're selected
3  on this jury, to be innocent, because you haven't heard any
4  evidence in this case, so he starts out with a presumption
5  of innocence.
6         I will also tell you that it is the Government's
7  job, I will tell you it's the Assistant United States
8  Attorneys on behalf of the Government's job to prove this
9  case beyond a reasonable doubt, and that's a heavy burden.
10  It is a -- it is a burden that I will describe more to you,
11  but the words mean what they say, beyond a reasonable doubt.
12         The defendant does not have to prove anything.  It
13  is up to the Government to prove what they have alleged in
14  the indictment, so not only is the defendant -- or must the
15  defendant be presumed by you to be innocent, the Government
16  has the burden of proof and the defendant has no burden of
17  proof.
18         Are there any of you -- and I will give this
19  instruction -- that will not be able to follow those
20  instructions, that a defendant is presumed innocent and the
21  Government has the burden of proof?
22         I will also tell you, as I said, the defendant
23  doesn't have to prove anything.  The defendant doesn't have
24  to testify.  The defendant doesn't have to call any
25  witnesses.  I have no idea whether he'll testify or call any

1  witnesses, but he has no burden to do so because it is the

2  Government that has that burden.

3          Do any of you -- would any of you not be able to

4  follow those instructions?

5          Okay.  I think I'm finished.

6          Mr. DeRenzo, I'm going to ask you to, in addition

7  to asking whatever follow-up questions you would like to

8  ask, read your list of witnesses.

9          MR. DERENZO:  Of course, Your Honor.

10          THE COURT:  Thank you.

11          MR. DERENZO:  May I proceed?

12          THE COURT:  Yes.

13          MR. DERENZO:  Good morning, ladies and gentlemen.

14          The Judge has already asked many of the questions

15  that I was going to ask this morning, but I do have a few

16  follow-up questions.  Before I get to them, I will read a

17  list of witnesses that you may hear from if you're chosen to

18  be seated for this jury to see if you know or recognize

19  those names.

20          Lieutenant Commander Thomas Humphrey from the

21  Coast Guard.

22          Petty Officer Brandon Dickinson, also from the

23  Coast Guard.

24          Petty Officer Eric Lauginiger from the

25  Coast Guard.

```
 1              Petty Officer Diego Rivera from the Coast Guard.
 2              Petty Officer Alexander Ramos from the
 3    Coast Guard.
 4              Petty Officer Paul Fahey, also from the
 5    Coast Guard.
 6              Petty Officer Tyler Perio from the Coast Guard.
 7              Chief Petty Officer Daniel Brooks from the
 8    Coast Guard.
 9              Senior Chief Petty Officer Steven Bomentre from
10    the Coast Guard.
11              Special Agent Steven Ray from the Coast Guard
12    Investigative Service.
13              Alfredo Caceres-Lopez.
14              Special Agent Karen McAllister from the FBI.
15              Special Agent Timothy Campbell, Homeland Security
16    Investigations.
17              Special Agent Jennifer Doherty of the DEA.
18              Special Agent John Bottone, Coast Guard
19    Investigative Services.
20              Special Agent Retzilu Rodriguez with the FBI.
21              Special Agent Daniel Ward, Coast Guard
22    Investigative Service.
23              Special Agent Jeff Foster, Coast Guard
24    Investigative Service.
25              Special Agent Carlos Galloza with the DEA.
```

 1              Lieutenant Commander Jeremy Montes with the

 2    Coast Guard.

 3              Does anybody believe they know those names,

 4    recognize those names, know those individuals?

 5              As I mentioned, I just have a few follow-up

 6    questions.  The Judge has covered most of the things I want

 7    to talk about.

 8              I had a follow-up question for you, Mr. Sowers.

 9              JUROR SOWERS:  Yes, sir.

10              MR. DERENZO:  Over your years as a reporter and a

11    journalist, have you covered any cases involving the

12    Coast Guard or drug interdictions?

13              JUROR SOWERS:  I have.

14              MR. DERENZO:  How many?

15              JUROR SOWERS:  Probably more than ten.

16              MR. DERENZO:  And what was your role in covering

17    those stories?

18              JUROR SOWERS:  Some of them I've been on

19    Coast Guard cutters that delivered some contraband that was

20    seized in port, such as St. Petersburg, and other cases I've

21    simply reported on facts that were brought into our newsroom

22    by other reporters as a news anchor.

23              MR. DERENZO:  As the Judge alluded to earlier,

24    I anticipate you'll hear from some Coast Guard witnesses

25    about drug interdiction.  Is there anything about your

1    experience as a journalist in covering these Coast Guard

2    interdictions in the past that will make it difficult for

3    you to impartially weigh the testimony and the evidence here

4    in this case?

5            JUROR SOWERS:  I don't think so, no, sir.

6            THE COURT:  Can you be a fair juror, not just to

7    the Government here but also to the defendant?

8            JUROR SOWERS:  Yes, sir.

9            MR. DERENZO:  Thank you.

10           If we could hand the microphone to Mr. Schilit.

11           JUROR SCHILIT:  Yes, sir.

12           MR. DERENZO:  Good morning, sir.  What is your

13   doctorate degree in?

14           JUROR SCHILIT:  It's in strategic planning from --

15   in the business school.

16           MR. DERENZO:  Okay.  You alluded to earlier you

17   have some neck pain here this morning.  I see you're wearing

18   a neck brace, and you're on some medication.  If this trial

19   lasts for the majority of the week, do you think you're

20   going to have any trouble paying attention to the evidence

21   and the witnesses throughout the day?

22           JUROR SCHILIT:  It's quite possible.

23           MR. DERENZO:  Okay.  I had a question for juror

24   number 11, Ms. Parrish.  I believe you said you had some

25   prior work experience with law enforcement; is that right?

```
 1              JUROR PARRISH:  No.  Well, yes.  Well, I deal with
 2    law enforcement with my job, dealing with fraud.  It's not
 3    like hands-on hands-on.  They fax over documents or they
 4    contact us on fraudulent cases.
 5              MR. DERENZO:  I see.  If you hear from some
 6    law enforcement witnesses in this case, do you think you'll
 7    be able to just fairly and impartially evaluate their
 8    testimony despite the fact that you may have worked with
 9    some law enforcement personnel in the past?
10              JUROR PARRISH:  Um-hum.
11              THE COURT:  You'd treat them like any other
12    witness?
13              JUROR PARRISH:  Um-hum.  Yes.
14              MR. DERENZO:  Okay.  Ms. Arias, juror number 15.
15    Good morning.
16              JUROR ARIAS:  Good morning.
17              MR. DERENZO:  I believe you mentioned that you're
18    a fluent native Spanish speaker.
19              JUROR ARIAS:  Yes.
20              MR. DERENZO:  I anticipate, and as the Judge
21    alluded to earlier, we do have a courtroom interpreter who
22    speaks Spanish, and we may even hear from a witness who also
23    speaks Spanish.  Do you think you'll have any trouble
24    listening to what the courtroom interpreter says is the
25    correct translation despite the fact that you fluently speak
```

1   Spanish?

2           JUROR ARIAS:  (Shaking head no.)

3           MR. DERENZO:  Okay.  Ms. Nau, did I get that

4   right?

5           JUROR NAU:  That's right.

6           MR. DERENZO:  You're a full-time student?

7           JUROR NAU:  Yes.

8           MR. DERENZO:  I think you said you're studying

9   English and potentially art; is that right?

10          JUROR NAU:  Yes.

11          MR. DERENZO:  Is there anything about your studies

12  that you think is going to distract you, any assignments

13  that might come up, any papers you have to hand in that

14  might leave you distracted during the course of the day?

15          JUROR NAU:  Yeah, I do have stuff that's due

16  throughout the week, so I might have to work on that.

17          MR. DERENZO:  What are those things?

18          JUROR NAU:  I have some papers due.  I have one

19  due tomorrow night and then a few quizzes due as well

20  throughout the week.

21          MR. DERENZO:  So if you are selected to sit as a

22  juror in this case, when will you be able to work on those

23  projects?

24          JUROR NAU:  When I get home.

25          THE COURT:  Okay.  Do you think they might be on

1   your mind as you're sitting here throughout the day,

2   you know, 9:00 to 5:00, and listening to witnesses?

3           JUROR NAU:  They honestly probably will be, yes.

4           MR. DERENZO:  Okay.  Thank you.

5           Question in the gallery here for Mr. Ostema.

6   Is that right?  Good morning, sir.

7           JUROR OSTEMA:  Good morning.

8           MR. DERENZO:  If my notes are right, I think you

9   said that you're blind in one eye.

10          JUROR OSTEMA:  Left eye.

11          MR. DERENZO:  Left eye?  How does that affect your

12  ability to view videos and things of that nature?

13          JUROR OSTEMA:  They're flat, so that's not 3D.

14          MR. DERENZO:  No problem.

15          JUROR OSTEMA:  I have no binocular vision, so I

16  can't catch a ball very well.

17          MR. DERENZO:  Okay.  Does looking at video screens

18  or video or being under fluorescent light for an extended

19  period of time, does that affect your onset of migraines in

20  any way?

21          JUROR OSTEMA:  Absolutely.

22          MR. DERENZO:  Can you explain what you mean.

23          JUROR OSTEMA:  Well, it's close to like having a

24  seizure, so if it strobes a little bit, the rate of the

25  frequency of the lights or video can basically trigger.

1          MR. DERENZO:  What if, say, there were several

2    hours of continuous video, how would that affect the

3    potential that you have might have an onset of migraine?

4          JUROR OSTEMA:  Well, I don't see very well to

5    begin with, so it's -- but, you know, it doesn't stop me

6    from watching movies.

7          MR. DERENZO:  Fair enough.

8          THE COURT:  What did you say?  It hasn't stopped

9    you from watching movies?

10          JUROR OSTEMA:  Yeah, especially old movies,

11   Humphrey Bogart.

12          MR. DERENZO:  Thank you, sir.

13          Ms. Smith.  Good morning, ma'am.

14          JUROR SMITH:  Good morning.

15          MR. DERENZO:  You described some recent very

16   personal issues to you, and I apologize for just asking,

17   I just want to make sure you'll be able to concentrate.

18   I think you said you might have some trouble.

19          Given the recency of those events and -- do you

20   think that's going to be on your mind as you sit here, if

21   you were selected?

22          JUROR SMITH:  Definitely.  Yeah, because it's

23   only -- it was a couple weeks before Christmas, and it's

24   just been tough.

25          MR. DERENZO:  Do you think that's going to be a --

1    potentially a distraction as we have witness after witness

2    come in and testify?

3            JUROR SMITH:  Yeah, because it's hard to

4    concentrate.

5            MR. DERENZO:  Thank you.

6            Ms. Badillo, good morning, ma'am.

7            JUROR BADILLO:  Good morning.

8            MR. DERENZO:  What is a nephrologist, for those of

9    us, like me, that do not know?

10           JUROR BADILLO:  It's a kidney specialist.  We deal

11   with dialysis patients and diseases of the kidneys.

12           MR. DERENZO:  You mentioned before that you

13   testified as a treating physician.

14           JUROR BADILLO:  Correct.

15           MR. DERENZO:  Have you ever testified as an expert

16   witness?

17           JUROR BADILLO:  It's pseudo-expert witness, but

18   the main reason I was there is to ask questions about my

19   treatment of the patient that was suing someone else,

20   luckily.

21           MR. DERENZO:  You mentioned that you have a

22   wedding to go to this week.

23           JUROR BADILLO:  I do.  And that's --

24           MR. DERENZO:  You would have to leave on Thursday?

25           JUROR BADILLO:  We have reservations to leave on

1  Thursday, a hotel reservation.

2            MR. DERENZO:  Does that include -- are you driving

3  or flying?

4            JUROR BADILLO:  Flying.

5            MR. DERENZO:  And you're leaving on Thursday?

6            JUROR BADILLO:  Yes, I hope to leave on Thursday.

7            MR. DERENZO:  If this case were to go into

8  Thursday or beyond, is that going to be a hardship for you?

9            JUROR BADILLO:  Yes.  I wouldn't be thrilled,

10  but --

11            MR. DERENZO:  Whose wedding?

12            JUROR BADILLO:  It's the daughter of a good friend

13  of ours.

14            THE COURT:  I'm sorry.  You probably said this and

15  I missed it.  Where is the wedding?

16            JUROR BADILLO:  Louisiana.  New Orleans.

17            MR. DERENZO:  I assume you've already paid for

18  your airline tickets and your hotel reservation?

19            JUROR BADILLO:  My husband did, yes.  I think so.

20            MR. DERENZO:  Thank you.

21            And this is just a question for the entire panel

22  here this morning.  The Judge asked about any specialized

23  training with regard to navigation or being on the water,

24  but since we live in Florida, I'll ask a slightly different

25  question.  Does anybody have any specialized experience,

```
 1   perhaps not formal training, but experience, since we have

 2   a lot of mariners in the public here, either being on the

 3   water, navigating your own personal boat, fishing, anything

 4   like that?

 5            JUROR MASTERSON:  I do.

 6            MR. DERENZO:  Start with Mr. Masterson.

 7            JUROR MASTERSON:  Other than being a watercraft

 8   engineer, I got a boat around here, fishing, kids and all.

 9            MR. DERENZO:  Sure.  Anything specialized, or just

10   going around Tampa Bay or in the gulf?

11            JUROR MASTERSON:  Usually it's in the gulf,

12   Tampa Bay, drive a boat.

13            THE COURT:  Ms. Ebsworth, did you have your hand

14   up?

15            JUROR EBSWORTH:  I'm from Puerto Rico, so as a

16   kid, you know, we had our boat and we would -- I had a

17   license to drive my boat, and so it's been a long time, but

18   yeah.  But nothing specialized.

19            MR. DERENZO:  Nothing recent?

20            JUROR EBSWORTH:  I mean, we went to Venice,

21   you know.

22            MR. DERENZO:  Anybody else have their hands up in

23   the back few rows?

24            Mr. Dawson?

25            JUROR GREGORY DAWSON:  Nothing really other than
```

1   what I mentioned earlier, just being on the water, lakes and

2   stuff like that.

3           MR. DERENZO:  Nothing specialized about navigation

4   or --

5           JUROR GREGORY DAWSON:  Not other than what I just

6   had already mentioned, the training in regards to sailing

7   instructions.

8           MR. DERENZO:  Right.  Thank you.

9           Anybody else have their hand up?

10          JUROR NEAL:  Just fishing boats.  Just fishing.

11          MR. DERENZO:  Mr. Neal?

12          JUROR NEAL:  Yes.

13          MR. DERENZO:  Just recreational fishing, sir?

14          JUROR NEAL:  Yes.

15          MR. DERENZO:  Anybody else in the back two rows?

16  Mr. Sapio?

17          JUROR SAPIO:  We had a pleasure boat about

18  25 years ago, just fishing, and we used to do SCUBA diving,

19  and I also took some courses at the power squadron on

20  navigation.

21          MR. DERENZO:  And where was this?

22          JUROR SAPIO:  Tampa.

23          MR. DERENZO:  Okay.  Are you a certified SCUBA

24  instructor?

25          JUROR SAPIO:  I was a certified SCUBA diver, but

1    not an instructor.

2             MR. DERENZO:  Okay.  Mr. Dawson?

3             JUROR GREGORY DAWSON:  I am a certified SCUBA

4    diver, not instructor.

5             MR. DERENZO:  Thank you, sir.

6             Anybody in the front panel area in the jury box?

7    We have Mr. Santos.

8             JUROR SANTOS:  Yeah.  I've owned --

9             MR. DERENZO:  One second.

10            JUROR SANTOS:  I've been a boater most of my life,

11   owned a lot of boats.  I'm actually just finishing my

12   training as a divemaster on dive boats.

13            MR. DERENZO:  Okay.  And where was most of your

14   nautical experience, here in the Tampa Bay area?

15            JUROR SANTOS:  About 60 percent of it in the

16   Northeast off Cape Cod, and probably in the last ten years

17   here.

18            MR. DERENZO:  Thank you, sir.

19            Anybody else with their hand up?

20            Mr. Luetzow.

21            JUROR LUETZOW:  30 years of boating down here,

22   anywhere from, you know, 30 to 40 miles out, fishing.

23            MR. DERENZO:  Recreationally?

24            JUROR LUETZOW:  Yes.

25            MR. DERENZO:  Ever work on a fishing boat,

1   commercial fishing boat?

2           JUROR LUETZOW:  No.

3           MR. DERENZO:  Anybody else here with their hands

4   up in the jury box?

5           THE COURT:  Mr. DeRenzo, you need to conclude.

6           MR. DERENZO:  I have no further questions,

7   Your Honor.

8           THE COURT:  That was just a coincidence?

9   All right.

10          Mr. Hernandez.

11          MR. HERNANDEZ:  Thank you, Your Honor.  May it

12  please the Court.

13          Ladies and gentlemen, I should reintroduce myself.

14  It's been a while since I was introduced.  My name is

15  Daniel Hernandez and I represent Mr. Hinestroza-Newbbooll.

16  I have a few individual questions and some general

17  questions, and I'll try not to be repetitious, but I want to

18  stress that these questions are not designed because we're

19  being nosy or trying to annoy you, and we know that there

20  are things going on in your life and we appreciate your time

21  and effort.

22          I want to make sure that when someone has an

23  issue, that they can set it aside and not have it in their

24  mind while the case is proceeding, and I feel like I need to

25  start with you, Mr. Neal.

```
 1              JUROR NEAL:  Yes, sir.

 2              MR. HERNANDEZ:  Your wife is in surgery as we

 3   speak, or is it later today?

 4              JUROR NEAL:  It was probably this morning, but

 5   they took -- I couldn't have my cell phone, so --

 6              MR. HERNANDEZ:  I could only imagine that it's got

 7   to be on your mind.

 8              JUROR NEAL:  Yeah.

 9              MR. HERNANDEZ:  And you don't know -- not

10   necessarily just the outcome, but you don't know anything

11   about at this point what the follow-up care might be?

12              JUROR NEAL:  Yes.

13              MR. HERNANDEZ:  Do you think that if you were

14   selected to serve on this jury, that it could affect your

15   ability to concentrate on what's being presented during this

16   trial?

17              JUROR NEAL:  To be completely honest, yes.

18              MR. HERNANDEZ:  Okay.  Thank you.  If you could

19   pass the microphone to Mr. Dawson.

20              It is Mr. Dawson, correct?

21              JUROR GREGORY DAWSON:  Correct.

22              MR. HERNANDEZ:  Mr. Dawson, you indicated that

23   your job -- you're self-employed, correct?

24              JUROR GREGORY DAWSON:  It's a corporation and the

25   corporation employs me.  My wife owns 51 percent and I own
```

1   49 percent of the corporation.

2         MR. HERNANDEZ:  And if my notes are correct,

3   I think you said something to the effect that being here

4   four days could be a work hardship?

5         JUROR GREGORY DAWSON:  Absolutely.

6         MR. HERNANDEZ:  And do you think that if you were

7   selected to serve on this jury, no matter how hard you tried

8   to focus on the evidence and the testimony, that it could be

9   something that could be interfering with your ability to

10  concentrate?

11        JUROR GREGORY DAWSON:  I multitask a lot, all the

12  time, so, to be frank, I can probably -- even if the

13  thoughts come into my mind, I can probably still focus on

14  the case at hand.

15        MR. HERNANDEZ:  What I want to stress to you,

16  Mr. Dawson, and everyone here, is that there is no right or

17  wrong answer as long as your answer is the honest truth.

18        JUROR GREGORY DAWSON:  Yes.

19        MR. HERNANDEZ:  We're not trying to get you to --

20  force you to -- steer you to a certain answer.  If you think

21  it's going to interfere with your concentration, please let

22  us know.

23        JUROR GREGORY DAWSON:  The bigger issue is

24  probably that I will be working at night.  I worked all

25  weekend long, knowing that I was going to be here today and

```
 1    not knowing how long the case would last.  So it's
 2    concentration of I've got to go work after this.
 3              MR. HERNANDEZ:  Thank you.  If you could pass the
 4    microphone to Mr. Paresh.
 5              Mr. Paresh.
 6              JUROR AMIN:  Yes, sir.
 7              MR. HERNANDEZ:  You may have answered this
 8    question, but I want to get it clear in my mind.  I think
 9    you indicated that English is not your first language,
10    correct?
11              JUROR AMIN:  Yes, sir.
12              MR. HERNANDEZ:  Do you think that you might have
13    trouble understanding anything that's being testified to
14    during the course of the trial?  You obviously haven't heard
15    it yet, but do you anticipate that you might have some
16    problems?
17              JUROR AMIN:  Yes, sir.  A little bit less
18    understanding, yeah.
19              MR. HERNANDEZ:  All right.  Thank you.
20              And if you could pass it to Dr. Badillo.
21              JUROR BADILLO:  Yes.
22              MR. HERNANDEZ:  And I got to say, I cheated,
23    I Googled, I didn't know what a nephrologist was and now
24    I do.
25              JUROR BADILLO:  Well, you can Google because you
```

1    have a phone.  We don't.

2         MR. HERNANDEZ:  I had a problem because I was

3    misspelling it, I thought it was neurologist, but I found

4    there is such a thing.

5         Doctor, I don't think you've been asked, when is

6    your flight, in the morning, during the day or in the

7    evening?

8         JUROR BADILLO:  Thursday -- I didn't make the

9    reservation.  I think it's like midday, but I can check it

10   out.  I brought my purse --

11        MR. HERNANDEZ:  If you were selected to serve, do

12   you believe that it's going to affect your ability to focus

13   on the evidence in this case?

14        JUROR BADILLO:  Yes.

15        MR. HERNANDEZ:  Knowing that you've got a flight

16   sometime during the day possibly.

17        JUROR BADILLO:  And then you said that it's going

18   to last past Thursday.  Yes.

19        THE COURT:  No, it's not going to last past

20   Thursday.

21        JUROR BADILLO:  I hope not.

22        MR. HERNANDEZ:  Thank you.  If you could pass the

23   microphone to Mr. Ostema.

24        JUROR OSTEMA:  Ostema.

25        MR. HERNANDEZ:  You've been asked a bunch of

1   questions about the migraines and your ability to focus.

2              JUROR OSTEMA:  Yes, sir.

3              MR. HERNANDEZ:  And I understand that migraines

4   are unpredictable.

5              JUROR OSTEMA:  Very.

6              MR. HERNANDEZ:  Do you think -- would it be fair

7   to say or accurate to say that you cannot assure us that

8   you're able to give us your -- no matter how hard you try,

9   if you're suffering from some of these conditions, that you

10  may not be able to concentrate and focus like a juror

11  should?

12             JUROR OSTEMA:  Absolutely.  I really don't know

13  when it's going to happen, and they've gotten worse as I've

14  gotten older.  They're supposed to not get worse, but they

15  have gotten worse.

16             MR. HERNANDEZ:  Thank you.  I don't think I have

17  any other questions for the back of the courtroom, but I do

18  have a question of Ms. -- juror number 1, Ms. Brisson.

19             If my notes are correct, you indicated that you

20  might have some trouble paying attention, correct?

21             JUROR BRISSON:  Yeah.  I was diagnosed with

22  Epstein-Barr syndrome.

23             MR. HERNANDEZ:  What is it again?

24             JUROR BRISSON:  Epstein-Barr syndrome, it's a

25  fatigue, it's just a -- like you just get really fatigued,

1   you hit a wall and you just kind of fall asleep.

2           MR. HERNANDEZ:  And we've been here a couple of

3   hours.  Have you had trouble paying attention?

4           JUROR BRISSON:  Yes.  I'm not quite sure what the

5   heck happened in the past couple of hours.  I've been kind

6   of in and out.

7           MR. HERNANDEZ:  And do you think that if you were

8   selected, your issue or problem would continue through the

9   trial, where you're not able --

10          JUROR BRISSON:  Oh, absolutely.

11          MR. HERNANDEZ:  Okay.  Thank you.

12          If you could pass the microphone down to

13  Mr. Sowers.

14          You may have answered this, but I want to make

15  sure.  You've been a TV reporter for how long?

16          JUROR SOWERS:  35 years.

17          MR. HERNANDEZ:  And you indicated that you report

18  the news as opposed to sports or weather, correct?

19          JUROR SOWERS:  That's correct.  Uh-huh.

20          MR. HERNANDEZ:  And some of your news reporting

21  has included situations such as what we might be talking

22  about during the course of this trial, correct?

23          JUROR SOWERS:  I've reported on drug cases and

24  drug arrests and so forth.

25          MR. HERNANDEZ:  And do you think any of that could

```
1   interfere with your ability to be fair and impartial, that
2   your background -- you don't come in here without life
3   experiences, obviously, and do you think that that in any
4   way could affect your ability to be fair and impartial?
5            JUROR SOWERS:  I spend a lot of time trying to be
6   objective in a professional sense, and I think that,
7   you know, all human beings have biases, but I spend a lot of
8   time being objective in what I do, so I consider myself a
9   pretty objective person.
10           MR. HERNANDEZ:  Thank you.  If you could pass the
11  microphone to Ms. Dawson.
12           I can tell you Anna Casanova Ward is a State
13  prosecutor --
14           JUROR BROOKE DAWSON:  Amy.
15           MR. HERNANDEZ:  -- not a Federal prosecutor.  Do
16  you think that her -- knowing her and being friends with her
17  could in any way affect your ability to be fair and
18  impartial?
19           JUROR BROOKE DAWSON:  No.  I didn't even know
20  exactly what she does.  I just know she's an attorney.
21           MR. HERNANDEZ:  Okay.  Thank you.
22           I think that's it for individual questions, but
23  I am going to talk a minute about reasonable doubt, and I'd
24  like to ask a question of Mr. -- is it Luetlow?
25           JUROR LUETZOW:  Leutzow.
```

1          MR. HERNANDEZ:  Leutzow.  I apologize.

2          I believe you were one of the individuals that

3    indicated that you have served on a civil jury as opposed to

4    a criminal jury, correct?

5          JUROR LUETZOW:  Yes.  Both.

6          MR. HERNANDEZ:  You've done both?

7          JUROR LUETZOW:  Yes.

8          MR. HERNANDEZ:  Okay.  And without everyone -- I

9    know there's some of you that have indicated that you've

10   served on juries before that are civil, and the reason

11   I bring it up is the Judge already talked about reasonable

12   doubt and said herself that she'll give you a definition and

13   it's a very heavy burden.  You may remember when you sat on

14   your civil jury, you may have heard some terms like the

15   burden of proof is by the greater weight of the evidence or

16   by the preponderance of the evidence, which basically means

17   that it's like a scale, and if one side tips the scale just

18   a little bit, which may be the plaintiff doing the suing,

19   that would be enough to find in favor of the plaintiff.  Do

20   you remember any of that?

21         JUROR LUETZOW:  Yes.

22         MR. HERNANDEZ:  And you may have been told that

23   just tipping the scale means that if the person -- the

24   defendant who is being sued, if he's probably guilty of

25   whatever he's being accused of, that's enough to render a

1   verdict for the plaintiff, okay?

2            JUROR LUETZOW:  Um-hum.

3            MR. HERNANDEZ:  Recollect?

4            And the reason I bring it up is because none of

5   that applies in this case.  Reasonable doubt in a criminal

6   case is totally different from the greater weight of the

7   evidence, it's a much heavier burden.  Possibly, probably,

8   maybe, it's not enough.  You have to find -- before you

9   would render a verdict in a criminal case, you would need

10  to -- and you've experienced it because you've been on a

11  criminal jury, you must find each and every element of the

12  offense beyond a reasonable doubt.  It's got to be proven

13  beyond a much heaver burden.  Would you agree, sir?

14           JUROR LUETZOW:  Yes.  Correct.

15           MR. HERNANDEZ:  Thank you.

16           Does anyone have any questions about that?  I know

17  some of you did serve on civil juries, and basically what

18  you're being asked is just disregard everything that you've

19  heard in a jury instruction in a civil case, and the fact

20  that my client is -- there's an indictment, a paper that was

21  filed, that he's sitting here charged with a criminal

22  offense is not to be taken by you as any evidence

23  whatsoever.  Does everyone agree with that?  He is -- as the

24  Judge said, he is presumed innocent.

25           And along those lines, when you came in here this

1    morning, please raise your hands, who thought -- when you
2    walked in here this morning and saw the defendant sitting
3    next to me, when you determined he was the defendant, said
4    "I wonder what that man is falsely accused of"?  Please
5    raise your hand if that was the first thing you thought of.
6            I'm not surprised that there are no hands raised,
7    but it goes back to the point that the defendant is presumed
8    innocent and the fact that he is here charged with criminal
9    offenses is not to be considered by you as evidence in this
10   case.  Can everyone agree with that?
11           And as the Judge said, the entire burden of proof
12   in this case is by the prosecuting agency, which is the
13   U.S. Attorney's Office.  The defense may ask questions, but
14   they have -- the defense has absolutely no burden of proof,
15   and you are not to in any way consider it against the
16   defendant if the defendant does not present any evidence or
17   testify.  Does everyone agree with that?
18           Ms. Lewis, if you were selected to serve on this
19   jury, would you hold the Government to this heavy burden of
20   proving their case beyond a reasonable doubt?
21           JUROR LEWIS:  Yes.
22           MR. HERNANDEZ:  And would you in any -- in no way
23   expect the defendant to prove anything because he doesn't
24   have that burden?
25           JUROR LEWIS:  Yes.

 1              MR. HERNANDEZ:  Thank you.

 2              You've already heard that Mr. Hinestroza-Newbbooll

 3    is a Colombian national, and I think most of you are old

 4    enough to remember Miami Vice, and sometimes when you

 5    mention Colombian nationals someone might get already a

 6    negative impression.  Did anyone feel that way, that they

 7    would hold it against the defendant for being a Colombian

 8    national?

 9              And this is not an immigration case where he is

10    accused of trying to, you know, cross the border illegally.

11    He is here because he was arrested and that's the reason

12    he's sitting right there, he was arrested on a boat.  Does

13    anyone feel that those circumstances in any way, in any way

14    influence you negatively towards the defendant?

15              JUROR LUETZOW:  That brings up a --

16              MR. HERNANDEZ:  Yes.  Yes, sir.  And for the

17    record, Mr. -- and I apologize, I'm going to say it wrong

18    again.

19              JUROR LUETZOW:  Luetzow.

20              MR. HERNANDEZ:  Yes, sir.

21              JUROR LUETZOW:  He's -- I have an issue if he's

22    not -- if he's not an American citizen and we're sitting in

23    a U.S. Court.  I have an issue with that, personally.

24              MR. HERNANDEZ:  Can you explain that a little

25    further?

1          JUROR LUETZOW:  Why is he in a U.S. court wasting
2     U.S. dollars and not back in Colombia where -- if he is a
3     citizen of that country, why isn't he back in Colombia?
4     That's -- full disclosure.
5          MR. HERNANDEZ:  No, it's full, and I'm not sure
6     I can answer that for you.  Obviously the United States
7     Government has decided to charge him and bring him in front
8     of this Court, so that's all I can tell you.
9          Does that concern that you have in any way --
10    you think would affect your ability to be fair and
11    impartial?
12         JUROR LUETZOW:  I -- I think it would, because
13    I don't -- I don't agree with the fact that he's in a U.S.
14    court and not back in Colombia, where personally I think he
15    belongs.
16         MR. HERNANDEZ:  And that's fine.  Like I said,
17    there's no right or wrong answer, as long as it's what you
18    are truly thinking and feeling in your heart.
19         Anyone else?
20         Just a couple of basic things.  I just want
21    everyone to understand that there may be times where one of
22    the attorneys has to object and make a legal objection,
23    you know, hearsay or whatever, but there may be occasions
24    where we would ask the Judge to approach sidebar because
25    it's going to involve a little more talking.  I want to make

1   sure that no one would feel offended by that, because we're

2   talking outside your presence, and hold it against me or,

3   for instance, against my client, which is what I'm concerned

4   about, if we ask to do that and the judge gives us that

5   permission.

6           Also, along those lines, there may be times where

7   we might -- while the case is pending, if you're selected,

8   we might see each other in the hallway or the elevators or

9   the restaurant, and the attorneys are not allowed to in any

10  way have any contact with you outside the courtroom, outside

11  of the rules of procedure, and I don't want a situation

12  where we find ourselves in that awkward position where one

13  of the attorneys has to turn our back on you and hold it

14  against particularly my client if that happened to be me.

15  Does everyone -- everyone understand that?

16          Thank you very much.

17          THE COURT:  All right.  Mr. Luetzow, in response

18  to your concerns, you haven't really heard any evidence in

19  this case.  You're going to hear what happened in this case

20  and you're going to hear why he is in court here, and I will

21  tell you as a legal matter, I've already found that this

22  court has jurisdiction to try this case and this defendant,

23  but you're going to hear evidence about what happened and

24  how he ended up here, so -- and I am not going to give you a

25  jury instruction that asks you to make any determination

1   about whether or not this court has jurisdiction, or I'm not

2   going to give you a jury instruction that asks you anything

3   about do you think this is fair that he is charged here.

4   I'll give you the jury instructions and you'll have the

5   evidence in the case.  Can you wait until you hear the

6   evidence to make a determination here?

7              JUROR LUETZOW:  Yes.

8              THE COURT:  Okay.  Thank you.

9              All right.  Ladies and gentlemen, we're going

10  to -- here is what's going to happen.  We're going to select

11  a jury, and we're going to do it outside of your presence.

12  I'm sure everybody is anxious to get up and walk around

13  anyway.  It's probably going to take us about 25 minutes to

14  do that, and so I'm going to just take a recess as far as

15  you're concerned until 12:15, and I will ask you if you will

16  meet Mr. Fitchett outside in the hallway at 12:15 and I'll

17  bring you in and announce the names of the jurors.

18             We are on -- just as a reminder, we are on the

19  10th floor.  So you're welcome to walk around, but you need

20  to come back here to the 10th floor, and we are on the

21  south side of the 10th floor -- north side of the

22  10th floor.  I'm sorry.  North side of the 10th floor, but

23  you will see the other jurors out there.

24             We are in recess until 12:15.

25                    *(Jury exits proceedings.)*

1          *(Juror Alderson remains in proceedings.)*

2          THE COURT:  Thank you.  I forgot.

3          Ms. Alderson, I'm going to ask you if you'll join

4     us at sidebar.  Mr. Hernandez and Mr. DeRenzo, or both

5     attorneys if you --

6          *(The following bench conference was held.)*

7          JUROR ALDERSON:  I'm sorry, ma'am.  I felt

8     a little awkward saying stuff in front of everyone, being

9     a little younger.

10         THE COURT:  It's fine.  Mr. Alderson, you earlier

11    suggested that -- and I don't want to put words in your

12    mouth, but the question came about as a result of my asking

13    do any of you think cocaine ought to be legal.

14         JUROR ALDERSON:  I didn't want to -- I wanted to

15    be completely honest and say like more about my opinions of

16    the incrimination on possession charges, being that like,

17    you know -- being, Your Honor, I have had friends that have

18    partaken in harder drugs and have had negative consequences,

19    and while I see it as like they've made poor choices, I also

20    see it from a perspective of wanting people generally to

21    have the opportunity to go to like rehabilitation centers or

22    be able to be healed from addiction rather than being

23    imprisoned, but I understand that this case is different and

24    I also understand what the law is currently and that my duty

25    as a juror is to be complete impartial and follow based off

1  the law, and I respect and understand that entirely, so

2  I just started to feel a little awkward and not being able

3  to put my words --

4           THE COURT:  Fair enough.  So if I give you a jury

5  instruction and tell you that you need to make a

6  determination as to whether the defendant is guilty or not

7  guilty of possession with the intent to distribute

8  5 kilograms -- that's a lot of cocaine.  It's more than --

9           JUROR ALDERSON:  It's a lot of cocaine, that's why

10 I would say it's different.

11          THE COURT:  You could make that determination?

12          JUROR ALDERSON:  Yes, ma'am.

13          THE COURT:  And you could follow the law that I

14 give you?

15          JUROR ALDERSON:  Um-hum.  I know what the laws

16 are.  Well, I'll listen to what the laws are and everything,

17 but I understand that trial by jury is important and that we

18 need to uphold the integrity of everything in the system,

19 that we have to follow what the law currently is.

20          THE COURT:  Okay.

21          JUROR ALDERSON:  I understand that.

22          THE COURT:  All right.  Mr. DeRenzo, do you have

23 any questions?

24          MR. DERENZO:  I think you've covered it, Judge.

25          MR. HERNANDEZ:  I don't have any questions,

1  Your Honor.

2          THE COURT:  All right.  Thank you.  Then we'll see

3  you at 12:15.

4          JUROR ALDERSON:  Okay.  Thanks.

5  *(End of bench conference; proceedings resume in open court.)*

6              *(Juror Alderson exits proceedings.)*

7          THE COURT:  All right.  Let's see if we can do the

8  challenges for cause and then I'll take a brief recess

9  regarding the preemptory challenges.

10          We now have -- we had requested more jurors,

11  obviously, and apparently -- I don't know how many the

12  jury -- they always -- or they should have always ordered

13  more, but I don't know how many they ordered, but apparently

14  a lot -- not the full complement turned up, so we are now

15  with 33 jurors, so I ask to keep that in mind as we attempt

16  to select a jury here.

17          Challenges for cause are just that, they are,

18  you know, this person cannot be a fair and impartial juror.

19  So let's start with the jurors that are in the jury box.

20          As to anybody seated on the first row,

21  Mr. DeRenzo, do you have any challenges for cause?

22          MR. DERENZO:  Yes, Your Honor, jurors number 1 and

23  number 6, Ms. Brisson and Ms. Alderson.

24          With respect to Ms. Brisson --

25          THE COURT:  Go ahead.  Let's just take one at a

1  time.

2         MR. DERENZO:  Yes, Your Honor.  I believe when

3  Mr. Hernandez asked her if her medical condition would

4  affect her ability to concentrate over the days where we

5  receive evidence, I think her response was "absolutely," and

6  I think that while she might be able to be fair and

7  impartial, she's going to have, at least according to her

8  response, a difficult time reviewing the evidence and then

9  weighing it come deliberation time.

10         THE COURT:  Mr. Hernandez?

11         MR. HERNANDEZ:  Number 1?

12         THE COURT:  Yes.

13         MR. HERNANDEZ:  No objection.

14         THE COURT:  Okay.  I will strike her for cause.

15  I agree that for health-related reasons she said that she

16  could not pay attention, in fact couldn't even remember some

17  of the things that we'd already talked about.

18         And Ms. Alderson, what's the reason for

19  challenging her?

20         MR. DERENZO:  Yes, Your Honor.  I know we just

21  talked to her and the Court did ask her if she could apply

22  the law and be fair based on this case, although it's

23  different than her anecdotal experiences; however, her

24  initial response to the Court's questions were -- and

25  I wrote this down -- "don't think I could be fair and

1    impartial."

2          My argument is that that was her gut level

3    response the first time the Court asked her any questions

4    about drugs, and while sometimes we're able to rehabilitate

5    these potential jurors, that's some indication that's how

6    she actually feels.  The defendant certainly has a right to

7    a fair trial, but not a right to have a juror who would

8    potentially not follow the law and have moral and mental

9    reservations about doing so.

10          THE COURT:  Mr. Hernandez?

11          MR. HERNANDEZ:  Judge, I would object.  Although

12   she indicated that she may not agree with the law, she said

13   she could follow the law, and both sides had opportunities,

14   including the Court, to ask any follow-up questions, and

15   I would -- I would submit that she has -- there's no basis

16   for a cause challenge.

17          THE COURT:  And I agree.  When she was at sidebar,

18   she said she would follow the law, and her concern was

19   that -- and not unlike a lot of people, I think, that there

20   should be more attempts to treat rather than punish for

21   possession, and obviously we know this is a large amount of

22   drugs and it's not only possession but it's possession with

23   the intent to distribute.  So I'm not going to strike her

24   for cause.

25          Mr. Hernandez, do you have anybody else on the

1    first row?

2              MR. HERNANDEZ:  No, Your Honor.

3              THE COURT:  All right.  Mr. Hernandez, in the

4    second row, is there anybody you think should be struck for

5    cause?

6              MR. HERNANDEZ:  Judge, I would ask that number 9,

7    Warren Schilit, be excused for cause.  I think he indicated

8    that basically -- because of his medical condition I'm not

9    confident he can sit through four days of trial and focus on

10   the case.

11             THE COURT:  Okay.  Mr. DeRenzo?

12             MR. DERENZO:  No objection, Your Honor.

13             THE COURT:  Okay.  I'll strike Mr. Schilit for

14   cause.

15             Anybody else, Mr. DeRenzo, in the second row?

16             MR. DERENZO:  Not for cause, Your Honor.

17             THE COURT:  All right.  For cause in the third

18   row, Mr. DeRenzo?

19             MR. DERENZO:  None, Your Honor.

20             THE COURT:  Mr. Hernandez?

21             MR. HERNANDEZ:  No, ma'am.

22             THE COURT:  All right.  Let's go out to the

23   jury room.  Let's talk about the first row, 19 through 26.

24   Mr. DeRenzo?

25             MR. DERENZO:  Yes, Your Honor.  I have three.

1   Juror numbers 20, 22 and 25.

2          THE COURT:  Okay.

3          MR. HERNANDEZ:  I don't object to any of them,

4   Your Honor.

5          THE COURT:  All right.  Ms. Hayden, who is in seat

6   20, is the one that has the salon and said she obviously

7   doesn't get paid if she doesn't work.  She also says that

8   she had children who had had drug problems, and one for a

9   number of years, and that she didn't think she could be a

10  fair juror when it involved drugs.  So I'll strike

11  Ms. Hayden for cause.

12         Ms. Smith has -- she said some mental concerns,

13  her husband apparently left her, she has trouble

14  concentrating as a result of that.  Recently left her,

15  I should say.  She's been to work only a couple of days in

16  the past three weeks.  So I'll strike her for cause,

17  concerns about her paying attention.

18         Mr. Ostema indicated that he had migraines and

19  that he didn't know when they were going to come, and

20  sometimes seeing a video -- and having watched this very

21  lengthy video with clouds, I feel it might be a concern as

22  well, and he also mentioned about his sight, so I'll strike

23  him for cause as well.

24         Anybody else on the first row, Mr. Hernandez?

25         MR. HERNANDEZ:  No, Your Honor.

```
1              THE COURT:  All right.  Second row, Mr. Hernandez?
2              MR. HERNANDEZ:  Judge, I have three, number 27,
3   number 29 and number 31.
4              THE COURT:  Okay.  Let's start with 27.  Mr. Neal
5   is the one -- his wife had gallbladder surgery today.
6              MR. HERNANDEZ:  Correct, Your Honor, and doesn't
7   know the condition now, but more importantly -- well, that's
8   very important, I don't mean to minimize that, but also
9   doesn't know anything about the follow-up care.
10             THE COURT:  All right.  Do you have any objection
11  to excusing Mr. Neal?
12             MR. DERENZO:  None, Your Honor.
13             THE COURT:  I'll strike Mr. Neal for cause.
14             And I realize Mr. Dawson had lots of excuses, but
15  tell me which one is the concern.
16             MR. HERNANDEZ:  Judge, the biggest concern, and
17  I did follow that up on my questioning, is that he indicated
18  that -- the work hardship, and he indicated that, yes, those
19  things -- everything combined, but specifically the work
20  hardship, that it would affect his ability to be -- to focus
21  on the case.
22             THE COURT:  Well, you know, anybody can say that.
23  It's a good way of getting out of jury duty, you know, it's
24  my concern about focusing on the case; but let me see what
25  Mr. DeRenzo's position is.
```

1          MR. DERENZO:  Your Honor, I don't believe

2     Mr. Dawson should be stricken for cause.  I think his

3     response was -- I was actually a little surprised he said

4     it -- I can multitask, I should be able to put aside those

5     thoughts when they come into my head and focus on the

6     presentation of the evidence.  He certainly had every reason

7     to wiggle out of that position if he wanted to, and he gave

8     no indication on the record that he wouldn't be able to

9     fairly and impartially pay attention to the evidence and

10    weigh it come deliberation time.

11         THE COURT:  Okay.  I'm not going to strike him for

12    cause.  I think he owns a corporation, and as I understand

13    the corporation, a lot of their stuff is sourced out, and he

14    is the primary person in the corporation but I don't think

15    that's a reason to excuse him, so we'll let him multitask.

16         All right.  And the other one, I believe, is

17    Dr. Badillo; is that correct, Mr. Hernandez?

18         MR. HERNANDEZ:  Judge, I think I failed to

19    mention -- I meant 30 -- also 30 and 31.  Mr. Paresh, number

20    30, the big problem with him is that he indicated that

21    English was not his first language, and I asked him if he's

22    been able to -- I forget exactly the words I used, but

23    basically he indicated that he wasn't -- he didn't believe

24    he had been able to understand everything that's going on.

25         THE COURT:  All right.  That's juror number 30.

1          Mr. DeRenzo?

2          MR. DERENZO:  We agree, Your Honor.

3          THE COURT:  I'll strike him for cause.  Yes, he

4   did seem to have a language problem.

5          I wouldn't strike him because of the work

6   situation, but obviously he's going to need to be able to

7   understand what's being said and testified to.  He is

8   originally from India, and even though he works in a

9   convenience store and has to understand English in order to

10  work in the convenience store, it would appear that sitting

11  as a juror is a far different matter, so I'll strike him for

12  cause.

13         Mr. Hernandez?

14         MR. HERNANDEZ:  Judge, the last one is

15  Dr. Badillo.  Her -- the main issue with her is the fact

16  that she has apparently a flight out sometime during the day

17  on Thursday to New Orleans and indicated that that -- plus

18  I think she also mentioned work-related, but that was the

19  main reason where she indicated that she didn't believe that

20  she could give this case its full attention.

21         MR. DERENZO:  We agree, Your Honor.

22         THE COURT:  All right.  I'll strike her for cause.

23         Anyone else in that row, Mr. DeRenzo?

24         MR. DERENZO:  No, Your Honor.

25         THE COURT:  All right.  Okay.  Well, now, keep in

1   mind when you're thinking about your preemptories we have

2   now struck one, two, three, four, five, six, seven, eight

3   jurors for cause and we had a total of 33 jurors, so we are

4   down to, what 15?  No, that's not right.  That can't

5   possibly be right.  25, I guess.

6          So we're down to 25 jurors from which -- you know,

7   if everybody exercises all of their challenges, then clearly

8   we don't have a jury, so -- anyway, it is now ten after, so

9   we'll take five minutes and see where we are after we try to

10  select a jury.  Okay.

11                      - - - - -

12          (Recess at 12:07 p.m. until 12:12 p.m.)

13                      - - - - - -

14          THE COURT:  Okay.  Just briefly, we'll start with

15  the juror that's seated in seat number 1, I'll ask the

16  Government if they wish to exercise a preemptory, one of

17  their six.  If they do not, I'll ask you, Mr. Hernandez.  If

18  you do not, that juror is on the jury and actually will be

19  seat number 2.

20          And then the next juror, I'll skip over to

21  Mr. Hernandez and ask him first if he wishes to exercise one

22  of his ten preemptories.  If he does not, I'll ask

23  Mr. DeRenzo.  If he does not, that juror is on the jury.

24          There are no back strikes.  We will continue in

25  that manner until we have a jury.

```
1              So starting now with Cheryl Rhum, who is in seat
2    number 2, because the first juror was struck for cause, so,
3    Mr. DeRenzo, do you wish to exercise one of your
4    preemptories as to Cheryl Rhum?
5              MR. DERENZO:  No, Your Honor, we accept.
6              THE COURT:  Mr. Hernandez?
7              MR. HERNANDEZ:  No, Your Honor.
8              THE COURT:  Okay.  She'll be the first juror
9    seated.  There are no back strikes.
10             The next one is --
11             MR. HERNANDEZ:  You said there is or is not back
12   strikes?
13             THE COURT:  No back strikes.
14             MR. HERNANDEZ:  Okay.
15             THE COURT:  She is seated.  No back strikes.
16             All right.  Michele Lewis in seat number 3,
17   Mr. Hernandez.
18             MR. HERNANDEZ:  Accept, Your Honor.
19             THE COURT:  And Mr. DeRenzo?
20             MR. DERENZO:  Accept, Your Honor.
21             THE COURT:  She'll be the second juror.  No back
22   strikes.
23             Carole Rossman, in seat number 4.  Mr. DeRenzo?
24             MR. DERENZO:  Accept, Your Honor.
25             THE COURT:  And Mr. Hernandez?
```

```
 1              MR. HERNANDEZ:  Accept.

 2              THE COURT:  Lloyd Ross Sowers, in seat number 5.

 3    Mr. Hernandez?

 4              MR. HERNANDEZ:  Strike, Your Honor.

 5              THE COURT:  Sarah Alderson, in seat number 6.

 6    Mr. DeRenzo?

 7              MR. DERENZO:  Strike, Your Honor.

 8              THE COURT:  Brooke Dawson, in seat number 7.

 9    Mr. Hernandez?

10              MR. HERNANDEZ:  Accept.

11              THE COURT:  Mr. DeRenzo?

12              MR. DERENZO:  Accept, Your Honor.

13              THE COURT:  She'll be the fourth juror seated.

14              Gregory Rebello Santos, in seat number 8.

15    Mr. DeRenzo?

16              MR. DERENZO:  Accept.

17              THE COURT:  Mr. Hernandez?

18              MR. HERNANDEZ:  Strike, Your Honor.

19              THE COURT:  Skipping over number 9, John Daniel

20    Luetzow in seat number 10.  Mr. Hernandez?

21              MR. HERNANDEZ:  Accept.

22              THE COURT:  Mr. DeRenzo?

23              MR. DERENZO:  Strike.

24              THE COURT:  Ebony Parrish, seat number 11.

25    Mr. DeRenzo?
```

```
 1              MR. DERENZO:  Accept, Your Honor.
 2              THE COURT:  And Mr. Hernandez?
 3              MR. HERNANDEZ:  One second, Your Honor, if
 4    I could.
 5              THE COURT:  Sure.
 6              MR. HERNANDEZ:  Accept.
 7              THE COURT:  Rhonda Stewart, in seat number 12.
 8    Mr. Hernandez?
 9              MR. HERNANDEZ:  Accept.
10              THE COURT:  Mr. DeRenzo?
11              MR. DERENZO:  Accept.
12              THE COURT:  Annette Noffz, in seat number 13.
13    Mr. DeRenzo?
14              MR. DERENZO:  Accept.
15              THE COURT:  And Mr. Hernandez?
16              MR. HERNANDEZ:  Accept, Your Honor.
17              THE COURT:  Courtney Burdett Johnson, in seat
18    number 14.  Mr. Hernandez?
19              MR. HERNANDEZ:  Accept.
20              THE COURT:  Mr. DeRenzo?
21              MR. DERENZO:  Accept.
22              THE COURT:  Maria Alessandra Arias, in seat number
23    15.  Mr. DeRenzo?
24              MR. DERENZO:  Strike, Your Honor.
25              THE COURT:  Carmen James Frongillo, in seat number
```

```
 1   16.  Mr. Hernandez?
 2           MR. HERNANDEZ:  Strike.
 3           THE COURT:  Kennedy Christine Nau, in seat number
 4   17.  Mr. DeRenzo?
 5           MR. DERENZO:  Strike, Your Honor.
 6           THE COURT:  Helen Hester Madison, in seat 18.
 7   Mr. Hernandez?
 8           MR. HERNANDEZ:  Accept.
 9           THE COURT:  Mr. DeRenzo?
10           MR. DERENZO:  Accept, Your Honor.
11           THE COURT:  Joann Elizabeth Dixon, in seat number
12   19.  Mr. DeRenzo?
13           MR. DERENZO:  Accept, Your Honor.
14           MR. HERNANDEZ:  Accept.
15           THE COURT:  Scott Michael Skidmore, in seat 21.
16   Mr. Hernandez?
17           MR. HERNANDEZ:  Accept, Your Honor.
18           THE COURT:  Mr. DeRenzo?
19           MR. DERENZO:  Accept.
20           THE COURT:  Madam Clerk, how many is that?
21           COURTROOM DEPUTY:  11 jurors.  11 now.
22           THE COURT:  All right.  Brian Joseph Schnieders,
23   in seat number 23.  Mr. DeRenzo?
24           MR. DERENZO:  Accept.
25           THE COURT:  Mr. Hernandez?
```

```
1              MR. HERNANDEZ:  Accept.

2              THE COURT:  All right.  That would be the 12th

3    juror.

4              All right.  Let's see if we can get some

5    alternates.  I'd like to get two if we can.

6              Robert Joseph Sapio, in seat 24.  Mr. Hernandez?

7              MR. HERNANDEZ:  Accept, Your Honor.

8              THE COURT:  And Mr. DeRenzo?

9              MR. DERENZO:  Accept, Your Honor.

10             THE COURT:  He'll be alternate one.  Okay.

11             We're skipping over Mr. Ostema.

12             Jennifer Anne Sawicki, in seat 26.  Mr. Hernandez?

13             MR. HERNANDEZ:  Accept.

14             THE COURT:  And Mr. DeRenzo?

15             MR. DERENZO:  Accept, Your Honor.

16             THE COURT:  Okay.  We've got a jury.  So let's

17   just verify that we all agree.

18             The jurors are as follows:  Cheryl Rhum in 2,

19   Michele Lewis in 3, Carole Rossman in 4, Brooke Dawson in 7,

20   Ebony Parrish in 11, Rhonda Stewart in 12, Annette Noffz in

21   seat 13, Courtney Burdett Johnson in seat 14, Helen Hester

22   Madison in seat 18, Joann Elizabeth Dixon in seat 19, Scott

23   Michael Skidmore in seat 21, Brian Joseph Schnieders in seat

24   number 23.  The alternates are Robert Joseph Sapio in seat

25   24 and Jennifer Anne Sawicki in seat number 26.
```

1          Does everybody agree with that?

2          MR. HERNANDEZ:  Yes, Your Honor.

3          MR. DERENZO:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  When I bring the

5    jury in, I'll excuse those jurors that are not selected,

6    I'll then seat the jury, and we will then ask -- I'll then

7    send them to lunch, and when they get back I will do the

8    preliminary instructions and we'll begin with opening

9    statements.  Okay?

10          MR. DERENZO:  Yes, Your Honor.

11          MR. HERNANDEZ:  Yes, Your Honor.

12          THE COURT:  All right.  Would you bring the jurors

13    in.

14               (Jury re-enters proceedings.)

15          THE COURT:  Okay.  Before I announce the names of

16    the jurors who were selected to try this case,

17    Mr. Masterson, I think I might owe you an apology.  I am

18    told by the courtroom deputy that, yes, your jury summons

19    did say noon.  Apparently there is another judge this

20    afternoon that was supposed to pick a jury and apparently he

21    had his jurors come in at noon, and when you came early,

22    they just brought you up.  So my apologies, you were

23    absolutely on time.  In fact, you were very early.

24          I'd like to thank all of you for the time and the

25    attention that you've given to us during this long period of

```
 1   jury selection.  I hope that if you're not going to serve on
 2   the jury, I hope that you understand that what happens when
 3   we select a jury is we select a jury, and when I say "we,"
 4   it's mostly the attorneys, but certainly I am involved as
 5   well, based on a number of things.  Some of the things have
 6   to do with your -- what you told us as far as any conflicts
 7   are concerned or health-related reasons, and the others are
 8   just challenges that the attorneys make based on their
 9   belief that they want a jury that can fairly and impartially
10   try this case.
11           So certainly you shouldn't take it personally in
12   any way if you are not selected to serve on this jury, and
13   really you shouldn't take it personally if you are selected
14   to serve on this jury, but we really do appreciate your
15   being here, and I think we said earlier that if we didn't
16   have you who are willing to come in, that we couldn't have
17   the system that we have that relies on jurors to make
18   decisions in these cases.
19           I'd like to particularly say, Mr. Neal, it says
20   something that you came in even in light of the fact that
21   your wife was having gallbladder surgery, so I hope that the
22   surgery went well, or goes well.  And we do allow jurors to
23   bring in, with some restrictions, cell phones after the jury
24   selection, so I am sorry if this created a hardship for you.
25           The following persons were selected as jurors to
```

```
 1   try the case of the United States of America versus Emiro
 2   Hinestroza-Newbbooll, they are as follows, and if I read
 3   your name, just remain seated where you are.
 4             Cheryl Rhum, Michele Lewis, Carole Rossman,
 5   Brooke Dawson, Ebony Parrish, Rhonda Stewart, Annette Noffz,
 6   Courtney Burdett Johnson, Helen Hester Madison, Joann
 7   Elizabeth Dixon, Scott Michael Skidmore, Brian Joseph
 8   Schnieders, Robert Joseph Sapio and Jennifer Anne Sawicki.
 9             So if your name was called, you are on the jury
10   and you need to remain seated where you are.  For those of
11   you that your name was not called, you will not be serving
12   on this jury, and I am told that whatever jury that was
13   scheduled for this afternoon or jury selection has been
14   continued, so for those of you that aren't serving on this
15   jury, you're free to go, and I thank you again.
16             All right.  If you'll just stay where you are,
17   please, I'm going to seat you.  Just hold on for just a
18   minute.
19             So let me just see how we are.
20             Let me ask first of those in the first row just to
21   move over one.  Everybody move over one.  Thank you.
22             And then Ms. Parrish and Ms. Stewart, will you
23   move down all the way to the end.  Thank you.
24             And Ms. Madison and Mr. Johnson, would you come
25   down and have a seat on the second row.  Thank you.
```

1          And for those of you that are in the courtroom,

2     Ms. Sawicki, if you'll come up, please, and if you'll take a

3     seat on the top row.  Don't go all the way to the end, but

4     on the top row, the next to the last seat.

5          And Mr. Sapio, if you'll come up as well, and if

6     you'll have a seat on the top row next to Ms. Sawicki.

7          Mr. Schnieders, if you will come up as well.  If

8     you'll have a seat on the top row, please, sir.

9          Mr. Skidmore, if you'll come up, please, and,

10    Mr. Skidmore, if you'll have a seat.  Why don't you have a

11    seat on the first row.

12         Ms. Dixon, if you'll have a seat on the second

13    row.

14         Okay.  You may be seated.

15         Ladies and gentlemen, I'm going to ask if you will

16    stand, and I'm going to ask the courtroom deputy to swear

17    you in as the jury to try this case.

18         COURTROOM DEPUTY:  Please raise your right hands.

19         Do you and each of you solemnly swear or affirm

20    under penalty of perjury that you will well and truly try

21    the issues in the cause now on trial and a true verdict

22    render according to the evidence and the charge of this

23    Court?

24         JURORS:  I do.

25         COURTROOM DEPUTY:  Thank you.  Please have a seat.

1            The jurors are sworn, Your Honor.

2            THE COURT:  All right.  Let me tell you a little

3    bit about what's going to happen the rest of the day.

4            In just a few minutes I'm going to excuse you to

5    go to lunch, and I know most of you have been here since

6    early and it's now about 12:30, and we'll take about an hour

7    and 15 minutes for lunch.  Generally that's the time I take

8    every day, so we'll certainly take about that time tomorrow

9    and about that time on Wednesday, and Thursday we'll just

10   sort of have to see where we are with the trial as far as

11   lunch is concerned, when and how long.

12           At any rate, then we'll recess midafternoon, but

13   when you get back from lunch, the first thing that will

14   happen is that I will give you some general preliminary

15   instructions, and these are not case-specific instructions

16   except I will read the indictment to you, but these are

17   instructions about what your responsibility is as a juror,

18   what is going to happen during the course of the trial and

19   just general instructions about service as a juror, and then

20   we will start with the case.

21           We'll start with the opening statements by the

22   attorneys, and the attorneys will each have an opportunity

23   to make an opening statement if they want to do that.  An

24   opening statement gives the attorneys an opportunity to tell

25   you what evidence is going to be presented during the trial,

1     at least what they believe is going to be presented.

2             After the opening statements we'll actually start

3     with the evidentiary portion of the trial.  The Government

4     goes first because the Government has the burden of proof in

5     this case, so I will call on the Government's attorneys,

6     either of the Government's attorneys, and ask them to call

7     their first witness, and that witness will take the stand

8     and testify, they'll sit over here in the witness chair,

9     that witness will be examined and cross-examined, and I'm

10    not sure how many witnesses we will get through this

11    afternoon, but there may be other evidence.  There may be

12    documentary evidence.  I know there's going to be a video

13    shown, and the video shows up on that screen up there.  We

14    dim the lights so that you can see it belter.

15            We'll work until about five o'clock this afternoon

16    and then we will recess for the day.  We will start in the

17    morning, I believe, at 9:00 or 9:15, and I'll have to check

18    that out, but generally we start at 9:00, but I will tell

19    you if it's going to be 9:00 or 9:15 before we recess, and

20    we'll continue with the evidentiary portion of the trial.

21    We'll continue in that way until both sides have finished

22    their cases, and then we'll have closing arguments by the

23    attorneys and then the instructions on the law, which I will

24    give you the elements that the Government has to prove in

25    order to prove its case.

1          So if you're wondering, you know, maybe I don't
2    know everything I need to know in order to make this
3    decision, what you just need to worry about now are the
4    facts, what the witnesses testify to or what the exhibits
5    are.
6          Any exhibits that are received into evidence will
7    go back with you to the jury room, so you'll have them back
8    there during your deliberations.  I will also after lunch
9    pass out notepads and pens.  You can take notes if you wish
10   to do that, and those notes will go back with you during
11   your deliberations as well.
12         I mentioned phones earlier, and the courtroom
13   deputy is going to go back with you in just a minute, so
14   before you go to lunch she's going to tell you about the
15   cell phones.  Essentially you can bring your cell phone in,
16   you need to leave it down in the locker in the jury assembly
17   room, but you can on any break or lunch go down to the
18   jury room and use it, so we'll talk to you about that.
19         There's also -- the jury room is right outside of
20   this courtroom.  There's a water cooler back there and
21   there's a coffee maker, there's a refrigerator, there's a
22   microwave, so, you know, if you want to bring something
23   tomorrow, you're welcome to do that.
24         It will be that room that you return to after
25   lunch.  It will be that room that you return to tomorrow

1    morning.  You might want to lock your phone up before you

2    come up to the 10th floor, but it will be the jury room that

3    Mr. Fitchett will knock on the door and bring you into the

4    courtroom to begin the trial this afternoon and also

5    tomorrow morning and the mornings thereafter.

6            So again, we are on the 10th floor, and this is

7    10B, which is, as I was corrected earlier, the north side of

8    the 10th floor, and this is where you will return after

9    lunch.

10           So it's now 12:35, so we're going to be in recess

11   until, let's say, 1:50, that's an hour and 15 minutes, and

12   part of -- in a few minutes you're going to be -- Ms. Black

13   is going to be talking to you about cell phones, but you

14   should be back up here in this room, because we'll start

15   promptly at ten minutes of 2:00.  So at 1:50, ten minutes of

16   2:00, we will begin the trial.

17           Do any of you have any questions?

18           Yes, sir.

19           JUROR:  Typically there's alternate jurors.  Are

20   there a couple of us that are alternates?

21           THE COURT:  Yes, we do -- two of you are alternate

22   jurors.  The law allows only 12 jurors to make a decision,

23   so if everybody is still here at the end of the trial,

24   I will excuse those alternate jurors.  I don't name the

25   alternate jurors until it's time for the jurors to go back,

1    and it's not in any order that you're seated, so -- and if

2    somebody does get sick -- I think I mentioned this during

3    jury selection, if somebody does get sick, for example, and

4    can't come in, then that alternate juror would take that

5    juror's place, obviously; otherwise we'd have to start the

6    trial all over again.

7              Any other questions?

8              Yes.  All right.  We've got two questions, so let

9    me start with the juror who is seated in the back row,

10   because you had your hand up first.  And so -- Ms. Sawicki,

11   is that correct?

12             JUROR SAWICKI:  Sawicki.

13             In that room, are we allowed to leave our stuff?

14             THE COURT:  Sure.

15             JUROR SAWICKI:  We're not worried about it being

16   stolen, like our books or something?  Because I'm lugging

17   around books here that I don't want to lug around.

18             THE COURT:  Yeah, everything is secure in the jury

19   room and you're allowed to -- nobody else is going to be in

20   there and you're allowed to bring whatever you want to bring

21   and leave it in there.  Absolutely.

22             JUROR SAWICKI:  Just the cell phone is locked

23   downstairs?

24             THE COURT:  Only the cell phones.  And one of

25   the -- you know, every cell phone now is a smart phone and

1  you can use it to do research, and one of the things I tell

2  you you can't do is do research on your own, so that's why

3  we ask jurors to leave them down there during the trial,

4  except on breaks.  And that may not make a lot of sense, but

5  on breaks you can go down and use the cell phone if you wish

6  to do that.

7          JUROR SAWICKI:  I have a 13-year-old, so it's nice

8  to know what's happening.

9          THE COURT:  I understand.

10          Is it Ms. Dixon?

11          JUROR DIXON:  Yes.  What if we get stuck in

12  traffic or something or have a car issue?

13          THE COURT:  Would you give her the microphone.

14          Go ahead.

15          JUROR DIXON:  I was just asking, if we get stuck

16  in traffic or have car --

17          THE COURT:  You need to start again.  For some

18  reason you keep breaking up.

19          JUROR DIXON:  If we get stuck in traffic or have a

20  car issue, we don't want to be late, so is there a contact

21  number or --

22          THE COURT:  Yes, the Clerk will give you a contact

23  number, but, frankly, if you're too late, we'll have to

24  go ahead and start, and that's -- in those kind of instances

25  the alternate juror would then take over.  So obviously,

1   you know, if you're five minutes late or something like

2   that, that's not a problem, but if you're going to be like

3   two or three hours late, then that becomes a problem.

4            JUROR DIXON:  Thank you.

5            THE COURT:  All right.  Any other questions?

6            All right.  We're in recess until ten minutes of

7   2:00.  Enjoy your lunch, and I'll see you at ten minutes of

8   2:00.

9                    *(Jury exits proceedings.)*

10           THE COURT:  Okay.  We are in recess until

11  ten minutes of 2:00.

12                    - - - - -

13            (Recess at 12:39 p.m. until 1:51 p.m.)

14                    - - - - -

15           THE COURT:  Anything before I bring the jurors in?

16           MR. DERENZO:  Nothing from the United States.

17           MR. HERNANDEZ:  Judge, only that you were not

18  sure, you did say 9:15 tomorrow?

19           THE COURT:  Yeah.  Well, I wasn't sure.  You were

20  going to check.  9:15, is that good?

21           MR. HERNANDEZ:  9:15 tomorrow morning, yes, ma'am.

22           THE COURT:  Okay.  Then that's what I will tell

23  them.

24           MR. HERNANDEZ:  Thank you.

25           THE COURT:  If you'll bring the jurors in, please.

1        *(Jury re-enters proceedings.)*

2            THE COURT:  All right.  Ladies and gentlemen, you

3    recall I said we would start with the preliminary

4    instructions, and that's what we're going to start with.

5            You have now been selected and sworn as the jury

6    to try this case, and I'm going to talk about some basic

7    principles in a criminal trial, and these are, as I said,

8    preliminary instructions, and you will have more detailed

9    instruction, case specific instructions, at the close of the

10   case.

11           It will be your duty to decide what happened, so

12   you can determine whether the defendant is guilty or not

13   guilty of the crimes charged in the indictment.  At the end

14   of the trial I'm going to explain to you the law, in fact,

15   I'll give you a copy of the jury instructions in writing and

16   you can take them back to the jury room, and you must follow

17   the law that I give to you in reaching your verdict.  Even

18   if you don't agree with the law, you must follow the law.

19           You must decide the case solely on the evidence

20   presented here in the courtroom.  Evidence can come in many

21   forms, it can be testimony of the witnesses who sit in the

22   witness chair and testify under oath, it can be an exhibit

23   admitted into evidence, it can be a video, it can be

24   somebody's opinion.

25           Some evidence is what we call indirect evidence,

1  circumstantial evidence, some evidence is direct evidence,

2  and some evidence proves a fact indirectly and some evidence

3  proves a fact directly, and the law does not put any

4  particular emphasis on either.  As far as the law is

5  concerned, it makes no difference whether the evidence is

6  direct or indirect, and you may choose to believe or

7  disbelieve either kind of evidence, and you give it whatever

8  importance or emphasis or weight that you think it deserves.

9          There are certain things that are not evidence and

10  you ought to know what those are as well.  In just a few

11  minutes the attorneys are going to make an opening

12  statement.  That's not evidence.  Closing arguments by the

13  attorneys, that's not evidence.  Remarks that an attorney

14  may make, that's not evidence.  Questions or objections by

15  the attorneys, that's not evidence.  Only what the witness

16  answers is evidence, and you should not think that something

17  is true just because a lawyer's question suggests that it is

18  true.

19          There are Rules of Evidence that control what can

20  be received into evidence, and when a lawyer asks a question

21  or offers an exhibit and a lawyer on the other side thinks

22  that's not permitted by the Rules of Evidence, then that

23  other lawyer may object, and it's my job to rule on that

24  objection.  If I overrule the objection and the question

25  isn't answered, the evidence doesn't come in.  If I sustain

1    the objection then the question cannot be answered and the

2    exhibit cannot be received.  So I'll make the determination

3    as far as the evidence is concerned, and you really

4    shouldn't concern yourself with that.

5          Sometimes I may order that evidence be stricken,

6    and I may turn to you and ask you to disregard that

7    evidence, and that means you should disregard that evidence

8    in deciding the case and in considering your verdict.

9          Some evidence is admitted for a limited purpose,

10   and if that happens to be the case in this trial, I'll turn

11   to you and say that.  That evidence is admitted for a

12   limited purpose and for that purpose -- what that purpose

13   is.

14         In deciding your verdict, you may have to decide

15   what testimony to believe and what testimony not to believe,

16   and you may believe everything a witness says, part of it or

17   none of it.  In considering the testimony of any witness,

18   you should take into account the opportunity and the ability

19   of the witness to see or hear or know the things the witness

20   testifies to, the witness's memory, the witness's manner

21   while the witness is testifying, the witness's interest, if

22   the witness has an interest, in the outcome of the case or

23   any bias or prejudice that witness might have, whether the

24   witness's testimony is contradicted by other evidence, the

25   reasonableness of the witness's testimony in light of the

other evidence in the case, and any other factors that you
think bear on believability, and I will talk more about this
at the close of the trial.

As you know, this is a criminal case, and you
should keep in mind that the defendant, as we talked about
earlier, is presumed by the law to be innocent until or if
proven guilty.

The indictment against the defendant is brought by
the Government, it's only an accusation, it's nothing more,
it's not proof of guilt or anything else.  The defendant
starts out with a clean slate.

Second, the burden of proof is on the Government
until the very end of the case.  The defendant has no burden
of proof.  The defendant doesn't have to prove his innocence
or present any evidence at all, doesn't have to testify,
doesn't have to call witnesses.

Since the defendant has the right to remain
silent, he may choose whether to testify.  You cannot
legally put any weight on a defendant's choice not to
testify, that's simply not evidence.

Third, the Government must prove the defendant's
guilt beyond a reasonable doubt, and I will give you a
further instruction about that, but as I said before, those
words mean just what they say, beyond a reasonable doubt.
The burden of proof is a high burden of proof.

1          Our law requires jurors to follow certain

2    instructions regarding personal conduct, and this is to

3    assure a fair trial to both sides.  You should not talk,

4    either among yourselves or with anyone else, about anything

5    related to this case.  You may tell people with whom you

6    live, your employer, that you're on the jury, you can give

7    them information that you are serving and how long you

8    anticipate it might take to try the case and that you're

9    required to be in court, but you may not discuss the case

10   with them or with anyone else.

11          Do not at any time during the trial request,

12   accept, agree to accept or discuss with any person any type

13   of payment or benefit in return for supplying any

14   information about the trial.  You must promptly tell me or

15   Mr. Fitchett about any incident you know of involving an

16   attempt by any person to improperly influence you or any

17   members of the jury.

18          Don't visit or view the premises or places that

19   you may hear described where the crime was allegedly

20   committed.  Don't Google it.  Don't use Google Earth to go

21   and try to look at where you think this might have occurred.

22   Don't read, watch or listen to any accounts, should there be

23   any, on television or the radio or in the newspaper.  Don't

24   attempt to research any fact or law related to this case,

25   and whether that means information about where this

1  occurred, information about the attorneys, information about

2  the Judge, just don't do any kind of research on the

3  computer or otherwise.

4     In this age of instant electronic communication

5  and research, I want to emphasize that in addition to not

6  talking face-to-face with anyone about the case, you must

7  not communicate with anyone about the case by any other

8  means, such as by telephone, text, e-mail, chat, blogs,

9  Facebook.  If I've left out anything, you know what I mean.

10  Twitter maybe.  You must not provide any information about

11  the case to anyone by any means whatsoever, and that

12  includes posting information about the case or what you're

13  doing in the case on any device or any internet site or in

14  any social network website.

15     Again, you must not Google anything for search

16  purposes, whether it's using Google Earth or whether it's

17  just Googling individuals.  Please don't Google.

18     Our law does not permit that the attorneys talk

19  with the jurors, and so if you run into them in the hallway,

20  they won't talk with you, and they're not being rude,

21  they're just under instructions not to do that, because it's

22  the appearance that creates the problem.

23     In addition, you shouldn't talk with them, anyone

24  or among yourselves about this case until you actually go

25  back to deliberate, and that will probably be Thursday.

1    So when you go back, and you'll be back in the jury room

2    together a lot, don't talk about the case.  Not until you go

3    back to decide the case should you have any discussions

4    about the case, period.

5              Our law also does not permit jurors to discuss

6    anything about the individuals involved, about what you

7    think the verdict should be, prior to you going back to

8    discuss the case, because premature discussions can lead to

9    a premature final decision.  You need to wait until you hear

10   all of the evidence and the closing arguments by the

11   attorneys and the instructions in the law and I send you

12   back to the jury room to decide the case before you talk

13   about the case.

14             I'm not sure this will be an issue, but you should

15   also not try to visit physically any of the scenes that you

16   may hear described during the evidence.

17             Finally, I mean, I've talked about don't read or

18   listen to anything should there be anything on the news

19   media.  I don't think there will be anything on the news

20   media, but obviously the importance of my telling you that

21   is the decision you make should be made based on what you

22   hear and see in this courtroom, not outside of the

23   courtroom, and the purpose of that is to guarantee a fair

24   trial to both sides.

25             In just a few minutes I'll ask Mr. Fitchett to

1    pass out some pads and pens or pencils so that you can take
2    notes, and you can take notes throughout the trial if you
3    want to do that.  I'll ask that you leave the pads face down
4    on your chairs when you exit the courtroom, but at the close
5    of the trial, when you go back to deliberate, you'll be able
6    to take your notes back there with you.  I just will remind
7    you that the notes shouldn't be -- or shouldn't carry any
8    greater weight than your own memory and impression.
9           Now, I told you that at the beginning the
10   Government will make an opening statement and then the
11   defense attorney, if he wishes, may make an opening
12   statement.  Opening statements are not argument and they are
13   not evidence.  The Government will then call their
14   witnesses.  The defendant may cross-examine those witnesses.
15   Following the Government's case, the defendant is entitled
16   to present a case if he wishes to do so.  He does not have
17   to do so.  After that I will instruct you in the law that
18   applies to the case, you'll hear the closing arguments by
19   the attorneys and then you will go back to the jury room to
20   deliberate.
21          So let me read to you the indictment.  And this is
22   a charging document, nothing more.  It's up to the
23   Government to prove what has been alleged in this
24   indictment.  It is not evidence of guilt, but it reads as
25   follows.  And you will hear a number of others described in

1    the indictment because this is a conspiracy involving the

2    defendant and others; however, it is only the defendant that

3    is on trial in this case, and I just ask you not to

4    speculate on why that's the case.  Your decision will only

5    be as to Mr. Hinestroza-Newbbooll, but you may hear others

6    described because others are charged in the indictment.

7            The indictment read as follows:  From an unknown

8    date, continuing through on or about December 1st, 2018,

9    while upon the high seas on board a vessel subject to the

10   jurisdiction of the United States, the defendants,

11   Emiro Hinestroza-Newbbooll, Rudolph Randolph Meighan,

12   Jorge Ramon Newball-May and Calbot Reid-Dilbert, did

13   knowingly, willfully and intentionally conspire with each

14   other and other persons, both known and unknown to the

15   grand jury, to distribute and to possess with the intent to

16   distribute 5 kilograms or more of a mixture and substance

17   containing a detectable amount of cocaine, a Schedule II

18   controlled substance.

19           Count Two, from an unknown date continuing through

20   on or about December 1st, 2018, while upon the high seas

21   on board a vessel subject to the jurisdiction of the

22   United States, the defendants, Emiro Hinestroza-Newbbooll,

23   Rudolph Randolph Meighan, Jorge Ramon Newball-May and Calbot

24   Reid-Dilbert, did knowingly and intentionally possess with

25   the intent to distribute a controlled substance, which

violation involved 5 kilograms or more of a mixture and
substance containing a detectable amount of cocaine, a
Schedule II controlled substance.

So that is the indictment, those are the two
charges, and at the close of the trial you're going to be
given a verdict form and you're going to be asked to find
unanimously, that means all of you have to agree whether or
not the defendant is guilty or not guilty of the crimes
charged in the indictment.

Now, the attorneys are going to make what we call
an opening statement, and I said this a couple of times, but
I'm going to probably reiterate it as we go through the
trial.  What the attorneys say is not evidence.  I don't
mean to suggest you shouldn't listen to what they say,
because I'm sure they are going to be talking about what
they believe will be the evidence in the trial, but the
evidence comes from the witnesses and the evidence comes
from the exhibits that are introduced and received into
evidence.

Both sides have an equal amount of time if they
want to use it to make an opening statement.  In fact,
I normally don't put any time limit on opening statements.
The Government goes first, as I've told you, because it's
the Government that has the burden of proof.

Before we do the opening statements, I'm going to

1  ask Mr. Fitchett to hand out pads and pencils so that you

2  can take notes if you wish to do so.

3         And if you'll put your names on the front page.

4         Okay.  I would suggest you write your name on the

5  first page of that pad, and that identifies it as belonging

6  to you, and then when you leave the courtroom you can put it

7  face down in your chair.

8         All right.  Any questions before we start?

9         The Government may make an opening statement.  Who

10  is going to make the opening statement?

11         MS. GOODIN:  I will, Your Honor.

12         THE COURT:  Ms. Goodin may make an opening

13  statement on behalf of the United States.

14         MS. GOODIN:  Good afternoon, ladies and gentlemen.

15  My name is Toni Goodin, you heard the Judge mention that as

16  well, and I'm working with Nicholas DeRenzo, we're coming

17  from the U.S. Attorney's Office, and we, finally, have

18  Agent Tim Campbell from Homeland Security who is working

19  with us representing the defendant.

20         The defendant in this case is Emiro

21  Hinestroza-Newbbooll.  He and three of his defendants made a

22  plan and set sail north from Colombia with over 600 kilos of

23  cocaine on his boat.  The boat was full to the brim with

24  nothing but cocaine and gasoline.

25         Now, this isn't any ordinary boat.  This is

1  something that you're going to hear referred to as a go-fast

2  vessel, so that's going to be a speed boat that's been

3  modified, it has been painted black and then they have

4  pulled over a tarp to cover the contents of the boat.

5          For the trip that they needed to take, the

6  defendant and his three co-conspirators had to work around

7  the clock speeding to their destination north.  Everyone had

8  a role, everyone had a job, and they were trying to get

9  there as fast as possible.  The defendant's role in that was

10  as the captain of the vessel.

11          Over the next few days you're going to hear that

12  the defendant and his men, they didn't reach their

13  destination.  The Coast Guard intercepted that vessel on

14  December 1st, 2018 when they detected his vessel by

15  aircraft.

16          The pilots, which you'll hear from, detected the

17  vessel in the water and began to circle around the vessel.

18  They stayed there for several hours, taking video of the

19  defendant and his co-conspirators.  They were able to see

20  all the steps that he took to get rid of the drugs and then

21  eventually to use his own engines to sink the drugs, and

22  then -- it was then that the Coast Guard boarding team

23  members arrived.

24          So let's go through the evidence that you'll hear

25  and some of the testimony that will come before you as well.

1          First I want to talk to you about some videos.

2     As I told you, the Coast Guard plane was there for multiple

3     hours, and we have that video for you, okay?  This is

4     unedited, you'll see exactly what they saw in real-time, so

5     we're going to ask you to be patient with us, because it is

6     a lot to watch, but it is compelling evidence as to what

7     occurred on that date, December 1st, 2018.

8          So let's talk about the footage.  As I said,

9     multiple hours, be patient with us, but there will also

10    be -- we'll ask you to take a look at -- pay attention to

11    the video, because as we said, it's going to be on an

12    aircraft, there's going to be clouds breaking in, there's

13    going to be a lot of moving around as the airplane was

14    circling, but you'll see the information that you need.

15         First you're going to see the go-fast vessel, as

16    we said, painted black, a large tarp covering over the top

17    of the vessel, covering up what's inside, okay?  When you

18    first see the vessel, it's speeding north.  As we said, they

19    were coming from Colombia, they had a destination, but as

20    you continue to see, the boat comes to a slow, then there's

21    a flurry of movement underneath the tarp.  The defendant and

22    his crew are trying to scramble to make a new plan.  What

23    are they going to do?  They have detected that the airplane

24    is above them.

25         Now, you'll see these multiple people on the

1   vessel moving around, including the defendant, and he's

2   going to be distinct and distinguishable from the other

3   members of the crew because he's wearing a bright white

4   shirt.  Pay attention to that, the heavyset man in the white

5   shirt who is moving about the vessel.  Pay attention to what

6   actions you see him taking on that video.

7          So as I said, there's a flurry of movement under

8   the tarp.  What do we see next?  We see splash over the side

9   of the vessel, splash over the side of the vessel.  They're

10  throwing the packages of contraband over the vessel and you

11  see it there, big white blocks splashing into the water and

12  then floating right there like ice cubes in a drink.  You'll

13  see there's one line of these blocks and then two lines of

14  these blocks.  Now, what they've done is they're tying the

15  cocaine bales together so that they can then sink them,

16  okay?  So they have a line of 15 to 17 different very square

17  uniform blocks, and you'll see that the lines start to go

18  pulling back to the back of the vessel, because that's where

19  the engines are, we stated.

20         Now, while all of this is going on, the crew

21  members are moving back and forth, you're going to see that

22  white T-shirt like a sore thumb sticking out.  You're going

23  to see him as he stands by the helm, you're going to see him

24  as he moves back to the engines, and especially look for him

25  when he reaches over the boat into the water to grab one of

1    those bales of cocaine.  That will be on the video.

2           After getting the first line together, you will

3    see that it moves to the back of -- by the engines, and then

4    you'll see the boat circling around, these ice cubes in the

5    water, these packages of cocaine.  At that point you have a

6    line of -- you have a line full of packages, and then notice

7    on the vessel, there's only one engine.  Where did that

8    other engine go?  It went down with the cocaine.  You'll see

9    that they have difficulty navigating in the water because

10   there are strong waves and they've only got that one engine.

11          Then we go to the second line.  You'll see that

12   as, again, it is sinking to the bottom, and the boat now has

13   no engines.

14          Now, this is pretty incredible.  This is a boat

15   with four individuals, now no engines, 100 nautical miles

16   south from the closest landmass, being Jamaica.  They wait

17   and they wait in the ocean, no way to move through it, until

18   the boarding team shows up, the Coast Guard boarding team.

19          Some of the boarding team members will tell you

20   that this interdiction stuck out in their minds because on

21   this patrol, this was the only interdiction that they had,

22   okay?  They're going to tell you that they got the message

23   from the airplane and this vessel matched the position and

24   it matched the description of all the information that they

25   received from those pilots.  The only difference, as we

1    said, two engines missing, and now that tarp that had been

2    used to cover over everything was drawn back.  There was

3    nothing left to hide under there.

4           Now, something they'll also tell you is when they

5    arrived, these four men who had been drifting far from any

6    land, they weren't happy to see them, and you'll actually be

7    able to see in one of the photos we have just the reaction

8    and appearance that these men had, and specifically the

9    defendant.  They weren't happy to see them.  The Coast Guard

10   never got any distress calls, and there on the vessel there

11   was still multiple unused flares that weren't sent up when

12   the airplane was there and weren't sent up as the

13   Coast Guard vessel approached.

14          You're also going to hear from Petty Officer

15   Rivera.  Now, he's the Spanish interpreter.  He's the one

16   who was communicating -- interpreting and communicating for

17   the rest of the crew, asking questions of the defendant and

18   his co-conspirators.

19          One of the typical things the Coast Guard does

20   when we do any boarding, whether it's a search and rescue or

21   any other type, we're going to ask them, hey, what are you

22   doing out here on the water?  The defendant and his men

23   said, oh, we're fishing, we're out here to get some

24   mahi mahi.  Well, then they changed it.  Oh, no, no, not

25   mahi mahi, we're here for some conch.

1           When Petty officer Rivera said, okay, well, where
2    is the conch?  Oh.  Oh.  We threw it overboard when we saw
3    the Coast Guard airplane because we know that we shouldn't
4    be fishing for that.

5           Then the next question from Petty Officer Rivera,
6    okay, you're SCUBA driving -- you said that you're SCUBA
7    diving out here for some conch.  Where is your SCUBA
8    equipment?  Oh, we didn't mean SCUBA driving, we meant
9    snorkeling.  There was no SCUBA diving equipment, there was
10   no conch on board, there was no ice on board, there was
11   nothing that you would think would logically be on board for
12   any sort of fishing vessel.

13          The defendant and his co-conspirators also stated
14   that they had been drifting out in that water for six days.
15   They said that they ran out of fuel and that they decided to
16   throw their engines overboard and use them as anchors.
17   Engines as anchors.

18          So there on the vessel the Coast Guard boarding
19   team already had information from the airplane, they had the
20   stories that didn't match, and then they thought, okay, what
21   to do now?  Let's look at the evidence we can collect.

22          You'll hear from one of the other Coast Guard team
23   members, a Petty Officer Perio.  Petty Officer Perio was
24   there because he was going to collect what we call
25   ion scans.  Ion scans might be something that you're

1   familiar with from going through the airport.  It's

2   essentially thin white paper or swabs that they use to wipe

3   on a particular area to pick up traces of cocaine or other

4   controlled substances.

5          Petty Officer Perio, working with the boarding

6   team, they went to the places where -- they said, "Where can

7   we find the evidence?"  They went to the center hold of the

8   vessel.  You'll see in the picture where that is.  They

9   wiped the ion swab to see what there was there.  They went

10  to the rails of the vessel to see what could be there.

11  Members, all of those scans came back positive for cocaine.

12         At this point the boarding team moved the

13  defendant and his co-conspirators onto their vessel.  They

14  then went to ask the defendant for him to be scanned,

15  because the thing with cocaine, it stays with you, it stays

16  on, it's very hard to get off, so again they used that same

17  ion scan procedure and they swabbed the hands and then the

18  forearms, here.  Members, again, they came back positive for

19  cocaine, and you'll see those tests, you'll see the results

20  that have cocaine on the forearm and cocaine on the hands.

21         Additionally, you'll hear about the boarding

22  team's process in preparation of this, that they actually

23  scan themselves ahead of time to make sure that they're not

24  bringing about any false positives, that they are very

25  processed and procedured as they go through this to ensure

1    that when they have their positives they can be linked to

2    the defendant.

3            Now, we understand that for many of you this might

4    be the first in-depth conversation you've had about cocaine,

5    not familiar with the world of drug smuggling, even less

6    familiar with the world of maritime drug smuggling, so we

7    have for you Agent Steven Ray.  He's going to come in and

8    he's going to give you kind of a drug smuggling 101, the

9    inside scoop on cocaine, how it's manufactured, how it's

10   processed, how it's distributed, transported and smuggled.

11   He's going to tell you about the routes that they take, the

12   vessels that they use.  He's going to be able to give

13   greater context to the evidence that you have before you.

14   He's going to be able to tell you why that evidence is so

15   typical of any drug smuggling boat that comes in.

16           Another person that you're going to hear from is

17   Alfredo Caceres-Lopez.  You're going to hear from Mr. Lopez

18   that he met the defendant here in Tampa at the

19   Pinellas County Jail, that they were housed in nearby cells,

20   that they became familiar with each other, they found out

21   they were from the same town -- or similar towns in

22   Colombia.  They found out they both spoke Spanish.  There,

23   alone, away from home, away from family, there was some

24   commonality, and they engaged, like many of you have, I'm

25   sure, with your colleagues about shop talk.  Oh, you were

smuggling?  Were you smuggling?  Oh, we know some of the same people.

During this time the defendant came to confide in Mr. Caceres-Lopez, and he told him about everything that happened leading up to his arrest.  He told him that, yeah, I was the captain of the vessel.  The defendant told him, yeah, my other crew were two Colombians and a Belizean. Yeah, we threw the drugs over the side of the boat when we saw the airplane, and that -- again, the most significant thing, we used our engines to sink the cocaine.

But that's not the only person that you'll hear from who spoke with the defendant.  You're also going to hear from Special Agent Karen McAllister.  She sat down with the defendant after he was picked up by the Coast Guard. She showed him some of the same videos that you're going to watch here in this case, and after watching that video and after she explained to him that she wanted to talk to him about drug smuggling, the defendant said, I'm the captain, I'm the captain, I know more than all the other guys about this, I'm the captain, repeatedly.

At the end of this trial you're going to see that as you go through the evidence and you listen to the testimony, that when my colleague, Nicholas DeRenzo, comes before you and asks you apply your common sense and your knowledge of the law and the evidence, that the only logical

1  conclusion is that there is only one verdict consistent with

2  the evidence and that is guilty on both counts.

3          Thank you.

4          THE COURT:  Mr. Hernandez.

5          MR. HERNANDEZ:  Thank you, Your Honor.  May it

6  please the Court, Counsel.

7          As the Judge has already indicated, everything

8  that is said during opening statements is not evidence, so

9  everything that I say is not evidence, but certainly

10 everything that you've just heard the Government say is not

11 evidence.  What the purpose is is to give you an outline of

12 what we believe the evidence is going to show, and, for that

13 matter, what the evidence is not going to show.

14         Please, always keep in mind, as you've already

15 been told, that as you listen carefully to the evidence, the

16 testimony, the documents, always remember that the

17 Government has the entire burden of proof and that the

18 defendant has absolutely zero burden of proof.

19         I believe the evidence is going to show that the

20 defendant, Emiro Hinestroza-Newbbooll, is not guilty.

21         This is a drug case without drugs.  The Government

22 is alleging that the defendant possessed cocaine in an

23 amount of over 5 kilos of cocaine with intent to distribute.

24 I believe the evidence is going to show that there is no

25 proof he possessed any cocaine other than this ion scan test

1    for traces that you've already heard about, and I believe
2    you're going to determine that this testing has serious
3    limitations.
4            The expert witness that the Government will
5    present, I believe -- and they can call whoever they wish to
6    call, but I have a general idea of what they're going to
7    present.  I believe he will testify that the actual quantity
8    of the swabs is destroyed in the process of testing and
9    there is no even alleged cocaine remaining, not even traces,
10   as they've indicated.  The only alleged evidence of cocaine
11   was microscopic, not visible to the naked eye, and you will
12   hear in the course of the testimony, both direct and
13   cross-examination, you will hear about such things as
14   contamination, about how someone can get a trace to them
15   because it's microscopic and not visible to the naked eye,
16   how someone can get a trace to them without even knowing
17   about it.  You'll hear, I believe, during the questioning of
18   the witnesses how this affects knowledge, as to whether or
19   not someone is knowingly possessing cocaine, even if it's a
20   microscopic amount.
21           I believe the evidence will not show any proof or
22   will show no proof that the amount was -- what the amount
23   was or much less any amount over 5 kilograms of cocaine, and
24   I believe that you will not see or hear any evidence of
25   intent to distribute cocaine.

1          The defendant, Emiro Hinestroza-Newbbooll, along

2     with the other mariners, was detained, was aboard a fishing

3     vessel, as determined or found by the Coast Guard.  The

4     video that you've heard about, I believe, that shows the

5     jettisoning of some cargo also has serious limitations.

6     It's up to you to determine what it actually shows and what

7     it actually proves and what it does not show and what it

8     does not prove.  Please keep in mind you are not to

9     speculate.  If the Government is suggesting, well, that

10    means this, it's up to you to determine what it actually

11    shows and what it does not show, but please refrain from

12    speculating simply because that's something that the

13    Government is suggesting.

14          You've also heard about this Mr. Lopez,

15    Caceres-Lopez, that will testify.  He is what sometimes can

16    be refer to as a jailhouse informant.  You will determine --

17    and you as the jury are the judge of the facts.  The Judge

18    is the one that tells you what the law is and what to apply,

19    but are you the judge of the facts.  You will have an

20    opportunity to listen to whatever he has to say, and it's --

21    but you as the judge of the facts have every right to accept

22    or reject his testimony.

23          I suggest to you that I believe the evidence is

24    going to show that Mr. Caceres-Lopez has serious credibility

25    problems.  He has a monstrous motive to lie, because you

1  will hear in the course of questioning that he is a

2  convicted felon now, he has been sentenced to 240 months,

3  20 years in prison, and he has an opportunity to reduce his

4  sentence, and that is through something that you'll hear

5  about called a Rule 35.  A Rule 35 is a Federal rule that --

6  and you will hear this in the course of the questioning --

7  is a rule that only the Government can file this motion.

8  For Mr. Lopez -- or Caceres-Lopez to get a reduction of

9  sentence, the Government has to file this motion.  So he

10  knows that he can say a lot of things, things that cannot be

11  verified one way or the other, but if he says something that

12  pleases the Government, his motivation is to please the

13  Government, because he wants them to file a motion that

14  could result in a reduction of sentence.

15          Again, it's up to you to judge him, but I wanted

16  to give you an idea of what to expect from the testimony of

17  Mr. Caceres-Lopez.

18          Ladies and gentlemen, I ask that you keep an open

19  mind during the course of the entire trial, the presentation

20  of the evidence, but also keep in mind:  What is this

21  showing me?  The video is a perfect example.  What is this

22  actually showing me, but also what is it not showing me?

23  And I'm not going to speculate if it's not showing me

24  something one way or the other.

25          I believe if you do that, ladies and gentlemen,

1  there will be an abundance of reasonable doubt and that the

2  only just verdicts in this case are verdicts of not guilty.

3          Thank you.

4          THE COURT:  Mr. DeRenzo, you may call your first

5  witness.

6          MR. DERENZO:  Thank you, Your Honor.  The

7  United States calls Lieutenant Commander Thomas Humphrey,

8  U.S. Coast Guard.

9   *(Lieutenant Commander Thomas Humphrey enters proceedings.)*

10          COURTROOM DEPUTY:  Please raise your right hand.

11          Do you solemnly swear or affirm, under penalty of

12  perjury, that the testimony you're about to give will be the

13  truth, the whole truth and nothing but the truth?

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  Please state your full name for

16  the record and spell your last name.

17          THE WITNESS:  Lieutenant Commander Thomas

18  Humphrey, last name H-U-M-P-H-R-E-Y.

19          COURTROOM DEPUTY:  Thank you, sir.  You may take

20  the witness stand.

21          MR. DERENZO:  May I inquire, Your Honor?

22          THE COURT:  Yes, you may.  I was just checking to

23  make sure my real-time is still up.

24          Yes.  Thank you.  Go ahead.

25          MR. DERENZO:  Good afternoon, sir.

1          THE WITNESS:  Hello.

2      **DIRECT EXAMINATION OF LT. COMMANDER THOMAS HUMPHREY**

3   **BY MR. DERENZO:**

4   Q    I see you're in a uniform here this afternoon.  Where

5   do you work?

6   A    I am a flight instructor at the aviation training

7   center in Elizabeth City, North Carolina.

8   Q    Is that with the Coast Guard?

9   A    That is with the Coast Guard.

10  Q    How long have you been working for the Coast Guard?

11  A    A little over 20 years.

12  Q    And could you just summarize for the jury here this

13  afternoon your Coast Guard career.

14  A    Sure.  I was enlisted in January 2000, drove rescue and

15  pursuit boats during my enlistment, three different tours in

16  Alaska, South Texas and California.  I was selected to

17  officer candidate school and flight school in 2007 and have

18  been flying C-130s and T-6s for the last 12 years.

19  Q    And how did you become qualified to become a pilot on a

20  C-130?

21  A    All pilots go through flight training in Pensacola,

22  Florida, do about eight months there in a single engine and

23  then later transition to a King Air multi-engine down in

24  South Texas.  From there went to Elizabeth City,

25  North Carolina at the air station, got qualified as a

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020  174
Direct Examination by Mr. DeRenzo

1   co-pilot, spent four and a half years there, worked up to

2   aircraft commander; after that went to an instructor tour

3   at -- back at Pensacola to be a flight instructor, and then

4   came back as a flight instructor in Elizabeth City, teaching

5   all the new C-130 pilots.

6   Q    What's an aircraft commander?

7   A    Aircraft commander is the person in charge of all the

8   missions, worldwide missions for the crew of usually seven

9   or more people on the aircraft.

10  Q    So basically you're in charge of the plane?

11  A    Yes, sir.

12  Q    You mentioned flight instructor.  What is that?

13  A    After aircraft commander of so many years you get

14  qualified as an instructor pilot.  To become an instructor

15  pilot you teach all the new copilots and first pilots their

16  syllabus to upgrade to their next level, and then after that

17  they need a check ride, which is done by a flight examiner,

18  which I've been a flight examiner for three years, so we

19  give them their final check to sign them off as either

20  aircraft commander, first pilot or copilot.

21  Q    So physically you're currently assigned in

22  North Carolina; is that right?

23  A    Correct.

24  Q    What is your actual unit?

25  A    My unit is aviation training center for the C-130J

1    training division in Mobile, we're detached and we stay up

2    in Elizabeth City, because that's where we have our planes,

3    but we work closely with -- the air station, the operational

4    unit and us work, coincide together.

5    Q    And what are your day-to-day duties in North Carolina?

6    A    Mainly teaching new students how to fly.  I will do

7    standardization for all the operational units, and then

8    I work with the operational unit doing standing duty,

9    24 hours on call duty as well as deployments whenever they

10   need somebody.

11   Q    Does that include flying on C-130s?

12   A    It does.

13   Q    And you mentioned deployments.  Where do you deploy in

14   your current duties?

15   A    Currently we'll deploy to St. John's, Newfoundland for

16   ice surveillance and down to Central and South America --

17   Central and South America for counter-narcotics.

18   Q    In addition to those two missions you just mentioned,

19   what other missions do you support as a C-130 pilot?

20   A    We do a lot of long range roamings on call, so long

21   range search and rescue is one of our primary missions,

22   especially stuff where the helicopters can't get out to,

23   we'll go out, drop life rafts, radio cans, seawater pumps to

24   vessels in distress, that, cargo and -- hauling persons,

25   cargo for hurricane response, or just any logistics type

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 176
Direct Examination by Mr. DeRenzo

1   missions they have.

2   Q    When you're on a counter-narcotics patrol, what is the

3   role of a C-130 aircraft?

4   A    Main role is surveillance and communications back to

5   our tactical commanders.

6   Q    Are you familiar with the term "covert"?

7   A    Yes.

8   Q    What does that mean to you as a C-130 pilot?

9   A    Covert means we try to stay where we can't be detected

10  by surface assets.

11  Q    In layman's terms, what do you mean by a surface asset?

12  A    Any boats.  We try to stay out of sight from any boats.

13  Q    Let's talk about boats for a minute.  When you're on

14  one of these counter-drug patrols as an aircrew member, what

15  are you looking for?

16  A    Our main mission is looking for drug smuggling

17  operations, so there's certain -- depending on where we're

18  at, there's certain boat types that we're looking for,

19  one is mainly a panga, which is an open hull thirty-ish foot

20  boat or so, center console, two to four engines on it, and

21  depending on the mission we might be looking for a fishing

22  vessel that might be out of place as well.

23  Q    Are there any particular geographic locations that you

24  generally patrol when you're on one of these deployments?

25  A    Yes.  We'll patrol the Eastern Pacific and the

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020  177
Direct Examination by Mr. DeRenzo

1    Caribbean, mainly from South America up to Mexico and the

2    U.S. and Caribbean islands.

3    Q    Why those two areas specifically?

4    A    That's generally the traffic pattern of narcotics

5    coming from South America up north.

6    Q    Okay.  Now, you mentioned some potential vessels that

7    you're used to spotting or looking for.  If you see a vessel

8    like that on one of these patrols, what do you do as an

9    aircraft commander?

10   A    We'll take imagery of it, record its position, record

11   anything we see of it, pass that information off to our

12   tactical commanders who then will relay back to us if they

13   want us to continue on or provide further action on the

14   target.

15   Q    In the event -- well, let me ask you this, what kind of

16   information are you passing?

17   A    Everything visually we can see with the vessel, the

18   location, the speed, description, number of people on board,

19   number of engines it might have, its direction, its heading,

20   and if it's loitering or actually heading somewhere.

21   Q    Let's talk about a deployment in 2018.  Were you

22   deployed as a member of an aircrew in December of 2018?

23   A    I was.  I was on -- the aircraft commander for a seven

24   or eight man crew that ended on -- it was 12 days, it ended

25   on December 4th.

1    Q    And what was your role?

2    A    I was the aircraft commander on that mission.

3    Q    Who else was with you?

4    A    We had a crew of eight, including my mission system

5    operator, Petty Officer Brandon Hickinson.

6    Q    What kind of aircraft were you flying?

7    A    We were flying a C-130J Hercules.

8              MR. DERENZO:  May I approach the witness,

9    Your Honor?

10             THE COURT:  You may.

11   BY MR. DERENZO:

12   Q    Lieutenant Commander Humphrey, I've just handed you

13   what's been marked as Government's Exhibit 1 for

14   identification.  Do you recognize those documents?

15   A    I do.

16   Q    How do you recognize it?

17   A    This is one of the aircraft that I fly.

18   Q    How many times have you flown it, approximately?

19   A    Hundreds.

20   Q    Is there any difference between Government's Exhibit 1

21   for identification and the aircraft you were flying on that

22   December patrol of 2018?

23   A    No, the aircraft -- or the Coast Guard has 13 C-130Js

24   and they're all identical.

25   Q    Is Government's Exhibit 1 for identification a fair and

1  accurate depiction of the C-130 aircraft -- the exterior of

2  the C-130 aircraft that you were -- that is, the same model

3  as the aircraft you were flying in December 2018?

4  A    Yes, this is the exact same thing I was flying.

5  Q    Any differences between those two aircraft?

6  A    Just the number on the side, one digit.

7            MR. DERENZO:  Thank you.

8            At this time, Your Honor, I move to admit

9  Government's Exhibit 1.

10            MR. HERNANDEZ:  No objection.

11            THE COURT:  Receive into evidence 1.

12            MR. DERENZO:  Let's publish 1.

13            THE COURT:  Can I get you to dim the lights.

14            COURTROOM DEPUTY:  I'm sorry, Judge?

15            THE COURT:  You'll need to dim the lights so they

16  can see it.

17  BY MR. DERENZO:

18  Q    Sir, in that screen to your right you should see

19  Government's Exhibit 1 displayed, and could you just explain

20  for the jury what we're looking at here.

21  A    Sure.  This is a C-130J Super Hercules that the

22  Coast Guard has.  We currently have about six of them at

23  Air Station Elizabeth City and five up in Kodiak, which we

24  recently just stood up.  As you can see, it's a four engine.

25  Each engine is about 4700-horsepower, so it has a much --

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 180
Direct Examination by Mr. DeRenzo

 1  upgraded from the old H models you guys are used to seeing.

 2  That black thing on the very bottom of it is our multi-mode

 3  radar, it's a 360 degree surface radar.

 4  Q    Sir, let me stop you right there.

 5       Could you circle on the screen in front of you

 6  what you're referring to.

 7  A    Sure.  This guy right here.

 8  Q    Okay.  And could you tell the jury about the paint

 9  scheme of that aircraft.

10  A    Say the question again.

11  Q    The paint scheme on the aircraft.

12  A    Oh, the paint scheme?  White and orange, obviously.

13  Since our main mission is search and rescue, we try to be as

14  visible as we can for anybody to see us, that way they

15  can -- once they do see us, they can shoot flares, signaling

16  device, mirrors, wave, whatever, smoke flare, or sea dye we

17  can mark their position with.  So orange and red -- or,

18  excuse me, orange and white and a little bit of black.

19  Q    Is there -- you mentioned imagery.  How do you get

20  imagery from this aircraft?

21  A    So one -- mainly -- the main imagery comes from -- we

22  have a camera mounted right here, underneath the nose, it's

23  a camera that can spin all the way, 360 degrees, look in

24  most all directions except very high angles up, but usually

25  what we're looking for is down anyway.

1        So, yeah, it can link up to our radar, so if we
2   have a radar target, it will lock onto that so we can see
3   what we're looking at.
4   Q    You mentioned that this aircraft has four engines.
5   I assume you've been around these aircraft many times when
6   they are -- when the engines are running, right?
7   A    Yeah, it's an extremely loud aircraft.
8   Q    Okay.  And let's talk about where you were at.
9        On this December 2018 deployment, what geographic
10  region were you patrolling?
11  A    We were patrolling the Caribe.
12  Q    What do you mean by "Caribe"?
13  A    A position from kind of south of Colombia, Venezuela,
14  the upper side of South America, up to Jamaica and Cuba,
15  that general area up there.
16  Q    In the Caribbean Sea?
17  A    Yes.
18  Q    At any point during the patrol did you see any
19  suspicious vessels like the ones you were referencing
20  before?
21  A    Yes, we saw two vessels that matched a similar
22  description of the panga, is what we look for.  We reported
23  both of those back, witnessed one, took down the report,
24  passed it over to our agency and then shortly after had
25  another one on our radar, ran over to that one, took imagery

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 182
Direct Examination by Mr. DeRenzo

 1  of it and stayed on scene with that one.
 2  Q    So let's talk about the first boat that you saw.  Can
 3  you describe that boat for the jury.
 4  A    They're very similar ones.  A blue -- blue panga with
 5  I think it was two outboards on it meandering in kind of one
 6  area, and the second one was a reddish color that looked
 7  a little different, but still same -- same boat shape.
 8  Q    What if any action did you take with respect to the
 9  first boat?
10  A    What we usually do with all of them, took pictures,
11  took imagery, record the position, record all the
12  information we could fill out for it and sent that back up
13  to our TacCom.
14  Q    How long did you stay on scene with that vessel?
15  A    I don't recall.  Probably 15 minutes or so.
16  Q    What happened after you report that information to your
17  tactical commanders?
18  A    We pass that on, wait for further tasking, and that's
19  when we got another target on radar that we decided to go
20  check out too, so we flew over to that other one.
21  Q    And after you saw -- or spotted that second vessel,
22  what action did you take?
23  A    Same as the first, try to stay covert as much as
24  possible, but we were flying relatively lower than we would
25  like to just due to cloud layers and got it on imagery,

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 183
Direct Examination by Mr. DeRenzo

1    started recording it and noting any factors we could and

2    report that back, description, speed, which way it was

3    headed, what the cargo, if any, was on board.

4    Q    And how long did you stay on scene with that vessel?

5    A    We were on scene with that one for several hours.

6    Q    Do you recall approximately what altitude you were

7    flying at when you spotted the second vessel?

8    A    Around 6500 feet.

9    Q    Okay.  And approximately what was the location where

10   you initially spotted this second vessel?

11   A    Approximately, if I can remember, about 60 miles

12   Southwest of Jamaica.

13   Q    And are you familiar with the term "international

14   waters"?

15   A    Yes.

16   Q    When you spotted that vessel, was it in international

17   waters?

18   A    Yes.

19   Q    Which direction was the vessel headed?

20   A    At the time we spotted it, it was heading northeast.

21   Q    Towards what country?

22   A    Towards Jamaica.

23   Q    That would be away from Colombia?

24   A    Correct.

25   Q    And once you actually got the -- spotted it, what

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 184
Direct Examination by Mr. DeRenzo

1  actions did you take as the pilot?

2  A    As the pilot we, you know, mark all that down, mark the

3  location, its initial direction, where it was going, any

4  other data we can find out on it, and stayed on scene.

5  Q    You say "stayed on scene."  Physically what did you do

6  in the aircraft?

7  A    We start orbiting, set up an orbit, try to stay within

8  distance where we, you know, have a somewhat better chance

9  of not being seen, but with the cloud layer we had to come

10  in a little closer, but we try to keep the camera on it so

11  we can get good data, good imagery on it.

12  Q    And during the time that you're on scene in this orbit,

13  how are you able to maintain either instrument or visible --

14  how are you able to make sure you maintain the location of

15  this boat?

16  A    Three ways, really.  One is just visually with us in

17  the aircraft looking out the window at it.  A second is

18  using our camera.  The camera has several different modes on

19  it where we can switch from IR, or what we call TV mode,

20  which is just kind of a normal camera lens through it, as

21  well as our radar.  Once our radar gets a lock on it, we can

22  maintain that position over the target.

23  Q    During the entire time that you're on scene with the

24  second boat we're talking about, did you ever lose track of

25  it in any way?

1    A    No.

2    Q    Did you note either visually by, as you put it, looking

3    out the window or on your display in front of you, did you

4    note any activity, any suspicious activity during your time

5    on scene with the second vessel?

6    A    Yes.

7    Q    What was that?

8    A    During our time reporting its position and relative

9    speed and course, shortly after that we began to observe

10   white packages coming out of the side of it in large groups.

11   Q    And how long did that activity last?

12   A    Quite a while.  I would say 45 minutes to maybe an hour

13   and a half, somewhere in that range.

14   Q    And during the entire time that -- the events you're

15   describing now, were you still in that same orbit around

16   this vessel?

17   A    Yes, sir.

18   Q    When you observed this jettison of packages, what did

19   you do as the aircraft commander?

20   A    One, made sure that we were getting -- getting all the

21   data we could, so recording it, marking its position,

22   marking the position of these objects, passing it on to

23   tactical commanders, and then there was a boat in the area

24   that had a Coast Guard LEDET team on that we passed the word

25   to as well.

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 186
Direct Examination by Mr. DeRenzo

1  Q    So how frequently did you provide these updates about
2  what's happening on scene and the location of the boat?
3  A    Every 10 to 20 minutes, I would say, to the boat and to
4  the tactical commanders.
5  Q    And why would you pass that information to the surface
6  asset?
7  A    One, it matched the description of jettisoning packages
8  if it was narcotics.  With the boat description, the area it
9  was in and the -- and the objects in the water, we can't go
10 down there, you know, we can't get close enough to I.D. what
11 that is, so we want to get the surface asset to come in and
12 I.D. that.
13 Q    You mentioned that you initially saw the boat moving
14 when you first spotted it.
15 A    Yes.
16 Q    Did you at any point after that see the boat moving?
17 A    Yes.  Yeah, the boat would continue to maneuver around,
18 but stayed in somewhat of a general area, but would
19 constantly maneuver around these packages.
20 Q    Did it appear like the vessel was moving in any
21 particular direction, towards Jamaica, back towards
22 Colombia?
23 A    Its general direction -- when we first saw it, it was
24 definitely heading towards Jamaica, but after that it was
25 just kind of loitering in the same area, just maneuvering

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 187
Direct Examination by Mr. DeRenzo

1  around.

2  Q    You mentioned that one of the missions of the

3  Coast Guard is search and rescue --

4  A    Yes.

5  Q    -- is that right?

6         Have you been on search and rescue cases as a

7  pilot?

8  A    Several.

9  Q    What are the radio frequencies that you monitor on a

10 Coast Guard airplane for a search and rescue call?

11 A    There's three main frequencies we monitor, one is a

12 EPIRB frequency, it's a satellite 406, another is an

13 aviation frequency of 123 -- or 121.5 or 243 uniform, and

14 the main -- the Maritime -- International Maritime Frequency

15 is channel 16.

16 Q    Why monitor channel 16?

17 A    Well, we're out in the ocean, so all the boats are out

18 there, and so any distress comes up, chances are it's going

19 to be coming over channel 16.

20 Q    Is that true whether you're in the Caribbean Sea or the

21 Indian Ocean?

22 A    Yeah, it's the international hailing and distress

23 frequency.

24 Q    During your patrol in December of 2018 when you're

25 circling this boat, did you hear any calls over channel 16

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020  188
Direct Examination by Mr. DeRenzo

1   asking for help?

2   A    No calls.

3   Q    When you're on a search and rescue mission, are you

4   trained to look out for visual distress signals?

5   A    Yes.

6   Q    And what are some of the things you've been trained to

7   look out for as a C-130 pilot?

8   A    Several things, and I've seen them personally, people

9   waving hands, waving clothing, flares, smoke, sea dye

10  markers, mirrors, whistle, anything like that.

11  Q    During your entire time on scene orbiting this vessel

12  did you see any visual distress signals?

13  A    No, no visual distress signals.

14  Q    When -- approximately when did you actually depart?

15  A    It was several hours later, towards -- I think right

16  after sunset.

17  Q    Why?

18  A    We were running low on fuel.

19  Q    What did you do before you departed the scene?

20  A    We continued to monitor as we departed, passing its

21  position to the cutter with the Coast Guard Law Enforcement

22  Detachment on it.  We continued to monitor it as we went,

23  kind of still vectored in the boat to that target.

24  Q    Do you recall if you passed the last known position

25  before you departed the scene to that vessel?

LT. COMMANDER THOMAS HUMPHREY - JANUARY 27, 2020 189
Direct Examination by Mr. DeRenzo

1    A    Yes.

2    Q    Did you send any imagery that you recall of the vessel

3    that you spotted?

4    A    We did.  Sent a few pictures back to our tactical

5    commanders.

6    Q    To the best of your knowledge, were you able to record

7    the second vessel that you were on scene with the entire

8    time?

9    A    We recorded, yes, the entire time.

10   Q    At any point did you look for those packages that you

11   saw being thrown overboard?

12   A    Yes, we continued to monitor them, later lost sight of

13   them, especially due to the darkness and some cloud cover,

14   but later came back out the next day to try to locate them.

15   Q    What if anything did you find?

16   A    Didn't find anything.

17            MR. DERENZO:  May I have just a moment,

18   Your Honor?

19            THE COURT:  You may.

20            MR. DERENZO:  Tender the witness, Your Honor.

21            THE COURT:  All right.  Mr. Hernandez.

22            MR. HERNANDEZ:  Good afternoon.

23            THE WITNESS:  Sir.

24

25

1    **CROSS-EXAMINATION OF LT. COMMANDER THOMAS HUMPHREY**

2   **BY MR. HERNANDEZ:**

3   Q    How far did you say you were flying when you were doing

4   this surveillance?

5   A    How far away from the boat?

6   Q    How far up?

7   A    We were about 6500 feet.

8   Q    And how many miles would that be?

9   A    How many miles?

10  Q    Yes.

11  A    Slant range -- so we're up 6500 feet, it's about

12  a little over a mile.

13  Q    Okay.  So you yourself were not able to see anything up

14  close; would that be an accurate statement?

15  A    Yes.

16  Q    And you said you saw that something, some package or

17  packages were being tossed.

18  A    Yes.

19  Q    Would it be correct to say that you never actually saw

20  any of these packages or cargo up close?

21  A    Not up close, no.

22  Q    Okay.  And obviously being that far away, you're not --

23  you had no way of determining what was being said by the

24  people in the boat, correct?

25  A    Correct.  Yeah, we can't hear anything on the boat.

1   Q    And you wouldn't have any -- by these observations,

2   have no idea of how the people on the vessel ended up on the

3   vessel, correct?

4   A    I don't know how they got on the vessel, no.

5   Q    And from what was being observed, was it being observed

6   by you by the naked eye or with the -- some type of

7   equipment?

8   A    Some with the naked eye, we could look down and see a

9   string of white objects in the water, and then on camera,

10  our camera operators sit behind us, they have two screens,

11  and then up front for the pilots, we have a screen up in

12  front of us that mirrors whatever they have, and then the

13  camera they can zoom in and get good looks on the boat, the

14  people and the objects.

15  Q    Now, are you -- did you personally prepare a report?

16  A    No, I did not.

17  Q    Okay.  So you're relying on your memory?

18  A    Yes.

19  Q    Okay.  And did you determine whether or not there was

20  any distress equipment on board?

21  A    From that altitude and from the video of the boat

22  zoomed in, we didn't see any distress equipment on the boat.

23  Q    Did not?

24  A    Did not, no.

25           MR. HERNANDEZ:  Thank you.

 1            THE COURT:  Mr. DeRenzo, any redirect?

 2            MR. DERENZO:  No, Your Honor.

 3            THE COURT:  Thank you, sir.  You may step down.

 4            THE WITNESS:  Thank you, Your Honor.

 5            THE COURT:  You may call your next witness.

 6            MR. DERENZO:  The United States calls Petty

 7   Officer Brandon Dickinson, U.S. Coast Guard.

 8      *(Petty Officer Brandon Dickinson enters proceedings.)*

 9            THE COURT:  Sir, if you'll come forward to be

10   sworn.

11            COURTROOM DEPUTY:  Please raise your right hand.

12            Do you solemnly swear or affirm, under penalty of

13   perjury, that the testimony you're about to give will be the

14   truth, the whole truth and nothing but the truth?

15            THE WITNESS:  I do.

16            COURTROOM DEPUTY:  Please state your name for the

17   record and spell your last name.

18            THE WITNESS:  Brandon Dickinson,

19   D-I-C-K-I-N-S-O-N.

20            COURTROOM DEPUTY:  Thank you, sir.  You may take

21   the witness stand.

22            THE COURT:  Mr. DeRenzo.

23            MR. DERENZO:  Thank you, Your Honor.

24            Good afternoon, Petty Officer Dickinson.

25            THE WITNESS:  Good afternoon.

1       **DIRECT EXAMINATION OF PETTY OFFICER BRANDON DICKINSON**

2   **BY MR. DERENZO:**

3   Q     What do you do for a living?

4   A     I am in the United States Coast Guard.  I'm an avionics

5   electrical technician.

6   Q     How long have you been in the Coast Guard?

7   A     I've been in the Coast Guard a little over five years,

8   almost six years now.

9   Q     Have you been in aviation the entire time?

10  A     No.  I've been in aviation going on almost four years

11  now.

12  Q     And what is the particular job you have in aviation?

13  A     The particular job I have is I work on the electrical

14  components of the C-130 fixed wing aircraft.

15  Q     How did you get qualified to do that job?

16  A     I got qualified to do this job by going to what we call

17  A School, which is a six month school in which I pick up all

18  the skills I need to do the job that I do.

19  Q     And where are you currently assigned now?

20  A     I'm currently at Air Station Elizabeth City,

21  North Carolina.

22  Q     How long have you been there?

23  A     I've been there almost four years.

24  Q     And what are your day-to-day responsibilities at the

25  air station?

1  A    My duties involve holding a crew member position on the

2  C-130 as well as maintaining the C-130 and its electrical

3  components.

4  Q    Does that mean when the C-130s fly, you also fly?

5  A    Yes, sir.

6  Q    And what do you do when the aircraft is flying?

7  A    When the aircraft is flying I hold a position called

8  mission system operator.

9  Q    And what is that job?

10  A    So mission system operator, we assist the pilots by

11  operating the radar, the radios and the camera.  Depending

12  on what job we're doing, that mission will change.

13  Q    And physically where do you do that job in the

14  aircraft?

15  A    I do it on the flight deck of the aircraft, so we are

16  seated behind the pilots.

17  Q    So during a flight on a C-130 are you able to

18  communicate fluidly with the pilots?

19  A    Yes, sir.

20  Q    At the air station where you're currently assigned, do

21  you do any deployments?

22  A    I do.

23  Q    What kind?

24  A    I do JIATF deployments down south, drug interdiction

25  deployments, as well as ICE patrols.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     195
Direct Examination by Mr. DeRenzo

1  Q    And what's the role of the missions systems operator in

2  a drug patrol?

3  A    Our role is going to be, like I stated before,

4  operating the radar, the camera and radios, and this will be

5  for suspicious vessel detection.

6  Q    What kind of tools or instruments do you have at your

7  disposal to do that job?

8  A    We have a radar, which is on the belly of the aircraft,

9  a camera, and all of it is integrated into one system that

10  we can use at one station.

11  Q    And do the pilots also have those same instruments

12  available to view where they're sitting?

13  A    Yes, they have a screen positioned in front of them in

14  which they can see a camera feed.  Pretty much what we're

15  seeing on the camera, they can see up front.

16  Q    When you're looking at this camera feed, what are you

17  specifically looking for as a mission systems operator?

18  A    When I'm looking at the -- could you restate that?

19  Q    Yes.  When you're on one of these narcotics patrols as

20  the mission systems operator, what are you looking for?

21  A    We're looking for any vessel that is suspicious in

22  nature that may be running drugs or smuggling drugs.

23  Q    If you see such a vessel, what do you do as the MSO?

24  A    When we see this vessel, we have it on radar, so we

25  have their position and we will pick it up visually on our

P.O. BRANDON DICKINSON - JANUARY 27, 2020      196
Direct Examination by Mr. DeRenzo

 1   camera and then we will report any information back to
 2   JIATF, which is our sector, basically.
 3   Q    Is that the person who tells you where to go and where
 4   to search, who has control over your aircraft?
 5   A    Yes, sir.
 6   Q    When you are passing this information, what kind of
 7   detail information are you passing?
 8   A    When we're passing this information we're giving them
 9   position, course, speed, any suspicious nature of the
10   vessel.  We're also describing the vessel to them.
11   Q    I want to talk to you about December of 2018.  Do you
12   recall being on a deployment during that time period?
13   A    Yes, sir.
14   Q    Where were you deployed?
15   A    We were deployed down south for a JIATF patrol.
16   Q    Where graphically?
17   A    We were in Central America.
18   Q    At any point during that patrol did you get tasked to
19   search for a suspicious vessel?
20   A    Yes, sir.
21   Q    What geographic region were you searching in?
22   A    We were searching in the Western Caribbean.
23   Q    Between what countries?
24   A    Roughly between Colombia and Jamaica.
25   Q    On that patrol, what was your job?

1   A    My job was, like I explained to you before, the mission

2   system operator, so I was using all the tools we had

3   available to search for vessels of interest.

4   Q    Who were the pilots on this patrol?

5   A    The pilots were Jim McCormack and Thomas Humphrey.

6   Q    At any point during that patrol did you spot any

7   suspicious vessels?

8   A    Yes, sir.

9   Q    Can you tell the jury about that.

10  A    We were searching in a search box passed to us by JIATF

11  as well as possible position of a vessel, and we began

12  searching that area, and once we finally found some vessels

13  on radar, we began to get a closer look at them.

14  Q    How many vessels did you spot?

15  A    Two.

16  Q    Let's talk about the first one.  How did you initially

17  detect that vessel?

18  A    On radar.

19  Q    And what, if anything, did you do to investigate?

20  A    So once we detect a vessel on radar, we will get in a

21  position where we can pick them up visually on our camera.

22  Q    And were you able to do that in this case?

23  A    Yes, sir.

24  Q    Were you able to actually view that vessel?

25  A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     198
Direct Examination by Mr. DeRenzo

1   Q    And can you describe it for the jury.

2   A    The vessel was a smaller vessel which we call a Panga,

3   pretty much, a 30-foot vessel with multiple engines so they

4   can go at higher speeds.

5   Q    And this is the first vessel you're talking about?

6   A    Yes, sir.

7   Q    How long were you on scene with that boat?

8   A    Not long with the first vessel.  Approximately 10 to 20

9   minutes.

10  Q    What did you do after you left the scene with that

11  boat?

12  A    After we had passed a report on that vessel we had

13  another detection on our radar within around a 20-mile

14  vicinity that we also began to investigate.

15  Q    And how did you -- strike that.

16        What did you do to investigate that second boat?

17  A    To investigate the second one, pretty much the same as

18  the first.  We had a radar detection and then we flew into

19  an orbit to where we were able to visually see this vessel

20  on camera.

21  Q    And can you describe that second vessel.

22  A    The vessel was very similar to the first.  It was a

23  small 30-foot vessel.  This vessel did have a tarp over the

24  top of the bow.

25  Q    And were you able to tell which direction it was

P.O. BRANDON DICKINSON - JANUARY 27, 2020    199
Direct Examination by Mr. DeRenzo

1  heading?

2  A    When we found this vessel underway, it was headed in a

3  north-northeast direction.

4  Q    And geographically is that away from Colombia?

5  A    Yes, sir.

6  Q    After you picked up this vessel on radar, what did you

7  and your fellow aircrew do?

8  A    Once we picked this vessel up on radar, we got a visual

9  of them on camera, and then we passed a report to JIATF

10  describing what we saw, and also the tarp seemed suspicious

11  to us.

12  Q    Okay.  Were you able to determine the coordinates of

13  where the boat was?

14  A    Yes, sir.

15  Q    How do you determine that as the mission systems

16  operator?

17  A    We determine that by -- for our mission system it has

18  its own functioning GPS that runs off the plane's GPS, and

19  we have multiple areas on our mission system which we can

20  see coordinates, whether it's of our plane or the vessel

21  we're looking at, and if it's the vessel we're looking at

22  it's going to be displayed on the radar and the camera.

23  Q    Were you able to actually record this second vessel?

24  A    Yes, sir.

25  Q    And how long were you on scene approximately with the

1    second vessel?

2    A    Approximately three hours.  Maybe a little more.

3    Q    And what was the aircraft doing during this entire

4    time?

5    A    The entire time we're sustaining an orbit in which we

6    can maintain a visual on our radar and our camera so we

7    don't lose track of the vessel.

8    Q    So basically flying circles around this boat?

9    A    Yes, sir.

10   Q    And where you're seated as a mission systems operator,

11   were you able to see the camera feed the entire time?

12   A    Yes, sir.

13   Q    Were you able to record the entire time you were

14   orbiting this vessel?

15   A    Yes, sir.

16   Q    Either through the use of radar or any of the other

17   tools that you mentioned earlier or through the camera, were

18   you able to maintain some kind of visual or other location

19   of the vessel during the entire time you were on scene?

20   A    Yes, sir.

21   Q    Did you ever lose track of it?

22   A    We lost track of the vessel visually while flying in

23   cloud coverage, but we always had the vessel on our screen

24   and on our radar.

25   Q    Whenever you did lose visual of it because of clouds or

1   anything else, were you able to reacquire it?

2   A    Yes, sir.

3   Q    Now, during that entire time you were in an orbit, did

4   you see anything suspicious by the second vessel?

5   A    Yes, sir.

6   Q    What did you see?

7   A    After we spotted the vessel underway, which means

8   they're moving, the vessel came to a stop, which we call

9   dead in the water, where they're no longer using power by

10  engine to move, and they began to jettison packages

11  overboard.

12  Q    And how long did that occur, the jettisoning of

13  packages?

14  A    The jettisoning occurred pretty much the entire time we

15  were on scene with this vessel.  And "jettison" just means

16  they were throwing these packages overboard.

17  Q    Were you able to record all of that activity?

18  A    Yes, sir.

19  Q    And could you just briefly describe for the jury what

20  that looked like where you were seated as the mission

21  systems operator.

22  A    What we saw on camera was the vessel dead in the water,

23  and they began to throw these packages overboard and string

24  them together, and there was movement above the vessel and

25  also under the tarp during -- during the entire time.

1  Q    You mentioned just a couple of minutes ago that you had

2  seen the boat underway or moving initially.

3  A    Yes, sir.

4  Q    At the point during the time you were on scene did you

5  see the vessel get back underway?

6  A    Yes, sir.

7  Q    Could you describe what you observed.

8  A    We observed the vessel initially dead in the water, and

9  after stringing out groups of packages, they would

10 continuously go underway and then stop, the entire time,

11 just to kind of maintain these lines as well as get in

12 position better for them to do the job.

13 Q    Did it appear that the vessel was staying in the

14 vicinity of the packages or leaving the area?

15 A    They were staying in the vicinity.

16 Q    Now, as the mission systems operator, you mentioned

17 you're monitoring radios?

18 A    Yes, sir.

19 Q    What frequencies are you monitoring?

20 A    We are monitoring distress frequencies, emergency

21 frequencies, and any frequency we're using to talk to JIATF

22 as well as any other assets.

23 Q    And what international frequencies are you monitoring?

24 A    The main one we're monitoring is Channel 16, which is a

25 marine distress frequency.

1   Q    And why do you as the mission systems operator monitor

2   that frequency?

3   A    We monitor that frequency to hear any possible

4   emergencies or distress, and also mariners know they can use

5   this frequency worldwide if they -- if they need help while

6   they're out at sea.

7   Q    So do you monitor that frequency even when you're on a

8   counter-drug patrol?

9   A    Yes, sir.

10  Q    What would happen if you, as the mission systems

11  operator, heard a distress call over Channel 16?

12  A    If we hear a distress call, we will relay it to the

13  pilots as well as our sector or JIATF at the time, and we

14  have a SAR pallet on board we can use to respond to that.

15  Q    So even on a counter-drug patrol you're equipped to

16  respond to distress, mariner distress, at any time?

17  A    Yes, sir.

18  Q    During the entire time you were on scene with that

19  second vessel did you hear any distress calls over

20  Channel 16 or any other frequency?

21  A    No, sir.

22  Q    As an aircrew member on a C-130, are you trained to

23  look out for any visual distress signals of a mariner in

24  distress?

25  A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020      204
Direct Examination by Mr. DeRenzo

1   Q     And what are the things you've been trained to look
2   for?
3   A     We have been trained to look for multiple distress
4   calls, whether it's verbally over the radio or it's a flare,
5   signal mirror, color dye, pretty much anything that will
6   attract attention to the vessel in distress.
7   Q     Did you see any visual distress signals during the
8   entire time you were in an orbit over that second vessel?
9   A     No, sir.
10  Q     At some point did you depart the area with that second
11  vessel?
12  A     Yes, sir.
13  Q     Why did you all leave?
14  A     We had to eventually leave because we were running out
15  of fuel.  We didn't have enough fuel to stay on scene.
16  Q     What, if any, actions did you take before you and your
17  fellow C-130 aircrew left the scene?
18  A     Before we left the scene we passed the position to
19  JIATF, we passed the position to the boat we're working
20  with, that way they know where the vessel is.
21  Q     What was the name of the boat you were working with?
22  A     The name of the boat was the MONCTON.
23  Q     Did you pass -- well, let me back up.
24        Were you able to record all of those things you
25  observed in the camera while you were on scene?

P.O. BRANDON DICKINSON - JANUARY 27, 2020      205
Direct Examination by Mr. DeRenzo

```
 1   A     Yes, sir.
 2   Q     Did you pass any of those recordings on to anybody
 3   else?
 4   A     We were able to pass pictures.
 5   Q     To whom?
 6   A     To JIATF, as well as the boat, the MONCTON.
 7   Q     And was that pictures of that second boat or the first
 8   boat?
 9   A     The second boat.
10   Q     While we're talking about cameras, could you describe
11   for the jury the camera that's on the C-130.
12   A     The camera we use on the C-130 is a clear turret, it's
13   a forward-looking infrared camera.
14   Q     What does that mean?
15   A     It is an HD camera that has extended range as well as
16   modes we can use to detect vessels.
17   Q     What is -- what is the infrared capability?  What does
18   that allow you to do?
19   A     The infrared will pick up heat signatures.  When we're
20   flying at higher altitudes looking for small vessels, it's
21   easier for us to pick up those heat signatures in the open
22   ocean.
23   Q     And when you're looking at the camera feed where you're
24   seated in the aircraft, what is visibly displayed on that
25   screen?
```

P.O. BRANDON DICKINSON - JANUARY 27, 2020      206
Direct Examination by Mr. DeRenzo

1   A    When we're looking at that screen we have our aircraft

2   data as well as the time and date and also the vessel data

3   that we're looking at.

4   Q    So the aircraft data, what is that?

5   A    Aircraft data would be our position, our course, our

6   altitude.

7   Q    So this is where the plane is?

8   A    Yes, sir.

9   Q    And what is the other information that you referenced?

10  A    The other information is the date and time as well as

11  vessel information, like the course and the distance.

12  Q    So when you say that, do you mean the vessel that

13  you're looking at through the camera?

14  A    Yes, sir.

15  Q    Okay.  And how does -- how is it that that information

16  is displayed on the screen?  I mean, how does that screen

17  get the information?

18  A    The screen gets the information from being tied into

19  the GPS of the system, and all that data is available for

20  all the equipment we use.

21  Q    So the position -- the GPS position that's displayed in

22  the camera, is that also linked to the aircraft's GPS?

23  A    Yes, sir.

24  Q    And where does that information come from?

25  A    Satellites.

1  Q    Okay.  Are you trained to examine and repair those
2  systems as an avionics technician?
3  A    Yes, sir.
4  Q    And to the best of your knowledge, on that particular
5  patrol, was all this equipment working properly?
6  A    Yes, sir.
7  Q    Is all -- is there any way for you as the mission
8  systems operator, or even as an avionics tech, to input the
9  information you see on that screen?
10  A    No, sir.
11  Q    So it's automatically generated?
12  A    Yes, sir.
13  Q    Now, in this case were you able to -- other than the
14  brief images you talked about sending to the MONCTON and
15  your tactical patrol, were you able to obtain any of the
16  recordings from this patrol?
17  A    Yes, sir.  We were able to extract all the recording
18  that we took.
19  Q    Can you describe the process that you used to do that.
20  A    To do that we can -- anything we record will go onto
21  the mission system, which is essentially a computer, and we
22  can extract all of that information onto a laptop and then
23  we can put that information on either a CD, DVD or hard
24  drive.
25  Q    Is that the process you used in this case?

P.O. BRANDON DICKINSON - JANUARY 27, 2020      208
Direct Examination by Mr. DeRenzo

 1   A    Yes, sir.

 2   Q    As an avionics technician, is that something that

 3   you're trained, in fact it's part of your duties to actually

 4   make sure it's working properly?

 5   A    Yes, sir.

 6   Q    When you were -- strike that.

 7        Were you personally involved in downloading the

 8   recordings from this particular patrol?

 9   A    Yes, sir.

10   Q    When you did that, did you note if there were any --

11   any deviations or errors in the process you just described?

12   A    Yes, sir.

13   Q    Were there any?

14   A    Oh, no, sir, there were not.

15   Q    And to the best of your knowledge -- well, let me --

16   let me back up.

17        Before you actually get in the plane, did you do

18   any procedures to ensure everything is working properly?

19   A    Yes, sir.  We do a preflight to check all our

20   equipment, as well as when we initially run the equipment,

21   we do a systems status check, which will display if

22   everything is working properly.

23   Q    So before you actually took off in December of 2018,

24   did you do one of those inspections?

25   A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     209
Direct Examination by Mr. DeRenzo

1   Q    Did you notice anything about the camera or the related

2   equipment or the GPS that wasn't working properly?

3   A    No, sir.

4              MR. DERENZO:  May I approach the witness,

5   Your Honor?

6              THE COURT:  You may.

7   BY MR. DERENZO:

8   Q    Petty Officer Dickinson, I've handed you what's been

9   marked as Government's Exhibits 2A through 2O for

10  identification, as well as 2P and 2Q for identification.  If

11  you would, just take a moment and look at those exhibits and

12  look up when you're done.

13             So let's start with Exhibits 2A through 2O.  Do

14  you recognize those?

15  A    Yes.

16  Q    How do you recognize them?

17  A    They have my initials on the CD.

18  Q    And have you reviewed those?

19  A    Yes, sir.

20  Q    And what are they?

21  A    These CDs hold the recording we took for that

22  deployment.

23  Q    Are these the same recordings you just testified about

24  that you downloaded from the aircraft?

25  A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     210
Direct Examination by Mr. DeRenzo

```
 1   Q    Was that the same aircraft you were in on this
 2   December 2018 patrol?
 3   A    Yes, sir.
 4   Q    Are Exhibits 2A through 2O true and accurate copies of
 5   the video from the C-130 that you downloaded?
 6   A    Yes, sir.
 7   Q    Is there anything different about those videos?
 8   A    No, sir.
 9   Q    And do those videos fairly and accurately depict what
10   you observed in the camera footage of the vessel you spoke
11   about, the second vessel we spoke about in that
12   December 2018 patrol?
13   A    Yes, sir.
14        MR. DERENZO:  Your Honor, move to admit
15   Government's Exhibits 2A through 2O.
16        MR. HERNANDEZ:  No objection.
17        THE COURT:  I'll receive into evidence 2A through
18   2O.
19   BY MR. DERENZO:
20   Q    Less move on to 2P and 2Q.  Do you recognize those?
21   A    Yes, sir.
22   Q    How do you recognize them?
23   A    The initials on the CD.
24   Q    Have you also reviewed the contents of those?
25   A    Yes, sir.
```

1    Q    Now, are those the full unedited videos from your

2    patrol in December 2018?

3    A    No, sir.

4    Q    What are they?

5    A    These are clips from the same recordings.

6    Q    Other than the fact that they are clips and not the

7    complete video, are they fair and accurate depictions of

8    what you were able to see in that screen in the C-130 in

9    December of 2018 as the mission systems operator?

10   A    Yes, sir.

11        MR. DERENZO:  Your Honor, move to admit

12   Government's 2P and 2Q.

13        MR. HERNANDEZ:  No objection.

14        THE COURT:  Receive into evidence 2P and 2Q.

15        MR. DERENZO:  May we publish, Your Honor?

16        THE COURT:  Okay.  This might be a good time to

17   take a recess, an afternoon recess.

18        Ladies and gentlemen, we'll be in recess until

19   about ten minutes of 4:00.  You're welcome to walk around.

20   Please don't discuss the case, and leave your pads on your

21   chairs.

22                    *(Jury exits proceedings.)*

23        THE COURT:  Remind me again how long.

24        MR. DERENZO:  Total video, Your Honor, is about

25   four hours.  We will fast forward through much of it, but

P.O. BRANDON DICKINSON - JANUARY 27, 2020     212
Direct Examination by Mr. DeRenzo

1    I -- I'd guess it's still about an hour and a half.

2              THE COURT:  I knew it was long, I just couldn't

3    remember how long.

4              MR. HERNANDEZ:  Judge, may I ask a couple

5    questions?

6              THE COURT:  Sure.

7              MR. HERNANDEZ:  I didn't realize that the

8    jurors -- I went to the restroom right after lunch and one

9    of the jurors was in there.  Do they use the same restrooms?

10             THE COURT:  No.  I'm not sure why that juror was

11   in that restroom.  They have restrooms in their jury room.

12             MR. HERNANDEZ:  Because I was thinking of going on

13   another floor or something because I didn't realize -- I was

14   surprised when I walked in there.

15             The second question is:  Is the courtroom locked

16   during the night?  Because there's a lot of stuff that

17   I wasn't necessarily going to transport back and forth every

18   day.

19             THE COURT:  Yes.

20             MR. HERNANDEZ:  Pardon?

21             THE COURT:  It is.

22             Okay.  We're in recess.

23             You may step down, sir.  Please don't discuss your

24   testimony over the recess, and we'll start again at ten of.

25             THE WITNESS:  Yes, Your Honor.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     213
Direct Examination by Mr. DeRenzo

```
 1                        - - - - -

 2              (Recess at 3:34 p.m. until 3:52 p.m.)

 3                        - - - - -

 4         MR. HERNANDEZ:  Judge, may we approach on a

 5    procedural matter?

 6         THE COURT:  You know, I'm also getting feedback.

 7    I'm not sure why we're getting the feedback.  Anyway,

 8    I don't know.

 9              (The following bench conference was held.)

10         THE COURT:  On an unrelated matter, Mr. Fitchett

11    said sometimes the jurors, especially -- that wouldn't

12    pertain to you, but if there are a lot of women, they'll go

13    use the --

14         MR. HERNANDEZ:  It doesn't matter.  I went to the

15    12th floor.  So from now on, just as precaution --

16         THE COURT:  All right.

17         MR. HERNANDEZ:  This is something that I was

18    talking to Nick about.  He anticipates that he will

19    finish -- if it's consistent with the last trial, he'll

20    finish mid-afternoon on Wednesday.

21         MR. DERENZO:  Somewhere thereabouts, I think.

22         MR. HERNANDEZ:  I am not making a final decision

23    as to my witness until I see what I get out on Cross from

24    their expert.

25         THE COURT:  Um-hum.
```

1           MR. HERNANDEZ:  It may turn out that he says
2      everything that my expert would say and it would be a waste
3      of time.  The reason I bring it up is because as of today my
4      witness I think has a trial or something tomorrow, but
5      I have -- she is supposed to be flying in Wednesday night --
6           THE COURT:  Oh, okay.
7           MR. HERNANDEZ:  -- to testify Thursday morning, if
8      I decide to call her.
9           THE COURT:  Okay.
10          MR. HERNANDEZ:  And my question would be --
11     I didn't want you to get upset if they finish early on
12     Wednesday, I don't know if I can get her in here Wednesday
13     afternoon, but I wanted --
14          THE COURT:  Yeah.
15          MR. HERNANDEZ:  I still think there's not a
16     problem, we're going to finish Thursday, no matter what, but
17     I wanted to -- I don't know when exactly --
18          THE COURT:  Well, let me ask you, is your client
19     going to testify?
20          MR. HERNANDEZ:  No.
21          THE COURT:  Are you sure?
22          MR. HERNANDEZ:  I'm positive.  Two reasons.
23     Number one, he's told me he's not; and then, secondly, it
24     would open the door for all the debriefing information.
25          THE COURT:  Okay.

 1          MR. HERNANDEZ:  So I can almost guaran -- I mean,
 2   you can never say never, but I --

 3          THE COURT:  Yeah.

 4          MR. HERNANDEZ:  I'm 99.9 percent sure.

 5          THE COURT:  Well, the only caveat would be if he
 6   rests Wednesday, and I don't care if your expert testifies
 7   on Thursday, but if he's going to testify, I'd like him to
 8   go ahead and testify Wednesday afternoon.

 9          MR. HERNANDEZ:  That's fine.  And like I said,
10   I could be totally surprised, but I can almost promise that
11   he's not, and there's a strategic reason, he knows why he
12   wants to not testify.

13          THE COURT:  Yeah.  Okay.

14          MR. HERNANDEZ:  Okay.

15          THE COURT:  All right.  Would you bring the jury
16   in.

17             *(Jury re-enters proceedings.)*

18          THE COURT:  Okay.  Ladies and gentlemen, the
19   Government is going to publish the video.  That is the last
20   exhibit that I received into evidence prior to our taking a
21   break.  It's a fairly lengthy video because it's, you know,
22   an airplane surveillance video, so just sit back and relax.

23          All right.  Mr. DeRenzo.

24          MR. DERENZO:  Thank you, Your Honor.

25          Madam Clerk, if we could put the laptop display on

1  the screen.

2           Your Honor, may I proceed to publish?

3           THE COURT:  You may.

4  BY MR. DERENZO:

5  Q   Petty Officer Dickinson, in the screen to your right

6  you should see what's now been admitted as Government's

7  Exhibit 2A.  Could you just explain to the jury what it is

8  we're looking at here.

9  A   Yes, sir.  So we're looking at the video feed from that

10  camera I was explaining, and pretty much the heads-up

11  display, which will give you all your flight data

12  information.

13  Q   So I've placed a red circle in the upper left-hand

14  corner of the screen.  What is that information?

15  A   So that information is going to be our aircraft data.

16  You can see our plane number, our position, our speed, our

17  heading and also our altitude.

18  Q   And I've zoomed in on a portion of the left-hand side

19  of the screen.  What is this?

20  A   So this will be the current date and Zulu time.

21  Q   What's Zulu time?

22  A   Zulu time is world time.  It's what we use in the

23  military so that we're all able to be on the same time.

24  Q   And how do you get from Zulu time to local time in the

25  area that you were patrolling?

P.O. BRANDON DICKINSON - JANUARY 27, 2020    217
Direct Examination by Mr. DeRenzo

1  A    So at this time Zulu time is going to be five hours

2  past local time.

3  Q    Okay.  So in order to get local time we subtract five

4  hours from this?

5  A    Yes, sir.

6  Q    So what's the local time at this point in your patrol?

7  A    So the local time at this point would be 1:24 p.m.

8                         *(Video played.)*

9  Q    I've paused Exhibit 2A at approximately 1824 Zulu time.

10 What is depicted at this point in the video?

11 A    At this point, this is the first vessel we spotted on

12 radar.

13 Q    And how long did you stay on scene with this vessel?

14 A    We stayed on scene roughly 10 to 20 minutes with this

15 vessel.

16 Q    During those 10 to 20 minutes did you observe any other

17 suspicious activity with respect to this vessel depicted in

18 2A?

19 A    No, sir.

20 Q    So I'm publishing now what's now been admitted as

21 Government Exhibit 2B.  I'm going to fast forward to

22 approximately 5 minutes and 48 seconds.

23                         *(Video played.)*

24 Q    What is displayed at this point in Exhibit 2B?

25 A    This is the second vessel we detected on radar, and we

 1  have visual of them going underway at this time.

 2                    *(Video played.)*

 3  Q    And if I pause the video right here -- so this is

 4  approximately 18 minutes -- or 1846 Zulu time.  Are you able

 5  to tell in this screenshot where in terms of latitude and

 6  longitude the vessel is?

 7  A    Yes, sir.  So with the cursor being on the vessel, if

 8  you look in the top right corner of this feed, there is a

 9  position displayed, and that's the position of where the

10  cursor is pointed.

11  Q    So I've zoomed in on the upper right-hand corner.

12  Is this what you're talking about?

13  A    Yes, sir.

14  Q    I'm now pressing play on Exhibit 2B.

15                    *(Video played.)*

16  Q    So the jury understands, what's happening when we see

17  that white go over the screen?

18  A    So that's going in and out of cloud coverage while

19  we're orbiting this vessel.

20                    *(Video played.)*

21  Q    And what do we see here, Petty Officer Dickinson?

22  A    Here we have the vessel and they're continuing to go

23  underway and we can see that there are four persons

24  on board.

25  Q    And at this point are you able to see how many engines

 1   are on the vessel?

 2   A    Yes, you can clearly see there is two engines.

 3   Q    You mentioned before in your testimony that the

 4   vessel -- the second vessel you spotted had a tarp on it.

 5   Are you able to see that in this picture?

 6   A    Yes, you can see the tarp is covering the majority of

 7   the front of the vessel and it's a reddish color.

 8   Q    And from this vantage point are you able to make out

 9   what any of the individuals on the boat are wearing?

10   A    Yes, sir.

11   Q    Can you describe that for the jury.

12   A    You can see it looks like there's two individuals

13   wearing white shirts, one is wearing a blue shirt, from this

14   angle.

15   Q    And from this vantage point, this moment in the

16   footage, are you able to tell approximately the course of

17   the vessel?

18   A    Yes.  So the top of the screen in the middle, displayed

19   right now is 048 degrees true, and that is the position of

20   where the camera is facing, the course of where the camera

21   is facing, and the boat is following where the camera is

22   pointed.

23   Q    And so in terms of north, south, east, west, which

24   direction is this boat heading right now?

25   A    Northeast.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     220
Direct Examination by Mr. DeRenzo

1  Q    As the mission systems operator, are you able to
2  control the camera in any way?
3  A    Yes, sir.
4  Q    How so?
5  A    We have a hand control unit which we can use to control
6  as well as our MSO keyboard.
7  Q    Does that allow you to zoom at all?
8  A    Yes, sir.
9  Q    So when we see this video, when it appears to be
10 zooming in and out, who is doing that?
11 A    We're doing that as the operator.
12 Q    At this point in the video it appears that the vessel
13 is depicted in a different color.  Why is that?
14 A    So we have now switched to infrared mode or IR mode,
15 and this is our heat detection mode, so anything giving off
16 heat will display white in color.
17                    *(Video played.)*
18         MR. DERENZO:  Skip ahead to approximately
19 ten minutes into Exhibit 2B.
20                    *(Video played.)*
21 Q    What do we see depicted here?
22 A    We see the same vessel, and they are currently
23 underway.
24 Q    Approximately how long after you initially spotted this
25 boat did you see it finally stop?

 1  A    I do not recall the exact time in which they stopped

 2  moving.

 3                      *(Video played.)*

 4  Q    At this point, which is 1851 Zulu time in Exhibit 2B,

 5  what's going on?

 6  A    Now you can see the vessel has stopped moving and they

 7  are what we call dead in the water.

 8  Q    I'm going to move now to Exhibit 2C.

 9           MR. DERENZO:  Skip ahead to approximately

10  4 minutes, 30 seconds.

11                      *(Video played.)*

12  Q    What do we see here, Petty Officer Dickinson?

13  A    Here we see the same vessel we're continuing to orbit

14  and monitor.

15                      *(Video played.)*

16  Q    What's happening right now?

17  A    So now you can see there's movement under the tarp and

18  they begin to jettison or throw overboard packages.

19  Q    How can you tell it's a package?

20  A    You can tell by the shape and size as well as it

21  hitting the water.

22           MR. DERENZO:  Skip ahead to 11 minutes, 20 seconds

23  in Exhibit 2C.

24                      *(Video played.)*

25  Q    What are we looking at here, Petty Officer Dickinson?

P.O. BRANDON DICKINSON - JANUARY 27, 2020      222
Direct Examination by Mr. DeRenzo

1  A    We're looking at the same vessel, they are still dead

2  in the water, and they are continuing to throw packages

3  overboard.

4                    *(Video played.)*

5  Q    And are you able to tell what side of the vessel those

6  packages appear to be being thrown overboard from?

7  A    Yes, sir.  They're coming off the right side of the

8  vessel.

9                    *(Video played.)*

10 Q    I'm going to pause it here at 1908 Zulu.

11        Are you able to tell at this vantage point whether

12 anybody appears to be in the back of the boat?

13 A    Yes, sir, we can tell, but no, it appears there is

14 no one in the back.

15 Q    Specifically, do you see anybody in the back of that

16 boat with a white shirt on?

17 A    No, sir.

18 Q    I'm going to resume at approximately 13 minutes.

19                    *(Video played.)*

20 Q    What are you able to observe at this point?

21 A    At this point the vessel is still continuing to throw

22 packages overboard on the right side.  You can notice a line

23 will continue to come out of the water that they're using to

24 keep these packages grouped together.

25                    *(Video played.)*

1   Q    I'll move now to Exhibit 2D.

2            MR. DERENZO:  Fast forward to approximately

3   3 minutes, 25 seconds.

4                          (Video played.)

5   Q    Which view is this, Petty Officer Dickinson?

6   A    This is back to the infrared view, or our heat

7   detection.

8   Q    How does the top of the boat appear in this mode?

9   A    Could you repeat that?

10  Q    How does the top of the boat appear in infrared mode?

11  A    The top of the boat is white.  That just shows it's

12  picking up a heat signature.

13                         (Video played.)

14  Q    At this point in the video, which is, for the record,

15  1915 Zulu, are you able to see anybody in the back of the

16  boat?

17  A    No, sir.

18                         (Video played.)

19  Q    Now, as you are seeing these -- what appear to be white

20  packages tossed overboard from this boat, what are you doing

21  as the mission systems operator?

22  A    As we're observing this, we're making sure we maintain

23  a visual as well as a contact on radar, and we are relaying

24  this information to our task director as well as the asset

25  we're working with.

P.O. BRANDON DICKINSON - JANUARY 27, 2020      224
Direct Examination by Mr. DeRenzo

1  Q    Does part of that information include the position
2  where the vessel is?
3  A    Yes, sir.
4  Q    And how frequently is this update happening?
5  A    This update is happening every 15 to 30 minutes.
6  Q    Throughout your three or four hours on scene?
7  A    Yes, sir.
8                        *(Video played.)*
9  Q    Now, at this point, 1917 Zulu, are you able to
10 determine how many engines are on the boat?
11 A    Yes, sir.
12 Q    How many?
13 A    Two engines.
14                       *(Video played.)*
15 Q    At this point, 1919 Zulu, what are we looking at?
16 A    We are continuing to observe the vessel as they are
17 throwing the packages overboard.
18 Q    Have you been able to determine how those packages are
19 secured?
20 A    Yes.  You can see a line surface above the water as it
21 tightens up.
22                       *(Video played.)*
23        MR. DERENZO:  Skip ahead slightly to approximately
24 12 minutes, 50 seconds.
25                       *(Video played.)*

P.O. BRANDON DICKINSON - JANUARY 27, 2020      225
Direct Examination by Mr. DeRenzo

1   Q    What are we looking at here, Petty Officer Dickinson?

2   A    Here we're currently orbiting the vessel still,

3   monitoring them visually and seeing them continuing to throw

4   these packages overboard.

5   Q    So at this point, as you're circling over this vessel,

6   did it appear that they were continuing to throw packages

7   overboard?

8   A    Yes, sir.

9   Q    Were you able to determine how many groups of packages

10  there were?

11  A    There were two separate groups of packages that were

12  strung together.

13                    *(Video played.)*

14  Q    At this point, 1925 Zulu, what's going on?

15  A    We're still monitoring the vessel, and it appears that

16  an individual is leaning over the back of the boat at this

17  time.

18                    *(Video played.)*

19  Q    I'm going to move now to Exhibit 2E, start it from the

20  beginning.

21           What are we looking at here?

22  A    Here we're still monitoring the vessel as they throw

23  these packages overboard.

24  Q    Are you able to see anybody in the back of the boat at

25  this point?

1  A    Yes, sir.

2  Q    Are you able to identify what color clothing they're

3  wearing?

4  A    Yes, sir.

5  Q    What color?

6  A    A white shirt.

7                          *(Video played.)*

8  Q    When you initially saw the packages being jettisoned

9  from the boat, were you able to tell relative to the front

10 or the back where packages were coming out?

11 A    Originally they were coming from the right side of the

12 boat.

13 Q    At this point, 1927 Zulu, what are we looking at?

14 A    At this point the packages are trailing behind the boat

15 off the back right side of the vessel.

16                         *(Video played.)*

17          MR. DERENZO:  Skip ahead slightly to 2 minutes,

18 51 seconds.

19                         *(Video played.)*

20          MR. DERENZO:  Skip ahead to 5 minutes, 5 seconds.

21                         *(Video played.)*

22 Q    At this point in your orbit what's taking place with

23 respect to the boat?

24 A    At this point the vessel is back underway, which means

25 they're beginning to move again.

P.O. BRANDON DICKINSON - JANUARY 27, 2020      227
Direct Examination by Mr. DeRenzo

```
 1                      (Video played.)
 2   Q    At this point are you able -- how many groups of
 3   packages are you able to observe?
 4   A    At this point just one.
 5                      (Video played.)
 6         MR. DERENZO:  Skip ahead to 8 minutes and
 7   30 seconds.
 8                      (Video played.)
 9         MR. DERENZO:  Back it up slightly to 8 minutes,
10   23 seconds.
11                      (Video played.)
12   Q    At this point are you able to tell if there's anybody
13   in the back of the boat?
14   A    Yes, sir.
15   Q    Are you able to identify an article of clothing on any
16   of them?
17   A    Yes, sir.
18   Q    What is that?
19   A    A white shirt.
20                      (Video played.)
21   Q    So at this point, 1936 Zulu time, what's happening?
22   A    At this moment the vessel is back underway.
23                      (Video played.)
24   Q    At this point, 1937 Zulu time, Exhibit 2E, are you able
25   to tell how many engines are on this boat?
```

P.O. BRANDON DICKINSON - JANUARY 27, 2020      228
Direct Examination by Mr. DeRenzo

1  A    Yes, sir.  One engine.

2  Q    How are you able to tell that?

3  A    You can -- you can only see the one sticking out from

4  the left side, as well as the wake of it.

5  Q    What do you mean by "the wake"?

6  A    You'll -- initially when there was two there was a much

7  wider wake.  Now it's more of just a single trail.

8                      (Video played.)

9  Q    What's taking place right here, 1938 Zulu?

10 A    Here we can see the vessel is underway and they are

11 picking a package out of the water.

12            MR. DERENZO:  Skip ahead to approximately

13 12 minutes, 30 seconds.

14                      (Video played.)

15 Q    What are we looking at here?

16 A    Here we see the same vessel we've been monitoring, and

17 they are still underway and moving.

18                      (Video played.)

19 Q    I'm going to move now to 2F, start at approximately

20 25 seconds.

21                      (Video played.)

22 Q    Is this the same boat you've been in orbit over the

23 entire time, Petty Officer Dickinson?

24 A    Yes, sir.

25 Q    At this point are you able to make out anybody in the

1  back of the boat?

2  A    Yes, sir.

3  Q    Can you tell what they're -- what color shirt they're

4  wearing?

5  A    A white shirt.

6                        *(Video played.)*

7  Q    At this point, Petty Officer Dickinson, what's

8  happening?

9  A    At this point we're still orbiting the vessel, we're

10 maintaining visual, and they continue to go from moving and

11 underway to not moving to tend to the packages.

12                       *(Video played.)*

13 Q    What are we looking at right here, 1946?

14 A    Here we are still monitoring this vessel, and you can

15 see someone in the back of the vessel reaching over the

16 side.

17 Q    What color shirt is he wearing?

18 A    White shirt.

19                       *(Video played.)*

20      MR. DERENZO:  Skip ahead to 9 minutes, 30 seconds.

21                       *(Video played.)*

22 Q    At this point, this is 1952 Zulu time, Exhibit 2F.

23 What do you see here, Petty Officer Dickinson?

24 A    Here you can see the vessel, this is a more clear image

25 of them just having the one engine on the left side, and you

 1   can see there's packages behind them as well as off the left
 2   side of the vessel.
 3   Q    Are you able to make out any of the crew members of the
 4   boat you've been circling?
 5   A    Yes, sir.
 6   Q    Do you see anybody wearing a white shirt?
 7   A    Yes, sir.
 8   Q    And could you mark him somewhere on this, draw an arrow
 9   or a circle.
10                         *(Video played.)*
11   Q    So at this point -- you already mentioned a few times
12   now an individual with a white shirt.  Can you make out
13   clothing of anybody else on the boat?
14   A    Yes, sir.  You can see an individual in a blue shirt as
15   well as -- well, looks to be two white shirts, a light blue
16   shirt and a dark blue shirt.
17                         *(Video played.)*
18           MR. DERENZO:  Skip ahead now to approximately
19   14 minutes, 43 seconds.
20                         *(Video played.)*
21   Q    What's happening at this point during your patrol?
22   A    At this point we're still maintaining visual with the
23   vessel.  They are not moving at this time.
24   Q    Are you able to tell how many engines are on the boat?
25   A    Yes, sir.  Just one engine.

1    Q    How are you able to tell that?

2    A    You can see the engine at this point is trimmed out of

3    the water, which means moved up out of the water.

4          MR. DERENZO:  Move now to Exhibit 2G.  Start at a

5    minute -- 1 minute, 40 seconds approximately.

6                        *(Video played.)*

7          MR. DERENZO:  Skip ahead to 6 minutes, 30 seconds.

8                        *(Video played.)*

9          MR. DERENZO:  Skip ahead to 9 minutes, 58 seconds.

10                       *(Video played.)*

11   Q    What's happening at this point, Petty Officer

12   Dickinson?

13   A    At this point -- sorry.  At this point we're still

14   orbiting this vessel and keeping a visual on them, and they

15   are underway and moving.

16   Q    Are you able to see what the crew is doing?

17   A    Yes, sir.  You can see here someone is leaning over the

18   left side of the boat to grab one of the packages out of the

19   water.

20         MR. DERENZO:  Skip ahead to about 14 minutes and

21   7 seconds.

22                       *(Video played.)*

23         MR. DERENZO:  Skip ahead slightly to 14:36.

24                       *(Video played.)*

25         MR. DERENZO:  Skip now to 2H.  Start from the

P.O. BRANDON DICKINSON - JANUARY 27, 2020     232
Direct Examination by Mr. DeRenzo

1  beginning.

2                      *(Video played.)*

3           MR. DERENZO:  Skip ahead to 5 minutes, 39 seconds.

4                      *(Video played.)*

5  Q    At this point are you able to make out any of those

6  packages you referenced earlier?

7  A    Yes, sir.

8  Q    What portion of the vessel are they near?

9  A    You can see them near the back right side of the

10 vessel.

11                     *(Video played.)*

12 Q    From this vantage point, even though you're several

13 thousand feet in the air, through the use of your camera are

14 you able to make out the color of the hull of this vessel?

15 A    Yes, sir.  It appears to be a dark colored hull, either

16 dark blue or black.

17                     *(Video played.)*

18 Q    At this point are you able to make out or see any of

19 the crew of the boat in the back?

20 A    Yes, sir.

21 Q    How many people?

22 A    I can make out two people at this time.

23 Q    And were you able to determine what color clothing

24 they're wearing?

25 A    Yes, sir.

1    Q    What was that?

2    A    One was wearing a light blue shirt, the other

3    individual is wearing a white shirt.

4                         *(Video played.)*

5    Q    Now, from this vantage point are you able to tell how

6    many engines are on the boat?

7    A    Yes, sir.

8    Q    How many?

9    A    One engine.

10                        *(Video played.)*

11   Q    I'm going to move now to 2I.

12            THE COURT:  Okay.  Why don't we recess.  At this

13   time is a good place to recess.

14            Could you turn the lights up, please.

15            Ladies and gentlemen, we'll continue this in the

16   morning.  We're going to start tomorrow morning at 9:15.

17   I anticipate we'll start promptly at 9:15, so you need to be

18   here in the jury room on the 10th floor at 9:15, we'll bring

19   you into the courtroom and continue the trial.

20            Please don't discuss the case with anyone, leave

21   your pads face down on your chairs, and I'll see you in the

22   morning at 9:15.

23                   *(Jury exits proceedings.)*

24            THE COURT:  Sir, you may step down.  Please don't

25   discuss your testimony over the evening hours, and we will

```
1    start in the morning at 9:15.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  And we're in recess until 9:15.

4                        - - - - -

5          (Proceedings adjourned at 5:01 p.m.)

6                        - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in a jury trial in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed

7    by computer under my supervision, this the 22nd day of March

8    2021.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25