```
 1                 IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                  Plaintiff,        )
                                      )
 6                                    ) Case No.
            vs.                       ) 8:18-CR-00594-SCB-JSS-1
 7                                    )
                                      )
 8   EMIRO HINESTROZA-NEWBBOOLL,      )
                                      )
 9                  Defendant.        )

10

11

12   _____

13                     JURY TRIAL - DAY 2
          BEFORE THE HONORABLE SUSAN C. BUCKLEW
14              UNITED STATES SENIOR JUDGE

                       JANUARY 28, 2020
15                        9:36 A.M.
                       TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23             DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
24           801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
25
```

```
 1    APPEARANCES:

 2

 3    FOR THE GOVERNMENT:

 4

 5              Nicholas G. DeRenzo

 6              Toni Goodin

 7              United States Attorney's Office

 8              400 N. Tampa Street, Suite 3200

 9              Tampa, Florida  33602

10              (813) 274-6000

11

12    FOR THE DEFENDANT EMIRO HINESTROZA-NEWBBOOLL:

13

14              Daniel Mario Hernandez

15              Law Office of Daniel M. Hernandez

16              902 North Armenia Avenue

17              Tampa, Florida  33609

18              (813) 875-9694

19

20

21    INTERPRETERS:

22              Beatriz Velasquez

23              Etienne van Hissenhoven

24

25
```

1                    I N D E X

2                JANUARY 28, 2020

3

4     GOVERNMENT'S WITNESSES:

5

6     **PETTY OFFICER BRANDON DICKINSON**                    PAGE
      Continued direct examination by Mr. DeRenzo              6
7     Cross-examination by Mr. Hernandez                       9
      Redirect examination by Mr. DeRenzo                     14
8
      **PETTY OFFICER ERIC LAUGINIGER**                     PAGE
9     Continued direct examination by Mr. DeRenzo             17
      Cross-examination by Mr. Hernandez                      55
10    Redirect examination by Mr. DeRenzo                     63

11    **PETTY OFFICER DIEGO RIVERA**                        PAGE
      Continued direct examination by Mr. DeRenzo             66
12    Cross-examination by Mr. Hernandez                      88

13    **PETTY OFFICER ALEXANDER RAMOS**                     PAGE
      Continued direct examination by Mr. DeRenzo             92
14    Cross-examination by Mr. Hernandez                     116

15    **PETTY OFFICER PAUL FAHEY**                          PAGE
      Continued direct examination by Ms. Goodin            120
16    Cross-examination by Mr. Hernandez                     136

17    **PETTY OFFICER TYLER PERIO**                         PAGE
      Continued direct examination by Ms. Goodin            138
18    Cross-examination by Mr. Hernandez                     158
      Redirect examination by Ms. Goodin                     165
19
      **CHIEF PETTY OFFICER DANIEL BROOKS**                 PAGE
20    Continued direct examination by Mr. DeRenzo            168
      Cross-examination by Mr. Hernandez                     206
21    Redirect examination by Mr. DeRenzo                    209

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    - - - o0o - - -

 3          THE COURT:  Anything before we bring the jury in?

 4          MR. DERENZO:  Nothing for the United States.

 5          MR. HERNANDEZ:  No, Your Honor.

 6          THE COURT:  All right.  Would you bring the jury

 7   in.

 8               (Jury re-enters proceedings.)

 9          THE COURT:  Good morning.

10          All right.  Ladies and gentlemen, we've all been

11   sitting in here since 9:15.  We had a problem with the

12   air conditioning system again and the noise, the blowers

13   were -- they blow and make a noise and it's very hard to

14   hear, it would have been very difficult for you to hear

15   anything because it's right in this area right here, so to

16   make a long story short, the people that own this building,

17   the General Services Administration, have been trying to

18   figure out the problem since, I guess, about nine o'clock or

19   earlier and it just took them that long to figure it out,

20   but we were about ready to change courtrooms if it didn't

21   get figured out any sooner.

22          Tomorrow morning hopefully this will not happen

23   again.  If it does happen again we will immediately change

24   courtrooms.  I can't explain to you why it's happening.  It

25   doesn't happen -- it's happened one other time that I can
```

1  remember, but obviously it's sort of slowed everything down,

2  so I'm sorry for the delay.  We actually were all ready to

3  start at 9:15.

4          So let me just ask if anything happened over the

5  evening hours that could affect any of your ability to sit

6  as a juror on this case.  Any concerns or problems before we

7  start?

8          All right.  The schedule today is a little

9  different.  We're going to recess for lunch early at 11:30

10  and we'll pick back up at one o'clock, and other than that,

11  we'll follow the same schedule.

12          Since we are so late in starting, I don't think

13  we'll take a morning break until 11:30, but if anybody does

14  need to break, and that includes people at counsel table

15  too, just let me know and I'll be happy to take a break, or

16  the court reporter as well.

17          All right.  You will recall when we recessed

18  yesterday we had a witness on the stand, and we are going to

19  get that witness back and we'll continue with the video.

20      *(Petty Officer Brandon Dickinson enters proceedings.)*

21          THE COURT:  Sir, if you'll come forward and have a

22  seat back in the witness chair, and I will not swear you in

23  again, but I will remind you that you are under oath.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  All right.  So we will pick back up

1  where we were, and we'll start, Mr. DeRenzo, with wherever

2  you want to start the video.

3          MR. DERENZO:  Thank you, Your Honor.

4          Madam Clerk, if we could display the laptop on the

5  screen and dim the lights as much as you can.

6          So we'll move on to publish Exhibit 2I, which has

7  been admitted.

8          THE COURT:  This is where we had it yesterday, or

9  did we have it a little darker?  Thank you.

10          MR. DERENZO:  Skip ahead to 13 minutes,

11  32 seconds.

12                **CONTINUED DIRECT EXAMINATION OF**

13                **PETTY OFFICER BRANDON DICKINSON**

14  **BY MR. DERENZO:**

15  Q    Petty Officer Dickinson, is this the same boat that we

16  were talking about yesterday at length?

17  A    Yes, sir.

18  Q    And you're still in an orbit in the C-130?

19  A    That's correct.

20  Q    And what are you able to observe at this point during

21  your orbit?

22  A    At this point we can observe the vessel is dead in the

23  water, not moving, and the packages are off the stern or

24  back of the boat.

25  Q    Are you able to tell from this vantage point whether

 1  the vessel has any engines on it?

 2  A    Yes, sir, from this view it looks like they still have

 3  one engine.

 4  Q    We'll move on to Exhibit 2J, start at approximately

 5  7 minutes, 47 seconds.

 6                        *(Video played.)*

 7            MR. DERENZO:  Skip ahead slightly to 9 minutes,

 8  30 seconds.

 9                        *(Video played.)*

10  Q    Is this the same boat?

11  A    Yes, sir.

12  Q    What are we looking at?

13  A    We are currently still orbiting, keeping a visual of

14  the boat.  We can see that they are not moving at this time

15  and the packages are strung out behind the vessel.

16  Q    Are you able to tell what time in Zulu time it is at

17  this point in the orbit?

18  A    Yes, sir.  It is 2053 Zulu.

19  Q    So what is that in local time?

20  A    So in local time that is 8:50-- excuse me, in local

21  time that is --

22  Q    How do we get from Zulu time to local time?

23  A    So local time it's 3:53.  Sorry.

24  Q    And we'll skip ahead to Exhibit 2K.

25            How long are each of these individual videos?

1   A     Each video is approximately 15 minutes.

2   Q     So we'll start Exhibit 2K at 4 minutes, 23 seconds.

3                        *(Video played.)*

4   Q     So at this point, and for the record 2103 Zulu time,

5   Exhibit 2K, what are you able to observe?

6   A     At this time we are still in an orbit monitoring the

7   vessel and they are still dead in the water, not moving.

8   Q     Do you see any of the packages from this vantage point

9   that you saw earlier?

10  A     No, sir.

11  Q     Are you able to determine if the vessel has any engines

12  on it?

13  A     At this time the vessel does not have any engines.

14  Q     And is this the same vessel you've been in orbit over

15  for several hours at this time?

16  A     Yes, sir.

17  Q     Let's move to Exhibit 2L.

18              MR. DERENZO:  Skip ahead four minutes.

19                        *(Video played.)*

20  Q     Is this the same boat?

21  A     Yes, sir.

22  Q     What, if anything, are you able to observe in this

23  video?

24  A     At this time we observed the tarp was moved closer to

25  the bow or the front of the vessel.

Case 8:18-cr-00594-SCB-JSS   Document 355   Filed 03/22/21   Page 9 of 212 PageID 3294
P.O. BRANDON DICKINSON - JANUARY 27, 2020      9
Cross-examination by Mr. Hernandez

```
 1                         (Video played.)

 2             MR. DERENZO:  Skip ahead now to 12 minutes,

 3    16 seconds.

 4                         (Video played.)

 5    Q    Is this the same vessel you've been in orbit over the

 6    entire time?

 7    A    Yes, sir.

 8    Q    Now, after this point in your patrol did you ever see

 9    the vessel get back underway?

10    A    No, sir.

11    Q    Was it essentially just floating in the same vicinity

12    the entire time before you left the scene?

13    A    Yes, sir, still dead in the water.

14             MR. DERENZO:  May I have just a moment,

15    Your Honor?

16             THE COURT:  You may.

17             MR. DERENZO:  Tender the witness, Your Honor.

18             THE COURT:  Can we turn the lights up, please.

19             Mr. Hernandez?

20             MR. HERNANDEZ:  Thank you, Your Honor.

21             Good morning, sir.

22             THE WITNESS:  Good morning, sir.

23      CROSS-EXAMINATION OF PETTY OFFICER BRANDON DICKINSON

24    BY MR. HERNANDEZ:

25    Q    How far away were you from the boat that you were
```

Case 8:18-cr-00594-SCB-JSS   Document 355   Filed 03/22/21   Page 10 of 212 PageID 3295
P.O. BRANDON DICKINSON - JANUARY 27, 2020      10
Cross-examination by Mr. Hernandez

1   observing?

2   A    We were at an altitude of 6700 feet, so close to

3   7,000 feet, and we stayed within two to six miles of the

4   vessel.

5   Q    And your observations were by watching the camera or

6   the video, or were your observations with your naked eye?

7   A    My observations were through the video, sir.

8   Q    So obviously you couldn't see anything with the naked

9   eye or hear anything, correct?

10  A    No, sir.

11  Q    And that would be the entire time you were watching the

12  video?

13  A    Yes, sir.

14  Q    And based on watching the video, you could see movement

15  by different people, correct?

16  A    Yes, sir.

17  Q    But you could not actually determine who was doing

18  what, correct?

19  A    No, sir.  We could just see different individuals doing

20  different things.

21  Q    And did you observe any distress equipment?

22  A    No, sir.

23  Q    Did you -- and at some point you indicated that you

24  left the scene, correct --

25  A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020      11
Cross-examination by Mr. Hernandez

1   Q    -- because you were short on fuel?

2   A    Yes, sir.

3   Q    And that resulted in your losing sight of the vessel?

4   A    Yes, sir.

5   Q    And whatever was done after that would have been

6   someone else, correct?

7   A    Yes, it was then passed on to the MONCTON.

8   Q    It was -- pardon?

9   A    It was then passed on to the other asset, the boat we

10  were working with.

11  Q    And did you relay information to these other people or

12  are you assuming that correct information was provided to

13  them?

14  A    Yes, sir, we had constant communication with the vessel

15  we were working with as well as our task director.

16  Q    Were you the one providing the info or was it someone

17  else in your team?

18  A    Yes, sir, I was providing that info.

19  Q    Now, what was the color of the vessel?

20  A    The color of the vessel we couldn't make out

21  completely.  The hull looked dark, like a dark blue or a

22  black.

23  Q    Was the -- we're seeing red.  What was -- what was the

24  red part?

25  A    The red was the tarp above the hull, sir.

Case 8:18-cr-00594-SCB-JSS   Document 355   Filed 03/22/21   Page 12 of 212 PageID 3297
P.O. BRANDON DICKINSON - JANUARY 27, 2020       12
Cross-examination by Mr. Hernandez

1   Q    And there are -- from what we're seeing on the video,

2   even edited there's a lot of stretches of cloud cover,

3   correct?

4   A    Yes, sir.

5   Q    And obviously what the jury is not seeing is a lot of

6   stretches of cloud cover where you can't see anything,

7   correct?

8   A    Yes, sir.

9   Q    And it would obviously be correct that you don't know

10  what's going on, you can't even see it on the video what's

11  going on when the cloud cover is involved, correct?

12  A    That's correct, sir.  We can maintain position and

13  information on the target, but we do lose visual contact.

14  Q    And you were asked by Mr. DeRenzo several times on

15  Direct Examination if that was the same boat, and you said

16  yes, correct?

17  A    Yes, sir.

18  Q    Was that based on your observations, assumptions, or

19  what?

20  A    Could you rephrase that, sir?

21  Q    You were asked several times if it's the same boat,

22  correct?

23  A    Yes, sir.

24  Q    And you said yes, correct?

25  A    Yes, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020      13
Cross-examination by Mr. Hernandez

1   Q    Would that indicate that there were many times where

2   you lost sight of the boat?  Correct?

3   A    Yes, sir, we did lose visual with cloud coverage.

4   Q    And when your answer was yes, it was the same boat,

5   is that based on your observations or assuming that you're

6   looking at the same boat?

7   A    That's based on target detection we have on our radar,

8   and we can maintain that target detection throughout the

9   cloud coverage, so we know it's the same vessel we're

10  looking at.

11  Q    Now, the video does not show -- it shows -- you've

12  indicated -- I think you referred to it as packages,

13  correct?

14  A    Yes, sir.

15  Q    There was nothing from your observations of the video

16  that would indicate that you knew what the packages

17  contained, correct?

18  A    No, sir.

19  Q    Certainly because of that it -- is it because the

20  package was completely covered or you just couldn't really

21  determine it from watching it on the video?

22  A    We could see packages, we could see white packages

23  being thrown into the water, but since we were not

24  physically present we couldn't tell what was in the

25  packages.

1          MR. HERNANDEZ:  Thank you.

2          THE COURT:  Mr. DeRenzo, any Redirect?

3          MR. DERENZO:  Briefly, Your Honor.

4     **REDIRECT EXAMINATION OF PETTY OFFICER BRANDON DICKINSON**

5  **BY MR. DERENZO:**

6  Q    Petty Officer Dickinson, have you ever been a

7  Coast Guard boarding officer?

8  A    No, sir.

9  Q    Have you ever been a Coast Guard boarding team member?

10 A    No, sir.

11 Q    So as a Coast Guard aviator do you have to go through

12 any training in order to get any law enforcement

13 qualifications to do drug boardings?

14 A    No, sir.

15 Q    What is your job as a member of the Coast Guard aircrew

16 in a case like this?

17 A    Our job as the aircrew is to report anything that we

18 think is suspicious, we report it to our command center and

19 we await further tasking.

20 Q    Fair to say it's not your job to draw conclusions

21 necessarily about what you're seeing?

22 A    Yes, sir.

23 Q    Have you ever -- strike that.

24          Have you ever handled a bale of cocaine?

25 A    No, sir.

P.O. BRANDON DICKINSON - JANUARY 27, 2020     15
Redirect Examination by Mr. DeRenzo

1  Q    Have you ever participated in any DEA offloads from a
2  Coast Guard cutter to the shore?
3  A    No, sir.
4  Q    Mr. Hernandez asked you some questions about what
5  happened before you actually left the scene with this
6  vessel.  What did you do before leaving the scene?
7  A    Before leaving the scene we passed all relevant
8  information to the boat we were working with, which was the
9  MONCTON, as well as our command center, which is position of
10 the vessel, course of the vessel, speed.
11 Q    And was that transmitted to the MONCTON, the service
12 asset?
13 A    Yes, sir.
14 Q    Why did you do that?
15 A    We provide them with this information so even with us
16 not being on scene they're still able to find this vessel.
17 Q    Mr. Hernandez asked you a few questions about whether
18 this is the same boat.
19         You've reviewed Exhibits 2A through 2Q several
20 times at this point; is that fair?
21 A    Yes, sir.
22 Q    And at any point while you were over this target did
23 you lose instrument visibility of this vessel?
24 A    We lost camera visibility, but we maintained radar
25 visibility throughout.

1    Q    Do you have any doubt in your mind that the video we

2    saw in Exhibits 2A -- or, excuse me, 2B through 2L is the

3    same vessel?

4    A    No, sir.

5              MR. DERENZO:  Nothing further, Your Honor.

6              THE COURT:  All right.  You may step down, sir.

7    Thank you.

8              THE WITNESS:  Thank you, Your Honor.

9              THE COURT:  And you may call your next witness.

10             MR. DERENZO:  Thank you, Your Honor.

11             The United States calls Petty Officer Eric

12   Lauginiger, U.S. Coast Guard.

13        *(Petty Officer Eric Lauginiger enters proceedings.)*

14             THE COURT:  Sir, if you'll come forward to be

15   sworn.

16             COURTROOM DEPUTY:  Please raise your right hand.

17             Do you solemnly swear or affirm, under penalty of

18   perjury, that the testimony you're about to give will be the

19   truth, the whole truth and nothing but the truth?

20             THE WITNESS:  I do.

21             COURTROOM DEPUTY:  Please state your name for the

22   record and spell your last name.

23             THE WITNESS:  Eric Boyd Lauginiger,

24   L-A-U-G-I-N-I-G-E-R.

25             COURTROOM DEPUTY:  Thank you, sir.  You may take

 1   the witness stand.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Mr. DeRenzo.

 4              MR. DERENZO:  Thank you, Your Honor.

 5              Petty Officer Lauginiger, good morning.

 6              THE WITNESS:  Good morning, sir.  How are you?

 7        **DIRECT EXAMINATION OF PETTY OFFICER ERIC LAUGINIGER**

 8   **BY MR. DERENZO:**

 9   Q    I see you're in uniform here this morning.  What do you

10   do for a living?

11   A    I am in the United States Coast Guard.

12   Q    How long have you been in the Coast Guard?

13   A    I have been in the Coast Guard for 14 years now.

14   Q    And what do you do in the Coast Guard?

15   A    I'm a maritime enforcement specialist, first class.

16   Q    What is that?

17   A    So essentially we specialize in maritime enforcement,

18   all the law enforcement in the maritime realm.

19   Q    How long have you been in that job specifically, a

20   maritime enforcement specialist?

21   A    Specifically -- so I joined in 2006, came out of

22   boot camp and went and became a nonrated personnel, so

23   I didn't have a specific rate yet.  Once I went there

24   I still stayed lookout and I worked Aids to Navigation.

25   From there I went to Gunner's Mate 'A' School, so that was

1   originally my rate, specific rate I had.  This is before the

2   Coast Guard actually came out with a maritime enforcement

3   rate.

4           From there I went and became a Coast Guard police

5   officer in Petaluma, California, where I went to a 13 week

6   police academy.  After that, in 2010 they came out with the

7   maritime enforcement rate.  After my experience, and all

8   I did was about three years or so of law enforcement,

9   I decided to lateral over to the initial Coast Guard

10  maritime enforcement specialist rate.

11          Then from there I went to the Maritime Safety

12  Security Team in Boston, Massachusetts.  We specialized in

13  maritime law enforcement, ports protection, we did a lot of

14  ports, waterway, coastal security type law enforcement and

15  we also did counter-piracy stuff out in the Middle East.

16          From there I did four years at the MSST, the

17  Maritime Safety Security Team.  I went to TACLET Pacific,

18  which is a tactical law enforcement team.  What a tactical

19  law enforcement team is, it's made up of several smaller

20  teams, which are known as LEDETs or law enforcement

21  detachment, they're normally made up of 8 to 12 individuals,

22  and what we do is we go out on the -- on platforms like the

23  U.S. Navy ships or Allied ships, such as Canadian or British

24  or Dutch ships, and essentially they're a platform for us to

25  conduct law enforcement at sea.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   19
Direct Examination by Mr. DeRenzo

1   Q    So in addition to being a maritime enforcement

2   specialist, do you have any particular qualifications or

3   certifications in the Coast Guard?

4   A    Yes, sir, I do.  I am a qualified boarding officer, a

5   law enforcement instructor, water survival training master,

6   also an EMT, digital evidence, search and seizure operator

7   as well as a tactical operator, just to name a few.

8   Q    And what does a boarding officer qualification allow

9   you to do?

10   A    Allows me to conduct actual law enforcement.

11   Q    At sea, I take it?

12   A    Yes.

13   Q    How does one become a certified boarding officer?

14   A    You have to actually go to a school.  I went to a five

15   week school in 2011 to become a boarding officer in

16   Charleston, South Carolina.

17   Q    So since 2006 how much of your career has been devoted

18   to some aspect of law enforcement in the Coast Guard?

19   A    13 years total, nine years actually doing maritime

20   law enforcement.

21   Q    Let's talk a little bit about where you're currently

22   stationed.  You said that's the TACLET Pacific; is that

23   right?

24   A    Yes, sir.

25   Q    Are you a qualified boarding officer at that unit?

1  A    I am, yes.

2  Q    And how long have you been at that unit in particular?

3  A    I've been at that unit, it will be five years this

4  June.

5  Q    In the course of your duties at the TACLET, do you

6  deploy at all?

7  A    I do, yes.  I've been deployed about 11 times at TACLET

8  itself.  I've done eight counter-drug boardings.  I would

9  say three of them were in the Eastern Pacific Ocean and then

10  seven of them were in the Caribbean Sea.

11  Q    Let's talk about some of those deployments.  When

12  you're on one of these counter-drug patrols, what are you

13  looking for as a Coast Guard boarding officer?

14  A    We're looking for any suspicious activity, mostly any

15  ships that are coming up north from the South American

16  countries, such as Colombia, Venezuela, and they'll go up

17  north and then a lot of times they'll cut towards Mexico and

18  try to go through on land to bring narcotics or contraband

19  to the United States.

20  Q    And in your experience are there any types of vessels

21  in particular you're looking for as a boarding officer?

22  A    Yes.  So it can be a variety of vessels.  The majority

23  of the time it's going to be what we call as a go-fast

24  vessel, it's a Panga-style vessel, typically anywhere from

25  25 to 40 feet long, multiple engines, they'll be blended in

1  with the environment to try to evade detection, multiple

2  people on deck, multiple fuel drums on deck, a lot of times

3  these vessels will be tarped over in addition to try to

4  blend in even more with the environment.

5  Q    And those characteristics that you've just described,

6  is that something you've learned over your years doing this

7  kind of work?

8  A    Yes.

9  Q    Approximately how many interdictions at sea,

10  specifically in the counter-narcotics environment, have you

11  been involved in?

12  A    Counter-narcotics, I've had 17 interdictions.

13  Q    Have any of those resulted in drug seizures?

14  A    Yes, all 17 of those were interdictions.

15  Q    What kinds of drugs?

16  A    Cocaine.

17  Q    All of them?

18  A    Yes.

19  Q    At the point during those 17 interdictions did you have

20  an opportunity to observe how the cocaine was packaged for

21  transportation?

22  A    Yes.

23  Q    And can you describe for the jury how the cocaine was

24  packaged.

25  A    Yes.  So cocaine is typically packaged individually,

1    first in a kilo-sized package, it's about the size of a

2    book, I would say, and each kilo weighs 2.2 pounds, and what

3    they do is they'll take one kilo, wrap it in something like

4    cellophane and then in rubber and then some tape, and

5    they'll do that multiple times, make multiple layers, and

6    then they'll take that, put their type of stamp on it or

7    something like that, and then they'll -- typically what I've

8    seen, on average, you'll have a book-size and then ten more

9    book-size on top of that, so 10 kilos stacked up, wrap it

10   all together so it stays together, and then you'll make two

11   rows of them so it's like two books like that, so it's a big

12   rectangle.  Average would be 20 kilos in one bale, sometimes

13   there's a little bit more, could be 40.  So on average a

14   20 size bale probably weighs about 50 pounds including all

15   the extra baggage and stuff that they wrap it in.

16   Q    So you used the word "bale."

17   A    Yeah.

18   Q    When you say "bale," do you mean the individual

19   book-size kilos that you were talking about or do you mean

20   the whole thing packaged up?

21   A    So, yeah, it's the whole -- the whole thing packaged

22   up, so 20 kilos would equal one bale.

23   Q    Other than those 17 at-sea interdictions, at any point

24   in your career have you had an opportunity to see or handle

25   cocaine bales in any other context?

1   A    I have, yes.

2   Q    In what context?

3   A    I've done offloads with the DEA, so typically they will

4   round up all the interdictions that I've had in one period

5   of time, they'll go on a Coast Guard cutter and that

6   Coast Guard -- I'm stationed in San Diego currently, so one

7   of the DEA labs over in San Diego, and when the Coast Guard

8   cutter pulls in, DEA representatives come there as well as

9   some guys from our unit and we'll help assist with offloads

10  of all the bales and it goes to the DEA labs.

11  Q    Have you had any other occasions, other than a DEA

12  offload, to handle or observe cocaine bales?

13  A    I've been to the actual Drug Enforcement Administration

14  labs, but other than that.

15  Q    Okay.  In total, including your time with the at-sea

16  interdictions or offloads or just moving cocaine bales from

17  Coast Guard ship to Coast Guard ship, how many bales of

18  cocaine would you estimate you've seen personally or

19  handled?

20  A    I've seen thousands of bales of cocaine, kilos of

21  cocaine.

22  Q    Fair to say you're familiar with what it looks like?

23  A    Yes.

24  Q    All right.  So let's talk about December 2018.  Do you

25  recall that time period?

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   24
Direct Examination by Mr. DeRenzo

1   A    I do, yes.

2   Q    Were you deployed for the Coast Guard during that time

3   period?

4   A    I was deployed on the HMCS MONCTON.

5   Q    What is that vessel?

6   A    It's a Canadian mine sweeper that we use for a platform

7   in order for us to do law enforcement.

8   Q    Is that one of those Allied ships you were talking

9   about just a few minutes ago?

10  A    Correct.  Yes.

11  Q    Who else was with you on this patrol?

12  A    So we were deployed with seven total LEDET members.

13  We had Petty Officer Perio, Petty Officer Ramos, Petty

14  Officer Rivera, Petty Officer Fahey, Chief Petty Officer

15  Brooks, as well as our deployable team leader, Lieutenant

16  Miller.

17  Q    What kind of patrol was this?

18  A    It was a counter-drug patrol down in the Caribbean Sea.

19  Q    And approximately how long did that patrol last?

20  A    Approximately 60 days.  45 to 60 days.

21  Q    During that period of time did you have any at-sea

22  interdictions?

23  A    We had one, yes.

24  Q    And do you recall the date of that interdiction?

25  A    It was December 1st into December 2nd.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   25
Direct Examination by Mr. DeRenzo

1    Q    Of 2018?

2    A    2018.  Correct.

3    Q    Let's talk about that interdiction in particular.

4    Let's start with what kind of vessel it was.  What kind was

5    it?

6    A    So initially the photographs I saw were an actual

7    Panga-style vessel or go-fast style vessel, and then when I

8    came alongside of it I confirmed that it was a Panga or

9    go-fast style vessel.

10   Q    Let's back up just a little bit.  How did you receive

11   notification of this vessel?

12   A    Yes.  So we got notification that a maritime patrol

13   aircraft, or what we call as an MPA -- we like to use

14   abbreviations -- they --

15            MR. HERNANDEZ:  Objection, hearsay.

16            THE COURT:  Yes.  Sustained as to what they might

17   have said.

18   BY MR. DERENZO:

19   Q    Did you have an opportunity to view any imagery of this

20   vessel?

21   A    I did, yes.

22   Q    And can you describe what you saw in that imagery.

23   A    Yes.  It was a go-fast or a Panga-style vessel.

24            THE COURT:  Can you tell us what a Panga-style

25   vessel is.

1            THE WITNESS:  Yes, Your Honor.  Sorry.  So a

2    Panga-style vessel, it's what they use for fishing.  It's

3    roughly 25 to 40 feet in length, you'll have a cargo hold in

4    the middle, typically, and it could either be tiller driven

5    or it can be console driven, with somebody actually driving

6    at a wheel, open bow.  That's pretty much it.

7    BY MR. DERENZO:

8    Q    When you first received notification, did you receive a

9    last known position of the vessel?

10   A    We did, yes.

11   Q    And after you received the notification and had a

12   chance to look at this imagery, what if any steps did you

13   take as a boarding officer?

14   A    We determined where the actual vessel was, how far away

15   we were from it.  We decided to start getting the boarding

16   team ready to actually go conduct the boarding itself while

17   we started making our way towards the target of interest.

18   Q    And how far away from this vessel, based on the

19   information you received, were you?

20   A    We were roughly three to four hours away.  We launched

21   our first boarding team at approximately ten nautical miles

22   away.

23   Q    And who was on that first boarding team?  Was that you?

24   A    I was not on the initial boarding team.  What the

25   original plan was, we launched an initial boarding team of

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   27
Direct Examination by Mr. DeRenzo

1    Petty Officer Fahey and Petty Officer Rivera, 10 nautical

2    miles out.  It was starting to get a little dark.  It was

3    evening time.  Once they launched, I went up to the bridge

4    where you drive the ship and I kept lookout for the contact

5    that we received information about.  The small boat had some

6    troubles, we were actually making better way towards the

7    contact than the small boat was, so I was told by my

8    deployable team leader to get ready myself and get on the

9    second small boat to start going towards the TOI.

10   Q    And what was the -- so we're talking about three boats

11   here, we've got the MONCTON and these two smaller boats,

12   correct?

13   A    Correct.  Yes.

14   Q    Which vessel was actually -- did any of these vessels

15   actually arrive on scene with the target that you were

16   looking for?

17   A    Yes.

18   Q    Which vessel?

19   A    My vessel arrived initially on scene, the second small

20   boat that was launched, and then the second -- the initial

21   boat arrived second.

22   Q    When you arrived on scene, how far away was the MONCTON

23   from this boat?

24   A    We launched our small boat around 400 yards towards the

25   small boat, towards the TOI, the target of interest.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020  28
Direct Examination by Mr. DeRenzo

1  I still couldn't see it with my naked eye.  The bridge had
2  it on radar, where they could see it with the radar, but
3  no one could actually see it with their eye, so we launched
4  with night vision goggles, tried to get closer, and then
5  I actually put my actual eyes on the target of interest
6  roughly around 50 to 100 yards away before I could actually
7  see it.
8  Q    What is the purpose of launching that first small boat?
9  Why is the small boat -- why not just drive the MONCTON
10 there?
11 A    So what we want to do is launch our small boat
12 beforehand, because it's a smaller profile, so the target of
13 interest can't see it, and normally typically the small boat
14 can outrun the ship itself.
15 Q    Can you recall in any of those other prior 17
16 interdictions an instance where the bigger ship, in this
17 case the MONCTON, actually arrived to the target before the
18 small boat?
19 A    Not that I can recall no.
20 Q    When you -- when you personally arrived on scene, who
21 was on the boat with you?
22 A    It was myself and Petty Officer Ramos.
23 Q    And as you arrived on scene, what did you see?
24 A    So we arrived on scene and we saw four individuals on
25 the back of a go-fast style vessel or Panga-style vessel

 1  that was approximately 30 feet in length.  They were

 2  concealed -- concealing themselves with clothes over top of

 3  their head behind the actual helm or the console where you

 4  drive the boat.  We noticed the Panga was dark in color,

 5  blending in with the environment.  There was no navigation

 6  lights.  There was multiple fuel drums on deck, they were

 7  all about 55-gallon fuel drums, so bigger fuel drums on

 8  deck.  They had lines that were frayed and cut hanging off

 9  the side of the vessel as well, and we noticed the vessel

10  had no engines on board.

11  Q    In your 17 previous interdictions, had you ever seen

12  that before, a boat, no engines, in the middle of the ocean?

13  A    That was the first time that I personally have seen a

14  boat with no engines.

15  Q    Where did you find this boat?  What was the location?

16  A    It was approximately 16 degrees north and 079 degrees

17  west, so approximately 110 nautical miles southwest of

18  Jamaica, was the closest point of land.

19  Q    When you first saw the boat, how far were you from it?

20  A    I was approximately 100 to 50 yards away from the boat,

21  only being able to see it with night vision goggles on.

22  Q    At any point -- well, let's -- let's back up.

23          After you get on scene with the boat, what's the

24  next action you took as the boarding officer?

25  A    Yes.  So as soon as we get on scene with them, we want

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   30
Direct Examination by Mr. DeRenzo

1    the whole crew to stand up and muster so we can account for

2    them, and we moved them to the front where the cargo hold

3    was.  Excuse me.  And then we start -- we want to find out

4    who the master is, so I ask each individual, are you the

5    master, are you the master, until someone claims to be the

6    master.  Then we ask if they have -- if they want to make a

7    claim of actual nationality for the vessel itself.

8    Q    And we'll get to that part in just a moment.

9    A    Okay.

10   Q    At any point during your interactions with the people

11   on this boat were you able to ascertain the nationalities of

12   the individuals on board?

13   A    Yes.

14   Q    And what were those?

15   A    We had three Colombian individuals on board and then

16   one from Belize.

17   Q    In your 17 prior interdictions, can you recall a

18   go-fast vessel crew with somebody from Belize on it?

19   A    Not from Belize, no.

20   Q    So let's talk about that, the portion of the boarding

21   you just referenced.  Were you able to observe whether this

22   vessel was flying a flag of any kind?

23   A    It had no indicia or indication of nationality, no.

24   Q    Did it have any registration numbers on the boat?

25   A    Didn't have any registrations on the boat.

1   Q    At any point in time were you provided with any

2   registration documents from any country?

3   A    Negative.  No.

4   Q    Were you able to ascertain who was the master?

5   A    I was, yes.

6   Q    And who was that?

7   A    It was Emiro Hinestroza-Newbbooll.

8   Q    Do you see that person in the courtroom anywhere?

9   A    I do, yes.

10  Q    And just so the record is clear, can you point him out

11  and just identify what he's wearing clothing-wise.

12  A    This gentleman right here with the orange shirt on.

13           MR. DERENZO:  Your Honor, at this time I'd request

14  that the record reflect that the witness has identified the

15  defendant.

16           THE COURT:  The record should so reflect.

17  BY MR. DERENZO:

18  Q    Now, after you identified who has now been identified

19  as the defendant as the master of the vessel, what did you

20  do as the boarding officer?

21  A    I asked him if he wanted to make a claim of nationality

22  for the vessel itself.

23  Q    What was his response to that question?

24  A    He said Colombia.

25  Q    What did you do with that information?

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   32
Direct Examination by Mr. DeRenzo

1   A    I sent the information up to my deployable team leader

2   and then he sent it up to District 7, or Coast Guard

3   District 7.

4   Q    And what's the purpose of doing that?

5   A    So we send it up to the Coast Guard District and then

6   they want to ask the actual country that's claimed, in this

7   case Colombia, if they would like to confirm that this

8   vessel is in fact Colombian, if they want to confirm or deny

9   it.

10  Q    Did you ever receive any confirmation that this vessel

11  was in fact registered in Colombia?

12  A    So I received information back that Colombia could not

13  confirm.

14           MR. HERNANDEZ:  Objection.  Hearsay.

15           THE COURT:  Overruled.  Go ahead.

16  A    So I received that information from my deployable team

17  leader, that Colombia would not confirm or deny that this

18  was their vessel.

19  Q    Now, as a boarding officer, what does that mean to you?

20  A    So that gives us -- lets us know that it's treated

21  without nationality, so it allows us to go on board and

22  conduct a law enforcement boarding.

23  Q    Can you at that point enforce U.S. law on the boat?

24  A    Yes.

25  Q    All right.  Other than the defendant, were you able to

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   33
Direct Examination by Mr. DeRenzo

1  positively identify the other three individuals on the boat?

2  A    Yes, there was three other individuals.

3  Q    Do you recall their names?

4  A    Yes.  There was a Calbot Reid-Dilbert, there was a

5  Jorge Ramon Newball-May, and then a Rudolph Randolph

6  Meighan.

7  Q    How did you identify these individuals?

8  A    I had the actual documentation, I.D.s.

9  Q    What do you mean by documentation?

10 A    Their identification.

11 Q    Okay.  Now, after you asked the questions about where

12 was the vessel registered, what else did you do as the

13 boarding officer?

14 A    So we go through right of approach questioning, which

15 is a line of questioning to determine the nationality of the

16 vessel through actual questioning itself, so it's a form

17 that we fill out.  We started gathering information like

18 their last port of call, their next port of call, what their

19 purpose of the voyage is and stuff like that in order to

20 pass all that information up.

21 Q    Did you ask the defendant what the last port of call

22 was?

23 A    I did, yes.

24 Q    What was his response?

25 A    Cartagena, Colombia.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   34
Direct Examination by Mr. DeRenzo

1    Q    Did you ask the defendant what the purpose of the

2    voyage was?

3    A    I did, yes.

4    Q    What was his response?

5    A    Initially he said he was fishing for mahi.  When we

6    asked can we see your catch, he changed his catch to he

7    wasn't fishing for mahi anymore, he was fishing for conch

8    shells.  So we asked to see how he was fishing for it, and

9    he said SCUBA, so we asked to see the SCUBA gear that he was

10   using to fish for the conch.  Then he switched his claim to

11   he was just using a snorkel and a mask to fish for conch

12   shells.

13   Q    Let's back up to the claim of fishing for a moment.  At

14   some point did you do a search of the vessel?

15   A    We did, yes.

16   Q    Did you find any fishing gear on board?

17   A    We did not find any fishing gear.

18   Q    How about any ice or bait?

19   A    We did not find any ice or bait.

20   Q    How about any tackle to use if you were fishing?

21   A    There was no tackle that I could see, no.

22   Q    You mentioned SCUBA gear just a minute ago.  Did you

23   find any SCUBA gear on board?

24   A    Did not find any SCUBA gear.

25   Q    How about fins or a mask?

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   35
Direct Examination by Mr. DeRenzo

1  A    I did not find any fins.  I can't recall if I saw a

2  mask or not.

3  Q    All right.  At any point did you ask the defendant

4  where was the conch that he was looking for?

5  A    I did, yes.  We asked him to see his catch or the

6  conch, and he said that he threw the seashells overboard

7  when he saw the Coast Guard plane flying over top.  We asked

8  him why he did that and he said because it's illegal for him

9  to fish for conch shells.

10  Q    Now, you mentioned before that this boat didn't have

11  any engines.

12  A    Correct.

13  Q    Did you ever at any point ask the defendant how they

14  got out there in the middle of the Caribbean Sea with no

15  engines?

16  A    Yes, we asked him what he did with his engines, and

17  Mr. Newbbooll claimed that he used the engines as anchors.

18  He said that was a common thing for local fishermen to do

19  around there.  And he was also at sea for six days drifting

20  without any fuel.

21  Q    When you arrived on scene with the defendant and the

22  three other individuals on the boat, did you have an

23  opportunity to be able to observe their physical appearance?

24  A    I did, yes.

25  Q    How did they appear to you?

 1  A    They appeared to be fine.  They didn't have any

 2  significant health issues that I noticed.

 3  Q    Did the defendant have any trouble answering your

 4  questions when you were talking to him?

 5  A    No.

 6  Q    Did he appear alert when you were talking to him?

 7  A    Yes.

 8  Q    You mentioned that you are an EMT before.  Are you

 9  trained, either through your EMT training or through the

10  Coast Guard, to be able to recognize signs of physical

11  distress at sea?

12  A    Yes.

13  Q    What kind of things do you look for as a Coast Guard

14  boarding officer and a qualified EMT?

15  A    We look to see if they have really dry skin, if their

16  eyes are really dry, you can see the chapped lips, you can

17  see how they are, how they're alert, and stuff like that.

18  Q    Did you see any of those types of indications apparent

19  on any of the people on the boat, including the defendant?

20  A    I did not, no.

21  Q    Any indication that they might have been stranded at

22  sea for six days?

23  A    No.

24  Q    Now, when you arrived on scene, I believe you said it

25  was Petty Officer Ramos was with you?

1  A    Correct.  Yes.

2  Q    At any point in time did additional personnel come

3  on board to assist you?

4  A    Yes.

5  Q    Who was that?

6  A    Petty Officer Perio and Ramos come on, but before that

7  I had Petty Officer Fahey and Petty Officer Rivera with me

8  as well.

9  Q    Okay.  At any point after this right of approach, as

10 you put it, did you have an opportunity to actually search

11 the boat?

12 A    Yes.

13 Q    And can you just take the jury through what you did in

14 terms of that search.

15 A    Yes.  So when we get permission to do an actual

16 law enforcement boarding on board one of these vessels, we

17 go on board, and the first thing we want to do is to make

18 sure that it's safe for my boarding team to be on board, so

19 we do an initial safety search -- or initial safety sweep,

20 sorry, which is we go through the vessel to make sure that

21 it's seaworthy and we're good to be on board.

22        After that we get the full boarding, we start

23 doing actual ion scans of the vessel to see if we can find

24 any trace detections of any contraband, anything like that.

25 As we do that, as a boarding officer, I collect

1 identification and documentation from the master and the
2 crew.  Once we've done an ion scan, we send that all back up
3 to the mother ship, which is in this case the HMCS MONCTON,
4 to be actually processed by another Coast Guard member or a
5 LEDET member and sent up to District.
6          While they're doing that, we start conducting a
7 at-sea space accountability on the boat, which is a -- we
8 want to account for every single space on the vessel itself,
9 so we take measurements of multiple locations of the boat to
10 see if there's any hidden compartments or anything like
11 that.  We look through all the different compartments to see
12 if there's anything in there as well.  So we just want to
13 account for everything on that -- on that vessel itself.
14 Q   So let's take each of those portions of the boarding
15 separately.
16          The initial safety sweep, other than the fact that
17 this boat didn't have any engines on it, did you find any
18 other indications that it wasn't seaworthy?
19 A   Yes.  Didn't have the engines, but then it didn't have
20 any navigation lights, so typically it's not safe to be at
21 sea, especially in the middle of the ocean, for a smaller
22 vessel if you don't have any navigation lights, because
23 these bigger ships can't see it without any lights.  I mean,
24 I couldn't see it until I was 400 yards away -- or, sorry,
25 closer than that.  On radar we couldn't see it 400 yards

 1  away.  I couldn't see it until I was about 50 to 100 yards

 2  away.  There was excess fuel on board as well, and then

 3  that's about it for seaworthiness.

 4  Q    Did you personally do any ion scan testing on this

 5  boat?

 6  A    I didn't personally do the swabs, no.  I directed my

 7  boarding team to do the swabs.

 8  Q    And who are those individuals that you tasked?

 9  A    Petty Officer Perio and Petty Officer Ramos helped out.

10  Q    At any point did you receive any -- well, what happened

11  to any documentation with respect to the ion scan swabs?

12  A    Yes.  So after they finished doing the swabs, they --

13  we put them in a sealed bag, and one of us, which in this

14  case was Petty Officer Perio, goes on the small boat to

15  bring it back to the HMCS MONCTON and then he hands it off

16  to -- in this case it was our Chief Petty Officer Brooks to

17  put it through the IONSCAN 500 and actually analyze the

18  swabs themselves.

19  Q    Let's talk now for a minute about the at-sea space

20  accountability.  And just so the jury understands, is that

21  basically like a front-to-back search of the boat?

22  A    Correct.  Yes.

23  Q    All right.  So when you did this portion of the

24  boarding, did you find any bulk contraband on the boat?

25  A    We did not find any bulk contraband on the boat.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   40
Direct Examination by Mr. DeRenzo

1   Q    Did you note any smells of any kind?

2   A    There was fuel.  I smelled fuel.  I didn't smell

3   anything else, no.

4   Q    Did you see any distress signals on the boat, anything

5   you could use to signal for help, say, from the Coast Guard?

6   A    Yes, we found four distress flares on the boat.

7   Q    Did they appear to be used or unused?

8   A    They were unused.

9   Q    So after you completed the at-sea space accountability,

10  what was the next step you took as a boarding officer?

11  A    So after that we pass up all the information to the

12  actual deployable team leader and then he passes it up to

13  District again.

14  Q    At any point in time did you receive authorization to

15  detain the people on the boat?

16  A    So in this case the weather got rough out, so actually

17  two of the individuals fell in the water.  I pulled them --

18  we both pulled them back out, they got back on board, so

19  I requested to get them off the Panga, because it was unsafe

20  for them to be on this vessel at this time, so I wanted to

21  get them off and get them into a safer location on the HMCS

22  MONCTON.  Then at this point, when we took them off, they

23  were treated as safety of life survivors, safety at sea

24  survivors, so we brought them back on the MONCTON and

25  continued processing there.  Once we brought them back on

1   the MONCTON, we requested from District to do ion scan swabs

2   of their hands and forearms to see if there was any trace

3   detection on the individuals themself.

4   Q    And after you did that process did you at some point

5   receive authority to detain the defendant and the other

6   three individuals?

7   A    We did not actually receive authority ourselves to

8   detain.  We sent them over to a Coast Guard cutter, where

9   they later on received authority to detain them and treat

10  them as detainees rather than safety of life at sea.

11  Q    At some point just now you mentioned two people -- two

12  of the ultimate detainees were -- fell into the water while

13  you were trying to transfer them to your boat.  Who were

14  those individuals?

15  A    It was Rudolph Randolph Meighan and Mr. Newball-May as

16  well.

17  Q    To be clear, not the defendant?

18  A    Not the defendant, no.

19         MR. DERENZO:  May I approach the witness,

20  Your Honor?

21         THE COURT:  You may.

22  BY MR. DERENZO:

23  Q    Petty Officer Lauginiger, I've handed you what has been

24  marked as Government's Exhibits 3A through 3M for

25  identification as well as 4A through 4I.  Take a minute,

 1  please, look through those, and look up when you're done.

 2  A    Okay.

 3  Q    Okay.  Let's start with Exhibits 3A through 3M.  Do you

 4  recognize those?

 5  A    I do, yes.

 6  Q    How do you recognize them?

 7  A    That is the crew that is on board the vessel I was on

 8  that day.

 9  Q    Let's talk about all the exhibits, 3A through 3M.  How

10  do you recognize all of them?

11  A    As the members that were on board.

12  Q    Okay.

13  A    And the actual boat I was on board.  The boat that

14  I was on board.

15  Q    Could you repeat that?

16  A    As all the members that are on board and then the

17  actual boat that I was on board as well.

18  Q    Okay.  So Exhibits 3A through 3M, were those part of

19  your case package that you prepare as a boarding officer?

20  A    It was, yes.

21  Q    Okay.  Have you seen those documents before, Exhibits

22  3A through 3M?

23  A    Yes.

24  Q    And do they fairly and accurately depict the

25  individuals you just described and the vessel you

1   encountered on December the 1st and 2nd of 2018?

2   A    They do, yes.

3            MR. DERENZO:  Your Honor, move to admit

4   Government's 3A through 3M.

5            MR. HERNANDEZ:  No objection.

6            THE COURT:  Receive into evidence 3A through 3M.

7   BY MR. DERENZO:

8   Q    Let's talk briefly about 4A through 4I.  Do you

9   recognize those?

10  A    I do, yes.

11  Q    And how do you recognize them?

12  A    That was the vessel the morning after that we boarded

13  on December 1st through 2nd.

14  Q    Are those also photographs that were part of your case

15  package?

16  A    They were, yes.

17  Q    Do Government's 4A through 4I fairly and accurately

18  depict the vessel that you encountered on December the 1st

19  and 2nd of 2018?

20  A    They do.

21  Q    The following day?

22  A    They do, yes.

23           MR. DERENZO:  Move to admit Government's 4A

24  through 4I.

25           MR. HERNANDEZ:  No objection.  Sorry.

1          THE COURT:  Receive into evidence 4A through 4I.

2          MR. DERENZO:  May we publish, Your Honor?

3          THE COURT:  You may.

4          MR. DERENZO:  If we could have the laptop at

5    counsel table and dim the lights slightly, please.

6    BY MR. DERENZO:

7    Q     So let's pull up Government 3A first.

8          What is 3A, Petty Officer Lauginiger?

9    A     That is the crew on board the vessel that I boarded on

10   December 1st and 2nd.

11   Q     Anywhere in this photograph do you see the person who

12   you previously identified as the defendant?

13   A     Yes.  Mr. Newbbooll is the one -- the heavier-set

14   gentleman in the white shirt and hat.

15   Q     If you could, on that screen to your right, you have

16   the ability to -- it's a touch screen.  If you would just

17   draw an arrow to the individual who you're talking about.

18   A     Yes.

19   Q     It's an older touch screen, so you have to be a little

20   bit more deliberate.

21          Thank you.

22          Was that the same person who admitted to you that

23   he was the master of the vessel?

24   A     It was, yes.

25   Q     Who is the individual on the left, do you recall?

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   45
Direct Examination by Mr. DeRenzo

1    A    The one in the blue --

2    Q    Yes.

3    A    -- shirt?  That was Mr. Dilbert.

4    Q    And who is the person wrapped in something orange

5    sitting next to him?

6    A    Mr. Rudolph Randolph.

7    Q    And how about the person sitting on the opposite side

8    of the boat?

9    A    Mr. Newball-May.

10   Q    And are you able to tell from this picture, 3A, what

11   color shirt Mr. Newball-May is wearing?

12   A    Yes.  It's a blue -- blue-colored shirt.

13   Q    Let's move on to 3B.  What is 3B?

14   A    That was the master, and Mr. Newball-May as well.

15   Q    If you would just circle or draw an arrow to the person

16   you're talking about who was the master.

17        That's the same person that you identified as the

18   defendant previously?

19   A    Correct.  Yes.

20   Q    Let's move on to -- actually, let's back up to 3A

21   briefly.

22        Now, when you arrived on scene in your boat, did

23   any of these four individuals signal to you in any way that

24   they might need help?

25   A    They did not, no.

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   46
Direct Examination by Mr. DeRenzo

1   Q    Let's go to 3C.  What are we looking at here?

2   A    This is the empty cargo hold that they were sitting in.

3   They also have a fuel drum in there as well.

4   Q    3D.  What is 3D?

5   A    That shows that -- the flares that we found on board as

6   well as buckets that had their belongings in them.

7   Q    Are those the same unused flares you were referring to

8   earlier?

9   A    Yes.  Yes.

10  Q    3E.  What is 3E?

11  A    This is a compartment that is directly behind the helm

12  where you drive the boat.  They have a toolbox in there as

13  well as some water.

14  Q    Now, during your search of the boat, did you see any

15  food or other provisions other than the bottled water here?

16  A    Not that I can recall seeing any food, no.

17  Q    3F.  What is 3F?

18  A    So this is used to transfer fuel from the drums over to

19  the engines.

20  Q    What is it?

21  A    It's like a -- I guess you can call it like a syphon,

22  like you siphon the fuel over to transfer it to the engines.

23  Q    A hose of some kind?

24  A    Yes, that's correct.

25  Q    Okay.  And this was also on the same boat?

1    A    Correct.  Yes.

2    Q    And let's just be clear, so 3A through 3M, these were

3    all pictures taken on scene that evening?

4    A    Yes.

5    Q    Okay.  Let's go to 3G.  What is 3G?

6    A    This is the back of the boat, where the engines would

7    have been on a typical boat.

8    Q    3H.  What are we looking at here?

9    A    This is a cleat that has frayed line attached to it as

10   well as a hose running kind of all the way back along the

11   rail.

12   Q    3I, what is this?

13   A    This is another cleat, has an attached line that you

14   can see was cut as well.

15   Q    3J.  What is 3J?

16   A    This is a -- you can see another line that hangs over

17   the side, also a fuel drum on board.

18   Q    So the individual who appears to be sitting wrapped in

19   something orange on the left-hand side of 3J, what portion

20   of the boat is that that they're sitting on?

21   A    That was the starboard side.

22   Q    Relative to the front and the back of the boat, what

23   part of the boat was that?

24   A    He was about midships, middle of the boat.

25   Q    3K.  What is 3K?

```
 1    A    This is an overall profile of the vessel we took while
 2    we were on our small boat, kind of shows how it blends in
 3    with the environment.  We weren't able to get a great
 4    picture of it because it was nighttime and we couldn't
 5    really see it too well even with our flashlights, so we got
 6    another picture later on when it was daytime.
 7    Q    And so this picture right here, did you have the
 8    benefit of a flash on the camera or no?
 9    A    No.  We tried our best to use our flashlights as well.
10    Q    Okay.  So you had some light source, just not a flash?
11    A    Yes.  Correct.
12    Q    Okay.  Let's move on to 3L.  What's 3L?
13    A    That's the stern or the back of the vessel, showing
14    where the engines would be as well.
15    Q    3M.  What's 3M?
16    A    This is the port side or the left side of the vessel,
17    depicting the overall profile as well.
18    Q    What is the -- what appears to be a white object
19    towards the right-hand side of that photograph?
20    A    That was a cooler.
21    Q    And where was that in relationship to other things on
22    the vessel?
23    A    It was directly in front of the helm where you drive
24    the boat.
25    Q    All right.  Let's move now to 4A.
```

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   49
Direct Examination by Mr. DeRenzo

1   A    So this is a picture the next day when the sun came up

2   so we could get a better picture of the vessel itself with

3   lighting.

4   Q    And this picture is taken from the vantage point of the

5   front of the boat?

6   A    Correct.  Yes.  This is the front of the boat.  We also

7   put chemical lights on there, like a chemical light, so --

8   because when we get off the boat we want to make sure it's

9   not a hazard to navigation, so we want to put some sort of

10  lighting on there so we can see it and other boats can see

11  it that are passing by.

12  Q    Did you do that because this boat didn't have any

13  lights on it, apparently?

14  A    Correct.  Yes.

15  Q    Okay.  Let's move on to 4B.  What is 4B?

16  A    This is the port side or the left side of the vessel.

17  You can see multiple lines hanging over the vessel that

18  appear to be cut.  You can see some hoses that are running

19  back towards the engines themselves, multiple fuel drums on

20  deck, I see some of our chemical lights again, and the

21  cooler in the back too.

22  Q    4C.  What's 4C?

23  A    Another profile picture of the vessel itself.  Again

24  you see fuel drums, the cargo hold, lines over the side that

25  were cut.

1    Q    Can you draw a circle around the cargo hold.

2         And you mentioned the helm.  Can you just circle

3    or draw an arrow where you were talking about.

4         Let's move to 4D.  What is 4D?

5    A    This is a picture of the middle of the vessel itself.

6    You can see the empty cargo hold in there, multiple lines,

7    see our chemical lights again, all the fuel -- drums for

8    fuel on deck as well.

9    Q    4E?

10   A    This would be the stern or the back of the vessel.

11   Again, it's a better visual of where the engines would be.

12   You can see multiple hoses going back towards where the

13   engines would be as well as lines hanging off of the vessel

14   from the cleat as well.

15   Q    Let's go to 4F.  What's this?

16   A    That's another similar picture of the stern of the

17   vessel, overall profile of the vessel itself.

18   Q    4G?

19   A    This is the starboard side or the right side of the

20   vessel.  You can see there's little rub marks on the bow up

21   there near the front as well.

22   Q    4H?

23   A    This is a good picture of the profile.  You can also

24   see the -- it looks to be more of like a rush paint job to

25   paint it black, because you can see the blue underneath of

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   51
Direct Examination by Mr. DeRenzo

1   where the water line is itself too.

2   Q    Is that what you're referring to?

3   A    Yes.  Correct.

4   Q    Let's go to 4I.  What's 4I?

5   A    Another profile of the vessel, profile view of the

6   vessel itself.

7          MR. DERENZO:  Okay.  Let's publish 2P, and just

8   press play.

9   Q    In your screen to the right, Petty Officer Lauginiger,

10  you should see what's now been admitted as Government's

11  Exhibit 2P.  Take a look at it.  I'm going to ask you a

12  couple questions.

13  A    Okay.

14                    *(Video played.)*

15  Q    Are you able to recognize the vessel you see in

16  Exhibit 2P?

17  A    Yes.

18  Q    How so?

19  A    It's the vessel that I saw on documentations prior to

20  the boarding and then it's a similar vessel to the vessel

21  I actually boarded that day.

22  Q    To be clear, the imagery you talked about in the

23  beginning of your testimony that you received about a

24  suspicious vessel, is this some of the same imagery you saw

25  before?

1    A    Yes.  We saw still imagery of it before we actually

2    went out and boarded.

3    Q    Picture?

4    A    Picture, yes.

5    Q    Did it appear to be a still frame of the video you're

6    watching now with all this green lettering on it?

7    A    Yes.

8    Q    Okay.  But to be fair, the vessel you boarded didn't

9    have any engines, right?

10   A    It did not have engines, no.

11   Q    And it didn't have a tarp over the front?

12   A    Correct.  No tarp.

13          MR. DERENZO:  Okay.  So let's move to 2K and go to

14   4 minutes, 40 seconds.

15                        *(Video played.)*

16   Q    Are you able to recognize that vessel?

17   A    Yes.

18   Q    Is that the same boat you boarded on December the 1st,

19   2018?

20   A    Yes.

21   Q    Does that vessel appear to have a tarp on it?

22   A    It does not appear to have a tarp on it that I can see.

23          MR. DERENZO:  Let's move to 2L.  And we can fast

24   forward to 13 minutes, 30 seconds.

25                        *(Video played.)*

1  Q     Petty Officer Lauginiger, do you recognize that boat?

2  A     Yes.

3  Q     How so?

4  A     As the vessel that I boarded that evening.

5  Q     Is there anything about the vessel you see here in

6  Exhibit 2L that makes you confident that it's the same boat?

7  A     Yes.  You can see the cooler that's directly in front

8  of the helm and also appears to not have engines on board as

9  well.

10 Q     Are you able to ascertain from this imagery what color

11 the hull is?

12 A     It appears to be a dark color or black color.

13         MR. DERENZO:  May I have just a moment,

14 Your Honor?

15         THE COURT:  You may.

16         MR. DERENZO:  Let's pull up Exhibit 2Q, and we can

17 fast forward to approximately a minute and 30 seconds.

18 BY MR. DERENZO:

19 Q     Take a look at this, Petty Officer Lauginiger, and I'm

20 going to ask you a few questions.

21 A     Okay.

22                     *(Video played.)*

23         MR. DERENZO:  We can skip ahead slightly about a

24 minute or so.

25                     *(Video played.)*

1          MR. DERENZO:  Fast forward another minute or so.

2                    (Video played.)

3     BY MR. DERENZO:

4     Q    Explain what you're looking at here, Petty Officer

5     Lauginiger.

6     A    Appears to be the vehicle jettisoning over multiple

7     bales of contraband.

8     Q    Let me ask you this.  Those white objects you see

9     floating in the water, do you have an opinion on what they

10    are?

11         MR. HERNANDEZ:  Objection.  Speculation.

12         THE COURT:  I'm going to overrule the objection.

13    You may answer the question.

14    A    Yes.  They -- they look like bales of cocaine that I've

15    seen in the past.

16    Q    And why do you believe that?

17    A    Due to my training and experience.  I've also been an

18    AUF controller, or Aerial Use of Force controller, so I've

19    been up in helicopters where we're doing similar video

20    footage of vessels that have jettisoned over bales of

21    cocaine that we later found that were proven to be bales of

22    cocaine.

23    Q    These objects that you see now in Exhibit 2Q, do they

24    appear to be consistent in size, shape and appearance to

25    those bales of cocaine you talked about during the earlier

1    part of your testimony?

2           MR. HERNANDEZ:  Objection.  Leading.

3           THE COURT:  Overruled.  You may answer the

4    question.

5    A    Yes.  Yes, they look very similar to what I've seen in

6    the past.

7           MR. DERENZO:  No further questions, Your Honor.

8           THE COURT:  Mr. Hernandez.

9           MR. HERNANDEZ:  Thank you, Your Honor.

10          Good morning.

11          THE WITNESS:  Good morning.

12          MR. HERNANDEZ:  I'm not sure if I know how to

13   pronounce your name.  Lauginiger?

14          THE WITNESS:  Lauginiger, sir.  Yes.

15       **CROSS-EXAMINATION OF PETTY OFFICER ERIC LAUGINIGER**

16   **BY MR. HERNANDEZ:**

17   Q    You testified about your experience in interdiction,

18   but in this case there were no bales to inspect, correct?

19   A    Correct, sir.  Yes.

20   Q    And I think you were already asked, you never saw

21   anything of bulk in nature that you could inspect?

22   A    Correct.  No.

23   Q    And when you -- you boarded the vessel, correct?

24   A    Yes.

25   Q    Did you see any type of spilled powder or anything that

 1   would be something that you could recover that you could

 2   actually see with the naked eye?

 3   A     No.

 4   Q     And you do have this experience, but you don't have any

 5   supernatural powers to be able to look at white objects on a

 6   screen and say that's cocaine, correct?

 7   A     Correct.  Yes.

 8   Q     I don't mean to be funny, but the point is that you can

 9   see white objects and that's it?

10   A     Yes.

11   Q     And to say that is cocaine or having an opinion that

12   it's cocaine, even though you have this experience, you

13   would agree with me that it's speculation on your part?

14   A     Yes.

15   Q     You were watching the video, correct, during some of

16   this surveillance before you got to the boat?

17   A     No, I wasn't watching the actual video of it.

18   Q     Okay.  So any view of the video would be something that

19   you saw afterwards?

20   A     Yes.

21   Q     And you, I think, indicated that you had -- there was

22   some difficulty actually approaching the vessel to recover

23   the individuals in the vessel because there were no,

24   I think, navigation lights, I think, is one of the things

25   you mentioned?

1   A    Yes.

2   Q    And it was at nighttime?

3   A    Yes.

4   Q    And the vessel was -- you believe to be black in color?

5   A    Yes.

6   Q    So basically harder to see what was happening, correct?

7   A    Yes, hard to see the vessel.

8   Q    Now, was the red tarp there when you actually

9   approached the vessel?

10  A    It was not.

11  Q    Was that ever recovered?

12  A    It was not.

13  Q    Okay.  So the vessel that you actually approached did

14  not have any type of red tarp?

15  A    It did not.

16  Q    And you spoke to Mr. Hinestroza-Newbbooll and he

17  indicated that he was the master or -- did he use the word

18  master or captain?

19  A    Captain.  Yes.

20  Q    And despite your experience in these matters, you do

21  not know the particular circumstances of how these men got

22  on the boat or things of that nature, correct?

23  A    No.

24  Q    Was this in an interview that you conducted with

25  Mr. Hinestroza-Newbbooll directly in Spanish, or how did

1    that take place?

2    A    Yes.  So what happened is I have a translator on board

3    and I talk through my translator, and we follow the

4    documentation on how to actually ask the questions.

5    Q    Okay.

6    A    So my translator does all actual questioning.

7    Q    So anything that you've relayed to this jury about

8    anything that Mr. Newbbooll might have said would not be a

9    direct conversation you were having with him, correct?

10   A    Correct.  Yes.

11   Q    It would be something that the interpreter indicated to

12   you --

13   A    Yes.

14   Q    -- correct?

15         You already indicated that you do not have any

16   idea how these men ended up on the vessel; would that --

17   is that an accurate statement that you made?

18   A    Other than them telling me that they came from

19   Cartagena.

20   Q    Okay.  But the particular circumstances of what they

21   did or got on board, you would have no idea, correct?

22   A    Correct.

23   Q    Would you agree with me that being the captain of the

24   boat by itself does not mean that you have knowledge of the

25   cargo?

1    A    Not necessarily.

2    Q    Well, is it possible -- not knowing the circumstances,

3    is it possible that the captain could be used as an

4    unknowing patsy by drug traffickers?

5    A    Certainly possible.

6    Q    And in some cases you would agree that even a captain

7    can be threatened, correct?

8    A    Possible, yes.

9    Q    Now, do you -- in some cases, not necessarily in this

10   case, contraband can be hidden in compartments, correct?

11   A    Yes.

12   Q    Are you able -- were you able to determine whether that

13   was the case in this case?

14   A    If there are hidden compartments, you're asking?

15   Q    Right.

16   A    There was no hidden compartments I found, no.

17   Q    And from your experience -- I think you've already said

18   this, but I just want to verify that when you've recovered

19   bales of cocaine, are they marked in any way?

20   A    The bales typically are in burlap sacks, they're not

21   necessarily marked.  The kilos themselves will usually have

22   some sort of marking on them, but then it's wrapped in a

23   burlap sack.

24   Q    And whatever wrapping -- in this case you saw something

25   white, correct, from the video?

1    A    Yes.

2    Q    Generally, the cargo itself, whether it's a burlap sack

3    or some other package, white package, is it completely

4    covered up?

5    A    I'm not sure what you're asking, sir.

6    Q    Is it -- if you see a -- generally, from your

7    experience, I'm not asking you now about this case,

8    generally, if you see a bale of cocaine covered up in

9    packaging, can you walk up to it and just look at it and say

10   "that's got to be cocaine"?  Is the cocaine visible?  Is it

11   covered up?

12   A    The actual powder substance is not visible, no, it's

13   covered up.

14   Q    I'm sorry.  Could you repeat that?

15   A    The actual powder itself is covered up, yes.

16   Q    Okay.  And in this case we can't be specific because

17   you never inspected any bales, correct?

18   A    Correct.  Yes.

19   Q    And you would agree with me that -- would you not, that

20   if a person finds out once on board, it doesn't matter

21   whether you're the captain or not, you're basically in open

22   waters and you either have to stay there or jump out and try

23   to swim back to shore, correct?

24   A    I'm not sure what you're asking.

25   Q    Let's say someone, hypothetically, doesn't know

1   anything about the cargo but finds out, hypothetically,

2   while on board in the open waters, and he says, oh, my God,

3   you know, there's something -- there's contraband here.  He

4   only would have -- you would agree with me that he only has

5   two options, either stay on board, try to get rid of the

6   contraband, or say, the heck with this, I'm jumping off the

7   boat, and swim to shore?

8   A    Yes.

9   Q    Those are the only two options, correct?

10  A    Most likely, yes.

11  Q    Okay.  And that is assuming, for the sake of this

12  hypothetical, that the captain at some point would find out

13  that there might be something wrong on board, correct?

14  A    Yes.

15  Q    And it's certainly possible that one person, not

16  necessarily the captain, might know -- might have knowledge

17  of the contraband while the other ones would not, correct?

18  A    Yes.

19  Q    Assuming for the sake of this hypothetical that this

20  one person might be an agent of the drug traffickers,

21  correct?

22  A    Sure.  Yes.

23  Q    And without -- without actually having knowledge, we're

24  all just using hypotheticals and speculating, correct?

25  A    Yes.

1   Q    And that's -- this hypothetical is even assuming that
2   there was cocaine on board, correct?
3   A    Yes.
4   Q    Now, you supervised the ion scan testing, correct, or
5   the obtaining of the swabs?
6   A    Yes, I told the boarding team to conduct the ion scan
7   swabs themselves.
8   Q    So you did not actually do it, but you actually
9   supervised it or observed it, correct?
10  A    Yes.  So they were doing that while I was going over
11  documentation, but I did tell them to do the ion scan swabs.
12  Q    And when you're doing this, you're not the person
13  that's going to do the actual analysis and testify as to the
14  results, correct?
15  A    Correct.
16  Q    But when you are either taking the swabs or simply
17  supervising the taking of the swabs, when you're talking
18  about traces, none of this is visible to the naked eye,
19  correct?
20  A    Correct.
21  Q    And it would be correct from your knowledge about this
22  that someone could touch cocaine without even knowing it's
23  there, much less knowing that it's cocaine?
24  A    Yes.
25  Q    And if there are some traces on a boat, a crewman could

1   not -- it's microscopic, so he can't see it, correct?

2   A    Yes.

3   Q    And it could have come from, say, a previous --

4   hypothetically, from a previous voyage with a different crew

5   altogether, correct?

6   A    It's possible, yes.

7            MR. HERNANDEZ:  Thank you.  That's all I have.

8            THE COURT:  Redirect?

9            MR. DERENZO:  Yes, Your Honor.

10      **REDIRECT EXAMINATION OF PETTY OFFICER ERIC LAUGINIGER**

11   **BY MR. DERENZO:**

12   Q    Do cocaine bales sink or float in the water by

13   themselves?

14   A    By themselves, they'll float.

15   Q    Mr. Hernandez was asking you if you found a red tarp

16   anywhere.  How confident are you that the vessel you saw,

17   the videos I showed you earlier, is the same boat you

18   boarded in December 2018?

19   A    Confident, yes.

20   Q    And how many vessels did you interdict in the

21   Caribbean Sea on that patrol?

22   A    One.

23   Q    When you were asking the questions about where the

24   defendant was from and where the boat is from and such and

25   who was the captain, where was the interpreter, Petty

PETTY OFFICER ERIC LAUGINIGER - JANUARY 28, 2020   64
Redirect Examination by Mr. DeRenzo

 1   Officer Rivera, in relationship to you?

 2   A    He was right next to me.

 3   Q    So could you hear his questions to the defendant?

 4   A    Yes.

 5   Q    Could you hear the responses from the defendant to

 6   Petty Officer Rivera?

 7   A    I could, yes.

 8   Q    Did you have any trouble communicating with Petty

 9   Officer Rivera the entire time?

10   A    I did not.

11   Q    On a Coast Guard ship, who is in charge of the whole --

12   the whole ship?

13   A    The CO, the captain.

14   Q    Captain.  How many captains are on a ship?

15   A    Just one.

16   Q    Does it matter if it's a small boat or a big ship?

17   A    No.

18   Q    And how would you describe the responsibilities of a

19   captain of a ship, whether it's a Coast Guard ship or a ship

20   that the -- ship that the Coast Guard has boarded?

21   A    The captain is overall in charge of the whole entire

22   vessel, anything that happens on the vessel, anything that's

23   on the vessel, any personnel that's on the vessel as well.

24   Q    Would that include his crew?

25   A    Yes, his crew, his cargo, the ship itself.

1              MR. DERENZO:  No further questions, Your Honor.

2              THE COURT:  All right.  Thank you, sir.  You may

3     step down.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  And you may call your next witness.

6              MR. DERENZO:  The United States calls Petty

7     Officer Diego Rivera, U.S. Coast Guard.

8          *(Petty Officer Diego Rivera enters proceedings.)*

9              THE COURT:  Sir, if you'll come forward to be

10    sworn.

11             COURTROOM DEPUTY:  Please raise your right hand.

12             Do you solemnly swear or affirm, under penalty of

13    perjury, that the testimony you're about to give shall be

14    the truth, the whole truth and nothing but the truth?

15             THE WITNESS:  I do.

16             COURTROOM DEPUTY:  Please state your full name for

17    the record and spell your last name.

18             THE WITNESS:  Diego A. Rivera, R-I-V-E-R-A.

19             COURTROOM DEPUTY:  Thank you, sir.  You may take

20    the stand.

21             THE COURT:  Mr. DeRenzo.

22             MR. DERENZO:  Thank you, Your Honor.

23             THE WITNESS:  Sir.

24             MR. DERENZO:  Take a moment if you need to get

25    some water, Petty Officer Rivera.

1          Good morning.

2          THE WITNESS:  Good morning.

3     **DIRECT EXAMINATION OF PETTY OFFICER DIEGO RIVERA**

4  **BY MR. DERENZO:**

5  Q    What do you do for a living?

6  A    I am a maritime law enforcement officer in the

7  United States Coast Guard.

8  Q    How long have you been in the Coast Guard?

9  A    So August will be five years.

10 Q    And just briefly, could you summarize what you've done

11 so far in those five years in the Coast Guard.

12 A    So right out of boot camp I was stationed in Louisiana.

13 I was a -- basically an engineer, a boat engineer.  I was

14 there for about two years waiting for me to be called up to

15 our 'A' school.  So after two years I was called up to

16 'A' school and I went through my law enforcement training,

17 approximately two months.  That was -- that took place in

18 South Carolina.  After those two months I was stationed in

19 San Diego, California, where I've been, currently at right

20 now.  I've been there for a little bit over two years and

21 just conducting law enforcement missions.

22 Q    For those of us who might not be in the Coast Guard,

23 what is an 'A' school?

24 A    It's basically our technical school, our technical

25 training for our occupational specialty.

1   Q    Is that where you learned initially to become a

2   maritime enforcement specialist?

3   A    Yes.

4   Q    Okay.  So other than that brief time in Louisiana, have

5   you been a maritime enforcement specialist the entire time

6   you've been in the Coast Guard?

7   A    Yes.

8   Q    And of course when you were in 'A' school, right?

9   A    Yes.

10  Q    Do you hold any law enforcement qualifications or

11  certifications in the Coast Guard?

12  A    Yes.  I'm a boarding officer.

13  Q    And how did you become a boarding officer?

14  A    So that came through technical training and on-the-job

15  training.

16  Q    And do you have any other certifications that assist

17  you in your law enforcement mission?

18  A    Yes.  I am also a boarding team member, I am an aerial

19  use of force controller and also a law enforcement Spanish

20  interpreter.

21  Q    How did you become a Spanish interpreter?

22  A    So I have to take a test that is administered by the

23  Department of Defense, it's divided into a listening section

24  and a reading section.

25  Q    I take it you passed that test?

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020      68
Direct Examination by Mr. DeRenzo

1    A    Yes.

2    Q    How long have you been speaking Spanish?

3    A    So I'm a native speaker, I actually grew up in Mexico,

4    so all my life.

5    Q    What's the name of your current duty station?

6    A    Tactical Law Enforcement Team Pacific.

7    Q    And what's your job at that unit?

8    A    My primary job is as a boarding officer.

9    Q    Do you deploy?

10   A    Yes.

11   Q    In support of what mission?

12   A    Support of the counter-drug missions.

13   Q    Geographically, where have you deployed?

14   A    So I've done a couple deployments in the Caribbean Sea

15   and then the Eastern Pacific Sea.

16   Q    When you deploy, in addition to being a Spanish

17   interpreter, have you had occasion to be a boarding officer

18   as well?

19   A    Yes.

20   Q    Let's talk a little bit about your deployments.  How

21   many patrols have you been on?

22   A    I've done five.

23   Q    And on those five, what were you looking for?

24   A    We were looking for suspected contraband, smuggling

25   vessels.

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020     69
Direct Examination by Mr. DeRenzo

1   Q     Any types in particular of vessels?

2   A     So anything from Ecuadorian Panga-style vessels to

3   fishing vessels to -- if it happened to be a larger vessel,

4   like merchant vessels, we would have to have a lot of,

5   you know, suspicion.

6   Q     How many interdictions -- well, let me back up.

7         Have you had any at-sea interdictions during those

8   patrols?

9   A     Yes.

10  Q     How many?

11  A     Around ten.

12  Q     Have any of those interdictions resulted in a drug

13  seizure?

14  A     Yes.

15  Q     How many of those interdictions?

16  A     Nine out of ten.

17  Q     What kind of drugs were you able to seize during those

18  interdictions?

19  A     Cocaine.

20  Q     Any other drugs?

21  A     No.

22  Q     When you interdicted these vessels, were you able to

23  observe how the cocaine was packaged?

24  A     Yes.

25  Q     How was it packaged?

1    A     So it's packaged in individual kilos, which a kilo is

2    about 2.2 pounds.

3    Q     And were those kilos just strewn about the deck, or how

4    were they packaged on the boat?

5    A     So to describe a kilo, it's basically like the size of

6    a book, it's maybe 4-inch by 2-inch by 8-inch, and it's

7    stacked ten high, with columns of ten, so two columns of

8    ten, and it looks like a perfect rectangle.

9    Q     And what's that overall big package called, the

10   rectangular package?

11   A     That is called a bale.

12   Q     Other than those interdictions that you just testified

13   about, have you had other occasions as a Coast Guard member

14   to see or handle cocaine bales?

15   A     Yes.

16   Q     When was that?

17   A     So I've done two DEA drug offloads and then also

18   transporting contraband from different ships to other ships.

19   Q     And in total approximately how many bales of cocaine

20   have you either handled or seen personally during your

21   Coast Guard career, cocaine bales specifically?

22   A     I would say a couple thousand.

23   Q     Fair to say you're familiar with what a cocaine bale

24   looks like?

25   A     Yes.

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020     71
Direct Examination by Mr. DeRenzo

1   Q    Because of the way cocaine bales are packaged, the way

2   you just described it, does it have a distinctive shape or

3   size?  Is there any consistency in the ones you've seen?

4   A    Yes.

5   Q    Can you explain to the jury what you mean by that.

6   A    So on average they're approximately 20 kilograms in

7   size, or, excuse me, in weight, and then the shape, like I

8   said, it looks like rectangles.

9   Q    Let's talk about December 2018.  Do you recall that

10  time period?

11  A    Yes.

12  Q    Were you deployed during that time period?

13  A    Yes.

14  Q    Was that while you were assigned at the TACLET from

15  San Diego?

16  A    Yes.

17  Q    What ship were you deployed on?

18  A    I was on the HMCS MONCTON.

19  Q    Is that a Canadian ship?

20  A    Yes, sir.

21  Q    What kind of patrol were you on?

22  A    I was on a counter-drug patrol.

23  Q    And approximately how long did that patrol last?

24  A    Approximately two months.

25  Q    During those two months did you have any at-sea

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020     72
Direct Examination by Mr. DeRenzo

1    interdictions?

2    A     We had one.

3    Q     Do you remember the date of that interdiction?

4    A     December 1st.

5    Q     2018?

6    A     Yes, sir.

7    Q     What was your role in that interdiction?

8    A     I was the Spanish interpreter.

9    Q     And what kind of boat did you interdict?

10   A     It was a Panga, Panga-style vessel.

11   Q     At any point in time did you launch from the MONCTON?

12   A     Yes.

13   Q     Who did you launch with?

14   A     So I launched with Officer Fahey and then the small

15   boat driver.

16   Q     Okay.  Were you the first ones to arrive on scene?

17   A     No.

18   Q     Why is that?

19   A     So due to the rough sea state and the other weather

20   conditions and the lack of capabilities for the small boat

21   that we were on, we weren't able to catch up to the

22   suspected vessel.

23   Q     During your previous I believe you said seven at-sea

24   interdictions, did that happen, where the bigger ship was

25   able to actually make better time than the small boat?

1    A    No, because the other -- the other vessels I've been

2    on, their small boats were usually a lot more capable.  This

3    one just wasn't.

4    Q    So is this the first time in your career that this

5    occurred?

6    A    Yes.

7    Q    At any point in time after you launched did you

8    actually arrive on scene?

9    A    Yes.

10   Q    And what did you do?

11   A    As soon as I arrived on scene, I saw that the other

12   officers were already present, were right next to the

13   vessel, so I got alongside with them and I embarked the

14   secondary small boat, I guess the secondary boarding team

15   small boat, and it was directed by Officer Lauginiger.

16   Q    And how did you assist Petty Officer Lauginiger?

17   A    So he was the boarding officer.  He was basically

18   having me translate all the questions he was asking.

19   Q    And who was he directing his questions to?

20   A    He was directing his questions towards the master.

21   Q    Did you get -- did you have an opportunity once you

22   arrived on scene to actually get eyes on the boat?

23   A    Yes.

24   Q    And what did you see?

25   A    So as we arrived, I saw a boat that was approximately

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020    74
Direct Examination by Mr. DeRenzo

1    30 feet long, appeared to be like dark purple in color, had

2    no engines, multiple fuel barrels, and then four people

3    on board.

4    Q    Did it appear to have any lights or navigation

5    instruments that you could see?

6    A    No.

7    Q    Do you see in the courtroom any of the people that you

8    encountered on that boat that evening?

9    A    Yes.

10   Q    Could you point to that individual and identify an

11   article of clothing that they're wearing?

12   A    So the gentleman right here, the master, Emiro

13   Hinestroza-Newbbooll, and showing the pictures, he was

14   wearing a white beanie and a white T-shirt.

15   Q    We'll get to that in just a minute.

16           MR. DERENZO:  May the record reflect that Petty

17   Officer Rivera has identified the defendant?

18           THE COURT:  The record should so reflect.

19   BY MR. DERENZO:

20   Q    So the portion of the boarding that you assisted Petty

21   Officer Lauginiger with, what's the name of that portion of

22   the boarding?

23   A    It's the right of approach.

24   Q    And what's the purpose of this?

25   A    Basically we approach any vessel that's out at sea in

 1  order to verify its nationality through questioning and to
 2  determine really what it's doing out there.
 3  Q    And how did you do that as the Spanish interpreter?
 4  A    I asked questions directly to the master.  It was -- we
 5  were right next to each other, so I was able to talk to him
 6  face-to-face.
 7  Q    And did anybody on that boat identify themselves to you
 8  as the master of the boat?
 9  A    Yes.
10  Q    Who was that person?
11  A    That was Emiro Hinestroza-Newbbooll.
12  Q    The person you just identified as the defendant?
13  A    Yes, sir.
14  Q    Now, we'll get into what you asked him in a second, but
15  during the entire time you talked with the defendant, did
16  you have any trouble communicating with him?
17  A    No.
18  Q    Did you understand the Spanish -- well, let me ask you,
19  what language was he speaking?
20  A    He was speaking Spanish.
21  Q    Did you have any trouble at all understanding the
22  Spanish he spoke to you?
23  A    No.
24  Q    Did he appear to have any trouble understanding you?
25  Did he appear alert when you were asking him questions?

1   A    Yes.

2   Q    After the defendant identified himself as the master of

3   the boat, what happened next?

4   A    So I basically continued with the right of approach

5   questions.

6   Q    What did you ask?

7   A    I asked him what their purpose of voyage was.

8   Q    And when you say "them," who are you talking about?

9   A    I asked the master.

10  Q    Okay.  And what did he say?

11  A    He said that they were out fishing.

12  Q    Did he say what for?

13  A    At first it was mahi.

14  Q    When you say "first," was there something he told you

15  later?

16  A    Yes.

17  Q    What was that?

18  A    So afterwards he later claimed that they were actually

19  diving for seashells.

20  Q    And at any point -- well, what did you ask him about

21  that?

22  A    So I asked him -- yeah, I asked them what they were

23  doing it for and what kind of equipment they were using.

24  Q    Okay.  What was the defendant's response?

25  A    At first he said they were using SCUBA gear.

1  Q   When you say "at first," did he claim something after

2  that?

3  A   Yeah, eventually he clarified what it was that they

4  were using.

5  Q   And what did he claim?

6  A   Just free driving equipment, like snorkel and a mask.

7  Q   Okay.  Did you ask the defendant what happened to the

8  seashells that he was driving for, free driving for?

9  A   Yes.

10  Q   What was his response?

11  A   He said him along with the other crew members threw it

12  overboard.

13  Q   Did he say when?

14  A   He said he threw -- yes, he did.

15  Q   What did he say?

16  A   He said he threw them overboard earlier that day.

17  Q   Did the defendant indicate whether there was anything

18  that prompted him to throw these seashells from the boat?

19  A   Yes.

20  Q   What was that?

21  A   So he told me that earlier that day they had seen an

22  aircraft flying which they believed to be a Coast Guard

23  aircraft, and therefore they -- you know, they became afraid

24  that if interdicted with the seashells that they would get

25  in trouble for having them.

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020      78
Direct Examination by Mr. DeRenzo

1   Q     Now, when you approached the boat, did you notice

2   anything unusual about it?

3   A     About who, the people on board?

4   Q     The boat itself.

5   A     Yes.

6   Q     What was that?

7   A     Multiple things.  It had no engines, no navigation

8   lights, no real navigation equipment.

9   Q     Did you at any point during your interactions with the

10  defendant ask them about the fact that this boat didn't have

11  any engines on board?

12  A     Yes.

13  Q     And what was his response?

14  A     He said that the engines were lost, they used them as

15  anchors because the line that it was hooked onto took on too

16  much tension and it snapped, so they lost the anchor, or the

17  engines.

18  Q     Now, when you talked to the defendant did he -- did you

19  ask him how long they had been out there?

20  A     Yes.

21  Q     And what was his response?

22  A     He said they'd been adrift approximately six days.

23        THE COURT:  Mr. DeRenzo, this is probably a good

24  time to recess.

25        Ladies and gentlemen, we're going to recess at

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020    79
Direct Examination by Mr. DeRenzo

 1  this time.  We'll pick back up at one o'clock.  Leave your

 2  pads on your chairs.  Please don't discuss the case.  We'll

 3  start again promptly at one o'clock.

 4              *(Jury exits proceedings.)*

 5         THE COURT:  Officer Rivera, you may step down.

 6  Please don't discuss your testimony with anyone over the

 7  recess, and we'll start again promptly at one o'clock.

 8                     - - - - -

 9         (Recess at 11:31 a.m. until 1:14 p.m.)

10                     - - - - -

11         THE COURT:  Anything before I bring the jury in?

12         MR. DERENZO:  Real quickly, Your Honor, I would

13  respectfully request that the witnesses who have already

14  testified be released.  I've talked to Mr. Hernandez and he

15  said he doesn't object or plan to re-call.

16         THE COURT:  Yeah, that's fine.

17         Would you get the witness -- could I get one of

18  you to get the witness and get him back on the stand, and

19  I'll have the security officer get the jurors.

20         MR. DERENZO:  Yes, Your Honor.

21         THE COURT:  If you'll get the jury.

22         Sir, if you'll retake the witness chair.

23         THE WITNESS:  Yes, ma'am.

24              *(Jury re-enters proceedings.)*

25         THE COURT:  You may continue, Mr. DeRenzo.

 1            MR. DERENZO:  Thank you, Your Honor.

 2            If we could please pull up Exhibit 3A, which has

 3   previously been admitted.

 4   BY MR. DERENZO:

 5   Q    Now, Petty Officer Rivera, do you see anybody in this

 6   photograph who was the individual who you previously

 7   indicated was the master of the boat?

 8   A    Yes, sir.

 9   Q    Can you draw an arrow to that person on the screen in

10   front of you.

11            When we left off with your testimony earlier, you

12   were discussing -- we were discussing a conversation you had

13   with that individual; do you recall that?

14   A    Yes, sir.

15   Q    And we were discussing questions you asked him after he

16   indicated he was the master.

17            At any point did the defendant indicate to you how

18   long they had been at-sea?

19   A    Yes.

20   Q    How long?

21   A    He claimed that they were drifting for approximately

22   six days.

23   Q    And did he indicate -- "he" being the defendant

24   indicate when he saw this aircraft he referenced earlier?

25   A    Yes.

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020    81
Direct Examination by Mr. DeRenzo

1    Q    When was that?

2    A    He said he saw it earlier that day, around 4:00 p.m.

3    Q    Now, did you at any point speak to any of the other

4    individuals on the boat?

5    A    Yes.

6    Q    Who did you speak to?

7    A    I spoke to the other two Colombian nationals and the

8    one Belizean national.

9    Q    What languages did the two other Colombian individuals

10   speak?

11   A    So one of them spoke only Spanish, the other one

12   a little bit of English and Spanish.

13   Q    And how about the individual from Belize, what language

14   did he speak?

15   A    He spoke English.

16   Q    Did you have any trouble communicating with any of

17   these three individuals?

18   A    No.

19   Q    Did they appear as if they had any trouble speaking

20   with you?

21   A    No.

22   Q    Did you ask those three individuals any questions?

23   A    Yes.

24   Q    What did you ask?

25   A    I asked them the same questions that I asked the master

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020      82
Direct Examination by Mr. DeRenzo

1   regarding what they were doing out here and how long they

2   had been out at-sea.

3   Q    And what did those three individuals tell you about

4   what they were doing out there in the middle of the ocean?

5   A    They said the same thing, that they were out fishing,

6   and then later on they also said they were out diving for

7   seashells.

8   Q    You mentioned that word, seashell, earlier.  Do you

9   recall the Spanish word that the defendant used when he told

10  you that they were out looking for seashells?

11  A    Yes.

12  Q    What's that word?

13  A    Concha.

14  Q    And what does that -- does it mean anything other than

15  seashell?

16  A    It would be a conch.

17  Q    Do you know what a conch is?

18  A    Yes.

19  Q    What is it?

20  A    It's a large seashell, maybe about this size.  It's got

21  a -- that's all I know.  It's pretty spikey.

22  Q    Is it like a snail?

23  A    Yes.

24  Q    But larger?

25  A    Yeah.

1  Q     Yes?

2  A     Yes.

3  Q     Okay.  Now, did you ask the other three individuals,

4  other than the defendant, how long they had been at-sea?

5  A     Yes.

6  Q     What was their responses?

7  A     Response was the same, they had been out adrift for six

8  days.

9  Q     How long were you -- how long did you participate in

10  this boarding?

11  A     So I was just on there for the right of approach

12  questioning, but I didn't actually go physically on board

13  for the actual law enforcement boarding.

14  Q     So how long were you on scene?

15  A     Maybe a couple hours, hour and a half, two hours.

16  Q     Were you relieved by anyone?

17  A     Yes.

18  Q     Who were you relieved by?

19  A     I was relieved by Officer Ramos and Officer Perio.

20  Q     Can we go back just briefly to the questions or the

21  conversations you had with the defendant and the other

22  individuals on the boat.  Could you describe -- let's start

23  with the defendant, can you describe his demeanor when you

24  were asking them these questions about why they were out

25  there and how they ended up with no engines.

1  A    Yes.  He was -- he was pretty receptive, pretty aware

2  and understanding to the questions I was asking him.  He was

3  not having any trouble understanding me.

4  Q    How about the other three individuals?

5  A    Same thing.

6  Q    The next day did you participate in any evolution with

7  respect to this same boat?

8  A    Yes.

9  Q    What did you do?

10  A    I participated in the sinking of the vessel.

11  Q    Now, why would you sink the boat?

12  A    Because there's -- there's no way we can -- we can take

13  it with us.  We can't just leave it out floating at-sea, it

14  would be a hazard to navigation.

15  Q    And was there anything in particular about this boat

16  that in your experience would make it such a hazard to

17  navigation?

18  A    Yes.  There's no engines.

19  Q    Other than the chemical lights that you used, was there

20  any other way to illuminate it at night if, say, another

21  ship like the MONCTON or a freighter would have come by,

22  come about this vessel?

23  A    I mean, the only way would be using a spotlight, but

24  that probably wouldn't be very practical.

25  Q    It didn't have any navigation lights on it that you

1   could illuminate?

2   A     No.

3   Q     Is that the first time you as a boarding officer have

4   ever participated in sinking a boat like that?

5   A     No.

6   Q     And how many times have you done that?

7   A     Just about every time that I've dealt with a

8   Panga-style vessel.

9   Q     So this is routine?

10  A     Yes.

11  Q     All right.  How did you sink the boat?

12  A     So I launched the -- we went during the morning, I went

13  on board the small boat, and basically I got on and what

14  little fuel there was left, I knocked it over so it would

15  spread all over the deck, then I was able to pick up the

16  55-gallon fuel drum and spread it as best as I could, then

17  I got off and I used a flare to ignite it.

18          MR. DERENZO:  Let's bring up Exhibit 2P.  And we

19  can press play.

20  Q     In that monitor in front of you, Petty Officer Rivera,

21  you'll see what has now been admitted as 2P.  Take a look at

22  that, and I'm going to ask you a couple questions about it.

23                    *(Video played.)*

24  Q     Petty Officer Rivera, do you recognize that vessel?

25  A     Yes.

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020      86
Direct Examination by Mr. DeRenzo

1    Q    How so?

2    A    It's the vessel we interdicted.

3    Q    Now, to be fair, that boat appears to have engines on

4    it, right?

5    A    Yes.

6    Q    The boat you boarded on December 1st, that did not,

7    right?

8    A    Right.

9         MR. DERENZO:  Let's move to Exhibit 2K.  Fast

10   forward to 4 minutes, 40 seconds, and press play.

11   Q    Do you recognize that boat, Petty Officer Rivera?

12   A    Yes.

13   Q    How so?

14   A    It's the vessel we interdicted.  It has no engines.

15        MR. DERENZO:  Let's move to Exhibit 2Q, and we can

16   start that at one minute into the video.

17                      (Video played.)

18        MR. DERENZO:  We can fast forward about

19   45 seconds.

20                      (Video played.)

21        MR. DERENZO:  And fast forward again.

22                      (Video played.)

23   BY MR. DERENZO:

24   Q    Now, Petty Officer Rivera, have you seen anything that

25   resembles those white packages floating in the water before

PETTY OFFICER DIEGO RIVERA - JANUARY 28, 2020    87
Direct Examination by Mr. DeRenzo

1    in your Coast Guard career?

2    A    Yes.

3    Q    Do you have an opinion, based upon your prior

4    experience in the Coast Guard, what you see here in

5    Exhibit 2Q?

6            MR. HERNANDEZ:  Objection.  Speculation.

7            THE COURT:  You're talking about -- you're asking

8    about the packages, right?

9            MR. DERENZO:  Yes, Your Honor.

10           THE COURT:  When you say "see here"?  Overruled.

11   BY MR. DERENZO:

12   Q    Do you have an opinion?

13   A    Yes, sir.

14   Q    What do you believe are those packages?

15   A    I believe those are bales of contraband being thrown

16   overboard.

17   Q    Any specific kind of contraband?

18   A    Cocaine.

19   Q    Why do you believe that?

20   A    Just the similar size in the packaging.  Also what I've

21   seen before in the past is when you throw cocaine overboard

22   it usually floats, like is happening here.

23   Q    Is there anything distinctive about size and shape from

24   what you can see here in Exhibit 2Q that leads you to this

25   opinion?

1  A    Yes, the rectangular shape and the way it's all tied

2  together.

3  Q    You testified earlier about typical bales, cocaine

4  bales, and to be fair, they're not always exactly the same;

5  is that right?

6  A    Correct, sometimes it does vary.

7  Q    Does this appear to be -- is there any particular size

8  that you believe these packages to be consistent in size and

9  shape to, in your experience?

10       THE COURT:  And I'll sustain the objection to

11  that.  It's hard to see what's on that screen.

12       MR. DERENZO:  May I have just a moment,

13  Your Honor?

14       THE COURT:  You may.

15       MR. DERENZO:  Tender the witness, Your Honor.

16       THE COURT:  Mr. Hernandez.

17    **CROSS-EXAMINATION OF PETTY OFFICER DIEGO RIVERA**

18  **BY MR. HERNANDEZ:**

19  Q    Sir, when you say in your opinion those packages

20  contain cocaine, you're rendering an opinion based on some

21  experience you have, correct?

22  A    Yes, sir.

23  Q    You cannot see what's inside those packages, correct?

24  A    Correct.

25  Q    It could be a variety of things that may not -- that's

1    something that would float on the surface of the water,

2    correct?

3    A    Potentially.

4    Q    Okay.  And you were asked about seashells versus conch

5    shells.  The seashells would be something that maybe

6    beachgoers might pick up on the shore, correct?

7    A    I don't know.

8    Q    Okay.  Conch shells is actually food, correct?  It

9    actually contains -- in fact, would you agree that Key West

10   is known for conch shells and conch soup and conch fritters

11   and a variety of seafood entrees that deal with conch,

12   correct?

13   A    Yes.

14   Q    The vessel -- your testimony is the vessel -- you

15   destroyed the vessel, correct?

16   A    Yes, sir.

17   Q    Was that pursuant to some instructions from someone

18   else?

19   A    Yes.

20   Q    Okay.  And that would mean that that vessel, once it's

21   destroyed, obviously would not be available for further

22   testing, say, by a chemist or something of that nature?

23   A    Yes.

24   Q    Or maybe the defense might want to do some testing.

25   Once it's destroyed, it's gone, correct?

1   A    Correct.

2   Q    And it's not something that I or the jury can see in

3   person, correct?

4   A    Yes, sir.

5   Q    When you interviewed the defendant and the other crew

6   members, did you interview them individually, separately?

7   A    No, they were all -- everybody was present.

8   Q    Okay.  But were you asking questions individually or

9   just a group question where everybody was answering?

10  A    No, I asked direct questions.

11  Q    Okay.  Let me make sure I'm relaying my question

12  correctly.

13       Did you sit down with one separately at a time or

14  did you just ask a general question to the four of them

15  together?

16  A    So they were all sitting together, but I directed

17  myself specifically to each person to make sure they --

18  Q    So when you indicated that one of the defendants says

19  that the -- apparently you asked about the engines and they

20  said that there was some trouble with the engines so they

21  decided to use them as anchors, correct?

22  A    Right.

23  Q    When you asked that question about the anchors, were

24  all four of them listening to the questions and each one was

25  concurring, or were you individually interviewing each

1  defendant?

2  A    I individually asked them about the question regarding

3  the anchors.

4  Q    Okay.  And you asked it as a group?

5  A    No.  Individual.  I made sure I got their attention and

6  I made sure they understood what I was asking them, so, yes,

7  individually.

8  Q    Okay.  And they were all consistent?

9  A    Yes.

10 Q    Okay.  And when you asked them about dumping the conch

11 shells overboard and the reasons for doing that, were they

12 all consistent in explaining what had happened?

13 A    Yes.

14           MR. HERNANDEZ:  Thank you.

15           THE COURT:  Any redirect?

16           MR. DERENZO:  No, Your Honor.

17           THE COURT:  Thank you, sir.  You may step down.

18           You may call your next witness.

19           MR. DERENZO:  United States calls Petty Officer

20 Alexander Ramos, U.S. Coast Guard.

21     (Petty Officer Alexander Ramos enters proceedings.)

22           THE COURT:  Sir, if you'll come forward to be

23 sworn.

24           COURTROOM DEPUTY:  Please raise your right hand.

25           Do you solemnly swear or affirm, under penalty of

1    perjury, that the testimony you will give in this cause

2    shall be the truth, the whole truth and nothing but the

3    truth?

4              THE WITNESS:  Yes, I do.

5              COURTROOM DEPUTY:  Please state your name for the

6    record and spell your last name.

7              THE WITNESS:  Alexander George Ramos.  Last name

8    R-A-M-O-S.

9              COURTROOM DEPUTY:  Thank you, sir.  You may take

10   the witness stand.

11             THE COURT:  Mr. DeRenzo.

12             MR. DERENZO:  Thank you, Your Honor.

13        **DIRECT EXAMINATION OF PETTY OFFICER ALEXANDER RAMOS**

14   **BY MR. DERENZO:**

15   Q    Petty Officer Ramos, good afternoon.

16   A    Good afternoon.

17   Q    What do you do for a living?

18   A    I am a law enforcement officer at Pacific Tactical

19   Law Enforcement Team.

20   Q    In the Coast Guard?

21   A    Yes.

22   Q    How long have you been in the Coast Guard?

23   A    I've been in the Coast Guard 12 years.

24   Q    And could you summarize for the jury's benefit your

25   career thus far in the Coast Guard.

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020   93
Direct Examination by Mr. DeRenzo

1   A     The majority of my career I've done law enforcement,

2   but the majority of it was counter-narcotics, and that was

3   for about nine years.

4   Q     And what is your rating in the Coast Guard, your job

5   specifically?

6   A     So my main rating is an engineer.  I just recently

7   switched over to a maritime enforcement officer, but

8   throughout my whole career I've conducted law enforcement

9   and counter-narcotics.

10  Q     Before you were a maritime enforcement specialist what

11  was your rating?

12  A     Machinery technician.

13  Q     And what is that?

14  A     That means dealing with internal combustion engines,

15  hydraulics, electrical work, air conditioning and anything

16  machinery-wise.

17  Q     On boats or aircrafts?

18  A     On boats.

19  Q     Did any part of your training or experience have to do

20  with specifically small boat maintenance and repair?

21  A     Yes, a big portion of being a machinery technician is

22  being able to deal with the engines themselves, the way they

23  work, their components, the way the fuel is transferred over

24  to the engines, and then also maintenance work as well.

25  Q     How long were you a machinery technician before you

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020   94
Direct Examination by Mr. DeRenzo

1   became a maritime enforcement specialist?

2   A     For six years.

3   Q     As you sit here today, do you have any particular

4   certifications or qualifications to do law enforcement?

5   A     Yes.  So I started out as a boarding team member back

6   in 2008, carried that law enforcement all the way up to

7   2013, where then I went to boarding officer school, also

8   went to a counter-narcotics school, and then other

9   certifications that go along with being a boarding officer.

10  Q     And what's your current unit?

11  A     Current unit is Tactical Law Enforcement Team Pacific.

12  Q     Are you a boarding officer there?

13  A     Yes, I am.

14  Q     What's your primary job at the TACLET?

15  A     As a counter-narcotics officer to deter transnational

16  organized crime.

17  Q     Okay.  Does part of that include deploying as a

18  boarding officer or boarding team member?

19  A     Yes, it does.

20  Q     What regions do you deploy to specifically?

21  A     Eastern Pacific and the Caribbean.

22  Q     You mentioned -- well, let's go back.

23        How much time of your total time in the

24  Coast Guard has been devoted to the counter-drug mission

25  specifically?

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020   95
Direct Examination by Mr. DeRenzo

1   A    Total in time is about nine years.

2   Q    And outside of the counter-drug mission, have you done

3   any other law enforcement activity?

4   A    Just recreational boarding law enforcement, so ensuring

5   that the public is safe when they're out operating on the

6   waters.

7   Q    Say, out here in the Tampa Bay region, for instance?

8   A    That's correct.

9   Q    All right.  In your time doing the counter-drug

10  missions specifically, how many patrols do you think you've

11  been on?

12  A    I've been on a numerous amount of patrols, in total

13  ranging from 15 to 20.

14  Q    Have you had any vessel interdictions?

15  A    I have had a total of 17 interdictions.

16  Q    Of those 17, did any of them result in a drug seizure?

17  A    Yes.

18  Q    What kinds of drugs?

19  A    Cocaine.

20  Q    All of them?

21  A    Yes.

22  Q    Any other drugs of those 17?

23  A    No.

24  Q    During those 17 interdictions, how was the cocaine that

25  you seized packaged?

1  A    They were packaged in bales, square-shaped, and used

2  with a burlap sack to cover them up.

3  Q    And can you describe the size and appearance of the

4  bales that you seized during those 17 interdictions.

5  A    So they start out in a small key, which is about

6  book-size, probably about 1.5 to 2 inches thick, and they're

7  stacked in a number of tens, then they're wrapped in Saran

8  wrap, then rubber, to prevent water intrusion.  They'll wrap

9  another set of ten next to them, wrapping them in Saran wrap

10  and rubber as well, preventing any further water intrusion,

11  and then they're going to be put in a -- various of colors

12  on the burlap sack, and they're usually between -- normal

13  size is between 40 to 50 pounds, and then you have your

14  larger individual ones, which are about 70 to 80 pounds.

15  Q    And how does a smaller, as you describe it, 20-kilogram

16  size bale appear as opposed to the larger bales?

17  A    The best way to put it, so about this far apart, coming

18  up, and then (indicating).

19  Q    So what are you describing there, the larger ones or

20  the smaller ones?

21  A    Smaller bales.

22  Q    Okay.  Other than those 17 interdictions, have you had

23  any other occasions in your Coast Guard career to either see

24  personally or actually handle cocaine bales?

25  A    So other than the actual interdictions, we've also done

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020  97
Direct Examination by Mr. DeRenzo

1  DEA offloads, where they bring the bales to a DEA off-site

2  area and then we offload them, or from the actual cutter

3  itself, from the interdiction itself, and then hand it over

4  to DEA.

5  Q    Total, throughout your Coast Guard career, how many

6  cocaine bales have you seen personally or handled?

7  A    Thousands.

8  Q    Let's talk about December 2018.  Do you recall that

9  time period?

10 A    Yes, I do.

11 Q    What were you doing during that month?

12 A    We were paroling the Caribe during that time looking

13 for northerly-bound vessels maybe carrying narcotics.

14 Q    And was this as a member of the -- of a detachment team

15 from the TACLET?

16 A    Yes, I was.

17 Q    Who else was with you?

18 A    I was with Officer Lauginiger, Officer Brooks, Officer

19 Fahey, Officer Perio and Officer Rivera.

20 Q    What was the name of the ship that you were deployed

21 on?

22 A    The HMCS MONCTON.

23 Q    Was this a counter-drug patrol?

24 A    Yes, it was.

25 Q    Did you have any interdictions during that patrol?

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020   98
Direct Examination by Mr. DeRenzo

```
 1   A     One.

 2   Q     What was your role -- well, let me back up.

 3         What kind of vessel did you ultimately interdict?

 4   A     A profile go-fast vessel.

 5   Q     What do you mean by "profile"?

 6   A     So it means that it had a raised front, had a V-hull,

 7   planing hull, so what happens is that uses it to cut through

 8   the water, and approximately 30 to 32 feet in length, used

 9   to go high rates of speed, to be non-pursued, and then also

10   they use no nav lights.  Coloration is to blend in with the

11   water to prevent from being seen.

12   Q     So have you seen a vessel like this before in your

13   Coast Guard career?

14   A     Yes, I have.

15   Q     Was that in the local recreational boardings or some

16   other context?

17   A     Counter-drug context.

18   Q     All right.  When did you first receive notice of this

19   vessel?

20   A     The morning of December 1st.

21   Q     And who did you receive tasking from to go investigate?

22   A     We got information from a marine patrolling aircraft

23   that said that they had spotted a vessel with two engines

24   loitering around the area approximately 100 miles off of

25   Jamaica.
```

1   Q    And what steps were taken before you actually launched?

2   A    They started prepping and planning, started letting us

3   know what the vessel looked like, saying that they started

4   taking imagery, that it was dumping bales, and the initial

5   team was going to be Officer Fahey and Officer Rivera, so we

6   were getting them ready and set up and standing by.

7   Q    What does that mean, getting ready and set up?  What

8   do you do?

9   A    So we go through our process of PMC, which is

10  pre-mission checks, to be sure that our gear is good-to-go

11  before we actually go out on the boarding to ensure that we

12  don't have any foul-ups or mess-ups with our gear, then our

13  DTL, which our division team leader, will then brief us as

14  more information comes in, as we start getting closer.

15  Q    Do you take any steps to -- well, let's back up.

16       You're looking for drugs, right, when you go out?

17  A    Yes.

18  Q    Do you take any steps before you actually set foot on a

19  boat to launch to make sure that there's no contamination or

20  anything if you had an interdiction, say, the previous week?

21  A    Yes.  So prior to actually disembarking the MONCTON,

22  you get ion scan swiped to ensure that you're not bringing

23  contamination onto the suspect vessel.

24  Q    Was that done in this case?

25  A    Yes, it was.

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 100
Direct Examination by Mr. DeRenzo

1   Q     Of which boarding team members?

2   A     So initially it was -- Officer Fahey and Officer Rivera

3   were initially ion swiped by Officer Brooks, which all of us

4   actually have ion scan experience and have been taught in

5   it, and they were swiped before actually disembarking the

6   vessel.

7   Q     Okay.  How about the -- who else was involved in the

8   boarding?

9   A     So later on, when we were coming up to the vessel,

10  realized that the first small boat that launched couldn't

11  make enough speed to keep up due to sea state, so then they

12  launched Officer Lauginiger and myself, and we were

13  ion swiped before disembarking the MONCTON.

14  Q     Who did that?

15  A     Officer Brooks.

16  Q     Did anybody else participate in the boarding?

17  A     And Officer Perio as well.

18  Q     What about -- who acted as the Spanish interpreter?

19  A     Officer Diego.  Officer Rivera.

20  Q     Do you know if Officer Perio and Officer Rivera were

21  ion scan swiped before they left the boat?

22  A     Yes.

23  Q     Who did that?

24  A     Officer Brooks.

25  Q     So that's to prevent contamination, say, of your

1  person?

2  A    Yes.

3  Q    Was there any other actions taken by either you or the

4  Canadian crew of the MONCTON to attempt to prevent any

5  cross-contamination of the boat you're going to leave on?

6  A    So one of the -- they have two vessels on the MONCTON

7  itself.  Every morning they do boat checks, they completely

8  wash down the boat and also wash down the engines

9  themselves, so that when we come alongside the vessel, our

10  vessel that we have does not contaminate the suspected

11  vessel.

12  Q    Now, during your time on the MONCTON, did you have an

13  occasion to personally observe that taking place?

14  A    Yes.  Every morning we would wake up and they would be

15  doing their boat checks, and visually seeing them washing

16  down the boat with fresh water and then also checking the

17  engines as well.

18  Q    To be fair, that's not just for contamination purposes?

19  A    That's for upkeeping on the vessel, to be sure that it

20  runs perfectly once it's actually disembarked.

21  Q    Okay.  And that's something you've done in the past as

22  a machinery technician?

23  A    Yes, I have.

24  Q    Fair to say that's routine?

25  A    Yes.

1  Q    All right.  What was your role during this particular

2  interdiction?

3  A    I was the assisting boarding officer to Officer

4  Lauginiger.

5  Q    And as an assistant boarding officer, even though

6  you're already fully qualified as a boarding officer, what's

7  your job?

8  A    My job is for him -- so he'll start focusing on the

9  paperwork itself, talking with the master of the vessel, and

10 then my job is to start the process of the initial safety

11 sweep, also doing ion scan swipes, so that the focus of the

12 mission would be able to find the narcotics if they're on

13 there.

14 Q    Okay.  At any point did you arrive on scene with Petty

15 Officer Lauginiger?

16 A    So when -- backing up to when the first boarding team

17 left, which was Officer Rivera and Officer Fahey, they

18 couldn't keep up with the bigger boat, the MONCTON, due to

19 sea state, so then the MONCTON had saw that the boat was

20 about four nautical miles -- not four nautical miles,

21 400 yards off the port side, so then they launched us, and

22 we got into the boat and they sent us out and we had to use

23 night vision goggles to find the vessel, because it was

24 using the cover and concealment of night, and we came up on

25 it and visually what I saw was there were no engines on the

1    boat, it appeared to be a dark blue color due to nighttime,

2    and then we saw four individuals crouched down using their

3    clothes to hide near the stern of the vessel.

4    Q    When you say "we launched," who do you mean?

5    A    Officer Lauginiger, the cockswain from the MONCTON, or

6    the boat driver, and myself.

7    Q    Other than the fact that this boat didn't appear to

8    have engines, did you notice anything else about the boat?

9    A    There was no navigation lights on it.  That means --

10   usually when a vessel is traveling at night, they need to be

11   seen so they don't get run over by a vessel that we are on

12   or any other bigger vessels.

13   Q    How long were you on scene with this vessel?

14   A    So initially we did the first contact, but then Officer

15   Fahey and Rivera came alongside and I noticed the boat that

16   Officer Lauginiger and I were on was starting to take on a

17   little bit of water due to the sea state, so

18   Officer Lauginiger left from the boat that I was on, went

19   with Officer Rivera and Officer Fahey, and then I took that

20   boat back just to help de-water it and then was later

21   brought back due to Officer Fahey and Officer Rivera getting

22   seasick, to replace them.

23   Q    So when the -- in the total time you were on scene, did

24   you have a chance to get a good look at the four individuals

25   on the boat?

1   A    Yes, I did.

2   Q    Do you see any of those individuals in this courtroom?

3   A    Yes, I see one of them.

4   Q    Can you point to that person and identify an article of

5   clothing he or she is wearing.

6   A    Emiro Hinestroza-Newbbooll, and he is wearing the

7   orange and white outfit.

8   Q    Okay.  Geographically, where did you locate this

9   vehicle?

10  A    About approximately 100 nautical miles southwest of

11  Jamaica.

12  Q    Do you know the approximate water depth in that area?

13  A    It was around 1300 fathoms.

14  Q    What does that mean in feet, do you know?

15  A    So in relation -- in fathoms, for every fathom equals

16  six feet, and that's approximately around 8,000, 8,000 feet.

17  Q    Did you participate in the initial safety inspection of

18  the boat?

19  A    Yes, I did.

20  Q    What, if anything, did you note in terms of the

21  seaworthiness?

22  A    The vessel had no engines, had an extensive amount of

23  fuel barrels but only one of them had fuel in them, smell of

24  fumes and gas from the vessel itself, and, well, it had a

25  forward hold -- a center hold area with nothing in it.

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 105
Direct Examination by Mr. DeRenzo

1   Q    Have you ever removed engines on a vessel of that size

2   before?

3   A    Yes.

4   Q    How many times?

5   A    About a total of two times and two engines, so a total

6   of four engines.

7   Q    When you're removing an engine from a vessel of that

8   size, how long does it take?

9   A    An extensive amount of time.

10  Q    Can you give us an estimate?

11  A    Depending on the type of strength you have of the

12  individuals, how many bolts are on it, could probably be

13  two -- an hour and a half.

14  Q    One person or multiple people?

15  A    Multiple people.

16  Q    When you were doing your safety sweep, were you able to

17  determine whether or not those engines had been recently

18  removed from the vessel?

19  A    Looked like there was debris where the actual bolts

20  were placed on the vessel itself near the transom, the aft

21  part of the vessel.

22  Q    For those of us who are less nautically inclined, what

23  does the aft and transom mean?

24  A    It means the backmost part of the vessel.

25  Q    Okay.  What do you mean by "debris"?

1  A    So when -- the threading and the fiberglass, you've got

2  metal on fiberglass, what will happen is due to the -- if

3  you don't have something to actually lift it up to prevent

4  the metal from scraping when you're removing the bolt, will

5  leave kind of residue from the fiberglass.

6  Q    Was there anything else that you noted that led you to

7  believe that the engines that were apparently not there were

8  recently there?

9  A    Due to the fuel setup of the vessel, the fuel lines,

10  the high powered fuel filters that they had on them, the

11  electronics that connected to the actual center console

12  itself, as well as the power cables that were taken off

13  pretty quickly, but they were still connected to the

14  battery.

15          MR. DERENZO:  All right.  Let's bring up

16  Exhibit 3F.

17  Q    What is 3F, Petty Officer Ramos?

18  A    So as you can tell, the clear lines right here are fuel

19  lines, just so you can actually see the fuel going through

20  itself.  You're going to have your extended fuel lines as

21  well, all throughout here, that tie-in, and that's so they

22  can run them forward and then connect them into the amount

23  of fuel barrels they have.

24  Q    Let's move to 3G.  What are we looking at here?

25  A    So this picture is kind of blurry, but from what

 1  I remember is you have your fuel filters, which are

 2  high powered, reason for that being is because most engines

 3  already have a primary and a secondary fuel filter on them,

 4  so when you're actually taking these fuel lines and running

 5  them forward to the actual fuel barrels, what happens is you

 6  don't know how pure the fuel is itself, how much sediment

 7  might be in these plastic fuel barrels, because fuel does

 8  deteriorate plastic, so what you want to do to have

 9  continuous motion of the vessel and you don't want to have

10  any interruptions within the fuel injectors, you have these

11  high powered primary fuel filters that filter out the

12  sediment so by the time it gets to the engine itself that

13  you won't have any delays in going at a high rate of speed

14  or continuous forward motion.

15  Q    On your average mom and pop recreational vessel or

16  small fishing vessel, would you expect to find a fuel system

17  set up like that?

18  A    No, I would expect that to be on a bigger -- a bigger

19  vessel.

20  Q    Are you able to see in this picture the area where

21  you're referencing earlier about the debris?

22  A    So where you could see -- even if it's a little

23  blurred, you have these little marks from actually where the

24  engines were connected at one point, and you could tell

25  they're a bigger set of engines because the way they sit in

1   between it, you're going to have your two tie-down points,

2   which are the holding points where they're going to have

3   bolts on either side to prevent either swaying or the

4   engines from coming off.

5   Q    Let's move to 3L.  What are we looking at here?

6   A    The aft-most part of the suspected vessel.

7   Q    And do you see those fuel filters in this view that you

8   were talking about?

9   A    Yeah.  So you could tell that there's fuel in them

10  right here, that there was fuel, darkness -- due to the

11  darkness of color, because most fuel filters are going to be

12  clear, so that you if you need to visually inspect them to

13  see if they might have been clogged or if they might have

14  sucked up some type of paper, some type of plastic, that you

15  would be actually able to actually unscrew it quickly and

16  rescrew it back up so that you could continue the actual

17  fuel being filtered.

18          And then you can see in here -- so you're going to

19  have your suction line that runs to this part of the

20  vessel -- to the fuel filter, the other suction line, and

21  then you have your discharge, which is this one right here,

22  which connects to the actual engines themselves, so that it

23  has a primary way of running through, going through the

24  process of removing the sediment and sending it to the

25  engines themselves.

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 109
Direct Examination by Mr. DeRenzo

1   Q    Let's move to 4F.  What are we looking at here,

2   Petty Officer Ramos?

3   A    So here we're at daytime, off the back left of the TOI,

4   same -- the same setup, but you actually could see the fuel

5   lines running up the port and starboard side, where they're

6   able to connect them to the different fuel barrels that are

7   full and to continue on traveling in the northerly

8   direction.

9   Q    Now, in your experience as both a boarding officer and

10  a machinery technician, why would you have a fuel system

11  setup like this?

12  A    So that you can constantly keep moving forward and also

13  at a high rate of speed.

14  Q    In all your time at the Coast Guard, have you seen a

15  fuel system setup like this before?

16  A    Yes.

17  Q    In what context?

18  A    On other go-fasts that I've interdicted.

19  Q    Involving narcotics?

20  A    Yes.  Normally cocaine seizures.

21  Q    Have you seen that fuel system ever on a recreational

22  boarding or a fishing vessel?

23  A    No.

24  Q    Did you participate in the at-sea space accountability

25  of the boat?

1    A    Yes, I did.

2    Q    Did you note any particular smells when you did that

3    portion of the boarding?

4    A    The presence of fuel.

5    Q    Did you see any flares on board?

6    A    Yes.

7    Q    Did they appear to be used or unused?

8    A    Unused.

9    Q    Did you see any SCUBA gear on the boat?

10   A    I just saw a snorkel and a -- and a mask, that was it.

11   Q    Did you see any fins?

12   A    No.

13   Q    How about any ice?

14   A    No.

15   Q    Any fishing gear?

16   A    No.

17   Q    When you arrived on scene with Petty Officer

18   Lauginiger, were you able to observe the appearance,

19   physical appearance and demeanor of the four individuals on

20   the boat?

21   A    Yes.

22   Q    Could you describe what you saw.

23   A    They were hiding initially when we first came up on

24   them.  They didn't seem fatigued.  They didn't seem happy,

25   happy to see us.

1   Q    Are you trained as a boarding officer what to look for

2   if somebody, say, were distressed at-sea?

3   A    Yes.  So initially too I was also a boat crewman, and

4   we go through also our like medical training and as well as

5   noticing signs from other crew members, whether they're in

6   distress or going through heat exhaustion, hypothermia,

7   malnourishment, being malnourished.

8   Q    So you've received that training whether you're doing a

9   drug patrol or perhaps a search and rescue mission?

10  A    Yes.

11  Q    And what are the things that you've been trained to

12  look for when you encounter a vessel potentially in distress

13  at-sea?

14  A    What we're supposed to look for is warning signs of an

15  individual not being able to follow task directions,

16  showing -- being tired, being exhausted, not being able --

17  wanting to be rescued, wanting to be saved, and that's not

18  one of the things we came across.

19  Q    Did you see any of those indicators exhibited by either

20  the defendant or the other three individuals on the boat?

21  A    No, I did not.

22  Q    Now, other than the at-sea space accountability, did

23  you participate in any other law enforcement activities

24  on board this boat?

25  A    Doing the ion scan swipes, I was recording down the

1  areas that Officer Perio was doing ion scan swabs.

2  Q    Okay.  So can you take the jury through exactly what

3  was done with respect to that process.

4  A    So before we can start doing ion scan swipes, we have

5  to do an initial safety sweep to ensure the vessel is safe

6  for us to be on and also the occupants themselves.  We do an

7  ASSA.  Once we get done with ASSA, we'll do ion scan swipes,

8  and what happens is Officer Perio will take one swab and use

9  multiple gloves to prevent from contamination, and on one

10 side he's going to swab the area, which would be the bow,

11 and then I would label the bow with a number 1, and then

12 with the opposite side that he didn't swab with he would put

13 a number 1 and then enclose it in that glove to prevent it

14 from contamination and put it inside an evidence bag, and

15 then continue that all the way from the front of the boat to

16 the back of boat.

17 Q    And why do you -- why is it important to have two

18 people do this job?  Why can't you just let one person do

19 it?

20 A    To prevent the contamination from occurring, so that

21 you're focused on one job and one job only.

22 Q    Okay.

23 A    But you're still working in unison for that common

24 goal.

25 Q    Okay.  And your job was not to actually take the swabs,

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 113
Direct Examination by Mr. DeRenzo

1    right?

2    A    No.

3    Q    So what is your focus on during this process?

4    A    Ensuring that when he's taking the ion scan swabs,

5    making sure that the number is correct on mine and on his

6    and the area that we're swabbing.  So like 1 would be the

7    bow, 2 would be the center hold, 3 would be port side.  So

8    ensuring we have accountability on where the ion swabs are.

9    Q    So that when it's later tested, you can match up --

10   A    With the area that it might have tested positive for.

11   Q    Okay.  You've used the term a couple times now, "swab."

12   What is an ion scan swab?

13   A    The best way -- it's a thin piece of paper,

14   oval-shaped, and has a way that you would run it over to

15   pick up the particles that might be from narcotics or pick

16   up whatever minute amount might be, and then enclosed in a

17   glove and then taken back for testing.

18   Q    Now, can you just use any old piece of paper or cloth,

19   or what do you use?

20   A    They come with the actual kit itself, with the

21   500DT IONSCAN system, and then you'll use those and you can

22   order them from DOL.

23   Q    Is that -- did you use the kind you just described --

24   A    Yes.

25   Q    -- in this case?

1  A     Yes, I did.

2          MR. DERENZO:  All right.  Let's pull up

3  Exhibit 2P.

4  Q    Let's take a look at the monitor in front of you, Petty

5  Officer Ramos, and then I'm going to ask you a couple

6  questions.

7                      (Video played.)

8  Q    Do you recognize that vessel?

9  A    Yes.

10  Q    How so?

11  A    From the still imagery that we had gotten from the MPA.

12  Q    When?

13  A    December 1st.

14  Q    And does this appear to be the same vessel you saw in

15  that imagery?

16  A    Yes.

17          MR. DERENZO:  Let's pull up 2L, and we can fast

18  forward to 13 minutes, 30 seconds.

19                      (Video played.)

20  BY MR. DERENZO:

21  Q    Do you recognize that vessel?

22  A    Yes.

23  Q    How so?

24  A    The color, the white ice chest in the front, the

25  blue-colored shirt individual, and then also the

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 115
Direct Examination by Mr. DeRenzo

```
1   white-colored individual, center console.

2   Q    Have you ever seen that vessel before?

3   A    Yes.

4   Q    When?

5   A    During the interdiction of December 1st to the 2nd.

6        MR. DERENZO:  Let's pull up Exhibit 2Q and start

7   at a minute into the video.

8   Q    Take a look at this video, Petty Officer Ramos, and I'm

9   going to ask you a few questions.

10                  (Video played.)

11        MR. DERENZO:  Skip ahead another minute.

12                  (Video played.)

13  Q    Petty Officer Ramos, based on the experience you

14  described earlier for the jury, do you know what those

15  floating objects are that you see in Exhibit 2Q?

16  A    Due to my experience and my knowledge as a boarding

17  officer, and I've seen this trend before, appear to be bales

18  of cocaine.

19  Q    You described two kinds of bales earlier for the jury.

20  A    Yes.

21  Q    Do these appear to be like either one of those?

22  A    Yes.

23  Q    Which one?

24  A    The white ones -- when initially they were dropping

25  them over on the right side of the vessel, you could tell by
```

1   the amount of splash that was coming up from being thrown

2   out.  It takes a good amount of weight to create a splash

3   that big, especially throwing them over.  And then with them

4   being tethered together, it's a common practice.

5   Q    And of the interdictions that you've been involved in

6   before this case, have you ever encountered any cocaine

7   smugglers attempt to get rid of the bales of cocaine?

8   A    Yes, I have.

9   Q    How so?

10  A    We were coming up on one of the vessels that had

11  literally jettisoned all their bales and were backing up

12  down on it and they were going to try to tie them to their

13  engines and use that as a sink -- basically a weight to sink

14  the bales.

15  Q    Were they successful?

16  A    No, they weren't.

17           MR. DERENZO:  Tender the witness, Your Honor.

18           THE COURT:  All right.  Mr. Hernandez.

19           MR. HERNANDEZ:  Yes, Your Honor.  Thank you.

20      **CROSS-EXAMINATION OF PETTY OFFICER ALEXANDER RAMOS**

21  **BY MR. HERNANDEZ:**

22  Q    Sir, you indicated that before going on board, that you

23  and the other boarding officers swiped yourself to --

24  A    No, I said Officer Brooks had swiped us.  So we didn't

25  actually swab ourselves, we had another officer who was not

1  on the actual boarding --

2  Q    I see.  So one officer swipes everybody?

3  A    Um-hum.

4  Q    And -- is that correct?

5  A    Yes, that is correct, sir.

6  Q    And how does that appear?  Is it done in the form --

7  what is used in the process of swiping each individual?

8  A    So, sir, they use the gloves that are also provided in

9  the kit, so they put on multiple gloves to ensure that

10 you're not contaminating multiple swabs, and then they'll

11 have one individual come forward and then they'll swab their

12 hands, their wrists and then the back of their neck and then

13 close it up inside that glove itself and set it off to the

14 side to be tested.

15 Q    Is that testing done before you get on board?

16 A    Yes.

17 Q    And is it just the hands as opposed to the arms and

18 elbows and --

19 A    It's just the hands, the wrists and then the back of

20 the neck.

21 Q    What is significant about the back of the neck?

22 A    That is policy for us.

23 Q    But if, let's say, your arm touches something on the

24 boat, that part has not been swiped; is that what you're

25 saying?

PETTY OFFICER ALEXANDER RAMOS - JANUARY 28, 2020 118
Cross-Examination by Mr. Hernandez

1    A    Well, we hadn't gone on the boat itself.

2    Q    Sir?

3    A    We hadn't gone on the TOI yet.  We were basically in a

4    sterile room where they keep the IONSCAN.

5    Q    But to be clear, the only thing that is swiped is your

6    hands, your wrists and the back of your neck?

7    A    Yes.

8    Q    Okay.

9    A    As per policy.

10   Q    Now, when you're in the process of assisting with going

11   to different parts of the boat for obtaining swabs, what

12   you're recovering is not seen to the naked eye, correct?

13   A    Correct.

14   Q    It's purely -- if you're going to pick up -- whatever

15   you're picking up is going to be something that you cannot

16   see as you're doing it, correct?

17   A    Correct.

18   Q    And you don't have any personal knowledge of when that

19   boat may have been washed or cleaned before the time that

20   you're taking the swabs?

21   A    Are you talking about the TOI or the boat that we are

22   on?

23   Q    No, not the boat that you -- not the boat that you came

24   on.  I'm talking about the vessel that was interdicted.

25   A    That's correct.

1    Q    You don't have any idea when it was cleaned?

2    A    (Shaking head no.)

3    Q    Correct?

4    A    Correct.

5    Q    And literally you did not see any contraband on board,

6    correct?

7    A    Correct.

8    Q    Did you see any nets?

9    A    No.

10            MR. HERNANDEZ:  That's all I have.  Thank you.

11            THE COURT:  Mr. DeRenzo, any redirect?

12            MR. DERENZO:  No, Your Honor.

13            THE COURT:  Thank you, sir.  You may step down.

14            THE WITNESS:  Thank you, Your Honor.

15            THE COURT:  You may call your next witness.

16            MS. GOODIN:  Your Honor, the Government would call

17    Petty Officer Paul Fahey of the U.S. Coast Guard.

18            *(Petty Officer Paul Fahey enters proceedings.)*

19            THE COURT:  All right.  Sir, please come forward

20    to be sworn.

21            COURTROOM DEPUTY:  Please raise your right hand.

22            Do you solemnly swear or affirm, under penalty of

23    perjury, that the testimony you're about to give will be the

24    truth, the whole truth and nothing but the truth?

25            THE WITNESS:  Yes.

1              COURTROOM DEPUTY:  Please state your name and

2    spell your last name for the record.

3              THE WITNESS:  Paul Fahey, F-A-H-E-Y.

4              COURTROOM DEPUTY:  Thank you, sir.  You may take

5    the witness stand.

6              THE COURT:  Ms. Goodin.

7              MS. GOODIN:  Thank you, Your Honor.

8         **DIRECT EXAMINATION OF PETTY OFFICER PAUL FAHEY**

9    **BY MS. GOODIN:**

10   Q    Petty Officer Fahey, where do you work?

11   A    I work actually currently in Tactical Law Enforcement

12   Pacific, which is located in San Diego, California.

13   Q    And that's with the United States Coast Guard?

14   A    Yes.

15   Q    And how long have you been a member of the

16   United States Coast Guard?

17   A    Over 18 years now.

18   Q    And can you tell me -- you said that you are a First

19   Class Petty Officer?

20   A    That's correct.

21   Q    And what is your rate, your job there?

22   A    I'm a maritime enforcement specialist.  I rank as an

23   E-6.

24   Q    And what is a maritime enforcement specialist?

25   A    Maritime enforcement specialist, like it says in the

1    name, we specialize in law enforcement within the

2    Coast Guard.

3    Q    And how long have you been with the job of a maritime

4    enforcement specialist?

5    A    Since 2010.

6    Q    Can you tell me about some of the qualifications that

7    you had to become an ME.

8    A    Sure.  I was -- I started off as a -- I started

9    law enforcement in 2003 with the Coast Guard as a boarding

10    team member, and then I became a boarding officer in 2007,

11    and I have other side collateral jobs within the

12    Coast Guard.

13    Q    Can you summarize for me the law experience --

14    law enforcement experience that you have through the

15    Coast Guard.

16    A    Nutshell, starting in 2003 I was a boarding team

17    member, I was stationed down in Miami, Florida, and I was

18    there from 2003 to 2008, where I became a boarding officer

19    in 2007.  I've conducted mostly port waterways and coastal

20    security boardings, which are deep draft vessels, container

21    ships that come in from various countries, coming into the

22    ports of Miami and other areas, as well as very minimal

23    recreation boardings, but we've done a lot of cruise ships

24    escorts, coming in, going in, different ports, from

25    Key West, Miami, as well as here in Tampa.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    122
Direct Examination by Ms. Goodin

1   Q    So approximately since about 2003 you've had some job

2   within law enforcement?

3   A    Yes.

4   Q    Now, can you say again your current duty station.

5   A    Sure.  It's Tactical Law Enforcement Team Pacific,

6   which is located in San Diego, California.

7   Q    And how long have you been at that specific job?

8   A    I've been there since 2017.

9   Q    What is the mission of the Tactical Law Enforcement

10  Team?

11  A    We -- our primary mission is counter-drug or

12  counter-narcotic operations.

13  Q    And what are some of your duties there?

14  A    I am assigned to a law enforcement detachment, which my

15  primary position is an assistant officer in charge for my

16  team, my detachment, which includes 12 other individuals

17  within my team, and primary duty is a boarding officer.

18  Q    You mentioned it a little bit before, but where are

19  some of the places -- or do you deploy?

20  A    I deploy quite often, yes.

21  Q    And where are some of the places that you deploy to?

22  A    I've been to the Eastern Pacific, into the

23  Caribbean Sea.  I've been to Africa.  I've been to various

24  places all over the world.

25  Q    Now, I'd like to talk to you specifically about your

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    123
Direct Examination by Ms. Goodin

1  counter-drug operational experience.  Can you say -- or can

2  you let us know, approximately how many patrols have you

3  been on?

4  A    I've been on -- with my current unit, TACLET Pacific,

5  I've been on five patrols.

6  Q    And when you're on these patrols, what are you looking

7  for, the type of vessels perhaps?

8  A    Specific vessels?  We're looking for anything --

9  combating transnational organized crime, we're looking for

10  specific go-fast vessels or targets of interest, fishing

11  vessels that are in areas which they don't normally patrol

12  or fish, anything that's suspected of possible smuggling.

13  Q    And that's smuggling drugs?

14  A    Contraband, yes.

15  Q    So of the patrols that you've been on, how many

16  interdictions have you participated in?

17  A    I've participated in ten interdictions since 2017.

18  Q    And how many of those resulted in a cocaine seizure?

19  A    All ten.

20  Q    I'd like you to tell the jury, if you could, in those

21  that you participated in, how was it that those drugs that

22  were seized -- how were they packaged?

23  A    They were packaged in these like three foot by two foot

24  by three foot bales, wrapped in burlap sacks, and each

25  individual bale had multiple kilo-sized packages, which is

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020   124
Direct Examination by Ms. Goodin

1    about eight inches by six inches by two inches, about

2    2.2 pounds per each individual kilo, and they varied from

3    size.  It could be from 50 pounds all the way up to what we

4    refer to as super bales, which is 120 pounds.

5    Q    Can you tell us, are there other occasions that you've

6    had to see bales of cocaine, as you've called them?

7    A    Can you repeat the question, please?

8    Q    What other occasions have you had to -- not your

9    interdictions, but outside of those, to interact, handle

10   bales of cocaine?

11   A    Yes.  Well, we've -- sometimes we transfer it, the

12   bales, over to other ships, other Coast Guard cutters, in

13   order to -- for those cutters to pull into port, so they can

14   swap out crew members or whatever they need to do, pull into

15   port, and so -- just to shift everything over before we pass

16   it off to other Government agencies, ma'am.

17   Q    And how many occasions would you say you've

18   participated in those types of transfers or offloads?

19   A    At least a dozen times.

20   Q    Can you estimate for us then the total number of bales

21   of cocaine that you have either seen or handled as a

22   Coast Guard law enforcement member.

23   A    It's been several hundred, from various cases.

24   Q    Now, I'd like to talk to you about the interdiction in

25   December of 2018.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020   125
Direct Examination by Ms. Goodin

1   A    Okay.

2   Q    At that time you were deployed as part of the

3   law enforcement detachment, correct?

4   A    That's correct.

5   Q    And you were aboard the Canadian ship the MONCTON?

6   A    That's correct.

7   Q    During that time -- or how long were you deployed with

8   them?

9   A    That was since October of 2018 until that time, so

10  about two and a half -- two and a half months.

11  Q    And were there any interdictions during that particular

12  patrol?

13  A    Just this one, for this case.

14  Q    And when was that?

15  A    That was on December 1st, 2018.

16  Q    How were you notified about the vessel that was

17  interdicted?

18  A    We were notified through a deployable team leader who

19  got -- had maritime patrol aircraft, they radio the

20  information in to us, and they identified this vessel that

21  was the suspected target of interest.

22  Q    How did they identify it for you?  What information did

23  you receive?

24  A    They were taking video imagery.  They described a

25  vessel approximately 30 feet in length, dark in color, had

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    126
Direct Examination by Ms. Goodin

1  two outboard engines, had a tarp, had four crew members

2  on board, and they seemed to be moving packages off to the

3  side or overboard.

4  Q    So for the boarding team, what role did you have on

5  that team?

6  A    Initially I was part of the initial boarding team with

7  Officer Diego Rivera.  I was the assistant boarding officer.

8  Q    All right.  And so you said that you launched with

9  Petty Officer Rivera?

10 A    That's correct.

11 Q    And when you launched, what was the position of the

12 MONCTON at that point?

13 A    Where their current location was?

14 Q    Yes.

15 A    All right.  It was -- I think they estimated the

16 closest point of land was Jamaica, approximately

17 100 nautical miles offshore of Jamaica.

18 Q    And, forgive me, how close were you to the target of

19 interest, the vessel at issue?

20 A    Oh, the vessel, when we launched, it's approximately

21 10 nautical miles.

22 Q    Now, you launched first off the MONCTON, correct, but

23 you weren't the first to reach that vessel, correct?

24 A    That's correct.

25 Q    Now, why was it that you weren't the first to reach the

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    127
Direct Examination by Ms. Goodin

1  vessel?

2  A    It was a poor sea state and the small boat capability

3  that we were on, it can only move about 8 knots.  At the

4  time, the sea state was about four to six foot seas and

5  there was like 20 knot winds, or 20 miles per hour winds

6  basically.

7  Q    So describe for the jury, when you did arrive on scene,

8  what did you see?

9  A    When we arrived on scene we noticed that the other

10 small boat that was on the MONCTON was already alongside

11 that vessel.  When we approached that vessel of interest, we

12 noticed -- I noticed that it didn't have any outboard

13 engines on it at all, there was no tarp or anything covering

14 it and there was no indication of nationality, no painted

15 flag.  There were four crew members on board, and I noticed

16 frayed lines on the side, like yellowish or white in color,

17 on both the right side and the left side of the boat.  They

18 were tied to these cleats.

19 Q    Now, the vessel that you just described, did that match

20 what you received in the imagery from the marine patrol

21 aircraft earlier?

22 A    Yes, from what we were told.

23 Q    But there were some differences, such as that vessel

24 didn't have the engines?

25 A    Yes.  No engines and it didn't have a tarp, I didn't

1    see physically on board.

2    Q    Now, when you do any sort of typical boarding, you

3    start with what's called a right of approach; is that

4    correct?

5    A    That's correct.

6    Q    Okay.  Can you describe what process you're going

7    through as part of the right of approach.

8    A    Well, initially, before we get to the right of

9    approach, we do a quick safety sweep of the vessel, so we

10   kind of do like a horseshoe-shaped pattern around the

11   vessel, make sure that the vessel is not listing, or if it's

12   unsafe for their crew members to be on board as well as for

13   our boarding team to get on board, so we make sure we do a

14   horseshoe-shaped pattern, make sure everything -- it's

15   safety for them.

16   Q    And what is "listing," just for people that may not be

17   as familiar.

18   A    Listing is when the vessel you can see is maybe either

19   taking on water or it's drifting off to the starboard or --

20   the right side or the left side.

21            MR. HERNANDEZ:  Your Honor, may we approach?

22            THE COURT:  Yes.

23            (The following bench conference was held.)

24            MR. HERNANDEZ:  Judge, my objection is this,

25   I don't know if there's something to be added, but I'm

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    129
Direct Examination by Ms. Goodin

 1  looking at his statement and it's a pure repetition of just

 2  what we've heard two or three times already.  Unless he did

 3  something different, I would object to this as just being

 4  repetitious.

 5           THE COURT:  It is.  It is cumulative.  Is he --

 6  I'm not sure what his role is actually.

 7           MS. GOODIN:  He's going to have to bring in some

 8  evidence about the I.D. and the personal items that were

 9  collected from the crew members.

10           THE COURT:  Okay.  Maybe we can get to that.

11  *(End of bench conference; proceedings resume in open court.)*

12  BY MS. GOODIN:

13  Q    Petty Officer Fahey, we were talking about the right of

14  approach, but I'd like to move on now to -- when you were

15  on board, were you able to identify the master of the

16  vessel?

17  A    Through questioning from -- Officer Diego Rivera was

18  asking questions, yes, we identified who the master was.

19  Q    Okay.  And do you see the master here in court?

20  A    Yes, I do.

21  Q    Would you be able to point him out and identify a piece

22  of clothing that he's wearing?

23  A    Sure.  He's wearing orange, and he's got a white

24  T-shirt underneath.

25           MS. GOODIN:  Your Honor, please let the record

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    130
Direct Examination by Ms. Goodin

 1  reflect that the witness has identified the defendant.

 2          THE COURT:  The record should so reflect.

 3  BY MS. GOODIN:

 4  Q    So as further processing of the individuals on the

 5  vessel, you try to determine who they are, correct?

 6  A    That's correct.

 7  Q    And how do you do that?

 8  A    We ask basic questions.  We actually ask them generally

 9  who is the master or owner of the vessel, and they will

10  identify themselves, and then we ask what's the nationality

11  of the vessel.

12          MS. GOODIN:  Your Honor, may I approach?

13          THE COURT:  You may.

14          MS. GOODIN:  Your Honor, I've handed the defendant

15  what's been previously marked as Exhibits 5A through 5D.

16  BY MS. GOODIN:

17  Q    Petty Officer Fahey, I'll ask you to take a look at

18  those, and when you've had a chance to review them, please

19  look up.

20          Do you recognize the exhibits that have been

21  previously marked as 5A through 5D?

22  A    I do.

23  Q    How do you recognize those documents?

24  A    I was -- I took the inventory of these items once

25  on board the Canadian ship MONCTON.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    131
Direct Examination by Ms. Goodin

1   Q    And what are those documents?

2   A    These -- well, here you can see -- per these exhibits,

3   you can see the various currency as well as the cédulas or

4   identifications of the crew members that were on board.

5   Q    So those are photos of the I.D.s and currency that you

6   collected --

7   A    That's correct.

8   Q    -- from the crew members?

9        And these were things that you personally

10  collected from the crew members?

11  A    That's correct.

12  Q    Is there anything different or off from what you

13  recall?

14  A    Not that I can recall.

15  Q    Do those appear to be true and accurate copies --

16  A    Yes.

17  Q    -- of the items that were collected from the crew

18  members?

19  A    Yes.

20        MR. DERENZO:  Your Honor, at this time I would

21  move to admit Exhibits 5A through 5D into evidence.

22        MR. HERNANDEZ:  No objection.

23        THE COURT:  Okay.  These are actually photographs,

24  correct?

25        MS. GOODIN:  Photographs, yes.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    132
Direct Examination by Ms. Goodin

1          THE COURT:  And no objection, Mr. Hernandez?

2          MR. HERNANDEZ:  No objection, Your Honor.

3          THE COURT:  I'll receive into evidence 5A through

4   5D.

5   BY MS. GOODIN:

6   Q    Petty Officer Fahey, could you look specifically at

7   Exhibit 5D.  What is 5D?

8   A    It's a cédula card of Mr. Newbbooll and a cell phone as

9   well that was on board.

10  Q    Okay.  So it's a photograph of what you called a

11  cédula.  What is a cédula?

12  A    Cédula is just an identification number that they use

13  primarily in Central and South America.  It's like how we

14  would have -- people would identify themselves, like they'll

15  know their number on there, as if we know our

16  Social Security number.

17  Q    And that particular one corresponds to the defendant,

18  Hinestroza-Newbbooll?

19  A    That's correct.

20          MS. GOODIN:  One moment, Your Honor.  I would like

21  to publish Exhibits 5A through 5D.

22          THE COURT:  All right.

23  BY MS. GOODIN:

24  Q    So we'll start with Exhibit 5A.  Can you describe for

25  the jury what it is that they're looking at here.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    133
Direct Examination by Ms. Goodin

1   A    You see different types of currency, you see Colombian

2   currency, U.S. currency, as well as identification here for

3   Mr. Hinestroza-Newbbooll.

4   Q    This is 5A that we're looking at?

5   A    Yeah.

6          MS. GOODIN:  And if you could publish 5B.

7          THE COURT:  I'm sorry.  Whose identification is

8   this?  Can we go back to 5A?

9   BY MS. GOODIN:

10  Q    Are you able to read that on the screen?

11  A    It is kind of blurry.

12  Q    Okay.  We'll move on to --

13         THE COURT:  So we don't know whose identification

14  this is?

15  Q    Are you able to tell from the picture?

16  A    It's kind of blurry.  I'm trying to read it.  Sorry.

17         THE COURT:  All right.

18  BY MS. GOODIN:

19  Q    We'll move on to publish Exhibit 5B.

20  A    Yes.  This is identification of Mr. Jorge Newball-May,

21  one of the crew members, as well as other standard cards,

22  and he's got also U.S. and Colombian currency.

23  Q    We'll move along to Exhibit 5C.

24  A    You can see the passport of Mr. Rudolph Randolph

25  Meighan.  He is from Belize.  It's got different types of

1   currency here, Mexican primarily.

2   Q    And finally we'll take a look at -- publishing

3   Exhibit 5D.

4   A    This is the cédula identification of

5   Mr. Hinestroza-Newbbooll as well as a cell phone.

6   Q    Okay.  I'll ask you to put those aside, Petty Officer

7   Fahey.

8   A    Sure.

9   Q    After the boarding team -- or after the boarding, what

10  happened -- or what steps were taken after that to process

11  the individuals?

12  A    After the boarding?

13  Q    Yes.

14  A    So once Officer Diego Rivera and I were relieved by

15  Officer Eric Lauginiger and Officer Alexander Ramos and

16  Officer Tyler Perio, we went back, we had them -- all the

17  crew members come on board of the MONCTON, and what we did

18  is we do our standard frisk search, make sure it's safe for

19  them to be on board, make sure they don't have any weapons,

20  and we gave them -- since their clothes were wet, we gave

21  them cover also to wear as well as making sure that they had

22  all their personal belongings with them.  That's after we

23  took the photos.  They had their backpacks with their

24  identifications and currency with them.

25  Q    Next I'd like to bring up what has been previously

1   entered into evidence as Exhibit 2P.

2           Petty Officer Fahey, do you recognize this vessel?

3   A    Yes, I do.

4   Q    How is it you recognize it?

5   A    This was the vessel that the MPA, maritime patrol

6   aircraft, took imagery of and that we -- was in the

7   location, and it describes everything minus -- I see four

8   crew members on board, I see two outboard engines, I see a

9   tarp over the bow, Panga-style vessel, which means it looks

10  like a -- the bow was raised.  It matches the description of

11  the target of interest that we were -- that we intercepted.

12  Q    And you are confident that that is the same vessel that

13  you intercepted?

14  A    I am.

15  Q    I will now publish Exhibit 2Q.

16          MS. GOODIN:  If we will fast forward to the

17  one minute time.

18          Fast forward a few minutes.

19  BY MS. GOODIN:

20  Q    Petty Officer Fahey, based on your training and

21  experience handling contraband, what do these white packages

22  appear to be to you?

23          MR. HERNANDEZ:  Objection.  Speculation.

24          THE COURT:  Overruled.  You may answer the

25  question if you can do so.

1          THE WITNESS:  Yes, Your Honor.

2   A    So my training and experience, it looked like packages

3   that could be suspected contraband.

4   Q    And what about the packages makes you say that?

5   A    Just the size overall and how they're linked together.

6   I've come across several bale fields, that's what we refer

7   to them as, which contained multiple packages like that, all

8   linked together with some type of line or rope.

9   Q    So in, again, your training and experience, have you

10  seen other vessels try to dispose of their contraband?

11  A    Yes.

12  Q    And you said that you've seen them create what you

13  called bale fields; is that correct?

14  A    Yes.

15  Q    And have you ever seen a vessel try to dispose of their

16  contraband using engines to weigh it down?

17  A    No, I have not.

18          MS. GOODIN:  Your Honor, we tender the witness.

19          THE COURT:  All right.  Can we turn the lights on,

20  please.

21      **CROSS-EXAMINATION OF PETTY OFFICER PAUL FAHEY**

22  **BY MR. HERNANDEZ:**

23  Q    Officer, can you see inside those white packages?

24          THE COURT:  Wait a minute.  I'm sorry.  Leave the

25  lights down.

PETTY OFFICER PAUL FAHEY - JANUARY 28, 2020    137
Cross-Examination by Mr. Hernandez

1            Can you put that back up?

2    BY MR. HERNANDEZ:

3    Q    Can you see what is inside those white packages?

4    A    No, I cannot.

5            MR. HERNANDEZ:  Okay.

6            THE COURT:  Oh, okay.

7            Any redirect?

8            MS. GOODIN:  No, Your Honor.

9            THE COURT:  You may step down.  Thank you, sir.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  You may call your next witness.

12           MS. GOODIN:  The Government would call Petty

13   Officer Tyler Perio.

14        *(Petty Officer Tyler Perio enters proceedings.)*

15           THE COURT:  Sir, if you'll come forward to be

16   sworn.

17           COURTROOM DEPUTY:  Please raise your right hand.

18           Do you solemnly swear or affirm, under penalty of

19   perjury, that the testimony you're about to give shall be

20   the truth, the whole truth and nothing but the truth?

21           THE WITNESS:  Yes, ma'am.

22           COURTROOM DEPUTY:  Please state your name for the

23   record and spell your last name.

24           THE WITNESS:  Tyler Perio.  Last name P-E-R-I-O.

25           COURTROOM DEPUTY:  Thank you, sir.  You may take

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    138
Direct Examination by Ms. Goodin

1    the witness stand.

2                THE COURT:  Ms. Goodin.

3          **DIRECT EXAMINATION OF PETTY OFFICER TYLER PERIO**

4    **BY MS. GOODIN:**

5    Q    Petty Officer Perio, what organization do you work for?

6    A    United States Coast Guard.

7    Q    And how long have you worked with the Coast Guard?

8    A    Approximately five and a half years.

9    Q    And what is your job with the Coast Guard?

10   A    I'm a Maritime Enforcement Specialist, Third Class.

11   Q    How long have you been a maritime enforcement

12   specialist?

13   A    Approximately three and a half years.

14   Q    And what did you do in order to become a maritime

15   enforcement specialist?

16   A    I went to a specialized school that taught me how to be

17   a maritime enforcement specialist.

18   Q    Were there any certifications or qualifications that

19   were part of that?

20   A    Yes, ma'am, there were.  I had to get a certificate

21   saying that I was a maritime enforcement specialist.  I've

22   also been to BO school, boarding officer school, and have a

23   certificate from that.

24   Q    So you have been certified as a boarding officer?

25   A    Yes, ma'am.

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020   139
Direct Examination by Ms. Goodin

1   Q    Can you summarize what law enforcement experience you
2   have through the Coast Guard.
3   A    My two years and eight months at TACLET, which is the
4   Tactical Law Enforcement Team Pacific, and then now
5   stationed in Galveston, Texas, and I'm a boarding officer
6   and a living marine resources boarding officer.
7   Q    So you said you're now stationed in Galveston, Texas,
8   but you were at one time stationed at the Tactical
9   Law Enforcement Team?
10  A    Yes, ma'am.
11  Q    And you were on the Tactical Law Enforcement -- when --
12  how long were you on the Tactical Law Enforcement Team?
13  A    I left in August of '19.
14  Q    And while you were a part of that team, what were some
15  of your duties there?
16  A    To be a Tactical Law Enforcement Team boarding officer,
17  be an IONSCAN operator, help out with any training that we
18  needed to get done, any range equipment that needed to get
19  done.
20  Q    Did you ever deploy?
21  A    Yes, I did.
22  Q    And where did you deploy?
23  A    I've deployed five different times on three different
24  Canadian bilateral agreement cutters and a Dutch deployment
25  and also a training mission to Africa.

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020   140
Direct Examination by Ms. Goodin

1   Q    And bilateral agreements are agreements that the U.S.

2   has with foreign nations?

3   A    Yes, ma'am.

4   Q    As part of a cooperative service between the military

5   services?

6   A    Yes, ma'am.

7   Q    Now, you mentioned the number of patrols that you've

8   been on.

9   A    Yes, ma'am.

10   Q    And when you're on those patrols, what are you looking

11   for?

12   A    We're usually out searching for counter-drug patrols --

13   or on counter-drug patrols.

14   Q    And what are some of the characteristics or things that

15   might help you identify that?

16   A    A Panga-style vessel, which is an open-hulled vessel,

17   usually 25 to 45 feet in length, usually has more than

18   two outboards, raised bow, which is the front of the vessel,

19   it's usually painted to match the water, so usually like a

20   bluish, a dark blue or maybe a purple.  They tend to use

21   tarps sometimes to cover the contraband up front.

22   Q    Have you participated in any interdictions of such

23   vessels?

24   A    Yes, ma'am, I have.

25   Q    How many?

1    A      Approximately three.

2    Q      And of those three, how many of those resulted in a

3    cocaine seizure?

4    A      Three of them.

5    Q      And when you had those seizures, how was the cocaine

6    packaged?

7    A      The cocaine is packaged usually in a kilo size, which

8    is 2.2 pounds approximately, they're Saran wrapped,

9    sometimes they're stamped, sometimes they're not, and then

10   they're stacked.  Usually in a normal-sized bale they're

11   stacked about ten high and two rows of them, and it's

12   usually 50 to 60 pounds a bale, and then that's all Saran

13   wrapped together.

14   Q      Have you had any other occasions outside of those

15   interdictions to see bales of cocaine?

16   A      Yes, ma'am, I have.

17   Q      And what are those?

18   A      As a nonrated, I was on the Coast Guard Cutter

19   BOUTWELL, the 378, I did two offloads with them, and

20   I saw -- I have seen multiple different bales of cocaine.

21   Q      How many would you say that you've seen over your

22   experience through the BOUTWELL and then with the Tactical

23   Law Enforcement Team?

24   A      Easily over 100.

25   Q      Now I'd like to talk to you about the interdiction in

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    142
Direct Examination by Ms. Goodin

1    December of 2018.

2    A    Yes, ma'am.

3    Q    During that time you were deployed as a member of the

4    law enforcement detachment?

5    A    Yes, ma'am.

6    Q    Were there any interdictions during that patrol?

7    A    Yeah, ma'am.  Only one.

8    Q    And when was that?

9    A    Can you repeat the question?

10   Q    What date was that?

11   A    Oh.  I believe it was 01 December 2018.

12   Q    What was your role within that interdiction?

13   A    I was on standby.  I went out to relieve some of the

14   other crew members that were fatigued, and when I got

15   on board I was the person that did the --

16   Q    Let's go back.  Let me just slow it down there.

17         You said that you were on standby.  How long did

18   that boarding take, would you say, the full evolution?

19   A    I don't remember.

20   Q    But several hours?

21   A    Yes, ma'am, easily.

22   Q    So you said that you were there to relieve others?

23   A    Yes, ma'am.

24   Q    Who was it that you relieved?

25   A    I relieved ME-1 Fahey and ME-1 Rivera.

1    Q    Now, when you're on scene there, can you describe for

2    us the vessel that you saw.

3    A    I saw an open-hulled vessel approximately 30 feet in

4    length, there was no engines on board, there were 04

5    personnel on board.

6              MR. HERNANDEZ:  Objection.  Cumulative.

7              THE COURT:  Well, at some point, again, it

8    probably is going to be cumulative.  I'm going to -- the

9    question is what did you see, so I'm going to overrule the

10   objection.

11   BY MS. GOODIN:

12   Q    Continue.

13   A    There were coolers on board, or one cooler on board.

14   The vessel was painted in a dark color.

15   Q    Okay.  Was it easy to see the vessel at night?

16   A    No, ma'am, it was not.  There was no nav lights either.

17   Q    Now, what about individuals on board?  Were there any

18   individuals on board?

19   A    Yes, ma'am.  There was 04 individuals on board.

20   Q    Do you see any of those individuals here in the

21   courtroom?

22   A    Yes, I do.

23   Q    Would you point them out and identify a piece of

24   clothing.

25   A    So Mr. Newbbooll, in the orange jumpsuit.

1          MS. GOODIN:  Your Honor, please let the record

2     reflect that the witness has identified the defendant.

3          THE COURT:  The record should so reflect.

4     BY MS. GOODIN:

5     Q     So in a law enforcement boarding, what is one of the

6     first things that you do?

7     A     One of the first things that we do after we get

8     permission to conduct a full law enforcement boarding is we

9     get on board and do an initial safety sweep, which is the

10    boarding team just checking the vessel to ensure its

11    seaworthiness, no arcing, sparking, fire, flooding on board

12    the vessel, for boarding team safety and crew member safety.

13    Q     And after it's been established that the vessel is safe

14    to go on, what was something that you then took part in that

15    evening?

16    A     I took part in the ion scanning.

17    Q     Before then even, was there anything else regarding the

18    vessel that occurred?

19    A     I did ASSA on it as well, at-sea space accountability.

20    Q     And what is an at-sea space accountability?

21    A     At-sea space accountability is taking different

22    measurements of the entire vessel in order to ensure that

23    there's no hidden compartments or hidden decks, in order to

24    get full accountability of all the space on board the

25    vessel.

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    145
Direct Examination by Ms. Goodin

1   Q    And how do you do that?

2   A    So you get like a piece of paper and then you draft out

3   a picture of the vessel, and then you take lengths fore to

4   aft, so from the front of the boat to the very back of the

5   boat, measure those all out, include the bulkhead spaces as

6   well, so you're getting the full length, and then you take

7   at least eight different measurements down the width of the

8   vessel as well and look for any inconsistencies in the

9   width, anything that changes, if any bulkheads are

10  different.

11            MS. GOODIN:  Your Honor, may I approach?

12            THE COURT:  You may.

13  BY MS. GOODIN:

14  Q    Petty Officer Perio, I've handed you what's been

15  previously marked as Government's Exhibit 6 for

16  identification.  If you could take a look at that and let me

17  know when -- look up, letting me know when you're ready to

18  answer questions.

19            Do you recognize that document?

20  A    Yes, ma'am.

21  Q    What is it?

22  A    It's the ASSA, at-sea space accountability, sketch that

23  I drew of the vessel.

24  Q    And how do you recognize it as the one that you drew?

25  A    It's my handwriting.

1  Q    Do you see anything different from your memory of

2  actually putting it together?

3  A    No, ma'am.

4  Q    And does it look like a fair and accurate

5  representation of the document that you created on that

6  night?

7  A    Yes, ma'am.

8         MS. GOODIN:  Your Honor, at this time I would move

9  to have Government's Exhibit 6 entered into evidence.

10         THE COURT:  Any objections?

11         MR. HERNANDEZ:  May we approach?

12         THE COURT:  Sure.

13         (The following bench conference was held.)

14         MR. HERNANDEZ:  Judge, I don't have any new

15  objections, but I -- we're dealing with this and it's

16  leading to the ion scan.  I want to make sure that my

17  previous objections to the -- to this is preserved for

18  appeal.

19         THE COURT:  Okay.  What particular objections to

20  this?

21         MR. HERNANDEZ:  This is leading to the testifying

22  of -- I believe this is part of the testimony of the witness

23  that he conducted ion scan testing throughout the boat.

24  He's the one that actually did the testing, and anything

25  that relates to that I'm objecting to.

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    147
Direct Examination by Ms. Goodin

 1          THE COURT:  Okay.  That's actually the diagram

 2   that he did; is that correct?

 3          MS. GOODIN:  It's the diagram he created, yes,

 4   Your Honor.

 5          THE COURT:  And that's the space diagram to make

 6   sure all spaces are accounted for?

 7          MS. GOODIN:  Yes, Your Honor.

 8          THE COURT:  Okay.  I'll note the objection but

 9   overrule the objection and I'll receive that into evidence.

10          MR. HERNANDEZ:  Okay.

11   *(End of bench conference; proceedings resume in open court.)*

12          THE COURT:  I'll receive into evidence 6.

13   BY MS. GOODIN:

14   Q    Now, Petty Officer Perio, can you tell us basically --

15   or some of the basic dimensions of the vessel that you were

16   able to capture from the --

17          MS. GOODIN:  Forgive me, Your Honor.  I would like

18   to publish what's been admitted into evidence as Government

19   Exhibit 6.

20          THE COURT:  You may.

21   BY MS. GOODIN:

22   Q    Officer Perio, could you explain for the jury some of

23   the markings in here and how they describe the vessel that

24   you encountered that evening.

25   A    Yes, ma'am.  So this whole length is the entire length

1  of the vessel.  I got that by taking these lengths right

2  here and adding them all up, and then I took the width

3  lengths of the vessel to show any inconsistencies within the

4  vessel in the widths.

5          So the vessel was approximately 30 feet in length

6  and approximately seven feet in width.

7  Q    Petty Officer Perio, I'm going to clear the screen for

8  a minute here.

9  A    Okay.

10 Q    But could you identify here on the diagram where that

11 area known as the center hold is.

12 A    Yes, ma'am.  Right here.

13 Q    And that was part of what you were doing as your

14 measurements for the ASSA?

15 A    Yes, ma'am.

16 Q    And then could you also identify where the helm of the

17 vessel is.

18 A    The helm of the vessel is right here.

19 Q    And then finally could you identify where it was where

20 you would expect the engines to have been.

21 A    Right there.

22 Q    And in doing your at-sea space accountability, did you

23 find any hidden compartments?

24 A    No, ma'am, I did not.

25 Q    And you were able to account for all of the space that

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    149
Direct Examination by Ms. Goodin

1    was found by the boat?

2    A    Yes, ma'am.

3    Q    Now, getting back to on the vessel, as part of this you

4    had to search the vessel, correct, or review the different

5    areas of the vessel?

6    A    Yes, ma'am, I did.

7    Q    While on the vessel did you see any SCUBA gear?

8    A    No, ma'am.

9    Q    Did you see any fins?

10   A    No.

11   Q    How about any fishing gear?

12   A    No, ma'am, I did not.

13   Q    Any ice?

14   A    No, ma'am.

15   Q    Now, Petty Officer Perio, I would like to move on to

16   what you mentioned as one of your other jobs there on the

17   vessel.

18            You collected the ion swabs?

19   A    Yes, ma'am.

20   Q    So can you tell me what training you received for that.

21   A    I received training from Tactical Law Enforcement Team

22   Pacific in IONSCAN operating, and IONSCAN operating also

23   includes taking the swabs and running them through an

24   analysis on the instrument as well.

25   Q    And so are you qualified by the Coast Guard in order to

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020   150
Direct Examination by Ms. Goodin

1    run those tests?

2    A    Yes, ma'am, I am.

3    Q    Now, I'd like you to describe, what is the standard

4    procedure in collecting an ion scan swab?

5    A    The standard procedure is we put on multiple clear

6    non-powdered gloves on one hand and have one on the other

7    hand.  We really --

8    Q    Why are there multiple gloves?

9    A    There are multiple gloves so that when we take one

10   swab, we roll the -- we roll the glove up, like you would if

11   you don't want to touch anything on a glove, and roll it

12   inside out so that that swab doesn't get contaminated with

13   anything else.

14   Q    Please continue.

15   A    So we put on multiple gloves.  It's usually a

16   two-person operation.  One person is going to be having a

17   piece of paper, a plastic baggy, something they can write

18   on.  We'll take the swab, we'll number it with a pencil, and

19   then say it's number 1, swab number 1, we'll put swab number

20   1 on the piece of paper, put where I swabbed, so like swab

21   number 1, port side rail; swab number 2, center hold --

22   Q    Okay.

23   A    -- and so on.

24   Q    Officer Perio, can you describe for the panel, what is

25   a swab exactly?

1  A    A swab is a paper-like material, it's approximately

2  three inches in length and about an inch and a half in

3  width, and it's rounded on both edges.

4  Q    And when you are getting a swab, prior to actually

5  swabbing a particular area for evidence, where are you

6  getting that swab from?

7  A    I'm taking the swabs out of the -- it's a cylinder

8  container, cylinder metal-like container that has been

9  sealed and sterilized, and my partner that's helping me out

10  with it is opening the container, I'm grabbing one swab with

11  a clean glove, he's closing it right back up.

12  Q    And what do you do next?  You have the swab in your

13  hand.  What happens next?

14  A    I have the swab in my hand with my gloves on.  I swab

15  the area that I'm suspecting that any kind of contraband

16  might touch, I swab that area, I fold the glove up after

17  marking it and having my partner mark the appropriate number

18  for the location, and then that glove that I just now have a

19  swab in is now placed inside of an evidence bag.

20  Q    And what happens to the evidence bag?

21  A    Once we're done with all the swabs, we seal the

22  evidence bag, and in this case I escorted the ion scan swabs

23  back to the cutter, I directly handed them to Chief Brooks,

24  and Chief Brooks ran the ion scan swabs.

25  Q    Now, on December 1st you ran through this process with

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    152
Direct Examination by Ms. Goodin

1    Petty Officer Ramos?

2    A    Yes, ma'am.

3    Q    And you stated that you were the one who was collecting

4    the swabs?

5    A    Yes, ma'am.

6    Q    And he was the one noting the location?

7    A    Yes, ma'am.

8    Q    Now, you handed the swabs off directly to Chief Brooks?

9    A    Yes, ma'am, I did.

10   Q    Can you tell me, those swabs, where did you take them

11   from in the vessel?

12   A    I'm sorry?

13   Q    Where did you get -- where did you swab in the vessel?

14   A    I swabbed the starboard rail, the center hold, the

15   port rail, the forward hatch, the forward rail and the

16   steering console.

17   Q    So, Petty Officer Perio, I'm going to ask you to make

18   that a little bit more understandable for some of us.

19   A    Okay.

20   Q    When you say the starboard rail, let's start with that

21   one.

22   A    The starboard rail is the outside rail of the vessel.

23   Q    On what side?

24   A    On the right side.

25   Q    Okay.  And then what was the next swab that you took?

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    153
Direct Examination by Ms. Goodin

1    A    I believe the center hold, which is the big square

2    opening in the middle of the vessel.

3    Q    And why would you swab an area like that?

4    A    I would swab an area like that because it's more likely

5    to have contact with contraband because it's a flat surface.

6    If they decided to get rid of them in the middle of going,

7    then that would be somewhere where they might put them,

8    along with the rails.

9    Q    Okay.  So you mentioned the starboard rail, the center

10   hold.  What are some of the other places that you swabbed?

11   A    The port side rail, which is the left side.  The

12   forward rail, which is the -- it's the rail past the center

13   hold, so the center -- the center hold and then there's

14   another --

15   Q    Is that closer to the front or the back of the boat?

16   A    The front of the boat.

17   Q    And then would that be on the left side or the right

18   side?

19   A    It's actually the beam that runs in the middle.

20   Q    Okay.  So it runs across the boat?

21   A    Horizontally.  Yes, ma'am.

22   Q    And where else?

23   A    The forward hatch, which is at the front of the boat,

24   and then I also swabbed the steering console at the back of

25   the boat.

1   Q    That's essentially the steering wheel?

2   A    Yes, ma'am.

3   Q    And are you aware of the results of those swabs?

4   A    I don't remember all of them.

5   Q    Okay.  Do you remember any of them?

6   A    I know that the port side rail, center console and

7   starboard side rail all came back positive for cocaine.

8   Q    Now, after the swabs that you ran on the vessel, did

9   you collect any more swabs as part of this interdiction?

10  A    Yes, ma'am, I did.

11  Q    Okay.  And where did -- tell us about that.

12  A    Well, after the boarding was over and we took the

13  personnel back on board the HMCS MONCTON, we were directed

14  by District to go ahead and run their fingertips and

15  forearms or their hands and forearms, and I took the swabs

16  on those.

17  Q    So you're saying that you took the swab of the

18  defendant and the other crew members?

19  A    Yes, sir.

20  Q    And you did that process on the MONCTON itself?

21  A    Yes, ma'am.

22  Q    And the MONCTON, again, is the Canadian ship that you

23  were traveling on?

24  A    Yes, ma'am.

25  Q    Can you describe the process used for taking the swabs

1    from the defendant.

2    A    The process used for taking the swabs on the defendant

3    were the same as before.  I got multiple sterile gloves,

4    clear, non-powdered, on one hand and one on the other.

5    I had someone else grab the silver tin, open it for me so I

6    could take a swab with a clean hand, swab their hands,

7    number it, have them write it down, corresponding numbers to

8    location, rolling the glove back up, putting it in an

9    evidence bag, and then repeated that for their forearms and

10   then switched -- I switched swabs between hands and forearms

11   for each defendant -- or for the defendant and then each of

12   the other crew members I also do the same.

13   Q    And why was it that you did the hands and the forearms?

14   A    That's what we were directed, and the hands and

15   forearms are what's more likely to come in contact with

16   contraband.

17   Q    And how were you able to label the swabs for each

18   individual?

19   A    I don't understand what you're asking.

20   Q    To tell one person from the next.

21   A    You can do it multiple different ways.  You can do

22   1 through 6.

23            THE COURT:  I think it's what did you do here.

24            MS. GOODIN:  Yes.

25   A    Oh, I don't remember how we marked them.

1    Q    Did you check people's I.D.s to identify who they were?

2    A    Yes, ma'am, we did.

3    Q    And after conducting that process, you handed them off,

4    the swabs off for testing?

5    A    Yes, ma'am.

6    Q    And are you aware of the results for the defendant?

7    A    I know they came back positive for cocaine.

8            MS. GOODIN:  At this time I'd like to show you

9    what's been previously entered into evidence as Exhibit 2P.

10           THE COURT:  Can you dim the lights, please.

11                       *(Video played.)*

12   BY MS. GOODIN:

13   Q    Petty Officer Perio, do you recognize the vessel in

14   Exhibit 2P?

15   A    Yes, ma'am, I do.

16   Q    How do you recognize it?

17   A    There's four persons on board matching the description.

18   They're wearing the same clothing that we found them in.

19   "We" is the boarding team.  And it looks like the same

20   vessel that we boarded.

21   Q    And what are some of the similar characteristics to the

22   vessel that you boarded?

23   A    Where the steering console is, there's -- I mean,

24   there's engines on it in that picture, or in the video.

25   Q    Okay.  And how confident are you that the vessel that

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    157
Direct Examination by Ms. Goodin

1  you boarded is the vessel depicted here?

2  A    100 percent.

3           MS. GOODIN:  Your Honor, we tender the witness.

4           THE COURT:  All right.  Let's take a recess,

5  please.  It is almost 3:15.  We're going to take about

6  20 minutes.  We'll be in recess until 3:35.

7           You're welcome to walk around.  Leave your pads on

8  your chairs, and don't discuss the case.

9                (Jury exits proceedings.)

10          THE COURT:  Officer, you may step down.  Please

11 don't discuss the case over the recess, and we'll start

12 again at 3:35.

13          THE WITNESS:  Yes, Your Honor.

14                    - - - - -

15          (Recess at 3:14 p.m. until 3:39 p.m.)

16                    - - - - -

17          MR. DERENZO:  Your Honor, before we bring the jury

18 in, may we release Petty Officers Ramos, Rivera and Fahey?

19          MR. HERNANDEZ:  No objection.

20          THE COURT:  No objection?  Yes.  Certainly.

21          MR. DERENZO:  Thank you, Your Honor.

22          THE COURT:  Bring the jury in.

23                (Jury re-enters proceedings.)

24          THE COURT:  Mr. Hernandez.

25          MR. HERNANDEZ:  Thank you, Your Honor.

1              Good afternoon, sir.

2              THE WITNESS:  Good afternoon.

3         **CROSS-EXAMINATION OF PETTY OFFICER TYLER PERIO**

4    **BY MR. HERNANDEZ:**

5    Q    One of the things that you did, if I understand your

6    testimony, is that you conducted ion scan swipes on the

7    crewmen's hands and forearms?

8    A    Yes, sir.

9    Q    Specifically the hands, and what part -- tell me what

10   you mean by forearm.

11   A    Their forearms is on the inner part of their forearm

12   and outside part of their forearm.

13   Q    Okay.  And it's my understanding that the policy for

14   the boarding officers, before they board the vessel, they

15   are also to be swiped for -- to avoid contamination?

16   A    Yes, sir.  That's correct.

17   Q    But it's also my understanding that their testing or

18   their swipes areas are the hand, wrist and the back of the

19   head.

20   A    Per policy, their swiped areas are their palms and

21   their fingertips.

22   Q    Okay.  So their forearms are not swiped?

23   A    No, sir, because they're covered with clothes.

24   Q    And that's simply because there's a policy to that

25   effect, but then again, the crewmen's forearms are swiped?

 1   A     Yes, sir.

 2   Q     So there's an inconsistency there, correct, a

 3   difference?

 4   A     I don't believe so, sir.  Yes, there's a difference.

 5   Q     There's a difference.

 6         And are the back of the heads of the crewmen

 7   swiped?

 8   A     Of the defendant?

 9   Q     Of the crewmen, yes, the defendants.

10   A     No, sir.

11   Q     Okay.  In the process, you're using multiple gloves,

12   correct?

13   A     Yes, sir, I am.

14   Q     And every swipe is one glove?

15   A     Yes, sir.

16   Q     And is that placed in some type of Ziploc bag, evidence

17   bag, to preserve it?

18   A     Yes, sir, it is.

19   Q     Are any -- do any of the evidence bags contain more

20   than one swipe?

21   A     You mean more than one glove?

22   Q     Correct.  Every glove is placed in an evidence bag or a

23   Ziploc bag, correct?

24   A     They're all placed in the same evidence bag, but

25   they're all closed up from the glove.

1  Q    Okay.  So you're saying that one evidence bag can

2  contain multiple bags?

3  A    Multiple gloves.

4  Q    I'm sorry.  Strike that.

5         You're saying that one evidence bag, one Ziploc

6  bag, can contain multiple gloves?

7  A    Yes, sir.

8  Q    So that what one bag -- what one glove has can touch

9  another glove, correct, inside the same evidence bag?

10  A    No, sir.

11  Q    How is that?

12  A    Because the -- when you're doing the swabs, the gloves

13  are rolled inside out with the swab in between the glove, so

14  the swab gets taken like either in between the finger or

15  right in the palm of the glove, and it's inside the glove.

16  Q    That's assuming there's no human error, correct?

17  A    Yes, sir.

18  Q    Okay.  Now, you said that this vessel did not have

19  hidden compartments, correct?

20  A    Yes, sir.

21  Q    Is it your -- from your experience, that many times

22  that illegal drugs are transported in vessels that have

23  hidden compartments?

24  A    I've had illegal drugs be transported in vessels that

25  have hidden compartments and that have not.

1  Q    But the purpose of a hidden compartment is to --
2  someone knowing that you have cocaine or some type of
3  illegal drug is --
4            MS. GOODIN:  Objection.  Speculation.
5            THE COURT:  Overruled.  He ought to be able to
6  answer this.  Go ahead.
7            MR. HERNANDEZ:  Thank you, Your Honor.
8  BY MR. HERNANDEZ:
9  Q    You would agree with me that a hidden compartment or a
10 use of a hidden compartment is for someone who is knowingly
11 possessing something illegal, you're hiding it in the hidden
12 compartment, correct?
13 A    Yes, sir.
14 Q    And when you're going about the vessel, say, taking a
15 swab, you're not seeing anything that's suspicious, correct?
16 You're simply swabbing areas that someone might touch?
17 A    I'm swabbing areas that contraband might touch.
18 Q    Correct.  But you're not going to the railing and
19 saying, God, this looks suspicious, I'm going to swipe right
20 here, because I see something there?
21 A    No, sir, because I can't see particles of cocaine
22 residue.
23 Q    So when you're talking about these traces that you're
24 trying to identify, they are not visible to the naked eye,
25 they're microscopic, correct?

 1  A    Yes, sir.

 2  Q    Now, you said that there were several places that you

 3  found traces of cocaine, correct?

 4  A    Yes, sir.  That's correct.

 5  Q    And there were a much greater amount of places that

 6  there were no traces found, correct?

 7  A    Yes, sir.

 8  Q    Okay.  In fact, I believe it's an Officer -- are you

 9  familiar with an Officer Brooks?

10  A    Yes, sir, I am.

11  Q    Did he prepare a boarding sample log as to the findings

12  that you're testifying about?

13  A    Yes, sir.

14  Q    Have you seen it?

15  A    The sample log for the ion scan sheets?

16  Q    Yes.

17  A    Yes, sir, I have.

18          MR. HERNANDEZ:  May I approach the witness,

19  Your Honor?

20          THE COURT:  You may.

21  BY MR. HERNANDEZ:

22  Q    And, sir, is this the log that we're talking about?

23          MR. HERNANDEZ:  May I ask a few questions from

24  here, Your Honor?

25          THE COURT:  Yes.  As long as -- if you can't hear,

PETTY OFFICER TYLER PERIO - JANUARY 28, 2020    163
Cross-Examination by Mr. Hernandez

1    let us know.

2    BY MR. HERNANDEZ:

3    Q    Okay.  That's another report.  I'm sorry.

4    A    Yes, sir, that's the log.

5    Q    It's a two page report, correct?

6    A    Yes, sir.

7    Q    And it has a list of locations that you took swipes of,

8    correct?

9    A    Yes, it does.

10   Q    And we go one, two, three, four, five, six, seven,

11   eight, nine, the first nine locations you found nothing,

12   correct?

13   A    Yes, sir.  But the first one, two, three, four, five

14   were all of the boarding team members.

15   Q    Okay.

16   A    And then you have to run blank swabs after that to

17   clear it out.

18   Q    That's fine.

19         And then the first interview you have here is

20   7 percent -- it says -- somebody, I assume it's

21   Officer Brooks, wrote 7 percent cocaine, correct?

22   A    Yes, sir.

23   Q    And it's 7 percent, correct, of a trace?

24   A    Yes, sir.

25   Q    Okay.  And then you have four more entries, nothing,

1   correct?

2   A    Yes, sir, because, again, after you get a positive hit

3   or any hit, you have to clear out the -- you have to clear

4   out the instrument or it's not going to analyze properly.

5   Q    Okay.  And what is 3 percent MDMA, 2 percent PCP?

6   A    That just means that that was on the vessel, in this

7   case around the forward hatch.  There was presence of it

8   there, not that -- doesn't mean that I found any, just that

9   there was presence.

10  Q    And then you have more entries of nothing, including

11  the rail, correct?

12  A    Yes, sir.

13  Q    And then you have -- when it says "blank," does that

14  mean -- what does that mean?

15  A    A blank swab is not something that I took on the

16  vessel, that's something that had to be ran through the

17  IONSCAN machine in order to calibrate it back to normal.

18  Q    Okay.  But again, there are many places that you swiped

19  that came back negative, correct?

20  A    There are some, yes, sir.

21  Q    And none of the positives are something that you can

22  see with the naked eye; is that -- I think you've answered

23  it, but I want to make sure that I've asked the question

24  correctly.

25  A    Yes, sir.  They're particles.

1          MR. HERNANDEZ:  Thank you.

2          THE COURT:  Redirect?

3          MR. HERNANDEZ:  That's all I have.

4          MS. GOODIN:  Yes, Your Honor.

5     **REDIRECT EXAMINATION OF PETTY OFFICER TYLER PERIO**

6  **BY MS. GOODIN:**

7  Q    Petty Officer Perio, the defense asked you about

8  whether or not the boarding team members' forearms were

9  swabbed.

10 A    Yes, sir.

11 Q    And they were not?

12 A    I don't believe so.  Through policy, it's palms and

13 fingertips.

14 Q    And what does the boarding team wear to a boarding?

15 A    We wear our Crye Precision tops, which are

16 long-sleeved, and our Crye Precision pants, some sort of tan

17 boots and our LE gear.

18 Q    So when you're going onto the vessel, your forearms are

19 covered?

20 A    Yes, ma'am.

21 Q    When you're going -- before you go onto the vessel,

22 you're swabbed?

23 A    Yes, ma'am.

24 Q    And you're not handling cocaine before you go onto the

25 vessel, go on an interdiction?

1   A     No, ma'am.

2   Q     But you suspected that the defendant had been handling

3   cocaine before you swabbed?

4   A     I'm sorry?

5   Q     It was suspected that the defendant had been handling

6   cocaine before it was swabbed, before he was swabbed?

7   A     Yes, ma'am.

8   Q     Now, the defense also asked about hidden compartments.

9   A     Yes, sir.

10  Q     You would agree that it's harder to jettison or throw

11  packages over when they're lodged in hidden compartments?

12  A     Yes, ma'am.

13  Q     Specifically like when a Coast Guard airplane shows up

14  and you have to get rid of evidence?

15  A     Yes, ma'am.  It's way harder to jettison when they're

16  hidden in hidden compartments.

17  Q     Now, to move onto the testing, the defense pointed out

18  in the document that there were a number of blanks.

19  A     Yes, ma'am.

20  Q     And it's your understanding that the procedure when

21  running the swabs through the machine is to put blanks in

22  between samples that are tested?

23  A     Yes, ma'am.

24  Q     And that's done to ensure that there's no contamination

25  in between the samples that are tested?

1   A     Yes, ma'am.  Exactly.

2   Q     So in running any number of swabs, you would expect an

3   excessive number of blanks?

4   A     Yes, ma'am, enough to clear it out.  At least two.

5              MS. GOODIN:  Thank you.

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  Thank you, sir.  You may step down.

8              THE WITNESS:  Thank you, Your Honor.

9              THE COURT:  And you may call your next witness.

10             MR. DERENZO:  Thank you, Your Honor.  The

11  United States calls Chief Petty Officer Daniel Brooks, U.S.

12  Coast Guard.

13     *(Chief Petty Officer Daniel Brooks enters proceedings.)*

14             THE COURT:  Sir, if you'll come forward to be

15  sworn.

16             COURTROOM DEPUTY:  Please raise your right hand.

17             Do you solemnly swear or affirm, under penalty of

18  perjury, that the testimony you're about to give will be the

19  truth, the whole truth and nothing but the truth?

20             THE WITNESS:  Yes, I do.

21             COURTROOM DEPUTY:  Please state your name for the

22  record and spell your last name.

23             THE WITNESS:  Daniel William Brooks, spelled

24  B-R-O-O-K-S.

25             COURTROOM DEPUTY:  Thank you, sir.  You may take

1    the witness stand.

2              THE WITNESS:  Thank you, ma'am.

3              MR. DERENZO:  Chief, how are you?

4              THE WITNESS:  Great, sir.  How are you?

5              THE COURT:  I was just waiting for him to get his

6    water.

7              Okay, Mr. DeRenzo.

8              MR. DERENZO:  Thank you, Your Honor.

9      **DIRECT EXAMINATION OF CHIEF PETTY OFFICER DANIEL BROOKS**

10   **BY MR. DERENZO:**

11   Q    You're in uniform here today.  What service are you in?

12   A    United States Coast Guard, sir.

13   Q    How long have you been in the Coast Guard, Chief?

14   A    Approximately 15 years.

15   Q    And what is it that you do in the Coast Guard?

16   A    I'm a maritime enforcement specialist.  My primary

17   duties is to conduct maritime Federal law enforcement on the

18   high seas.

19   Q    How long have you been doing that job?

20   A    Approximately 12 years out of my 15 years.

21   Q    Do you hold any law enforcement related qualifications

22   or certifications?

23   A    Yes.  I currently hold a deployable team leader

24   qualification on my current unit, boarding officer and

25   IONSCAN operator.

                  CHIEF PETTY OFFICER DANIEL BROOKS          169
                  Direct Examination by Mr. DeRenzo

 1   Q    Let's take each of those in kind.
 2            What is it that you have to do to become a
 3   deployable team leader?
 4   A    It's a qualification that an E-6 or above can obtain.
 5   It's a qualification for personnel management, overall
 6   responsibility for all the law enforcement detachment
 7   personnel while conducting counter-drug operations on
 8   foreign and U.S. Allied ships.
 9   Q    And how about becoming an IONSCAN operator, how does
10   one become qualified or certified to do that job?
11   A    We get trained by someone who is qualified to train
12   other operators from Smith Detection.
13   Q    And what's your current unit?
14   A    It's the Pacific Tactical Law Enforcement Team,
15   San Diego, California.
16   Q    Do you have anybody at that unit who is qualified to
17   provide the training you just described to become an
18   IONSCAN operator?
19   A    Yes.
20   Q    Who is that person?
21   A    We have Senior Chief Bomentre, Steven Bomentre.
22   Q    How much of your Coast Guard career has been devoted to
23   law enforcement of some type?
24   A    Total law enforcement experience?
25   Q    Yes.

CHIEF PETTY OFFICER DANIEL BROOKS          170
Direct Examination by Mr. DeRenzo

1   A    About 12 years.

2   Q    And how long have you been at the TACLET specifically?

3   A    I've been at TACLET -- this is my second tour.  It will

4   be a total of eight years at TACLET.

5   Q    During those two tours at the TACLET, has it been part

6   of your responsibilities day-to-day to deploy?

7   A    Yes.

8   Q    How many times have you deployed as either a member of

9   a TACLET or any other unit?

10  A    Entirety, the whole time, I've deployed, I would say,

11  approximately 25 times.

12  Q    And what geographic locations have you personally

13  deployed in?

14  A    Personally I've deployed in the Eastern Pacific and the

15  Caribbean Sea for counter-drug operations, I've also been to

16  the Horn of Africa conducting counter-piracy operations, and

17  I've done fisheries, your Living Marine Resource

18  law enforcement for fisheries management in the Bering Sea

19  or Alaska.

20  Q    During those patrols have you had any counter-drug

21  interdictions?

22  A    Yes.

23  Q    How many?

24  A    Approximately 46 interdictions in my career.

25  Q    How many of those interdictions involved a drug

CHIEF PETTY OFFICER DANIEL BROOKS          171
Direct Examination by Mr. DeRenzo

1   seizure?

2   A     All 46.

3   Q     Those 46 drug seizures, how many of them involved

4   specifically cocaine?

5   A     All of them.

6   Q     Have you -- in those 46 interdictions have you

7   encountered or seized any other types of drugs other than

8   cocaine?

9   A     Yes.  Marijuana.

10  Q     How many?

11  A     Two.  Two occasions.

12  Q     How many times?

13  A     Marijuana, two occasions of the 46.

14  Q     Okay.

15  A     But they were also carrying cocaine as well.

16  Q     I see.  Let's talk about cocaine first.

17         During those forty-some interdictions, how was the

18  cocaine packaged?

19  A     It's in -- it's wrapped in a burlap sack, almost like

20  the sacks you see in the supermarket that they put rice in,

21  and it will be anywhere from 20 to 25 kilogram brick-size --

22  kilo bricks of cocaine stacked up alongside each other.

23  Q     And in your experience did those bales have a

24  distinctive size or shape to you?

25  A     Yes.  They have really sharp edges on them, really

CHIEF PETTY OFFICER DANIEL BROOKS                172
Direct Examination by Mr. DeRenzo

1   distinct, you can actually see some of the kilogram bricks

2   at a pretty great distance, showing that it is actual like

3   kilograms of contraband embedded inside the burlap sack.

4   Q    How about marijuana?  On the two occasions you actually

5   seized marijuana, how was that packaged?

6   A    The best way I can describe it is picture any --

7   different size Thanksgiving turkeys, like the marijuana is

8   shoved inside cellophane or plastic and they'll shove it

9   inside like a larger burlap sack, a lot larger than the ones

10  you'll see with cocaine, and it's misshaped, they're never

11  the same size, it's really inconsistent; as opposed to the

12  bricks of cocaine, which are pressed really fine and wrapped

13  a lot more because of the residue that can come out of them

14  and the instruments we use to try to find them.

15  Q    So comparing a typical cocaine bale to the marijuana

16  bales that you've seen, how would you compare or contrast

17  those two types of bales?

18  A    I would say the cocaine bales are, like I said before,

19  very like sharp edges, very distinct, anywhere from like a

20  square or a rectangular shape, and the bales of marijuana

21  are just very inconsistent, almost looking like an

22  over-filled laundry bag.

23  Q    Other than those forty-some interdictions where you

24  seized drugs, were there other times in your 15 year

25  Coast Guard career or 12 years in law enforcement that

CHIEF PETTY OFFICER DANIEL BROOKS          173
Direct Examination by Mr. DeRenzo

1   you've seen or handled bales of cocaine?

2   A    Yes.  I've worked with the Drug Enforcement

3   Administration, and I've also handled a lot of drugs to be

4   the -- to take into port to hand over to the -- to the

5   Drug Enforcement Administration.  They'll pick one ship

6   underway to compile all the bulk contraband seized to take

7   back, so I've seen quite a bit, not just what I've

8   interdicted personally.

9   Q    To give us some perspective, when you're doing one of

10  those DEA offloads, are we talking a couple hundred

11  kilograms of cocaine, or how much typically?

12  A    You're looking in the tons, so anywhere from five to

13  six tons easy you'll visually see at any given time.

14  Q    During the entirety of your career, if you had to

15  estimate, how many bales of cocaine have you seen personally

16  or handled?

17  A    Thousands.

18  Q    All right.  Let's talk about December of 2018.  Do you

19  remember that time period?

20  A    Yes, sir.

21  Q    And where were you?

22  A    I was deployed in the Caribbean Sea on board the

23  Canadian warship MONCTON.

24  Q    What was your role during that deployment?

25  A    I was the assistant officer in charge, also known as

CHIEF PETTY OFFICER DANIEL BROOKS          174
Direct Examination by Mr. DeRenzo

```
1  like a team chief for the Law Enforcement Detachment 102
2  stationed in San Diego, California, and my primary duties
3  was -- at the time was boarding officer and
4  IONSCAN operator.
5  Q    Did you or your team have any vessel interdictions
6  during that deployment?
7  A    Yes.  We only had one.
8  Q    Did you act as the boarding officer?
9  A    No.
10 Q    What was your job?
11 A    My role was solely to run the IONSCAN swabs any time
12 the boarding team went out to conduct a boarding.
13 Q    So was that the qualification you were talking about
14 earlier as an operator of the instrument?
15 A    Yes.
16 Q    Okay.  When you're the operator of the IONSCAN
17 instrument, what is your job?
18 A    My job is to take the samples collected from the
19 boarding team and analyze them, as well as prior to the
20 boarding team leaving I'll actually swab the boarding team
21 to ensure that they don't do any type of cross-contamination
22 for any interdictions that we've done that patrol.
23 Q    And what is the purpose of the testing that you're
24 performing?
25 A    The purpose is to find any trace amounts of drugs or
```

CHIEF PETTY OFFICER DANIEL BROOKS          175
Direct Examination by Mr. DeRenzo

1    explosives.

2    Q    How long have you -- well, strike that.

3         What was the model of the instrument you used in

4    this case?

5    A    In this case it was the 500DT.

6    Q    And prior to this interdiction have you used that

7    instrument before?

8    A    Yes.

9    Q    How long?

10   A    Since it came to our -- the Pacific Tactical

11   Law Enforcement Team in 2012.

12   Q    And have you used any other models of the IONSCAN

13   instrument?

14   A    Yes, the 400 Bravo.  Oh, I always qualify that.  The

15   first time was 2009.

16   Q    So since 2009, when you initially got qualified on the

17   400B, have you been continuously qualified to run an IONSCAN

18   instrument of some type?

19   A    Yes.  You're -- it's a permanent qualification for each

20   model.

21   Q    All right.  Now, both with the 500DT and the 400B,

22   total, how many times would you estimate you've run some

23   type of sample through an IONSCAN machine?

24   A    Hundreds for each one, for the 400 Bravo and the 500DT.

25   Q    Okay.  And as an IONSCAN instrument operator, are you

1  aware of the policies and procedures that are used to

2  actually take the samples prior to testing?

3  A    Yes.

4  Q    Let's talk about that for a couple minutes.

5          Would you explain to the jury the process of

6  actually obtaining the sample.

7  A    For in the instance when I'm on board a boat swabbing

8  or for the boarding team?

9  Q    For an individual who is on a vessel, looking for trace

10  amounts of potential narcotics, what is the process from

11  start to finish in terms of, first, obtaining the sample?

12  A    Yes, sir.

13          So we'll take a non-powdered latex glove, gloves,

14  and just put multiple gloves on one hand and then on the

15  other.  Once you have the multiple gloves, you'll grab

16  your -- there's a small silver disk can with our ion scan

17  swabs.  The best way to describe those is they're very

18  fiber -- they're made of very thin fiber and they look like

19  a small little hotdog, best I can describe them, about three

20  and a half inches long, two inches wide.

21          You will then take that, that sample, you'll have

22  a partner while you're working, and they will have a legend,

23  if you will, or a notepad, writing down the number of the

24  swab that you're taking.  So in this instance, if the first

25  one I'm taking, let's say it's the steering wheel of the

 1  ship, I'll put a 1, a number 1, on the bottom of that swab

 2  and I'll take it and I'll go against whatever the surface

 3  is, if it's the steering wheel at that time.  Once I get a

 4  good swab of that area, I'll take the glove and I'll pull it

 5  inside-out, keeping that swab inside that glove to prevent

 6  any type of cross-contamination when I put it then into an

 7  evidence bag.  Then I'll go throughout the vessel and take

 8  more samples.

 9  Q    The process you just described, multiple gloves, taking

10  one off at a time with a sample inside, is that standardized

11  at all?

12  A    Yes, standard Coast Guard policy.

13  Q    How do you teach -- well, do you teach a new potential

14  boarding officer or boarding team member how to do the

15  process you just described for the jury?

16  A    Yes.  To obtain the lowest law enforcement

17  qualification at our unit, everyone has to go through the

18  IONSCAN training, even if you're a prior IONSCAN operator,

19  you'll go through the initial buildup again, and every year

20  after that we ensure that our members go through the

21  training to ensure that they are proficient in operating the

22  machine, or instrument.

23  Q    Once you have that evidence bag with whatever samples

24  you've taken, what steps do you take typically to ensure

25  that those samples get to whoever it is that's going to do

CHIEF PETTY OFFICER DANIEL BROOKS          178
Direct Examination by Mr. DeRenzo

1   the testing?

2   A    You'll seal it, because it's got a piece of tape that

3   you'll take off and actually seal it on itself and it will

4   glue shut to prevent any type of environment or sea spray to

5   get in there or any type of contamination, and then you'll

6   hand it off to another Coast Guard member to maintain a

7   chain of custody, and that will be escorted to whatever

8   vessel you're working on with the IONSCAN instrument.

9   Q    So to be clear, when you're actually doing the testing,

10  and we'll get to that in a moment, are you doing that on the

11  boat you're investigating or on the surface asset that

12  you're deployed on?

13  A    The surface asset.  The instrument is very delicate and

14  too sensitive to bring on board a boat.

15  Q    Let's talk a little bit about the actual testing that

16  you do.  Could you describe briefly for the jury, kind of

17  start to finish, what that process looks like.

18  A    Yes.  So when I analyze the sample, I'll go to the

19  machine, it will have a -- should have a green screen, which

20  means it's ready, and it will have the word "Ready" on the

21  top center of the screen, and that's saying that I can

22  go ahead and analyze a sample.

23         So I'll take the -- I'll break open the evidence

24  bag, I'll grab that piece of notepad paper that has the list

25  or legend of what swab and location, and I will place them

1    in order, making sure that they're still inside the gloves,

2    and then once I have them in order, I'll go ahead and

3    analyze the first swab.

4    Q    Are you able to test multiple swabs at a time, or is it

5    a one at a time process?

6    A    One at a time.  So if I analyze one and it alarms for a

7    substance, whether it's drugs or explosives, I have to clear

8    down the machine to get all that substance that is burnt up

9    in the machine for me to go -- to analyze another sample.

10              So, no, you can't, you can only do one at a time,

11   and anything after an alarmed substance we have to clear a

12   minimum of two.  Sometimes it can be from two to however

13   much it takes to clear down the machine.

14   Q    Explain the process that you take to do that clear-down

15   procedure you just described.

16   A    As I'm going, you're burning through a lot of these

17   plastic gloves, we deploy with a lot of them, so every time

18   I'm inserting a blank sample and it comes back and tells me

19   to go through another one, I'll take that glove off and I'll

20   have that fresh one on, take a fresh new sample, until it

21   clears down.

22   Q    When you're doing the actual clearing process, are you

23   inserting anything into the instrument itself, or are you

24   just -- or does the instrument just clear itself?

25   A    It's blank swabs, so it's the swabs I talked about the

CHIEF PETTY OFFICER DANIEL BROOKS                180
Direct Examination by Mr. DeRenzo

1   boarding team will be using to swipe the surface, it's just
2   it was never swiped, it was in a concealed can that we use
3   to conceal that comes from Smith Detection, and I'm using
4   blank swabs that haven't been used.
5   Q    When you're testing a swab, what indication will you
6   get as the IONSCAN instrument operator that it has detected
7   something, whether it's drugs or explosives?
8   A    The screen, it will go from a green to a red, and it
9   has this real loud annoying sound alerting you that
10  something has been detected.  It will tell you what the
11  substance or explosive is as well as a percentage of how
12  much percentage of that, whatever it is.
13  Q    Other than that -- is that on a screen of some kind?
14  A    Yes.  It's a touch screen.
15  Q    Other than the visual or the audible alarm you just
16  talked about, are the results of that test procedure
17  recorded anywhere?
18  A    Yes, internally.  Throughout the life of the machine,
19  you can go through and pull back and look at any swabs that
20  were ran, and this is -- so any time I get an alarm, I'll
21  print out the receipt that has the full readout of what it
22  found.
23  Q    As the IONSCAN instrument operator, is there anyplace
24  that you record the results you get?
25  A    Yes.  We have an IONSCAN log that we use for our case

CHIEF PETTY OFFICER DANIEL BROOKS          181
Direct Examination by Mr. DeRenzo

1  packages, and we also have it internally in the machine that

2  gets recorded, as well as when I print out those receipts of

3  any substance or explosive found, I'll print those out and

4  I'll write down on the comments section on the bottom the

5  location of that, of that sample.

6  Q    How long after you do the actual testing and get a

7  result do you record the results in your -- in the log that

8  you just referenced?

9  A    Right away.

10  Q    In this log, other than the fact that it alarmed for

11  some substance, what other information do you record there?

12  A     It will be the location of it, the swab -- the sample

13  number and whatever substance it found, percentage.

14  Q    How about the blanks that you referenced just a minute

15  ago, do you record those on your log as well?

16  A    Yes, to show consistency and to account for every swab

17  conducted during that boarding.

18  Q    As an IONSCAN operator, is it your job to maintain

19  these logs and the receipts you just talked about?

20  A    Yes.

21  Q    All right.  Let's move to the procedures that you did

22  in this particular case.

23        Did you participate in the actual swabbing of the

24  boarding team at all?

25  A    Yes.

CHIEF PETTY OFFICER DANIEL BROOKS          182
Direct Examination by Mr. DeRenzo

1  Q    Can you tell the jury what you did.

2  A    I swabbed the boarding team's hands and fingertips,

3  as per Coast Guard policy, to ensure there is no

4  cross-contamination when they leave our underway asset to

5  the boarding -- parts of the ship to be boarded, or vessel.

6  Q    So is this before any boarding team -- Coast Guard

7  boarding team members left the MONCTON?

8  A    Yes.

9  Q    Who did you swab?

10  A    I swabbed Officer Lauginiger, Officer Ramos, Officer

11  Perio, Officer Fahey and Officer Rivera.

12  Q    And did you use the same general process that you just

13  described earlier?

14  A    Yes.

15  Q    Multiple gloves, clean swabs?

16  A    Yes.

17  Q    Okay.  Did you get -- did you at any point test the

18  swabs from the boarding team?

19  A    Yes.  Immediately after I take them, I'll take them up

20  to the area where we have the instrument stored and I'll

21  analyze the swabs.

22  Q    What were the results of the ion scan swabbing of the

23  boarding team?

24  A    There was no substance found on our boarding team.

25  Q    Did you record those results anywhere?

CHIEF PETTY OFFICER DANIEL BROOKS            183
Direct Examination by Mr. DeRenzo

1   A    Yes.  I recorded them on the IONSCAN log, and it's also

2   stored internally on the IONSCAN machine.

3   Q    Okay.  Did you at any point do any actual testing of

4   swabs taken from the vessel that was interdicted by your

5   counterparts?

6   A    Yes, I analyzed all ion scan swabs of the vessel.

7   Q    Okay.  How did you receive those swabs?

8   A    I received them from Officer Perio in an evidence bag

9   while I was still on board the MONCTON after they took the

10  swabs of the vessel.  Petty Officer Perio escorted them

11  back, I took them and went straight to the room where the

12  instrument was to analyze each swab.

13  Q    Did you do anything in between the time you received

14  the swabs from Petty Officer Perio and then when you

15  actually sat down and tested them?

16  A    No.

17  Q    We'll get to the results in a minute, but did you

18  record them anywhere?

19  A    Yes, on the IONSCAN log.  And anything that alarmed for

20  any substance, I also printed out the log, per the receipt,

21  and then I wrote down the location.

22  Q    Okay.  Let's talk about the individuals who are found

23  on that boat.

24       Did you participate in any way in the -- in the

25  swabbing of those individuals?

CHIEF PETTY OFFICER DANIEL BROOKS                184
Direct Examination by Mr. DeRenzo

1   A    Yes.  I recorded their name.  I ensured that each

2   member -- crew member of the vessel being swabbed, I ensured

3   while verifying with their identification that they had on

4   them, making sure the spelling of their name was correct,

5   and I wrote down the sample number on the boarding log.

6   Q    Can you be a little bit more specific on how you

7   confirmed with each individual what their name was before

8   you did this process.

9   A    Yes.  So I took their identification, I'll ask them

10  their name, and then I'll record it down on my notepad and

11  I'll have them look at it, ensuring that it is theirs, I'll

12  ask them their date of birth and their identification

13  number, and then ensuring that all that is correct and their

14  name is spelled correctly and in the right order, I'll put

15  down the sample number for each person.

16  Q    Now, who actually did the swabs of the four individuals

17  that were found on the boat?

18  A    It was Petty Officer Perio.

19  Q    And where were you while he was doing the actual swab?

20  A    I was right beside him.

21  Q    Were you able to observe what he did?

22  A    Yes.

23  Q    What parts of these individuals did he swab?

24  A    The hands and forearms of each individual.

25  Q    Is that something you're trained to do by the

CHIEF PETTY OFFICER DANIEL BROOKS                185
Direct Examination by Mr. DeRenzo

1   Coast Guard?

2   A    Yes, as per Coast Guard policy.

3   Q    Okay.  When you were confirming the names of these four

4   individuals, did you have any trouble communicating with

5   them?

6   A    No.  When we deploy doing counter-drug operations, we

7   ensure that we have a Spanish interpreter.  We had one.

8   It was Petty Officer Rivera.

9   Q    Did you confirm the name of an individual named

10  Emiro Hinestroza-Newbbooll?

11  A    Yes.

12  Q    And what document did you use?

13  A    It was a cédula, they call them.  It was a Colombian

14  cédula.

15  Q    Is that like a national identification card?

16  A    Yes.

17  Q    And do you see that person in the courtroom?

18  A    Yes.

19  Q    Could you point him out and identify an article of

20  clothing he is wearing.

21  A    Yes.  He is the individual in the orange outfit.

22           MR. DERENZO:  Your Honor, request that the record

23  reflect that the witness has identified the defendant.

24           THE COURT:  The record should so reflect.

25

1    BY MR. DERENZO:

2    Q    Did you identify the names of the other three people?

3    A    Yes.

4    Q    Who were they?

5    A    It was Mr. Dilbert, Mr. Meighan and Newball-May.

6    Q    How did you keep track of the locations of the swabs of

7    these four individuals and ensure that you had the right

8    name with the right person and the right body part?

9    A    Once I have their name written correctly, I put down

10   a -- like a sample number.  How I've done it in the past is

11   it will be a P for the person, the first person I swab will

12   be a number, so it's -- the first person will be P tack 1,

13   and then the other number will be the number sample that

14   I took, which would be -- so the first number that

15   I swabbed, it would be P tack 1 tack 1, and I always start

16   with the hands first and do the same every time to ensure

17   that I don't mix up any of them.  And then once we have that

18   we'll make another number for the -- say I'm swabbing the

19   same person, his first one was P tack 1 tack 1, and then

20   once we have that I will have them swab the forearm, which

21   I'll label P tack 1 tack 2., so the first person I swab, two

22   samples, hands and forearms.

23   Q    After Petty Officer Perio was done swabbing the hands

24   and forearms of the four individuals, what happened to those

25   swabs?

CHIEF PETTY OFFICER DANIEL BROOKS          187
Direct Examination by Mr. DeRenzo

1   A    I took them up with the legend that I had for each swab

2   and who it belonged to, I went up to the area where the

3   IONSCAN instrument is stored and I analyzed each swab.

4   Q    Did you do anything in between the time you received

5   those swabs and the time that you tested them?

6   A    No.

7   Q    Did you directly observe the entire process that Petty

8   Officer Perio used?

9   A    Yes.

10  Q    Did he use the same process that you described earlier

11  in your testimony?

12  A    Yes.

13        MR. DERENZO:  May I approach the witness,

14  Your Honor?

15        THE COURT:  You may.

16  BY MR. DERENZO:

17  Q    Chief, I've handed you two documents, one marked

18  Exhibit 7A for identification and the other is 7C for

19  identification.  Take a minute, look at those documents and

20  look up when you're done.

21        Let's start with Exhibit 7C, for identification.

22  Do you recognize that document?

23  A    Yes.

24  Q    How do you recognize it?

25  A    My handwriting.

1  Q    And what is it?

2  A    That's the IONSCAN boarding sample log that I described

3  earlier that we utilized for our case packages for any type

4  of counter-drug interdiction.

5  Q    Did you prepare that log personally?

6  A    Yes, I did.

7  Q    As an IONSCAN operator and Coast Guard boarding

8  officer, do you have a duty under Coast Guard policy to make

9  that log and make that report?

10 A    Say again?

11 Q    Do you have a duty as an instrument operator to make

12 that log?

13 A    Yes, I do.

14 Q    And when you made the log, did you have knowledge of

15 the facts that you put in that log?

16 A    Yes.

17 Q    When in relation to -- how long did you -- after you

18 did the testing did you create the log?

19 A    Immediately.

20 Q    Is it part of your regular practice as a boarding

21 officer and IONSCAN operator to make that log?

22 A    Yes.

23 Q    Is it kept in the normal course of business?

24 A    Yes.

25 Q    Coast Guard case package, for instance?

CHIEF PETTY OFFICER DANIEL BROOKS          189
Direct Examination by Mr. DeRenzo

1   A    Yes.

2          MR. DERENZO:  Your Honor, move to admit

3   Government's 7C.

4          MR. HERNANDEZ:  No objection.

5          THE COURT:  Receive in evidence 7C.

6          MR. HERNANDEZ:  Judge, may we approach?

7          THE COURT:  Yes.

8          *(The following bench conference was held.)*

9          MR. HERNANDEZ:  Judge, I do not mean to be

10  redundant, but when I say "no objection," I mean no

11  additional objection.  I want to make sure I'm preserving

12  this.

13         THE COURT:  Yeah, it's my understanding that

14  you're objecting to all ion scan evidence.

15         Okay.  Over objection then.

16         MR. HERNANDEZ:  Thank you.

17  *(End of bench conference; proceedings resume in open court.)*

18  BY MR. DERENZO:

19  Q    Chief, let's talk for a minute about Exhibit 7A for

20  identification.  Do you recognize that document?

21  A    Yes.

22  Q    How do you recognize it?

23  A    My handwriting.

24  Q    And what is Exhibit 7A for identification?

25  A    These are the receipts for the positive swabs, analyzed

CHIEF PETTY OFFICER DANIEL BROOKS          190
Direct Examination by Mr. DeRenzo

1    by the machine, or the instrument, and has my handwriting at

2    the bottom.

3    Q    Is this -- were those receipts for this boarding in

4    December of 2018?

5    A    Yes.

6    Q    Now, the information that's contained on there, other

7    than any notes you've written on there, where does that come

8    from?

9    A    It's all generated from the machine.  I can't really do

10   anything to that.  Like all the sample numbers that are on

11   this log up here, that's where I'm taking that sample number

12   that's on 7C and writing down to correlate this receipt to

13   this boarding log.

14   Q    So just to clarify for the jury, those sample numbers,

15   are they serialized in order and initialed?

16   A    Yes.

17   Q    Now, the receipts themselves, did you personally print

18   those out from the instrument?

19   A    Yes.

20   Q    And did you print them out -- well, when in

21   relationship to the testing did you print them?

22   A    Right away.  Once it alarms, I will print out the

23   receipt, write down the location of it, and then after I'm

24   done with that and writing it down on my log, I'll clear

25   down the machine and analyze my next sample.

1    Q    Is that part of your ordinary routine practice as an

2    IONSCAN operator?

3    A    Yes, to ensure accountability and make sure everything

4    is good to go on the log, you want to do it right away.

5    Q    Those receipts themselves, is that something that's

6    kept in your ordinary practice as both an instrument

7    operator and a boarding officer, if you're going to prepare

8    a case package?

9    A    Yes.

10         MR. DERENZO:  Your Honor, at this time we move to

11   admit Government's 7A.

12         THE COURT:  Over objection I'll receive into

13   evidence 7A.

14   BY MR. DERENZO:

15   Q    Did any of the swabs from the interdicted vessel alarm

16   for any type of drugs?

17   A    Yes.

18   Q    Which drugs?

19   A    Cocaine.

20   Q    What areas alarmed for cocaine?

21   A    The port rail, which is your left side of the boat, and

22   your starboard side rail, which is also your -- is the right

23   side of the boat, and your center hold, which is the center

24   of the boat, alarmed for cocaine.

25   Q    Now, for the nautically challenged in the room, like

CHIEF PETTY OFFICER DANIEL BROOKS          192
Direct Examination by Mr. DeRenzo

1    me, can you describe what it is that a rail is.  Is it like

2    a railing you hold onto, like on the stairs?  What is that?

3    A    It's just the side of the boat.  So if this was -- like

4    if I'm on a boat on this podium here, this would be the rail

5    I'm talking -- describing.  So it would be just the rail,

6    like the side of the ship or side of the boat.

7    Q    Would it be fair to say that it's a horizontal surface

8    on either side of the boat?

9    A    Yes.

10   Q    And why would you look for trace amounts of drugs in

11   that area?

12   A    That's primarily for jettison cases.  In my experience,

13   that's normally where the drugs would be rubbing up against

14   for me to get any type of trace amounts of contraband.

15   Q    Did any of the swabs taken from the detained crew

16   members alarm for drugs?

17   A    Yes.

18   Q    What kind of drugs?

19   A    Cocaine.

20   Q    How many of the individuals alarmed -- well, how many

21   of the swabs from these individuals alarmed for cocaine?

22   A    All members, crew members on the boat, their hands

23   alarmed for cocaine, but only two members' forearms and

24   hands alarmed for cocaine.

25   Q    Do you recall which individuals had positive alarms for

CHIEF PETTY OFFICER DANIEL BROOKS                193
Direct Examination by Mr. DeRenzo

1   cocaine on their forearms?

2   A     On their forearms and hands, it was Mr. Dilbert and

3   Hinestroza-Newbbooll.

4   Q     The defendant?

5   A     Yes.

6           MR. DERENZO:  Your Honor, may we publish first 7C?

7           THE COURT:  You may.

8           MR. DERENZO:  If we could zoom in to, say, the top

9   third of that page.

10  BY MR. DERENZO:

11  Q     All right.  So remind us again, Chief, what's 7C?

12  A     7C is the IONSCAN boarding sample log.

13  Q     And if you could, for the benefit of the jury, could

14  you take us through each of those lines and can you tell us

15  what, if anything, is significant?

16  A     Yes, sir.

17          So the top left you see there where it says

18  IONSCAN serial number, that's just the serial number that

19  identifies each machine and is also recorded on the receipts

20  as well to ensure that the receipts are coming from that

21  machine.  The date is the day that I ran them.  The vessel

22  name, there was no name.  Most of these cases that we get,

23  the vessels don't have names, so the UNK stands for unknown.

24  GFV stands for go-fast vessel, because this vessel

25  specifically met the profile go-fast description.  The TWON

CHIEF PETTY OFFICER DANIEL BROOKS          194
Direct Examination by Mr. DeRenzo

1    stands for treat without nationality.  And then the

2    IONSCAN operator is myself, Officer Brooks.

3              Then you'll have these other columns below that,

4    which is the location, so that's where the sample that

5    you're taking, the sample number.  That sample number is

6    what we were talking about, the sequential number that's

7    recorded internally in that machine, I'll jot that down; and

8    then the alarmed substance and percentage, I'll write down

9    that.

10   Q    So I'm just going to go down each line.  The first line

11   says BO.  What's that?

12   A    That's a boarding officer.

13   Q    And what was the result of that scan, testing of that

14   swab?

15   A    It had no -- no alarms for any substance.

16   Q    Was that for -- well, let's go to the next one,

17   assistant boarding officer.  ABO, is that assistant boarding

18   officer?

19   A    Yes.

20   Q    And what was the result of the testing of that swab?

21   A    No alarms for substance.

22   Q    Right below ABO, what's BTM1?

23   A    BTM1 is the next boarding team member that I swabbed,

24   and also had no -- no alarms or any substance found on that

25   swab.

                  CHIEF PETTY OFFICER DANIEL BROOKS          195
                  Direct Examination by Mr. DeRenzo

```
 1   Q     BTM2 and BTM3, what's that?

 2   A     It's the other boarding team members, and also no

 3   alarms or substance found when analyzing those samples.

 4   Q     Right below BTM3 there's two spots that say "blank."

 5   Did I read that write?

 6   A     Yes.

 7   Q     And what does that indicate?

 8   A     Those are just blank swabs I did because there was a

 9   break between me running those swabs and then the vessel, so

10   I just wanted to ensure the vessel -- or the machine was

11   operating correctly by clearing out the machine.

12   Q     Below those two, what's console?

13   A     Console, that's, again, where -- the steering wheel of

14   the ship.

15   Q     So is that the area that was swabbed on the go-fast

16   vessel?

17   A     On the go-fast vessel, yes.

18   Q     Okay.  So that indicates that the area swabbed was the

19   console area?

20   A     Yes.

21   Q     And what was the result of that?

22   A     No alarms or substance found.

23   Q     Below console, what is that?

24   A     Your starboard rail, or your right side horizontal

25   surface of the go-fast vessel.  The first one I analyzed had
```

 1  no alarm or substance found.

 2  Q    How about the one below it?  2412 is the sample number.

 3  A    2412, that was the second right side rail of the vessel

 4  taken, and it alarmed for 7 percent cocaine.

 5  Q    Below that I see three blanks, 2413 through 2415.  Did

 6  I read that right?

 7  A    Yes.

 8  Q    What are those?

 9  A    Those are the blank swabs that I took to clear out the

10  machine before it allowed me as the operator to analyze any

11  other sample.

12  Q    Okay.  If we could move to the middle third.  We'll

13  start with the top one, 2416.  What is that?

14  A    That's the forward hatch or -- you know, it's just a

15  storage compartment, anchor locker, if you will, that they

16  utilize for storage on board go-fast vessels or Panga-style

17  vessels.

18  Q    And the result of that is?

19  A    The first one did not alarm for anything.

20  Q    How about the second one, 2417?

21  A    The second one alarmed for 3 percent MDMA and 2 percent

22  PCP.

23  Q    After 2417, how many blank swabs did you run?

24  A    Took six swabs.

25  Q    And was that for the same reasons you explained before,

                CHIEF PETTY OFFICER DANIEL BROOKS              197
                Direct Examination by Mr. DeRenzo

1   to make sure the machine is ready, clear to test another

2   sample?

3   A    Yes.

4   Q    Okay.  Now, what's the next sample you ran?

5   A    It's labeled forward rail, so there's a -- there's a

6   rail forward up on the front of the vessel that sometimes

7   during drug transfers may have some type of trace amounts of

8   contraband.

9   Q    Now, is it unusual, in your experience in running these

10  swabs, to perhaps have some parts of the vessel alarm for

11  drugs and others not?

12  A    No.  The drug traffickers are getting very used to our

13  capabilities of this instrument, so they can use any type of

14  detergents, fuel, to mask it, so sometimes they'll start

15  scrubbing the boat, throw all that stuff overboard before we

16  get on scene to try to disrupt our instrument from finding

17  any trace amounts of contraband or explosives.

18  Q    And you've personally taken swabs as a boarding

19  officer, right?

20  A    Yes.

21  Q    When you do that, are you able to actually see the

22  drugs on the surface?

23  A    No.  It's -- you cannot see it with the naked eye.

24  Q    Okay.  Let's move to 2426.  What area of the boat were

25  you testing at that point?

CHIEF PETTY OFFICER DANIEL BROOKS           198
Direct Examination by Mr. DeRenzo

1   A    That's the center hold.  That's the biggest portion of

2   the Panga-style go-fast vessel, where it's common to put

3   their drugs while trafficking, and that alarmed for

4   12 percent of cocaine.

5   Q    2427 and 2428, the two samples below that, what are

6   those?

7   A    Those are the blank swabs that I did to ensure that the

8   machine was cleared out so I can analyze the next sample.

9   Q    And did you follow that procedure through all of the

10  samples you did?

11  A    Yes.

12  Q    Let's move now to the bottom third of the page.

13          What is that first line, Chief?

14  A    It's the port rail or the left side horizontal surface

15  of the ship, and it alarmed for 3 percent of cocaine.

16  Q    Below the port rail, how many blanks did you run?

17  A    Five.

18  Q    To be clear, how do you know the machine is ready to

19  test another sample, when you're running these blanks one

20  after the other?

21  A    So once I get a red alarm, which in this case when I

22  put in the port rail IONSCAN swab it alarmed red, like

23  I described before, letting me know I had a substance, once

24  I record it on my IONSCAN log and then wrote down -- printed

25  out the receipt and wrote down the location of it, when

CHIEF PETTY OFFICER DANIEL BROOKS          199
Direct Examination by Mr. DeRenzo

1   I clear it down it will have a yellow screen, which means I

2   cannot analyze anything until I clear it out, and it's

3   telling me how many blanks I need.  It's a minimum of two,

4   but it will just keep on recycling, saying run another,

5   run another, until it lets me go to a green screen to

6   analyze the next sample.

7   Q     So green means ready to go?

8   A     Yes.

9   Q     All right.  So after you ran the blanks after testing

10  the swab for the port rail, what is P-1-1, 2435?

11  A     So P tack 1 tack 1, that sample is for Mr. Dilbert, his

12  hands, and again it alarmed for 3 percent cocaine.

13  Q     How many blanks did you run after the positive alarm on

14  Mr. Dilbert's hands?

15  A     Three.

16  Q     And what's the next swab that you tested?

17  A     It's P tack 1 tack 2, which is for Mr. Dilbert's

18  forearms.

19  Q     And what was that the result of that test?

20  A     It alarmed for 3 percent cocaine.

21  Q     How many blanks after the test on Mr. Dilbert's

22  forearms?

23  A     Two.

24  Q     And what's the next swab that you tested?

25  A     It was for Mr. Jorge Newball-May, and I labeled it

                CHIEF PETTY OFFICER DANIEL BROOKS              200
                 Direct Examination by Mr. DeRenzo

1    P tack 2 tack 1, which was for Mr. Newball-May's hands.  It

2    alarmed for 8 percent cocaine.

3    Q    How many blanks after that alarm?

4    A    Three.

5         MR. DERENZO:  All right.  Let's move to page 2,

6    and if we could zoom into the top half of the page.

7    Q    So 2445, is that one of the three blanks you were just

8    referencing?

9    A    Yes.

10   Q    All right.  What is the next sample that you analyzed?

11   A    The next sample was for Mr. Newball-May's forearms,

12   which was labeled P tack 2 tack 2, which did not alarm for

13   any substance.

14   Q    And since it didn't alarm for any substance, did you

15   need to do any blanks?

16   A    No.  The screen will go to green and it will say ready

17   to analyze next sample.

18   Q    So you only need to run those blanks if you get a

19   positive for something?

20   A    Yes.

21   Q    All right.  So the next sample after P tack 2 dash 2 is

22   what?

23   A    It's P tack 3 tack 1, which is for Mr. Rudolph

24   Meighan's hands.  It alarmed for 1 percent cocaine.

25   Q    After that we have several blanks.  How many blanks did

CHIEF PETTY OFFICER DANIEL BROOKS          201
Direct Examination by Mr. DeRenzo

1   you run?

2   A    Six.

3   Q    And what is the next sample that you analyzed?

4   A    It was labeled P tack 3 tack 2, which was for

5   Mr. Meighan's forearms.

6   Q    And what was the result of that test?

7   A    No alarm or substance found.

8            MR. DERENZO:  Zoom out and then zoom in on the

9   remainder of page 2.

10  Q    So 2454 we just talked about.  What's 2455?

11  A    2455 is P tack 3 tack 2, which is Mr. Meighan's

12  forearms.

13  Q    And what was the result of that test?

14  A    No alarm found.

15  Q    Let's talk about the next one, P tack 4 tack 1.

16  A    P tack 4 tack 1 was the defendant,

17  Mr. Hinestroza-Newbbooll's hands.  It alarmed for 7 percent

18  cocaine.

19  Q    Okay.  How many blanks did you run after that test?

20  A    Two.

21  Q    And what was the last sample that you analyzed in this

22  case?

23  A    It was Mr. Hinestroza-Newbbooll's forearms, labeled

24  P tack 4 tack 2, which alarmed for 2 percent of cocaine.

25  Q    How many blanks did you have to run after analyzing the

CHIEF PETTY OFFICER DANIEL BROOKS          202
Direct Examination by Mr. DeRenzo

1  swab on the defendant's forearms?

2  A     Four.

3          MR. DERENZO:  Your Honor, may we publish 7A?

4          THE COURT:  You may.

5          MR. DERENZO:  Let's just zoom in at the bottom, at

6  the bottom part of the receipt.

7  BY MR. DERENZO:

8  Q    There's a lot of figures and details here, but can you

9  just describe generally what the jury is looking at.

10 A     Yes.  So down there, those are the other substances

11 that it found on that location.  For instance, it was the

12 forward hatch where it found MDMA, it's the primary

13 substance for Ecstasy, and PCP.  And the one on the bottom

14 I'm not familiar with, but there's a library that's stored

15 inside this instrument that allows it to identify certain

16 substances.

17 Q    Okay.  Now, there's some handwriting there in what

18 appears to be the Comments section.  Whose handwriting

19 is that?

20 A     That's mine.

21 Q    When did you write that information in?

22 A     Immediately after I recorded the alarms and percentages

23 on the IONSCAN sample log and it will print out the receipt,

24 I'll write it down immediately.

25         MR. DERENZO:  Okay.  If we could zoom out and go

                CHIEF PETTY OFFICER DANIEL BROOKS          203
                Direct Examination by Mr. DeRenzo

1   to the next page, and let's first zoom into the same portion

2   of the receipt on the left side of the page.

3   Q    So which side -- or which portion -- let me back up.

4        Which swab is this?

5   A    This is why I went back, because the number of the swab

6   is up on the top of the receipt, so for the port rail, this

7   sample was 2429.

8   Q    So that number you're saying, that's in the top corner

9   of the actual receipt?

10  A    Of the receipt, yeah.  Yeah, it's recorded up on the

11  top.

12  Q    Okay.  And the port side rail, is there any -- anywhere

13  in this zoomed-in part does it reference what it alarmed

14  for?

15  A    Yes.  Where you see the 2 and the forward slash and the

16  channel just below it, you'll see a 1 and then cocaine.

17        MR. DERENZO:  Zoom back out and then zoom into the

18  other side of page 2.

19  Q    What can we see here, Chief?

20  A    It's an alarm that went off for the center hold for

21  cocaine.

22        MR. DERENZO:  Okay.  We can zoom back out and

23  scroll to the next page, and zoom into the same portion on

24  the left receipt.

25  Q    What can you see here, Chief?

CHIEF PETTY OFFICER DANIEL BROOKS          204
Direct Examination by Mr. DeRenzo

1   A    It's the swab sample I took of Cabot Dilbert's

2   forearms.  It has an alarm for cocaine.

3          MR. DERENZO:  Zoom out and then zoom into the same

4   portion on the right-hand receipt.

5   Q    What sample was this?

6   A    It's the receipt printout of Mr. Dilbert's sample that

7   alarmed for cocaine for his hands.

8          MR. DERENZO:  Okay.  Let's zoom out.  Scroll to

9   the next page, please.  Let's go to the left-hand receipt,

10  same portion.

11  Q    What's depicted here?

12  A    It's an alarm that sounded for cocaine for

13  Mr. Meighan's hands.

14         MR. DERENZO:  Zoom back out.  Zoom into the same

15  portion on the right.

16  Q    Which result is this?

17  A    It's a -- an alarm that sounded for Mr. Newbbooll-May's

18  hands for cocaine.

19         MR. DERENZO:  Zoom out and scroll to the next

20  page, and let's go to the bottom part of the left-hand

21  receipt.

22  Q    Which sample is this?

23  A    This is the forearms of the defendant,

24  Hinestroza-Newbbooll, for cocaine, for his forearms.

25         MR. DERENZO:  Zoom out.  The same portion on the

CHIEF PETTY OFFICER DANIEL BROOKS                205
Direct Examination by Mr. DeRenzo

1  right-hand side of the receipt.

2  Q    Which sample is this?

3  A    This is a sample that alarmed for the defendant

4  Hinestroza-Newbbooll's hands for cocaine.

5         MR. DERENZO:  Zoom out and go to the next page,

6  and scroll down one more time.

7  Q    What is the location of this sample?

8  A    This is the starboard side rail, which alarmed for

9  7 percent of cocaine, but because it picked up multiple

10 other things, really low, the primary substance found here

11 was cocaine, which is on the top portion of the receipt.

12 Q    Thank you, Chief.

13        MR. DERENZO:  If we could bring up Exhibit 2Q,

14 queue it to a minute into the view.

15 Q    Chief, you didn't actually participate in the boarding,

16 correct?

17 A    No.

18 Q    Take a look at what you see in the monitor in front of

19 you, which has been admitted as Exhibit 2Q.  I'm going to

20 ask you a few questions about it.

21                    *(Video played.)*

22        MR. DERENZO:  If we could fast forward

23 approximately a minute.

24 BY MR. DERENZO:

25 Q    Chief, now that you've had a chance to look at

CHIEF PETTY OFFICER DANIEL BROOKS            206
Cross-Examination by Mr. Hernandez

1  Exhibit 2Q, based on your experience in counter-narcotics

2  that you detailed for the jury earlier, do you know what

3  those white floating objects are in 2Q?

4  A    Yes.  Those white objects are what I described earlier

5  as a bale of cocaine, and looks consistent with drugs that

6  I have interdicted in the past that later tested positive

7  for cocaine.

8            MR. DERENZO:  No further questions, Your Honor.

9            THE COURT:  All right.  Mr. Hernandez.

10    **CROSS-EXAMINATION OF CHIEF PETTY OFFICER DANIEL BROOKS**

11  **BY MR. HERNANDEZ:**

12  Q    So when you identify a trace, are you able to say how

13  it got there?

14  A    No.

15  Q    Are you able to say when it got there?

16  A    No.

17  Q    There's -- any way of determining how long that trace

18  had been in the -- say if we're talking about a railing,

19  let's say, how long it had been there?

20  A    I wouldn't be able to tell that.

21  Q    And I assume it would also be correct to say that it's

22  impossible to say who put it there, correct?

23  A    Yes.

24  Q    Okay.  And everything that we're talking about is

25  microscopic, correct?

CHIEF PETTY OFFICER DANIEL BROOKS              207
Cross-Examination by Mr. Hernandez

1   A    Yes.

2   Q    And when the log says 1 percent cocaine, is that 1 --

3   is there a difference -- well, obviously there's a

4   difference, but is there a difference in the microscopic

5   viewing of 1 percent versus, say, 50 percent?

6   A    No.  There's other numbers on this receipt that if you

7   zoom in you will see that -- the number of the sample being

8   taken, it breaks it up into certain sections and it will run

9   different numbers of -- so it cuts up the sample in like 31

10  slices, and then depending on that each sample that it takes

11  will alarm.

12  Q    If something says 1 percent, that means 1 percent of

13  that item is cocaine, a trace, correct?

14  A    I'm not trained or -- that's more of a question for

15  Senior Chief Bomentre.

16  Q    And this is something that's placed in the machine and

17  it prints out a result for you?

18  A    Yes.

19  Q    Okay.  And it's -- is it correct to say that in the

20  process of this testing, whatever trace there was has been

21  destroyed, correct?

22  A    Can you rephrase that, please?

23  Q    That the traces that you process, because of the

24  testing involved, is it correct to say that that trace does

25  not exist anymore?

CHIEF PETTY OFFICER DANIEL BROOKS          208
Cross-Examination by Mr. Hernandez

1    A     On the swab, once I test it, is what you're referring

2    to, after it's tested on the instrument?

3    Q     Right.

4    A     From what I've been told, yes.

5    Q     Okay.  So it doesn't exist anymore?

6    A     No.

7    Q     Okay.  So that whatever was being tested is --

8    obviously if it doesn't exist anymore, is there anything

9    left to submit to, say, a chemist for a lab analysis to

10   determine whether it was cocaine or not?

11   A     No.

12   Q     Okay.  You indicated that the team that picks up the

13   swabs is tested or -- I don't know if I'm using the right

14   term, but is swiped before going on board, correct?

15   A     Yes.

16   Q     And is there any testing while -- of them while they're

17   there?

18   A     On board the --

19   Q     Yes.

20   A     -- go-fast?  No.

21   Q     Is there any testing of them after they left the boat?

22   A     No.  Because if there was traces of it on board, that

23   would go onto them.

24   Q     Pardon me?

25   A     So if they did that, if that was the case and I go to

 1  touch something afterwards, you could potentially be

 2  contaminated from that boarding, so it would make no sense.

 3  Q    Well, could it possibly have gotten on one of the

 4  gloves that was being tested as they're picking something up

 5  or swiping something?

 6  A    No, because you're changing the gloves on both hands

 7  each time, so no.

 8           MR. HERNANDEZ:  That's all I have.  Thank you.

 9           THE COURT:  Any redirect?

10           MR. DERENZO:  Very briefly, Your Honor.

11  **REDIRECT EXAMINATION OF CHIEF PETTY OFFICER DANIEL BROOKS**

12  **BY MR. DERENZO:**

13  Q    Chief, I just wanted to clarify a couple things real

14  quick.  Mr. Hernandez asked you about percentages and

15  figures, and I think your testimony was basically "I'm not

16  the guy to ask."  Is that fair?

17  A    Yes.

18  Q    There are other people in the Coast Guard who can

19  actually answer those types of questions?

20  A    Yes.

21  Q    Is there anybody at your unit, at TACLET Pacific, who

22  actually can do that?

23  A    Yes.

24  Q    What's that person's name?

25  A    Senior Chief Steven Bomentre.

CHIEF PETTY OFFICER DANIEL BROOKS          210
Redirect Examination by Mr. DeRenzo

1   Q    When Mr. Hernandez asked you about whether -- I think

2   his question was it's impossible to say how a trace amount

3   of drugs got on a particular surface, say the rail of the

4   boat.

5   A    Yes.

6   Q    Do you remember that question?

7   A    Yes.

8   Q    When you say it's impossible to say, do you mean just

9   by looking at that piece of paper?

10  A    Say again?

11  Q    When you say it's impossible to say exactly how it got

12  on that surface, do you mean just by looking at the readout

13  from the instrument itself?

14  A    Yes.

15  Q    Okay.

16  A    But it's consistent with interdictions I've had in the

17  past, similar percentages, and the receipts, the readouts,

18  are similar, identical to prior interdictions that I've had.

19  Q    Okay.  So when you're doing a counter-drug boarding, is

20  it fair to say that the ion scan results, whatever they are,

21  that's just one piece of the puzzle?

22  A    Yes, it's just a tool.  We don't rely on that.  We

23  utilize other tools.

24          MR. DERENZO:  Thank you, Your Honor.  No further

25  questions.

1              THE COURT:  All right.  Thank you, sir.  You may

2     step down.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  Ladies and gentlemen, we're going to

5     recess for the evening.  We'll start in the morning at

6     nine o'clock, not 9:15, nine o'clock, and hopefully we won't

7     have a bunch of noise and we can't start at nine o'clock.

8              Leave your pads on your chairs.  Please don't

9     discuss the case.  I'll see you in the morning at

10    nine o'clock.

11                   *(Jury exits proceedings.)*

12             THE COURT:  All right.  We're in recess until

13    nine o'clock tomorrow morning.

14             Thank you, sir.  You may step down.

15                        - - - - -

16             (Proceedings adjourned at 5:01 p.m.)

17                        - - - - -

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in a jury trial in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed

7    by computer under my supervision, this the 22nd day of

8    March, 2021.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25