```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                  Plaintiff,        )
                                      )
 6         vs.                        ) Case No.
                                      ) 8:18-CR-00594-SCB-JSS-1
 7                                    )
                                      )
 8   EMIRO HINESTROZA-NEWBBOOLL,      )
                                      )
 9                  Defendant.        )

10

11

12   _____

13                   JURY TRIAL - DAY 3
           BEFORE THE HONORABLE SUSAN C. BUCKLEW
14              UNITED STATES SENIOR JUDGE

                     JANUARY 29, 2020
15                      9:11 A.M.
                     TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23              DAVID J. COLLIER, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
24           801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
25
```

```
 1    APPEARANCES:

 2

 3    FOR THE GOVERNMENT:

 4

 5              Nicholas G. DeRenzo

 6              Toni Goodin

 7              United States Attorney's Office

 8              400 N. Tampa Street, Suite 3200

 9              Tampa, Florida  33602

10              (813) 274-6000

11

12    FOR THE DEFENDANT EMIRO HINESTROZA-NEWBBOOLL:

13

14              Daniel Mario Hernandez

15              Law Office of Daniel M. Hernandez

16              902 North Armenia Avenue

17              Tampa, Florida  33609

18              (813) 875-9694

19

20

21    INTERPRETERS:

22              Beatriz Velasquez

23              Etienne van Hissenhoven

24              Xavier Keogh

25
```

```
 1                    I N D E X

 2                 JANUARY 29, 2020

 3

 4   GOVERNMENT'S WITNESSES:

 5

 6   SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE        PAGE

 7   Direct examination by Mr. DeRenzo                    5

 8   Cross-examination by Mr. Hernandez                  43

 9   Redirect examination by Mr. DeRenzo                 50

10

11   SPECIAL AGENT STEVEN RAY                          PAGE

12   Direct examination by Ms. Goodin                   57

13   Cross-examination by Mr. Hernandez                 95

14

15   SPECIAL AGENT KAREN McALLISTER                    PAGE

16   Direct examination by Mr. DeRenzo                 121

17   Cross-examination by Mr. Hernandez                130

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2                    - - - o0o - - -

3          THE COURT:  Anything before I bring the jury in?

4          MR. HERNANDEZ:  No, Your Honor.

5          MR. DERENZO:  Briefly.  Request that Chief Brooks

6   and Petty Officer Perio be released, absent any objection by

7   the defense.

8          MR. HERNANDEZ:  No objection.

9          THE COURT:  All right.  They may be released.

10         MR. DERENZO:  Thank you, Your Honor.

11         THE COURT:  And you can bring the jury in.

12              (Jury re-enters proceedings.)

13         THE COURT:  Ladies and gentlemen, did anything

14  happen over the evening hours that you think might affect

15  your ability to serve on this jury?

16         JURORS:  No.

17         THE COURT:  Any questions before we start today?

18         Okay.  Let me talk to you a little bit about the

19  schedule.

20         I anticipate that we'll follow what I would call a

21  normal schedule today.  We'll recess for lunch sometime

22  probably around 12:30 or so, we'll recess mid-morning and

23  recess mid-afternoon, and then recess again at 5:00.  So

24  some things could change, but that, as far as I see it now,

25  will be the schedule.
```

1               All right.  The Government may call its next

2    witness.

3               MR. DERENZO:  The United States calls Senior Chief

4    Petty Officer Steven Bomentre.

5               THE COURT:  All right.  Thank you.

6               MR. DERENZO:  U.S. Coast Guard.

7               THE COURT:  Sir, if you will raise your right hand

8    to be sworn.

9               COURTROOM DEPUTY:  Do you solemnly swear or affirm

10   under penalty of perjury that the testimony you're about to

11   give will be the truth, the whole truth and nothing but the

12   truth?

13              THE WITNESS:  I do.

14              COURTROOM DEPUTY:  Please state your name for the

15   record and spell your last name.

16              THE WITNESS:  Steven Bomentre, B-O-M-E-N-T-R-E.

17              COURTROOM DEPUTY:  Thank you, sir.  Please take

18   the witness stand.

19              THE COURT:  Mr. DeRenzo.

20              MR. DERENZO:  Thank you, Your Honor.

21                        **DIRECT EXAMINATION OF**

22         **SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE**

23   **BY MR. DERENZO:**

24   Q    Good morning, Senior Chief.

25   A    Good morning, sir.

1    Q    What do you do for a living?

2    A    I am a Senior Chief Maritime Enforcement Specialist

3    with the United States Coast Guard.

4    Q    How long have you been a maritime enforcement

5    specialist?

6    A    I've been -- since 2010, January 1st, so a little over

7    ten years.

8    Q    And what did you do before you became a maritime

9    enforcement specialist?

10   A    Before I was a maritime enforcement specialist I was an

11   operations specialist from 2005 to 2010.

12   Q    Could you just describe for the jury your experience in

13   Coast Guard law enforcement.

14   A    Sure.  I have 12 years of law enforcement experience in

15   the Coast Guard operationally.  I've done well over

16   20 boardings, 14 interdictions, detained 49 suspected

17   smugglers, seized 20 metric tons of cocaine on multiple

18   vessels.

19           I've been an instructor at the Maritime

20   Law Enforcement Academy in Charleston, South Carolina, it's

21   a Federal Law Enforcement Training Center, where there

22   I taught authority and jurisdiction, international law,

23   narcotics identification, at-sea space accountability,

24   multiple different venues.

25   Q    And what is the Coast Guard's Maritime Law Enforcement

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE        7
Direct Examination by Mr. DeRenzo

1    Academy, what takes place there?

2    A     So the Maritime Law Enforcement Academy is where we

3    train all of the Coast Guard law enforcement officers how to

4    do the law enforcement mission in the maritime domain, so it

5    could be anywhere from recreational boating safety to

6    counter-drug to alien migrant interdiction operations,

7    anything that takes place that's a Federal law on the water

8    is what we train there and certify them.  It's a FLETA

9    accredited course, Federal Law Enforcement Training

10   Accreditation course.

11   Q     At that Academy, in addition to being an instructor

12   like you just described, did you have any other duties?

13   A     Yes.  So for three years while I was there I was a

14   member of a CLEAR team.  CLEAR stands for Comprehensive

15   Law Enforcement Assessment and Readiness, it's an auditing

16   team that goes around to all the Coast Guard units that

17   conduct law enforcement to ensure that they are following

18   policy and procedures, they are training their members

19   correctly, they're keeping up with their certifications, and

20   we do evaluations on them to make sure that they can do the

21   job properly.

22   Q     Where are you currently assigned?

23   A     Currently I'm assigned at a unit called the Tactical

24   Law Enforcement Team Pacific, located in San Diego,

25   California.  My job there is the assistant training officer.

1  My primary responsibilities include training, mainly in the

2  area of trace detection and at-sea space accountability.

3  Q    Let's talk about the training you provide.  Could you

4  describe for the jury at your current unit what kind of

5  training you provide.

6  A    I currently do all of the high risk training, so water

7  survival training, all of the range training, shoot house

8  training, and then for trace detection I train the members

9  on an instrument called a Smiths Detection 500DT, they get

10  that training annually to maintain their certification to

11  operate that.

12  Q    How many people in the Coast Guard Pacific region are

13  qualified, certified to provide the training on the 500DT

14  that you just described?

15  A    So last year we only had two in the entire Pacific

16  region.  We just certified two more this year, so we have

17  four members able to train on it, but we only have

18  two technicians capable of, you know, analyzing data from it

19  and conducting higher level instrument maintenance on it.

20  Q    And are you one of those two individuals?

21  A    I am.

22  Q    Okay.  Let's talk about the training you received

23  throughout your Coast Guard career, specifically as it

24  relates to the IONSCAN instrument.  What kind of training

25  have you personally received?

1  A    So my first experience with the trace detection

2  equipment, IONSCAN, was -- I believe it was 2006, on a

3  previous version of it that was the Smiths Detection IONSCAN

4  400B, and then from -- and I maintained certification for

5  that for many years, and then I was trained on the 500DT

6  back in 2017, I believe, where I learned how to be

7  operator/technician, Train the Trainer, and all this

8  training came from the company that manufactures the

9  instrument.

10 Q    That's Smiths Detection?

11 A    That's correct.

12 Q    When you say "Train the Trainer," what do you mean by

13 that?

14 A    It's a course that teaches you how to be an instructor.

15 Some people might have a wealth of knowledge but don't know

16 how to get that information across, so the Train the Trainer

17 course is a -- it's a requirement to certify other operators

18 within your -- within the Coast Guard.

19 Q    Have you trained anybody on how to use an IONSCAN

20 instrument at your current unit?

21 A    Many.  I've trained all the members there on how to use

22 it.

23 Q    And how about people outside the TACLET?

24 A    Yes, I've trained multiple Coast Guard cutters from

25 Port Angeles, Washington, Seattle, San Francisco, San Diego.

1  I've flown to Guam to train the members over in Guam on how

2  to use it, including CBP, ICE, Customs Border Protection,

3  ICE, and their Coast Guard Investigative Services.

4  Q    In addition to your IONSCAN instrument training, is

5  there any other relevant law enforcement training that

6  you've received over the years?

7  A    Yes.  So I've been to a multitude of courses in my

8  career with the Coast Guard.  I've attended Boarding Team

9  Member School at MLE, the Maritime Law Enforcement Academy

10 in Charleston, South Carolina.  I attended Boarding Officer

11 School at Maritime Law Enforcement Academy.  I attended

12 something called Maritime Counter-Trafficking Course there

13 as well, a multitude of fishery schools.  So I think

14 I pretty much hit every school that we offer.

15 Q    You mentioned a couple qualifications already.

16 In addition to being an IONSCAN instrument trainer,

17 maintainer and operator, do you have any other

18 law enforcement qualifications?

19 A    Currently a professional member of an

20 ASTM International working group to develop methods for

21 detecting synthetic opioids, mainly fentanyl, fentanyl

22 analogues, precursors, and what instruments will work to

23 detect those synthetic opioids, and that's funded by the

24 Department of Homeland Security Science and Technology

25 Directorate and Pacific Northwest National Laboratory.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      11
Direct Examination by Mr. DeRenzo

1  Q    In addition to yourself, what kinds of other people are
2  on this working group?
3  A    Scientists, chemists, engineers, first responders in
4  the field for hazmat, hazardous materials, lots of Ph.D.s.
5  Q    How many people in the Coast Guard are on this working
6  group?
7  A    There's currently two, two members on this working
8  group from the Coast Guard.
9  Q    And you're one of them?
10 A    Correct.
11 Q    Are you a qualified boarding officer as well?
12 A    I am.
13 Q    That's just not your primary day-to-day job at the
14 TACLET?
15 A    We maintain all of our certifications regardless of if
16 it's a primary job or not, because we don't know when
17 something might happen and you need extra bodies to go out
18 the door, but my primary job is training.
19 Q    Okay.  And I should have asked you this at the
20 beginning of your testimony, but what is a Senior Chief in
21 the Coast Guard?
22 A    So Senior Chief is the second highest enlisted rank.
23 It goes from Enlisted 1 or E-1 to Enlisted 9.  I am
24 Enlisted 8 or E-8.
25 Q    Let's talk a little bit about IONSCAN instruments in

1   the Coast Guard.  What kinds of instruments does the

2   Coast Guard use?

3   A    The Coast Guard currently uses the Smiths Detection

4   IONSCAN 500DT, DT standing for dual tube.

5   Q    You mentioned another model before.  Was that just

6   something you were trained on or was that something the

7   Coast Guard used as well?

8   A    So the 500DT didn't come about until 2005.  The 400 --

9   400B came around in the 19 -- late 1990s, 1997.  So the 400B

10  is the same technology, the only difference is that I could

11  only do -- I could only analyze drugs or explosives, I could

12  do one at a time, I couldn't do them both, where the 500DT,

13  for dual tube, I can analyze drugs and explosives at the

14  same time.

15  Q    So the 500DT, is that the one the Coast Guard is

16  currently employing?

17  A    That's correct.

18  Q    Basically a newer model?

19  A    Newer model, same technology.

20  Q    Okay.  And for what purposes does the Coast Guard use

21  this instrument?

22  A    The Coast Guard has been using it for trace detection

23  of narcotics during boardings.

24  Q    And do you know why in particular the Coast Guard uses

25  the IONSCAN instrument specifically, the 500DT and its

1    predecessor the 400B?

2    A    Sure.  The technology has been around since the 1970s.

3    It's been proven to be effective.  It's highly sensitive for

4    detecting things that aren't visible to the naked eye, down

5    to approximately less than a nanogram or one billionth of a

6    gram.  It's -- this one is optimized for drugs and

7    explosives, but they can be optimized to detect anything

8    they want.  So it's used in the medical industry for

9    bacteria and other items that they're looking for.  It's

10   used in universities for science, in their science labs.

11   It's used at the airport every day.  I don't know if any of

12   you have been lucky enough to get a random inspection.

13   Well, that hand swipe they do of your carry-ons and

14   yourself, that goes through an instrument similar to the

15   Smiths Detection 500DT, if not that one, to look for

16   explosives.

17   Q    Now, when you're doing specifically the counter-drug

18   mission at the Coast Guard, you're not in a laboratory doing

19   these tests, right?

20   A    We are not.  They're designed to be field use and field

21   detection, so they're certified in a laboratory setting,

22   however, they're designed to be used out in a non-laboratory

23   setting.

24   Q    All right.  If you could, please, just describe for the

25   jury just what an IONSCAN instrument looks like.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE     14
Direct Examination by Mr. DeRenzo

 1  A    Sure.  I got a couple of slides I can show you about
 2  that, or --
 3  Q    Would that help you in your testimony, explaining that?
 4  A    It would.
 5           So this is the Smiths Detection IONSCAN 500DT.
 6  To give you an approximate size, about a small or
 7  medium-sized printer in an office or like a microwave size.
 8           Looking at the front of this here, here is the
 9  sample inlet area, where the operator inserts a swab.
10  Up here is your display touch screen, where the operator
11  selects what they want to do, whether it's, you know,
12  conduct a verification or an analysis of the sample.
13  Additionally, this is where it will display other
14  information, like alarms.  It has a built-in printer which
15  can be configured so that whenever an alarm is displayed it
16  will print out a receipt and it will list all of the
17  operating parameters of the instrument at the time, it will
18  list what it alarmed for.  A lot of different information is
19  displayed on this receipt.
20  Q    How long has the Coast Guard been using this particular
21  instrument?
22  A    They've been using this before I -- maybe not this
23  model, but they've been using ion scan technology since
24  before I joined in 2005.
25  Q    Are you aware if any other Federal agencies or State

1  agencies use either this instrument itself or the underlying

2  technology?

3  A    Yes.  So they use it at the border, so CBP uses it at

4  the border, border patrol.  They use it in airports every

5  day, so TSA uses it, Capitol Police use it.

6  First responders have the capability of using this type of

7  instrument for if they come across a clandestine lab where

8  they manufacture methamphetamines or fentanyl, they can use

9  it to identify what chemicals they may be coming across.

10  Q    So those other agencies you spoke of, do they also use

11  it for detection of trace amounts of drugs as well?

12  A    Some do.  Some use it strictly for explosives.

13  So airport TSA uses it strictly to detect explosives.  At

14  the border they use it for both.  It depends on what your

15  unit -- or your agency's mission is.

16  Q    Are you aware of any known or potential rates of error

17  with this particular instrument?

18  A    So the published false alarm rate or false positive

19  rate is less than 1 percent.

20  Q    And you said "published."  Published by whom?

21  A    It's part of the operating manual for the Smiths

22  Detection equipment.

23  Q    You mentioned the term "false positive."  What does

24  that mean?

25  A    So a false positive means that when the operator runs a

1  sample, they don't know if there's anything on it yet or

2  not, that's what they're relying on the instrument for.

3  A false positive would be there was not a drug or narcotic

4  on the swab but the instrument said that there was.

5  Q    Are you familiar with the term "false negative"?

6  A    Yes.

7  Q    What does that mean?

8  A    So a false negative would be there is drugs on the swab

9  or explosives on the swab and the instrument does not alarm.

10  Q    And what are some of the reasons why there might be

11  drugs on a swab and yet the instrument does not signal or

12  alarm for that drug?

13  A    So because it's highly sensitive, there's three things

14  that can affect the detection criteria for an alarm, that's

15  mainly air pressure, temperature and humidity.  So if a swab

16  was wet, it creates steam when it's heated, it would bond

17  with the sample and possibly slow it down, not showing an

18  alarm for cocaine or some other explosive.

19  Q    Are there any environmental factors when, say, you're

20  taking swab samples from a vessel that would make it more or

21  less difficult to find trace amounts of drugs on the boat?

22  A    Sure.  If a sample was submitted and it was still damp

23  with moisture, it could affect the result of that sample.

24  Like I said, when water is heated it creates steam, and that

25  will slow down the molecules.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE       17
Direct Examination by Mr. DeRenzo

1    Q    Are you aware of any solvents or any other substances

2    that can move particles of drugs, cocaine, for instance,

3    around a vessel at sea?

4    A    So, yes, fuel is used commonly to wash down the boat.

5    Additionally, fuel is just inherently there because of the

6    amount that's on board and the amount of containers during

7    fuel -- during transferring of fuel containers.  We

8    generally train not to swipe anything wet because of this

9    reason; however, if it is, we instruct the operators to let

10   it evaporate before running it through.  Additionally,

11   I wouldn't want to run fuel through this because it is

12   heating it, and when you heat fuel you could create an

13   explosion, and that would not make the instrument work very

14   well.

15   Q    To be clear, when you're actually doing the samples

16   themselves on a surface, boat or anywhere else, are you

17   looking for visible amounts of drugs?

18   A    No.  So this instrument is designed for trace

19   detection, it's not visible to the naked eye, so because

20   it's not visible, the operators are trained to swipe

21   anywhere that the hands may come in contact with or where

22   bulk packaging may come in contact with, so generally the

23   rails, side rails, hatches, the steering column or steering

24   wheel where the helm is at, radios, or even areas where they

25   believe that possibly it might be concealed.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      18
Direct Examination by Mr. DeRenzo

1   Q    And how would an operational setting, like on a boat

2   out in the middle of the ocean, affect the movement of

3   potential drug particles?

4   A    So generally speaking these are large quantities of

5   narcotics that are being smuggled, so -- and they're running

6   at high rates of speed, so when you're talking many, many

7   bales that are in a compartment, they're going to bounce

8   around, they're going to be hitting sides.  Additionally,

9   the people on board have to move around to change the fuel,

10  so they're going to have to come across and touch certain

11  areas, so transfer is highly likely.

12  Q    Can the fact that you're in a marine environment or the

13  fact that there's fuel on board -- you mentioned the

14  possibility of someone wiping down a boat.  How could that

15  affect whether or not you ultimately find some of the

16  substance on the surfaces you're swiping?

17  A    Yeah.  So water is a universal solvent.  If there's

18  anything it was on, like trace amounts, the water would mix

19  with that and then as the water evaporated it would leave

20  the trace amounts behind.  So if you think like a -- like a

21  slurry and I get my hand wet with cocaine water, wherever

22  I touch I'm leaving -- I'm leaving trace amounts of cocaine

23  behind.  However, over a period of time, eventually it's

24  going to wash away, so wind will affect, blowing away the

25  trace amounts, water will eventually wash it all away and it

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE     19
Direct Examination by Mr. DeRenzo

 1  will just go into the ocean.
 2  Q    Okay.  Now, I want to go back to those two terms, false
 3  positive and false negative.
 4          Is a false negative more or less likely than a
 5  false positive?
 6  A    A false negative would be more likely based on those
 7  factors that can affect it, mainly the humidity, because
 8  we're working in a maritime environment, there's water all
 9  around.
10  Q    All right.  So let's talk a little bit more about this
11  instrument specifically, the 500DT, and how it actually is
12  used to determine whether or not there's drugs on a surface.
13  Can you describe that process.
14  A    Sure.  I have another slide here that shows a cutaway
15  of what an ion mobility spectrometer looks like inside.
16          So what we're looking at here is one of the IMS
17  tubes, or ion mobility spectrometry.  The front of the unit
18  I showed you before, where I showed you the operator inserts
19  a sample, that's this area here.  What happens is the
20  operator will insert one of the swabs into there and they
21  will hit Analyze on the touch screen.  When they hit
22  Analyze, this right here will raise up and it will heat or
23  vaporize the swab, uses about 450-degree heat to vaporize
24  everything that's on the swab.  Additionally, it will blow
25  clean dry air into the instrument, so anything that's on the

1   swab is then vaporized and it goes through this tube here to

2   an ionization region.  This has a weak radioactive source

3   that either gives a positive or a negative charge, so for

4   narcotics it gives it a positive charge, for explosives it

5   gives it a negative charge, and this happens simultaneously

6   in two different tubes.

7            From here it's held in this region until what's

8   called a gating grid opens up.  So we have a mixture of

9   different charged molecules in there and the gating grid

10  will open up 30 times during an analysis and allow particles

11  to drift from point A to point B, which is over here at the

12  collector, and the time that they reach there is called the

13  drift time.  Each particular molecule has a specific drift

14  time based on its mass and shape or the way it spins through

15  the air from point A to point B, and that's a known number

16  that's been tested in a laboratory setting, it's been

17  programmed by the manufacturer into the system to kind of

18  give a fingerprint for everything that it's been designed to

19  look for.

20  Q    So that drift time, is that something you input into

21  this instrument?

22  A    It is not.

23  Q    How about another individual in the Coast Guard, an

24  IONSCAN -- just an operator, do they put that information in

25  there?

1   A     They do not.

2   Q     Okay.  And how does that -- well, what are the factors

3   you're looking for, or specifically the instrument looks for

4   to determine whether it's cocaine or some other substance?

5   A     So it's mainly based on drift time, but it also has

6   other factors added in to eliminate false alarms, so not

7   only drift time, it needs to have a minimum amplitude or a

8   minimum height, so it has to detect a certain number of

9   molecules of cocaine, it has to be the right shape, so the

10  width of the peak when it gets there has to fall within

11  certain parameters, and then it also has to have the correct

12  number of segments consecutively.  These numbers have been

13  set very high to get a less than 1 percent false alarm rate,

14  so -- yeah.

15  Q     Let's talk about actually using the instrument.

16  A     And we can go back a slide.  I can -- the touch screen

17  is a little off.  I can't clear it.

18  Q     Could you describe for the jury exactly how it is that

19  you test a sample.

20  A     Sure.  So this is the display that the operator sees

21  when they're inserting a sample.  Before they insert the

22  sample they'll see a green screen, which is the ready screen

23  located here, and then when they want to run the sample

24  there's a button over here to the right called Analyze, we

25  can see that it's bold and black right there in the green

1   screen.

2   Q    What does that mean?

3   A    It means that the instrument is ready to submit a

4   sample.  If it was not ready, they would not be able to

5   submit a sample, meaning it would show a yellow screen.

6           So above here we have a yellow screen, which is

7   Waiting, this is an error on the slide, it should say

8   Waiting, Not Ready, and you will also notice that the button

9   over here Analyze is stippled out or grayed out, meaning the

10  operator cannot select it.

11  Q    So if I were trying to analyze a sample, a swab that I

12  took from a boat, and I saw that yellow screen and I tried

13  to press Analyze, what would happen?

14  A    It wouldn't analyze.  The instrument -- it's very

15  operator user friendly.  It's designed for a person who is

16  not a chemist or a lab scientist to operate.  So the

17  instrument conducts all the calibrations, it maintains its

18  proper air flow and temperatures, and if it was not ready,

19  it would not let the operator select Analyze.

20  Q    If when testing an ion scan swab the instrument does

21  detect some substance that's programmed into it, what will

22  the operator see?

23  A    So the operator would see the red screen at the bottom

24  here, it will display Alarm and then it will also show the

25  operator what it alarmed for, so that would be this area

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE     23
Direct Examination by Mr. DeRenzo

1  here, telling the operator what it alarmed for.

2       Additionally, it could be configured to print out

3  a receipt at that time for case package purposes or

4  documentation purposes; however, the instrument stores every

5  sample, every run into its hard drive, so if it doesn't

6  print out, we can always go back in there and print it

7  again, because it's permanently stored.

8  Q    Is that something you've done as a -- not only a

9  trained operator but someone who is trained to actually

10 repair and maintain these instruments?

11 A    It is.

12 Q    Let's talk about some of the other features of the

13 instrument itself.  Are there any built-in features that

14 decrease the likelihood that there's going to be user error?

15 A    Increase the likelihood of user error?

16 Q    Decrease the likelihood.

17 A    Decrease the likelihood of user error.

18       Can you rephrase the question?

19 Q    Are there any built-in features that help the --

20 A    Yes.

21 Q    -- reliability of the instrument itself?

22 A    So there's something called a verification.  What a

23 verification is is it helps the user build confidence that

24 the instrument is working properly.  So if the machine did

25 not pass verification then it would not alarm for what it's

 1  detected to alarm for.  We train to conduct a verification

 2  at a minimum of weekly, and in this particular instrument

 3  involved in this -- in this court case, verification was

 4  done prior to the boarding, within that week timeframe, and

 5  a verification was done after the boarding, which showed

 6  that the instrument was working properly before and after.

 7  Q    How do you know that?

 8  A    Because it passed the verification.

 9  Q    But how do you personally know that?

10  A    I was able to go into the instrument, pull the

11  verification log and verify that it -- what the instrument

12  was designed to look for, the instrument found.

13  Q    So let me give you a hypothetical.  If I swab a

14  surface, it just so happened that surface has some cocaine

15  on it, but for some reason that verification process either

16  wasn't done or didn't go right --

17  A    Or it didn't pass.

18  Q    -- and I sample -- try to analyze a sample, what would

19  you expect to happen?

20  A    It would not show an alarm for cocaine.

21  Q    And what would you call that?

22  A    I would call that a false negative.

23  Q    You mentioned some factors earlier that can affect this

24  testing process, air temperature, humidity.  Is there

25  anything in the instrument itself, built in, that adjusts

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      25
Direct Examination by Mr. DeRenzo

1    for those factors?

2    A    Yes.  So the instrument is constantly maintaining its

3    optimal operating specifications.  There is a calibrant,

4    which is built into both of the ion mobility spectrometry

5    tubes, and that calibrant is constantly running through the

6    instrument and it's -- excuse me, it's calculating what the

7    expected drift time is for all of the narcotics and

8    explosives in its library based on where it sees the

9    calibrant at.  So if air pressure changes, it sees the

10   air pressure has changed, it calculates where it expects to

11   see the calibrant, and this is constantly being done while

12   the instrument is on.

13   Q    You mentioned that the instrument itself is somewhat

14   portable.  In your experience, and the way you train

15   members, is that -- is this process done, the analysis, on

16   the target that you're looking at?

17   A    So it is not.  The instrument requires power, either

18   120 or 240 volts, so the instrument stays on board the host

19   ship wherever the crew -- the bulk of the crew is located

20   at, and then the samples are taken separately from the

21   boarding team.  Those samples are then bagged, gloved and

22   bagged and sent back to the host ship, where they are run

23   separately from the actual collecting of it, so there is no

24   chance of contamination from the actual ship.

25   Q    Now, every ship is a little bit different in the way

1  it's set up and how big it is, but is there any spaces in

2  general where you would not only store this instrument

3  during a patrol but actually run the tests?

4  A     So the instrument is generally stored in a restricted

5  space which has limited access only to people with

6  clearances, either secret or above, and in that space is a

7  air conditioned climate-controlled positive air flow

8  controlled space.

9  Q     And why that space, other than the security aspect?

10 A     Because there's other electronics in that space, it's

11 generally where all their radar equipment is, and it needs

12 to stay cool.  Additionally it needs to stay dry.  You can't

13 have wet computers.  So it's an optimal space to run samples

14 because of the dry -- dry, cool environment.

15 Q     You mentioned before that one of your jobs is to train

16 people on how to use this particular instrument.  Do you, in

17 the course of your current duties, train people on how to

18 actually take the samples from a boat?

19 A     I do.

20 Q     And what do you train people to do?

21 A     So before the boarding team or the officers go out to

22 conduct a boarding, swabs are taken of them, of their hands,

23 to -- palms, hands, fingertips, to ensure that they do not

24 have cocaine residue on them and they could not be a source

25 of contamination.  Those samples are run, and if a positive

1   is observed, one of the members alarms, they're either

2   removed from the boarding or they're sent to decontaminate,

3   wash their hands, whatever it might be that alarmed, and

4   come back and be tested again.

5   Q    And then the actual process of sampling, what do you

6   train people to do?  How do you do that process?

7   A    So during the boarding it's a two-person operation, you

8   have the person who writes down where the samples are taken

9   from and then you have a person who actually physically

10  takes the samples.  The person physically taking the

11  samples, that's what they call loading up gloves, or he'll

12  put on nitrile gloves, ten maybe at a time, whatever he can

13  fit on his hand, and what he will do is he will take a clean

14  swab from a sealed container, he will take that swab, swab

15  an area where he expects to find trace amounts of narcotics.

16  Again, we're dealing with non-visible particles, so they are

17  trained to swab wherever hands might come in contact with.

18  He then removes that glove, leaving the sample in there, he

19  will label it with a number or a place, and then the person

20  who is taking the log will write down what sample 1 is of.

21  That glove is then placed into a sealed bag and that bag is

22  brought back to the ship.  And this is repeated multiple

23  times.

24  Q    When you actually analyze a sample and you get that

25  red screen that we can see here in the PowerPoint, what is

1  the significance of seeing that red screen, that alarm?

2  A    It notifies the operator that a substance that the

3  instrument was looking for was detected.  It will display a

4  red screen, it will play an audible alarm, we have ours

5  configured to print receipts, and then the operator will

6  notify the people on board of the results.

7  Q    Now, you have detailed for the jury your extensive

8  training and experience you have with this instrument.  Are

9  you able to actually look at the data from the testing and

10  analyze and interpret those results?

11  A    I am.

12  Q    Let's talk first about the methodology that you use to

13  interpret those results.  What's the starting point for you

14  when you see one of the receipts you talked about with the

15  information on it?

16  A    So the first thing I look at is the operating

17  parameters, the top, make sure the instrument was operating

18  properly, then I will look to see what the instrument

19  alarmed for, and that will be displayed at the bottom of the

20  receipt.  Then there's multiple sectors -- there's multiple

21  different items listed there for the alarm, and I'll look at

22  those items to determine the quality of the hit.

23  Q    And we'll talk about those individual factors in a few

24  minutes here, but are you aware of any known thresholds that

25  you're looking for when you're looking at this information?

1  A     Yeah.  So there's different things you're looking for.

2  For example, cocaine needs a minimum amplitude of 50, it

3  needs to have a drift time of plus or minus 50 microseconds,

4  which is -- a microsecond is one billionth of a second.  If

5  you were to think of a blink of an eye, which is a third of

6  a second, it would be 6,000 times faster than a blink of an

7  eye.  It has -- you're looking for the shape or the width of

8  the -- of the peak, the reference peak, and then you're also

9  looking for something called the consecutive number of hits.

10  For instance, cocaine is two consecutive hits.

11  Q     And what's that number called?

12  A     That's your segments.

13  Q     When you look at that data, say for a receipt that

14  alarmed for cocaine, what can you infer simply by looking at

15  that information?

16  A     So the instrument is a qualitative instrument, not

17  quantitative.  Qualitative meaning that it's very good at

18  identifying substances.  It will not tell you how much of a

19  substance is available, because we're dealing with such

20  small amounts.  I couldn't tell you, you know, if it was one

21  brick or a million bricks, but I just know that cocaine is

22  present.

23  Q     Okay.  So some amount.

24  A     Some amount.

25  Q     You couldn't say definitively when or how it got there,

1    but by looking at one of those receipts, how much confidence

2    can you have that some amount of that substance is there?

3    A    I could have high confidence that there was some of

4    that substance there.

5    Q    All right.  You mentioned this case, the interdiction

6    in this case earlier.  Have you had an opportunity to

7    examine the ion scan results from this case in particular?

8    A    I have.

9    Q    Are you able to, based on the criteria you just

10   discussed, render an opinion as to those results?

11   A    I am.

12   Q    Let's take a look at those.

13             Pulling up what's now been admitted as

14   Government's 7A --

15             THE COURT:  Could we dim a little bit more.

16   Q    We'll start at the top here.

17             As an IONSCAN operator, and based on the

18   experience you just discussed, what is relevant to you at

19   this part of the result?

20   A    So I'm looking at, one, that -- the IONSCAN model,

21   serial number, but I'm also looking at the alarm and that

22   the operation was normal.  I take into account the

23   air pressure, differential pressure and drift flow.  For

24   those numbers I generally want the differential pressure to

25   be less than .1 and drift flow to be somewhere between 299

1    and 301, which is kind of the standard operating for this

2    instrument.

3    Q    We'll zoom in.  This is the second page of 7A at the

4    top here.

5           Do you see the area I've highlighted that says

6    cocaine 3 percent?  Did I read that right?

7    A    You did.

8    Q    What does that mean to you?

9    A    So the percentage doesn't necessarily mean anything.

10   It's a subjective number.  Because the instrument already

11   has a high threshold to get that less than 1 percent alarm

12   rate, all the 3 percent is saying, that it was 3 percent

13   higher than its threshold amount.  It could be a 1 percent

14   alarm or it could be a 100 percent alarm, they both mean the

15   same thing to me.  An alarm is an alarm or a hit is a hit.

16   Q    And that means what?  "A hit is a hit," what does that

17   mean to you?

18   A    It means that cocaine was present.

19   Q    We'll zoom into the bottom of that left-hand receipt,

20   and in the Comments section it says, Location, port side

21   rail.  Did I read that right?

22   A    Yes, sir.

23   Q    I'm going to highlight some numbers.  If you could

24   just explain to the jury what is the significance, if any,

25   of those numbers.

 1  A    Sure.  So at the top we saw an alarm for cocaine.

 2  This was the cocaine 3 percent alarm.  So down here it gives

 3  you more specific information about what it actually saw

 4  during that alarm.  For instance, this number -- this number

 5  symbol here, this tells me the number of segments that it

 6  saw cocaine.  During an analysis there are 30 possible

 7  segments.  In this one it saw cocaine in 11 out of 30 of

 8  those segments.

 9           You have your amplitude -- this is not working.

10           You have your amplitude, which is your highest

11  peak that it saw, in this case it was 93, where the minimum

12  I need is 50.

13           You have your delta.  In this case it's

14  negative 4.  This is measured in microseconds.  So the

15  expected drift time was 4 microseconds off of where it

16  needed -- or where it wanted to be.  And the threshold for

17  this is plus or minus 50 microseconds.  So if we think of

18  the delta of being zero as the very, very, very center of a

19  bullseye, you can't get more center than that, this would be

20  4 microseconds away from that very center of the bullseye.

21           And then your cumulative A is -- your cumulative

22  amplitude is how much -- it adds up all of the 11 segments

23  and tells you how much it saw during that -- during that

24  analysis.

25  Q    Okay.  So let's talk about the delta briefly.

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE     33
Direct Examination by Mr. DeRenzo

1           When you talk about the drift time, that's the
2    ideal -- we're in a laboratory, we know what's on the swab
3    is cocaine or whatever we're testing for, and this time has
4    been figured in an ideal setting.  Did I have that right?
5    A    That's correct.
6    Q    And so relative to that ideal time, what does the delta
7    tell us?
8    A    That's almost as close to perfect time as you could see
9    for a sample run in the field.
10   Q    And how does that affect your confidence that the
11   substance was in fact cocaine when you are looking at a
12   result like this?
13   A    Based on the fact that it already has a less than
14   1 percent false alarm rate, my confidence is already high,
15   but reading this I would have an even greater confidence
16   that, yes, that was cocaine.
17   Q    So fair to say that the lower that number is, the
18   delta, the closer it is to zero, plus or minus, does that
19   increase your confidence that it is in fact some amount of
20   cocaine?
21   A    It does.
22   Q    Thank you.
23           Now, the figure in between the number sign and the
24   A-M-P, CumA.
25   A    Cumulative amplitude.  Is that what you're talking

 1  about, the CumA?

 2  Q    Yes.  Mathematically how do we get that number?

 3  A    So it's just a total of the 11 segments added up to get

 4  your cumulative amplitude of cocaine molecules detected.

 5  Q    Does the amplitude have any correlation to the quantity

 6  of substance on a particular swab?

 7  A    The higher the amplitude, the more cocaine is present

 8  on that swab.

 9  Q    But to be clear, you couldn't say whether it's so many

10  grams or milligrams or nanograms?

11  A    I could not.

12  Q    But the higher the number in amplitude means a

13  relatively higher quantity?

14  A    Correct.

15  Q    So is there any correlation between the cumulative

16  amplitude, the number right next to it, and the relative

17  quantity of cocaine on the sample?

18  A    So the higher the cumulative amplitude, the more

19  molecules of cocaine were detected, the higher amount of

20  cocaine was on that sample.

21  Q    So we'll zoom into the right-hand receipt which the

22  Comments section has labeled as Location, center hold.  Did

23  I read that right?

24  A    Yes, sir.

25  Q    Could you discuss for the jury the figures I have

1    highlighted just above that.

2    A    Yes.  So, again, we have an alarm for cocaine.  This

3    time the pound sign below that, we see 24, meaning that out

4    of a possible 30 segments, the instrument saw cocaine in 24

5    of them.  Remembering that I only need two consecutive

6    segments to get an alarm, this one had 12 times that number.

7         The cumulative amplitude is in the thousands, with

8    a high amplitude of 227.  The minimum I need for a cocaine

9    alarm, again, is 50 for amplitude, so this is four and a

10   half times higher than the minimum required.

11        And the delta here is minus 2 microseconds.

12   We can have up to plus or minus 50 microseconds.  This is

13   almost dead center on the bullseye for cocaine.

14   Q    How many samples, either in a training setting,

15   operational setting, total, do you think you've run through

16   an IONSCAN instrument?

17   A    Hundreds.  Many, many hundreds of samples.

18   Q    In relationship to other samples you've seen,

19   personally analyzed, how would you compare this particular

20   sample?

21   A    This sample is probably as near perfect as you can get

22   in a -- in a field setting.

23   Q    Go to the next page of Exhibit 7A and zoom in on the

24   bottom of the left-hand receipt, which is labeled in the

25   Comments section as, forearms, Calbot Reid-Dilbert.  Did

1    I read that right?

2    A    Yes, sir.

3    Q    I'll again highlight the information here just above,

4    and if you could just take the jury through that

5    information.

6    A    Again, this is an excellent alarm for cocaine.  We saw

7    cocaine in 12 out of 30 segments.  We have an amplitude of

8    100, which is twice the minimum.  Your delta is

9    4 microseconds from dead center.  This is an excellent --

10   additionally, the members that -- the detainees or suspects

11   are -- they're not swabbed until very later on, so they have

12   a chance of actually washing down between then, so the fact

13   that you got a sample like this is very good on a person.

14   Q    And based on the parameters you just discussed, is this

15   sample itself within parameters?

16   A    Yes, it is.

17   Q    Zoom into the right-hand side of 7A.  The Comments

18   says, Calbot Reid-Dilbert, hands.  Did I read that right?

19   A    Yes.

20   Q    If you could, again, explain to the jury these figures

21   that I've highlighted.

22   A    Yes.  So again we have a cocaine alarm, 17 segments out

23   of 30; amplitude of 98, which is pretty much twice the

24   minimum required; a delta of minus 20 microseconds, or

25   20-millionths of a second, which is well within the plus or

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE      37
Direct Examination by Mr. DeRenzo

1  minus 50 microseconds allotted for an alarm for cocaine.

2  Q    And how many segments do you need consecutive?

3  A    I need two.

4  Q    And here we have how many?

5  A    17.

6  Q    So is this sample within parameters as well?

7  A    It is.

8  Q    What is your confidence level that some amount of

9  cocaine is on this swab?

10  A    I have high confidence that there was cocaine on this

11  swab.

12  Q    All right.  We'll go to the next page of 7A, zoom in on

13  the bottom left receipt, it's labeled Rudolph Randolph

14  Meighan, hands.  Did I read that right?

15  A    Yes, sir.

16  Q    Could you once again explain to the jury the

17  significance, if any, of the figures I've just highlighted.

18  A    So again we have an alarm for cocaine.  Number of

19  segments, we have 8; amplitude of 58; and a delta of minus

20  19 microseconds.  We were four times required number of

21  segments.  We're slightly above the minimum amplitude

22  threshold, but we're well within the timeframe for cocaine.

23  So there was cocaine detected.  It wasn't a large amount of

24  cocaine on that swab.

25  Q    When you say that, you mean relative to the other

1  swabs?

2  A    Relative to the swab.  Again, you're dealing with trace

3  amounts, not visible to the eye.  It doesn't mean that it

4  wasn't there, it just means that maybe they didn't swab an

5  area that had more located on it.

6  Q    I'll move to the other receipt on the right-hand side

7  of the page, comments labeled, hands, Jorge Ramon

8  Newball May.  Did I read that right?

9  A    Yes.

10  Q    And if you could do the same thing with the highlighted

11  portion.

12  A    So we have an alarm for cocaine, 17 segments out of the

13  required 2; I have an amplitude of 161, where all I need is

14  50; and my microseconds are minus 7 microseconds, which is

15  well within the plus or minus 50.  This is a very good hit

16  for cocaine.

17  Q    Is every one of those figures within the parameters?

18  A    It is.  The instrument will not alarm if it's not

19  within the parameters.

20  Q    Go to the next page.  I'm zooming into the bottom here.

21        Comments of this result labeled Emiro

22  Hinestroza-Newbbooll, forearms.  Did I read that right?

23  A    Yes, sir.

24  Q    Highlight some data just above that, if you could, to

25  explain to the jury the significance of that information.

1  A    Sure.  So again it alarmed for cocaine.  We have

2  8 segments where cocaine was seen; we have an amplitude of

3  72, which is above the 50; and a delta of minus 22

4  microseconds, which is well within my plus or minus 50.

5  Q    Now, we're obviously dealing with small particles here.

6  In your experience would you expect to find a relatively

7  stronger hit on an individual's hands or their forearms if

8  they were handling cocaine bales?

9  A    You would expect to see a higher hit most likely on

10 their hands because the hands are the tools that come in

11 contact with everything, but again, because we're dealing

12 with trace amounts, you're kind of swabbing blindly, hoping

13 that where you're swabbing is a good spot.

14 Q    To be clear, is this particular analysis within

15 parameters --

16 A    It is.

17 Q    -- on each of the relevant criteria?

18 A    It is.

19 Q    Zoom into the right-hand side of this page.  It's

20 labeled under the Comments section as

21 Emiro Hinestroza-Newbbooll, hands.  Did I read that right?

22 A    Yes.

23 Q    If you could explain the significance of the portion

24 I've highlighted just above that.

25 A    So in this sample an alarm for cocaine was detected in

1    13 segments; the amplitude was 147, three times the required

2    amount; the delta was minus 12 microseconds, which is within

3    my 50 plus or minus; and like I said, 13 segments is six and

4    a half times the requirement for consecutive segments.

5    Q    Is every one of these criteria within parameters?

6    A    It is.

7    Q    So this last two pages, Senior Chief, it's a longer

8    receipt, I'll first zoom into the bottom.  It's labeled as

9    Location, starboard side rail.  Did I read that right?

10   A    Yes, sir.

11   Q    What we'll do is scroll back to the previous page,

12   middle of the receipt.  Can you explain the significance of

13   the portion that I've highlighted.

14   A    Yes.  So this is another excellent hit.  This is an

15   alarm for cocaine.  22 out of 30 segments, the instrument

16   saw cocaine, with an amplitude -- a max amplitude of 150,

17   which is three times the required amount.  Your expected

18   drift time was minus 6 microseconds from dead center of

19   bullseye, which is within that plus or minus 50.

20   Q    So that first number, 22, is that 22 out of 30?

21   A    That is correct, 22 out of 30.

22   Q    Now, what side of the boat is the starboard side?

23   A    That's the right side of the boat.

24   Q    Now, after analyzing each of these results, and based

25   on what you know about ion scan technology, your experience

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE        41
Direct Examination by Mr. DeRenzo

1  as a boarding officer, your training as a boarding officer,

2  are you able to form an opinion regarding the presence of

3  drugs on board the vessel where these swabs were taken?

4  A    I am.

5  Q    What is your opinion?

6  A    That cocaine was present on board this vessel.

7  Q    Now, are you able to say exactly when or how long ago?

8  A    I can't say when or how long ago because trace

9  detection can be persistent; however, the fact that the

10 vessel is made from fiberglass, it's nonporous, it would

11 have a hard time clinging to a surface like that;

12 additionally, the maritime environment, water would end up

13 washing it away, along with wind, and sun would degrade the

14 results.

15 Q    And does that in any way affect your opinion of how

16 recently you believe cocaine was on board the vessel where

17 these samples were taken?

18 A    Based on the number of samples that alarmed for

19 cocaine, the quality of the samples, meaning the number of

20 segments that it alarmed on, and the amplitudes, I would say

21 that cocaine was on board this vessel very recently.

22 Q    What is the likelihood that every single one of these

23 positive samples for cocaine was a false positive?

24 A    Again, since the instrument already has a 99 percent --

25 less than 1 percent false alarm rate, if it was maybe one

SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE     42
Direct Examination by Mr. DeRenzo

```
 1   alarm out of that, there's a possibility.  The fact that we
 2   have ten alarms for cocaine out of 18 swabs taken is -- it
 3   would probably be easier to win the lotto.
 4   Q    Now, based on the same criteria, experience or training
 5   that we've just discussed, are you able to form an opinion
 6   about contact by the individuals referenced in these samples
 7   with respect to cocaine?
 8   A    Yes.  So are you talking about people?
 9   Q    People, yes.
10   A    So, yes, all four persons on board this vessel came in
11   contact with cocaine.
12   Q    Now, I just want to be clear, you can't say exactly
13   when or exact how?
14   A    I can't.  It could be from direct contact or indirect
15   contact, meaning they physically actually touched cocaine or
16   they touched something that cocaine did touch, so that would
17   be -- indirect would be they touched something that cocaine
18   touched.
19   Q    I see.  But in some way or manner is it your opinion
20   that they did have direct contact with some amount of
21   cocaine?
22   A    Yes.
23            MR. DERENZO:  May I have just a moment,
24   Your Honor?
25            THE COURT:  You may.
```

```
 1                 MR. DERENZO:  No further questions, Your Honor.

 2                 THE COURT:  Mr. Hernandez, this might be a good

 3       time to take a short break before you start your Cross.

 4                 Ladies and gentlemen, we'll be in recess until

 5       10:30.  You're welcome to walk around.  Please don't discuss

 6       the case, and leave your pads on your chairs.

 7                     (Jury exits proceedings.)

 8                 THE COURT:  Chief Bomentre, you may step down.

 9       Please don't discuss your testimony over the recess, and we

10       will start again at 10:30.

11                 THE WITNESS:  Thank you, Your Honor.

12                 THE COURT:  We're in recess until 10:30.

13                         - - - - -

14               (Recess at 10:12 a.m. until 10:30 a.m.)

15                  (Jury re-enters proceedings.)

16                         - - - - -

17                 THE COURT:  Mr. Hernandez.

18                 MR. HERNANDEZ:  Thank you, Your Honor.

19                 Good morning, sir.

20                        CROSS-EXAMINATION OF

21              SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE

22       BY MR. HERNANDEZ:

23       Q    Your law enforcement experience, has it always been

24       maritime or has it ever been on land?

25       A    It has not, sir.  It's always been in the maritime
```

 1  environment.

 2  Q    Okay.  And the reason I ask is are you familiar with

 3  procedures that may exist, say, in a traffic stop where

 4  someone is stopped and may be suspected of having drugs?

 5  A    I'm familiar with that.

 6  Q    Okay.  And are you familiar with procedures --

 7  something called a Valtox test that is a test that is done

 8  at the scene of a traffic stop?

 9  A    A Valtox test?  I am not familiar with that term, with

10  that test.

11  Q    Are you familiar with testing procedures that a police

12  officer might make at the scene to determine at least

13  preliminarily if there is evidence of illegal drugs?

14  A    I am.

15  Q    Okay.  And are you aware that generally the typical

16  procedure is that subsequently, if in fact there is a

17  finding pursuant to a test by the officer, it is

18  subsequently sent to a lab where a chemist would actually do

19  further testing and more -- and actual scientific testing?

20  A    That's correct, sir.

21  Q    Okay.  Now, you are not a chemist, correct?

22  A    I am not.

23  Q    Okay.  And in this case you did not -- would it be

24  correct to say that you did not participate in the actual

25  testing on board, correct?

1  A    I was not present, that's correct.

2  Q    And your opinion is based solely on the documents

3  containing the test results prepared by other officers,

4  correct?

5  A    That's correct, sir.

6  Q    And if there was any error by them, you would not have

7  any personal knowledge of that?

8  A    Based on the fact I was not there, I would not know if

9  there was a procedural error.

10  Q    And you would have no knowledge of how many people were

11  actually involved in handling up the evidence before it was

12  given to you for further testing?

13  A    Other than what the officers' statements say, no,

14  I would not.

15  Q    Okay.  And would it be correct to say that whatever was

16  tested, these swipes, that in the course of that testing,

17  that that was destroyed, correct?

18  A    So once the sample is analyzed, yes, it is destroyed,

19  it cannot be used again.

20  Q    So there is nothing that can be submitted to a chemist

21  for testing, scientific testing, to determine what in fact

22  those results are, correct?

23  A    That's correct.

24  Q    Would you agree that the ion scan method used in this

25  case, and I assume in these other cases that you've been

1    involved in, is not scientifically valid -- it's not a

2    scientifically valid means of discriminating between

3    individuals who knowingly handled illicit drugs and

4    individuals who were unknowingly exposed to residue of

5    illicit drugs?

6    A    So the IONSCAN is very good at identifying substances.

7    Again, it is qualitative, not quantitative, so it just says

8    that a person came in contact or an object came in contact

9    with narcotics or explosives.

10   Q    So it does not give you any more information other than

11   that, correct?

12   A    It doesn't tell you who physically handled it.

13   Q    And consequently is it correct to say that a positive

14   ion scan result for cocaine does not provide any information

15   about how, when or where the trace quantity came to be

16   present on the sampled surface, correct?

17   A    It doesn't tell you how, when or where.

18   Q    Do you know the boarding officers that actually did the

19   testing at the scene, or obtained the swipes -- my

20   understanding is that they are tested themselves before

21   boarding on the vessel, correct?

22   A    That's correct.  That's per policy.

23   Q    But they are not tested after they have left the

24   vessel, correct?

25   A    They're not tested after they left the vessel because

1   most likely from moving around the vessel they might come

2   back with some amount on them, but it's only policy to test

3   prior to the boarding to make sure that they're not bringing

4   over contaminants.

5   Q    But you would agree that if they were tested afterwards

6   it might be informative if inadvertently they had picked up

7   traces while on the boat, correct?

8   A    It's not policy, but it's -- anything is informational.

9   Q    But you would agree that it would -- it would certainly

10  provide information that it could have been picked up

11  inadvertently in the course of their testing, correct?

12  A    Sure.

13  Q    The machine that is used, does it have the capability

14  to use a printer?

15  A    The instrument does have the capability to use a

16  printer, correct.

17  Q    And these logs that are prepared are prepared in a

18  handwritten fashion, correct?

19  A    They are.  So when they -- when the instrument alarms,

20  the person who is operating it will take down certain

21  information, what sample number it correlates to, what the

22  alarm was for percentage-wise and any other pertinent

23  information that's on the log.

24  Q    Would it not be the case that if there -- in light of

25  the fact that it does use a printer, that a direct

1  instrumental printout of the results would be -- there would

2  be less chance of error because it would eliminate the

3  chance of human error?

4  A     Yes.  However, the hard drive stores all the samples

5  and it's easier to submit a one page listing of everything

6  rather than flipping through 18 different receipts.

7  Q     But it would eliminate the possibility of human error?

8  It could be mechanical error but it would eliminate the

9  possibility of human error, correct?

10 A     Sure.

11 Q     Okay.  Can a trace amount exist on a substance more

12 than a year?

13 A     Possibly, depending on the substance and the way it's

14 stored, you know, if it's not subjected to elements, sure.

15 Q     Would it be the same principle, say, as fingerprints or

16 DNA, that as long as the surface where the sample is found

17 is not disturbed, that it could -- it could -- you cannot

18 determine the age of it, correct?

19 A     Correct.

20 Q     And again, all that we're talking about is something

21 that is completely microscopic, correct?

22 A     We're talking down to the nanogram level, one billionth

23 of a gram, trace amounts.

24 Q     And again, nothing visible to the naked eye, correct?

25 A     Correct.

1  Q    And these traces could have been put there by a

2  previous -- it could have been a previous voyage or by

3  different people on a different crew at a different time,

4  correct?

5  A    All I know is that cocaine was present on board that

6  vessel at some time.

7  Q    And when you make that determination of traces, you're

8  not able to determine how much was on the boat, correct?

9  A    That's correct.

10 Q    It could have been, you know, 2, 3, 4 grams of cocaine

11 for personal use by someone on that boat, or it could have

12 been something much larger, but you cannot make that

13 determination, correct?

14 A    I cannot make that determination, that's correct, sir.

15 Q    Any attempt to make that determination would be pure

16 speculation, correct?

17 A    That's correct, sir.

18 Q    And when you stated that there is a less than

19 one percent error rate, that's coming from the manual that

20 is prepared by the manufacturer, correct?

21 A    That's correct.  However, the illicit drug detection

22 working group I'm part of right now, where trace detection

23 is one of the items that they're evaluating, the ASTM

24 International develops the standards for the accuracy of

25 that and those are generally published into the operator's

1  manual.

2          MR. HERNANDEZ:  If I may have a moment,

3  Your Honor.

4          Thank you.  That's all I have, Your Honor.

5          THE COURT:  Mr. DeRenzo, any Redirect?

6          MR. DERENZO:  Yes, Your Honor.

7                  **REDIRECT EXAMINATION OF**

8          **SENIOR CHIEF PETTY OFFICER STEVEN BOMENTRE**

9  **BY MR. DERENZO:**

10  Q    Senior Chief, Mr. Hernandez was asking you about how

11  trace amounts of drugs might be moved from surface to

12  surface and essentially the limits of what you can testify

13  to.  From your experience as a boarding officer in

14  counter-drug interdictions, how is it that -- well, do you

15  know how cocaine particles --

16          THE COURT:  I'm not sure we've established what

17  his experience is of board -- I know he's trained, but

18  I don't know what his experience as a boarding officer is.

19          MR. DERENZO:  I'll back up just a minute.

20  BY MR. DERENZO:

21  Q    How many counter-drug patrols have you been on,

22  Senior Chief?

23  A    Counter-drug boardings?

24  Q    Patrols in particular.

25  A    I've been on at least 14 counter-drug patrols.

1   Q     How many interdictions have you participated in?

2   A     I've interdicted 14 suspected smugglers, seized

3   20 metric tons of cocaine, detained 49 -- 49 people,

4   discovered two hidden compartments.  I have a vast -- a good

5   amount of experience on the boardings in the maritime

6   domain.

7   Q     I take it you've seen a cocaine bale before?

8   A     I have.

9   Q     Do you know how it's packaged?

10  A     So -- yes.  It's generally packaged in a laboratory

11  somewhere on land.  During the packaging it's wrapped in

12  multiple layers.  It's pressed into a brick form to

13  consolidate it and then that brick is then wrapped in

14  multiple layers of cellophane, duct tape, packaging tape,

15  rubber, to try to prevent water intrusion.  But during the

16  packaging people's hands come in contact with all the

17  packaging material, so trace amounts of that get left behind

18  on the outside of that packaging, and then those packages

19  individually wrapped go into bales or like burlap sacks or

20  large rice bags, generally in about 20 -- two stacks of

21  10 kilos in each one for a standard bale and double that for

22  a super bale.

23  Q     So despite all of that numerous layers of packaging you

24  just referenced, would you expect to potentially find trace

25  amounts of cocaine on the outside of a cocaine bale?

1   A    I would.  It's something called particle contamination

2   theory, that when people's hands come in contact with items

3   that have a low vapor pressure like narcotics and explosives

4   they leave trace residue amounts onto that packaging or

5   whatever they touch.  It would be like somebody coughing

6   germs into their hand and then touching a doorknob and then

7   I touch that doorknob and now I got sick.

8   Q    If I then picked up one of those cocaine bales, could

9   you find potentially cocaine on my hands?

10  A    I would.

11  Q    How about on my forearms?

12  A    If your forearms came in contact with it, I would.

13  Q    If I were trafficking cocaine on a boat, could those

14  particles on the outside of the cocaine bales be found on

15  other surfaces in the boat?

16  A    They would.  Most likely wherever it was stored would

17  have the higher concentration, and then wherever else

18  anything would have come in contact with it.

19  Q    In a case -- in a jettison case, where the Coast Guard

20  doesn't find contraband on the boat but either observed in

21  some way a jettison, throwing of bales overboard, how does

22  the Coast Guard use the ion scan testing procedure in its

23  investigation?

24  A    So there's three particular ways that they use it.  The

25  reason for it is it helps build reasonable suspicion for

1   that officer to believe that criminal activity is afoot,

2   especially if you get on board a vessel and you don't see

3   any -- it's not blatantly obvious that there's bales right

4   in front of you, it's used to determine if there's possibly

5   hidden compartments on board the vessel, which in my

6   personal experience I have seen that happen where ion scan

7   swabs have determined there was a hidden compartment on the

8   vessel.  It can also be used to determine in a jettison case

9   that the vessel at one time had it on board and it was

10  thrown overboard, not to be recovered.  And then the third

11  one would be an at-sea transfer, where a vessel was

12  transmitting it to a certain point and then offloaded it to

13  another vessel to take it to its final destination, so it

14  could be used to link two vessels together in a conspiracy

15  case.

16  Q    To the best of your knowledge, did whoever it is that

17  did the testing in this case, did they print the receipts?

18  A    To the best of my knowledge they did.

19  Q    Okay.  Mr. Hernandez was asking you about the

20  possibility of cocaine being on a surface for more than a

21  year.  Let's talk about a boat in particular.

22         Would the fact that -- what are the factors, in

23  your experience, that would decrease the likelihood that

24  trace amount of narcotics were present on a boat from a year

25  ago?

1    A    Wind, water and sun.

2    Q    And why is that?

3    A    Wind would blow away trace amounts because it would --

4    the particles don't have anything to physically cling onto,

5    the vessel is exposed to the elements, water would wash it

6    away, it would wash it down to the bilge and then the bilge

7    would end up washing it out to sea, the sun would just

8    degrade it --

9    Q    There was some talk on --

10   A    -- evaporate it.

11   Q    I'm sorry.  What?

12   A    I'm sorry.  Or evaporate it.

13   Q    There was some discussion on cross-examination about

14   scientific testing.  I think we were talking about

15   confirmatory testing in a laboratory.  Do you remember that?

16   A    Correct.  They were talking about presumptive positives

17   in confirmatory settings in the field.  To give probable

18   cause you need presumptive evidence that what you're dealing

19   with is actual -- is an actual drug, and then generally

20   that's sent to a laboratory to confirm it in a confirmatory

21   setting, that, yes, that is drugs.

22   Q    Now, minus -- again, what is the name of the underlying

23   methodology that this particular instrument uses to detect

24   the presence of cocaine?

25   A    This particular instrument uses IMS, ion mobility

1  spectrometry, meaning that a particle is charged, the ion,

2  the mobility means it moves from point A to point B, and

3  then the spectrometry, it's displayed in a graph format for

4  a user to understand or read.

5  Q    Is IMS a scientifically valid way of determining the

6  presence and identification of narcotics on a particular

7  surface?

8  A    It is.

9  Q    Is the ion scan instrument, in particular the 500DT, a

10  scientifically valid and reliable instrument for detecting

11  the presence of cocaine on any particular surface?

12  A    It is.

13  Q    When you said -- when we were talking about the basis

14  of your opinion on cross-examination, we're talking about

15  relying on the results that somebody else did.

16  A    Correct.

17  Q    Did you also have an opportunity to examine the

18  particular instrument that was used in this case?

19  A    I did.

20  Q    Did you find anything in your examination of that

21  instrument that led you to believe that there were any

22  errors in either the instrument's operation or the process

23  used by the person who did the analysis?

24  A    As I testified before, a verification was conducted

25  prior to and after that, and upon return to TACLET, Tactical

 1   Law Enforcement Team Pacific, we conduct maintenance on it.

 2   There was nothing wrong with this instrument.

 3               MR. DERENZO:  No further questions, Your Honor.

 4               THE COURT:  All right.  Any other questions,

 5   Mr. Hernandez?

 6               MR. HERNANDEZ:  No, Your Honor.  Thank you.

 7               THE COURT:  All right.  Thank you, sir.  You may

 8   step down.

 9               THE WITNESS:  Thank you, Your Honor.

10               THE COURT:  You may call your next witness.

11               MS. GOODIN:  Your Honor, the United States would

12   call Special Agent Steven Ray, U.S. Coast Guard.

13          *(Special Agent Steven Ray enters proceedings.)*

14               COURTROOM DEPUTY:  Please raise your right hand.

15               Do you solemnly swear or affirm, under penalty of

16   perjury, that the testimony you're about to give will be the

17   truth, the whole truth and nothing but the truth?

18               THE WITNESS:  I do.

19               COURTROOM DEPUTY:  Please state your name for the

20   record and spell your last name.

21               THE WITNESS:  Steven Ray, R-A-Y.

22               COURTROOM DEPUTY:  Thank you, sir.  You may take

23   the witness stand.

24               THE COURT:  You may begin.

25

1      **DIRECT EXAMINATION OF SPECIAL AGENT STEVEN RAY**

2    **BY MS. GOODIN:**

3    Q     Special Agent Ray, what entity do you work for?

4    A     I am a Special Agent for the Coast Guard Investigative

5    Service assigned to Operation Panama Express.

6    Q     And the Coast Guard Investigative Service, that's a

7    wing or department of the U.S. Coast Guard?

8    A     Yes, ma'am.

9    Q     And how long have you been with the Coast Guard

10   Investigative Service?

11   A     I've been a Special Agent with them full-time as a

12   civilian since 2008, so approximately 12 years.

13   Q     And you say as a civilian.  Have you also been in the

14   military?

15   A     I was a reservist with the Coast Guard from 2003 and

16   I retired in 2016, with prior Army service before that.

17   Q     So let's talk about your law enforcement experience.

18   Do you have any prior law enforcement experience?

19   A     Yes, I do.  I graduated from the United States Military

20   Academy located at West Point in 1995 and was commissioned

21   as a Second Lieutenant as a military police officer at

22   Fort Stewart, Georgia.  I did tours in Bosnia Herzegovina as

23   well as in the Middle East and worked at the Provost

24   Marshal's Office at Fort Stewart-Hunter Army Airfield.  The

25   Provost Marshal is basically a fancy way for saying military

 1   police.

 2              In 2000 I left active duty Army and became a

 3   Special Agent with the Drug Enforcement Administration,

 4   where I was assigned into Seattle, Washington on a mobile

 5   enforcement team and a HIDTA, High Intensity Drug

 6   Trafficking Area, Task Force, and then I left Washington in

 7   2005 and was transferred to Yuma, Arizona, and was there for

 8   three years serving on the Yuma Narcotic Task Force and on

 9   the FBI's Joint Terrorism Task Force before I decided to

10   become a civilian full-time with the Coast Guard

11   Investigative Service in 2008.

12   Q    So approximately how many years would you say you have

13   of law enforcement experience?

14   A    I have 25 years of Federal law enforcement, five of

15   them being military and the last 20 being criminal

16   investigator as a civilian with the DEA and CGIS.

17   Q    With the Coast Guard Investigative Service, what unit

18   are you currently assigned to?

19   A    I'm assigned to Operation Panama Express.

20   Q    I'll let you grab your water.

21   A    I can multitask.

22   Q    And what is Panama Express?

23   A    Operation Panama Express is an organized crime drug

24   enforcement task force strike force composed of agents from

25   the FBI, the Federal Bureau of Investigation, the Drug

1  Enforcement Administration, DEA, Homeland Security

2  Investigations, HSI, and Coast Guard Investigative Service,

3  CGIS.  Our mission is to dismantle and disrupt transnational

4  criminal organizations utilizing maritime conveyances from

5  South America into Central America and the Carribean.

6         Basically what we do is we target people using

7  boats leaving from Colombia, Venezuela, Ecuador, moving

8  drugs into Honduras, Mexico, Costa Rica, Dominican Republic,

9  Aruba and the Islands.  So pretty much if you're on a boat

10 and you're moving drugs, we target those people, to go after

11 the major criminal organizations who utilize boats to move

12 their drugs, and then we'll use provisional arrest warrants

13 so we can go and arrest the major drug owners in Colombia.

14 Q    And what are your specific duties as a Special Agent

15 with Operation Panama Express?

16 A    So I do actual investigations, criminal investigations

17 into these organizations, conduct interviews on defendants,

18 write warrants, go down and arrest people.  In addition,

19 I am a liaison between the uniformed Coast Guard and their

20 vessels and working logistics of moving detainees,

21 drug evidence, non-drug evidence from the high seas into the

22 Middle District of Florida, where we can prosecute them.  So

23 I do a lot of hand working with the Coast Guard and then as

24 well as the logistics to make this operation successful.

25 Q    Throughout your career, approximately how many

1  narcotics-related investigations would you say you've been

2  part of?

3  A     Over 1,000, with that being probably over 500 on land

4  as a DEA agent, where we do search warrants, arrest

5  warrants, and well over 500 maritime cases involving boats,

6  sailboats, go-fast vessels, cargo vessels, self-propelled

7  semi-submersibles, low profile go-fast vessels, all sorts of

8  vessels on the water.

9  Q     And with your experience in Panama Express, you said

10 that they typically target the Eastern Pacific and the

11 Carribean; is that correct?

12 A     That is correct.

13 Q     And have you worked in both of those areas?

14 A     Yes, I have.

15 Q     And you mentioned that some of the countries that you

16 are particularly investigating or working with are Colombia,

17 Venezuela, some of the northern South American countries?

18 A     That is correct.

19 Q     And have you had occasion to travel to Colombia?

20 A     Yes, I have.

21 Q     Approximately how many times would you say that you've

22 been there?

23 A     A dozen times between Bogota and Cartagena.

24 Q     And while you're there do you interact with the

25 law enforcement over there?

1    A    Yes, I work with our Federal counterparts, who then

2    work hand-in-hand.  So, for example, DEA, FBI, HSI have

3    host -- they have agents assigned to those countries, and

4    then those agents work hand-in-hand with different

5    law enforcement and military agencies within Colombia, like

6    the Navy, the Coast Guard, the Marines, there's numerous

7    different law enforcement agencies within Colombia, and they

8    have their own specialties depending on what they're doing

9    and what cases they're working.

10   Q    And during that time you've been able to become

11   familiarized with some of their practices and customs over

12   there?

13   A    Yes, I have.

14   Q    Now, have you testified before in court?

15   A    Yes, I have.

16   Q    Can you tell us, have you testified for any --

17   regarding any drug smuggling operations?

18   A    Yes, I have.  I've testified as an expert here in the

19   Middle District seven times previous.

20   Q    And have you testified as to the value of drug

21   quantities?

22   A    Yes, I have.

23   Q    And those would, again, be in the Middle District here?

24   A    These are all just Middle District.  I mean, I've

25   testified in Arizona and Washington as well, but --

1   Q    So now I'd like to move to some additional experience

2   that you may have.

3                In addition to your law enforcement experience, do

4   you have any experience diving?

5   A    Yes, I do.

6   Q    And can you describe for us what certifications you

7   carry in diving.

8   A    Sure.  I started recreationally diving in 1995, got

9   trained down in Key Largo, and I've done -- I have a PADI,

10  NAUI, an SSI, basic SCUBA diving and advanced SCUBA diving.

11  In 2003 I was lucky enough to have the United States

12  Coast Guard send me to the Navy Dive School in Panama City,

13  where I spent six weeks becoming a certified military diver

14  for the Coast Guard.  There I was an active diver for the

15  next four years working military diving, and I did that as a

16  reservist with the Coast Guard, you know, where you do like

17  your two weeks a year, one weekend a month job, and that was

18  my job with the Coast Guard, was doing dives for them.

19  Q    Including both your recreational and your military

20  experience as you just described it, approximately how many

21  dives would you say you've done?

22  A    Over 150.

23  Q    And what are some of the places that you've dived?

24  A    I've dove in Washington State, California, Hawaii,

25  Arizona, New York, Georgia, Florida, Bahamas, Mexico,

1    Jamaica, Belize.  I believe that's it.

2    Q    Got them all?

3         And you're familiar there are two types of diving,

4    it's my understanding, both free diving and SCUBA diving?

5    A    There's actually, I guess, three.  There's hard-hat

6    diving, like if you ever saw Men Of Honor, "Cookie, give me

7    my 12," where they're wearing the hard helmets, that's

8    technical diving, that's surface supplied air.  SCUBA diving

9    involves the SCUBA tanks that you put on your back, where

10   you're breathing compressed air.  Then free diving is where

11   you go from the surface using breath holds.

12        I knocked my microphone off.  Sorry about that.

13        Where you use surface air, you jump up, take a

14   breath and then dive down.  So I am familiar with those

15   types of diving, yes.

16   Q    Now, you mentioned that with SCUBA diving -- what type

17   of equipment, again, would you say that --

18   A    So for SCUBA diving -- well, the Navy requires

19   different things in recreational.  A typical PADI course, if

20   you want to become a diver, is three days, and actually it's

21   changed now, most of it is done online and then you do five

22   certification dives.  For the military you do six weeks of

23   training and then you do certification dives.  So the

24   equipment required is you need a mask, fins, snorkel, a

25   regulator, first stage, second stage, tank.  So the military

1  requires that you need a depth gauge and a watch, because

2  based on those two things you can use dive tables.  Almost

3  everybody recreationally now uses dive computers that

4  actually calculates the time you can spend at depth before

5  you have to come up.  The military requires a knife,

6  recreational doesn't.  Actually, depending where you are on

7  recreational, sometimes they don't want you to wear gloves

8  because they don't want you touching reefs or things.  It

9  also depends on -- some type of protective suit, whether

10 it's a wet suit or dry suit, depending on the temperature of

11 the water.

12 Q    And how does the equipment that's required for SCUBA

13 diving contrast with that that's required for free diving?

14 A    So for SCUBA diving, because you're breathing off a

15 tank, you have to have the regulators, typically a buoyancy

16 compensator, which helps balance your movement through the

17 water column, where free driving you pretty much just need a

18 mask, snorkel, fins, and maybe or maybe not some type of

19 exposure suit depending on what you have.

20      Free driving typically has a weight belt.  That's

21 something I forgot.  You need a weight belt for SCUBA diving

22 as well, that's what helps keep you down underneath the

23 water, because typically what happens, as you use the air in

24 a tank it becomes less and less -- or it becomes more and

25 more bouyant because you're using that air and it wants to

1   float, so you use weights and a buoyancy compensator to make

2   sure that you stay down at depth.

3   Q    How does the use of equipment affect the depth of range

4   of someone going SCUBA diving as opposed to free diving?

5   A    So for a breath dive you're basically holding your

6   breath and going down.  Obviously there's people who

7   specialize in that, but you're talking at most typically a

8   minute to two minutes where you're going to go down; and

9   your depth range -- depending on how good of a diver you

10  are, because there are people that fish professionally in

11  third world countries that can stay down maybe for

12  two minutes and go down to 80 feet.

13          For SCUBA diving, typically we go down as long

14  as -- depending on how deep you are, because there's -- the

15  deeper you go, the more oxygen you use, the less time you

16  can stay down, as well as you have to balance it out between

17  if you stay down too long and come up there's something

18  called the bends, where if you come up too quickly you can

19  actually have an embolism, because what happens is your

20  lungs overinflate, air comes out and gets in your blood.

21  Typically though diving on SCUBA tanks is between 30 minutes

22  and 45 minutes depending on your depth and how long you can

23  stay down.

24  Q    So someone who is SCUBA diving goes deeper than someone

25  who is free diving, generally?

 1   A    Yes, generally.

 2   Q    And the range that you said for someone that is

 3   free driving, you would expect that to be somewhere around

 4   80 feet?

 5   A    Or shallower.

 6   Q    Or shallower.

 7   A    Depending on how good of a free driver you are, how

 8   often you practice.  People who run marathons obviously can

 9   run a lot better than people who just occasionally run, so

10   if you're a professional free diver it's different than if

11   you're just, you know, going out here into the depths and

12   one weekend a month doing a little spearfishing for grouper.

13   Q    Are you familiar with what a conch is?

14   A    Yes, I am.

15   Q    What is that?

16   A    It's a mollusk, like a snail that lives in the shallow

17   areas of tropical waters.  It has a very beautiful shell

18   that's normally highly desirable.  If you ever read the book

19   Lord of the Flies, they hold up the conch shell and that's

20   what they pass around to give the person the opportunity to

21   speak.  Conch is also served as a food throughout the

22   Caribbean, conch fritters, they'll put raw conch on salads.

23   So like I said, it's a food source.  It used to be here in

24   Florida, but they had population crashes, mostly in the

25   Keys, and so there's a lot more guidelines about trying to

1   license and hunt after it because the population in the

2   United States has declined so much.

3   Q    Based on your knowledge and experience, do you know if

4   fishing for conch or diving for conch -- you said that it's

5   found in the shallow areas, correct?

6   A    Yes, it's found in shallow waters, probably less than

7   100 feet or less.

8   Q    And based on that knowledge as well, do you know

9   whether or not fishing for conch is restricted within

10  Colombia, per se?

11  A    Yes, they have rules about -- just like the

12  United States, for what you can fish for and licensing the

13  fish for different creatures, critters and things they can

14  go after.

15  Q    And what would you expect the infraction for fishing

16  for conch in Colombia to be?

17  A    It would be a fine, similar to like most violations

18  here, depending if you -- you know, if you go and FWC

19  catches you and your limit is five and you grab seven, it's

20  typically going to be a fine.

21  Q    Now, I'd like to go and talk a little bit more about

22  your drug experience, okay?

23       Based on, again, your knowledge and experience as

24  a Federal agent investigating international narcotics

25  smuggling, have you become familiar with the means and

1    methods by which South and Central American drug trade

2    organizations operate?

3    A     Yes, I am.

4    Q     Can you tell us -- I'd like to start talking about

5    cocaine.  What is cocaine?

6    A     So cocaine grows from the coca plant and it's grown in

7    the higher elevations of the Andes, so pretty much you're

8    talking Colombia, Bolivia and Peru, is where it's grown.

9    It's grown as a plant.  The natives there have used it for

10   millennia.  They'll pull off the leaves, they'll chew on it.

11   It's a stimulant.  What they'll do is they'll gather up

12   these leaves, and kind of like if you've ever seen wine,

13   they'll gather the leaves and then they will put them in --

14   normally in this vat, and then they'll add mostly acetones

15   and some type of strong solvent chemicals and they will

16   grind and pulp the leaves away.  So kind of like when you're

17   making wine, they, you know, smash the grapes to help

18   release all the fluids, so they'll sit in there and they'll

19   do these with these strong acids and then that converts the

20   coca from a plant to a coca paste.

21          Then they'll take that coca paste and then move it

22   to a conversion lab, where they'll add some more chemicals

23   and do it and it turns it into cocaine hydrochloride, which

24   is basically cocaine.  It's a salt.  From there they'll

25   press it into these bricks that are basically kilos, and the

1    bricks, what it does is it puts a stamp on it, which helps

2    identify the brand name of that cocaine as well, basically

3    certifying the purity and the goodness of it.  Then they'll

4    take that cocaine and they'll wrap it up and they'll

5    heat seal it, they'll put tape over it, wrap it up in

6    plastic or rubberized -- and then they'll stack the cocaine

7    from typically 20 to 40 kilos and they'll put in it a bale.

8            Then from the bale they're going to move it from

9    those labs that are typically in the jungle down to where

10   it's going to go out via vessel out of normally Ecuador,

11   Colombia and Venezuela.  Colombia covers both sides of the

12   Carribean and the Pacific.  Ecuador is on the Pacific.

13   Venezuela is on the Carribean.  Or they'll move it to

14   airfields in Venezuela, where it will go out via air routes

15   out of Venezuela into Central America.

16   Q    Okay.  So I'm going to unpack some of the stuff that we

17   just went through there.

18           First, going back to the packaging, you said that

19   these are generally kilo-sized bricks.  Why is that a

20   consistency there?

21   A    Part of it is you want to have a standard measuring

22   weight, you know, of what you're selling, what you're

23   moving, and for them it's a kilo, which is 2.2 pounds.  It's

24   also -- when you're starting to sell drugs, you can break it

25   in quarters and it gets sold as quarter keys or esquinas or,

1  you know, there's different ways, but now you have a

2  standard about movement of weight and what things are, and

3  so the standard for cocaine is a kilo.

4  Q    And when you find one of these kilo-shaped bricks, you

5  said it's about the size of a book?

6  A    Yes.

7  Q    And how confident are you when you find one of these

8  that it does measure to exactly the size of a kilo?

9  A    Very confident.  I mean, they have -- basically it's a

10 press, and it's -- you know, it's how confident are you that

11 Ford is going to produce with those machines the same thing

12 every time.  I mean, it's a system.  When they press it into

13 that square, it's going to be a kilo.

14 Q    And in processing cocaine and handling it, even with

15 the use of the excessive packaging that you mentioned, would

16 you expect to find traces of cocaine on people's hands,

17 people who are handling it?

18 A    Yes.

19 Q    And why is that?

20 A    Well, ion scans find trace elements, it's just these

21 little small molecules get out and they spread around, so

22 even though things you think are completely sealed, and

23 while you're not going to necessarily have it rinse away

24 with water, it will still leave residue of what it was.

25 Q    Now I'd like to go back to a bit of the geographic

1  information that you talked about.  What are some of the

2  source countries that you would expect to -- or that you've

3  seen cocaine comes from?

4  A     Well, in terms of growing or in terms of moving?

5  Q     In terms of growing.

6  A     So in growing, it's Colombia, Bolivia and Peru, and

7  that's because they're in the Andes and they have that high

8  elevation, so that's where they grow the coca plant, but

9  what they do is -- like Bolivia is landlocked, so they'll

10  move the cocaine from those areas typically out via water

11  routes or, like I said, to air routes, mostly in Venezuela,

12  so that way they can get from the high country and move it

13  down.

14        Every time it moves, it goes -- you know, from

15  where they grow it, they make these labs that they make the

16  paste, then they'll move it to another lab where they'll

17  make it into the cocaine, until they finally move it to a

18  place where it can be distributed.

19        The countries for distribution are primarily

20  Ecuador, Colombia and Venezuela, and part of it is because

21  you have all this open coast, a lot of it is a jungle type

22  area, ungoverned.  It's not like going down the coast of

23  Florida, where you have constant buildings and people there.

24  There are a lot of places that it's very hard to get to,

25  it's very difficult for people around, and so it gives them

1   a sense of security and privacy; as well as a lot of these
2   countries have what's considered ungoverned territory, where
3   like the FARC own the area, so the Colombian Government
4   rarely goes in there.  If they do, it's with such a large
5   military presence that everyone knows in advance that, hey,
6   the Colombian Government is coming in here.
7   Q    And you mentioned the FARC.  What is the FARC?
8   A    It was a communist revolutionary party that was trying
9   to basically revolt against the Colombian Government, and
10  one of the main ways they sustain themselves is through
11  narcotic trafficking or providing protection for it.
12  They're considered a terrorist organization by the U.S.
13  Government.
14  Q    Now, you spoke about the jungle and why it's one of the
15  reasons why they use those areas.  Particularly with
16  Colombia, what are some of the areas -- well, particularly
17  with Colombia, are you familiar with the areas where you
18  would expect to see those boats coming out of more so than
19  others?
20  A    Yes, I am.
21  Q    And what are some of those areas?
22  A    So on the Carribean side it's called the Guajira, it's
23  actually a little bit north and east of Cartagena, and it's
24  a general area that is next to Venezuela that it's normal,
25  common for trafficking to come out.  You'll have some

1  commercial out of Cartagena.  On the Pacific side you're

2  talking Esmeraldas, Tumaco and some of those areas, which

3  are closer to Ecuador, and like I said, large areas of that

4  part of the country, Buenaventura.

5  Q    Okay.  And could you tell us, what have you found about

6  specifically that area that you mentioned, La Guajira?

7  A    Specifically I meant the nice -- there are a lot of

8  isolated places of beaches and jungle area.  There's a lot

9  of -- they call them fincas, which are like little

10 farm/housing areas that are controlled by the drug

11 traffickers.  What they'll do is they'll fly people to go

12 there, they'll take them by taxi, and then they can stay

13 pretty much in isolation, waiting until they have a trip

14 organized, ready, with a boat, engines, necessary

15 electronics, and then they can launch them out from that

16 area, where then they can transport the drugs to the final

17 destination.

18 Q    During your time working within this area, have you

19 become familiar with the international waters that the drug

20 trafficking organizations use for their smuggling?

21 A    Yes, I have.

22 Q    How is it that you've become familiar with these

23 waters?

24 A    I spent nine years in these different areas, and you

25 follow the cases, where they track, talking, interviews with

1   defendants, getting them to turn into cooperators, so then

2   we go after the organizers, where they exist, where they

3   operate, where we have actually gone to arrest them, the

4   parts of Colombia that -- working with host country to make

5   these arrests that we find these people.

6            MS. GOODIN:  Your Honor, may I approach?

7            THE COURT:  You may.

8   BY MS. GOODIN:

9   Q    Special Agent Ray, I've just handed you what's been

10  previously marked as Government Exhibit 8 for

11  identification.  Are you familiar with Government 8?

12  A    Yes, I am.

13  Q    What is it?

14  A    It's a map of the Carribean that shows the land and

15  water area of that place.  The map was made by a defense

16  agency.

17  Q    So you're saying -- who made it again?

18  A    It's a defense map -- map or oceanographic agency.

19  Q    And this map is one that's publicly available?

20  A    Yes.

21  Q    Was it made for any purposes in connection with this

22  case?

23  A    No.

24  Q    And from your view of the map, have there been any

25  additions made or alterations to the map?

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020      75
Direct Examination by Ms. Goodin

 1  A     None at all.

 2          MS. GOODIN:  Your Honor, at this time I would move

 3  to have Government Exhibit 8 entered into evidence.

 4          THE COURT:  Any objections?

 5          MR. HERNANDEZ:  No, Your Honor.

 6          THE COURT:  Receive into evidence 8.

 7          MS. GOODIN:  Your Honor, may I publish Government

 8  Exhibit 8?

 9          THE COURT:  You may.

10  BY MS. GOODIN:

11  Q    Okay.  Agent Ray, I would like you, if you could, to

12  use the touch screen in front of you.  Could you identify

13  that area that we mentioned, La Guajira.

14  A     (Indicating.)

15  Q    And now let me ask you, with the traffic -- or the

16  smuggling that's done in that area, are you familiar with

17  the routes that are generally --

18  A     Yes, I am.

19  Q    Okay.  What are some of the common routes that you

20  would expect to find a boat that is participating in drug

21  smuggling?

22  A     So there's four major routes in this area.  The first

23  route, it's considered -- called the hypolittoral, and what

24  they do is they'll launch out of here and they'll -- if my

25  finger can do it.  They basically follow close to the

1  coastline, and what they do is they dodge in and out of

2  international waters, going into the coast if they need to,

3  going back into international waters, but it basically

4  follows the closeness of the country.

5  Q    And why do they go darting in and out of international

6  waters?

7  A    So that way they can -- they blend in more with normal

8  traffic, because people -- you know, they'll go out and

9  fish.  It's not too far out there in the middle of the ocean

10 where it's attracting attention.  There's a lot more boat

11 traffic.  That way too, you know, if the Colombians are

12 coming, they can dump into Panama, as well as a lot of times

13 they'll have logistics to help support them on these little

14 areas.  I mean, the advantage about this is that you

15 typically blend in a little bit better.  The disadvantage is

16 they're typically smaller loads of cocaine, as well as you

17 need more logistical support, as well as every country

18 across that way, you're now vulnerable to their

19 law enforcement trying to get you.  The disadvantage -- or

20 another advantage too is you typically avoid U.S.

21 law enforcement, because you're going to be in the country

22 waters of Colombian, Panama, Nicaragua, Honduras, et cetera.

23 Q    Now, I'm going to first clear off the screen.

24 A    Okay.

25 Q    I'm going to then ask you -- okay.

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020     77
Direct Examination by Ms. Goodin

1    A    The second route pretty much --

2    Q    Pardon?

3    A    The second main route is called the Honduran Rise,

4    where they come up and they'll start heading north and at a

5    certain point they'll bank left and they'll head in towards

6    Honduras, Nicaragua, the Belizean area.  They'll typically

7    try to refuel somewhere, you know, in that area.  The

8    advantage here is that it's a fairly quick route of going

9    up, they get time to determine, you know, if there's like

10   some type of law enforcement in the area, and then they head

11   left and then head into Central America, where they can get

12   rid of their cocaine to one of those countries where it will

13   then go via land routes into the United States.

14   Q    And in choosing that particular route, it requires them

15   to be in international waters for a lot of the time,

16   correct?

17   A    Correct.

18   Q    And at that point they are susceptible to being picked

19   up by or intercepted by Coast Guard or other

20   law enforcement?

21   A    Correct, but you typically have larger loads and you

22   can typically have faster vessels, so they'll typically go

23   faster, and, like I said, they jump up, go across.  The

24   downside, like I said, is you need some type of logistical

25   refueling as well as you are susceptible to U.S.

1  law enforcement.  The advantage though too is even though

2  it's relatively quick time-wise, you still have some

3  visibility if there's any other boats.  You know, sometimes

4  there will be another boat that trails in front of it to

5  basically scout out the way, make sure that, you know, it's

6  cleared as they go through.

7  Q    Now, tell me about the logistical fueling.  What is

8  involved in that?

9  A    So typically you are going to have another boat,

10  whether it's a go-fast boat or a fishing vessel, that has

11  fuel, and what they'll do is they'll swap out the fuel

12  tanks, you know, do a quick passover, so that way the vessel

13  can continue on its way.

14  Q    I'm going to take down -- were there any other routes

15  that you wanted to tell us about?

16  A    There's two other routes.  If you can clear the map,

17  please.

18  Q    Yes.

19  A    So the other route is basically where they'll go up to

20  Hispaniola, and then from that area, actually right here,

21  they can divert to Puerto Rico, Dominican Republic or Haiti.

22  That one is pretty much a straight shot that goes through.

23  The advantage on that is speed and less logistics.  The

24  disadvantage on this one is from -- it's typically different

25  drug organizations, because the ones that are using Central

1   America are using land routes, where here they go to the

2   islands and then you have to have another set of -- group

3   then transport from these islands back to the United States

4   or into Puerto Rico.

5   Q    All right.  I'll clear that.

6   A    And then the last route -- and then the last route

7   is -- what happens is they'll come basically through the

8   islands and then they'll travel up through the ABCs.  So the

9   advantage about that one is that they're basically island

10  hopping and they're going once more through -- it's kind of

11  like the hypolittorals but it's on the other side, you're

12  going through different countries.  The advantage about --

13  once more, smaller loads.  The advantage is you're bouncing

14  back and forth between different countries' waters.  The

15  disadvantage, now you're much more susceptible to being

16  intercepted by those countries, especially like the Dutch,

17  the French, you know, the British, and ourselves, because we

18  all own property in those islands, as well as the countries

19  themselves that have the alliance to those.

20  Q    Now, going back to one of the routes that you talked

21  about, the Honduran Rise, when going through that area --

22  and if you could just draw that on the map again -- what

23  would you expect to be the general depths of the water that

24  the boat would be going through at that point?

25  A    It's pretty much very deep until you start getting

1   close to Honduras, Nicaragua, in which case there's -- it's

2   a lot shallower and there's a lot of small islands.

3   Colombia actually has an island out here called San Andres

4   that's approximately there.  That's a very well-known

5   basically drug support system where they'll send fuel out

6   there as well as a lot of times they'll bring bulk cash from

7   Central America directly over to the island, because it's

8   such a short trip, and then once it's in the island they can

9   convert it and bring it into Colombia proper.

10  Q    And do you tend to find vessels out there for other

11  purposes other than associated with some sort of drug

12  trafficking organization?

13  A    No.  I mean, most people who are going out there,

14  they're going to go out to some depth to fish but then come

15  back, or they're going to be island hopping.  I mean, most

16  people recreational don't want to be out in the middle of

17  the ocean dealing with the waves and the wind.  You know,

18  when cruise ships go, they're passing through.  That's not a

19  fun place to hang out and loiter because you're in the

20  middle of the ocean with winds and currents out there.

21  Q    All right.  I will remove this exhibit at this point.

22        I'd like to now talk to you more about the drug

23  trafficking organizations, not so much the vessels, but the

24  organizations themselves.

25        Can you tell us about some of the roles that are

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020      81
Direct Examination by Ms. Goodin

1    involved in a drug trafficking organization.

2    A    Yes.  You typically start off with the owners, and

3    they're the people who actually own the cocaine, who help

4    produce it, to turn it from poppy plants into cocaine.  Then

5    the owners of the drugs, what they'll do is they'll find a

6    person to help organize -- or a transportation network, so

7    they basically outsource the movement of their drugs to

8    another organization, which is a transportation network, who

9    will then utilize different vessels to move that cocaine

10   from the jungles of, you know, Colombia, Ecuador, Venezuela

11   to the people who are going to purchase that cocaine, which

12   are typically going to be Mexican cartels, whether it's

13   directly in Mexico or whether they're using subsidiaries in

14   Guatemala, Nicaragua, Honduras, Belize, any of those areas.

15   So depending on what type of vessel they do, you'll have a

16   recruiter who will then recruit the actual mariners to

17   operate those vessels, and then you have the mariners who,

18   like I said, move the drugs from point A to point B.

19   Q    And let's talk about when the drugs reach their

20   destination.  You've testified about the price of and value

21   of cocaine before previously.

22   A    Yes, I have.

23   Q    Based on your knowledge and experience, are you able to

24   estimate the wholesale value of a quantity of cocaine?

25   A    Yes, I am.

1  Q    And what would be the approximate value of a single

2  kilo of cocaine?

3  A    In which location?

4  Q    In this regional area here, Tampa.

5  A    In Tampa?  So a value of a kilo of cocaine in Tampa,

6  bulk, is approximately about $30,000 U.S.  Now, understand,

7  that's the Costco version of cocaine, you know, if you're

8  going in and buying it in bulk.  The cocaine that's coming

9  off these boats is probably around 98, 99 percent pure.

10         Well, what happens is -- how it goes from bulk to

11  street level use -- so the average dosage unit of cocaine is

12  about a gram, and if any of you guys ever have coffee or tea

13  and you get a sugar packet at Starbucks or another place,

14  that's approximately 1 gram.  Now, the cocaine on the street

15  here in Tampa is going to be around 25 percent purity, so

16  what they do is they'll take that one kilo, you know, and

17  they'll -- it's called stepping on.  They basically add

18  adulterants that basically reduce the percentage of cocaine

19  from being 98, 99 percent, down to 25 percent.  So you

20  basically take that one kilo and you can make 4 kilos out of

21  it.

22         So your normal usage if you're a user of cocaine,

23  like I said, is about a gram.  A gram is going to cost

24  probably around $100 here in the Tampa area.  So technically

25  if you broke down your 4 kilos, that would be 4,000 grams.

1    4,000 grams times 100 for each usage would give you the

2    street value.  But like I said, in Tampa, when we're talking

3    about the Costco cocaine, we're talking the Costco version,

4    where you're buying it in bulk.  Typically the further north

5    you go, the higher the cost of cocaine is.  The closer to

6    Colombia, the lower the cost of cocaine.

7    Q    Okay.  And then, as you said, it's because of this

8    stepped on process where they continue to dilute it that

9    really 1 kilo of cocaine as it comes off the boat is

10   amplified into so much more once it reaches the market?

11   A    Absolutely.

12            THE COURT:  Ms. Goodin, are you finished with the

13   map?

14            MS. GOODIN:  Oh.  Yes, Your Honor.

15            THE COURT:  Okay.  Can we turn the lights on then?

16   BY MS. GOODIN:

17   Q    Now I'd like to move towards the methods of

18   transportation.  What types of vessels are typically

19   employed within drug smuggling?

20   A    Basically, if it floats, they typically use it.  So

21   your major vessels and categories of vessels will be your

22   go-fast vessel, and your go-fast vessel is a boat that is

23   designed to go rapidly from point A to point B.  You also

24   have in that type of category -- it's called a low profile

25   go-fast vessel, which it has typically three outboards, it's

1   a very long narrow boat that has a sealed compartment that's

2   full of fuel, and it starts going off slow but as it

3   consumes the fuel continues to go.

4           You have something called a self-propelled

5   semi-submersible, which basically -- it's not a submarine

6   because it doesn't go underwater, it's just at the surface

7   of the water, just the very top of it.  They can hold up to

8   8 tons of cocaine, has an inboard engine that's typically a

9   diesel engine from a fishing vessel that they utilize.

10  They'll try to go 2 to 3 knots, relatively slow, so they're

11  not detected, because their whole goal is stealth.

12          You have fishing vessels.  The advantage of a

13  fishing vessel is it kind of looks like a normal vessel, has

14  fishing type gear, normally though they don't utilize the

15  gear, they're just using it either in the hull of it or in

16  what's called a caleta or a hidden compartment.

17          Sailing boats are also used as drug smuggling

18  boats.  The advantage there is they have a whole lot of

19  space and ability to hide the drugs.  The disadvantage is

20  they go relatively slow and are easy to interdict.

21          You also have cargo vessels, and then under cargo

22  vessels there's two aspects.  One is where they have hidden

23  compartments on the cargo vessel, and so they'll load the

24  drugs on it and then try to use a normal load of cargo to go

25  from like Colombia into Panama, to smuggle the drugs there.

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020      85
Direct Examination by Ms. Goodin

1            And then finally you actually have commercial

2    containerized vessels that if you go out to the Port of

3    Tampa you'd see all those Conexes or commercial containers,

4    they'll have like 800 of them, where the crew is actually

5    legitimately going from point A to point B, but someone on

6    land is basically hiding drugs either within the cargo in a

7    Conex box or they'll actually remove the seal and sneak some

8    of the drugs in, and then when it gets offloaded into the

9    host country, typically in Europe or even the United States,

10   someone is there to grab it and take the drugs out of those

11   commercialized boxes.

12   Q    Now, one of the first vessels that you mentioned was a

13   go-fast vessel.  Do you have experience investigating cases

14   with go-fast vessels?

15   A    Yes, I do.

16   Q    Okay.  Now, why would a go-fast vessel be an attractive

17   option for a drug trafficking organization to use?

18   A    First of all, they're cheap, they're commonly and

19   readily available, they're typically the same type of vessel

20   that you'll see fishermen use, so their ability to handle it

21   and operate it is extremely similar because it is a style

22   that they've used before.  They'll do some modifications,

23   because obviously instead of fishing they're running drugs,

24   so they'll, you know, change some of the things that they

25   have on it to accommodate it for drug trafficking as opposed

1  to fishing.  They're fairly easy to operate.  They use

2  outboard engines, and they go fast.  Typically the

3  Coast Guard likes to use helicopters to shoot out the

4  engines, because some of these vessels will actually outrun

5  the Coast Guard's boats themselves.

6  Q    I'd like to bring up what's been previously entered

7  into evidence as Government Exhibit 4I.

8            Agent Ray, you did not investigate this case; is

9  that correct?

10 A    That is correct.

11 Q    Now, what I'd like you to do is -- do you see the

12 vessel in front of you?

13 A    I do.

14 Q    Given your knowledge and experience of things that are

15 common in a go-fast vessel used for drug smuggling, can you

16 identify some markers here that might lead you to believe

17 that this vessel might also be involved in drug smuggling.

18 A    Yes, I can.

19 Q    Go ahead, please.

20 A    Well, first of all, I mean, if you look down here, it's

21 painted, you know, it's not the normal color that you use.

22 You know, a lot of these vessels are blue or white.  This

23 one is painted black.  It is painted black primarily because

24 it's trying to avoid detection, especially at night.  Most

25 fishing boats aren't going to want to be black because it

1    attracts a lot of heat, which melts the bait and all the

2    things you're trying to catch.

3           You have a whole lot of fuel containers, there and

4    there.  Fuel is the most expensive thing on a fishing boat.

5    They're not going to want to sit there and spend all their

6    money on fuel, because they want basically the fuel to go to

7    the engines.

8           You also notice -- like on most boats here in the

9    United States they'll have some type of registration or some

10   type of name on it, saying, hey, I'm registered.  Legitimate

11   vessels are commercial vessels, so just like here in the

12   United States, if you're going out and doing things, there's

13   a regulatory body to make sure that your boat is safe.

14   There's no registration on this vessel, there's no lights to

15   sit there and mark, you know, I am here, which way am I

16   going, there's no indication if I'm at night to pause so

17   I won't get ran over.  Now, I will say this is unusual

18   because normally on a go fast you have engines, and there

19   are no engines, so this is not a go-fast so much as a

20   slow-fast.

21   Q    Now, with go-fast vessels -- one moment.

22          In the course of your investigations into drug

23   smuggling investigations, are you familiar with how some

24   vessels will react when caught during the course of their

25   trip?

1   A     Yes, I am.

2   Q     And what are some of the things that you've seen

3   vessels do to evade either capture or detection?

4   A     So we call it counter-detection.  It's typically when

5   they see the aircraft above it.  I love our Coast Guard

6   pilots, but if you guys are familiar, it's really easy

7   sometimes to hear those big C-130s as they fly over, so they

8   sometimes try to be covert, but what happens is they get

9   detected, and typically then what they'll do is the go-fast

10  people will then try to flee, because they realize they're

11  being detected, knowing that if there's an aircraft, there

12  will soon be a cutter with a small Coast Guard boat to go

13  there and do interdiction, so they'll typically try to flee

14  at high speed.

15         When they realize at some point that they're

16  probably not going to get away, they'll do several things,

17  they'll jettison their drugs, thus making the Coast Guard

18  make a choice about do I pick up the drugs or do I continue

19  the boat.  Even upon capture I've seen things where they've

20  tried to sink the drugs that they throw overboard.  I've

21  seen them where they've actually lit the drugs on fire and

22  their boat on fire.  We've even had a case where -- it was a

23  fishing boat, but the Coast Guard team was on board the

24  boat, and when they discovered the boat, they swapped all

25  the fluid in the fishing tanks and flipped the boat to sink

1   it to the bottom, putting everyone in the water, because

2   they didn't want the drugs to be discovered.

3   Q    So, again, you gave us a lot of information, so I'm

4   going to unpack that.

5           One of the first things that you mentioned was the

6   idea of them just throwing the drugs overboard, correct?

7   A    Yes.

8   Q    You mentioned that the Coast Guard then has to decide

9   to go after the drugs or the individuals.

10  A    Correct.

11  Q    And when they throw the cocaine overboard, generally

12  what happens to the cocaine when it's thrown overboard?

13  A    Typically it just floats and creates a bale field.

14  Q    And so you would say that it's easy to collect?

15  A    It is.  The issue though is if you're slowing down to

16  pick it up, that then obviously gives that person who is

17  fleeing that much more time.  A lot of times the Coast Guard

18  will try to put out two boats, one to recover the drugs and

19  one to continue the chase, but it depends on the nature of

20  what cutter is out there.  Not all cutters are created

21  equal.  Some of them have much more capability than other

22  cutters.

23  Q    Now, you said that you've also seen when some suspects

24  attempt to sink the drugs.

25  A    Yes, I have.

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020      90
Direct Examination by Ms. Goodin

1    Q    Have you seen -- have you ever seen suspects use an

2    engine to sink drugs?

3    A    Yes, I have.

4    Q    Can you tell us about that.

5    A    So this boat was -- it was in the Carribean.  It was

6    stopped.  They basically tied the cocaine to the engine and

7    then they tried to drop the engine.  The problem they had

8    with this one is that they forgot to cut the fuel cords from

9    the engine to the tanks, so the engine was dangling off into

10   the water with the bale string of cocaine when the

11   Coast Guard was able to get on board and basically detain

12   the individuals.

13   Q    And that's one instance that you're aware of?

14   A    That is correct.

15   Q    And that's across your time that you have been doing

16   maritime investigations?

17   A    Yes.

18   Q    And again, somewhere in the area of nine years or so?

19   A    Correct.  It's unusual to get rid of your engines,

20   because the normal response for these people is to flee,

21   they drop the drugs and try to get as far away from the

22   drugs as they can, or outrun them.  I mean, it's not --

23   there are boats that outrun Coast Guard boats.  It's just

24   the nature of the beast.  The Coast Guard has developed

25   using helicopters to help shoot out the engines, but

1    sometimes the helicopters go down, so if they can outrun it

2    and get away, then that makes them -- you know, now they're

3    free to go on then.

4           The typical punishment, if you are a mariner with

5    drugs and you have to dispose of your load, is that then you

6    owe the drug people that you work for two more trips for

7    free that they don't have to pay you, so they have incentive

8    to get rid of it so then they can go back and do the

9    missions.  I have seen it where they've tied weights to the

10   drugs to sink them, and so that way there is no drug

11   evidence.  I've also seen it where they will throw the drugs

12   and put a GPS on them, and then hopefully if the Coast Guard

13   can't find it, maybe the drug people can, because they can

14   use GPS to track it.

15          THE COURT:  Ms. Goodin and Mr. Hernandez, could

16   I get you to approach sidebar?

17          (The following bench conference was held.)

18          THE COURT:  Okay.  This is -- half of this is not

19   relevant to this case, and to just allow him to get up there

20   and talk about anything and everything having to do with

21   Panama Express and how they find drugs and then how they

22   find boats and all of that kind of thing, I'm not going to

23   allow you to do that anymore, so let's stick to what's

24   involved with this case, if he has any opinions.

25          MS. GOODIN:  I will wrap it up, Your Honor.

 1              THE COURT:  Okay.

 2    *(End of bench conference; proceedings resume in open court.)*

 3    BY MS. GOODIN:

 4    Q    Now, Special Agent Ray, you were saying that it is rare

 5    that someone would use their engines specifically to sink

 6    the drugs, correct?

 7    A    Correct.

 8    Q    Now, why would you say that that's a least likely

 9    option?

10    A    Well, once you get rid of the engines, the boat no

11    longer has an ability to move, and therefore you've lost the

12    ability to go anywhere, so you're now basically floating at

13    sea hoping that it's the U.S. Coast Guard or another

14    Government agency that will come rescue you, or maybe

15    reaching out to someone to rescue you, because now you have

16    no ability to move.  You're basically at sea floating.

17    Q    Now, I'd like to move on to -- I'd like to move on to

18    the crews themselves.

19             Have you seen crews previously that have mixed

20    nationality?

21    A    Yes, I have.

22    Q    And from your knowledge and experience, what does

23    that -- what does that tell you?

24    A    It depends on the mixture of the crew.  Typically

25    you're going to recruit a crew from one area, whether

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020      93
Direct Examination by Ms. Goodin

1  they're Ecuadorians or Colombians or even Venezuelans.

2  Q    Well, let's bring it to this case.

3         We have on this boat three Colombians and a

4  Belizean.  What does that indicate to you, hearing that

5  composition?

6  A    That the people that were --

7             MR. HERNANDEZ:  Objection.  Speculation.

8             THE COURT:  Sustained.  Let's ask another

9  question.

10  BY MS. GOODIN:

11  Q    Well, I'll go broader than -- you were saying that the

12  mixed nationality has some investigative significance?

13             THE COURT:  Ask another question.

14             MS. GOODIN:  Yes, Your Honor.

15  BY MS. GOODIN:

16  Q    Let's talk then about the roles that the individuals

17  have on a vessel, on a go-fast vessel specifically.

18  A    So on a go-fast you're going to typically see between

19  two and four crew members.  You're always going to see a

20  captain.  The captain is the one who is responsible for the

21  boat, the one that's overall responsible for what's going on

22  it.  They are typically the ones that have the most

23  experience operating the boat, know how to use GPSes.

24  They'll typically have satellite phones and trackers, so

25  that way they can communicate back to the organizers.

SPECIAL AGENT STEVEN RAY - JANUARY 29, 2020     94
Direct Examination by Ms. Goodin

```
 1              Then almost always you're going to have a mariner,
 2    which is someone to help out and assist with the operation
 3    of the boat, moving the fuel around.
 4              The other two types you'll see is a mechanic,
 5    which is one that's skilled in the use of fixing the engine;
 6    and then you have a person that's a load guard.  Now, the
 7    load guard is typically responsible for the receiving end,
 8    the people who are receiving the drugs, to make sure that
 9    the drugs in fact leave from the source where it goes from
10    to the country it is.  Typically that load guard is from the
11    country where they're supposed to receive it.
12    Q    And how often would you say that it is that you find
13    someone who would be a bystander, not part of the roles that
14    you've put together there?
15    A    Never.  You're not going to see anyone who doesn't have
16    knowledge or is part of the drug trafficking trade be on a
17    drug boat.
18              MS. GOODIN:  Nothing further, Your Honor.
19              THE COURT:  Mr. Hernandez.
20              MR. HERNANDEZ:  I was going to say good afternoon,
21    but it's still good morning.
22              THE WITNESS:  Good morning.
23              MR. HERNANDEZ:  Good morning.
24
25
```

1          **CROSS-EXAMINATION OF SPECIAL AGENT STEVEN RAY**

2    **BY MR. HERNANDEZ:**

3    Q    Your testimony is in general terms about experiences

4    that you've had on drug -- other drug investigations,

5    correct?

6    A    Correct.

7    Q    It's not specifically directed to this case, in the

8    sense that you had no direct involvement whatsoever in the

9    investigation of this case, correct?

10   A    That is correct.

11   Q    Okay.  You would have no knowledge of how these

12   individuals ended up on the vessel?

13   A    I do not.

14   Q    And you would have no knowledge whatsoever of what

15   information they received?

16   A    I would not.

17   Q    Or by whom?

18   A    Correct.

19   Q    You have dealt with a lot of cocaine because of your

20   job, correct?

21   A    Yes, I have.

22   Q    And you would know its smell, correct?

23   A    I do.

24   Q    Would it be some type of pungent, solvent-type smell?

25   A    It's a pungent smell.  Solvents I characterize more

1    with methamphetamine, but it does have -- it smells like

2    cocaine, which I know sounds awkward.  There's nothing that

3    smells quite like cocaine like cocaine does.

4    Q    Would you agree that people who don't deal with a lot

5    of cocaine would not know what it smells like?

6    A    I agree.

7              MR. HERNANDEZ:  Thank you.

8              THE COURT:  Anything else?

9              MS. GOODIN:  No, Your Honor.

10             THE COURT:  Thank you.  You may step down.

11             You may call your next witness.

12             MR. DERENZO:  The United States calls Alfredo

13   Caceres-Lopez.

14        (Interpreter Xavier Keogh enters proceedings.)

15             THE COURT:  If you'll come forward, please, and

16   let us swear you in.

17             COURTROOM DEPUTY:  Do you solemnly swear or affirm

18   that you will truthfully and to the best of your ability

19   translate from English to Spanish and Spanish to English all

20   questions and responses propounded by this Court, so help

21   you God?

22             INTERPRETER:  I do.  Xavier Keogh, K-E-O-G-H.

23             Good morning, Your Honor.

24             COURTROOM DEPUTY:  Thank you, sir.

25             THE COURT:  I asked this, but I'm not sure you

 1  heard me.  Has someone notified the marshals?

 2          COURT SECURITY OFFICER:  Yes, ma'am.  The marshals

 3  have advised he's coming up.

 4          THE COURT:  Okay.

 5          (Alfredo Caceres-Lopez enters proceedings.)

 6          THE COURT:  Sir, if you'll have a seat.

 7          COURTROOM DEPUTY:  Please raise your right hand.

 8          Do you solemnly swear or affirm --

 9          THE WITNESS:  Yes.

10          COURTROOM DEPUTY:  -- that the testimony you will

11  give in this cause will be the truth, the whole truth and

12  nothing but the truth?

13          THE WITNESS:  Yes.

14          COURTROOM DEPUTY:  Please state your name for the

15  record.

16          THE WITNESS:  Alfredo Milan Caceres-Lopez.

17          COURTROOM DEPUTY:  Thank you.

18          THE COURT:  Mr. DeRenzo.

19          MR. DERENZO:  Thank you, Your Honor.

20          Good morning, sir.

21          THE WITNESS:  Good morning.

22              **DIRECT EXAMINATION OF ALFREDO CACERES-LOPEZ**

23  **BY MR. DERENZO:**

24  Q    I see you're in an orange jumpsuit.  Where are you

25  living these days?

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      98
Direct Examination by Mr. DeRenzo

1    A    At the Pinellas Jail.

2    Q    Did you get moved to the Pinellas Jail recently?

3    A    Yes.  I was at the Citrus Jail and I was recently

4    transferred to the Pinellas Jail.

5    Q    How is it that you came to be in jail here in the

6    Tampa Bay area?

7    A    I've been extradited from Colombia.

8    Q    Did you plead guilty to any crimes?

9    A    Yes.

10   Q    What crimes did you plead guilty to?

11   A    Conspiracy for the transportation of cocaine.

12   Q    Have you been sentenced yet?

13   A    Yes.

14   Q    How long were you sentenced to?

15   A    240 months.

16   Q    Mr. Caceres-Lopez, when you pled guilty, was it in a

17   courtroom just like this?

18   A    Yes.

19   Q    Before you actually came into court and pled guilty,

20   did you enter into a plea agreement between our office and

21   yourself?

22   A    I pled guilty to the charges that I was accused of.

23   Q    Okay.  Before you actually came into court and said

24   that you were guilty, did you actually sign a document?

25   A    Yes, I accepted the charges.

1  Q    Okay.  And was that an agreement between you and our

2  office, the U.S. Attorney's Office?

3  A    Yes, to plead guilty.

4  Q    Okay.  I want to discuss briefly that agreement.  So

5  you just mentioned part of that agreement, was that to plead

6  guilty, like you just suggested?

7  A    Correct.

8  Q    Did you agree to cooperate with our office as well?

9  A    To cooperate and to tell the truth.

10  Q    All right.  Have you met me before?

11  A    On two occasions.

12  Q    Where did we meet?

13  A    In Citrus and in Pinellas.

14  Q    At the jail?

15  A    Correct.

16  Q    Have you ever met Special Agent Tim Campbell, who is

17  seated at the counsel table?

18  A    Yes.

19  Q    How many times have you met with Special Agent

20  Campbell?

21  A    Approximately between 10 and 12 times.

22  Q    Okay.  Now, other than anything that's in your

23  plea agreement that we just talked about, have I made you

24  any promises?

25  A    No.

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      100
Direct Examination by Mr. DeRenzo

1    Q    How about Special Agent Campbell, has he specifically

2    made you any promises?

3    A    No.

4    Q    How about my co-counsel, Ms. Goodin?

5    A    No, neither.

6    Q    Has any other agent or person from my office made you

7    any promises other than what's in your plea agreement?

8    A    No.

9    Q    But to be fair, are you hoping that by testifying here

10   today it might benefit you in some way?

11   A    If it can help me, well, that would be fine, but still,

12   from the first moment that I came to this courthouse

13   I committed myself and I swore to cooperate from here on

14   forward against the narco trafficking problem.

15   Q    Okay.  Let's talk about you for just a moment.

16            Where are you from?

17   A    From Colombia.

18   Q    What part?

19   A    Bogota.

20   Q    What is it exactly that you were ultimately extradited

21   for?

22   A    For dispatching go-fast vessels from La Guajira,

23   Colombia to the Dominican Republic.

24   Q    Were those boats carrying any cargo?

25   A    Cocaine.

1   Q     How much?

2   A     Approximately, I believe, between 1,000 and

3   1200 kilograms.

4   Q     How long were you involved in dispatching those go-fast

5   vessels?

6   A     Approximately six years.

7   Q     How did you get involved in that line of work?

8   A     A male friend made a proposal to go work there, and

9   because of ambition of mine for money.

10  Q     And what geographic region in Colombia did you operate

11  in?

12  A     In the Department of Guajira, in the Upper Guajira in

13  Colombia.

14  Q     Does that region have any significance to you, in your

15  experience, in cocaine trafficking?

16  A     Yes.  It's a strategic zone for the dispatching of

17  cocaine to Central America.

18  Q     Now, I want to go back in time a little bit.  Before

19  you were in Citrus jail, where were you initially housed

20  when you were arrested here in the Tampa area?

21  A     In Pinellas.

22  Q     When you were in the Pinellas County Jail did you meet

23  an individual named Emiro Hinestroza-Newbbooll?

24  A     Correct.

25  Q     Do you see him anywhere in the courtroom?

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      102
Direct Examination by Mr. DeRenzo

1   A    Yes, over there.

2   Q    And could you identify what he's wearing.

3   A    A jumpsuit, orange color.

4        MR. DERENZO:  Your Honor, request that the record

5   reflect that the witness has identified the defendant.

6        THE COURT:  The record should so reflect.

7   BY MR. DERENZO:

8   Q    How did you initially meet the defendant?

9   A    When we were going to the church, we met, because we

10  were from the same country.

11  Q    Was this in the Pinellas County Jail?

12  A    Correct.

13  Q    Could you describe your initial interactions with the

14  defendant.

15  A    Initially we spoke about what part of Colombia we were

16  from and what charges we're facing here.

17  Q    Now, you have the assistance of an interpreter here

18  today to help you, because you speak Spanish, right?

19  A    Correct.

20  Q    What language did the defendant speak when you spoke

21  with him?

22  A    Spanish.

23  Q    Do you speak English?

24  A    No.

25  Q    Can you read English?

 1   A     No.

 2   Q     When you were eventually transferred to the

 3   Citrus County Jail, did you ever see the defendant in that

 4   facility?

 5   A     I arrived first and he got there afterwards, a week

 6   later.

 7   Q     Where in relationship to the defendant were you housed?

 8   A     At the HC Unit.

 9   Q     Would you describe for the jury what this area of the

10   jail is like.

11   A     It's a unit with 30 cells of two floors.

12   Q     So in each cell is it one person or multiple people?

13   A     Two people per cell.

14   Q     Was the defendant housed in your cell?

15   A     No.

16   Q     How close was he housed to where you were housed?

17   A     There were four or five cells next to mine.

18   Q     So just so that the jury understands, were you all

19   housed in the same unit but just not in the same cell?

20   A     Correct.

21   Q     Okay.  And in this bigger area where you're housed, are

22   you able to move around?

23   A     Yes.

24   Q     Are you able to interact with other inmates who are

25   housed there?

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020     104
Direct Examination by Mr. DeRenzo

1   A    Correct.

2   Q    At any point in time when you were housed in the

3   Citrus County Jail did you speak with the defendant?

4   A    Yes.

5   Q    And could you describe for the jury your initial

6   interactions and conversations with the defendant.

7   A    Yes.  We spoke about my case and about this case.

8   Q    Did you at any point learn from the defendant where he

9   was from?

10  A    Yes.

11  Q    What did he tell you?

12  A    That he was Colombian, from San Andres, and I am.

13  Q    You're from Colombia.  Do you know where San Andres is?

14  A    Yes.

15  Q    Now, at some point did he tell you why and how he ended

16  up in jail?

17  A    Yes.

18  Q    And we'll get to the details of that conversation in

19  just a moment.

20          When you spoke with the defendant, did you talk at

21  all about your respective lives back home in Colombia?

22  A    Yes, we spoke about our personal lives and about our

23  work lives.

24  Q    What did the defendant tell you about his work life?

25  A    That he had been caught on the high seas aboard a

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      105
Direct Examination by Mr. DeRenzo

1  go-fast vessel.

2  Q    Did he tell you whether this is the first time he'd

3  been on a go-fast vessel before?

4  A    No, that he had more or less done four or five previous

5  trips.

6  Q    When you say "trips," what do you mean?

7  A    In cocaine trafficking.

8  Q    At any point did the defendant tell you what his job

9  was on those previous trips, as you put it?

10 A    He was the vessel's captain.

11 Q    Specifically what did the defendant tell you about with

12 respect to what landed him in jail?

13 A    Because the airplane flew above them.

14 Q    Did he tell you what happened after the airplane showed

15 up?

16 A    Yes, that they made the decision to throw out the

17 merchandise.

18 Q    You said "they."  Did the defendant at any point tell

19 you who else was on this boat?

20 A    Two more Colombians and a citizen from Belize.

21 Q    Did the defendant tell you what his job was on the

22 boat?

23 A    He was the captain of the vessel.

24 Q    At any point in time during your conversations with the

25 defendant did you speak with him about whether or not he was

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020     106
Direct Examination by Mr. DeRenzo

1   paid for this particular trip?

2   A    He was going to be paid approximately $150,000.  That

3   they had advanced as a down payment 50 percent of it.

4   Q    Let's talk about that for just a moment.

5             How did that come up in conversation, the topic of

6   how much the defendant was paid?

7   A    Because we were talking and I commented to him about

8   how much we paid our crews, and he told me how much he had

9   been paid.

10  Q    Did the defendant at any point in your conversations

11  with him tell you where the boat left from that he was

12  ultimately --

13  A    Yes, from the Upper Guajira in Colombia.

14  Q    At any point during your conversations with the

15  defendant did he mention where the boat was going?

16  A    That it was going to Honduras.

17  Q    What did the defendant tell you happened after they

18  left Guajira?

19  A    That they got to the delivery spot but they were never

20  there for them to give it to them.

21  Q    Did he tell you what happened after the Coast Guard

22  plane arrived?

23  A    That they seen that they hadn't come for several hours,

24  that they had been waiting to be rescued by them, and upon

25  seeing that they had no one to deliver it to, they hadn't

1    come, they decided to throw out the drugs.

2    Q     Did the defendant at any point tell you what kind of

3    drugs?

4    A     Cocaine.

5    Q     Did the defendant tell you anything about what they did

6    after they decided to get rid of the drugs?

7    A     That they threw out the drugs tied to the engines and

8    that they threw it overboard so that it could sink, and that

9    they began to clean the boat with gasoline.

10   Q     During any of your conversations with the defendant did

11   he tell you what happened after they sank the drugs?

12   A     That approximately two hours after they sank the drugs

13   a zodiac boat approached, and a while later the cutter came.

14   Q     At any point did the defendant talk about what he and

15   the other people on the boat that you just described were

16   going to tell the Coast Guard if they showed up?

17   A     I commented to him -- I asked him if he was going to go

18   to trial, because there were no drugs, and I told him that

19   the airplane took photos of their boat, so then he had

20   spoken to the crew members and they had agreed that if they

21   were asked what they were throwing overboard, that it was

22   conch.

23   Q     Now, all these details that you've just testified about

24   to the jury about what the defendant told you when you were

25   in jail with him, why would he confide in you in particular?

```
 1              MR. HERNANDEZ:  Objection.  Speculation.

 2              THE COURT:  Overruled.

 3    A    Because I had also commented to him that my dispatches

 4    from the Upper Guajira were from Puerto Lopez specifically.

 5              MR. DERENZO:  May I have just a moment,

 6    Your Honor?

 7              Tender the witness, Your Honor.

 8              THE COURT:  Mr. Hernandez?

 9              MR. HERNANDEZ:  Thank you, Your Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**CROSS-EXAMINATION OF ALFREDO CACERES-LOPEZ**

**BY MR. HERNANDEZ:**

Q    Mr. Lopez, you are -- as I believe you just testified, you are serving a sentence, a prison sentence of 240 months, correct?

A    Correct.

Q    Which is 20 years in prison, correct?

A    Correct.

Q    And how old are you now?

A    45 years old.

Q    So obviously a great part of your future is at this point destined to serve a prison sentence, correct?

A    Correct.

Q    And you, I believe, have indicated that you are cooperating with the Government pursuant to a plea agreement, correct?

A    Correct.

Q    Your case has a -- I believe a 2017 case number.  Does that mean that your case was pending since 2017?

A    Correct.

Q    And you entered a plea of not guilty when you were brought before the court on this case, correct?

A    The first time I came to court, yes.

Q    And you did not sign a plea agreement until June 26, 2019, correct?

1   A     Correct.

2   Q     So you maintained a plea of not guilty from 2017 until

3   June of last year, correct?

4   A     Correct.

5   Q     And you did not plead guilty and promise to cooperate

6   pursuant to your plea agreement until you had been given

7   this plea agreement that you signed, correct?

8   A     Correct.

9   Q     Only after getting a deal, correct?

10  A     I was captured on December 5th of 2018, and I arrived

11  to the United States on December 5th of 2018.

12  Q     And you were -- prior to getting your sentence of

13  240 months, you were looking at up to life in prison,

14  correct?

15  A     Correct.

16  Q     And your motivation here is not for truth and justice,

17  it's to try to get out of prison a lot less than the time

18  that you're looking at right now, correct?

19  A     First of all, the truth, and my commitment to cooperate

20  from the date that I was sentenced.

21  Q     In discussing your case and his -- and Mr. Newbbooll's

22  case, if he had given you information about his case and

23  kept saying, you know, this is what happened but I am

24  totally innocent, if you told that to the Government, you

25  know very well that you would have received no benefit

1  whatsoever, correct?

2  A    Could you repeat the question for me, please?

3  Q    If you had discussed this case with the defendant and

4  he had given you some specifics about the case but kept

5  insisting that "I am innocent, I am not guilty of what I'm

6  being accused of," if you had relayed that information to

7  the Government, you know very well that you would not be

8  looking at possible reduction of your sentence, correct?

9  A    Initially when I decided to cooperate I had done so

10 because I had made a commitment to God and to myself to

11 cooperate in anything that was related to narco trafficking.

12 Q    Well, that didn't answer my question.

13      If in fact Mr. Newbbooll had told you, "I am

14 innocent, I am being accused, these are what -- this is what

15 I'm being accused of, but I am innocent," you know very

16 well, sir, that that would have been of no benefit to you,

17 if you had relayed that information to the Government?

18 A    Correct.

19 Q    And the information that you've given the Government

20 and that you've testified today is information that cannot

21 be corroborated or is not corroborated by other witnesses;

22 is that correct?

23 A    It can be corroborated.

24 Q    Is there any physical evidence that you can provide us,

25 for instance, that would corroborate what you're saying

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      112
Cross-Examination by Mr. Hernandez

 1   Mr. Newbbooll said?

 2   A     There is no physical evidence, because we in prison do

 3   not have any access to any type of recording device that

 4   we --

 5   Q     Exactly.  So you can say Mr. Newbbooll said this, that

 6   he did this, that he said that, and there is no verification

 7   other than your word, correct?

 8   A     Correct, but just like I know he commented things to

 9   me, he commented them to other people.

10   Q     And these people are here to testify, to your

11   knowledge?

12   A     I know that they're in prison, but I don't know if they

13   are specifically here in this building.

14   Q     Now, I've asked you if you expect a -- or you've been

15   asked if you expect a reduction of your sentence, correct?

16   A     Yes.

17   Q     And that is part of your plea agreement, correct?

18   A     Correct.

19   Q     There is something in your plea agreement called -- if

20   you remember correctly, it's called a Rule 35, which is a

21   Federal rule.

22   A     Correct.

23   Q     And that is a rule that even though you have already

24   been sentenced to 240 months, the Government, Mr. DeRenzo or

25   people from his office, can consider whether or not to file

1  a motion under Rule 35 for a reduction of sentence; isn't

2  that correct?

3  A    Correct.

4  Q    And the catch to this rule is that there is no way that

5  you're going to get a reduction of sentence unless the

6  U.S. Attorney's Office decides to file this motion, correct?

7  A    I'm clear of that.

8  Q    Sir, if they're not satisfied, "they" meaning the

9  U.S. Attorney's Office, if they're not satisfied with what

10 you testify, they don't have to file a motion and there's no

11 way you can get a reduction, correct?

12 A    Correct.

13 Q    And by the way, I believe that you said that you pled

14 to all of your charges; is that correct?

15 A    Correct.

16 Q    Isn't it a fact that in your plea agreement you pled

17 guilty to one of the charges and the other charge was

18 dismissed, because that was part of the deal that you had?

19 A    I pled guilty to conspiracy to traffic in cocaine.

20 Q    And that was Count Two of the indictment against you,

21 correct?

22 A    Correct.

23 Q    And isn't it a fact that your plea agreement included

24 the Government promising that they would dismiss Count One

25 of your indictment?

 1          INTERPRETER:  I'm sorry.  Did you say the second

 2   or the first count?

 3          MR. HERNANDEZ:  The first count was dismissed.

 4   A    Correct.

 5   Q    So one of -- it's not true that you pled guilty to all

 6   your charges.  One of the two counts was dismissed, correct?

 7   A    Correct.

 8          MR. HERNANDEZ:  That's all I have, Your Honor.

 9   Thank you.

10          THE COURT:  Mr. DeRenzo, do you have any redirect?

11          MR. DERENZO:  Yes, Your Honor.

12          **REDIRECT EXAMINATION OF ALFREDO CACERES-LOPEZ**

13   **BY MR. DERENZO:**

14   Q    Mr. Caceres-Lopez, have I ever told you what to say

15   here in court?

16   A    No.

17   Q    How about Special Agent Campbell, has he told you what

18   he wants you to say in this courtroom?

19   A    No.

20   Q    How about my co-counsel, Ms. Goodin, who is seated next

21   to Special Agent Campbell, has she told you what she wants

22   you to say here today?

23   A    No.

24   Q    We talked a little bit about your plea agreement

25   already, but when you signed that agreement, what was your

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      115
Redirect Examination by Mr. DeRenzo

1  understanding with regard to your obligation to tell the

2  truth?

3  A     The agreement was to tell the truth and that -- to

4  cooperate with anything that had to do with trafficking with

5  cocaine.

6  Q     When you signed that document to cooperate, did you

7  understand that if you didn't tell the truth at any time,

8  potentially you would get no benefit?

9  A     Correct.

10  Q     Did you understand when you signed that document that

11  if you didn't tell the truth, you could actually be charged

12  with perjury?

13  A     Correct.

14  Q     Now, the two times that you and I met, did I show you

15  any documents at all related to the defendant's case?

16  A     A photograph to identify him.

17  Q     When you say "photograph," who do you mean of?

18  A     You showed me six photographs, and I identified

19  Newbbooll's photograph.

20  Q     I see.  So this was a group of pictures and one of

21  which was the defendant?

22  A     Correct.

23  Q     Did I show you any other documents related to his case,

24  say, from the Coast Guard or anyone else?

25  A     No.

ALFREDO CACERES-LOPEZ - JANUARY 29, 2020      116
Redirect Examination by Mr. DeRenzo

1   Q    Did I show you any pictures of the boat he was on?

2   A    No.

3   Q    How about any videos that might have been taken in

4   connection with the defendant's case, did I show you any

5   video?

6   A    No.

7   Q    Now, I want to talk about the times you spoke with

8   Special Agent Campbell, just about the defendant.

9            During those meetings with Special Agent Campbell

10  did he show you any documents related to the defendant's

11  case other than those pictures?

12  A    No.

13  Q    Did Special Agent Campbell during those meetings show

14  you any pictures or videos taken by the Coast Guard?

15  A    No.  No.

16  Q    How about when you actually met with the defendant, did

17  he show you any pictures or any videos?

18  A    No.

19  Q    Did the defendant, when you met with him and spoke with

20  him, show any -- show you any reports from the Coast Guard?

21  A    He showed me some documents, but in truth they were in

22  English and I don't know how to read English.

23  Q    So all the details you just testified about to the

24  jury, where did that information come from?

25  A    From the mouth of Mr. Newbbooll.

```
 1               MR. DERENZO:  No further questions, Your Honor.

 2               THE COURT:  Mr. Hernandez, anything else?

 3               MR. HERNANDEZ:  No, Your Honor.  Thank you.

 4               THE COURT:  All right.  Thank you, sir.  You may

 5    step down.

 6               All right.  Ladies and gentlemen, we're going to

 7    recess for lunch at this time.  We're going to be in recess

 8    until -- let's say it's 20 minutes of 1:00, we'll be in

 9    recess until five minutes of 2:00.  You're welcome to walk

10    around.  That's about an hour and 15 minutes.  Get some

11    lunch or whatever.  Please don't discuss the case, and leave

12    your pads on your chairs, and we'll start again at

13    five minutes of 2:00.

14                      (Jury exits proceedings.)

15               THE COURT:  You can have a seat for just a moment.

16    Let me ask a question.

17               Mr. DeRenzo, you have about eight other witnesses

18    listed on your witness list.  How many of those are you

19    going to call?

20               MR. DERENZO:  At this time, Your Honor,

21    I anticipate at most two.

22               THE COURT:  Okay.  And which witnesses would those

23    be?

24               MR. DERENZO:  Definitely Special Agent Karen

25    McAllister, who is number 12 on my witness list, and
```

1    potentially the case agent, Special Agent Tim Campbell.

2              THE COURT:  Okay.  Thank you.

3              All right.  So that will put us over probably

4    until about 3:00 or 4:00, or what would you say?

5              MR. DERENZO:  I would say right around 3:00,

6    Your Honor.

7              THE COURT:  Okay.  All right.  Thank you.

8              Then obviously once they rest, the Government

9    rests, then, Mr. Hernandez, you can make whatever motions,

10   and then I would like to -- if the defendant chooses to

11   testify, like for him to begin with his testimony this

12   afternoon.

13             MR. HERNANDEZ:  Yes, Your Honor.  I -- at this

14   point I can tell you that the intent would be to rest.

15             THE COURT:  You what?

16             MR. HERNANDEZ:  The intent would be, if in fact

17   the Court does not grant the JOA motions, that we would be

18   intending to rest.

19             THE COURT:  Okay.  All right.  If that happens,

20   then what we would do is we'd talk about the jury

21   instructions a few minutes this afternoon, but we wouldn't

22   do closings and instructions until tomorrow morning.  Okay.

23             All right.  We're in recess until five minutes of

24   2:00.

25                          - - - - -

```
1              (Recess at 12:40 p.m. until 2:00 p.m.)

2                        - - - - -

3         THE COURT:  Anything before I bring the jurors in?

4         MR. DERENZO:  Two things, Your Honor.  I request

5    to release Senior Chief Bomentre, absent an objection by

6    Mr. Hernandez.

7         MR. HERNANDEZ:  Judge, we during the recess were

8    talking about the 404(b) instruction.

9         THE COURT:  Yeah, I was going to ask about that

10   too, but go ahead.

11        MR. HERNANDEZ:  And, Judge, there's really no

12   clearcut answer, but I think strategically it would be

13   better not to give that instruction.  I think it would just

14   highlight the situation.

15        THE COURT:  Okay.  And you said he objected to the

16   release of Chief Bomentre?

17        MR. DERENZO:  No.  No, Your Honor, he didn't

18   object.  I said absent an objection we would request that he

19   be released.

20        THE COURT:  Oh, okay.  Do you have any objection?

21        MR. HERNANDEZ:  No, no objection.

22        THE COURT:  All right.  He may be released then.

23        MR. DERENZO:  Thank you, Your Honor.

24        THE COURT:  Okay.  Will you bring the jury in.

25        Yeah, I will do whatever you want on that.
```

1          Oh.  Marshals, you're using your phone.  Please

2     don't use your phone so they can see.

3                    *(Jury re-enters proceedings.)*

4          THE COURT:  Mr. DeRenzo, you may call your next

5     witness.

6          MR. DERENZO:  The United States calls Special

7     Agent Karen McAllister, FBI.

8        *(Special Agent Karen McAllister enters proceedings.)*

9          THE COURT:  Agent, if you'll come forward to be

10    sworn.

11         COURTROOM DEPUTY:  Please raise your right hand.

12         Do you solemnly swear or affirm, under penalty of

13    perjury, that the testimony you will give in this cause will

14    be the truth, the whole truth and nothing but the truth?

15         THE WITNESS:  Yes, I do.

16         COURTROOM DEPUTY:  Please state your name for the

17    record and spell your last name.

18         THE WITNESS:  My name is Karen McAllister.  It's

19    spelled K-A-R-E-N, M-C capital A-L-L-I-S-T-E-R.

20         COURTROOM DEPUTY:  Thank you.  Please take the

21    witness stand.

22         THE COURT:  Mr. DeRenzo.

23         MR. DERENZO:  Thank you, Your Honor.

24         Special Agent McAllister, good afternoon.

25         THE WITNESS:  Good afternoon.

SPECIAL AGENT KAREN McALLISTER          121
Direct Examination by Mr. DeRenzo

1    **DIRECT EXAMINATION OF SPECIAL AGENT KAREN McALLISTER**

2    **BY MR. DERENZO:**

3    Q    Where do you work?

4    A    I work for the FBI here in the Tampa Division.

5    Q    How long have you worked for the FBI?

6    A    In March it will be 22 years.

7    Q    Could you summarize for the jury your professional

8    experience with the FBI.

9    A    Yes.  I joined in 1998.  After a 16 week training in

10   Quantico, Virginia, I was assigned to the Los Angeles

11   Division, where I worked gangs, and then from there

12   I transferred to San Juan Division.  I worked

13   drug trafficking cases there as well as national security

14   cases.  I then transferred to the Philadelphia Division,

15   where I continue to work some national security matters.

16          I did two years at FBI headquarters in the

17   Washington -- in Washington, D.C.  I returned to

18   Philadelphia for two years, and then from there

19   I transferred to the New York Division, where I continue to

20   work national security matters.  I've been in Tampa Division

21   since 2013, where I've been assigned to the Panama Express

22   North Strike Force since 2015.

23   Q    And what is your role at the Panama Express Strike

24   Force?

25   A    I'm one of the agents that investigate cases of

SPECIAL AGENT KAREN McALLISTER          122
Direct Examination by Mr. DeRenzo

1   Colombian drug trafficking organizations that engage in the

2   smuggling of narcotics through the Carribean basin and the

3   Eastern Pacific.

4   Q    And how long have you been with this particular

5   strike force?

6   A    I've been there since about 2015, and I work alongside

7   agents from the Drug Enforcement Administration, Homeland

8   Security Investigations and Coast Guard Investigative

9   Service.

10  Q    Day-to-day as a Special Agent as part of this strike

11  force, what are your duties?

12  A    That varies from day-to-day, but we primarily engage in

13  any task really related to an investigation, so this could

14  be conducting interviews, processing drug evidence,

15  processing what we consider to be non-drug evidence,

16  personal belongings, paperwork, miscellaneous documents,

17  things like that.  I also handle informants and cooperating

18  witnesses.

19  Q    Would that include interviewing suspects who were

20  detained by the Coast Guard?

21  A    Yes, it does.

22  Q    In your years at the Strike Force, if you had to

23  estimate, how many of these kinds of interviews have you

24  done personally?

25  A    Many.  I would say probably close to over 100.

SPECIAL AGENT KAREN McALLISTER          123
Direct Examination by Mr. DeRenzo

1   Q    How about -- let's talk about the number of

2   narcotics-related investigations you've been involved in

3   over your entire career.  Would you provide an estimate to

4   the jury of that?

5   A    It's difficult to estimate, but I also would put it at

6   over 100, dating back 22 years.

7   Q    And how many maritime drug cases in particular?

8   A    The bulk of the cases that I have investigated are

9   maritime.

10  Q    And of those, what percentage would you estimate were

11  in the Caribbean Sea?

12  A    Maybe 60 to 70 percent.

13  Q    Let's talk about the case you're here to testify about.

14  Were you involved in an investigation of a go-fast vessel

15  that was interdicted by the Coast Guard on December the 1st,

16  2018?

17  A    Yes, I was.

18  Q    What was your role in that investigation?

19  A    I conducted the post-arrest interview of Mr. Emiro

20  Hinestroza-Newbbooll.

21  Q    Do you see that individual in court anywhere?

22  A    Yes, I do.

23  Q    Could you point him out and identify an article of

24  clothing that he's wearing.

25  A    Yes, sir.  He's the gentleman at the defense counsel in

1    the orange clothing.

2              MR. DERENZO:  Your Honor, request that the record

3    reflect that the witness has identified the defendant.

4              THE COURT:  The record should so reflect.

5    BY MR. DERENZO:

6    Q    Special Agent McAllister, do you recall the date that

7    you interviewed the defendant?

8    A    I think it was about December 6th, 2018.

9    Q    And could you describe the setting where you

10   interviewed the defendant.

11   A    Yes.  We utilized a private office in the Tampa area.

12   It's not too big, not too small, I would say it's bare, and

13   it -- but it does offer privacy, and the only people present

14   during the interview are myself, two other -- one other

15   agent from the FBI that assisted with the interview and an

16   intelligence analyst from DEA that assisted with the

17   interview and then the interviewee.

18   Q    During the course of that interview did you offer the

19   defendant anything to eat or drink?

20   A    Yes, he -- during the interview he's unhandcuffed and

21   we provided food and drink, water, and if he needed the

22   bathroom, he could take a restroom break if he needed to.

23   Q    In what language was this interview conducted?

24   A    In Spanish.

25   Q    Do you speak Spanish?

1   A     I do.

2   Q     How long have you been speaking Spanish?

3   A     My whole life.

4   Q     Are you fluent?

5   A     I am.

6   Q     When you interviewed the defendant, did you have any

7   trouble communicating with him?

8   A     No.  I'm fluent in Spanish.  On my mother's side I'm

9   Hispanic, so I grew up speaking Spanish, and then the other

10  two people in the room interviewing him also were fluent

11  Spanish speakers.

12  Q     And we'll get to the substance of the interview in a

13  moment, but throughout the course of the interview did it

14  appear that the defendant had any trouble understanding you?

15  A     No, he told us that he could -- he understood us and he

16  could read and write in Spanish.

17  Q     All right.  Let's talk about the beginning of the

18  interview.  How did you begin the interview?

19  A     I always start the interviews by introducing myself and

20  anybody else present in the room and give them a little bit

21  of the overview of what we're going to do, because we do

22  have some administrative forms that we need to cover first

23  before we get to really the interview itself, and I think

24  that's how I started that interview, and a brief explanation

25  of what Panama Express is, meaning who the personnel are in

SPECIAL AGENT KAREN McALLISTER            126
Direct Examination by Mr. DeRenzo

1    the room, what we do.

2    Q    If you recall, what did you explain to the defendant

3    with respect to what you all do at the Panama Express Strike

4    Force?

5    A    That we investigate cases such as his of maritime

6    drug trafficking.

7    Q    Now, would you take us through that first part of the

8    interview, the administrative part that you just described.

9    A    There's biographical information that we need to fill

10   out on what we call a DEA Form 202, so this would include

11   things like his name, place of birth, parents' names,

12   address, things like that, that we fill out.  Consular

13   notification form.  We -- I think we did a declination of

14   recording form and a consent to search form, and all of

15   these forms we would do prior to the advice of rights form.

16   Q    Let's back up for just a minute.  The declination of

17   recording form, what is that?

18   A    The person being interviewed has the option whether

19   they want their interview to be recorded, audio to be

20   recorded or not, it's up to them, and he declined.

21   Q    Before he declined did you explain to him the right you

22   just told the jury?

23   A    Yes, we have a form that we read and then it was also

24   provided to him to review.

25   Q    What language did you read it in?

SPECIAL AGENT KAREN McALLISTER            127
Direct Examination by Mr. DeRenzo

1    A    In Spanish.

2    Q    Okay.  Now, after you went through this initial stage,

3    what was the next step you took with respect to the

4    interview of the defendant?

5    A    Well, at one point during the -- when we were reviewing

6    all of the forms with him, we showed him a videotape of --

7    it was a -- it was a clip of a video, I believe it was on a

8    cell phone, of packages being jettisoned, they were behind

9    the vessel, and we asked him at that point -- that we wanted

10   to show him the video but we didn't want him to make any

11   statements about the video at that time.

12   Q    Okay.  I'm going to show you in the monitor to your

13   right a portion of what's now been admitted as Exhibit 2Q.

14   I'm going to begin playing it at just before 1 minute,

15   5 seconds.  Just take a look at this video and then I'm

16   going to ask you a few questions.

17                      *(Video played.)*

18   Q    Do you recognize this video, Special Agent McAllister?

19   A    Yes.

20   Q    How so?

21   A    This was the video that we had that we showed to the

22   defendant.

23   Q    To be clear, this was just a portion of the video, a

24   clip?

25   A    Yes, it was a small portion of a larger video.

1   Q    Okay.  Now, after you showed the defendant that video,

2   what's the next step you took in the interview?

3   A    Once we completed all of the administrative forms, we

4   read him his advice of rights form, it's on an FD-395.15,

5   it's the advice of right forms, the Spanish version.

6   Q    And we'll get to that form in just a minute, but why

7   did you show the defendant that video?

8   A    We showed it to him because we wanted him to see that

9   we had strong evidence of this investigation.

10  Q    And could you describe for the jury the process you

11  went over or the process you used when going over that

12  advice of rights form.

13  A    What we do is we read each of the advice of rights

14  form -- each of the statements that are there, and then we

15  provide the form to him.  He said, as I had mentioned, that

16  he could read and write in Spanish, so we gave him then the

17  form to review himself.

18  Q    So when you read him that form, the advice of rights

19  form to the defendant, what language did you read it to him

20  in?

21  A    I read it to him in Spanish.

22  Q    And what language was the form you actually gave him to

23  read over?

24  A    It was also in Spanish.

25  Q    What is in the actual advice of rights form?

SPECIAL AGENT KAREN McALLISTER          129
Direct Examination by Mr. DeRenzo

1   A    It's the form where it speaks of the defendant's

2   rights, basically that he has the right to an attorney, that

3   if he cannot afford an attorney, one will be afforded to

4   him, anything that he tells us could be used against him in

5   a court of law, and if he chose to speak with us without an

6   attorney present, that he could choose to stop speaking to

7   us at any time as well.

8   Q    Now, after you went over that form with the defendant,

9   did he make any statements to you?

10  A    He did.

11  Q    And what did he say to you?

12  A    He told us that -- repeatedly told us that he was the

13  captain of the vessel on which he was arrested, that he

14  could give the agents more information than what we wanted,

15  including the names, the process and the lines of the

16  operation, he said from here to here to here.

17  Q    Did he talk about at any point quantity of information

18  he could provide relative to the other individuals on the

19  boat?

20  A    He said that as the captain he had more information

21  than they would have.

22  Q    Those statements you just referenced from the

23  defendant, was that in response to any questions by you?

24  A    No.  I would consider these to be spontaneous

25  statements.

1   Q    Could you describe the defendant's demeanor during this

2   interview.

3   A    I felt he was very arrogant.

4           MR. DERENZO:  No further questions, Your Honor.

5           THE COURT:  Mr. Hernandez?

6           MR. HERNANDEZ:  May I have a moment, Your Honor?

7       **CROSS-EXAMINATION OF SPECIAL AGENT KAREN McALLISTER**

8   **BY MR. HERNANDEZ:**

9   Q    Agent, so this conversation you had with him was not

10  recorded, correct?

11  A    It was not, sir.

12  Q    Okay.  So we don't have any recording of his exact

13  words, word-for-word rendition of what he said, correct?

14  A    Just the summary that I wrote on my report.

15          MR. HERNANDEZ:  That's all I have.  Thank you.

16          THE COURT:  Anything else?

17          MR. HERNANDEZ:  No, Your Honor.

18          THE COURT:  Thank you.  You may step down.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  You may call your next witness.

21          MR. DERENZO:  The United States rests.

22          THE COURT:  All right.  Ladies and gentlemen, we

23  have a matter to take up outside of your presence, so I'm

24  going to ask, Mr. Fitchett, if you would conduct them to the

25  jury room, and if you'll remain in the jury room.  I don't

1 think this will be lengthy.

2       *(Jury exits proceedings.)*

3     THE COURT:  You may be seated.

4     All right.  The Government has now rested its

5 case.  Mr. Hernandez, do you have a Rule 29 motion that you

6 would like to make as to either or both of the counts that

7 were alleged against the defendant in the indictment?

8     MR. HERNANDEZ:  Yes, Your Honor.  At this time

9 I would move for a judgment of acquittal as to both counts.

10 I would submit that looking at the evidence in the light

11 most favorable to the Government, that the Government has

12 not established a prima facie case.  This is a case where no

13 illegal drugs were produced other than something that can't

14 be seen with the naked eye, simply the testimony of the

15 witness regarding the ion scan testing, and certainly there

16 has been insufficient evidence to suggest the amounts that

17 were being alleged regarding the allegation that it's over

18 5 kilograms of cocaine, and there has been no evidence of

19 any intent to distribute.  The only evidence that comes

20 close would be the testimony of Mr. Caceres-Lopez, and

21 I would submit that his testimony is not credible, and

22 I would ask the Court to grant the motion as to both counts.

23     THE COURT:  All right.  Mr. DeRenzo?

24     MR. DERENZO:  Your Honor, we submit that, again,

25 as Mr. Hernandez alluded to, taking the evidence in the

1   light most favorable to the United States, there is

2   certainly more than sufficient evidence to make out a case

3   as to every element in both counts.

4          Specifically as to the drugs and the amount, we

5   have the testimony of each Coast Guard member who came in

6   here, other than Senior Chief Bomentre and the aircrew, who

7   all testified that based on their collective experience

8   handling, seeing thousands of cocaine bales, what they

9   believe floating in the ocean was in fact cocaine bales;

10  combined with the ion scan evidence in this case which

11  demonstrates that the vessel and its crew, including the

12  defendant, had cocaine on it, demonstrates that those white

13  floating objects were in fact cocaine; and then finally we

14  have the admissions by the defendant himself to

15  Mr. Caceres-Lopez and to Special Agent McAllister.

16         THE COURT:  All right.  I am going to deny the

17  motion.  I agree, obviously, that there were no drugs found

18  on the vessel; however, there was the testimony of the

19  law enforcement officers, the Coast Guard, the pilot, the

20  person that was taking the video while the plane was

21  circling the boat, there was a video that this jury could

22  conclude showed the crew of the boat throwing the --

23  throwing cocaine overboard and then sinking the cocaine.

24         In addition to the testimony of the Coast Guard

25  agents and the video that we saw, we also obviously had the

1  testimony of Alfredo Lopez, who stated that the defendant

2  admitted to making the drug trip.

3          So taking all of the evidence, and again taking

4  that evidence in the best light to the Government at this

5  point, which I must do, I'm going to deny the motion as to

6  the conspiracy and the motion with the intent to distribute.

7          All right.  Mr. Hernandez?

8          MR. HERNANDEZ:  Yes, Your Honor.

9          THE COURT:  I don't know what to tell the jury.

10 Does your client intend to testify?  And I'll talk to him in

11 a moment.

12         MR. HERNANDEZ:  We intend to rest, Your Honor.

13 I have discussed the matter with my client, and he does not

14 intend to testify.

15         THE COURT:  Okay.  And you had mentioned earlier,

16 and I know I think I had approved the funds for an expert

17 witness.  You do not intend to call that expert?

18         MR. HERNANDEZ:  No, Your Honor.  I have kept in

19 communication with the expert and she would -- I excused her

20 this morning, because I wanted to do the cross-examination

21 of the Government witness to make sure that basically on

22 Cross he would -- he said pretty much what my expert would

23 have said anyway, so the decision was made not to call her

24 as a witness, and I've alerted her, because she had a flight

25 this evening.  And again, we intend to rest as soon as the

1    jury comes back.

2              THE COURT:  Okay.  Mr. Hinestroza-Newbbooll, let

3    me just verify what your attorney has said.

4              Now you have an opportunity to take the witness

5    stand and to testify in your own behalf, to essentially tell

6    your side of the story.  Do you wish to take the stand and

7    testify?

8              THE DEFENDANT:  (Shaking head no.)

9              THE COURT:  Would you answer out loud.

10             THE DEFENDANT:  No.

11             THE COURT:  All right.  You understand that's your

12   decision?  Obviously you should talk it over with

13   Mr. Hernandez, but in the end you're the guy that's got to

14   decide whether you want to testify or don't want to testify.

15   So you do not want to testify?

16             THE DEFENDANT:  No.

17             THE COURT:  Okay.  All right.  Then it would be my

18   intent to bring the jury in and excuse them for the evening

19   and tell them to come back at nine o'clock tomorrow, I'll do

20   the instructions in the law and we'll do closing arguments.

21             MR. HERNANDEZ:  Your Honor, will I be given the

22   opportunity to rest in front of the jury?

23             THE COURT:  Yes.  You're right.  I'll call on you

24   and you'll be given the opportunity to rest.

25             Would you bring the jury in.

```
 1              (Jury re-enters proceedings.)

 2         THE COURT:  All right.  Mr. Hernandez?

 3         MR. HERNANDEZ:  Your Honor, at this time the

 4    defendant would rest.

 5         THE COURT:  All right.  Ladies and gentlemen, you

 6    have heard all of the evidence in this case.  Both the

 7    Government and the defendant have rested their cases.  There

 8    are two matters remaining, the instructions in the law and

 9    the closing arguments, and then you'll go back to the jury

10    room to deliberate.

11         We're going to recess for the evening, and we're

12    doing that because even if we started immediately with

13    instructions and the closing arguments, you really wouldn't

14    have time to complete deliberations this afternoon anyway,

15    I'm not even sure we'd have time to complete the jury

16    instructions and the closing arguments.  So we're going to

17    just start in the morning at nine o'clock.

18         When you get here I will instruct you in the law

19    that applies to this case, then the attorneys will make a

20    closing argument to you, and then you will go back to the

21    jury room to deliberate to reach a verdict, if you can do

22    so.

23         Do any of you have any questions?

24         All right.  We're in recess until nine o'clock

25    tomorrow morning.  Leave your pads on your chairs.  Please
```

1    don't discuss the case.

2              *(Jury exits proceedings.)*

3              THE COURT:  Okay.  You may be seated.

4         Mr. Fitchett, would you give everybody a copy of

5    the proposed jury instructions and the verdict form.

6         All right.  Essentially these are the proposed

7    instructions that the Government had given me, with a couple

8    of exceptions, which I'll talk about.

9         She gets a copy.  When I read the instructions,

10   we'll give the interpreter a copy.

11        All right.  Since, as I've said, we've tried

12   essentially the same case before with the co-defendants in

13   this case, a lot of if not almost all of the instructions

14   are instructions that I gave similarly or previously, so let

15   me just go through the instructions as you have them in

16   front of you and I'll also tell you a couple that I have

17   left out.

18        On page 2 is, obviously, a standard instruction,

19   the duty to follow the instructions and the presumption of

20   innocence.  The next one on page 3 is the definition of

21   reasonable doubt.  On page 4 is the consideration of direct

22   and circumstantial evidence, argument of counsel and

23   comments by the Court.  Page 5, the credibility of

24   witnesses.  Page 6, impeachment of witnesses because of

25   inconsistent statements.

1          Page 7 is an instruction, obviously, I didn't give

2    in the last trial.  This is standard instruction 1.3 and

3    I've tailored it to this case.  The standard instruction is

4    testimony of an accomplice or witness.  I'm sorry.  I read

5    that wrong one.  It's actually S1.1, testimony of an

6    accomplice, informer or witness with immunity, or in this

7    case who has been promised something, essentially.

8          It reads:  You must consider some of the

9    witnesses' testimony with more caution than others.

10   For example, a witness who hopes to gain more favorable

11   treatment in his own case may have a reason to make a false

12   statement in order to strike a good bargain with the

13   Government.  So while a witness of that kind may be entirely

14   truthful when testifying, you should consider that testimony

15   with more caution than the testimony of other witnesses.

16   And that's -- I'm giving that based on the fact that Alfredo

17   Caceres-Lopez testified.

18         We did have some expert witnesses testify, so

19   I think that's appropriate.

20         Page 9, there were some admissions by the

21   defendant, so I am going to give -- if the Government offers

22   evidence that a defendant made a statement or admission to

23   someone after being arrested or detained, you must consider

24   the evidence with caution and great care.  There was

25   testimony regarding that, so I think that's appropriate.

1    The introduction to the offense instructions
2    describes the two charges in the indictment.
3    The conspiracy instruction and the possession with
4    the intent to distribute while on board a vessel subject to
5    the jurisdiction of the United States are the standard
6    instructions.
7    The possession on page 16 is a standard
8    instruction.
9    The aiding and abetting -- the Government did
10   charge aiding and abetting in Count Two -- that's a standard
11   instruction.
12   The conjunctive charge is not a standard
13   instruction, but it was submitted and it is one that I give
14   almost all of the time because of the fact that the
15   indictment sometimes alleges "and" and it can be "or," so
16   I thought it was appropriate given the indictment in this
17   case.
18   "On or about" is a standard instruction on page
19   19.
20   Page 20 is just the note taking instruction.
21   21, the duty to deliberate, and 22, the verdict.
22   We've got a blank -- or at least I've got a blank
23   23.  I won't include that.
24   But let me just say what I didn't give, or I'm not
25   proposing to give.

1          All right.  On the instructions that the

2    Government submitted, page 19 of those instructions, B6.3,

3    obviously I'm not giving that because the defendant did not

4    testify.

5          On page 20, the law does not require the

6    prosecution to call all witnesses, that's sort of, I think,

7    an instruction that's been given in this district before.

8    I don't think there's -- there are a lot of witnesses in

9    this case, so I don't think it's necessary to give this

10   instruction.

11         Let's see.  Page 25, I did not include that

12   instruction.  False exculpatory statements.  I realize there

13   were statements that were made about conch and about

14   mahi mahi.  This is not really a standard Eleventh Circuit

15   instruction, so -- anyway, I didn't give it in the last

16   trial and I'm not inclined to give it in this trial either.

17         I believe those are the only ones, other than the

18   one that we alluded to earlier, that was the 404(b)

19   instruction that I'm not giving.

20         I'm assuming this instruction was submitted based

21   on the testimony of Alfredo Caceres-Lopez.  Is that why you

22   submitted it?  I'm sorry.  I'm talking about the 404(b)

23   instruction.

24         MR. DERENZO:  Yes, Your Honor, just in

25   anticipation of litigation we added that issue, anticipating

1  he would talk about the prior trips, because I alluded in

2  our response to the motion in limine we would support and

3  certainly ask for an appropriate limiting instruction.

4  I certainly understand the tactical decision of the defense.

5          THE COURT:  Okay.  And you don't want that

6  instruction?

7          MR. HERNANDEZ:  No, Your Honor.  Obviously we've

8  objected all along to the evidence coming in, but once the

9  Court has allowed it, I really don't want to give extra

10  attention to it.

11          THE COURT:  Okay.  All right.  Then I will not

12  give that instruction.

13          And the verdict form -- did we give them a copy of

14  the verdict form?

15          Yeah, the verdict form is just a standard verdict

16  form, the same verdict form I gave in the last trial with

17  the co-defendants.

18          So if you want to make any argument or want to

19  suggest anything now, you're welcome to do so.  If something

20  occurs over the evening hours and you want to e-mail

21  chambers about one of the jury instructions after you've had

22  a chance to go through them perhaps, that's fine too.

23          MR. DERENZO:  Your Honor, we have no further

24  argument.

25          THE COURT:  Okay.

1          MR. HERNANDEZ:  Neither do I, Your Honor.

2          THE COURT:  Okay.  Well, again, if that changes,

3    just, you know, e-mail me at my chambers e-mail.

4          All right.  Closing arguments, how long,

5    Mr. DeRenzo?  Are you making the closing?

6          MR. DERENZO:  I will be, Your Honor.

7          THE COURT:  Okay.

8          MR. DERENZO:  How long would the Court allow?

9          THE COURT:  Well, how long do you want?

10         MR. DERENZO:  In an abundance of caution, I ask

11   for a total of an hour, just because -- one of the reasons

12   why is we had a little bit of technical difficulty initially

13   with the video, so I would take a little bit longer with the

14   video perhaps than I would normally, so I would ask for 45

15   and 15.

16         THE COURT:  All right.  Mr. Hernandez, do you want

17   any more than that?

18         MR. HERNANDEZ:  No.  No, Your Honor.  I suspect

19   that I will keep it under an hour.

20         THE COURT:  Okay.  Then that's fine.  No more than

21   an hour, and certainly if you all go less than an hour,

22   that's fine too.

23         Anything else we ought to discuss?

24         MR. DERENZO:  Nothing for the United States.

25         MR. HERNANDEZ:  Nothing, Your Honor.

1              THE COURT:  All right.  Then we're in recess until

2    nine o'clock tomorrow morning.

3                          - - - - -

4              (Proceedings adjourned at 2:38 p.m.)

5                          - - - - -

```
1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4   of proceedings taken in a jury trial in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed

7   by computer under my supervision, this the 23rd day of

8   March, 2021.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```