```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3

 4    UNITED STATES OF AMERICA,       )
                                      )
 5               Plaintiff,           )
                                      )
 6                                    ) Case No.
              vs.                     ) 8:18-CR-00594-SCB-JSS-1
 7                                    )
                                      )
 8    EMIRO HINESTROZA-NEWBBOOLL,     )
                                      )
 9               Defendant.           )

10

11

12    _____

13                       JURY TRIAL - DAY 4
             BEFORE THE HONORABLE SUSAN C. BUCKLEW
14                UNITED STATES SENIOR JUDGE

                      JANUARY 30, 2020
15                        9:00 A.M.
                       TAMPA, FLORIDA
16    _____

17

18

19

20

21         Proceedings recorded by mechanical stenography,
      transcript produced using computer-aided transcription.
22    _____

23                  DAVID J. COLLIER, RMR, CRR
                   FEDERAL OFFICIAL COURT REPORTER
24              801 NORTH FLORIDA AVENUE, 7TH FLOOR
                     TAMPA, FLORIDA  33602
25
```

1    **APPEARANCES:**

2

3    **FOR THE GOVERNMENT:**

4

5            *Nicholas G. DeRenzo*

6            *Toni Goodin*

7            United States Attorney's Office

8            400 N. Tampa Street, Suite 3200

9            Tampa, Florida  33602

10           (813) 274-6000

11

12   **FOR THE DEFENDANT EMIRO HINESTROZA-NEWBBOOLL:**

13

14           *Daniel Mario Hernandez*

15           Law Office of Daniel M. Hernandez

16           902 North Armenia Avenue

17           Tampa, Florida  33609

18           (813) 875-9694

19

20

21   **INTERPRETERS:**

22           Beatriz Velasquez

23           Etienne van Hissenhoven

24

25

1                          I N D E X

2                       JANUARY 28, 2020

3

4                                                          **PAGE**

5   Court's instructions to the jury                          6

6   Government closing argument by Mr. DeRenzo                22

7   Defense closing argument by Mr. Hernandez                 46

8   Government rebuttal closing argument by Mr. DeRenzo       69

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2                      - - - o0o - - -
3            THE COURT:  Good morning.
4            MR. DERENZO:  Good morning.
5            MR. HERNANDEZ:  Good morning.
6            THE COURT:  Mr. DeRenzo, do you want the courtroom
7    deputy to keep track of your time, or are you going to keep
8    track of it yourself?
9            MS. GOODIN:  Yes, Your Honor, that would be ideal,
10   if the Clerk would just give me a ten minute warning on
11   the -- on my first closing.
12           THE COURT:  Okay.  And you wanted 45 minutes for
13   your first closing, right?
14           MR. DERENZO:  Yes, Your Honor.
15           THE COURT:  Okay.  Thank you.
16           MR. DERENZO:  Thank you.
17           THE COURT:  All right.  I'm going to instruct the
18   jury first, so, Mr. Fitchett, if you would give both
19   attorneys -- or the attorneys a copy of the jury
20   instructions and one to the court reporter, please.
21           MR. HERNANDEZ:  We have them, Judge.
22           THE COURT:  Oh, you already did?
23           Okay.  Would you bring the jury in.
24               (Jury re-enters proceedings.)
25           THE COURT:  Good morning.
```

```
 1              JURORS:  Good morning.
 2              THE COURT:  Ladies and gentlemen, did anything
 3    happen over the evening hours that any of you feel could
 4    affect your ability to serve on this jury in any way?
 5              JURORS:  No.
 6              THE COURT:  Any questions or concerns before we
 7    start this morning?
 8              JURORS:  No.
 9              THE COURT:  All right.  Let me just tell you a
10    minute about what's going to happen today.  In just a few
11    minutes we'll pass out jury instructions and I'll go over
12    the jury instructions with you.  Everyone else has a copy.
13              These are instructions that have been agreed to by
14    both sides and by me, and they're instructions in the law.
15    We'll read through those, and you'll be able to take those
16    back with you to the jury room, so feel free to write on
17    them if you want to do that.
18              After the jury instructions, the attorneys are
19    going to make a closing argument, and both sides have an
20    equal amount of time to make a closing argument if they want
21    to use it, but the Government goes first because the
22    Government has the burden of proof, and they are entitled to
23    divide their time up between an opening -- what we call an
24    opening closing argument and a rebuttal after the defense
25    attorney has made his closing argument.
```

```
 1              After that happens then I will send you back to
 2   the jury room to deliberate in this case.  So that will take
 3   the majority of the morning, and you'll have back there --
 4   you'll keep this in mind as the attorneys are talking,
 5   you'll have back there with you a copy of the indictment,
 6   you'll have back there with you a copy of the jury
 7   instructions, you'll have back there with you all of the
 8   evidence that was introduced, including the video, and
 9   you'll have the means to play the video if you wish to do so
10   in the jury room, and obviously a verdict form.
11              So if somebody talks about a piece of evidence and
12   you think, "I'd like to look at that a little bit more,"
13   you'll have an opportunity to do that if you choose to do
14   that back in the jury room.
15              Okay.  Mr. Fitchett, would you pass out the jury
16   instructions, please.
17              All right.  I'm going to read them aloud, and so
18   if you would just follow along with me.
19              It is now my duty to instruct you on the rules of
20   law that you must use in deciding in case, and after I've
21   completed these instructions you'll go back to the jury room
22   and begin your discussions, what we call deliberations.  You
23   must decide whether the Government has proven the specific
24   facts necessary to find the defendant guilty beyond a
25   reasonable doubt.
```

1          Your decision must be based only on the evidence

2     presented during the trial.  You must not be influenced in

3     any way by either sympathy for or prejudice against the

4     defendant or the Government.

5          You must follow the law as I explain it, even if

6     you do not agree with the law, and you must follow all of my

7     instructions as a whole.  You may not single out or

8     disregard any of the Court's instructions on the law.

9          The indictment, which you'll have back in the jury

10    room with you, or formal charge against a defendant, is not

11    evidence of guilt.  The law presumes every defendant is

12    innocent, and the defendant does not have to prove his

13    innocence or produce any evidence at all.  A defendant does

14    not have to testify, and if the defendant chose not to

15    testify, you cannot consider that in any way while making

16    your decision.  The Government must prove guilt beyond a

17    reasonable doubt.  If it fails to do so, you must find the

18    defendant not guilty.

19         The Government's burden of proof is heavy, but it

20    doesn't have to prove a defendant's guilt beyond all

21    possible doubt, the Government's proof only has to exclude

22    any reasonable doubt concerning the defendant's guilt.

23    A reasonable doubt is a real doubt based on your reason and

24    common sense after you've carefully and impartially

25    considered all the evidence in the case.  Proof beyond a

1    reasonable doubt is proof so convincing that you would be

2    willing to rely and act upon it without hesitation in the

3    most important of your own affairs.

4           If you are convinced that the defendant has been

5    proven guilty beyond a reasonable doubt, then you need to

6    say so, and if you are not convinced then you need to say

7    so.

8           As I said before, you must consider only the

9    evidence that I have admitted in the case, and evidence

10   includes the testimony of witnesses and the exhibits

11   admitted, but anything the lawyers say is not evidence and

12   is not binding on you.

13          You shouldn't assume from anything I've said that

14   I have any opinion about any factual issue in this case.

15   Except for my instructions to you on the law, you should

16   disregard anything I may have said during the trial in

17   arriving at your own decision about the facts.  It is your

18   own recollection and interpretation of the evidence that

19   matters.

20          In considering the evidence, you may use reasoning

21   and common sense to make deductions and reach conclusions.

22          You should not be concerned about whether the

23   evidence is direct or circumstantial.  Direct evidence is

24   the testimony of a person who asserts that he or she has

25   actual knowledge of a fact, such as an eyewitness.

1   Circumstantial evidence is proof of a chain of facts and

2   circumstances that tend to prove or disprove a fact, and

3   there's no legal difference in the weight you may give to

4   either direct or circumstantial evidence.

5           When I say you must consider all the evidence,

6   I don't mean you must accept all the evidence as true or

7   accurate.  You should decide whether you believe what each

8   witness had to say and how important that testimony was, and

9   in making that decision you may believe or disbelieve any

10  witness in whole or in part.  The number of witnesses

11  testifying concerning a particular point doesn't necessarily

12  matter.

13          To decide whether you believe any witness,

14  I suggest that you ask yourself a few questions.  Did the

15  witness impress you as one who was telling the truth?  Did

16  the witness have any particular reason not to tell the

17  truth?  Did the witness have a personal interest in the

18  outcome of the case?  Did the witness seem to have a good

19  memory?  Did the witness have the opportunity and the

20  ability to accurately observe the things he or she testified

21  about?  Did the witness appear to understand the questions

22  clearly and answer them directly?  Did the witness's

23  testimony differ from other evidence or other testimony?

24          You should also ask yourself whether there was

25  evidence that a witness testified falsely about an important

fact and ask whether there was evidence that at some other
time a witness said or did something or didn't say or do
something that was different from the testimony the witness
gave during the trial.  But keep in mind a simple mistake
doesn't mean a witness wasn't telling the truth as he or she
remembers it.  People naturally tend to forget some things
or remember them inaccurately, so if a witness misstated
something, you must decide whether it was because of an
innocent lapse in memory or an intentional deception, and
the significance of your decision may depend on whether the
misstatement is about an important fact or an unimportant
detail.

        You must consider some witnesses' testimony with
more caution than others.  For example, a witness who hopes
to gain more favorable treatment in his own case may have a
good reason to make a false statement in order to strike a
good bargain with the Government, so while a witness of that
kind may be entirely truthful when testifying, you should
consider that testimony with more caution than the testimony
of other witnesses.

        When scientific, technical or other specialized
knowledge might be helpful, a person who has specialized
training or experience in that field is allowed to state an
opinion about the matter, but that doesn't mean you must
accept the witness's opinion.  As with any other witness's

1  testimony, you must decide for yourself whether to rely upon

2  that opinion.

3       If the Government offers evidence that a defendant

4  made a statement or admission to someone after being

5  arrested or detained, you must consider that evidence with

6  caution and great care.  You must decide for yourself

7  whether the defendant made the statement, and, two, if so,

8  how much weight to give to it.  To make these decisions you

9  must consider all the evidence about the statement,

10  including the circumstances under which it was made.

11       The indictment charges two separate crimes, called

12  counts, against the defendant, and each count has a number,

13  and you'll be given a copy of the indictment to refer to

14  during your deliberations.

15       Count One charges that the defendant knowingly,

16  willfully and intentionally conspired with others to

17  distribute and to possess with the intent to distribute

18  5 kilograms or more of a mixture and substance containing a

19  detectable amount of cocaine, a Schedule II controlled

20  substance, while on board a vessel subject to the

21  jurisdiction of the United States.

22       Count Two charges that the defendant committed

23  what is called a substantive offense, specifically knowingly

24  and intentionally possessing with the intent to distribute a

25  controlled substance, a violation that involved 5 kilograms

1    or more of a mixture and substance containing a detectable

2    amount of cocaine, a Schedule II controlled substance.

3    I will explain the law governing the substantive offense in

4    a moment, but first note that the defendant is not charged

5    in Count One with committing a substantive offense, he's

6    charged with conspiring to commit that offense.  I'm now

7    going to give you a specific instruction on conspiracy.

8            It's a separate Federal crime for anyone to

9    conspire to knowingly possess with the intent to distribute

10   or distribute cocaine while on board a vessel subject to the

11   jurisdiction of the United States.  Title 46, United States

12   Code, Section 70503(a) makes it a crime for anyone, while

13   aboard a vessel subject to the jurisdiction of the

14   United States, to knowingly distribute cocaine or possess

15   cocaine with the intent to distribute it.  I have determined

16   and I instruct you as a matter of law that the vessel

17   involved in this case is a vessel subject to the

18   jurisdiction of the United States.

19           A conspiracy is an agreement by two or more

20   persons to commit an unlawful act.  In other words, it's a

21   kind of partnership for criminal purposes.  Every member of

22   the conspiracy becomes the agent or partner of every other

23   member.  The Government does not have to prove that all of

24   the people named in the indictment were members of the plan

25   or that those who were members made any kind of formal

1   agreement.  The heart of the conspiracy is the making of the

2   unlawful plan itself, so the Government does not have to

3   prove that the conspirators succeeded in carrying out the

4   plan.

5           The defendant can be found guilty only if all the

6   following facts are proven beyond a reasonable doubt:  One,

7   two or more people in some way agreed to try to accomplish a

8   shared and unlawful plan; two, the defendant knew the

9   unlawful purpose of the plan and willfully joined in it;

10  and, three, the object of the unlawful plan was to possess

11  with the intent to distribute or distribute a mixture and

12  substance containing a detectable amount of cocaine.

13          A person may be a conspirator even without knowing

14  all the details of the unlawful plan or the names and

15  identities of all the other alleged conspirators.  If the

16  defendant played only a minor part in the plan but had a

17  general understanding of the unlawful purpose of the plan

18  and willfully joined in the plan on at least one occasion,

19  that's sufficient for you to find the defendant guilty, but

20  simply being present at the scene of an event or merely

21  associating with certain people and discussing common goals

22  and interests doesn't establish proof of a conspiracy.

23  Also, a person who doesn't know about a conspiracy but

24  happens to act in a way that advances some purpose of one

25  doesn't automatically become a conspirator.

1          The defendant is charged with conspiring to

2     distribute and conspiring to possess with the intent to

3     distribute 5 kilograms or more of a mixture and substance

4     containing a detectable amount of cocaine, but you may find

5     the defendant guilty of the crime even if the amount of the

6     controlled substance for which he should be held responsible

7     is less than 5 kilograms, so if you find the defendant

8     guilty, you must also unanimously agree whether the weight

9     of the mixture and substance containing a detectable amount

10    of cocaine that the defendant conspired to distribute or

11    possess with the intent to distribute was 5 kilograms or

12    more, 500 grams or more, or less than 500 grams, and you

13    must then specify your unanimous weight determination on the

14    verdict form that you'll have back in the jury room with

15    you.

16          At some point when I finish I'm going to read the

17    verdict form to you.

18          It's also a Federal crime for anyone on board a

19    vessel subject to the jurisdiction of the United States to

20    knowingly or intentionally distribute or possess with the

21    intent to distribute a controlled substance.  Cocaine is a

22    controlled substance within the meaning of the law.

23          I have determined and I instruct you as a matter

24    of law that the vessel involved in this case is a vessel

25    subject to the jurisdiction of the United States.

 1           The defendant can be found guilty of this crime

 2     only if each of the following facts is proven beyond a

 3     reasonable doubt:  One, the defendant knowingly possessed

 4     cocaine; and, two, the defendant intended to distribute the

 5     cocaine.

 6           To possess with the intent to distribute means to

 7     knowingly have something while intending to deliver or

 8     transfer it to someone else, even with no financial interest

 9     in the transaction.

10           The defendant is charged in the indictment with

11     possessing with the intent to distribute 5 kilograms or more

12     of a mixture and substance containing a detectable amount of

13     cocaine, but you may find the defendant guilty of the

14     offense even if the amount of the controlled substance for

15     which he should be held responsible is less than

16     5 kilograms; so if you find the defendant guilty, you must

17     also unanimously agree whether the weight of the mixture and

18     substance containing a detectable amount of cocaine that the

19     defendant possessed with the intent to distribute was

20     5 kilograms or more, 500 grams or more, or less than

21     500 grams, and you must then specify your unanimous weight

22     determination on the verdict form that has been prepared for

23     you.

24           I'm on page 16.

25           The law recognizes several kinds of possession.

1  A person may have actual possession, constructive

2  possession, sole possession or joint possession.

3  Actual possession of a thing occurs if a person

4  knowingly has direct physical control of it.  Constructive

5  possession of a thing occurs if a person doesn't have actual

6  possession of it but has both the power and the intention to

7  take control over it later.  Sole possession of a thing

8  occurs if a person is the only one to possess it.  Joint

9  possession of a thing occurs if two or more people share

10 possession of it.  The term "possession" includes actual,

11 constructive, sole and joint possession.

12 As to Count Two, which is the possession with the

13 intent to distribute, it is possible to prove a defendant

14 guilty of a crime even without evidence that the defendant

15 personally performed every act charged.  Ordinarily any act

16 a person can do can be done by directing another person or

17 agent, or it may be done by acting with or under the

18 direction of others.

19 A defendant aids and abets a person if the

20 defendant intentionally joins with the person to commit a

21 crime.  A defendant is criminally responsible for the acts

22 of another person if the defendant aids and abets the other

23 person.  A defendant is also responsible if the defendant

24 willfully directs or authorizes the acts of an agent,

25 employee or other associated.

1          The finding that a defendant is criminally

2    responsible for the acts of another person requires proof

3    that the defendant intentionally associated with or

4    participated in the crime, not just proof that the defendant

5    was simply present at the scene of a crime or knew about it.

6    In other words, you must find beyond a reasonable doubt that

7    the defendant was a willful participant and not merely a

8    knowing spectator.

9          In these charges the Court has reviewed the

10   pertinent parts of the Federal statutes which are alleged to

11   have been violated.  Where a statute specifies several

12   alternative ways in which an offense may be committed, the

13   indictment may allege the several ways in the conjunctive,

14   that is, by using the word "and."  Therefore if only one of

15   the alternatives is proven beyond a reasonable doubt, that

16   is sufficient for conviction so long as the jury agrees

17   unanimously as to at least one of the alternatives.

18          You'll see that the indictment charges that a

19   crime was committed on or about a certain date, and the

20   Government doesn't have to prove that the crime occurred on

21   an exact date, the Government only has to prove beyond a

22   reasonable doubt that the crime was committed on a date

23   reasonably close to the date alleged.

24          The word "knowingly" means that an act was done

25   voluntarily and intentionally and not because of mistake or

1  by accident.  The word "willfully" means that the act was

2  committed voluntarily and purposely, with the intent to do

3  something the law forbids, that is, with bad purpose to

4  disobey or disregard the law.  And while a person must have

5  acted with the intent to do something the law forbids before

6  you can find that person acted willfully, the person need

7  not be aware of the specific law or rule that his conduct

8  may be violating.

9       During this trial you've been allowed to take

10  notes.  Maybe most of you have.  You'll be able to take

11  those notes back with you.  You must use your notes only as

12  a memory aid during your deliberations.  You must not give

13  your notes priority over your independent recollection of

14  the evidence, and you must not allow yourself to be unduly

15  influenced by the notes of other jurors.  I emphasizes that

16  notes are not entitled to any greater weight than your

17  memories or impressions about the testimony.

18       Your verdict, whether it's guilty or not guilty,

19  must be a unanimous verdict.  In other words, all 12 jurors

20  must agree to that verdict.  Your deliberations are secret

21  and you'll never have to explain your verdict to anyone.

22  Each of you must decide the case for yourself, but only

23  after fully considering the evidence with the other jurors,

24  so you must discuss the case with one another, try to reach

25  an agreement.

1          While you're discussing the case, don't hesitate

2     to re-examine your own opinion, change your mind, if you

3     become convinced that you were wrong, but don't give up your

4     honest beliefs just because the others think differently or

5     because you simply want to get the case over with.

6          Remember that in a real way here you're the

7     judges, the judges of the facts of this case, and your only

8     interest is to seek the truth from the evidence in this

9     case.

10         When you get back to the jury room you're going to

11    choose one of your members to act as the foreperson of the

12    jury, and it's the foreperson that will direct the

13    deliberations and will speak for you here in the courtroom,

14    and the foreperson will also be the one that signs and dates

15    the verdict form.

16         I'd like to read the verdict form to you at this

17    time.  I have the only verdict form up here, but it reads as

18    follows:  United States of America versus Emiro

19    Hinestroza-Newbbooll, Case 18-594.  Verdict form.

20         Count One of the indictment.  As to the offense of

21    conspiring to possess with the intent to distribute or

22    distribute cocaine while aboard a vessel subject to the

23    jurisdiction of the United States, in violation of 46 United

24    States Code Section 70503(a) and 70506(a) and (b), we,

25    the jury, find the defendant, Emiro Hinestroza-Newbbooll,

1   guilty, and there's a line, and not guilty, and there's a

2   line, once you've unanimously made a decision as to guilty

3   or not guilty.

4        If you find the defendant guilty then you'll need

5   to proceed to answer the following question:  We further

6   find that the amount of cocaine involved in the offense

7   charged in Count One is 5 kilograms or more, 500 kilograms

8   (sic) or more but less than 5 kilograms, less than

9   500 kilograms (sic), and there's a line in front of each one

10  for the foreperson to check once you make a unanimous

11  decision.

12       Count Two, as to the offense of knowingly and

13  intentionally possessing with the intent to distribute or

14  aiding and abetting each other and other persons in the

15  possession with the intent to distribute cocaine while

16  aboard a vessel subject to the jurisdiction of the

17  United States, in violation of 46 United States Code

18  Sections 70503(a) and 70506(a) and 18 United States Code

19  Section 2, we, the jury, find the defendant, Emiro

20  Hinestroza-Newbbooll, guilty, not guilty, and there's a line

21  after each, once you unanimously make a decision.

22       If you find the defendant guilty, then you need to

23  proceed to answer the following question:  We further find

24  the amount of cocaine involved in the offense charged in

25  Count Two is 5 kilograms or more, 500 grams or more but less

1    than 5 kilograms, less than 500 grams, and there's a line

2    before each for you to check once you unanimously make a

3    decision, and then there's a place for the foreperson to

4    sign and date the verdict form.

5            Now, it will be the foreperson's job to bring the

6    verdict form back to the courtroom, and obviously sign and

7    date it and return the verdict.

8            The last paragraph, which is on page 22, I'm going

9    to save until after the attorneys have made their closing

10   arguments and then I will go back to that.

11           Now, I've told you that both sides have an equal

12   amount of time to address you in their closing arguments,

13   and I've also told you the order of presentation, that the

14   Government goes first because the Government has the burden

15   of proof in this case.  I told you that both sides have an

16   equal amount of time.

17           I remind you that what the attorneys say in

18   closing argument is not evidence.  The evidence came from

19   the testimony and the exhibits.  I don't mean to suggest you

20   shouldn't listen to the closing arguments, because I think

21   both sides will be recalling the evidence with you and will

22   be arguing their case with you.

23           So with that said, I'll just tell you that we'll

24   take a break at some time, maybe after the Government

25   finishes, but I will take a break at some point during the

1   closing, but if anybody needs to recess at a time other than

2   I'm recessing, just raise your hand and let me know.

3          All right.  Mr. DeRenzo, you may make a closing

4   argument at this time on behalf of the United States.

5          MR. DERENZO:  Thank you, Your Honor.

6          Madam Clerk, if we could display the laptop at

7   counsel table on the overhead and dim the lights slightly.

8          May it please the Court.

9          Conch or cocaine, that's really what this case

10  boils down to.

11         You saw those floating white packages.  You saw

12  hours and hours of video, perhaps even more than you wanted

13  to see.  So that's the real question, what's in the white

14  packages that the defendant threw overboard along with his

15  three fellow crew members when the Coast Guard plane

16  arrived.  Was it what the defendant said to the Coast Guard

17  boarding team when they arrived on scene on December the 1st

18  2018, conch; or are those cocaine bales, what every other

19  piece of evidence in this case, what every minute of

20  testimony in this case supports, typical 40 to 50-pound

21  floating bales of cocaine.

22         If you recall the video you watched, I apologize,

23  it was hours and hours, but at this point you've seen these

24  bales, you know what they look like, you've heard lots of

25  testimony about what a cocaine bale is, and you saw, first,

1  bale after bale coming over the side, making a big splash,

2  tied together with a string, one line of bales, about a

3  dozen or so, and then a second line of bales.  You saw those

4  bales being moved from the middle of the boat to the back of

5  the boat, and then you saw one string and one engine, and

6  then you saw no bales and no engines.

7          Now, the defendant himself admitted to the

8  Coast Guard that he threw something overboard.  When?  When

9  he saw the Coast Guard plane.  You remember what the

10  Coast Guard plane looks like.  You saw a picture of it.

11  It's white, it's orange, it's painted brightly, search and

12  rescue, so it can be seen for somebody who is in distress.

13  It's got four big engines, it's loud, and when the defendant

14  and the three other individuals on that boat saw that plane,

15  they dumped the cargo.

16          So the question is:  What's the cargo?  What did

17  you see with your own eyes?  Was it conch, which you now

18  know, if you didn't know already, is a snail, it's got a

19  shell.  It's not a fish.  It doesn't float.  So was it conch

20  that you saw in those white packages or are those 40 to

21  50-pound rectangular, typical in every way bales of cocaine,

22  floating for hours?  You saw it yourself.  Even when we

23  skipped around in the video to save some time, collectively

24  you've seen hours and hours of video of those white

25  rectangular packages floating, tied together.

1          Conch.  What else do we know about conch?  It's

2    found on the bottom of the ocean, shallow water, that's what

3    Special Agent Ray testified to in this courtroom.  So was it

4    conch that the defendant threw overboard when the

5    Coast Guard plane showed up, or are the bales that you saw

6    in this video throughout the trial floating in thousands and

7    thousands of feet of water, are those packages cocaine

8    bales?

9          Recall that Petty Officer Ramos, the third

10   Coast Guard boarding team member you heard from, you

11   remember he was the one who was the machinery technician,

12   small boat engineer before he was actually a maritime

13   law enforcement specialist, he told you that when they

14   spotted this vessel, when they actually boarded it, they

15   were in thousands of feet of water.  Conch at the bottom of

16   the ocean?  Recall there's no gear on this boat.  There's no

17   SCUBA gear, there's no fins.  Either the defendant is

18   Aquaman and he's able to swim to the bottom of the ocean in

19   thousands of feet of water, or it wasn't conch that he threw

20   overboard, it was Colombian cocaine that he was transporting

21   on that boat that you see in the video.

22         Was it conch that the defendant risked his life to

23   get rid of?  Recall, this boat, with no engines, no oars, no

24   way to get back to shore, no lights, you saw the boat

25   spray-painted black.  I believe it was Petty Officer

1  Lauginiger who said it looked like a rushed paint job.

2  Pitch black, in the dark, no navigation lights.  All it

3  would take is one boat, like say the Canadian ship, the

4  MONCTON, the one that the Coast Guard was on, or another

5  shipping freighter, or even a fishing vessel to hit this

6  boat in the middle of the night, everybody is overboard and

7  everybody is dead.

8          No food on the boat, a limited amount of water,

9  stranded at sea with no hope of getting back to shore.  You

10  can't see land.  100 plus miles from the nearest point of

11  land, Jamaica.  Nowhere near Colombia.  The defendant and

12  the other guys on the boat literally, literally risked their

13  lives to get rid of what was on that boat, so you got to ask

14  yourself, did he risk his own life for some conch or to get

15  rid of the evidence when he saw the Coast Guard plane

16  because he knew, he knew what was coming next?  He knew the

17  Coast Guard was going to be on its way, and he was

18  desperate, he would risk his own life to get rid of the

19  evidence.

20          Did he lie to the Coast Guard about conch?  Well,

21  first he said it was mahi, and then he said -- you'll recall

22  when Petty Officer Rivera, the Spanish interpreter, took the

23  stand, he said, okay, well, where is your fishing gear?

24  Where is your ice?  Where is your bait?  Where is your

25  tackle?  All the things you would need to catch mahi.

1        Oh, not mahi, now it's conch.  We were SCUBA

2   diving.  Where is your SCUBA gear?  Did we say SCUBA diving?

3   Misunderstanding.  We were free diving.  We were snorkeling.

4   The story keeps changing, and that's really the problem,

5   ladies and gentlemen.  The lies are hard to keep straight

6   when you're confronted with the facts.

7        But the most notorious and, frankly, absurd lie

8   was that they were drifting for six days out of gas.  How

9   many times have you seen this video, Exhibit 2P?  I showed

10  it to, I believe, every single Coast Guard witness who was

11  part of the boarding, and you watched with your own eyes for

12  hours and hours and hours.  It's one of the reasons we

13  showed you all that video, so you could see them driving

14  around, literally for hours.  This is just a clip.

15       So they're not drifting for six days on December

16  the 1st.  The date, by the way, is in the video itself.

17  They're not drifting for six days and they're obviously not

18  out of gas.

19       So we talked a little bit about reasonable doubt

20  already this morning.  You don't have any doubt that the

21  boat was drifting for six days.  You don't have any doubt

22  that it was out of gas.  So don't take my word for it that

23  it was a lie.  You know it was a lie.

24       The question is:  Why did the defendant lie?

25  Because of conch or because he got caught smuggling cocaine

 1    on a boat?

 2           Keep in mind, it wasn't just the defendant who

 3    told a lie, it was all four guys.

 4           You heard from Petty Officer Rivera, the Spanish

 5    interpreter.  He communicated with everybody.  He speaks

 6    Spanish and English.  They all had the same story, drifting

 7    for six days, we lost our engines, ran out of gas.

 8           Why did they all have the same lie?  Because at

 9    the end of the last video we showed you from the aircraft,

10    they're just bobbing around the Caribbean Sea with no

11    engines, waiting, hour after hour after hour.  They know

12    what's coming.  They know the Coast Guard is going to get

13    there eventually and they've got to get their story

14    straight.

15           There's a word for that, and we just heard about

16    it from the Judge, "conspiring."  They conspired on the boat

17    after they got rid of the evidence and they conspired long

18    before that.

19           You don't have to be an expert in ion scan

20    evidence or Coast Guard patrols or counter-narcotics or any

21    of that to know why people lie.  You just have to be a human

22    being on planet earth for about 15 minutes.

23           The defendant lied for the same reason everybody

24    lies when they're in a situation like that.  He knows he's

25    guilty, and he's doing anything he can to try to get away

1   with it.

2           Now, at this point when they're on the boat he

3   doesn't know that there's ion scan evidence, he hasn't seen

4   any of the video yet, so he thinks he can get away with it,

5   as do the other individuals on the boat.  But he lies for a

6   very understandable reason, because he knows what he threw

7   overboard was not conch.  It was not only illegal, it was

8   Colombian cocaine.

9           Is it conch that left cocaine residue on the boat,

10  all over the boat, nine positive hits, on everyone's hands,

11  on the forearms of the defendant and one of his fellow crew

12  members?  That was conch that left that cocaine residue?

13  No.  It was the cocaine bales that you saw dumped over the

14  side one after another.

15          Recall when you heard from Special Agent

16  McAllister, she was the FBI agent, the last witness we

17  called, and she talked about her interview with the

18  defendant.  The first thing she did is tell the defendant

19  why she was there, what they do at the Panama Express Strike

20  Force.  She told him we investigate narcotics smuggling in

21  the maritime environment.  It's the FBI.  It's the DEA.

22  It's the Coast Guard.  It's Homeland Security.  She told him

23  that.

24          And then what happened?  She showed him the video,

25  Exhibit 2Q.  You've seen that several times, we've shown it

1   to most of the Coast Guard witnesses, and this is the

2   greatest hits, more or less, cocaine bales being jettisoned

3   and floating on the boat.

4          Specifically, we cued that video to the portion of

5   the video that she actually showed the defendant.  And this

6   is an important part because you can literally see the

7   cocaine bales tied together, tied to the boat, and you can

8   actually watch them come out from underneath that tarp and

9   make an enormous splash in the water, 40 to 50-pound

10  package, big splash.

11         Again, it's not rocket science.  You don't have to

12  be an ion scan expert to know what a 40 to 50-pound package

13  looks like when it's dumped into the water.

14         So Special Agent McAllister, after she tells them

15  what they do at the Strike Force, after she shows them this

16  video, what does he say?  I'm the captain.  Captain of what?

17  Of the boat in the video he just watched.

18         What else does he say?  I know everything.  I know

19  more than the other guys on the boat.  I'll tell you

20  everything, the names, the coordinates, the routes.  Is he

21  talking about good places to find conch in the Carribean or

22  was he talking about drugs, exactly what Special Agent

23  McAllister was there to talk to him about?  He knew what she

24  wanted to hear about, he knew why she was investigating, and

25  that's exactly what he was talking about.

1          He basically admitted to Special Agent McAllister

2     what they were doing out there.  He wasn't talking about

3     names of other conch fishermen, he was talking about names

4     of cocaine traffickers, and he wasn't shy about it.

5     Remember what Special Agent McAllister said, I believe it

6     was the last word of the trial, I asked her to describe his

7     demeanor, she said "arrogant."  Did he know what was going

8     on?  Was he in on it?  100 percent.

9          Really this case does boil down to what's in the

10    packages, conch or cocaine, because once you conclude those

11    are white bales of cocaine, there's really not much else to

12    debate, because you can see that this is routine, this is a

13    run-of-mill, cookie cutter, typical in every way maritime

14    smuggling operation using a go-fast vessel, Colombia to

15    Central America.

16          As my co-counsel Ms. Goodin alluded to in her

17    opening statement, we realize some of this information was

18    probably new.  You may not have known a lot about cocaine

19    trafficking or the Coast Guard, ion scan images or any of

20    that stuff, but you do now.

21          You heard from Special Agent Ray.  The benefit of

22    his testimony in many ways is he kind of gives you the

23    backdrop, he shows you what's normal, and then you can

24    evaluate the evidence in this case.  And what you see is

25    this is typical, this is routine.  You may not have known

1   that boats were leaving Colombia on a routine basis headed

2   north towards Central America loaded down with hundreds and

3   hundreds and hundreds of kilos of cocaine packaged just like

4   that, you may not have known that, but you do know now, and

5   this is typical in every way.

6            Let's start with the boat.  Exhibit 4H, it's one

7   of many pictures you have of the boat, and if ever there was

8   a cocaine smuggling boat, ladies and gentlemen, this is it,

9   right?  This is a good picture.  You can see it, painted

10  black, you can see the actual color of the boat, blue

11  underneath the water line.  Why does that matter?  One, you

12  heard from several witnesses, including Special Agent Ray

13  and some of the Coast Guard boarding team, this is typical,

14  they paint the boat black because, unlike fishermen, they

15  don't want to be seen.  Fishermen want to be seen.  People

16  who are diving for conch want to be seen.  It's dangerous on

17  the water.  Unlike on a highway, there's no -- there's no

18  lanes, right?  There's no traffic signals.  You rely on

19  communication and being seen.  This boat has no navigation

20  lights because it doesn't want to be seen, because it's got

21  illegal drugs on board.

22           You recall the tarp.  It's not in this picture,

23  but you saw it in the video that we just watched a minute

24  ago.  Why is the tarp important?  For the same reason the

25  boat is painted black.  You're trying to hide what's inside.

1    You're trying to hide the conch?  No.  You're trying to hide

2    the bales of cocaine.  From who?  The Coast Guard airplane

3    that showed up on scene.  This is nothing new, it's nothing

4    novel, and it's certainly not new or novel to Colombian

5    cocaine traffickers who have been doing this for some time.

6    Special Agent Ray talked a little bit about that, how they

7    adapt to the law enforcement techniques, in particular the

8    ones the Coast Guard uses.  So that's why we have the tarp.

9            Now, remember what's on this boat.  Again, no ice,

10   no bait, no tackle, no SCUBA gear, no fins, nothing but

11   cocaine and gasoline.

12           Recall Petty Officer Ramos, I mentioned him once

13   already, but he was the third Coast Guard witness, the small

14   boat engineer, he talked about removing engines and how he

15   can tell these engines were actually removed recently, but

16   specifically he talked about the very peculiar fuel system

17   that's on this boat.  He talked about those fuel filters

18   that are used, high pressure fuel filters, and the hoses,

19   the fuel lines you saw pictures of, and you can actually see

20   them coming over the side of the boat in this case -- or in

21   this picture, excuse me.  Multiple fuel drums.  Why?

22   Because you're running as long and as fast as you can to get

23   from Colombia to Central America with the illegal drugs

24   on board.  There's no time to wait.  Every minute you spend

25   refueling or stopping, every person you come in contact with

1   is a potential weak link in the chain.

2           Petty Officer Ramos told you, when I asked him:

3   Have you seen this kind of fuel system before?

4           Yes.

5           Where?

6           Cocaine trafficking boats, just like this one.

7           I asked him:  Have you seen it anywhere else,

8   maybe mom and pop boating out in Tampa Bay perhaps, a

9   fishing boat?

10          No, only on drug boats.

11          And that makes sense.  That makes sense,

12  because -- and Special Agent Ray talked a little about this.

13  If you're fishing it doesn't make sense to have this much

14  fuel on board and to be nowhere near Colombia.  It doesn't

15  make financial sense.  It does make a whole lot of sense

16  when you got tens of millions of dollars of cocaine

17  on board.  Fuel is a small cost.  It's a drop in the bucket.

18          And of course you heard from every Coast Guard

19  witness except for Senior Chief Bomentre, who came and

20  testified, who said they've seen boats just like this in

21  only one context, drug smuggling.

22          How about the crew?  Probably sounded a little

23  strange the first time you heard it, three Colombians, one

24  guy from Belize.  But you now know from hearing from Special

25  Agent Ray, this is typical, to have a mixed nationality

 1   crew.  And why?  You got a captain, we know who that is, the

 2   defendant, he admitted it to the Coast Guard and to Special

 3   Agent McAllister, insisted that he was the captain.  You got

 4   two guys from Colombia, they're helping out, they're

 5   mariners.  Somebody has got to change that fuel hose from

 6   fuel barrel to fuel barrel.  They don't stop for that.  They

 7   keep going.  That's why you have all that gasoline.  And

 8   somebody is the load guard, and that's the guy from Belize.

 9   That's probably a new term for you, but Special Agent Ray

10   told you basically he's the guy on the receiving end.  You

11   can't go to the police when somebody doesn't show up with

12   your illegal cocaine cargo, so you got to put someone you

13   trust on the boat.

14           And where is this boat going?  Along a known

15   smuggling route, the Honduras Rise, that's what Special

16   Agent Ray told you, an area near Honduras and Belize.  You

17   have a map, it's small, it's Government Exhibit A, but

18   Special Agent Ray did some circling on it, if you recall,

19   during his testimony.  Honduras is just south of Belize.

20   They border each other.  That's the reason why the guy from

21   Belize is on the boat.  And recall, he doesn't even speak

22   Spanish.  They're out conch diving?  He can't even

23   communicate with these guys.  He's on there for one reason

24   and one reason only, because he is the one to make sure that

25   the drugs get from where they're going -- or, excuse me,

1   where they're coming from in Colombia, where cocaine is

2   manufactured, grown, packaged, and then transported to

3   Central America.  So it's typical.  The route we just talked

4   about, known smuggling route, nothing new here, the Honduras

5   Rise.

6          And what did Mr. Caceres-Lopez tell you?  He was

7   the second-to-last witness, who was housed with the

8   defendant when they were in Pinellas County Jail and then

9   later in Citrus County jail.  The defendant told him where

10   he was going, Honduras, going to Honduras along the Honduras

11   Rise.  Typical.

12          Now, in a few minutes you're going to deliberate,

13   and really once you realize that this is routine, it's

14   typical, cocaine smuggling operation, there's not a lot to

15   talk about.  It's an easy case.

16          The Judge talked about some things we have to

17   prove in each count, and to make it even easier for you,

18   when you go back there and discuss the case and review the

19   evidence, I'm going to make it even simpler.  So let's go

20   over the things that we have to prove and that we did prove.

21          First of all, both counts require that the vessel

22   be subject to U.S. jurisdiction.  You can cross that right

23   off the list because, as the Judge just instructed, she has

24   already determined as a matter of law, that means it's

25   already decided, that the vessel is subject to U.S.

1  jurisdiction.

2        Now, if you're curious about why you heard

3  testimony in this case that a vessel without nationality is

4  one that we can enforce U.S. law on, Petty Officer

5  Lauginiger, he was the first Coast Guard witness, the

6  boarding officer, he told you once it's without nationality

7  we can then enforce U.S. law.  So that's the reason, if

8  you're curious.  Cross that off the list.

9        Now, the next thing, of course, is the cocaine

10  involved and how much cocaine.  Table that for just a

11  minute.  We'll talk about it.

12        What are the other things?  Count Two, possession

13  and intent to distribute.  Possession.  He's the captain.

14  He's in charge of what?  Cargo and the crew.

15        I believe it was Petty Officer Lauginiger who

16  I asked, well, like on a Coast Guard ship, or any ship,

17  what's the captain's job?  He's in charge of everything.  He

18  might not drive the boat the whole time, but he's in charge

19  of everything, the cargo and the crew.

20        So did he possess it?  Of course.  He was in

21  charge.

22        And in fact -- and it's certainly not necessary,

23  but literally in those video clips you can watch him, the

24  big guy in the white shirt, reach down and pick up a bale of

25  cocaine.  So did he possess it?  It's not even really in

1    dispute.

2         Intent to distribute, again, this is even easier.

3    I was actually surprised during Mr. Hernandez's opening

4    statement to hear him to say that we're not going to hear

5    any evidence of intent to distribute.  Ladies and gentlemen,

6    this amount of cocaine, right, every bale 20 kilograms --

7    how many bales did you see?  30 to 40, conservatively.

8    600 kilograms of cocaine.  Special Agent Ray told you

9    $30,000 U.S. for one kilo.  Math is not my strong suit, but

10   I think that's around $18 million U.S. of cocaine.  Did he

11   intend to distribute it?  Was it personal use, that amount

12   of cocaine?  Are they having a bachelor party out there in

13   the middle of the Caribbean Sea?  No.  Of course the intent

14   was to distribute it to other people.  And as the Judge just

15   told you, it doesn't have to be a financial transaction, it

16   just means deliver it to another person, and it just so

17   happens that's the exact reason why four guys are on a boat

18   in the middle of the ocean with that amount of drugs,

19   they're taking it to deliver it to other people.  They

20   intended to distribute it.

21        Count One, conspiracy count.  Is there a plan to

22   do something illegal?  Of course.  The Judge just instructed

23   you carrying narcotics on a boat subject to U.S.

24   jurisdiction is illegal.  Doesn't have to be a formal plan,

25   a handshake, there doesn't have to be text messages between

1    two people or, you know, a recorded conversation on a

2    telephone.  Was there a plan of some kind to do something

3    that was illegal, in this case transport drugs on a boat,

4    specifically some amount of cocaine.  Were there two or more

5    people involved?  Well, there was four on the boat alone.

6    That's easy.  And really if you have to decide anything in

7    Count One, it's did he know about it and did he willingly

8    join in.  In layman's terms, was he in on it?  I've already

9    told you how every single one of those guys was in on it.

10   You know it from the way they conspired to lie to the

11   Coast Guard and you know it from your common sense.

12        The Judge just gave you an important instruction

13   about evidence, and she said in considering the evidence you

14   may use reasoning and common sense to make deductions and

15   reach conclusions.  Cocaine trafficking, conspiracies that

16   are criminal in nature, people do their best to keep it

17   secret, so you're not going to have a lot of direct evidence

18   of a criminal conspiracy, you prove it circumstantially.

19        What are the circumstances in this case?

20   Four guys on a boat, three guys from Colombia, one guy from

21   Belize.  A whole bunch of cocaine worth tens of millions of

22   dollars.  Remember what Special Agent Ray told you, there's

23   no innocent bystanders on one of these boats, and that makes

24   perfect common sense.  If you're a drug trafficker in

25   Colombia, are you going to let somebody just tag along on

1   your drug smuggling trip who might talk to the police, who

2   might steal from you?  That's a weak link in the chain.

3   When you get on that boat, a boat like the one you just saw,

4   specifically designed for cocaine trafficking, everybody

5   knows what they're doing and everybody is in on it.

6           But if that wasn't enough, ladies and gentlemen,

7   if anyone on that boat knew what was going on, it was that

8   guy, and he admitted as much to Special Agent McAllister

9   when she talked to him.  I'm the captain.  I'm the captain.

10  He was insistent.  He's in charge.  And he admitted that not

11  only to her but to the Coast Guard, and he literally said:

12  I know more than the other guys, the names, the routes, the

13  coordinates.  Did he know?  Was he in on it?  There's no

14  doubt about that.

15          Getting rid of the evidence, we've already talked

16  about it, that's consciousness of guilt.  That proves that

17  he knew what he was doing.  It proves he knew what he was

18  doing was illegal and it proves he was in on it.

19          And, of course, if that wasn't enough, you have

20  the testimony of Mr. Caceres-Lopez.  If you recall, he

21  testified that the defendant told him how much he was paid.

22  And I asked him, why does that come up in conversation?  How

23  did that come up?  What he said makes perfect sense.  They

24  were talking shop.  Oh, how much are captains getting paid

25  these days?  Well, here's how much I was paid.  That was

1   basically the conversation.  It might seem a little weird to
2   you all, but it's not weird to these guys.  This is a
3   business for them, it's what they do for a living, like
4   somebody working for the post office or a lawyer or
5   accountant.  They're talking shop.  What's the going rate
6   for being a captain these days?
7           So the fact that he's paid proves he knows what's
8   going on.  He's hired for a specific purpose and he's
9   absolutely in on it, before he even sets foot on the boat
10  you saw.
11          So we've come full circle.  It's all about is it
12  cocaine and how much.
13          Let's talk about the amount.  Well, if you know
14  it's cocaine, it's way more than 5 kilograms.  Every one of
15  those bales, as you heard from every single Coast Guard
16  witness, has got 20 kilograms in it.  So count them if you'd
17  like.  You have the video.
18          And by the way, I apologize, at some points it was
19  probably difficult to see the videos, the videos you
20  actually have in evidence.  It's a little easier to see on a
21  smaller screen, so if you feel like you need to, watch the
22  video, count the bales.  But only one, one of those bales
23  that you see splashing in the water, 40 to 50 pounds, just
24  one is way over 5 kilograms, so that is easy.
25          Is it cocaine?  That's the question.

1            Well, you know it was illegal, something illegal,

2    and you know it was drugs, jettisoned after seeing the

3    plane, the desperation, the risking of lives we already

4    talked about, the lies to the Coast Guard.  We've talked

5    about this.  You know it's a lie, there's no doubt, because

6    they're not drifting for six days.  And, of course, what the

7    defendant tells Special Agent McAllister when he's

8    interviewed, after she tells him what she's interested in

9    hearing about, narcotics on boats, and after watching the

10   video clip that we watched this morning.  So you know it's

11   illegal drugs of some kind, easily.

12           Now, you heard from the Coast Guard.  It wasn't

13   just speculation on their part.  It wasn't merely an

14   opinion.  If anybody in the world knows what a cocaine bale

15   looks like, it's those guys.  Cumulatively they've seen or

16   handled thousands and thousands and thousands of bales.

17   They know it when they see it, including Petty Officer

18   Lauginiger, who told you he was an Air Use of Force

19   Controller, meaning he's in an aircraft, he's seen cocaine

20   bales floating in the water, just like you did.

21           Every one of those officers came into court and

22   told you, I know what I'm looking at, those are cocaine

23   bales, and a very specific kind, 20 kilograms, consistent

24   size and shape.  And it makes sense, the way it's packaged,

25   uniformly, two stacks of ten, it makes a consistent shape.

1          Chief Brooks is probably the best example of that.

2    He was the one who actually did the ion scan testing.  He

3    told you about the sharp edges, and sometimes they're

4    packaged so tight you can literally count the kilos.

5          So if you're asking, well, how in the world can

6    you tell from a video what you're looking at, it's because

7    they know what they're looking at, they've seen it, and it's

8    all very consistent.  This is a business.  This is an

9    operation for these guys in Colombia.  It's just like when

10   you go to the grocery store and you expect things to be a

11   certain way, packaged a certain way.  It's the same thing.

12   It's a commodity for them.

13         Of course, Mr. Caceres-Lopez told you what the

14   defendant told him when they were talking about the good old

15   days of running cocaine from Guajira.  He told you.  I asked

16   him:  Did the defendant mention what kind of drugs he was

17   running on that boat?  What did he say?  Cocaine.

18   Consistent with every other piece of evidence in this case.

19         And last but certainly not least, you have the

20   ion scan evidence.  That was some dense information, a lot

21   of numbers, but the bottom line is this:  Nine hits on that

22   boat and those individuals, nine, all positive for cocaine.

23   Not marijuana, not heroin, cocaine.

24         Every one of those hits, Senior Chief Bomentre

25   told you from that witness stand, was within the criteria

1  for determining some amount of cocaine is present on the

2  swab.  In fact --

3              COURTROOM DEPUTY:  Mr. DeRenzo, you have

4  ten minutes remaining.

5              MR. DERENZO:  Thank you.

6              In fact, he told you that almost all of them far

7  exceeded the criteria; in some cases three, four, five times

8  the threshold.  What does that mean?  Well, he told you,

9  I can't tell you exactly how much is on the swab, whether

10 it's, you know, 17 nanograms or a milligram, but I can tell

11 you that these specific swabs have a relatively larger

12 amount compared to other swabs.  These were strong hits.

13 I think that's the word he used, strong hit for cocaine.

14             Now, remember the video we just watched.  What did

15 you see?  Where did the cocaine come from?  Middle of the

16 boat.  What's in the middle of the boat?  Cargo hold, center

17 hold, one of the places the Coast Guard swabbed, one of the

18 places they tested.

19             Which side of the boat did the bale touch as it

20 was going overboard before it made that big splash?

21 Starboard side.  Right side.  And where do they find cocaine

22 on that boat when they swabbed it, when they tested it and

23 Senior Chief Bomentre testified about, center hold,

24 starboard rail.

25             Every single person on that boat had cocaine on

1    their hands, and the defendant even had it on his forearms,

2    as well as one other individual.

3         Recall that -- the center hold.  Why is that

4    important?  It's exactly where you would expect to find

5    cocaine stored underneath that tarp, the place where they

6    were taking it out of and throwing it overboard.  Senior

7    Chief Bomentre testified that was as close to perfect as you

8    can get in an operational environment for a hit of cocaine,

9    as close to perfect as you can get, because you've got

10   things like wind and rain and sea spray and water, or the

11   gasoline that the defendant and the three other individuals

12   wiped the boat down with to try to get rid of the evidence,

13   and still it was as close to perfect as you can get.

14        Ladies and gentlemen, what other evidence do you

15   need to prove that what was in those bales, what was in that

16   cargo hold before the defendant threw it overboard was

17   cocaine?

18        I'll conclude with basically how I started.  It

19   boils down to what's in those floating packages.  You saw it

20   with your own eyes.  Is it conch, like the defendant told

21   the Coast Guard when they showed up?  I mean, he admitted he

22   threw whatever was on the boat overboard when he saw the

23   plane.  So is it conch or is it cocaine?

24        Ladies and gentlemen, the defendant did his best

25   to try and get away with it, he risked his life to do it, he

1  lied about it, he tried to get rid of all the evidence, but

2  as my colleague mentioned in opening statement, he didn't

3  quite get rid of it all, because we have the ion scans, and

4  if it wasn't for the diligence of the Coast Guard, he

5  actually might have gotten away with it.

6            You now have the opportunity to make sure that

7  doesn't happen.  We ask you find the defendant guilty of

8  both counts, Count One, conspiracy to possess with the

9  intent to distribute and to distribute cocaine; Count Two,

10  possession of that same cocaine with the intent to

11  distribute it.

12            Thank you.

13            THE COURT:  We're going to take a morning recess

14  at this time.  It's just a good time to take it.  It's

15  10 minutes after 10:00.  We're going to be in recess until

16  10:25.

17            You're welcome to walk around.  Please don't

18  discuss the case.

19                   *(Jury exits proceedings.)*

20            THE COURT:  Okay.  We are in recess until 10:25.

21            Mr. DeRenzo, could I see you a second.

22            MR. DERENZO:  Yes, Your Honor.

23                      - - - - -

24             (Recess at 10:09 a.m. until 10:26 a.m.)

25                      - - - - -

```
 1              THE COURT:  Are the interpreters ready?
 2              INTERPRETER:  Yes, Your Honor.  Thank you.
 3              THE COURT:  Let's call the jury in.
 4              Mr. Hernandez, are you ready?
 5              MR. HERNANDEZ:  I'm ready.
 6                  (Jury re-enters proceedings.)
 7              THE COURT:  Mr. Hernandez, on behalf of
 8   Mr. Hinestroza-Newbbooll.
 9              MR. HERNANDEZ:  May it please the Court, Counsel.
10              How do you prove that you are not a drug
11   trafficker?  May heaven forgive you, Mr. Newbbooll, for
12   being a fisherman from Colombia in open waters, a fisherman
13   on a boat that apparently had microscopic traces of cocaine.
14              Fortunately for Mr. Newbbooll, in this country a
15   person that is accused of a crime does not have to prove his
16   innocence, he's not expected to.  A person accused of a
17   crime has a presumption of innocence, and it's up to the
18   Government in this case to prove their case beyond a
19   reasonable doubt.
20              Ladies and gentlemen, everything that you just
21   heard the Government say, it's not evidence, and for that
22   matter anything that I say is not evidence.  You've heard
23   all the evidence and lack of evidence.
24              I want to begin by thanking you very much for your
25   attention.  We know that serving on a jury is an extremely
```

1   important job, we cannot have criminal jury trials without

2   dedicated citizens like yourself to serve as a juror, but we

3   know it's an inconvenience.  We know it takes you away from

4   your business and your family, and I think I speak on behalf

5   of all parties involved, the Government, myself and the

6   Court, we greatly thank you for your participation and

7   attention.

8           Before we get into the facts of the case, there

9   are some preliminary matters that I think it's important for

10  me to address.  First of all, this is -- as the Court

11  already told you, this is my only opportunity to address

12  you.  The Government has the opportunity to address you, as

13  they did already, and then when I sit down, they come back

14  and they can say whatever they wish to in rebuttal.  The

15  purpose is and the reason is because they have the entire

16  burden of proof, but I mention that because I don't want

17  anyone to be thinking:  Well, you know, the Government came

18  back and said this, this and that, how come Mr. Hernandez

19  didn't come back and answer whatever it is that they say?

20  And the obvious reason is I'm not allowed to.

21          I also want to stress that as we go over what was

22  testified to, and I am confident I speak on behalf of the

23  Government as well, that there is no intent by the lawyers

24  to misstate anything, but, you know, we're all taking notes,

25  and if I say something that is different than what you

1   heard, please rely on your collective memories, but there is

2   no attempt to misstate what was actually said during the

3   course of the trial.

4            Again, you've already been read the instructions,

5   but I think it's so important to make sure that everyone

6   understands not just the fact that the Government has the

7   entire burden of proof, that the defendant has no burden

8   whatsoever and that you are not in any way to hold it

9   against the defendant for not presenting any evidence.

10           It's important to realize how significant this

11  burden of proof is.  You may recall that there was some

12  discussion in jury selection about some of you, and

13  I frankly forgot who might have served on a civil jury, and

14  the burden of proof is very, very light, it's by the greater

15  weight of the evidence, or the preponderance of the

16  evidence, and I believe I used the description that it's

17  sort of like a scale, and if one side, the accusing party,

18  the plaintiff in a civil case, is able to tip the scale just

19  ever so slightly, that you would be instructed to vote for

20  the plaintiff because they tip the scale by the greater

21  weight of the evidence.

22           In a criminal case it's totally different, we're

23  talking about a much higher burden, and the Judge has

24  already defined what it is, but it's important and I ask

25  that you emphasize that proof beyond a reasonable doubt is

1  proof so convincing that you would be willing to rely and

2  act on it without hesitation in the most important of your

3  own affairs.  Unlike a civil case where probably is enough

4  or maybe or possibly, that has no application whatsoever in

5  the case that we're here for today.  Each and every element

6  charged must be proven beyond a reasonable doubt.

7          I suggest to you that reasonable doubt can come

8  from the evidence, but it can also come from the lack of

9  evidence, and by that I mean that the evidence itself, if

10  you don't believe it's credible -- and the first thing that

11  comes to mind is Mr. Caceres-Lopez, but we'll get into --

12  talk about him in a few minutes; but the evidence itself can

13  cause you to have reasonable doubt.

14          But in that analysis it's also important to ask

15  yourself, well, what else is missing?  What in the -- not

16  just the evidence but the lack of evidence is causing me to

17  have reasonable doubt?  And when we talk about -- I know

18  that the word "innocence" has been mentioned a few times in

19  jury selection, at least, and I would submit to you that my

20  client is innocent, but really that has no bearing on your

21  consideration.  The question before you -- and it's right on

22  the verdict form.  You will never see in this case or, for

23  that matter, in any criminal case the word -- the choice

24  will never be "innocent."  That's just not for a jury's

25  consideration.  The choices are guilty or not guilty.  And

1   you may think, well, he might be guilty, but for the

2   purposes that the jury is here, if you believe that the

3   Government has failed to prove an element of the crime, or

4   all elements of the crime, you are to find the defendant

5   not guilty, because that is ultimately the decision that the

6   Court is putting upon you, to determine whether the

7   Government has proven their case beyond a reasonable doubt

8   or not.

9          Now, briefly I'd like to go over what I said to

10  you during opening statement, which I believed.  Obviously

11  we hadn't heard any evidence at that point, but I believed

12  the evidence would show the defendant was not guilty.

13  I told you that I believed the evidence would show this is a

14  drug case without drugs, that the Government is alleging the

15  defendant possessed cocaine in an amount of over 5 kilograms

16  with the intent to distribute, and that there would be no

17  proof he possessed any cocaine other than an ion scan --

18  ion scan test for traces that had serious limitations, and

19  we'll talk about that, and that the testimony would show

20  that the actual quantity of the swabs that were tested is

21  destroyed, so there would be no alleged cocaine remaining

22  for your consideration or for any further testing, that this

23  alleged evidence of cocaine was microscopic and not visible

24  to the naked eye, and that there would be testimony

25  regarding possible contamination, and because of the fact

1   that it was microscopic, as to whether someone having it on

2   them would even have any idea that it was on them.

3         I submitted to you that I believed the evidence

4   would show that there would be no proof that the amount

5   was -- what the amount was at all, but much less over

6   5 kilograms, as alleged by the Government, that there would

7   be no evidence of intent to distribute, and I believed the

8   evidence would show that the defendant was detained along

9   with other mariners by law enforcement after being aboard a

10  fishing vessel; and that I told you that I believed you were

11  going to see a video, which turned out to be correct,

12  showing the jettisoning of some cargo, and I told you that

13  you would find that that video had serious limitations to

14  what it actually shows, but even more than what it actually

15  shows, what it actually proves; and that, finally, you would

16  hear, among other things, the testimony of an informant who

17  I suggested to you then and I suggest to you now has serious

18  credibility problems, that he would have a very strong

19  motive to lie in order to reduce a significant sentence of

20  20 years in prison.  And of course, as you can any evidence,

21  then you can accept it or you can completely reject it.

22  Just because he testified doesn't mean that you have -- you

23  have to listen to it, which you did, and you have to

24  consider it, but you have the ability -- you are the judge

25  of the facts.  The judge is the Judge of the law, but you

1   are the ones that make that determination, and when a

2   witness testifies, particularly someone like

3   Mr. Caceres-Lopez, you have the absolute right to completely

4   reject it after considering it.

5           I asked you to keep an open mind and also please

6   do not speculate, because I'm suggesting to you, as we go

7   over some of what was presented, you are being asked

8   repeatedly by the Government to speculate.

9           Now, we heard -- I think the first two witnesses

10  were Officers Humphrey and Dickinson, who were on the plane,

11  and as you heard, everything that they could testify was

12  pretty much from the video, because they were three to

13  six miles away, at an altitude of 6,700 feet.  And you saw

14  the same video that they were seeing, except for the fact

15  that you only saw portions because many parts of the video

16  that were not shown, as testified to, visibility was just

17  not good because of cloud coverage and other factors, but

18  nevertheless you saw what they testified to.

19          The video, I suggest to you, and it's your

20  evaluation, I suggest to you, and I think the officers

21  admitted to that, that the officers -- the video doesn't

22  show what -- who did what.  The video doesn't show what

23  cargo was depicted.  The video doesn't show knowledge or

24  intent to distribute.  The video doesn't show who possessed

25  what.  And obviously, because of where they were at, as far

1  as they were, they couldn't hear what was going on, and

2  certainly they could not see anything from the -- with the

3  naked eye, it was strictly by watching the video.

4          And this is when we start the Government trying

5  to -- and I forget how many witnesses, I think they were all

6  asked, well, you saw what you're seeing here, these

7  packages, and what is your opinion of what these packages

8  contained?  And you heard several of them say:  My opinion

9  is that it was -- it was cocaine.  The fact is you've seen

10 the video, you're speculating, ladies and gentlemen, you're

11 being asked to speculate what it was, not what it actually

12 shows.

13         You also heard from -- and I apologize if --

14 I know I've mispronounced it already, so I'll probably

15 mispronounce it again, Petty Officer Eric Lauginiger, and

16 he -- based on his observations, he -- there were obviously

17 no bales to -- I think he was the first boarding officer.

18 He has no supernatural powers.  There were no bales to

19 inspect, there was no spillage of anything, because, yes,

20 there's testimony of traces that are microscopic, but

21 in addition to the fact that there were no bales to inspect,

22 there was no spillage of anything that would say, ahh, that

23 looks like we got to get that, recover that, and send it to

24 a lab because that might be cocaine.

25         Again, he's talking about his experience and he

1   has his opinion that it's cocaine based on the fact that

2   they -- you know, that's the consistent opinion of the

3   Coast Guard, but there is actually no proof that there was

4   cocaine.

5           One of the things about this officer, when we --

6   we did get into a conversation, because I think he was the

7   first officer that mentioned that the defendant had said he

8   was the captain, and obviously the Government is trying to

9   give that the significance that, well, he must know exactly

10  what was in those packages, and I -- I asked him a series of

11  questions, not specific about this case, because he wouldn't

12  be able to give us an answer, but in general what does it

13  mean to be a captain.

14          Being a captain -- and this is from the testimony

15  of the officer -- you're in charge of the boat, but you

16  don't necessarily know, you cannot say -- he cannot say

17  under oath that he knows that the captain would know the

18  contents of every package, or of any of the packages.  It's

19  not something that he would necessarily know.

20          I suggested to him in some cases -- and these are

21  hypothetical, general questions, not specific, because he

22  can't answer anything about the specifics of this case --

23  are there occasions where a captain could be used as a patsy

24  by someone else on board who was an agent of a drug

25  trafficker?  And I'm not suggesting that's -- there was no

1   evidence that that's what happened here, but it's certainly

2   something that the officer could say, yes, that that can

3   happen.

4           Nevertheless, the packages were wrapped, and from

5   everything that all the witnesses can say it's certainly not

6   marked cocaine by any means; in fact, nothing was recovered

7   to inspect regardless, other than what you saw in the video.

8           I did ask some questions, and again, it's general

9   questions, not case-specific, but if you find out

10  theoretically that -- you're on board and you find out that

11  you are carrying something that's illegal, whether it's

12  conch or whether it's cocaine or whatever it is, if you

13  don't want to get caught, you basically have two options.

14  If you -- you can -- if you're in the middle of the ocean

15  and you find out that maybe you might be doing -- you may be

16  carrying some cargo that's illegal, you certainly can stay

17  on board, or you can jump off in the middle of the ocean.

18  So it's very limited on what a person can do if they -- and

19  this is assuming, for the sake of argument, that you as a

20  captain or as a crewman -- if you happen to find out

21  afterwards.  And again, these are general questions that are

22  not case-specific to this case, but you do -- the point

23  being, in asking these questions of this officer, is that if

24  you were in that situation you would only have a very

25  limited amount of options available to you.

1           But in any event, getting back to the
2   case-specific of this case, cargo was never recovered, so
3   you -- there's no way of being able to determine that it was
4   in fact cocaine.
5           The officer -- and I believe he did, he gave his
6   opinion, but he said, I can't determine if the defendant or
7   anyone had knowledge.  I can't -- I only would be
8   speculating, that he cannot determine the amount, because
9   that would be speculating, and he answered that he would
10  have no idea how these men ended up on that vessel, don't
11  know how they were recruited or what they were told before
12  they went on board, so those questions were case-specific
13  and those questions clearly are consistent with the other
14  officers, that, yes, they have opinions of what it might be,
15  but none of them can say with any certainty, because in fact
16  there was nothing, nothing whatsoever to be recovered,
17  nothing was recovered other than the trace amounts that
18  you've heard about and we'll talk about.
19          You heard from Diego Rivera, who was another
20  boarding officer.  He was the Spanish interpreter.  He said
21  that all crew members were consistent regarding the --
22  getting -- dumping the engines, because they were -- they
23  were having trouble with the engine and were using it as
24  anchors.  Every one said the same thing.
25          Now, it might have been interesting if they had

1    been interviewed completely separately to see if they had

2    different answers, but they all said the same thing, they

3    were consistent with that explanation of why the engines

4    were dumped.

5          They were also -- I know there was some discussion

6    of sea shells versus conch shells.  Obviously it was a

7    correction that it was discussion about conch shells, but

8    each -- all four of them were consistent with that

9    explanation.

10         Now, it might have been interesting if one of them

11   had said, I don't know anything about conch shells, we

12   weren't looking at conch shells, but they all were

13   consistent with that explanation.

14         And we also heard from him that the vessel was

15   destroyed, so there would be -- there would be no ability to

16   result in further testing by a chemist or for anyone to be

17   able -- including the jury, to be able to see the vessel.

18         You also heard from Alexander Ramos, another

19   boarding officer.  He's one of the ones that was involved in

20   the swiping.  Other than the fact that it was policy, they

21   are inspected, their hands, their wrist and the back of

22   their neck, as opposed to the individuals, the crewmen

23   on board that apparently were only checked on their hands

24   and their forearms, but there was really no explanation for

25   that, but there's a difference between what they were

1   checked for and what the defendants were checked for.

2          In any event, all of these officers are saying the

3   same thing, they did not see any contract -- contraband

4   on board.  Same thing with Paul Fahey.

5          Tyler Perio, another officer that was involved in

6   the swiping, in fact, he was the one that conducted the

7   actual swipes of the crewmen's hands and forearms, and

8   I asked him about why are you doing that versus the

9   officers -- the boarding officers are actually not inspected

10  on their forearms, but other than the fact that it was

11  company -- it was policy, that there wasn't any real

12  explanation for that.  But in any event, they're looking for

13  microscopic evidence, trying places that people would likely

14  touch, such as the railing, doorknobs or whatever, but did

15  not see anything suspicious with the naked eye.  Cocaine

16  traces, per his testimony, were found in some areas but not

17  in many other areas.

18         Daniel Brooks also testified, where he asked --

19  I asked him about these traces and how it got there, when it

20  got there, who put it there, and he was not able to,

21  of course, provide any answers because it would be

22  impossible to do that, and again, repeating the fact that

23  everything was not visible to the naked eye.

24         We then heard from Steve Bomentre, who was the

25  Senior Chief Maritime Enforcement Officer and the person

1    that testified as an expert regarding ion scan testing.  He

2    is not a chemist.  I asked him about if he had any

3    experience in law enforcement on land, because I asked him

4    about the distinction between a preliminary test, such as

5    in -- on land, if you're driving your car and you have a

6    traffic stop and you're stopped and there's suspicions that

7    you might be using illegal drugs or something, you may be --

8    it doesn't have to be cocaine, but some other type of

9    illegal drugs, you would potentially be asked to submit to a

10   Valtox test.  That is not the same as a chemist coming in

11   later to court and saying, I conducted this scientific test

12   and in fact it was cocaine or whatever, but it was -- it's a

13   preliminary test, and he was not familiar with it, but

14   because of the fact that this ion scan testing, which is

15   similar to the Valtox test, it's a preliminary test, it

16   was -- whatever was recovered was not submitted to a lab.

17   I suggest to you that that's something for your

18   consideration.

19          And again, we're talking something microscopic,

20   where -- nothing that the Government can say the defendants

21   saw the cocaine, but nevertheless, it could -- these swipes

22   could have been recovered, and instead of using a

23   non-chemist to conduct a test, they could have submitted

24   these, these swipes or swabs, to a lab, where a scientist

25   could come in and say it is cocaine or it is not cocaine.

1    That was not done in this case.

2            He did not participate -- Mr. Bomentre did not

3    participate in the actual testing or the swiping, so his

4    opinion is based solely on the documents contained -- that

5    contain the test results prepared by the other officers, and

6    as I said, there can be no further testing because whatever

7    was recovered was destroyed in the process.

8            He agreed that ion scan, this method used in this

9    case is not scientifically valid, is not a scientifically

10   valid means of discriminating between individuals who handle

11   illicit drugs and individuals who were unknowingly exposed

12   to the residue of illicit drugs.  He also agreed that the

13   positive ion scan result for cocaine does not provide any

14   information about how, when or where the drug or the trace

15   quantity came to be present on the sampled surface, that

16   these trace quantities are consistent with potentially past

17   illegal activities or with an innocent simply exposure -- an

18   innocent exposure to an environment -- the environment that

19   you're there.

20           One thing that came out too was that -- it may not

21   be the most important thing, but I think it's something to

22   mention for your consideration, is that these boarding

23   officers were not tested afterwards, and I suggest to you

24   that it would have been interesting to find out that if in

25   the course of being there, doing whatever testing they were

1 doing, simply by rubbing up against something, that -- as to

2 whether any traces would have turned up on them.  That

3 didn't happen.

4         I asked him if a trace amount can exist on a

5 substance for more than a year, and his answer, of course,

6 was qualified, as long as the -- I can't remember the exact

7 words that he said, but basically if it's -- if the area is

8 not disturbed, if you have -- it's the same as a DNA or

9 fingerprints, if you leave evidence in a spot, it could --

10 it could -- there's no aging to it, it could be there for a

11 week, it could be there for a month, it could be there for a

12 year.  Then again, you could get a paper towel and rub it,

13 clean it up real well and it disappears.  So the point being

14 is that he was not able to put any date of how long these

15 traces may have been in the spots that they were recovered,

16 so obviously the traces could have been from a previous

17 voyage or brought on the boat by other people before this

18 voyage took place.

19         And also the traces themselves do not determine

20 how much was on the boat.  If in fact someone had 1 or 2 or

21 3 grams of cocaine for personal use, he can't make that

22 distinction, as opposed to say over 5 kilograms of cocaine.

23 Anything -- any answer along those lines would have been

24 pure speculation.

25         We heard from Mr. Caceres-Lopez.  He is

1    cooperating with the Government after having been sentenced

2    to 240 months, which is 20 years.  This was a 2017 case

3    where apparently he was taken into custody sometime in 2018

4    and did not plead guilty until he had a plea agreement that

5    was signed in June of -- June 25th of 2019.  Of course he's

6    going to come in here, he did, and tell you that he's doing

7    it -- I don't remember the exact words, but basically he's

8    doing it for truth and justice and, I guess, the American

9    way.  I suggest to you that that's a bunch of crap, that his

10   motivation is to try to get out of prison a lot shorter than

11   the 20 years he's been sentenced to.

12           I want to make something clear, that I'm not

13   suggesting that the Government suggested to him that he

14   needed to make up a story.  I'm not accusing law enforcement

15   at all.  But we have to use our common sense.  He signed a

16   plea agreement where he knows from the words of the

17   plea agreement there's something called a Rule 35, and a

18   Rule 35 means that you have to cooperate, but you can't even

19   be considered for a reduction unless the Government files

20   that motion.  If the Government decides we're not going to

21   do it, Mr. Lopez -- or Caceres-Lopez has no other possible

22   way of getting a reduction of sentence, so he knows what

23   he's got to tell them, whether it's against Mr. Newbbooll or

24   somebody else, but he's sitting in jail knowing that he's

25   got one possibility of getting a reduction of sentence.

1          It's logical that inmates at a jail may discuss

2    their cases, you know, even share some police reports, so

3    that Mr. Caceres-Lopez would have some knowledge about the

4    general facts, and say, hypothetically, a -- whether it's

5    Mr. Newbbooll or somebody else saying, you know, this is

6    what the Government is accusing me, these -- this is what

7    they're saying I did, and I am not guilty, I am not guilty,

8    I am not guilty.  Mr. Caceres-Lopez knows that that's of no

9    use to him.  He can't go to the Government and say, you know

10   what, you've got this guy sitting in the same general -- I

11   don't think it's the same cell, but the same block or

12   whatever, cellblock, and, you know, I know that you've got

13   him accused of these crimes, but he keeps telling me that

14   he's not guilty.  What do you think the Government is going

15   to do with that?  Absolutely nothing.  It's of no use to

16   him.

17          He's got -- he, Mr. Caceres-Lopez, has to be able

18   to come to the Government and say, guess what,

19   Mr. Hinestroza-Newbbooll confessed to me, he gave me the

20   fact that he was knowingly possessing over 20 kilos of

21   cocaine with intent to distribute.  He knows that those are

22   the words that will get the attention of the Government, and

23   he knows that he's got to testify accordingly in order to be

24   able to come back and get the Government to file this

25   Rule 35 motion, which is his vehicle, his only vehicle to be

1    able to get a reduction of his sentence.

2            Interestingly, he can say -- what he says are

3    things that cannot be verified one way or the other.

4    I mean, think about it, ladies and gentlemen of the jury.

5    Somebody could come in here and say, you know, I swam in the

6    Olympics and won a gold medal, and you can check that out,

7    you can check the Olympic records and find out if that

8    person is lying, because if he's not on the list of Olympic

9    medal winners for swimming, you know he's lying.  But a

10   person could come in here and say, I swam the

11   English Channel when I was 25 years old.  You may believe it

12   or not believe it, but the fact is you can't verify --

13   there's nothing you can do to verify it.

14           Everything that Mr. Caceres-Lopez -- nothing of

15   what he says can be verified.  He can say this, this, this

16   and that, he confessed, he told me this and told me that,

17   and you can question his credibility, but you can't with

18   hard facts verify anything that the man said.

19           I suggest to you, ladies and gentlemen, you could

20   ask yourself, why would the Government even call him?  If

21   they've got this bang-up case of possession and amounts and

22   proving everything they say they're proving, why would they

23   dirty up their case by bringing in someone like

24   Mr. Caceres-Lopez?

25           I suggest to you, ladies and gentlemen, it's

1     because the Government knows they've got proof problems in

2     this case.  The only person that could say that

3     Mr. Newbbooll possessed cocaine in this case is coming out

4     of the words of Mr. Caceres-Lopez.  That's why he's being

5     called as a witness.  That's why the Government is having

6     to -- they present all these credible boarding officers,

7     Coast Guard officers, that can testify truthfully about what

8     they saw.  I suggest to you that their opinion of whether

9     it's cocaine or not should not be considered because that's

10    speculation, but they're testifying about what they saw and

11    heard, but they can't say what Mr. Caceres-Lopez says,

12    that's why he's called as a witness, because they needed to

13    fill that huge void in their case.

14          There are plenty of reasons, ladies and gentlemen,

15    of why you should completely reject the testimony of

16    Mr. Caceres-Lopez.  He is not a credible witness.

17          The defendant made some statements to FBI Agent

18    McAllister, and you will be given -- oh, and by the way,

19    before I get off of Mr. Caceres-Lopez, I invite you to

20    remember the instructions by the Court that you should

21    consider -- I mean, obvious -- this is an obvious statement,

22    but you should consider his testimony with more caution.

23    "A witness who hopes to gain more favorable treatment in his

24    own case may have a reason to make a false statement in

25    order to strike a good bargain with the Government."

1        As I was saying, you heard from Agent McAllister

2   about statements that Mr. Newbbooll said, and let's make

3   sure that we know exactly what he did not say.

4        He said he was the captain and he knew more or had

5   more info than the others.  He never -- you never heard any

6   testimony about the fact that he had knowledge of illegal

7   drugs or anything along those lines.  That's what he said,

8   that's -- well, what you heard the agent say is what he

9   said.  He didn't say anything beyond that.

10       I'm almost done, but I think it's important to

11  discuss two more areas.  Possession.  You've already been

12  given the instruction on possession, and there can be actual

13  or constructive possession.  You can be guilty either way,

14  and basically what that means is that I have this pen in my

15  pocket, so I'm in actual possession of this pen.  If I put

16  it down by my notepad when I'm walking to throw something in

17  the trash can, I am in constructive possession.  It's not in

18  my physical possession, but it's mine, I know it's there,

19  I have knowledge that it's there, obviously.  That is

20  actual -- or that is constructive possession.

21       In order to be guilty of possession, much less

22  possession with intent to distribute or anything else, there

23  must be proof beyond a reasonable doubt that there was

24  in fact cocaine.  I suggest to you there's not.  There must

25  be proof beyond a reasonable doubt that there was more than

1    5 kilos of cocaine, and I suggest to you there's not.  And

2    there must be proof beyond a reasonable doubt that the

3    defendant has knowledge, and I suggest to you very strongly

4    that the evidence is not there.  You may have suspicion, but

5    suspicion is not enough.  You've been asked to speculate but

6    you can't speculate.

7            Ladies and gentlemen, if you -- if a jury

8    speculates, you're basically -- and I'm not suggesting you

9    would do this, but you would abandon your duty as jurors.

10   You are the judges of the facts, and you decide facts based

11   on the evidence that's actually been presented to you, not

12   speculation.  You're not -- you should not say, well, maybe

13   it is or maybe it isn't, so let's go with maybe it is.

14   That's just not the way it works.

15           We have several classic examples in this case.

16   The most obvious is packages, these packages, which were

17   never inspected, not even an empty package, it was -- no

18   package was ever inspected.  You have the video, is what you

19   see.

20           These officers, none of them suggested -- and I'm

21   not trying to be funny, but no one here has supernatural

22   powers.  This is not like -- some of you may not remember

23   the Superman TV Show, but I do, and, you know, whenever

24   there was a problem Superman could use his x-ray vision and

25   look inside panels or behind doors and determine what was

1   there.  That does not exist in reality, that does not exist

2   in real life, but you're on multiple times being asked to

3   speculate regarding the contents of those packages.  You're

4   being asked to speculate about the amount.  Pure

5   speculation.  You're being even asked to speculate that

6   because the boat was a certain color, that's evidence of

7   guilt.  You're being asked to speculate about intent to

8   distribute, something that isn't even proven itself, because

9   there has been no proof beyond a reasonable doubt of

10  cocaine.  The only real proof other than the traces is the

11  testimony of Caceres-Lopez.

12          Ladies and gentlemen, the Government is asking you

13  to speculate because they lack proof in this case, and

14  I suggest to you that if you -- and I -- whatever I may have

15  forgotten to mention, please rely on all of your notes and

16  all of your collective memories in this case.  I suggest to

17  you that if you carefully consider the evidence in this case

18  but also a lack of evidence in this case, that the only just

19  and correct verdict is a verdict of not guilty as to

20  Counts One and Two of the indictment.

21          Thank you.

22          THE COURT:  Mr. DeRenzo, in rebuttal.

23          MR. DERENZO:  Thank you, Your Honor.

24          Ladies and gentlemen, let's clear just a few

25  things up.

1           The testimony under oath in this courtroom,
2    whether it's from a Coast Guard officer or an inmate who
3    spent time with the defendant, is proof, it is evidence.
4    Testimony is proof.  Of course, it's your job to decide the
5    weight to give it, but no mistake, it is proof.
6           But don't take my word for it, take the word of
7    the Judge and what's in your instructions.  That's what the
8    law is and that's you law that you have to apply to the
9    evidence in this case.  You won't see anywhere in there that
10   just because a Coast Guard officer who has seen bales of
11   cocaine thousands of times comes in here and tells you that
12   he knows what he's looking at, that that's not proof.  You
13   won't see that in those instructions.  Do you know why?
14   Because that's not the case.
15          You won't see anywhere in those instructions that
16   in order to prove a drug conspiracy or possession of drugs
17   we have to actually put drugs on a table or have a chemist
18   testify.  You won't see that anywhere.  The reason is
19   because that's not the law.
20          So there's proof, and it's not speculation, it's
21   not conjecture, it's not just an opinion, we didn't just
22   drag somebody off the street to come in here and say, hey,
23   it's my opinion, it looks like cocaine to me.  These aren't
24   anybody -- these aren't your average people, these are
25   Coast Guard officers who know what they're looking at, who

1   have handled, personally unpackaged bales of cocaine

2   thousands of times.

3          Pay attention to the burden in this case, the

4   definition of reasonable doubt.  It's important.  It's not

5   insignificant.  I'm not minimizing it.  We own it from the

6   beginning and we own it now.  But it's important to

7   understand what it is and what it isn't, and that's in the

8   instructions that you've already received and the written

9   copy you have to take back with you.

10          Our burden is beyond a reasonable doubt, not

11  beyond all possible doubt.  We don't have to exclude every

12  theoretical, hypothetical, speculative possibility, because

13  that's impossible.

14          It says:  A reasonable doubt is a real doubt, a

15  real doubt, not conjecture, not speculation, not the

16  infinite world of possibilities.  It has to be real, but

17  more importantly it must be based on your reason and your

18  common sense.

19          When?  When do you apply that reason?  When do you

20  apply that common sense?  After.  Only after you've

21  carefully considered all the evidence.  Not in isolation,

22  not just one witness, not just one piece of evidence, all

23  the evidence.

24          I want to respond to a couple of the critiques of

25  the evidence in the case, and we'll just start with

1  Mr. Caceres-Lopez.  Mr. Hernandez asked, well, why in the

2  world would we even call that guy to the stand?  I submit to

3  you, we didn't need to, you can decide the case without his

4  testimony, but the reason is it makes your job easier.  You

5  can view his testimony, not alone, not in isolation, not in

6  a vacuum, but when you look at all the other evidence and

7  ask yourself how would he know those details unless it's

8  just like he told you.  What was the last thing he said?

9  I asked him, where did that information come from?  The

10  mouth of the defendant.  And how would he know these

11  details?  How would he know?

12          I'll get to that in just a second, but let's

13  address the cooperation issue.  Mr. Hernandez made some

14  argument about that.  He agreed to cooperate, he admitted

15  that to you, it's one of the first things I asked him about,

16  but what else did I ask?  When you signed that agreement,

17  what did you understand in terms of your obligation to tell

18  the truth?  He said, I had to tell the truth or all bets are

19  off.  No benefit, Rule 35s or whatever.  If you lie, you get

20  nothing.  That's what his testimony is.

21          So it's not just cooperation, it's not say

22  anything to get out of jail early, it's both.  So there's

23  not really a big benefit for him to come in here and lie to

24  you, because he knows if he does, not only will he not get a

25  benefit, he might not get out of prison early, he can

1  actually be prosecuted for perjury.  He told you that on the

2  stand.  He knew that.  He knew that was part of the deal.

3          But as I alluded to, more importantly, any motive

4  he might have -- and certainly people in jail might be

5  opportunistic.  We're not hiding from that.  It's a

6  possibility.  It's happened before.  But the question you

7  have to ask yourself is:  How would he know the details?

8          Apparently it's uncontested that nobody from the

9  Government told him what to say.  He doesn't read English.

10 He doesn't speak English.  He only speaks Spanish.  He's

11 never seen any information from the defendant's case.  And

12 what did he tell you?  What are the details?  They were very

13 specific to this case, sinking the cocaine with the engines.

14 If you recall, when the Coast Guard testified, Special Agent

15 Ray, they had only seen that collectively, everybody who

16 took the witness stand, one other time.  In fact, in that

17 case they screwed up, those fuel lines you saw got tangled

18 and they weren't actually able to sink.

19         Special Agent Ray, he's been doing this, can't

20 recall exactly, 12 years.  In 12 years he's seen one other

21 time, and somehow Caceres-Lopez knows about it?  The only

22 way he would know is because the defendant told him.  So you

23 don't just have to take him at his word.  Look at all the

24 evidence together.

25         The crew makeup is unusual, a guy from Belize,

1  doesn't even speak Spanish, not from Ecuador, not from

2  Mexico, not from Honduras.  He told you -- I asked him, did

3  he -- did the defendant tell you about the crew on the boat?

4  Yes, two other guys from Colombia and one guy from Belize.

5  Did he talk to the Coast Guard officers?  Did we show him

6  any reports?  Did he see the video?  None of that, and yet

7  he knew.  The only person who knew that information was the

8  defendant.

9            And he did what people do in jail.  They're

10  lonely, they speak Spanish, they don't speak English like

11  the other inmates, they talk.  It makes sense.  And what's

12  the most important thing on their minds while they're

13  sitting in jail waiting for their day in court?  Their

14  cases.  Exactly what you would expect two people housed in

15  the same block who only speak Spanish to talk about.

16            Contamination.  There was some argument about

17  that.  Recall, we had a few witness testify about the

18  processes that they used, start to finish, from the taking

19  of the swabs.  Well, really, it starts before that.  The

20  boarding team gets swabbed on their hands and their neck,

21  they're wearing long sleeves, that's why not the forearms,

22  you heard that, standard Coast Guard policy.  Literally

23  everything in this case was done according to the book.  And

24  that has not even really been challenged in this courtroom.

25  We're talking about errors and doubts and contamination.

1   Everything is done by the book, everything.

2         The boarding team was swiped before they get on

3   the boat.  No cocaine.  Only one interdiction on this

4   patrol.  One.  Where did the cocaine come from on those

5   swabs?  It wasn't from cross-contamination 100 miles off the

6   coast of Jamaica.  It came from that boat, those bales.

7         When Senior Chief Bomentre got on the stand --

8   you know, Mr. Hernandez is right, we don't have Superman to

9   use his x-ray vision to see in those packages, but we do

10  have a Senior Chief, and what the Senior Chief told you --

11  and he's an expert in this stuff, he knows all about it --

12  he told you that technology, the instrument that he used,

13  it's all valid, reliable, scientific method of determining

14  whether or not drugs are on a surface and what kind of

15  drugs.  It's not speculation.  It's not conjecture.  And

16  that has not even been challenged.  So you know, certainly

17  beyond a reasonable doubt, that cocaine was on those

18  surfaces.

19        There was some argument about, well, we don't know

20  how long the cocaine was on the boat.  It could have been a

21  year ago.  Well, I asked the Senior Chief about that.

22  Senior Chief, do you have an opinion about how recently the

23  cocaine was on the boat?  Yes.  His answer?  Recently.

24  I can't tell you if it was one day or one week, but I can

25  tell you it was recently, and that's because of all the

1   environmental factors, the presence of fuel.  You'll recall

2   that all the boarding team members said they smelled the

3   strong smell of fuel.  Why?  Because Mr. Caceres-Lopez told

4   you the defendant and the other three individuals wiped the

5   boat down.

6            So despite all of those things present, you still

7   got a lot of cocaine residue.  Senior Chief, who knows about

8   these things, who has been on boardings, has done

9   counter-drug patrols, said it's been there recently.  When?

10  Earlier that afternoon.  You saw it with your eyes.

11           The story that the defendant and the three other

12  guys told the Coast Guard when they showed up, Mr. Hernandez

13  argued to you was consistent, that's somehow helpful to his

14  cause.  I submit to you the reason it's consistent is

15  because they're all in on it.  You know it's a lie.  The

16  boat is not drifting for six days, it's not out of gas, you

17  don't have to wonder about that, and they all said the same

18  thing.  It's because they're all in on it.  The consistency

19  shows the conspiracy.

20           There was some talk about patsies or unknowing

21  participants.  That's the very definition of speculation and

22  conjecture, because there's not a witness who came into this

23  courtroom that talked about and testified to you that the

24  defendant was a patsy or unknowing person on this boat.  Not

25  one witness.  That, ladies and gentlemen, is unreasonable

1  doubt.  That's not our burden.

2          Now, I certainly understand the argument of the

3  defense, and they want you to focus on each piece of

4  evidence, each witness individually in a microcosm, in a

5  vacuum, and if you isolate one witness, one Coast Guard

6  officer, just the ion scan evidence, just the testimony of

7  Caceres-Lopez, sure, there could be reasonable doubt, but

8  that's not your job.

9          Think of it like a jigsaw puzzle.  What do you do

10  when you have a jigsaw puzzle?  You've got the picture on

11  the front, right?  That's what it's going to look like.

12  You open that thing up and you pour the pieces onto your

13  table.  Now, if you pick up one puzzle piece and you look at

14  it, you don't know what it is, you're not sure, because it's

15  just one piece.  Your job is not to look at one piece, it's

16  to look at all the pieces, and that's exactly what the law

17  tells you to do, because reasonable doubt can only be based

18  on weighing all the evidence together.

19          Remember that instruction, and I'll read it again,

20  it's probably the most important one:  In considering the

21  evidence, you may use reasoning and common sense to make

22  deductions and reach conclusions.  That means put the

23  evidence together using your common sense.  The common sense

24  is the glue.  And you shouldn't be concerned whether it's

25  direct evidence, like a chemist who talks about a brick of

1  cocaine and what's in it, or circumstantial evidence.  The

2  law says there's no difference and you decide what weight to

3  give it.

4         So put the puzzle pieces together, the video, the

5  Coast Guard testimony, the lies of the defendant, which are

6  proveably and ridiculously false, the ion scan evidence and

7  the defendant's own admissions, not just to Caceres-Lopez

8  but to Special Agent McAllister, who has been investigating

9  narcotics smuggling, who showed him the video, from his own

10  mouth said, I am the captain, I am the captain, I'll give

11  you more than you want, names, routes, coordinates.

12         Ladies and gentlemen, there's no reasonable doubt,

13  based on all that evidence, about what you're looking at,

14  the picture on the front of that puzzle box.  There's no

15  reasonable doubt here.  That picture is a routine, run of

16  the mill, typical in every way maritime cocaine smuggling

17  operation coming from ground zero, Guajira, Colombia, headed

18  to Honduras.  Hundreds and hundreds of kilograms of cocaine

19  worth millions of dollars.

20         When you put aside the theoretical possibilities

21  and conjectures, right, which is not our burden, when you

22  put that aside and you just look at the evidence, there's

23  only one reasonable conclusion, only one conclusion that

24  actually makes sense, and that is that the defendant is

25  in fact guilty of conspiring with the other three people on

1   the boat to possess with the intent to distribute and to

2   distribute cocaine and to actually possess that cocaine with

3   the intent to distribute it.  There's no reasonable doubt

4   about the amount.  We talked about that earlier.  So we ask

5   that you do just that, find the defendant guilty of both

6   Counts One and Two.

7         On behalf of my co-counsel, Ms. Goodin, and

8   Special Agent Campbell, we appreciate your time and your

9   attention throughout the week.

10        Thank you very much.

11        THE COURT:  All right.  Ladies and gentlemen, let

12  me ask if you would turn again to that last instruction.

13        I'll just remind you the first thing that you will

14  need to do when you get back to the jury room is to select a

15  foreperson, and the foreperson acts kind of like a chairman

16  and will direct your deliberations and will sign and date

17  the verdict form, and if you have a question or anything,

18  will speak for you when you come into court.

19        If at any time -- and I'm reading from the last

20  paragraph.  If at any time you wish to communicate with me,

21  please write down your question or message and give it to

22  the security officer, who will be the seated outside of your

23  deliberation room.  He will in turn bring it to me and

24  I will respond as soon as possible.

25        If it's an issue about the trial itself, something

1   that happened in the trial, maybe some question you have

2   regarding a fact or something, I will reconvene court and

3   get the attorneys here and we will get the defendant here,

4   Mr. Hinestroza, and answer it, bring you in here and answer

5   it in here.  So if that's the situation, it sometimes takes

6   me a few minutes to get everybody together, so I hope you

7   will understand that.  And I'm not suggesting you'll have a

8   question, I'm just telling you that's normally the procedure

9   if you do have a question.

10          The other thing that I was going to tell you --

11   well, a couple of other things.  One of the things that you

12   will have back in the jury room, as I have told you, is the

13   indictment, and as I've told you, the indictment is the

14   charging document, it's not evidence, it's not proof of

15   guilt, but it will go back with you to the jury room.

16          I just wanted to explain to you, in case you think

17   that something fishy is going on, you'll see some -- a blank

18   page and the top of another page that's black.  What we have

19   done or I have done is just blanked out a portion of the

20   indictment which really doesn't pertain to what you have to

21   decide here, it has to do with a forfeiture, which is an

22   entirely different issue, so I'm not trying to keep anything

23   from you, it's just we have blacked that out because it's

24   not anything that you're going to have to decide.

25          The other thing that has happened is that in the

1    indictment that we've blacked out, the other co-defendants

2    in the case -- there were obviously, as you know, other

3    co-defendants in this case, and there were actually four

4    people charged in this indictment, and you will only see

5    Mr. Hinestroza-Newbbooll's name on here, that's because he's

6    the only one that you have to make a decision for.  Again,

7    we're not trying to keep anything from you, but he is the

8    one that you're going to be asked to decide whether he's

9    guilty or not guilty of the charges against him, and then

10   I will also just remind you you're not to speculate on what

11   happened to the other defendants that were charged in the

12   indictment.

13           Finally, as I said, you will have back with you

14   the other evidence that's been introduced in this case, and

15   you can look at it at your leisure.  If you do break apart

16   at any time, to go get a Coke or a drink or just because you

17   want to walk around maybe or go down and use your phone, and

18   you want to take maybe a 15 minute recess, I will ask that

19   you stop your deliberations.  All 12 jurors should be in

20   that jury room if you're talking about the case.  Really the

21   importance of that is you don't want to get some jurors who

22   are hearing and talking about something and the other jurors

23   don't hear it, because this has to be a unanimous decision,

24   it's got to be a decision of all of you, the jury as a

25   whole.

1          So you're welcome to take a break if you want to
2   do that and walk around for a little bit during your
3   deliberations.  Mr. Fitchett will be right there, he'll know
4   you're doing that.  Please keep it at a limit of about
5   15 minutes if you do that, and please stop deliberations if
6   you do that.
7          We have ordered lunch.  I am told that lunch will
8   be here about noon.  That will keep you from having to take
9   an hour and 15 minutes at lunch to go get something to eat,
10  so you can deliberate as you're eating and not have to break
11  apart for an hour and 15 minutes to go get lunch.  Nothing
12  great, it's just usually sandwiches, but it will -- it will,
13  again, save time as far as breaking apart and going to get
14  lunch, because it is 11:30.
15         Last, two of you are alternate jurors.  The law --
16  I think we talked a little bit about this, but the law
17  allows only 12 jurors to make a decision in this case, and
18  we selected 14 of you.  The reason we did that, as I said,
19  is if somebody got sick or somebody was delayed in traffic
20  for a couple of hours and couldn't be here for two hours, we
21  would just ask the alternate juror to participate and we
22  wouldn't have to start the trial all over again, so always
23  I pick alternate jurors, as I think most judges do.  That's
24  just to save the time and the effort and expense of having
25  to retry a case if something happens to one of the 12

1    jurors.

2         So let me tell you who the alternate jurors are,

3    and because everyone has remained, you will not be

4    participating in the deliberations.  Ms. Sawicki and

5    Mr. Sapio, you are the alternate jurors in this case, so in

6    just a few minutes I'm going to send the jury back to the

7    jury room, you're welcome to go back if you've got anything

8    in the jury room, get it, but you're free to leave.  You can

9    go home, you can go back to work.  We have your telephone

10   number, and I'm going to ask the courtroom deputy to give

11   you a call after the jury reaches a decision, because I'm

12   sure you would like to know what the jury decides.

13        In addition to that, your notes that you may have

14   taken, the jury instructions, you can just leave those

15   face down in your chairs.  We will shred them.  We don't

16   read them, but we will shred them.  I want to thank you.

17   Thank you for the time and the attention you've given to me,

18   you've given to the attorneys, you've given to all of us.

19   You've both been very timely.  We were delayed a couple of

20   mornings because of the noise in here, or at least one

21   morning because of the noise in here, but you certainly have

22   been timely and we appreciate your service, we appreciate

23   your being here, and as one of the attorneys said, we really

24   couldn't have criminal trials unless you were willing to

25   come in and serve, so thank you.

1          All right.  I'm going to ask Mr. Fitchett to

2   conduct the jury to the jury room.  You're welcome to take

3   your notes and your -- and the jury instructions, and

4   Ms. Sawicki and Mr. Sapio, thank you again, and you're free

5   to leave.

6                    *(Jury exits proceedings.)*

7          THE COURT:  Okay.  Let me just ask Mr. Hernandez

8   and both prosecutors -- or one prosecutor, if you will make

9   sure you give Ms. Black your numbers so that she could call

10  you in case we have a question or a verdict, and if you can

11  be back in about 15 minutes, that's fine.

12          MR. HERNANDEZ:  15?

13          THE COURT:  What?

14          MR. HERNANDEZ:  15?

15          THE COURT:  About 15, yeah.  I would imagine

16  they're going to eat, so it will be a while before anything

17  happens, I would think.

18          The other thing I'd like you to make sure, if you

19  have not done, that you get with Ms. Black and make sure

20  you're satisfied that what she is sending back to the jury

21  is what's gone back to the jury.

22          Other than that, we're in recess, pending a

23  verdict.  Thank you.

24          MR. DERENZO:  Thank you, Your Honor.

25                    - - - - -

```
 1              (Recess at 11:35 a.m. until a.m. p.m.)

 2                          - - - - -

 3              THE COURT:  All right.  We have some questions.

 4    I'll start with the one I got first, which is the longer

 5    question, the one that's not signed, and it actually appears

 6    to be maybe three questions in one.

 7              The first says:  Can we please revisit exactly how

 8    we know the boat we see the men on when the MONCTON arrives

 9    is the same boat the Coast Guard plane identified.

10    Concerned about break in surveillance.

11              The second one is kind of a comment, perhaps:

12    Perhaps better definition video monitor in the courtroom.

13              The third says:  Question about why did they use a

14    red tarp if they are trying to avoid detection.

15              Could I ask -- we do have a monitor back there,

16    right, for them to play these videos?

17              COURTROOM DEPUTY:  Yes, Your Honor.

18              THE COURT:  And it's working and everything?

19              COURTROOM DEPUTY:  It works, yes.

20              THE COURT:  Okay.  All right.  Let's go through

21    these one at a time.

22              The first thing I will do is ask who wrote the

23    question and tell them in the future it should come from the

24    foreperson, the foreperson should sign it.  But at any rate,

25    can we revisit exactly how we know the boat we see the men
```

1  on when the MONCTON arrives is the same boat that the

2  Coast Guard plane identified.  Concerned about break in

3  surveillance.

4         I don't know exactly what they mean, revisit, but

5  it sounds like they want somebody just to get up and explain

6  that to them, and so I would suggest that we just say:

7  You've heard all the evidence in this case.  You need to

8  rely on the testimony of the witnesses you've heard and the

9  exhibits that have been received into evidence.

10         I don't know how else to answer that.

11         MR. HERNANDEZ:  Judge, I think that's the only

12  correct option.  Certainly you can't reopen the case, so if

13  they have questions, either they resolve them themselves or

14  not.

15         THE COURT:  All right.  And perhaps better

16  definition video monitor in the courtroom.  I would agree

17  that it was.  It may be a little bit of the monitor, it may

18  be a little bit of the video, but it is what it is, so

19  there's no better video monitor in the courtroom.

20         Also the question about why did they use a

21  red tarp if they are trying to avoid detection.  That might

22  be a good question.  I think the only answer to that -- I'm

23  not sure the witnesses that testified could answer that

24  question, so I think I just have to say:  You've heard all

25  the evidence that's going to be presented and you need to

1   rely on the evidence.

2           MR. HERNANDEZ:  Yes, Your Honor.

3           THE COURT:  Do you agree?

4           MS. GOODIN:  Mostly, Your Honor.  Are they aware

5   that they're able to play those CDs back there?  That was my

6   only particular question.

7           THE COURT:  Did you tell them that?

8           COURTROOM DEPUTY:  Yes, Your Honor, I told them

9   the video is there for their use.

10          THE COURT:  Okay.  I'll see what they say.

11          The second one, which came back later:  Is there

12  an index for the videos so we can find what we are looking

13  for, compare plane photo/video to interdiction photos of

14  boat/crew.

15          I'm not aware that there's an index.

16          MR. DERENZO:  Not in evidence, Your Honor.

17          THE COURT:  No.  All right.  I do normally send

18  back the exhibit list, which we apparently didn't do this

19  time, so I will send back the exhibit list, but that really

20  isn't going to help them with that, so I would just say that

21  there's no index for the videos, they need to just rely on

22  the evidence.

23          MR. DERENZO:  I concur, Your Honor.

24          MR. HERNANDEZ:  I agree, Your Honor.

25          THE COURT:  Okay.  Let's bring the jury in then.

1    But I will send back the exhibit list, but that's not going

2    to be helpful to them in resolving that.

3                    *(Jury re-enters proceedings.)*

4              THE COURT:  All right.  Ladies and gentlemen, let

5    me just talk about the question that -- I'm not sure, why

6    did you hand her the mic?

7              COURT SECURITY OFFICER:  Foreperson, Your Honor.

8              THE COURT:  Oh, she is?

9              COURT SECURITY OFFICER:  Yes.

10             THE COURT:  No one has told me that, so I did not

11   know that.

12             Could I ask -- the first question that we got was

13   really a series of three questions.  Can I ask who wrote

14   that?

15             JUROR LEWIS:  That was me.

16             THE COURT:  And, Ms. Lewis, are you the foreperson

17   of the jury?

18             JUROR LEWIS:  I am.

19             THE COURT:  Okay.  In the future could I ask you

20   to please sign your questions.

21             JUROR LEWIS:  Yes, ma'am.

22             THE COURT:  All right.  There are actually three

23   questions in one, I believe, here.  The first is:  Can we

24   please revisit exactly how we know the boat we see the men

25   on when the MONCTON arrives is the same boat the Coast Guard

1   plane identified.  Concerned about break in surveillance.

2          Did I read that correctly?

3          JUROR LEWIS:  Yes, ma'am.

4          THE COURT:  Okay.  And what do you mean by

5   "revisit"?

6          JUROR LEWIS:  We had a question arise --

7          THE COURT:  No.  I mean, what do you mean by the

8   word "revisit"?  What is it you want?

9          JUROR LEWIS:  That's a good question.  Probably a

10  better explanation, proof that the two boats are the same,

11  considering there is a break between the video from the

12  plane and the boat that the MONCTON eventually arrives.

13         THE COURT:  Okay.  You've heard all the evidence

14  in this case.  I mean, we're not going to reopen the trial

15  and call new witnesses and present new evidence.  You've

16  heard the evidence.  The evidence is what the witnesses

17  testified to and the exhibits that you've had.  That's what

18  you have to rely on.  You have to rely on the evidence that

19  you have.  That's the kind of thing you've got to talk about

20  and resolve.  That's what a jury does.

21         Okay.  The other thing is perhaps better

22  definition video monitor in the courtroom.  Okay.  I'm not

23  really sure what you mean by that.

24         JUROR LEWIS:  We revisited that with the next

25  question on the paper, was if there was an index, but we

1  realize now that the videos themselves are fairly short.  We

2  were trying to save time by seeing if they had an index of

3  what was on each video, but we are working our way through

4  them currently.

5        THE COURT:  All right.  Well, yeah, my answer is

6  there is no better monitor.

7        JUROR LEWIS:  Correct.

8        THE COURT:  But you do have one back there with

9  you that you can play them on, and you all realize that?

10        JUROR LEWIS:  Correct.  We were having trouble

11  getting it to work, but we are now making our way through

12  them.

13        THE COURT:  Okay.  Well, if you can't get it to

14  work, knock on the door and we'll get somebody up

15  immediately, because we had thought it worked or we wouldn't

16  have put it back there.

17        Also the question about why did they use a red

18  tarp if they are trying to avoid detection, and again, the

19  only way I can answer that is you need to rely on the

20  evidence which you've heard from the witnesses and from any

21  exhibits.

22        JUROR LEWIS:  Thank you.

23        THE COURT:  And then the next question is the one

24  that came back next.  It says:  Is there an index for the

25  videos so we can find what we are looking for - comparing

```
 1   plane photos/video to interdiction photos of boat/crew.

 2              Again, you have all the evidence.  There is no

 3   index that I can give you.  I have the exhibit list which

 4   I will send back with you, but it's really not an index.

 5              JUROR LEWIS:  Thank you.

 6              THE COURT:  Okay.  All right.  Thank you.

 7              Would you conduct the jury back to the jury room.

 8   Would you give this to the foreperson.

 9                    (Jury exits proceedings.)

10              THE COURT:  Okay.  We're in recess pending a

11   verdict maybe.

12                          - - - - -

13              (Recess at 1:41 p.m. until 3:14 p.m.)

14                          - - - - -

15              THE COURT:  I'm going to bring the jury in.

16   They're said we've reached a verdict.  Actually they said

17   decision, but -- verdict.  So when they get in, I will ask

18   if they've selected a foreperson, and they have obviously,

19   it's Ms. Lewis, and then I'll ask Ms. Lewis if they have

20   reached a verdict as to each of the counts, and if she says

21   yes, I'll ask her to hand the verdict form to Mr. Fitchett,

22   who will hand it to me, I will look at it to see if it is

23   filled in properly, and then I'll ask Ms. Black, the Clerk,

24   to publish the verdict.

25              When I do that then, Mr. Hinestroza, I'm going to
```

1  ask that you stand to receive the verdict.

2              Okay.  Would you bring the jury in, please.

3                   *(Jury re-enters proceedings.)*

4              THE COURT:  All right.  Ladies and gentlemen,

5  I have a note from Ms. Lewis that says we have reached a

6  decision.  Ms. Lewis, you are the foreperson of the jury; is

7  that correct?

8              JUROR LEWIS:  Yes, ma'am.

9              THE COURT:  All right.  Without telling me what

10 the verdict is, has the jury reached a unanimous decision as

11 to each of the counts in the indictment?

12             JUROR LEWIS:  Yes, ma'am.

13             THE COURT:  Could I get you to hand the verdict

14 form to Mr. Fitchett, please.

15             Mr. Hinestroza-Newbbooll, would you stand, please,

16 and I'm going to ask the courtroom deputy to publish or read

17 the verdict.

18             Ms. Black.

19             COURTROOM DEPUTY:  Yes, Your Honor.

20             In the case of United States of America versus

21 Emiro Hinestroza-Newbbooll, Case Number 8:18-CR-594-T-24JSS,

22 the verdict is as follows:  Count One of the indictment, as

23 to the offense of conspiring to possess with the intent to

24 distribute or to distribute cocaine while aboard a vessel

25 subject to the jurisdiction of the United States, in

1  violation of 46 U.S.C. Sections 70503(a) and 70506(a) and

2  (b), we, the jury, find the defendant Emiro

3  Hinestroza-Newbbooll -- checked is guilty.

4          We further find that the amount of cocaine

5  involved in this offense charged in Count One is -- checked

6  is 5 kilograms or more.

7          As to Count Two of the indictment, as to the

8  offense of knowingly and intentionally possessing with the

9  intent to distribute or aiding and abetting each other and

10 other persons in the possession with the intent to

11 distribute cocaine while aboard a vessel subject to the

12 jurisdiction of the United States, in violation of 46 U.S.C.

13 Sections 70503(a) and 70506(a) and 18 U.S.C. Section 2, we,

14 the jury, find the defendant Emiro Hinestroza-Newbbooll --

15 checked is guilty.

16         We further find that the amount of cocaine

17 involved in the offense charged in Count Two is -- checked

18 is 5 kilograms or more.

19         So say we all, this 30th day of January, 2020, and

20 it's signed by the foreperson.

21         THE COURT:  Thank you, Ms. Black.  You may be

22 seated.

23         Mr. Hernandez, would you like the jury polled,

24 sir?

25         MR. HERNANDEZ:  Yes, Your Honor.

```
1              THE COURT:  All right.  I'm going to, ladies and

2    gentlemen, ask the courtroom deputy to poll you, which means

3    essentially she's going to ask each of you if that was your

4    verdict.  You recall it must be a unanimous verdict, that

5    is, each juror must agree to the same verdict.

6              So, Ms. Black, would you poll the jury.

7              COURTROOM DEPUTY:  Yes, Your Honor.

8              Jury Cheryl Rhum, is this your verdict as to each

9    of the counts in the indictment?

10             JUROR RHUM:  Yes.

11             COURTROOM DEPUTY:  Juror Michelle Lewis, is this

12   your verdict as to each of the counts in the indictment?

13             JUROR LEWIS:  Yes.

14             COURTROOM DEPUTY:  Juror Carol A. Rossman, is this

15   your verdict as to each of the counts in the indictment?

16             JUROR ROSSMAN:  Yes.

17             COURTROOM DEPUTY:  Juror Annette Noffz, is this

18   your verdict as to each of the counts in the indictment?

19             JUROR NOFFZ:  Yes.

20             COURTROOM DEPUTY:  Juror Brooke Dawson, is this

21   your verdict as to each of the counts in the indictment?

22             JUROR BROOKE DAWSON:  Yes.

23             COURTROOM DEPUTY:  Juror Scott Michael Skidmore,

24   is this your verdict as to each of the counts in the

25   indictment?
```

1          JUROR SKIDMORE:  Yes.

2          COURTROOM DEPUTY:  Juror Ebony S. Parrish, is this

3    your verdict as to each of the counts in the indictment?

4          JUROR PARRISH:  Yes.

5          COURTROOM DEPUTY:  Juror Rhonda Stewart, is this

6    your verdict as to each of the counts in the indictment?

7          JUROR STEWART:  Yes.

8          COURTROOM DEPUTY:  Juror Helen Hester Madison, is

9    this your verdict as to each of the counts in the

10   indictment?

11         JUROR MADISON:  Yes.

12         COURTROOM DEPUTY:  Juror Courtney Burdett Johnson,

13   Jr., is this your verdict as to each of the counts in the

14   indictment?

15         JUROR JOHNSON:  Yes.

16         COURTROOM DEPUTY:  Juror Joann Elizabeth Dixon, is

17   this your verdict as to each of the counts in the

18   indictment?

19         JUROR DIXON:  Yes.

20         COURTROOM DEPUTY:  And Juror Brian Joseph

21   Schnieders, is this your verdict as to each of the counts in

22   the indictment?

23         JUROR SCHNIEDERS:  Yes.

24         COURTROOM DEPUTY:  Your Honor, the jury has been

25   polled.

1           THE COURT:  All right.  Thank you.

2           Mr. Hinestroza-Newbbooll, this jury has found you

3    guilty as to both of the counts that were charged in the

4    indictment, the conspiracy count that's charged in Count One

5    and also the possession with the intent to distribute that's

6    charged in Count Two.  I am going to adjudicate you guilty

7    to each of those counts.  I'm going to set a sentencing date

8    about 90 days away, order a presentence investigation

9    report, and, Ms. Black, can you give me a sentencing date.

10          COURTROOM DEPUTY:  Yes, Your Honor.  Thursday,

11   April 30th, 2020 at 9:00 a.m.

12          THE COURT:  Okay.  Thursday, April 30th at

13   9:00 a.m.  And obviously if someone has a conflict, you can

14   let me know.

15          Ladies and gentlemen, I thank you for the time and

16   the attention that you've given to all of us as well as the

17   trial of this case.  We appreciate your being here.  We

18   appreciate your service.

19          Would you conduct the jury back to the jury room.

20                  *(Jury exits proceedings.)*

21          THE COURT:  Okay.  Mr. Hernandez, if there is a

22   conflict, you can just let me know.

23          MR. HERNANDEZ:  I think it will be fine, Judge.

24   I'm not positive, but I think it's fine.

25          THE COURT:  Okay.  All right.

1           Mr. DeRenzo, do you have any other matters to come
2    before the Court at this time?
3           MR. DERENZO:  No, Your Honor.
4           THE COURT:  Mr. Hernandez, do you?
5           MR. HERNANDEZ:  No, Your Honor.  Thank you.
6           THE COURT:  All right.  Then we are adjourned.
7    Thank you.
8           MR. HERNANDEZ:  Thank you.
9                      - - - - -
10              (Proceedings concluded at 3:23 p.m.)
11                      - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4   of proceedings taken in a jury trial in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed

7   by computer under my supervision, this the 22nd day of

8   March, 2021.

9

10

11                                  /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25